

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
GREG GALEN,
individually, and on behalf of all others
similarly situated,

        Plaintiff,

    -against-

MOORE CAPITAL MANAGEMENT, LP,
MOORE CAPITAL ADVISORS, LLC,
MOORE ADVISORS, LTD., AND
JOHN DOES 1-10,

        Defendants.
------------------------------------------------------x

10 CV 3617

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**



Plaintiff complains, upon knowledge as to himself and his own acts and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. In violation of Section 9(a) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §13b, Defendants, between on or about November 1, 2007 and on or about May 31, 2008 ("Class Period"), engaged in a pattern of manipulative trades in order to manipulate the prices of platinum futures contracts and palladium futures contracts traded on the New York Mercantile Exchange ("NYMEX").

2. The platinum and palladium contracts are relatively "thin" and "illiquid" markets. See Substantive Allegations *infra*. As such, these markets were more susceptible to a trade manipulation than many other futures contracts. *Id.* These markets were particularly more susceptible to a trade manipulation that manipulated the settlement prices of such contracts. *Id.*

3. NYMEX settlement prices were reported throughout the market and, indeed,

nationally and globally, as the benchmark valuation prices of platinum futures and palladium futures.

4. (a) There is a daily mark-to-market computation of a commodity futures trader's so-called equity or margin position based upon the daily closing or settling prices. If the prices move sufficiently against the trader's position as of the close, then more "margin" deposits must be made. But if prices move sufficiently in favor of the position, then variation margin is paid to the trader, which increases the trader's buying power.

(b) The settlement prices of the NYMEX platinum and palladium futures contracts were used, as Defendants well knew, by the market as the most important price information of each day and also influenced variation margin. *Id.*

5. By consistently and repeatedly manipulating the NYMEX settlement prices, Defendants caused artificial NYMEX prices directly (a) through their trades themselves (b) through the representations and reports of the manipulative price to the public, and (c) through the margin effects.

6. Among other things, Defendants repeatedly manipulated prices higher or upwards. This repeatedly sent a price beacon signal in favor of artificially high prices and repeatedly influenced changes in margin payments that also favored higher prices. *Id.*

7. Defendants' manipulative acts and their concussive effect on prices were not disclosed publicly to the market during the Class Period or otherwise until on or about April 29, 2010, when the Commodity Futures Trading Commission ("CFTC") revealed same. See *In the Matter of: Moore Capital Management, LP, Moore Capital Advisors, LLC and Moore Advisors,*

*Ltd.*, CFTC Docket No. 10-09, Order Instituting Proceedings Pursuant to Sections 6(c), 6(d) and 8a of the Commodity Exchange Act and Making Findings and Imposing Remedial Sanctions.[1]

8.  Defendants agreed to pay a $25,000,000 civil monetary penalty and agreed to substantial other sanctions in order to settle the CFTC's charges. *Id*. This indicates a high number of manipulative trades. In settlements, the CFTC frequently agrees to file attempted manipulation charges whereas other government agencies or private plaintiffs will plead and prove that the challenged transactions were, as here, successful in manipulating prices.

9.  Plaintiff brings this action within the two years of learning of his claim.

10.  As a direct, foreseeable and proximate result of Defendants' ongoing violation of Section 9(a) of the CEA, Plaintiff and members of the Class paid artificial prices, suffered damages and are entitled to sue therefor under Section 22(a) of the CEA, 7.U.S.C. §25.

## JURISDICTION AND VENUE

11.  Palladium is a "commodity" and is the "commodity underlying" palladium futures and options contracts traded on the NYMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

12.  Platinum is a "commodity" and is the "commodity underlying" platinum futures and options contracts traded on the NYMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

13.  This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, 28 U.S.C. §§ 1331 and 1337.

---

[1] The CFTC Order is available at
http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfmoreorder04292010.pdf

14. Venue is proper in the Southern District of New York, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c) and 28 U.S.C. § 1391(b), (c) and (d). The Defendants transacted business in the Southern District of New York, the claims arose in the Southern District of New York, and a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

15. The New York Mercantile Exchange is located, at One North End Avenue, New York, New York. On or around March 17, 2008, the Chicago-based CME Group, Inc. acquired the parent company of NYMEX, NYMEX Holdings, Inc. Defendants' unlawful acts manipulated the prices of NYMEX palladium futures contracts and platinum futures contracts which are traded in this District on the NYMEX.

## PARTIES

**Plaintiff**

16. Plaintiff Greg Galen is a resident of Garfield Heights, Ohio. Plaintiff sold NYMEX platinum futures contracts short before and during the Class Period, and paid artificial prices due to the Defendants' manipulation which proximately caused losses, injury and damages to Plaintiff Galen. Also, Plaintiff Galen was injured in that he purchased at the artificially high prices caused by the Defendants.

**Defendants**

17. Defendant Moore Capital Management, LP is a New York limited partnership with headquarters at 1251 Avenue of the Americas, New York, New York. Moore Capital Management is a multi-strategy investment firm that manages several investment funds that invest in a wide variety of instruments, including, but not limited to, commodities and

4

commodity futures contracts. Moore Capital Management is registered as a commodity trading advisor and is a principal of Moore Capital Advisors.

18. Defendant Moore Capital Advisors, LLC is a Delaware limited liability company with headquarters at 1251 Avenue of the Americas, New York, New York. Moore Capital Advisors is a registered commodity pool operator and commodity trading advisor. Moore Capital Advisors, along with Moore Advisors, served as the co-general partner of the Moore Macro Fund, DP and the Moore Global Fixed Income Master Fund, LP.

19. Defendant Moore Advisors, Ltd. is a Bahamian company. Moore Advisors is a registered commodity pool operator. Moore Advisors, along with Moore Capital Advisors, served as the co-general partner of the Moore Macro Fund, DP and the Moore Global Fixed Income Master Fund, LP.

20. John Doe No. 1 is a former portfolio manager of Defendant Moore Capital Management, LP whose name has not been publicly revealed.

21. Plaintiff alleges on information and belief that at all relevant times, Defendants John Does 2-10, inclusive, were also engaged in or aided and abetted the manipulation of NYMEX futures prices as alleged herein. Plaintiff is presently unaware of the true names and identities of those Defendants sued herein as John Does 2-10. Any reference made to such Defendants by specific name or otherwise, individually or plural, is also a reference to the actions of John Does 2-10, inclusive.

## BACKGROUND

22. A person may act as a futures contract exchange or board of trade only if that person is approved and designated to do so by the CFTC. The CFTC approves such a designation only if the proposed exchange sufficiently demonstrates (a) that it has rules, such as

position limit rules, to prevent price manipulation, and (b) that it has procedures to enforce such anti-manipulation rules.

23.  The NYMEX is designated by the CFTC as a board of trade. NYMEX is the world's largest physical commodity futures exchange.

24.  The NYMEX applies to the CFTC for permission to trade each commodity in which the NYMEX offers a contract. The NYMEX must establish, among other things, that the proposed contract is not prone to price manipulation in order to win approval to trade such contract.

25.  A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity. See *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.) ("*Leist*") aff'd, *Merrill Lynch Fenner & Smith v. Curran*, 456 U.S. 353, 384-85 (1982). In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.

26.  The "bilateral" aspect of the futures contract is that there is a seller and buyer. *Leist*, 638 F.2d at 322.

27.  The sellers are one-half of the bilateral futures contract and one-half of the commodity futures market. *Id*. They are referred to as "shorts." *Id*.

28.  The buyers are the other one-half, and are referred to as "longs." *Id*.

29.  One of the many differences between stock and commodity futures trading is that the commodity exchange (here, the NYMEX) publishes the amount of the open interest of "longs" and "shorts" at the end of each trading day.

30.     Open interest is defined as the total number of futures contracts in a delivery month or market that has been entered into and not yet offset or cancelled. Each open transaction has a buyer (a long) and a seller (a short).

31.     All things equal, buying pressure in a commodity futures contract will increase prices and selling pressure will decrease prices.

32.     Because the prices are publicly reported, the increased or decreased prices resulting from buying pressure or selling pressure may encourage others to act accordingly. For example, buying pressure may increase prices and induce members of the public to buy as well.

**NYMEX Palladium Futures Contract**

33.     One of the futures contracts created by the NYMEX and approved by the CFTC, is the NYMEX palladium futures contract.

34.     Palladium is a silver-white metallic element.

35.     Palladium futures contracts are transacted electronically on the Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms and also through open outcry at the NYMEX in New York. Globex is an electronic trading platform owed by the NYMEX's parent company, the CME Group. Open outcry is a method of public auction for making bids and offers in the trading pits of futures exchanges.

36.     The size of a NYMEX palladium futures contract is 100 troy ounces.

37.     NYMEX palladium futures contracts call for settlement by physical delivery. Palladium delivered under this contract must be a minimum of 99.95% pure.

38.     During each calendar month (the "current calendar month"), the Exchange will make available for trading contracts that provide for delivery of Palladium in the following months: 1) the current calendar month; 2) the first calendar month following the current calendar

month; 3) the second calendar month following the current calendar month; and 4) each March, June, September and December during the period beginning with the first calendar month following the current calendar month through the 15th calendar month following the current calendar month.

39. Trading in palladium futures contracts terminates on the third to last business day of the delivery month.

40. The settlement prices for palladium futures contracts are calculated based on the volume-weighted average price of all transactions conducted both on the trading floor of the NYMEX and on Globex, during the two-minute closing period. The closing period for the palladium futures contract is from 12:58 p.m. to 1:00 p.m.

41. Trading in NYMEX palladium futures contracts are subject to the rules and regulations of the NYMEX.

**NYMEX Platinum Futures Contract**

42. Another futures contract created by the NYMEX and approved by the CFTC, is the NYMEX platinum futures contract.

43. Platinum is a grey-white metallic element.

44. Platinum futures contracts transact electronically on the CME Globex and CME ClearPort trading platforms and also through open outcry at the NYMEX in New York.

45. The size of a NYMEX platinum futures contract is 50 troy ounces.

46. NYMEX platinum futures contracts call for settlement by physical delivery. Platinum delivered under this contract must be a minimum of 99.95% pure.

47. During each calendar month (the "current calendar month"), the Exchange will make available for trading contracts that provide for delivery of Platinum in the following

months: 1) the current calendar month; 2) the first calendar month following the current calendar month; 3) the second calendar month following the current calendar month; and 4) each January, April, July and October during the period beginning with the first calendar month following the current calendar month through the 15th calendar month following the current calendar month.

48.     Trading in platinum futures contracts terminates on the third to last business day of the delivery month.

49.     The settlement prices for platinum futures contracts are calculated based on the volume-weighted average price of all transactions conducted both on the trading floor of the NYMEX and on Globex, during the two-minute closing period. The closing period for the platinum futures contract is from 1:03 p.m. to 1:05 p.m.

50.     Trading in NYMEX platinum futures contracts are subject to the rules and regulations of the NYMEX.

51.     Platinum and palladium are both platinum group metals and their respective prices can influence one another.

## SUBSTANTIVE ALLEGATIONS

52.     Provided that there is no price manipulation, the prices produced by futures contract trading serve three legitimizing functions: (1) price discovery, (2) efficient and fair risk transfer (also known as hedging), and (3) reduction in price volatility. *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1173 (8th Cir. 1971).

53.     But price manipulation destroys all three legitimizing functions of commodity futures trading. *Id.* Indeed, specific price manipulations in the past have even destroyed or greatly impaired various commodity exchanges and specific commodity futures contracts.

54. The palladium and platinum futures markets are not large futures markets, are relatively "illiquid", and are relatively "thin depth" markets. That is, the amount of actual trading is low and the amount of potential trading is low in these markets.

55. Accordingly, relative to many other futures contracts, the NYMEX platinum and palladium futures contracts were susceptible to a trade manipulation. A trade manipulation is a manipulation by the entry of manipulative trades.

56. During the Class Period, Defendants, through their agent and representative (a portfolio manager whose name has not yet been publicly disclosed) intentionally took advantage of the foregoing susceptibility to a trade manipulation of NYMEX platinum and palladium futures contracts.

57. (a) Defendants did so by intentionally and repeatedly entering orders to "bang the close" during the market on close ("MOC") period of trading in both palladium and platinum futures contracts traded on the NYMEX during the Class Period.

(b) "Bang the close" means to move the closing price by entering trades at or near the close. "Bang the close" trading is a blatant form of trade manipulation.

(c) The closing period for trading NYMEX palladium futures contract is 12:58 pm to 1:00 pm and for platinum futures contracts is from 1:03 pm to 1:05 pm. Market on close and "MOC" mean during the closing times.

58. Specifically, Defendants, through their agent (the portfolio manager or, at the direction of the portfolio manager through Defendants' order entry personnel), intentionally gave orders to Defendants' futures commission merchant ("FCM") and its associated person ("AP").

59. As Defendants' agents, the FCM and AP relayed Defendants' orders to the NYMEX floor for execution during the last moments of trading in NYMEX platinum and palladium futures contracts.

60. In the foregoing manner, Defendants intentionally gave buy orders "MOC" in the amount of 20-100 contracts in repeated instances between November 1, 2007 and May 31, 2008. Again, "MOC" orders are orders to be executed during the market on close period.

61. In fact, orders of 20-100 contracts are relatively large orders.

62. Moreover, such relatively large buy orders typically were transmitted by Defendants' agent to the NYMEX floor and executed in the last 10 seconds of trading.

63. These orders were given by Defendants, per their portfolio manager (or their order entry personnel at the direction of the portfolio manager), in order cause artificial prices, including artificially inflated prices.

64. Indeed, these orders were often placed through instant messages ("IMs") between Defendants (per their portfolio managers) and their FCM. These IMs included directions that indicated Defendants wanted to push prices higher, particularly the MOC settlement price

65. Typically—as Defendants, per their portfolio manager, specifically intended and often expressly instructed—their agent (the FCM, through its AP) purposely waited until the last 10 seconds of the closing period of NYMEX platinum and palladium futures trading to place Defendants' orders.

66. In such circumstances, buy orders of 20-100 contracts easily had the ability to cause artificial settlement prices, including artificially inflated settlement prices, of NYMEX palladium and platinum futures contracts.

67.  By repeatedly entering relatively large orders in relatively illiquid futures contracts at the end of trading, Defendants, through their agents, intentionally caused the settlement prices of such futures contracts to be higher than they otherwise would have been.

68.  This occurred in one part due to the mechanism of volume-weighted averaging of transactions during the settlement period in order to produce the settlement price. This mechanism weighted each of Defendants' manipulative contracts equally with other contracts during the settlement period.

69.  By reason of the foregoing, Defendants specifically intended to and did cause artificial NYMEX palladium and platinum futures contract prices, including artificially high prices during the Class Period.

## CLASS ALLEGATIONS

70.  Plaintiff brings this action on behalf of himself, and all others similarly situated, pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons or entities that purchased during the period from at least November 1, 2007 through at least May 31, 2008 a palladium futures contract or a platinum futures contract traded on the NYMEX, including in order to liquidate a short position.[2]
> Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.

71.  The Class is so numerous that joinder of all members is impracticable. Due to the nature of the commerce involved, the members of the Class are geographically dispersed throughout the United States. The number and identity of Class members is unknown to

---

[2] Plaintiff reserves his rights to change the definition of the Class in the class motion or otherwise.

Plaintiff, but can be ascertained from readily available information. Plaintiff believes that there are hundreds or perhaps thousands or more members of the Class.

72. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a. Whether Defendants manipulated NYMEX palladium and/or platinum futures contracts in violation of the CEA;

    b. Whether such manipulation caused NYMEX palladium and/or platinum futures contracts to be artificial;

    c. Whether such manipulation caused cognizable legal injury under the CEA;

    d. Whether such injury or extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests; and

    e. The operative time period and extent of Defendants' foregoing violations.

73. Plaintiff's claims are typical of the claims of the other members of the Class it seeks to represent. Plaintiff and members of the Class were injured by the same course of manipulative conduct and make the same legal claim.

74. Plaintiff will fully and adequately protect the interests of all members of the Class. Plaintiff has retained counsel experienced in complex antitrust and commodity futures manipulation class actions. Plaintiff has no interests which are adverse to or in conflict with other members of the Class.

75. The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

76.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

77.  The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The damages suffered by the individual Class members may be relatively small; and therefore, the expense and burden of individual litigation make it virtually impossible for them to redress the wrongs done to them. Plaintiff anticipates no difficulty in the management of this action as a class action.

### AS AND FOR A FIRST CLAIM

**(Manipulation In Violation of The Commodity Exchange Act, 7 U.S.C. §1 *et seq.*)**

78.  Plaintiff re-alleges and incorporates by reference all of the allegations of this Complaint with the same force and effect as if fully restated herein.

79.  Defendants, through their acts alleged herein, from at least November 1, 2007 through at least May 31, 2008, specifically intended to and did cause unlawful and artificial prices of NYMEX palladium and platinum futures contracts in violation the CEA, 7 U.S.C. §1, *et seq.* These included artificially high prices.

80. Alternatively, each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts of their agent and representative, the portfolio manager whose name has not been publicly revealed.

81. Plaintiff and other persons who purchased NYMEX palladium or platinum futures contracts during this time paid artificial and unlawful prices, and were further injured in that they transacted in an artificial and manipulated market, including at artificially high prices.

82. As a direct result, Plaintiff and Class members who purchased NYMEX palladium and platinum futures contracts were injured and suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A. For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative and his counsel as Class counsel;

B. For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

C. For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

D. For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY

Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Plaintiff respectfully demands a trial by jury.

Dated: New York, New York
April 30, 2010

*[signature]*

Christopher Lovell (CL-2595)
Ian T. Stoll (IS-3424)
Christopher M. McGrath (CM-4983)
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway, Suite 501
New York, New York 10006
Telephone:    (212) 608-1900
Facsimile:    (212) 719-4775

*Counsel for Plaintiff Greg Galen and the Proposed Class*