UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In Re: Platinum And Palladium Commodities Litigation* | MASTER FILE No. 10 Civ. 3617 (WHP) |
| This Document Relates To: | **JURY TRIAL DEMANDED** |
| *Greg Galen, et al. v. Moore Capital Management, LP, et al.*, 10 Civ. 3617 (WHP) | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| *Richard White, et al. v. Moore Capital Management, LP, et al.*, 10 Civ. 3634 (WHP) | |
| *Keith Kornell, et al. v. Moore Capital Management, LP, et al.*, 10 Civ. 4232 (WHP) | |
| *Lawrence Waxman, et al. v. Moore Capital Management, LP, et al.*, 10 Civ. 4273 (WHP) | |

Plaintiffs complain, upon knowledge as to themselves and their own acts and upon information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1.      Between October 25, 2007 and June 6, 2008 ("Class Period"), Defendants (as defined in ¶¶ 65-81), engaged in what the Commodity Futures Trading Commission ("CFTC") found to be a "manipulative scheme" consisting of blatantly unlawful and manipulative trades that were both "large" in size and a "significant percentage of the volume" at the times they were executed. *See* ¶¶ 65-74 *infra*; Ex A hereto. [1]

2.      All of what the CFTC found to be these "large" and "manipulative" trades are known as "bang the close" trades. *Id.* "Bang the close" means to move or "bang" the closing

---

[1] *In the Matter of: Moore Capital Management, LP, Moore Capital Advisors, LLC and Moore Advisors, Ltd.*, CFTC Docket No. 10-09, Order Instituting Proceedings Pursuant to Sections 6(c), 6(d) and 8a of the Commodity Exchange Act and Making Findings and Imposing Remedial Sanctions. ("CFTC Order") at p. 3 heading II.C.2 ("Manipulative Scheme") and p. 3 *passim*.

price by entering trades at or near the time of the close. "Bang the close" trading is a blatant form of trade manipulation.

3.    The CFTC found that these blatantly manipulative trades were all entered in --- and were all specifically intended to increase artificially the prices, including the closing prices, of --- the platinum futures contracts and palladium futures contracts traded in this district on the New York Mercantile Exchange ("NYMEX"). *Id.*

4.    Among many other important characteristics, the closing or settlement prices are the most widely reported prices of the day and serve as the proxy to market participants for the price of the futures contract.

5.    The CFTC repeatedly found that Defendants "frequently" engaged in these blatantly manipulative "bang the close" trades. CFTC Order pp. 2-3; see ¶¶ 70-81 *infra*. By frequently and consistently injecting this unlawful, uneconomic and illegitimate large demand element into the price equation for NYMEX platinum and palladium futures contracts at the times of their closing, Defendants caused NYMEX platinum and palladium futures prices to be artificially high during the Class Period. See ¶¶ 70-98 *infra*.

6.    Thereby, Defendants violated Section 9(a) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §13b, which prohibits the manipulation of commodity futures contract prices.

7.    Moreover, after Defendants began their systematic practice of making such blatantly manipulative trades, NYMEX platinum and palladium futures contract prices dramatically increased to levels that were not justified by the fundamentals of supply and demand. *See* ¶¶ 81-98 *infra.*

8.    Because such prices were not justified by supply and demand, NYMEX platinum and palladium futures contract prices later plummeted back down to lower levels. *Id.*

9.    Defendants' "manipulative scheme" and their "frequent" large, manipulative "bang the close" trades were a substantial cause of the unjustified and artificial prices of NYMEX platinum and palladium futures contracts during the Class Period. See ¶¶ 70-98 *infra*.

10.   Defendants' manipulation in violation of the CEA proximately caused class members to pay artificially high prices for NYMEX platinum and palladium futures contracts during the Class Period and to suffer losses and actual damages.

## JURISDICTION AND VENUE

11.   Palladium is a "commodity" and is the "commodity underlying" palladium futures and options contracts traded on the NYMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

12.   Platinum is a "commodity" and is the "commodity underlying" platinum futures and options contracts traded on the NYMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

13.   This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, 28 U.S.C. §§ 1331 and 1337.

14.   Venue is proper in the Southern District of New York, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c) and 28 U.S.C. § 1391(b), (c) and (d). The Defendants transacted business in the Southern District of New York, the claims arose in the Southern District of New York, and a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

15.   The New York Mercantile Exchange is located at One North End Avenue, New York, New York. On or around March 17, 2008, the Chicago-based CME Group, Inc. acquired the parent company of NYMEX, NYMEX Holdings, Inc. Defendants' unlawful acts

3

manipulated the prices of NYMEX palladium futures contracts and platinum futures contracts which are traded in this District on the NYMEX.

**PARTIES**

**Plaintiffs**

16.     Plaintiff Galan sold NYMEX platinum futures contracts short before the Class Period and purchased those contracts back at the artificially inflated prices that Defendants caused during the Class Period.  Further, Plaintiff Galan sold NYMEX platinum futures contracts short again on December 31, 2007 and purchased such NYMEX platinum futures contracts back at the artificiality inflated prices that Defendants caused on January 28, 2008 to liquidate such short position.  Plaintiff Galan lost monies on each such short position in NYMEX platinum futures contracts.

17.     Plaintiff Kornell purchased NYMEX palladium futures contracts at the artificially inflated prices that Defendants caused during the Class Period and sold such futures contracts back at the end of and after the Class Period.  Plaintiff Kornell lost monies on these trades.

18.     Plaintiff Waxman purchased NYMEX palladium futures contracts to open long positions at the artificially inflated prices that Defendants caused during the Class Period and sold those NYMEX palladium futures contracts at the end of and after the Class Period.  Plaintiff Waxman lost monies on each such long position.

19.     Plaintiff White purchased NYMEX palladium futures contracts to open a long position at the artificially inflated prices that Defendants caused during the Class Period and sold those contracts back at a loss later in the Class Period.

20.     Each Plaintiff was proximately caused losses and actual damages by Defendants' unlawful conduct in that, among other things, each Plaintiff lost monies on their purchases and sales of NYMEX platinum or palladium futures contracts, each Plaintiff paid artificially high prices to establish their long positions or to liquidate their short positions, and/or each Plaintiff paid more price artificiality than they sold or received.

**Defendants**

21.     Defendant Moore Capital Management, LP ("MCM") is a New York limited partnership with headquarters at 1251 Avenue of the Americas, New York, New York.  Moore Capital Management is a multi-strategy investment firm that manages several investment funds that invest in a wide variety of instruments, including, but not limited to, commodities and commodity futures contracts.  Moore Capital Management is registered as a commodity trading advisor and is a principal of Moore Capital Advisors.

22.     Defendant Moore Capital Advisors, LLC is a Delaware limited liability company with headquarters at 1251 Avenue of the Americas, New York, New York.  Moore Capital Advisors is a registered commodity pool operator and commodity trading advisor.  Moore Capital Advisors, along with Moore Advisors, served as the co-general partner of the Moore Macro Fund, DP and the Moore Global Fixed Income Master Fund, LP.

23.     Defendant Moore Advisors, Ltd. ("MA") is a Bahamian company.  Moore Advisors is a commodity pool operator registered with the Commodity Futures Trading Commission ("CFTC").  Collectively, Moore Capital Management LP, Moore Capital and Moore Advisors, Ltd are referred to herein as the Moore Defendants.  Moore Advisors, along with Moore Capital Advisors, served as the co-general partner of Defendants Moore Macro Fund, DP and the Moore Global Fixed Income Master Fund, LP.

24.     (a) Defendant Christopher Pia is a resident of Greenwich, Connecticut.   During the Class Period, Defendant Pia was a portfolio manager for Defendant Moore Capital Management and a close adviser to its founder and head, Louis Bacon.   Pia also was or had been the head of the execution desk of the Moore Defendants.   This gave Defendant Pia great influence over brokers and futures commissions merchants such as Defendant MF Global Inc. Defendant Pia had also been a successful trader for over a decade at Moore Capital.

(b) Given the convenient lack of compliance procedures and the presence of procedures designed to prevent detection of wrongdoing at the Moore Defendants (see ¶¶ 100-107 *infra*), employees of the Moore Defendants feared for their jobs if they reported manipulative trades to others in the firm.

25.     Defendant Moore Macro Fund, LP is an investment fund organized under the securities laws of the Bahamas.   Moore Macro Fund, LP acted through its agent and co-general partners Moore Advisors, Ltd and Moore Capital Advisors. Also, the Moore Defendants, through Defendant Pia and various other employees, acted   as agent and otherwise on behalf of Defendant Moore Macro Fund, LP to make for it part of the blatantly manipulative NYMEX platinum and palladium futures "bang the close" purchases alleged herein. See CFTC Order at p. 3.

26.     Defendant Moore Global Fixed Income Master Fund, LP is an investment fund organized under the securities laws of the Bahamas.   Defendant Moore Global Fixed Income Master Fund LP acted through its agent and co-general partners Moore Advisors Ltd and Moore Capital Advisors.   Also, the Moore Defendants, through Defendant Pia and various other persons, acted as agent and otherwise on behalf of Moore Global Fixed Income Master Fund, LP

to make for it the remainder of the manipulative "bang the close" purchases of the NYMEX platinum and palladium futures alleged herein.  See CFTC Order at p. 3.

27.    Defendants Moore Macro Fund, LP and Moore Global Fixed Income Master Fund, LP are sometimes hereinafter collectively referred to as the "Moore Funds."

28.    (a) Defendant MF Global, Inc. is a financial derivatives broker.  Defendant MF Global, Inc.'s headquarters is located in this District at 717 Fifth Avenue, New York, New York 10022.  Defendant MF Global, Inc. ("MF Global") was the Moore Defendants' futures commission merchant ("FCM")[2] and was a clearing member of the NYMEX throughout the Class Period.

(b) In order to make their blatantly manipulative "bang the close" trades in NYMEX platinum and palladium futures alleged herein, the Moore Defendants had to act through a NYMEX clearing member.  Defendant MF Global was that NYMEX member and accepted Moore's manipulative orders for the purchase of NYMEX platinum and palladium futures contracts, among other things.   Also as Moore's clearing broker, MF Global processed and settled Moore's trades through the NYMEX Clearing House, a division of the NYMEX.  MF Global was the NYMEX's counterparty for all trades and positions it cleared in the customer account with NYMEX, including the positions held by Moore during the Class Period.

(c)    As is alleged hereinafter, MF Global provided extraordinary assistance and services to the Moore Defendants.  First, MF Global repeatedly executed highly manipulative "bang the close" trades.  Second, MF Global did so even after being repeatedly told in writing by Moore to execute such trades so as to inflate prices.

---

[2]An FCM solicits or accepts orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any exchange and accepts payment from or extends credit to those whose orders are accepted.

(d)     Standard practice among FCMs and clearing members was to refuse to execute or forward for execution manipulative trades. Indeed, NYMEX rules and federal law prohibited such trades. But MF Global knowingly and willfully associated itself with the manipulative scheme and provided extraordinary assistance to that scheme and the manipulative trades. It did so by repeatedly and knowingly executing or forwarding for execution over a long time period such blatantly manipulative trades including when the written instructions accompanying such trades directed that the "buys" were to be made uneconomically, *i.e.*, intentionally so as to cause higher prices.

29.     Plaintiff alleges on information and belief that at all relevant times, Defendants John Does 1-10, inclusive, were also engaged in or aided and abetted the manipulation of NYMEX futures prices as alleged herein. Plaintiff is presently unaware of the true names and identities of those Defendants sued herein as John Does 1-10. Any reference made to such Defendants by specific name or otherwise, individually or plural, is also a reference to the actions of John Does 1-10, inclusive.

## BACKGROUND

30.     A person may act as a futures contract exchange or board of trade only if that person is approved and designated to do so by the CFTC. The CFTC approves such a designation only if the proposed exchange sufficiently demonstrates (a) that it has rules, such as position limit rules, to prevent price manipulation, and (b) that it has procedures to enforce such anti-manipulation rules.

31.     The NYMEX is designated by the CFTC as a board of trade. NYMEX is the world's largest physical commodity futures exchange.

8

32.    The NYMEX applies to the CFTC for permission to trade each commodity in which the NYMEX offers a contract. The NYMEX must establish, among other things, that the proposed contract is not prone to price manipulation in order to win approval to trade such contract.

33.    A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity. See *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.) ("*Leist*") *aff'd, Merrill Lynch Fenner & Smith v. Curran*, 456 U.S. 353, 384-85 (1982). In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.

34.    The "bilateral" aspect of the futures contract is that there is a seller and buyer. *Leist*, 638 F.2d at 322.

35.    The sellers are one-half of the bilateral futures contract and one-half of the commodity futures market. *Id*. They are referred to as "shorts." *Id*.

36.    The buyers are the other one-half, and are referred to as "longs." *Id*.

37.    One of the many differences between stock and commodity futures trading is that the commodity exchange (here, the NYMEX) publishes the amount of the open interest of "longs" and "shorts" at the end of each trading day.

38.    Open interest is defined as the total number of futures contracts in a delivery month or market that has been entered into and not yet offset or cancelled. Each open transaction has a buyer (a long) and a seller (a short).

39.    All things equal, buying pressure in a commodity futures contract will increase prices and selling pressure will decrease prices.

40.     Because the prices are publicly reported, the increased or decreased prices resulting from buying pressure or selling pressure may encourage others to act accordingly. For example, buying pressure may increase prices and induce members of the public to buy as well.

## NYMEX Palladium and Platinum Futures Contract

### A.     Palladium

41.     One of the futures contracts created by the NYMEX and approved by the CFTC is the NYMEX palladium futures contract.

42.     Palladium is a silver-white metallic element in the so called platinum group metals ("PGM").

43.     Palladium futures contracts are transacted electronically on the Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms and also through open outcry at the NYMEX in New York. Globex is an electronic trading platform owned by the NYMEX's parent company, the CME Group. Open outcry is a method of public auction for making bids and offers in the trading pits of futures exchanges.

44.     The size of a NYMEX palladium futures contract is 100 troy ounces.

45.     NYMEX palladium futures contracts call for settlement by physical delivery. Palladium delivered under this contract must be a minimum of 99.95% pure.

46.     During each calendar month (the "current calendar month"), the Exchange will make available for trading contracts that provide for delivery of Palladium in the following months: 1) the current calendar month; 2) the first calendar month following the current calendar month; 3) the second calendar month following the current calendar month; and 4) each March, June, September and December during the period beginning with the first calendar month

10

following the current calendar month through the 15th calendar month following the current calendar month.

47.    Trading in palladium futures contracts terminates on the third to last business day of the delivery month.

48.    The settlement prices for palladium futures contracts are calculated based on the volume-weighted average price of all transactions conducted both on the trading floor of the NYMEX and on Globex, during the two-minute closing period.  The closing period for the palladium futures contract is from 12:58 p.m. to 1:00 p.m.

49.    Trading in NYMEX palladium futures contracts is subject to the rules and regulations of the NYMEX.

**B.    Platinum**

50.    Another futures contract created by the NYMEX and approved by the CFTC is the NYMEX platinum futures contract.

51.    Platinum is a grey-white metallic element and is one of the platinum group metals ("PGM")

52.    Platinum futures contracts transact electronically on the CME Globex and CME ClearPort trading platforms and also through open outcry at the NYMEX in New York.

53.    The size of a NYMEX platinum futures contract is 50 troy ounces.

54.    NYMEX platinum futures contracts call for settlement by physical delivery. Platinum delivered under this contract must be a minimum of 99.95% pure.

55.    During each calendar month (the "current calendar month"), the Exchange will make available for trading contracts that provide for delivery of Platinum in the following months: 1) the current calendar month; 2) the first calendar month following the current calendar

11

month; 3) the second calendar month following the current calendar month; and 4) each January, April, July and October during the period beginning with the first calendar month following the current calendar month through the 15th calendar month following the current calendar month.

56.     Trading in platinum futures contracts terminates on the third to last business day of the delivery month.

57.     The settlement prices for platinum futures contracts are calculated based on the volume-weighted average price of all transactions conducted both on the trading floor of the NYMEX and on Globex, during the two-minute closing period.  The closing period for the platinum futures contract is from 1:03 p.m. to 1:05 p.m.

58.     Trading in NYMEX platinum futures contracts is subject to the rules and regulations of the NYMEX.

59.     Platinum and palladium are both platinum group metals.  Both are used in catalytic converters to cause changes in the emissions from internal combustion engines into gases that are more benign for the ozone layer and environment.  Both are also used for jewelry. The respective prices of NYMEX prices can influence one another.

## Substantive Allegations

60.     Provided that there is no price manipulation, the prices produced by futures contract trading serve three legitimizing functions:  (1) price discovery, (2) efficient and fair risk transfer (also known as hedging), and (3) reduction in price volatility.  *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1173 (8th Cir. 1971).

61.     But price manipulation destroys all three legitimizing functions of commodity futures trading.  *Id*.  Indeed, specific price manipulations in the past have even destroyed or greatly impaired various commodity exchanges and specific commodity futures contracts.

62.     The NYMEX palladium and platinum futures markets are not large futures markets, are relatively "illiquid," and are relatively "thin depth" markets.  That is, both the amount of actual trading is low and the amount of potential trading is low in these markets.

63.     Accordingly, relative to many other futures contracts, the NYMEX platinum and palladium futures contracts were susceptible to a trade manipulation.  A trade manipulation is a manipulation by the entry of manipulative trades.

64.     During the Class Period, Defendants, through their agents and representatives (including Defendants Pia and MF Global), intentionally took advantage of the foregoing susceptibility to a trade manipulation of NYMEX platinum and palladium futures contracts.

65.     Defendants Moore Capital LLC, Moore Capital Management, LP, Moore Capital Advisors, LLC and Moore Advisors, Ltd., paid $25,000,000 and agreed to extensive prohibitory and mandatory injunctive relief in order to negotiate a settlement of CFTC charges.  See Ex. A pp. 2-3, 6-9.

66.     These charges involved what the CFTC found to be a "manipulative scheme" in NYMEX platinum and palladium futures contracts traded in this District during the period of "**at least** November 2007 **through** May 2008." [Emphasis supplied].  Based on the foregoing "at least" language and other information, Plaintiffs have expanded the Class Period to begin slightly earlier, on October 25, and end slightly later, on June 6, than the CFTC time brackets.

67.     The CFTC Order found that, in this "manipulative scheme," the Moore Defendants' portfolio manager and agent (who, in fact, was Defendant Pia) "engaged in an unlawful, blatantly manipulative scheme known as 'banging the close.'" Ex. A. at pp. 2-3.  In devising, entering or causing others to enter these "bang the close" orders, Defendant Pia was, in

fact, an employee, agent and other person acting on behalf of each of the Moore Defendants and each of the Moore Funds.

68.     Specifically, the CFTC found that Defendant Pia caused "market on close". ("MOC") buy orders to be executed during the last ten seconds of trading in the NYMEX platinum and palladium futures contracts trading pit in order to move prices, including the settlement prices, higher.  Market on close and "MOC" orders mean that they are to be executed during the closing times. Again, the closing period for trading NYMEX palladium futures contract is 12:58 pm to 1:00 pm and for NYMEX platinum futures contracts is from 1:03 pm to 1:05 pm.

69.     (a) Indeed, the CFTC found that Defendants (per Defendant Pia or other of their employees or persons acting on Defendants behalf) often accompanied these "bang the close" MOC buy orders with written instructions or requests that the orders be executed so as to cause prices to increase. Ex. A p. 3.

(b) Ordinarily, traders seek to buy for the cheapest and sell for the highest price. Trying to buy at high prices is highly unusual, uneconomic, and blatantly manipulative.

70.     Importantly, the CFTC repeatedly found that these manipulative "bang the close" trades were engaged in "frequently." *E.g.* CFTC Order p. 2 (engaged in "frequently throughout the Relevant Period"); p. 3 ("frequently engaged"); see also p. 3 ("often"; "routinely").

71.     So frequent was Defendants' manipulative "banging the close" practice that the CFTC further found that such practice took on institutional aspects as follows:

a.   Defendants' Market on Close ("MOC") BUY orders "generally" ranged from "20 to 100 contracts."

b.   Defendants "routinely" submitted the MOC buy orders through

14

instant messages, "among other means."

Ex. A, CFTC Order p. 3.

       c.  Defendants, through their agents (including Defendant Pia or, at the direction of Defendant Pia, through Defendants' order entry personnel), intentionally gave such orders to Defendants' FCM, Defendant MF Global, Inc., and its associated person ("AP").[3]

       d.  Typically, Defendants, per Defendant Pia, specifically intended and often expressly instructed their agent (the FCM, through its AP) to purposely wait until the last 10 seconds of the closing period of NYMEX platinum and palladium futures trading to place Defendants' orders.

       e.  As Defendants' agents, Defendant MF Global, Inc. and its AP relayed Defendants' orders to the NYMEX floor for execution during the last ten seconds or last moments of trading in NYMEX platinum and palladium futures contracts.

CFTC Order pp. 2-3.

72.    In the foregoing manner, Defendants intentionally gave such relatively very large buy orders "MOC" in the amount of 20-100 contracts in repeated instances during the Class Period in order to exert maximum upward impact on prices.

73.    Indeed, these orders were often placed through instant messages ("IMs") between Defendants (per their portfolio managers, including Defendant Pia) and their FCM. These IMs included written directions or requests that indicated that Defendants wanted to push NYMEX platinum and palladium futures prices, including the settlement price, higher.

74.    Although the legal charges that the Moore Defendants negotiated to be settled in the CFTC Order were described as **attempted** manipulation (*Id.* p. 4), the CFTC Order

---

[3] An AP is a registered person who is similar to a registered representative in securities.

conspicuously fails to provide that there was no effect of the "frequent" large "bang the close" trades on prices.   Ex A *passim.*

75.   On the contrary, the CFTC Order takes pains expressly to make further findings that demonstrate Defendants did, in fact, succeed in manipulating prices higher through their "bang the close" trades.

(a)   First, the CFTC Order found that, relative to the low amount of trading and "thin" amount of market depth that were available in the NYMEX platinum and palladium futures contracts markets, the Defendants' typical bang the close trade was a "large" trade.  Ex. A, CFTC Order p. 3.

(b)   Second, the CFTC Order also expressly found that Defendants' MOC orders "typically" constituted a "significant percentage of the volume of trading on the close" in the NYMEX palladium and platinum futures contracts. *Id.*

(c) In such circumstances, buy orders of 20-100 contracts easily had the ability to cause artificial settlement prices, including artificially inflated settlement prices, of NYMEX palladium and platinum futures contracts.

(d)   Third, the CFTC Order repeatedly found that these "bang the close" trades were engaged in "frequently." This clearly implies that Defendant Pia knew that the bang the close trades were not futile acts. They were furthering the manipulative scheme by artificially inflating prices.

(e)   Fourth, just the $25,000,000 fine imposed by the CFTC is the third largest fine (or so called "civil monetary penalty") imposed by the CFTC for a manipulation case in the last ten years; the extensive injunctive relief here may be , to a large extent, unprecedented.

16

76.     Separately, even a single large buy order can have a long term upward impact on prices. *E,g,* Robert E. Holthausen, Richard Leftwich and David Mayers, *The Effects of Large Block Transactions on Security Prices: A Cross-Sectional Analysis*, 19 J. OF FIN. ECON. 237, 240 (1987) ("Block transactions have permanent price effects if trades convey information, even if there are sufficient close substitutes to produce perfectly elastic excess demand curves."); Myron Scholes, *The Market for Securities: Substitution Versus Price Pressure and the Effects of Information on Share Prices*, 2 J. OF BUSINESS 179, 193-94 (1972); Andrei Shleifer, *Do Demand Curves Slope Down?*, J. OF FINANCE 579, 580-582 (1986).

77.     Typically, the upward effects on prices of a large buy order do stay in the market for substantially longer than the downward effect on prices of a large sell order. *Id.*

78.     Here, the upward artificial effect of Defendants' frequent large "bang the close" trades clearly did stay in the market for an extended period. By repeatedly entering relatively large buy orders in relatively illiquid futures contracts at the end of trading, Defendants, through their agents, intentionally caused the settlement prices of such futures contracts to be artificially high, and in fact, higher than they otherwise would have been.

79.     But Defendants' blatantly manipulative trades were not merely large buy orders. They were also large "bang the close" trades that impacted the closing price. First, by intentionally buying at a high price, the Moore Defendants directly caused the closing price to be higher than it otherwise would have been. This is because the closing price is a volume weighted average price. By uneconomically calculating and making their buy transaction at a higher price rather than at the cheapest available prices, the Moore Defendants uneconomically and manipulatively increased such volume weighted average price to higher levels than economic behavior would have produced.

17

80.    Second, by making its "bang the close" transactions in the NYMEX floor market, which was a thinner market, Defendants further increased the upward effect on the volume weighted average price of their manipulative trades.

81.    (a) Third, so frequent and large were Defendants' "bang the close" trades that they not only caused NYMEX closing prices to be higher than they would have been but for the manipulation.

(b) Defendants' "bang the close" trades also caused NYMEX floor prices to increase on an absolute level during the two minute closing period relative to the price immediately preceding such two minute period.

(c) In fact, NYMEX floor prices increased during the two minute closing period by one-third more frequently during the Class Period than after the Class Period. A substantial cause of this greater frequency of price increases was the Moore Defendants' manipulative scheme and "frequent" large "bang the close" trades.  This greater frequency of increases of prices in the NYMEX pit trading during the final two minutes is not explainable by general price trends or changes in such price trends.

(d) In the absence of discovery, the records of the Defendants' trading are in the exclusive possession of Defendants and the Government, and Plaintiffs cannot specify further particulars.

82.    But Defendants' upward manipulation of the settlement prices did cause and create positive feedback loops of price increases.  For example, the settlement prices of the NYMEX platinum and palladium futures contracts were used, as Defendants well knew, by the market as the most important price information of each day. *Id.*  By repeatedly manipulating the

closing or settling prices higher, Defendants unlawfully and repeatedly sent a price beacon signal in favor of artificially high prices, and against and contrary to natural prices.

83.     For another example, as Defendants also well knew, there is a daily mark-to-market computation of a commodity futures trader's so-called equity or margin position based upon the daily closing or settling prices.  If the prices move sufficiently against the trader's position as of the close, then more "margin" deposits must be made.  But if prices move sufficiently in favor of the position, then variation margin is paid to the trader, which increases the trader's buying power.

84.     Thus, by consistently and repeatedly manipulating the NYMEX settlement prices upwards in NYMEX platinum and palladium futures contracts, Defendants caused artificially inflated NYMEX prices (a) through their "large" buy trades themselves, (b) through the representations and reports of the manipulative price to the public, and (c) through the margin effects that, effectively, altered the conduct of every other participant in the market by giving those participants with a "buy" opinion more buying power and those with a "sell" opinion less selling power.

85.     Defendants' manipulative acts and their concussive effect on prices were not disclosed publicly to the market during the Class Period or otherwise until on or about April 29, 2010, when the CFTC settlement was made.

86.     As a result of the foregoing, Defendants' frequent large manipulative "bang the close" trades caused NYMEX platinum and palladium prices to be artificially high during the Class Period.

87.     Separately, Defendants caused NYMEX platinum and palladium futures contracts to be artificially high in other respects during the Class Period.

19

88.     NYMEX platinum futures contracts prices increased to all-time record levels during the Class Period.   For example, between October 26, 2007 and March 5, 2008, there were 89 trading days in NYMEX platinum futures contracts.   Such contracts set new all-time record highs on 28 of those trading days.   Thereby, NYMEX platinum futures contracts rapidly increased from an all-time record high of $1472.10 per ounce on October 26, 2007 to the 28th all-time record high made during the Class Period, which occurred on March 5, 2008, of $2276.10 per ounce.   This was an increase of almost 55%.

89.     The fundamentals of the supply and demand for platinum did not warrant such dramatic increases.   For the first time in numerous years, the platinum market entered 2007 with a surplus and, as 2007 progressed, the deficit projected between current consumption and current production was less than that of various prior years.   Moreover, such deficit was far less than the inventories of platinum held in Switzerland and other locations.

90.     Confirming that the extraordinarily high NYMEX platinum futures prices were not justified by supply and demand and were artificial during the Class Period, NYMEX platinum futures contract prices thereafter plummeted to under $1400 by August 19, 2008 and $957 per ounce by October 3, 2008.



91.     As highly unusual and artificial as the NYMEX platinum futures contract price behavior was, the NYMEX palladium futures contract price behavior was as or almost as artificial.

92.     In October 2007, there was already held a very substantial existing excess supply overhang of palladium of in excess of 6,000,000-8,000,000 ounces.  This was approximately equal to or 33 1/3 % in excess of a year's consumption of palladium.

93.     Further, during 2007-2008, there was projected to be (and the projections were realized) an additional 25% excess of new production of palladium over the consumption needs.

94.     As the excess palladium supply overhang grew during the Class Period,  NYMEX palladium futures prices should have declined during the Class Period.

95.     However, NYMEX palladium futures contract prices did not decline.  Rather, such prices closed, prior to the start of the Class Period on October 25, 2007, at $369.50 per ounce.

96.     During the Class Period, NYMEX palladium futures prices rapidly increased to a six-year high on February 28, 2008 of $585.25 per ounce, an increase of 57%.

97.     Because these price increases were wholly unjustified by supply and demand, the artificially high NYMEX palladium futures prices thereafter quickly plummeted to $300 per ounce by August 19, 2008, $201.85 on October 3, 2008 and $162.10 on December 5, 2008.



98.     In all the circumstances, the increases in NYMEX platinum and palladium futures contract prices during the Class Period were unjustified by the fundamentals, were artificial, and

were in one substantial part caused by Defendants' manipulative scheme to make frequent, large "bang the close" trades.

99.     By reason of the foregoing, Defendants, through Defendant Pia and other employees, specifically intended to and did cause NYMEX palladium and platinum futures contract prices, to be artificially high during the Class Period.

100.    During the Class Period, the Moore Defendants had, as is reflected in the CFTC Order at pp. 6-9, an unusual absence of any compliance procedures and an unusual culture to prevent detection of wrong doing.

101.    The Moore Defendants pre-programmed their electronic systems in order to automatically erase e-mail communication within two weeks (or, at the longest, three weeks) after the date of each email. The Moore Defendants scanned for and deleted Outlook and .pst folders in order to ensure that no one could keep company emails for longer than the two-week period.

102.    This rapid and systematic deletion of emails was a highly uncommon practice among financial firms.

103.    Dovetailing with this unusual practice, the CFTC Order requires the Moore Defendants to preserve and maintain records of communications for "at least two (2) years, unless otherwise required to be maintained for five (5) years pursuant to Regulation 1.31." CFTC Order pp. 8-9. Moreover, the CFTC Order also required the Moore Defendants to record the telephonic conversations concerning orders and preserve the audio tapes for at least six months. *Id.* p. 9 #6.

104.    Since 2007, Moore Capital has been subject to various allegations or findings of unlawful conduct in the markets including, but not limited to:

    a.  The CFTC settled charges that Moore Capital Management, LP, Moore Capital Advisors, LLC, and Moore Advisors, Ltd., attempted to manipulate the settlement prices of platinum and palladium futures contracts on the NYMEX, and failed to diligently supervise the handling of MCM's commodity interest business.

    b.  In September 2008, Steven Harrison, a former top Moore Capital Trader in London paid a £52,500 fine as well as agreeing not to work as a trader or fund manager for 12 months to settle a "market abuse" investigation by British regulators. The Financial Services Authority found Harrison had received inside information before telling another trader to buy Rhodia SA corporate bonds.

    c.  In March 2010, Julian Rifat, a London based trader with Moore Capital Management LLC was arrested by UK authorities as part of a crackdown on insider trading.

    d.  Twice in the past two years, female employees working in Moore Capital's New York office sued in federal court, charging the firm and some of its executives with employment discrimination. Both suits were settled out of court.

105.   Thus, Moore employees who were aware of the manipulative trades during the Class Period were afraid to mention same for fear of losing their jobs.

106.   Regardless of whether the persons at the Moore Defendants who were actually committing the frequent "band the close" orders reported them to anyone, even the most rudimentary compliance system would have spit out as exceptions the repeated "bang the close" trades entered near or at the close of trading.

107.   This would have occurred within two weeks or one month of the start of such practice. Only by intentionally failing to have the most rudimentary compliance and trade

24

monitoring system in place, could the Moore Defendants avoid knowledge of these frequent large "bang the close" trades.  The rudimentary compliance system that the Moore Defendants intentionally avoided installing would not have allowed such blatantly manipulative trades to continue for more than a one month period (let alone for a seven-plus month period).

108.    The blatantly manipulative scheme alleged here, could not have continued for so long unless the Moore Defendants and the Moore Fund Defendants specifically intended it to.

109.    Defendant Moore Macro Fund, LP and Defendant Moore Global Fixed Income Master Fund, LP (collectively "Moore Funds") were at all relevant times controlled and managed by the Moore Defendants.  In fact:

> a.  Defendant MCM and Defendant MA served as the co-general partners of the Moore Funds;
>
> b.  Defendant MCA and Defendant MA acted as the commodity pool operators (or CPOs) for the Moore Funds; and
>
> c.  Defendant MCM was the trading advisor for the Moore Funds.

110.    As agents of the Moore Funds, the Moore Defendants, Defendant Pia and various other persons caused those funds to make the manipulative large "bang the close" trades in platinum and palladium futures trades detailed herein.

111.    The intent of the Moore Defendants and Defendant Pia is imputed to Defendant Moore Macro Fund, LP and Defendant Moore Global Fixed Income Master Fund, LP.

112.    Further, the Moore Funds were the persons actually making the NYMEX trades and actually holding the NYMEX positions the funds were the persons that benefitted from their frequent large "bang the close" trades.

113.    The Moore Funds knew that the Moore Defendants and Defendant Pia were engaged in a long term manipulative scheme to manipulate NYMEX platinum and palladium futures contract prices by causing each such fund to repeatedly make large manipulative "bang the close" trades.

114.    By acting over a long period of seven-plus months as the purchaser of and making these large, frequent manipulative trades, the Moore Funds intended and ratified the Moore Defendants' and Defendant Pia's objective and specific intent to manipulate the NYMEX platinum and palladium futures prices higher.

115.    Thereby, the Moore Funds knowingly participated in or aided and abetted the Moore Defendants' and Defendant Pia's manipulation, willfully intended to assist the manipulation, and had the motive and intent to cause the artificial prices.

116.    Plaintiffs originally filed this action on April 30, 2010. This was within the two years of learning of these claims and, also, within two years of the end of the unlawful conduct.

117.    As a direct, foreseeable and proximate result of Defendants' ongoing violation of Section 9(a) of the CEA, Plaintiffs and members of the Class paid artificial prices, suffered losses and are entitled to recover actual damages under Section 22(a) of the CEA, 7.U.S.C. §25.

## CLASS ALLEGATIONS

118.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated, pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons or entities that purchased during the period from at least October 25, 2007 through at least June 6, 2008 ("Class Period") a

palladium futures contract or a platinum futures contract traded on the NYMEX.[4]

Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.

119.    The Class is so numerous that joinder of all members is impracticable.  Due to the nature of the commerce involved, the members of the Class are geographically dispersed throughout the United States.  The number and identity of Class members is unknown to Plaintiff, but can be ascertained from readily available information.  Plaintiff believes that there are hundreds or perhaps thousands or more members of the Class.

120.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    Whether Defendants manipulated NYMEX palladium and/or platinum futures contracts in violation of the CEA;

b.    Whether Defendants are liable under CEA Section 2 (a)(1) or otherwise for such manipulation;

c.    Whether Defendants are liable for aiding and abetting such manipulation;

d.    Whether such manipulation caused NYMEX palladium and/or platinum futures contracts to be artificial;

e.    Whether such manipulation caused cognizable legal injury under the CEA;

f.    Whether such injury or the extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests; and

---

[4] Plaintiffs reserve their rights to amend the definition of the Class in the class motion or otherwise.

g.   The operative time period and extent of Defendants' foregoing violations.

121.   Plaintiffs' claims are typical of the claims of the other members of the Class they seek to represent.   Plaintiffs and members of the Class were injured by the same course of manipulative conduct and make the same legal claim.

122.   Plaintiffs will fully and adequately protect the interests of all members of the Class.  Plaintiffs have retained counsel experienced in complex antitrust and commodity futures manipulation class actions.  Plaintiff has no interests which are adverse to or in conflict with other members of the Class.

123.   The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

124.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.   The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.   A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

125.   The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.   The damages suffered by the individual Class members may be relatively small; and therefore, the expense and

burden of individual litigation make it virtually impossible for them to redress the wrongs done to them.  Plaintiffs anticipate no difficulty in the management of this action as a class action.

## AS AND FOR A FIRST CLAIM

### AGAINST ALL DEFENDANTS

**(Manipulation In Violation of The Commodity Exchange Act, 7 U.S.C. §1 *et seq*.)**

126.    Plaintiffs re-allege and incorporate by reference all of the allegations of this Complaint with the same force and effect as if fully restated herein.

127.    Defendants, through their acts alleged herein, from at least October 25, 2007 through at least June 6, 2008, specifically intended to and did cause unlawful and artificial prices of NYMEX palladium and platinum futures contracts in violation the CEA, 7 U.S.C. §1, *et seq*. These included artificially high prices.

128.    In all the circumstances previously alleged, each defendant had the ability to cause and did cause artificial prices, including artificially high prices.

129.    Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts of their agents and representatives, including the acts of Defendant Pia.

130.    Plaintiffs and other persons who purchased NYMEX palladium or platinum futures contracts during this time paid artificial and unlawful prices, and were further injured in that they transacted in an artificial and manipulated market, including at artificially high prices.

131.    As a direct result, Plaintiffs and Class members who purchased NYMEX palladium and platinum futures contracts were injured and suffered damages.

## AS AND FOR A SECOND CLAIM

### AGAINST ALL DEFENDANTS

**(Principal-Agent / Control Person Liability In Violation of The Commodity Exchange Act,**

**7 U.S.C. §1 *et seq.*)**

132.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

133.    Defendants Moore Capital Advisors and Moore Advisors—acting through Defendant Pia and others—directed the manipulative trades alleged herein as agents of Defendants Moore Capital Management and the Moore Funds.

134.    Defendant Pia was an employee and agent of Defendant Moore Capital Management and acted as an agent and on behalf of Defendants Moore Capital Advisors, Moore Advisors and the Moore Funds.

135.    Defendants Moore Capital Management, Moore Capital Advisors and Moore Advisors—acting through Defendant Pia and others—were the agents for the Moore Funds, which made the manipulative trades alleged herein.

136.    Defendant MF Global acted as FCM and agent of Defendants Moore Capital Management, Moore Capital Advisors, Moore Advisors, Pia and the Moore Funds because it entered the manipulative trades and orders alleged herein.

137.    Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B) each of the aforementioned Defendants is liable for the acts of its agents.  Under Section 13(b) of the CEA, 7 U.S.C. §13c(b), each of the aforementioned Defendants is liable as a control person.

138.    Plaintiffs and members of the Class are each entitled to damages for the violations alleged herein.

**AS AND FOR A THIRD CLAIM**

**AGAINST ALL DEFENDANTS**

**(Aiding and Abetting Manipulation In Violation of The Commodity Exchange Act, 7 U.S.C. §1 *et seq.*)**

139.     Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

140.     In all the circumstances of the long duration of the manipulative scheme and the blatantly manipulative nature of the "bang the close" trades, each and every Defendant had extensive knowledge of the manipulation.

141.     Each Defendant provided highly unusual assistance by engaging in acts to further the manipulation whereas standard practice was to refuse to do such acts.

142.     Defendant Moore Capital Management acted as the commodity trading advisor to the Moore Funds and, as a principal of Defendant Moore Capital Advisors, shared in the financial benefits from the manipulation and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by the Moore Defendants.

143.     Defendants Moore Capital Advisors and Moore Advisors were co-general partners of the Moore Funds and directed (though Defendant Pia and others) the manipulative investments in the Moore Funds alleged herein and thereby willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by the Moore Defendants.

144.     Defendant MF Global acted as FCM for Defendants Moore Capital Advisors and Moore Advisors and entered the manipulative trades and orders alleged herein (as directed by Defendant Pia and others) and thereby willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by the Moore Defendants.  Defendant MF Global substantially assisted in the aforesaid manipulations by executing the Moore Defendants' trades

31

while simultaneously being aware of the nature of the manipulative pattern of trading engaged in by the Moore Defendants.

145.    The Moore Funds held the manipulative positions for Defendants Moore Capital Management, Moore Capital Advisors and Moore Advisors and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by the Moore Defendants.

146.    Defendant Pia implemented the manipulative trading strategies alleged herein on behalf of the Moore Defendants and directed that manipulative trades and orders be placed through Defendant MF Global and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by the Moore Defendants.

147.    Defendants each played their component role and each knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.

148.    Under Section 13c(a) of the CEA, 7 U.S.C. §13, each of the aforementioned Defendants is liable for willfully intending to assist the manipulation.

149.    Plaintiffs and the Class are each entitled to actual damages for the violation of the CEA alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.  For a declaratory judgment that Defendants manipulated NYMEX platinum and palladium futures prices in violation of the CEA Section 9(a), 7 U.S.C. Section 13(b) (First Claim);

B.  For a declaratory judgment that Defendants are also liable for such manipulation under Section 2(a)(1) of the CEA; (Second Claim);

32

C.  For a declaratory judgment that Defendants are liable for aiding and abetting such manipulation under Section 13c(a) of the CEA, 7 U.S.C. Section 13;

D.  For an order certifying this lawsuit as a class action pursuant to the Federal Rules of Civil Procedure;

E.  For a judgment awarding Plaintiff and the Class damages against Defendants for Defendants' violations of the CEA together with prejudgment interest at the maximum rate allowable by law;

F.  For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY

Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Plaintiff respectfully demands a trial by jury.

Dated: New York, New York
      August 3, 2010

Christopher Lovell (CL-2595)
Ian T. Stoll (IS-3424)
Christopher M. McGrath (CM-4983)
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway, Suite 501
New York, New York 10006
Telephone:    (212) 608-1900
Facsimile:    (212) 719-4775

*Interim Class Counsel for Plaintiffs and the Proposed Class in the Platinum/Palladium Futures Action*

Vincent Briganti (VB 1497)
Geoffrey M. Horn (GH 4179)
**LOWEY DANNENBERG COHEN & HART, P.C.**
White Plains Plaza
1 North Broadway, 5th Floor
White Plains, New York 10601
Telephone:    (914) 997-0500
Facsimile:    (914) 997-0035

## CERTIFICATE OF SERVICE

I, Christopher M. McGrath, hereby certify that I served the foregoing ***Consolidated Class Action Complaint*** on the following persons by electronic mail on this 3rd day of August, 2010:

David M. Zensky
James A. Diehl
John B. Dugan
Peter I. Altman
Paul B. Hewitt
**AKIN GUMP STRAUSS HAUER & FELD LLP**
dzensky@akingump.com
jdiehl@akingump.com
bdugan@akingump.com
paltman@akingump.com
phewitt@akingump.com

*Counsel for Moore Capital Management, LP,*
    *Moore Capital Advisors, LLC and Moore Advisors Ltd.*

Jennifer L. Rochon
Jade A. Burns
**KRAMER LEVIN NAFTALIS & FRANKEL, LLP**
jrochon@kramerlevin.com
jburns@kramerlevin.com

*Counsel for Christopher Pia*

Christopher M. McGrath

# EXHIBIT A

UNITED STATES OF AMERICA
BEFORE THE
COMMODITY FUTURES TRADING COMMISSION

| | | |
|---|---|---|
| In the Matter of: | : | CFTC Docket No. 10-09 |
| | : | |
| Moore Capital Management, LP, | : | ORDER INSTITUTING PROCEEDINGS |
| Moore Capital Advisors, LLC and | : | PURSUANT TO SECTIONS 6(c), 6(d) and |
| Moore Advisors, Ltd., | : | 8a OF THE COMMODITY EXCHANGE |
| | : | ACT AND MAKING FINDINGS AND |
| | : | IMPOSING REMEDIAL SANCTIONS |
| Respondents. | : | |

I.

The Commodity Futures Trading Commission ("Commission") has reason to believe that Moore Capital Management, LP ("MCM"), Moore Capital Advisors, LLC ("MCA"), and Moore Advisors, Ltd. ("MA") (collectively "Respondents" or "Moore Capital") violated Sections 6(c), 6(d), and 9(a)(2) of the Commodity Exchange Act (the "Act"), as amended, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006), and that MCM violated Commission Regulation ("Regulation") 166.3, 17 C.F.R. §166.3 (2009). Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and they hereby are, instituted to determine whether Respondents engaged in the violations set forth herein, and to determine whether any order should be issued imposing remedial sanctions.

II.

In anticipation of the institution of an administrative proceeding, Respondents submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Without admitting or denying any of the findings or conclusions herein, Respondents acknowledge service of this Order Instituting Proceedings Pursuant to Sections 6(c), 6(d) and 8a of the Commodity Exchange Act and Making Findings and Imposing Remedial Sanctions ("Order").[1]

---

[1] Respondents consent to the entry of this Order, the use of these findings in this proceeding and in any other proceeding against Respondents brought by the Commission or to which the Commission is a party; provided, however, that Respondents do not consent to the use of the Offer, or the findings or conclusions consented to in this Order, as the sole basis for any other proceeding brought by the Commission, other than in a proceeding in bankruptcy or to enforce the terms of this Order. Nor do Respondents consent to the use of the Offer or this Order, or the findings or conclusions consented to in the Offer or this Order, by any other party in any other proceeding.

## III.

The Commission finds the following:

### A.    Summary

During the period of at least November 2007 through May 2008 (the "Relevant Period"), a former portfolio manager for MCM (the "Former PM") attempted to manipulate the settlement prices of palladium and platinum futures contracts traded on the New York Mercantile Exchange ("NYMEX"). The Former PM engaged in a trading practice known as "banging the close." Specifically, the Former PM caused to be entered market-on-close ("MOC") buy orders that were executed in the last ten seconds of the closing period for both contracts in an attempt to exert upward pressure on the settlement prices of the futures contracts. The Former PM engaged in this trading strategy frequently throughout at least the Relevant Period.

During the Relevant Period, MCM failed to supervise diligently the Former PM's trading on behalf of Respondents and failed to have sufficient policies and procedures designed to detect and deter the violations of the Act and Regulations found herein.

In accepting Moore Capital's Offer, the Commission recognizes the Respondents' significant cooperation during the Division of Enforcement's investigation of this matter and their representations concerning the remedial steps undertaken by Respondents during the investigation.

### B.    Respondents

**Moore Capital Management, LP** is a multi-strategy investment management firm with headquarters at 1251 Avenue of the Americas, New York, New York. During the Relevant Period, MCM and its affiliates managed several investment funds that invested in a wide variety of instruments, including but not limited to commodities, futures, and equities. During the Relevant Period, MCM had approximately twenty-five portfolio managers trading an estimated $15,500,000,000 in assets under management. MCM is registered as a commodity trading advisor ("CTA") and is a principal of MCA. MCM is the successor in interest to Moore Capital Management, LLC which was a registered CTA. The Former PM was an employee of Moore Capital Management, LLC.

**Moore Capital Advisors, LLC** is a Delaware limited liability company and a registered commodity pool operator ("CPO") and CTA, with headquarters at the same address as MCM. MCM is a principal of MCA. MCA, along with MA, served as the co-general partner of the Moore Macro Fund, LP and the Moore Global Fixed Income Master Fund, LP.

**Moore Advisors, Ltd.** is a Bahamian international company and registered as a CPO. MA, along with MCA, served as the co-general partner of the Moore Macro Fund, LP and the Moore Global Fixed Income Master Fund, LP.

C.   <u>Facts</u>

   1.   <u>NYMEX Palladium and Platinum Futures Contracts</u>

   Palladium and platinum futures contracts are traded on the NYMEX.   During the Relevant Period, the majority of trades in NYMEX palladium and platinum futures contracts were executed on the electronic trading platform, GLOBEX, rather than on the floor.   The number of traders in the palladium and platinum pit on the NYMEX floor was fewer than ten on any given date.

   The settlement prices of both the NYMEX palladium and platinum futures contracts are calculated based on the volume-weighted average price of all transactions conducted both on the trading floor and on Globex, during the two-minute closing period for the contracts.   The closing period for trading palladium futures contracts is from 12:58 p.m. to 1:00 p.m., and the closing period for trading platinum futures contracts is from 1:03 p.m. to 1:05 p.m. Globex and the trading pit trade side-by-side through the close.   Trading continues on Globex after the close of trading in the pit.

   Trading in both contracts was relatively illiquid, and the Former PM's trading in the contracts on the close frequently accounted for a significant portion of the volume.

   The Former PM's trading strategy took advantage of these key characteristics of these two futures markets – thinly traded, illiquid, and volume-weighted average settlement price calculations – to attempt to manipulate the daily settlement prices.

   2.   <u>The Manipulative Scheme</u>

   During at least the Relevant Period, the Former PM frequently engaged in a trading strategy in an attempt to manipulate upward the settlement prices of the palladium and platinum futures contracts.   The platinum and palladium trades executed by the Former PM were placed in two Moore Capital investment funds, the Moore Macro Fund, LP and the Moore Global Fixed Income Master Fund, LP.   MCA and MA acted as the CPOs for these two funds and MCM was the trading advisor.

   During at least the Relevant Period, the Former PM either directly or through Moore Capital execution clerks, placed MOC buy orders in platinum and palladium futures contracts through an associated person (the "AP") of a futures commission merchant ("FCM").   The FCM then relayed the Former PM's orders to the floor through a NYMEX floor clerk.   The Former PM's MOC buy orders executed on the floor during the close generally ranged from 20 to 100 contracts, which were relatively large orders for the relatively illiquid palladium and platinum markets.   Typically, the Former PM's orders constituted a large percentage of the volume of trading on the close.

   The Former PM or his execution clerk routinely submitted MOC buy orders in platinum and platinum futures to the AP through Instant Messages ("IMs"), among other means.   The Former PM often placed MOC orders with the FCM's AP with directions that indicated that he wanted to push the settlement prices higher.

To effectuate the Former PM's manipulative scheme, the AP waited until the last ten seconds of the closing periods of platinum and palladium futures trading to place the Former PM's buy orders with the floor clerk, who worked in the NYMEX trading pit.

The Former PM engaged in this manipulative strategy throughout the Relevant Period.

### 3.    MCM's Supervision of the Former PM

During the Relevant Period, MCM failed to supervise diligently the Former PM's manner of trading on behalf of Respondents and failed to have sufficient policies and procedures designed to detect and deter the violations of the Act and Regulations found herein. While MCM's policies prohibited manipulative trading, MCM did not have adequate procedures to detect and deter possible manipulative trading. For instance, MCM did not monitor or review the communications of the Former PM and the executing clerks or the Former PM's end-of-day trading to identify possible manipulative schemes.

Also, while MCM's written policy required violations to be reported to compliance, that policy did not provide sufficient guidance or means to ensure that possible violations were reported. For example, in one instance, an execution clerk was concerned about the Former PM's trading on the close but failed to bring his concerns to compliance because he felt intimidated by the Former PM's aggressive management style.

### D.    Legal Discussion

#### 1.    Respondents' Employee Attempted to Manipulate the Settlement Prices of NYMEX Palladium and Platinum Futures Contracts

Together, Sections 6(c), 6(d), and 9(a)(2) of the Act prohibit acts of attempted manipulation. Section 9(a)(2) of the Act makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." Sections 6(c) and 6(d) of the Act authorize the Commission to serve a complaint and provide for the imposition of, among other things, civil monetary penalties and cease and desist orders if the Commission "has reason to believe that any person ... has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce or for future delivery on or subject to the rules of any registered entity ... or otherwise is violating or has violated any of the provisions of [the] Act."

The following two elements are required to prove an attempted manipulation: (1) an intent to affect the market price, and (2) an overt act in furtherance of that intent. *See In re Hohenberg Bros. Co.* [1975-77 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271 at 21,477 (CFTC Feb. 18, 1977); *CFTC v. Bradley*, 408 F. Supp. 2d 1214 (N.D. Okla. 2005).

Here, MCM's Former PM entered or caused to be entered MOC buy orders during the close of trading in the palladium and platinum futures contracts with the intent to move higher the settlement prices of the platinum and palladium futures contracts.[2]

By this conduct, Respondents, through the acts of the Former PM, violated Sections 6(c), 6(d) and 9(a)(2) of the Act (2006).[3]

### 2.   MCM Had Inadequate Systems and Procedures to Supervise Its Business as a Registrant

Regulation 166.3 requires that every Commission registrant (except APs who have no supervisory duties) supervise diligently the handling by its partners, employees and agents of all of its commodity interest accounts and activities relating to its business as a registrant. In order to prove a violation of Regulation 166.3, it must be demonstrated that either: (1) the registrant's supervisory system was generally inadequate; or (2) the registrant failed to perform its supervisory duties diligently. *In re Murlas Commodities*, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,485 at 43,161 (CFTC Sept. 1, 1995); *In re Paragon Futures Ass'n*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,266 at 38,850 (CFTC Apr. 1, 1992); *Bunch v. First Commodity Corp. of Boston*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,352 at 39,168-69 (CFTC Aug. 5, 1992).

Under Regulation 166.3, a registrant has a "duty to develop procedures for the detection and deterrence of possible wrongdoing by its agents." *Samson Refining Co, v. Drexel Burnham Lambert, Inc.*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,596 at 36,566 (CFTC Feb. 16, 1990) *(quoting Lobb v. J.T. McKerr & Co.*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,568 at 36,444 (CFTC Dec. 14, 1989)). "A showing that the registrant lacks an adequate supervisory system can be sufficient" to establish a breach of duty under Regulation 166.3. *In re Collins*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,194 at 45,744 (CFTC Dec. 10, 1997). The lack of an adequate supervisory system can be established by showing that the registrant failed to develop proper procedures for the detection of wrongdoing. *CFTC v. Trinity Fin. Group Inc.*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,179 at 45,635 (S.D. Fla. Sept. 29, 1997), *aff'd in relevant part, vacated in part and remanded sub nom. Sidoti v. CFTC*, 178 F.3d 1132 (11th Cir. 1999). The existence of violations

---

[2] *In re DiPlacido*, [2007-2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 30,970 at 62,484 (CFTC Nov. 5, 2008), *aff'd*, 2009 U.S. App. LEXIS 22692 (2d Cir. Oct. 16, 2009), *cert. denied*, 2010 U.S. LEXIS 2461 (March 22, 2010)("[S]ettlement prices are market prices that can be manipulated.").

[3] Respondents are liable for the actions of the Former PM who acted as their employee and/or agent in trading on behalf of Moore Capital funds. Under Section 2(a)(l)(B) of the Act, 7 U.S.C. § 2(a)(l)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2009), the act, omission, or failure of any official, agent or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation or trust.

that should have been detected by a diligent system of supervision is independent proof of a failure to supervise. *See Paragon Futures Ass'n*, ¶ 25,266 at 38,850.

Based upon the supervisory failures described above, MCM failed to have an adequate supervisory system and procedures in place designed to both detect and deter the violations of the Commission's laws and Regulations found herein. MCM failed to have adequate policies and procedures in place to monitor trading and to supervise the acts of its employees, officers or agents.

By these acts, failures and omissions, MCM violated Regulation 166.3, 17 C.F.R. § 166.3 (2009).

IV.

## FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that Respondents attempted to manipulate the settlement prices of palladium and platinum futures contracts traded on the NYMEX in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006). The Commission further finds that MCM failed to have an adequate supervisory system and procedures designed to detect and deter potentially manipulative practices in violation of Regulation 166.3, 17 C.F.R. § 166.3 (2009).

V.

## OFFER OF SETTLEMENT

Respondents have submitted an Offer in which they acknowledge service of this Order and admit the jurisdiction of the Commission with respect to the matters set forth in this Order and waive: (1) the filing and service of a complaint and notice of hearing; (2) a hearing; (3) all post-hearing procedures; (4) judicial review by any court; (5) any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer; (6) any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2006) and 28 U.S.C. § 2412 (2006), and/or Part 148 of the Regulations, 17 C.F.R. §§ 148.1, *et seq.* (2009), relating to or arising from this action; (7) any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. 104-121, §§ 201-253, 110 Stat. 847, 857-68 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to or arising from this action; and (8) any claim of double jeopardy based upon the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief.

Respondents stipulate that the record basis on which this Order is entered consists of this Order and the findings in this Order consented to in their Offer. Respondents consent to the Commission's issuance of this Order that: (1) makes findings that Respondents each violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006), and that MCM also violated Regulation 166.3, 17 C.F.R. §166.3 (2009); (2) orders Respondents to cease and desist from violating Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and

13(a)(2) (2006); (3) orders MCM to cease and desist from violating Regulation 166.3, 17 C.F.R. § 166.3 (2009); (4) orders Respondents to pay, jointly and severally, a civil monetary penalty in the amount of Twenty-Five Million Dollars ($25,000,000), plus post-judgment interest; (5) restricts Respondents' registrations as CPOs and/or CTAs for a period of three years from the date of this Order by requiring Respondents and their successors and assigns to each comply with the undertakings consented to in the Offer and set forth below; and (6) orders Respondents comply with the conditions and undertakings as set forth in the Offer and incorporated in this Order.

Upon consideration, the Commission has determined to accept Respondents' Offer.

## VI.

Accordingly, **IT IS HEREBY ORDERED THAT:**

1.  Respondents shall cease and desist from violating Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006), and MCM shall further cease and desist from violating Regulation 166.3, 17 C.F.R. § 166.3 (2009).

2.  Respondents shall pay, jointly and severally, a civil monetary penalty in the amount of Twenty-five Million Dollars ($25,000,000), plus post-judgment interest, within ten (10) days of the date of the entry of this Order. Post judgment interest shall accrue beginning eleven (11) days after entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961. Respondents shall pay their civil monetary penalty by making electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made by other than electronic funds transfer, the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

    Commodity Futures Trading Commission
    Division of Enforcement
    ATTN: Marie Bateman – AMZ-300
    DOT/FAA/MMAC
    6500 S. MacArthur Blvd.
    Oklahoma City, OK 73169
    Telephone 405-954-6569

    If payment by electronic transfer is chosen, Respondents shall contact Marie Bateman or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Respondents shall accompany payment of the penalty with a cover letter that identifies Respondents and the name and docket number of this proceeding. Respondents shall simultaneously submit a copy of the cover letter and the form of payment to: (1) the Director, Division of Enforcement, Commodity Futures Trading Commission, at the following address: 1155 21st Street, N.W., Washington, D.C. 20581; and (2) the Chief, Office of Cooperative Enforcement, Division of Enforcement, Commodity

7

Futures Trading Commission, at the same address.   In accordance with Section 6(e)(2) of the Act, as amended, 7 U.S.C. § 9a(2) (2006), if this amount is not paid in full within fifteen (15) days of the due date, Respondents shall be prohibited automatically from the privileges of all registered entities, and, if registered with the Commission, such registration shall be suspended automatically until it has shown to the satisfaction of the Commission that payment of the full amount of the penalty with interest thereon to the date of the payment has been made.

3.   Respondents' registrations as CTAs and CPOs shall be restricted insofar as Respondents shall comply with the undertakings set forth below for a period of three (3) years from the date of this Order.  Respondents represent that they have already undertaken and are implementing certain compliance enhancements.

a.   Respondents shall institute, update and/or strengthen policies and procedures designed to detect, deter, discipline, and correct potential wrongdoing and violations of the Act and Regulations, including the type of violative conduct found by the Commission in this matter, and that are reasonably designed to provide diligent supervision in accordance with Regulation 166.3.  Such policies and procedures shall include but not be limited to:

i.   policies and procedures regarding supervision of execution, trading and back office personnel, and portfolio managers, including but not limited to reviews of trading desks and portfolio managers relating to order entry and trading practices for commodity futures, options on commodity futures, commodity options, and foreign currency subject to the Act and Regulations, with the reviews and results being documented;

ii.   policies and procedures to ensure that questionable, unusual or unlawful activity is promptly and directly reported to, and addressed and investigated by, Moore Capital's compliance or legal personnel; and

iii.   policies and procedures requiring periodic review of electronic communications and audio recordings as described in subparagraphs b and c below; such review will include the opening and closing periods of markets and expiration of trading on futures contracts; and

b.   Respondents shall implement a policy requiring that any person communicating in writing (*e.g.*, text messages, facsimile, chat, Instant Messaging, electronic mail) concerning non-equity (with the exception of exchange traded funds based on commodities or commodity futures) trading, transactions, prices and/or trading strategies shall use digital or electronic media which is recorded and maintained by Respondents.

Respondents shall record and maintain a record of all such communications for a period of at least two (2) years, unless otherwise required to be retained for five (5) years pursuant to Regulation 1.31.

c.   Respondents shall implement a policy requiring that any person engaging in audio communications reflecting non-equity (with the exception of exchange traded funds based on commodities or commodity futures) order placement, execution or handling shall use digital or electronic media which is recorded and maintained by Respondents. Respondents' policy shall also require that all non-privileged, business related telephonic communications occurring through each execution desk handling non-equity trading shall be recorded and maintained by Respondents. Respondents shall maintain such recorded audio and telephonic communications for a period of at least six (6) months.

d.   Respondents shall either implement a system of trade recording to include all elements of the transactions, such as order entry and execution time, or in its report to the Division explain why such system is not commercially feasible or practicable.

e.   Respondents shall ensure that compliance personnel have experience and knowledge of commodity futures and options trading, regulation and compliance.

f.   Respondents shall enhance and continue to provide mandatory training programs, which shall be updated annually, addressing the ethics, compliance and legal requirements of the Act and Regulations, including abusive and manipulative trading practices and indicators of such practices, to be given to Moore Capital professional staff, including all directors, officers, managers, portfolio managers, traders, associated persons, execution desk personnel, compliance personnel, and employees involved in any aspect of Moore Capital's commodity and/or commodity derivatives businesses. Such training programs will be provided within 120 days of the date of the employee's start date in one of the aforementioned positions and on an annual basis. Respondents will create and maintain documentation that the required individuals noted above have fulfilled their compliance training.

g.   Moore Capital shall submit a report to the Commission's Division of Enforcement within 120 days of the issuance of this Order. The report shall include the steps taken to comply and the results of its compliance with the above undertakings, including a detailed description of internal controls, policies and procedures formulated and implemented.

h.   Respondents shall distribute a copy of this Order to all current and future employees, principals and officers and shall ensure that all required disclosures of the Commission's actions are made.

9

4. Respondents also shall comply with the following conditions and undertakings as specified:

a.  **Trading Restriction**

Respondents agree not to engage in trading platinum and palladium options on commodity futures and commodity futures within fifteen minutes of the beginning of the closing period for trading until the end of the closing period for trading of those commodities for a period of two (2) years from the date of this Order.

b.  **Future Cooperation with the Commission**

Respondents shall continue to cooperate fully and expeditiously with the Commission, including the Commission's Division of Enforcement ("DOE"), and all other federal government agencies (hereafter collectively referred to as the "Government") in this proceeding, and in any investigation, civil litigation, or administrative matter related to the subject matter of this proceeding or any current or future Government investigation related thereto. As part of such cooperation, Respondents agree to:

(1) preserve all records relating to the subject matter of this proceeding, including, but not limited to audio files, e-mails, and trading records; and

(2) comply fully, promptly, and truthfully to any inquiries or requests for information including but not limited to inquiries or requests:

(i) for authentication of documents;

(ii) for any documents within Respondents' possession, custody, or control, including inspection and copying of documents;

(iii) to produce any current (as of the time of the request) officer, director, employee, or agent of Respondents, regardless of the employee's location and at such location that minimizes Commission travel resources, to provide assistance at any trial, proceeding, or Commission investigation related to the subject matter of this proceeding, including but not limited to, requests for testimony, depositions, and/or interviews, and to encourage them to testify completely and truthfully in any such proceeding, trial, or investigation; and

(iv)   for assistance in locating and contacting any prior (as of the time of the request) officer, director, or employee of Respondents.

Respondents also agree that they will not undertake any act that would limit their ability to fully cooperate with the Commission; provided, however, that nothing in this Order shall require Respondents to disclose any information that is protected by the attorney-client privilege, the attorney work product doctrine, or other legally recognized privilege.

Respondents designate the Akin Gump Strauss Hauer & Feld LLP law firm to receive all requests for information pursuant to this undertaking. Should Respondents seek to change the designated person to receive such requests, notice shall be given to the DOE of such intention 14 days before it occurs. Any person designated to receive such request shall be located in the United States.

c.   **Public Statements**

Respondents agree that neither they nor any of their agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in this Order, or creating, or tending to create, the impression that this Order is without a factual basis; provided, however, that nothing in this provision shall affect Respondents': (i) testimonial obligations; or (ii) right to take legal positions in other proceedings to which the Commission is not a party. Respondents shall undertake all steps necessary to ensure that all of their agents and employees under their authority or control understand and comply with this agreement.

5.   Miscellaneous Provisions

a.   This Order shall inure to the benefit and be binding on successors, assigns, beneficiaries and administrators of Respondents.

b.   If any Respondent fails to comply with any of the conditions or undertakings of this Order applicable to it, the entity failing to comply shall be subject to further proceedings pursuant to Sections 6(c) and 6(e)(2) of the Act, 7 U.S.C. §§ 9 and 9a(2) for violating a Commission Order.

The provisions of this Order shall be effective as of this date.

By the Commission.

David A. Stawick
Secretary of the Commission
Commodity Futures Trading Commission

Dated: ___April 29___, 2010