

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*In Re: Platinum And Palladium Commodities Litigation*

This Document Relates To:

All Actions

MASTER FILE
No. 10 Civ. 3617 (WHP)

**JURY TRIAL DEMANDED**

**CONSOLIDATED CLASS ACTION COMPLAINT**

The Futures Plaintiffs (¶¶18-20 *infra*) and Physical Plaintiffs (¶¶23-26 *infra*) complain, upon knowledge as to themselves and their own acts and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.    Between October 25, 2007 and June 6, 2008 ("Class Period"), Defendants (as defined in ¶¶27-34), engaged in what the Commodity Futures Trading Commission ("CFTC") found to be a "manipulative scheme" consisting of blatantly unlawful and manipulative trades that were both "large" in size and a "significant percentage of the volume" at the times they were executed.  See ¶¶81-92 *infra*; Exhibit A hereto.[1]

2.    All of what the CFTC found to be these "large" and "manipulative" trades are known as "bang the close" trades.  *Id.*  "Bang the close" means to move or "bang" the closing price by entering trades at or near the time of the close.  "Bang the close" trading is a blatant form of trade manipulation.

3.    The CFTC found that these blatantly manipulative trades were all entered in --- and were all specifically intended to increase artificially the futures prices, including the closing

---

[1]*In the Matter of: Moore Capital Management, LP, Moore Capital Advisors, LLC and Moore Advisors, Ltd.*, CFTC Docket No. 10-09, Order Instituting Proceedings Pursuant to Sections 6(c), 6(d) and 8a of the Commodity Exchange Act and Making Findings and Imposing Remedial Sanctions. ("CFTC Order") at p. 3 heading II.C.2 ("Manipulative Scheme") and p. 3 *passim*.

prices, of --- the platinum futures contracts and palladium futures contracts traded in this district on the New York Mercantile Exchange ("NYMEX"). *Id.* These blatantly manipulative trades also artificially increased the spot price of the physical market.

4.     Among many other important characteristics, the closing or settlement prices are the most widely reported prices of the day and serve as the proxy to market participants for the price of the futures contract.

5.     The CFTC repeatedly found that Defendants "frequently" engaged in these blatantly manipulative "bang the close" trades. CFTC Order pp. 2-3; see ¶¶81-92 *infra.* By frequently and consistently injecting this unlawful, uneconomic and illegitimate large demand element into the price equation for NYMEX platinum and palladium futures contracts at the times of their closing, Defendants caused NYMEX platinum and palladium futures prices to be artificially high during the Class Period. See ¶¶93-115 *infra.*

6.     Thereby, Defendants violated Section 9(a) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §13b, which prohibits the manipulation of commodity futures contract prices.

7.     Moreover, after Defendants began their systematic practice of making such blatantly manipulative trades, NYMEX platinum and palladium futures contract prices dramatically increased to levels that were not justified by the fundamentals of supply and demand. *See* ¶¶104-116 *infra.*

8.     Because such prices were not justified by supply and demand, NYMEX platinum and palladium futures contract prices later---after the Class Period—plummeted back down to lower levels. *Id.*

9.     Defendants' "manipulative scheme" and their "frequent" large, manipulative "bang the close" trades were a substantial cause of the unjustified and artificially high prices of

NYMEX platinum and palladium futures contracts during the Class Period. See ¶¶81-92 *infra*.

10.   Defendants' manipulation in violation of the CEA proximately caused the Futures Plaintiffs and members of the Futures Sub-Class (see ¶145 *infra*) to pay artificially high prices for NYMEX platinum and palladium futures contracts during the Class Period and to suffer losses and actual damages.

11.   During the Class Period Defendants entered into and engaged in a contract, combination or conspiracy in restraint of trade by manipulating and causing artificial prices in palladium and platinum futures contracts traded on the NYMEX. These manipulative trades also caused artificial prices in physical platinum and palladium conforming to NYMEX delivery requirements sold in the physical or "spot" market (hereinafter "Class Commodities"). *See* ¶¶165-197, *infra* (market allegations).

12.   Defendants' unlawful conspiracy and unlawful conduct created artificial high prices in Class Commodities and damaged the Physical Plaintiffs and members of the Physical Sub-Class (see ¶153 *infra*) who purchased platinum and palladium during the Class Period. Accordingly, the Physical Plaintiffs bring this action for treble damages and injunctive relief under Sections 4 and 15 of the Clayton Act (15 U.S.C. §§15, 26) for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. §1). In addition, the Physical Plaintiffs assert violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1961 *et seq.* ("Civil RICO").

**JURISDICTION AND VENUE**

13.   Palladium is a "commodity" and is the "commodity underlying" palladium futures and options contracts traded on the NYMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

14.    Platinum is a "commodity" and is the "commodity underlying" platinum futures and options contracts traded on the NYMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

15.    This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, 28 U.S.C. §§ 1331 and 1337 and 18 U.S.C. § 1964.

16.    Venue is proper in the Southern District of New York, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), 28 U.S.C. § 1391(b), (c) and (d), 15 U.S.C. § 22 and 18 U.S.C. § 1964.   The Defendants maintain offices in the Southern District of New York, transacted business in the Southern District of New York, the claims arose in the Southern District of New York, and a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

17.    The New York Mercantile Exchange is located in this District at One North End Avenue, New York, New York.   On or around March 17, 2008, the Chicago-based CME Group, Inc. acquired the parent company of NYMEX, NYMEX Holdings, Inc.   Defendants' unlawful acts manipulated the prices of NYMEX palladium futures contracts and platinum futures contracts which are traded in this District on the NYMEX.

## PARTIES

**Futures Plaintiffs**

18.    Futures Plaintiff Gregory Galan sold five January 2008 NYMEX platinum futures contracts before the Class Period on October 24, 2007 at an average price of $1,436.20 per ounce.   During the Class Period, on November 6, 2007, Plaintiff Galan paid $1,481.50 per ounce to purchase five January 2008 NYMEX platinum futures contracts (in order to liquidate his pre-existing short position) at the artificially inflated prices that Defendants caused.   Plaintiff Galan

lost $11,325 on the foregoing transaction.  See ¶¶63, 68 *infra* (NYMEX platinum futures contract prices are quoted in dollars per troy ounce and the contract size is 50 troy ounces). Plaintiff Galan sold two April 2008 NYMEX platinum futures contracts on December 31, 2007 at a price of $1,525 per ounce.  Plaintiff Galan bought back two April 2008 NYMEX platinum futures contracts at $1,704.50 per ounce on January 28, 2008.  This produced a further loss of $17,950.  Thus, Plaintiff Galan sold short before the Class Period and bought back at higher prices during the Class Period.  Also, Plaintiff Galan sold short during the Class Period and bought back at higher prices later in the Class Period.

19.     Futures Plaintiff Lawrence Waxman purchased three NYMEX September 2008 palladium contracts during the Class Period on May 29, 2008 at $433.30 per ounce.  Plaintiff Waxman sold two NYMEX September 2008 palladium contracts after the Class Period on July 18, 2008 at $422.40 per ounce for a total loss of $2,180.  Plaintiff Waxman then sold his one remaining NYMEX September 2008 palladium contract on July 24, 2008 at $379.25 per ounce for a loss of $5,405.  Thus, Plaintiff Waxman's purchase transactions of NYMEX palladium contracts during the Class Period that were sold after the Class Period resulted in a loss of $5,784.25.  Plaintiff Waxman also purchased one December 2007 NYMEX palladium futures contract before the Class Period on August 30, 2007 at $333.50 per ounce.  Plaintiff Waxman sold out of his December 2007 long position during the Class Period on November 30, 2007 at $345.15 per ounce for a gain of $1,165.  On November 30, 2007 Plaintiff Waxman purchased one March 2008 NYMEX palladium futures contract at $350 per ounce and sold such contract on February 27, 2008 at a price of $554.40 per ounce for a gain of $20,440.  Plaintiff Waxman purchased three June 2008 NYMEX palladium futures contracts during the Class Period:  one on February 12, 2008 at $436.50 per ounce, one on February 27, 2008 at $559.80 per ounce and one

5

on April 10, 2008 at $460.10 per ounce. Plaintiff Waxman liquidated his foregoing three June 2008 NYMEX palladium futures contracts at $430 per ounce on May 29, 2008 for a loss of $16,640.

20.     Futures Plaintiff Richard White purchased two NYMEX March 2008 palladium contracts during the Class Period on October 26, 2007 at prices of $378.65 per ounce and 378.70 per ounce, respectively. Plaintiff White sold these two contracts on November 18, 2007 at a price of $364 per ounce, resulting in losses of $1,465 and $1,470 per contract. Thus, Plaintiff White's transactions in NYMEX palladium contracts during the Class Period resulted in a net loss of $2,935.

21.     Each Futures Plaintiff was proximately caused injury, loss and actual damages by Defendants' unlawful conduct for the reasons alleged herein and in the following paragraph. Each Futures Plaintiff paid artificially high prices to establish their long positions or to liquidate their short positions. Each Futures Plaintiff also suffered net losses on all their purchases during the Class Period and related sales of NYMEX platinum or palladium futures.

22.     Futures Plaintiffs Galan and Waxman purchased contracts qualifying under the Futures Sub-Class definition at the artificially inflated prices existing during the Class Period which they sold outside of the Class Period. They suffered net losses and paid more artificiality than they sold or received on such transactions.

**Physical Plaintiffs**

23.     Plaintiff F.W. DeVito, Inc. Retirement Plan Trust ("DeVito Trust") is a retirement plan trust with its principal place of business in Stafford, Virginia. Plaintiff DeVito Trust purchased Class Commodities during the Class Period. Plaintiff DeVito Trust was damaged by

6

defendants' unlawful contract, enterprise, combination and conspiracy in restraint of trade as alleged herein.

24.    Plaintiffs Frederick W. and Mary T. DeVito are individuals as well as trustees of the F.W. DeVito, Inc. Retirement Plan Trust who reside in Stafford, Virginia. Plaintiffs Frederick W. and Mary T. DeVito purchased Class Commodities during the Class Period and were damaged by defendants' unlawful contract, enterprise, combination and conspiracy in restraint of trade as alleged herein.

25.    Plaintiff David W. DeVito is an individual and resident of Virginia. Plaintiff David W. DeVito purchased Class Commodities during the Class Period and was damaged by defendants' unlawful contract, enterprise, combination and conspiracy in restraint of trade as alleged herein.

26.    Plaintiff Russell W. Andrews is an individual and resident of the State of Colorado. Plaintiff Andrews purchased Class Commodities during the Class Period. Plaintiff Andrews was damaged by defendants' unlawful contract, enterprise, combination and conspiracy in restraint of trade as alleged herein.

**Defendants**

27.    Defendant Moore Capital Management, LP ("MCM") is a Delaware limited partnership with headquarters at 1251 Avenue of the Americas, New York, New York.  Moore Capital Management is a multi-strategy investment firm that manages several investment funds that invest in a wide variety of instruments, including, but not limited to, commodities and commodity futures contracts.  Moore Capital Management is registered with the CFTC as a commodity trading advisor and is a principal of Moore Capital Advisors.  MCM is the successor in interest to Moore Capital Management LLC.

28.     Defendant Moore Capital Management, LLC ("MCM LLC") is a Delaware limited liability company.  MCM LLC was registered with the CFTC as commodity trading advisor during the Class Period.  Defendant Pia was an employee of MCM, LLC during the Class Period.

29.     Defendant Moore Capital Advisors, LLC is a Delaware limited liability company with headquarters at 1251 Avenue of the Americas, New York, New York.  Moore Capital Advisors is a registered commodity pool operator ("CPO") and commodity trading advisor ("CTA").  Moore Capital Advisors, along with Moore Advisors, served as the co-general partner of the Moore Macro Fund, DP and the Moore Global Fixed Income Master Fund, LP.

30.     Defendant Moore Advisors, Ltd. ("MA") is a Bahamian company.  Moore Advisors is a commodity pool operator registered with the CFTC.  Moore Advisors, along with Moore Capital Advisors, served as the co-general partner of Defendants Moore Macro Fund, DP and the Moore Global Fixed Income Master Fund, LP.

31.     (a) Defendant Christopher Pia is a resident of Greenwich, Connecticut.  During the Class Period, Defendant Pia was a portfolio manager for Defendant Moore Capital Management and a close adviser to its founder and head, Louis Bacon.  Pia also was or had been the head of the execution desk of the Moore Defendants.  This gave Defendant Pia great influence over brokers and futures commissions merchants such as Defendant MF Global Inc.  Defendant Pia had also been a successful trader for over a decade at Moore Capital.

(b) Given the convenient lack of compliance procedures and the absence of procedures designed to prevent detection of wrongdoing at the Moore Defendants (see ¶¶116-126 *infra*), employees of the Moore Defendants feared for their jobs if they reported manipulative trades to others in the firm.

(c) The CFTC Order (Ex. A hereto) found and held that, because Defendant Pia intended to inflate prices and was a person acting on behalf of the Moore Capital Defendants (or, in the instance of the legal predecessor to MCM), each Moore Capital Defendant violated Section 9(a)(2) of the CEA which prohibits persons from manipulating or attempting to manipulate prices of commodity futures contracts. CFTC Order p. 5 fn. 3. The CFTC Order characterized the Moore Capital Defendants' liability for the actions of Defendant Pia as follows. Defendant Pia (who is referred to in the CFTC Order as the "Former PM") "...acted as their employee and/or agent in trading on behalf of Moore Capital Funds. Under Section 2(a)(l)(B) of the Act, 7 U.S.C.§ 2(a)(I)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2009), the act, omission, or failure of any official, agent or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation or trust."

32.     Defendant Moore Macro Fund, LP is an investment fund organized under the securities laws of the Bahamas. It made, paid for and financed the manipulative trades. Moore Macro Fund, LP acted through its agent and co-general partners Moore Advisors, Ltd and Moore Capital Advisors. Also, the Moore Capital Defendants, through Defendant Pia and various other employees, acted as agent and otherwise as persons acting on behalf of Defendant Moore Macro Fund, LP to make for it part of the blatantly manipulative NYMEX platinum and palladium futures "bang the close" purchases alleged herein. See CFTC Order p. 3.

33.     Defendant Moore Global Fixed Income Master Fund, LP is an investment fund organized under the securities laws of the Bahamas. It made, paid for and financed the manipulative trades. Defendant Moore Global Fixed Income Master Fund LP acted through its agent and co-general partners Moore Advisors Ltd and Moore Capital Advisors. Also, the

Moore Defendants, through Defendant Pia and various other persons, acted as agent and otherwise as persons acting on behalf of Moore Global Fixed Income Master Fund, LP to make for it the remainder of the manipulative "bang the close" purchases of the NYMEX platinum and palladium futures alleged herein.  See CFTC Order at p. 3.  Defendants Moore Macro Fund, LP and Moore Global Fixed Income Master Fund, LP are sometimes hereinafter collectively referred to as the "Moore Funds."  Defendants Moore Capital Management LP, Moore Capital Management, LLC, Moore Capital Advisors, LLC, Moore Advisors, Ltd, Christopher Pia, Moore Macro Fund, LP and Moore Macro Fund, LP are collectively referred to herein as the "Moore Defendants."  Defendants Moore Capital Management LP, Moore Capital Management, LLC, Moore Capital Advisors, LLC, Moore Advisors, Ltd and Christopher Pia are collectively referred to herein as the "Moore Capital Defendants."

34.     (a) Defendant MF Global, Inc. ("MF Global") is a financial derivatives broker. Defendant MF Global's headquarters is located in this District at 717 Fifth Avenue, New York, New York 10022.  MF Global was the Moore Defendants' futures commission merchant ("FCM").

(b)  An FCM is a registered brokerage firm with the CFTC and the self-regulatory organization.  As such, an FCM solicits or accepts orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any exchange and accepts payment from or extends credit to those persons whose orders are accepted.

(c)  MF Global was the FCM which carried the Moore Defendants' accounts, accepted and entered their manipulative trades, and otherwise assisted the Moore Defendants. MF Global was a clearing member of the NYMEX throughout the Class Period but MF Global has represented to Plaintiffs that it did not, also, act as the NYMEX clearing member for the

Moore Defendants.

**Co-Conspirators**

35.     The CFTC investigation that led to the $25,000,000 fine referenced in Exhibit A hereto, is still ongoing.

36.     Certain individuals, financial institutions, and other entities who are not named as defendants in this action also participated as co-conspirators in the violations alleged and performed acts and made statements during and in furtherance thereof.

37.     Defendants' co-conspirators include, among others, entities and individuals who assisted defendants in the manipulative trading alleged herein during the Class period, as well as individuals who exercised actual, implied or apparent decision-making authority on behalf of those entities and other individuals.

38.     The acts charged herein as having been performed by defendants and their co-conspirators were authorized, ordered, or performed by their directors, officers, agents employees, or representatives, while engaged in their employment or business duties and acting within the scope of their actual, implied or apparent authority.

## BACKGROUND

39.     A person may act as a futures contract exchange or board of trade only if that person is approved and designated to do so by the CFTC.   The CFTC approves such a designation only if the proposed exchange sufficiently demonstrates (a) that it has rules, such as position limit rules, to prevent price manipulation, and (b) that it has procedures to enforce such anti-manipulation rules.

40.     The NYMEX is designated by the CFTC as a board of trade.   NYMEX is the world's largest physical commodity futures exchange.

41.     The NYMEX applies to the CFTC for permission to trade each commodity in which the NYMEX offers a contract. The NYMEX must establish, among other things, that the proposed contract is not prone to price manipulation in order to win approval to trade such contract. NYMEX members and clearing members have to follow the rules of the NYMEX. This includes the most important rules, the rules prohibiting manipulation.

42.     Also, commodity futures professionals licensed as associated persons, futures commissions merchants, commodity trading advisors, and commodity pool operators are required to be familiar with CFTC and exchange requirements. This includes the most important requirements, those prohibiting price manipulation.

43.     A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity. See *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.) ("*Leist*") aff'd, *Merrill Lynch Fenner & Smith v. Curran*, 456 U.S. 353, 384-85 (1982). In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.

44.     The "bilateral" aspect of the futures contract is that there is a seller and buyer. *Leist*, 638 F.2d at 322.

45.     The sellers are one-half of the bilateral futures contract and one-half of the commodity futures market. *Id.* They are referred to as "shorts." *Id.*

46.     The buyers are the other one-half, and are referred to as "longs." *Id.*

47.     One of the many differences between stock and commodity futures trading is that the commodity exchange (here, the NYMEX) publishes the amount of the open interest of "longs" and "shorts" at the end of each trading day.

48.     Open interest is defined as the total number of futures contracts in a delivery month or market that has been entered into and not yet offset or cancelled.  Each open transaction has a buyer (a long) and a seller (a short).

49.     All things equal, buying pressure in a commodity futures contract will increase prices and selling pressure will decrease prices.

50.     Because the prices are publicly reported, the increased or decreased prices resulting from buying pressure or selling pressure may encourage others to act accordingly.  For example, buying pressure may increase prices and induce members of the public to buy as well.

**NYMEX Palladium and Platinum Futures Contracts**

**A.     Palladium**

51.     One of the futures contracts created by the NYMEX and approved by the CFTC is the NYMEX palladium futures contract.

52.     Palladium is a silver-white metallic element in the so called platinum group metals ("PGM").

53.     Palladium futures contracts are transacted electronically on the Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms and also through open outcry at the NYMEX in New York.  Globex is an electronic trading platform owned by the NYMEX's parent company, the CME Group.  Open outcry is a method of public auction for making bids and offers in the trading pits of futures exchanges.

54.     The size of a NYMEX palladium futures contract is 100 troy ounces.

55.     NYMEX palladium futures contracts call for settlement by physical delivery. Palladium delivered under this contract must be a minimum of 99.95% pure.

56.     During each calendar month (the "current calendar month"), the Exchange will make available for trading contracts that provide for delivery of Palladium in the following months: 1) the current calendar month; 2) the first calendar month following the current calendar month; 3) the second calendar month following the current calendar month; and 4) each March, June, September and December during the period beginning with the first calendar month following the current calendar month through the 15th calendar month following the current calendar month.

57.     Trading in palladium futures contracts terminates on the third to last business day of the delivery month.

58.     The settlement prices for palladium futures contracts are calculated based on the volume-weighted average price of all transactions conducted both on the trading floor of the NYMEX and on Globex, during the two-minute closing period.  The closing period for the palladium futures contract is from 12:58 p.m. to 1:00 p.m.

59.     Trading in NYMEX palladium futures contracts is subject to the rules and regulations of the NYMEX, and prices are quoted per troy ounce.  Typically—as was the case with palladium futures during the Class Period—the prices for different expirations of futures contracts in the same commodity are chained together by arbitrage and so-called spread trading. Thus, if one contract increases significantly in price it will cause other contracts to also increase in price (though not always by the exact same amount).  This was true of palladium futures contract prices during the Class Period.

**B.     Platinum**

60.     Another futures contract created by the NYMEX and approved by the CFTC is the NYMEX platinum futures contract.

61.     Platinum is a grey-white metallic element and is one of the platinum group metals ("PGM").

62.     Platinum futures contracts transact electronically on the CME Globex and CME ClearPort trading platforms and also through open outcry at the NYMEX in New York.

63.     The size of a NYMEX platinum futures contract is 50 troy ounces.

64.     NYMEX platinum futures contracts call for settlement by physical delivery. Platinum delivered under this contract must be a minimum of 99.95% pure.

65.     During each calendar month (the "current calendar month"), the Exchange will make available for trading contracts that provide for delivery of Platinum in the following months: 1) the current calendar month; 2) the first calendar month following the current calendar month; 3) the second calendar month following the current calendar month; and 4) each January, April, July and October during the period beginning with the first calendar month following the current calendar month through the 15th calendar month following the current calendar month.

66.     Trading in platinum futures contracts terminates on the third to last business day of the delivery month.

67.     The settlement prices for platinum futures contracts are calculated based on the volume-weighted average price of all transactions conducted both on the trading floor of the NYMEX and on Globex, during the two-minute closing period.  The closing period for the platinum futures contract is from 1:03 p.m. to 1:05 p.m.

68.     Trading in NYMEX platinum futures contracts is subject to the rules and regulations of the NYMEX, and prices are quoted per troy ounce.  Typically—as was the case with platinum futures during the Class Period—the prices for different expirations of futures contracts in the same commodity are chained together by arbitrage and so-called spread trading.

Thus, if one contract increases significantly in price it will cause other contracts to also increase in price (though not always by the exact same amount). This was true of NYMEX platinum futures contract during the Class Period.

69.     Platinum and palladium are both platinum group metals. Both are used in catalytic converters to cause changes in the emissions from internal combustion engines into gases that are more benign for the ozone layer and environment. Both metals are also used for jewelry. The prices of NYMEX platinum futures contracts can, and did during the Class Period, influence the prices of NYMEX palladium futures contracts and *vice versa*.

**The Palladium and Platinum Cash or Spot Market**

70.     The cash market for metals such as platinum and palladium also is called the "spot market." It is called the spot market because transactions take place instantaneously on the posted price, or the on the "spot."

71.     The Physical Plaintiffs' purchases were based on the New York cash, or "spot," market, plus a small transaction fee, typically 1.5% of the order. According to NYMEX, it is the "benchmark" for the metals "asset class," including platinum and palladium, the two metals Moore manipulated with its unlawful trades.

72.     NYMEX claims its superior "liquidity" translates into "tight bid-ask spreads and high-quality trade executions" in the metals market, helping customers' "business and risk management objectives."

73.     A review of the transaction histories in spot and futures prices, for both metals, confirms spot prices correlate directly with futures prices.



Palladium confirms the futures and spot price market link:



74.     A similar correlation is seen when comparing future vs. spot prices during the Class period.  See Exhibit B attached hereto.

## SUBSTANTIVE ALLEGATIONS

75.     Provided that there is no price manipulation, the prices produced by futures contract trading serve three legitimizing functions:  (1) price discovery, (2) efficient and fair risk

transfer (also known as hedging), and (3) reduction in price volatility. *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1173 (8th Cir. 1971).

76.     But price manipulation destroys all three legitimizing functions of commodity futures trading. *Id.* Indeed, specific price manipulations in the past have even destroyed or greatly impaired various commodity exchanges and specific commodity futures contracts.

77.     The NYMEX palladium and platinum futures markets are not large futures markets, are relatively "illiquid," and are relatively "thin depth" markets. That is, both the amount of actual trading is low and the amount of potential trading is low in these markets.

78.     Accordingly, relative to many other futures contracts, the NYMEX platinum and palladium futures contracts were extremely susceptible to a trade manipulation. A trade manipulation is a manipulation by the entry of manipulative trades.

79.     During the Class Period, the Moore Defendants, through their agents and other persons acting on their behalf (including Defendants Pia and MF Global), intentionally took advantage of the foregoing extreme susceptibility to a trade manipulation of NYMEX platinum and palladium futures contracts.

80.     Defendants Moore Capital LLC, Moore Capital Management, LP, Moore Capital Advisors, LLC and Moore Advisors, Ltd., paid $25,000,000 and agreed to extensive prohibitory and mandatory injunctive relief in order to negotiate a settlement of CFTC charges. See Ex. A pp. 2-3, 6-9.

81.     These charges involved what the CFTC found to be a "manipulative scheme" in NYMEX platinum and palladium futures contracts traded in this District during the period of "**at least** November 2007 **through** May 2008." [Emphasis supplied]. Based on the foregoing "at

18

least" language and other information, Plaintiffs have expanded the Class Period to begin slightly earlier, on October 25, and end slightly later, on June 6, than the CFTC time brackets.

82.     The CFTC Order found that, in this "manipulative scheme," the Moore Defendants' portfolio manager and agent (who, in fact, was Defendant Pia) "engaged in an unlawful, blatantly manipulative scheme known as 'banging the close'" (Ex. A. at pp. 2-3) as a result of which the Moore Capital Defendants violated Section 9(a)(2) of the CEA.  CFTC Order p. 1.

83.     As the CFTC's holding that the Moore Capital Defendants violated Section 9(a)(2) shows, in devising, entering or causing others to enter these "bang the close" orders, Defendant Pia was, in fact, an employee, agent and other person acting on behalf of each of the Moore Defendants.

84.     Specifically, the CFTC found that Defendant Pia caused "market on close". ("MOC") buy orders to be executed during the last ten seconds of trading in the NYMEX platinum and palladium futures contracts trading pit in order to move prices, including the settlement prices, higher.  Market on close and "MOC" orders mean that they are to be executed during the closing times. Again, the closing period for trading NYMEX palladium futures contract is 12:58 pm to 1:00 pm and for NYMEX platinum futures contracts is from 1:03 pm to 1:05 pm.

85.     (a) Indeed, the CFTC found that Defendants (per Defendant Pia or other of their employees or persons acting on Defendants behalf) "often" accompanied these "bang the close" MOC buy orders with instructions or requests that the orders be executed so as to cause prices to increase.  Ex. A at p. 3.  ("The Former PM [Defendant Pia] or his execution clerk routinely submitted MOC buy orders in platinum and [palladium] futures to the AP through Instant

Messages ("IMs"), among other means.  The Former PM often placed MOC orders with the FCM's AP with directions that indicated that he wanted to push the settlement prices higher").

(b) Ordinarily, traders seek to buy for the cheapest and sell for the highest price. Trying to buy at high prices and in order to cause higher prices is highly unusual, uneconomic, and blatantly manipulative.

(c) By trading in this manner, Defendants intentionally caused the prices at which the MOC orders were executed, to be artificially high.

86.    Importantly, the CFTC repeatedly found that these manipulative "bang the close" trades were engaged in "frequently." *E.g.* CFTC Order p. 2 (engaged in "frequently throughout the Relevant Period"); p. 3 ("frequently engaged"); see also p. 3 ("often"; "routinely").

87.    So frequent was Defendants' manipulative "banging the close" practice that the CFTC further found that such practice took on institutional aspects as follows:

     a.  Defendants' Market on Close ("MOC") BUY orders "generally" ranged from "20 to 100 contracts."

     b.  Defendants "routinely" submitted the MOC buy orders through instant messages, "among other means." Ex. A, CFTC Order p. 3.

     c.  These written instructions "often" included directions or requests that indicated that Defendants wanted to push the NYMEX platinum and palladium futures prices, including the settlement price higher.  CFTC Order p. 3.

     d.  Defendants, through their agents (including Defendant Pia or, at the direction of Defendant Pia, through Defendants' order entry personnel), intentionally gave such orders to Defendants' FCM, Defendant MF

Global, Inc., and its then associated person ("AP") Joseph Welsh.  An AP is a registered person who is similar to a registered representative in securities.

e.  Pursuant to the instructions of the Moore Defendants, MF Global, through Mr. Welsh and others, purposely waited until the last 10 seconds of the closing period of NYMEX platinum and palladium futures trading to "place" or "enter" Defendants' orders with floor personal.

f.  Defendant MF Global, through Mr. Welsh and others, acted as Defendants' agent in entering its orders to the NYMEX floor for execution during the last ten seconds or last moments of trading in NYMEX platinum and palladium futures contracts.  CFTC Order pp. 4.

88.  In the foregoing manner, Defendants intentionally gave such very large buy orders "MOC" in the amount of 20-100 contracts in repeated instances during the Class Period in order to exert maximum upward impact on NYMEX palladium and platinum futures prices.

89.  Indeed, these orders were "often" placed through instant messages ("IMs") between Defendants (per their portfolio managers, including Defendant Pia) and their FCM which express made clear that the MOC orders should be executed so as to push prices higher.

90.  Although the legal charges that the Moore Defendants negotiated to be settled in the CFTC Order were described as **attempted** manipulation (*Id.* p. 4), the CFTC Order conspicuously fails to provide that there was no effect of the "frequent" large "bang the close" trades on prices.  Ex A *passim.*

91.     On the contrary, the CFTC Order takes pains expressly to make further findings that demonstrate Defendants did, in fact, succeed in manipulating NYMEX platinum and palladium prices higher through their "bang the close" trades.

(a)     First, the CFTC Order found that, relative to the low amount of trading and "thin" amount of market depth that were available in the NYMEX platinum and palladium futures contracts markets, the Defendants' typical bang the close trade was a "large" trade. Ex. A, CFTC Order p. 3.

(b)     Second, the CFTC Order also expressly found that Defendants' MOC orders "typically" constituted a "significant percentage of the volume of trading on the close" in the NYMEX palladium and platinum futures contracts. *Id.*

(c)     In such circumstances, buy orders of 20-100 contracts easily had the ability to cause artificially inflated NYMEX palladium and platinum futures contract prices, including artificially inflated settlement prices, for such contracts.

(d)     Third, the CFTC Order repeatedly found that these "bang the close" trades were engaged in "frequently." This clearly implies—and Plaintiffs allege—that Defendant Pia knew that the bang the close trades were not futile acts. Rather, the repeated acts of Defendants, including Defendant MF Global, in "cutting it close" and waiting until the last ten seconds of trading, were successful in furthering and accomplishing the manipulative scheme by artificially inflating NYMEX platinum and palladium futures contract prices.

(e)     Fourth, the $25,000,000 fine imposed by the CFTC is the third largest fine (or so called "civil monetary penalty") imposed by the CFTC for a manipulation case in the last ten years; the extensive injunctive relief here may be, to a large extent, unprecedented.

(f)      Fifth, the CFTC expressly found that these large "bang the close" orders were not only entered but were also executed.  CFTC Order p. 3 ("The Former PM's MOC buy orders **executed** on the floor during the close generally ranged from 20 to 100 contracts...") [emphasis supplied].

92.      Separately, even a single large buy order can have a long term upward impact on prices. *E,g,* Robert E. Holthausen, Richard Leftwich and David Mayers, *The Effects of Large Block Transactions on Security Prices: A Cross-Sectional Analysis,* 19 J. OF FIN. ECON. 237, 240 (1987) ("Block transactions have permanent price effects if trades convey information, even if there are sufficient close substitutes to produce perfectly elastic excess demand curves."); Myron Scholes, *The Market for Securities:  Substitution Versus Price Pressure and the Effects of Information on Share Prices,* 2 J. OF BUSINESS 179, 193-94 (1972); Andrei Shleifer, *Do Demand Curves Slope Down?,* J. OF FINANCE 579, 580-582 (1986).

93.      Typically, the upward effects on prices of a large buy order do stay in the market for substantially longer than the downward effect on prices of a large sell order. *Id.*

94.      Here, the upward artificial effect of Defendants' frequent large "bang the close" trades clearly did stay in the market for an extended period.  By repeatedly entering such large buy orders in very illiquid futures contracts at the end of trading, Defendants, through their agents, intentionally caused the prices at which they transacted NYMEX platinum and palladium futures contracts to be artificially higher than they otherwise would have been.  See ¶¶58, 67 *supra* (settlement prices of platinum and palladium futures contracts are calculated as a volume-weighted average).

95.      But Defendants' blatantly manipulative trades were not merely large buy trades. They were also large "bang the close" trades that impacted the closing price.  By intentionally

paying and buying at a high price, the Moore Defendants also directly and automatically caused the closing or settlement price to be higher than it otherwise would have been. This is because the closing or settlement price is a volume-weighted average price. By uneconomically calculating and making their buy transaction at a higher price rather than at the cheapest available prices, the Moore Defendants automatically and necessarily caused uneconomic and manipulative increases in such volume-weighted average price to higher levels than economic behavior would have produced.

96.   Second, by making their "bang the close" transactions in the NYMEX floor market, which was a thinner market, Defendants further increased the price at which they purchased their NYMEX palladium or palladium futures contracts. This automatically increased the upward effect on the volume weighted average price of their manipulative trades.

97.   (a) Third, so frequent and large were Defendants' "bang the close" trades that they not only caused NYMEX closing prices to be higher than they would have been but for the manipulation.

(b) Defendants' "bang the close" trades also caused NYMEX floor prices to increase on an absolute level during the two minute closing period relative to the price immediately preceding such two minute period.

(c) In fact, NYMEX floor prices increased during the two minute closing period by one-third more frequently during the Class Period than after the Class Period. A substantial cause of this greater frequency of price increases was the Moore Defendants' manipulative scheme and "frequent" large "bang the close" trades. This greater frequency of increases of prices in the NYMEX pit trading during the final two minutes is not explainable by general price trends or changes in such price trends.

(d) In the absence of discovery, the records of the Defendants' trading are in the exclusive possession of Defendants and the Government, and Plaintiffs cannot specify further particulars except as follows.

(e)     Orders and executions of 20 – 100 contracts are apparently very large for the floor market of the NYMEX platinum and palladium futures contracts.

98.     Defendants' upward manipulation of, first, the NYMEX platinum and palladium contract prices at which they transacted and, second, the resulting NYMEX closing or settlement prices did cause and create positive feedback loops of artificial price increases. For example, as previously alleged, large buy trades have a longer impact on prices than large sell trades. Second, settlement prices of the NYMEX platinum and palladium futures contracts were used, as Defendants well knew, by the market as the most important price information of each day. By repeatedly manipulating the closing or settling prices higher, Defendants unlawfully and repeatedly sent a price beacon signal in favor of artificially high prices, and against and contrary to natural prices.

99.     Third, for another example, as Defendants also well knew, there is a daily mark-to-market computation of a commodity futures trader's so-called equity or margin position based upon the daily closing or settling prices. If the prices move sufficiently against the trader's position as of the close, then more "margin" deposits must be made. But if prices move sufficiently in favor of the position, then variation margin is paid to the trader, which increases the trader's buying power.

100.    Thus, by consistently and repeatedly manipulating the NYMEX settlement prices upwards in NYMEX platinum and palladium futures contracts, Defendants caused artificially inflated NYMEX prices (a) through Defendants' "large" buy trades themselves, (b) through the

25

long impact on prices these large buy trades had, (c) through the inclusion of those large buy trades in the volume-weighted average settlement price, (d) through the resulting inflated representations and reports of an artificially inflated and manipulated price to the public, as though it were a normal price, and (e) through the trading margin impacts that, effectively, altered the conduct of every other participant in the market by giving those participants with a "buy" opinion more buying power and those with a "sell" opinion less selling power.

101. Defendants' manipulative acts and their concussive effect on prices were not disclosed publicly to the market during the Class Period or otherwise until on or about April 29, 2010, when the CFTC settlement was made public.

102. As a result of all the foregoing, Defendants' frequent large manipulative "bang the close" trades caused NYMEX platinum and palladium prices to be artificially high during the Class Period.

103. Separately, Defendants caused NYMEX platinum and palladium futures contracts to be artificially high as examined through other measures or respects during the Class Period.

104. NYMEX platinum futures contracts prices increased to all-time record levels during the Class Period. For example, between October 26, 2007 and March 5, 2008, there were 89 trading days in NYMEX platinum futures contracts. Such contracts set new all-time record highs on 28 of those trading days. Thereby, NYMEX platinum futures contracts rapidly increased from an all-time record high of $1472.10 per ounce on October 26, 2007 to the 28th all-time record high made during the Class Period, which occurred on March 5, 2008, of $2276.10 per ounce. This was an increase of almost 55%.

105. The fundamentals of the supply and demand for platinum did not warrant such dramatic increases. For the first time in numerous years, the platinum market entered 2007 with

a surplus and, as 2007 progressed, the deficit projected between current consumption and current production was less than that of various prior years. Moreover, such deficit was far less than the inventories of platinum held in Switzerland and other locations.

106.    Confirming that the extraordinarily high NYMEX platinum futures prices were not justified by supply and demand and were artificial during the Class Period, NYMEX platinum futures contract prices thereafter plummeted to under $1400 by August 19, 2008 and $957 per ounce by October 3, 2008.



107.    As highly unusual and artificial as the NYMEX platinum futures contract price behavior was, the NYMEX palladium futures contract price behavior was as or almost as artificial.

108.    In October 2007, there was already held a very substantial existing excess supply overhang of palladium of in excess of 6,000,000-8,000,000 ounces.  This was approximately equal to or 33 1/3 % in excess of a year's consumption of palladium.

109.    Further, during 2007-2008, there was projected to be (and the projections were realized) an additional 25% excess of new production of palladium over the consumption needs.

110.    As the excess palladium supply overhang grew during the Class Period, NYMEX palladium futures prices should have declined during the Class Period.

111.    However, NYMEX palladium futures contract prices did not decline.  Rather, such prices closed, prior to the start of the Class Period on October 25, 2007, at $369.50 per ounce.

112.    During the Class Period, NYMEX palladium futures prices rapidly increased to a six-year high on February 28, 2008 of $585.25 per ounce, an increase of 57%.

113.    Because these price increases were wholly unjustified by supply and demand, the artificially high NYMEX palladium futures prices thereafter quickly plummeted to $300 per ounce by August 19, 2008, $201.85 on October 3, 2008 and $162.10 on December 5, 2008.



114.    In all the circumstances, the increases in NYMEX platinum and palladium futures contract prices during the Class Period were unjustified by the fundamentals, were artificial, and were in one substantial part caused by Defendants' manipulative scheme to make frequent, large "bang the close" trades.

115.    By reason of the foregoing, the Moore Defendants, through Defendant Pia and other employees, and Defendant MF Global, through Joseph Welsh and other employees, specifically intended to and did cause NYMEX palladium and platinum futures contract prices, to be artificially high during the Class Period.

116.    During the Class Period, the Moore Capital Defendants had, as is reflected in the CFTC Order at pp. 6-9, an unusual absence of any compliance procedures and an unusual culture to prevent detection of wrong doing.

117.    The Moore Capital Defendants pre-programmed their electronic systems in order to automatically erase e-mail communication within two weeks (or, at the longest, three weeks) after the date of each email.  The Moore Capital Defendants scanned for and deleted Outlook and .pst folders in order to ensure that no one could keep company emails for longer than the two-week period.

118.    This rapid and systematic deletion of emails was a highly uncommon practice among financial firms.

119.    Dovetailing with this unusual practice, the CFTC Order requires the Moore Capital Defendants to preserve and maintain records of communications for "at least two (2) years, unless otherwise required to be maintained for five (5) years pursuant to Regulation 1.31." CFTC Order pp. 8-9.  Moreover, the CFTC Order also required the Moore Capital Defendants to record the telephonic conversations concerning orders and preserve the audio tapes for at least six months. *Id.* p. 9 #6.

120.    Since 2007, the Moore Capital brand has been subject to various allegations or findings of unlawful conduct in the markets including, but not limited to:

> a.  The CFTC settled charges that Moore Capital Management, LP, Moore Capital Advisors, LLC, and Moore Advisors, Ltd., attempted to manipulate the settlement prices of platinum and palladium futures contracts on the NYMEX, and failed to diligently supervise the handling of MCM's commodity interest business.

b.  In September 2008, Steven Harrison, a former top Moore Capital Trader in London paid a £52,500 fine as well as agreeing not to work as a trader or fund manager for 12 months to settle a "market abuse" investigation by British regulators. The Financial Services Authority found Harrison had received inside information before telling another trader to buy Rhodia SA corporate bonds.

c.  In March 2010, Julian Rifat, a London based trader with Moore Capital Management LLC was arrested by UK authorities as part of a crackdown on insider trading.

d.  Twice in the past two years, female employees working in Moore Capital's New York office sued in federal court, charging the firm and some of its executives with employment discrimination. Both suits were settled out of court.

121.   Thus, the Moore Defendants' employees who were aware of the manipulative trades during the Class Period were afraid to mention same for fear of losing their jobs. CFTC Order p. 4 ("...an execution clerk was concerned about the Former PM's [Defendant Pia] trading on the close but failed to bring his concerns to compliance because he felt intimidated by the Former PM's aggressive management style").

122.   Regardless of whether the persons at the Moore Defendants who were actually committing the frequent "band the close" orders reported them to anyone, even the most rudimentary compliance system would have spit out as exceptions the repeated "bang the close" trades entered near or at the close of trading.

123.    This would have occurred within two weeks or one month of the start of such practice. Only by intentionally failing to have the most rudimentary compliance and trade monitoring system in place, could the Moore Defendants avoid automatic and actual knowledge of these frequent large "bang the close" trades.

124.    The rudimentary compliance system that the Moore Defendants intentionally avoided installing would not have allowed such blatantly manipulative trades to continue for more than a one month period (let alone for a seven-plus month period).

125.    Even the absence of such a rudimentary compliance system does not mean that the Moore Defendants were not actually aware of or lacked actual knowledge of Defendants' manipulative scheme.    On the contrary, such blatantly manipulative trades were entered "frequently" and were "often" accompanied by written or other instructions to push prices higher in two different futures contracts over a very extensive period.    Therefore, it is very likely that the top executives of the Moore Defendants actually knew of these trades regardless of whether other employees of the Moore Defendants did or did not actually tell the top executives.

126.    Indeed, the blatantly manipulative scheme alleged here, could not have continued for so long unless the Moore Defendants and the Moore Fund Defendants specifically intended it to.

127.    Defendant Moore Macro Fund, LP and Defendant Moore Global Fixed Income Master Fund, LP (collectively "Moore Funds") were at all relevant times controlled and managed by the Moore Defendants.    Again:

      a.    Defendant MCM and Defendant MA served as the co-general partners of the Moore Funds;

      b.   Defendant MCA and Defendant MA acted as the commodity pool operators (or CPOs) for the Moore Funds; and

      c.   Defendant MCM was the trading advisor for the Moore Funds.

128.   As agents of the Moore Funds, the Moore Defendants, Defendant Pia and various other persons caused those funds to make the manipulative large "bang the close" trades in platinum and palladium futures trades detailed herein.

129.   The intent of the Moore Defendants and Defendant Pia is imputed to Defendant Moore Macro Fund, LP and Defendant Moore Global Fixed Income Master Fund, LP.

130.   Further, the Moore Funds were the persons actually making the NYMEX trades, actually holding the NYMEX positions, and actually paying for and financing such manipulation. They were the persons that stood to benefit from their frequent large "bang the close" trades.

131.   The Moore Funds knew that the Moore Defendants and Defendant Pia were engaged in a long term manipulative scheme to manipulate NYMEX platinum and palladium futures contract prices by causing such funds to repeatedly make large manipulative "bang the close" trades.

132.   By acting over a long period of seven-plus months as the purchaser of and making these large, frequent manipulative trades, the Moore Funds intended and ratified the Moore Defendants' and Defendant Pia's objective and specific intent to manipulate the NYMEX platinum and palladium futures prices higher.

133.   Thereby, the Moore Funds knowingly participated in or aided and abetted the Moore Defendants' and Defendant Pia's manipulation, willfully intended to assist the manipulation, and had the motive and intent to cause the artificial prices.

134.   In order to make their blatantly manipulative "bang the close" trades in NYMEX platinum and palladium futures alleged herein, the Moore Defendants had to enter through trades to the NYMEX through an FCM or otherwise.   Defendant MF Global was the requested FCM that accepted and entered all of Moore's manipulative orders for the purchase of NYMEX platinum and palladium futures contracts.

135.   Funds typically use more than one FCM to execute their trades.   This includes using more than one FCM when making significant amounts of trades in the same or similar futures contracts.   Such use of multiple FCMs can help prevent any one broker from being aware of the firm's trading strategy.   Also, it incentivizes good executions. This occurs both through competition and the increased ability of the fund to check with other brokers on the executions compared to the contemporaneous prices and other information relating to execution quality.

136.   In contrast to this standard practice to use multiple FCMs, the Moore Defendants put all of their manipulative orders through the same registered FCM and broker, Defendant MF Global.   This departure from standard practice afforded more revenues to MF Global. Reciprocally, it limited to only one firm, MF Global, the risk that an FCM would report the Moore Defendants for doing manipulative trades.   FCMs and exchange members have a duty not to assist their customers in unlawful conduct and to report such unlawful conduct.

137.   Receiving the revenues on all of the Moore Capital Defendants' frequent, large manipulative trades in both the NYMEX platinum and palladium futures contracts was not the sole non-standard financial benefit that was actually and potentially received by Defendant MF Global.   As previously alleged, Defendant Pia had long controlled or strongly influenced who received the brokerage business from Moore Capital.   Defendant Pia was in a real or apparent

34

position to provide more business to MF Global if the Moore Defendants' manipulative instructions and manipulative trades were followed by MF Global.

138.    Executing trades to push prices up is not a normal broker service.  In fact, it is a highly unusual and clearly unlawful service.  MF Global had actual knowledge that the Moore Capital Defendants' trades previously alleged herein, were intended to push prices higher.  This knowledge, in one part, came from the Moore Capital Defendants' repeated express instructions to Defendant MF Global, through MF Global's then employee Mr. Welsh and others, to enter and execute the orders to as push prices higher.

139.    With such knowledge, Defendant MF Global, per Mr. Welsh and others, purposely did so, including by waiting until the last 10 seconds of trading to enter the orders.

140.    Thus, Defendant MF Global provided extraordinary assistance to the Moore Defendants by repeatedly entering and executing these highly manipulative "bang the close" trades.  Even more unusual, MF Global repeatedly did so even after being "often" told in writing and otherwise by the Moore Defendants to execute such trades so as to inflate prices.

141.    Standard practice among FCMs and clearing members was to refuse enter, to execute or to forward for execution manipulative trades.  Indeed, NYMEX rules and federal law prohibited such trades.

142.    But MF Global knowingly and willfully associated itself with the manipulative scheme and provided extraordinary assistance to that scheme and the manipulative trades.  It did so by repeatedly and knowingly entering and executing or forwarding for execution over a long time period such blatantly manipulative trades.  This included when the written or other instructions accompanying such trades directed that the "buys" were to be made uneconomically, i.e., intentionally so as to cause higher prices.

143.    The Futures Plaintiffs originally filed this action on April 30, 2010. This was within the two years of learning of these claims and, also, within two years of the end of the unlawful conduct.

144.    As a direct, foreseeable and proximate result of Defendants' ongoing violation of Section 9(a) of the CEA, the Futures Plaintiffs and members of the Futures Sub-Class paid artificial prices, suffered losses and are entitled to recover actual damages under Section 22(a) of the CEA, 7.U.S.C. §25.

## SUB-CLASS 1:  FUTURES PLAINTIFFS' CLASS ALLEGATIONS

145.    Plaintiffs allege two separate so-called sub-classes herein.  The Futures Plaintiffs bring this action on behalf of themselves, and all others similarly situated, pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.  The Futures Sub-Class consists of:

> All persons or entities that purchased during the period from at least October 25, 2007 through at least June 6, 2008 ("Class Period") a palladium futures contract or a platinum futures contract traded on the NYMEX.[2]  Excluded from the Futures Sub-Class are the Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.

146.    The Futures Sub-Class is so numerous that joinder of all members is impracticable.  Due to the nature of the commerce involved, the members of the Futures Sub-Class are geographically dispersed throughout the United States.  The number and identity of Futures Sub-Class members is unknown to the Futures Plaintiffs, but can be ascertained from readily available information.  The Futures Plaintiffs believe that there are hundreds or perhaps thousands or more members of the Futures Sub-Class.

---

[2] The Futures Plaintiffs reserve their rights to amend the definition of the Class in the class motion or otherwise.

147.   Common questions of law and fact exist as to all members of the Futures Sub-Class and predominate over any questions solely affecting individual members of the Futures Sub-Class. Among the questions of law and fact common to the Futures Sub-Class are:

    a.   whether Defendants manipulated NYMEX palladium and/or platinum futures contracts in violation of the CEA;

    b.   whether Defendants are liable under CEA Section 2 (a)(1) or otherwise for such manipulation;

    c.   whether Defendants are liable for aiding and abetting such manipulation;

    d.   whether such manipulation caused NYMEX palladium and/or platinum futures contracts to be artificial;

    e.   whether such manipulation caused cognizable legal injury under the CEA;

    f.   whether such injury or the extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests; and

    g.   the operative time period and extent of Defendants' foregoing violations.

148.   The Futures Plaintiffs' claims are typical of the claims of the other members of the Futures Sub-Class they seek to represent. The Futures Plaintiffs and members of the Futures Sub-Class were injured by the same course of manipulative conduct and make the same legal claim.

149.   The Futures Plaintiffs will fully and adequately protect the interests of all members of the Class. The Futures Plaintiffs have retained counsel experienced in complex antitrust and commodity futures manipulation class actions. The Futures Plaintiff has no interests which are adverse to or in conflict with other members of the Futures Sub-Class.

150.    The questions of law and fact common to the members of the Futures Sub-Class predominate over any questions which may affect only individual members.

151.    A class action is superior to other available methods (if any) for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. The prosecution of separate actions by individual members of the Futures Sub-Class would impose heavy burdens upon the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Futures Sub-Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

152.    The interest of members of the Futures Sub-Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Futures Sub-Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The damages suffered by the individual Futures Sub-Class members may be relatively small; and therefore, the expense and burden of individual litigation make it virtually impossible for them to redress the wrongs done to them. The Futures Plaintiffs anticipate no difficulty in the management of this action as a class action.

### SUB-CLASS 2:  PHYSICAL PLAINTIFFS' CLASS ALLEGATIONS

153.    The Physical Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23. The Physical Sub-Class consists of:

> All persons and entities who purchased Class Commodities during the period October 25, 2007 through June 6, 2008 (the "Class Period").

> Excluded from the Physical Su-Class are defendants, their employees, affiliates and co-conspirators.[3]

154.    Thousands of transactions in physical platinum and palladium conforming to NYMEX delivery requirements occurred during the Class Period. The number of persons and entities who purchased and/or sold Class Commodities during the Class Period is in the hundreds and/or thousands, and those persons and entities are geographically dispersed. Thus, joinder is impracticable pursuant to Federal Rule of Civil Procedure 23(a)(1).

155.    Common issues of fact or law predominate over individual issues within the meaning of Federal Rule of Civil Procedure 23(a)(2).

156.    Common issues of law and fact include:

    a.    whether the manipulative activities in connection with the contract, combination and conspiracy alleged herein existed;

    b.    whether such unlawful activities had the result of creating artificial prices in Class Commodities; and, if so, to what extent prices were artificial;

    c.    whether defendants' conduct violated the antitrust laws; and

    d.    the sum of damages.

157.    The Physical Plaintiffs' interests are typical of, and not antagonistic to, the Physical Sub-Class's interests.

158.    The Physical Plaintiffs have retained competent counsel experienced with class actions and complex litigation including litigation under the antitrust and commodities laws and intend to vigorously prosecute this action.

---

[3] The Physical Plaintiffs reserve the right to amend or modify the class definition at the time of their motion for class certification.

159.   Common issues predominate. A class action is superior to all other methods for the fair and efficient adjudication of this controversy. Indeed, a class action is the only method by which the Physical Plaintiffs and the Physical Sub-Class can efficiently seek redress and obtain a uniform adjudication of their claims. The size of individual damages is small in comparison to the complexity and scope of the defendants' alleged manipulation and unlawful conduct.

160.   The Physical Sub-Class members' identities and their trades generally can be identified by members of the NYMEX clearing house and the futures brokers clearing through them and the records of dealers in physical platinum and palladium conforming to NYMEX delivery requirements (as well as the records of NYMEX concerning delivery made and taken).

161.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Physical Sub-Class members is impracticable. Further, as the damages suffered by most individual Physical Sub-Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for most Physical Sub-Class members individually to redress the wrongs done to them. There will be no significant difficulties in managing this action as a class action.

**Injury To Physical Plaintiffs**

162.   Defendants' anticompetitive market manipulation conduct has directly and proximately caused plaintiffs to suffer injury in their business and property.  The Physical Plaintiffs' injuries are of the type the antitrust laws were designed to prevent, and those injuries flow directly from the aspects of defendants' conduct rendering it unlawful.

163.   As a result of Defendants' market manipulation scheme, the Physical Plaintiffs have purchased and sold Class Commodities at artificial prices during the Class Period.