UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In Re: Platinum and Palladium Commodities Litigation*<br><br>This Document Relates To:<br><br>　All Actions | MASTER FILE<br>No. 10 Civ. 3617 (WHP) |

## NOTICE OF CONSTITUTIONAL QUESTION

　　Pursuant to Fed. R. Civ. P. 5.1(a), Defendants in the above-captioned action submit this Notice of Constitutional Question to the Attorney General of the United States. Defendants are challenging the constitutionality of the Commodities Exchange Act ("CEA"), 7 U.S.C. § 25(a)(1)(D).

### Statement of Question

　　The CEA's failure to define the term manipulation, specifically the absence of a definition of price artificiality, renders 7 U.S.C. § 25(a)(1)(D) constitutionally void for vagueness under the Fifth Amendment to the United States Constitution as applied to the conduct alleged against Defendants in the above-captioned action.

### Identification of Papers Raising Constitutional Questions

　　Pending before the Court at the time of this mailing is, *inter alia*, Defendants' Motion to Strike and Dismiss Plaintiffs' Second Amended Consolidated Complaint. This Motion, and the supporting Memorandum of Law in Support of Defendants' Motion to Strike and Dismiss the Second Amended Consolidated Complaint, are enclosed herein.

Dated: New York, New York
November 8, 2010

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP
David M. Zensky, Esq.
Jamison A. Diehl, Esq.
Peter I. Altman, Esq.
One Bryant Park
New York, New York 10036

*Counsel for Defendants Moore Capital
Management LP, Moore Capital Advisors, LLC,
Moore Advisors, Ltd., Moore Macro Fund, LP, and
Moore Global Fixed Income Master Fund, LP*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Jennifer L. Rochon, Esq.
Jade A. Burns, Esq.
1177 Avenue of the Americas
New York, New York 10036
*Counsel for Defendant Christopher L. Pia*

HERRICK, FEINSTEIN LLP
Therese M. Doherty, Esq.
Christopher Greeley, Esq.
2 Park Avenue
New York, New York 10016
*Counsel for Defendant MF Global Inc.*

## CERTIFICATE OF SERVICE

I, Jamison A. Diehl, hereby certify that on November 8, 2010, true and correct copies of the above document were served on the Attorney General of the United States at the address below and were filed electronically with the United States District Court for the Southern District of New York with notice of case activity to be generated and sent electronically by the Clerk of the Court to counsel for Plaintiffs at the addresses below.

By: _____
         Jamison A. Diehl, Esq.

Attorney General of the United States
Department of Justice
950 Pennsylvania Avenue, NW
Washington D.C. 20530

CC: All counsel of record

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In Re: Platinum and Palladium Commodities Litigation* | MASTER FILE No. 10 Civ. 3617 (WHP) |
| This Document Relates To: | |
| All Actions | |

## DEFENDANTS' NOTICE OF MOTION

PLEASE TAKE NOTICE THAT, upon the accompanying memorandum of law and

supporting declarations, as well as any prior pleadings, submissions and proceedings in this

matter, and any other pleadings, submissions and proceedings as shall be made in support of this

motion, Defendants Moore Capital Management LP, Moore Capital Advisors, LLC, Moore

Advisors, Ltd., Moore Macro Fund, LP, Moore Global Fixed Income Master Fund, LP,

Christopher L. Pia, and MF Global Inc. will move this Court before the Honorable William H.

Pauley III at the United States District Court for the Southern District of New York, located at

500 Pearl Street, New York, New York 10007 as soon as the Court may direct for an order

striking and dismissing Plaintiffs' Second Amended Consolidated Complaint.

Dated: New York, New York
November 5, 2010

By:   /s/ David M. Zensky

AKIN GUMP STRAUSS HAUER & FELD LLP
David M. Zensky, Esq.
Jamison A. Diehl, Esq.
Peter I. Altman, Esq.
One Bryant Park
New York, New York 10036

Paul B. Hewitt, Esq.
J. Brady Dugan, Esq.
1333 New Hampshire Avenue, NW
Washington, D.C. 20036
*Counsel for Defendants Moore Capital Management
LP, Moore Capital Advisors, LLC, Moore Advisors,
Ltd., Moore Macro Fund, LP, and Moore Global
Fixed Income Master Fund, LP*


By:   /s/  Jennifer L. Rochon

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Jennifer L. Rochon, Esq.
Jade A. Burns, Esq.
1177 Avenue of the Americas
New York, New York 10036
*Counsel for Defendant Christopher L. Pia*


By:   /s/  Therese M. Doherty

HERRICK, FEINSTEIN LLP
Therese M. Doherty, Esq.
LisaMarie F. Collins, Esq.
2 Park Avenue
New York, New York 10016
*Counsel for Defendant MF Global Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

*In Re: Platinum and Palladium Commodities Litigation*

This Document Relates To:

    All Actions

MASTER FILE
No. 10 Civ. 3617 (WHP)

---

# DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO STRIKE AND DISMISS
### THE SECOND AMENDED CONSOLIDATED COMPLAINT

AKIN GUMP STRAUSS HAUER & FELD LLP
David M. Zensky, Esq.
Jamison A. Diehl, Esq.
Peter I. Altman, Esq.
One Bryant Park
New York, New York 10036

Paul B. Hewitt, Esq.
J. Brady Dugan, Esq.
1333 New Hampshire Avenue, NW
Washington, D.C. 20036
*Counsel for Defendants Moore Capital Management
LP, Moore Capital Advisors, LLC, Moore Advisors,
Ltd., Moore Macro Fund, LP, and Moore Global
Fixed Income Master Fund, LP*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Jennifer L. Rochon, Esq.
Jade A. Burns, Esq.
1177 Avenue of the Americas
New York, New York 10036
*Counsel for Defendant Christopher L. Pia*

HERRICK, FEINSTEIN LLP
Therese M. Doherty, Esq.
LisaMarie F. Collins, Esq.
2 Park Avenue
New York, New York 10016
*Counsel for Defendant MF Global Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 2

        A.     Overview of the Futures Markets for Platinum and Palladium .................. 2

        B.     The CFTC Settlement with Certain Moore Defendants ............................. 3

        C.     The Second Amended Consolidated Complaint .......................................... 4

ARGUMENT ........................................................................................................................ 5

   I.     ALLEGATIONS BASED ON THE CONSENT ORDER MUST BE
        STRICKEN ............................................................................................................ 5

   II.    PLAINTIFFS FAIL TO SATISFY APPLICABLE PLEADING
        BURDENS ............................................................................................................. 7

   III.   PLAINTIFFS FAIL TO STATE A VALID CEA CLAIM .................................... 11

        A.     The Complaint Fails to Allege Any *Artificial* Prices ................................ 11

        B.     The Complaint Fails to Allege Manipulative *Intent* .................................. 14

              1.     The Complaint Does Not Allege Intent *via* Motive ...................... 16

              2.     The Complaint Does Not Allege Intent *via* Strong Evidence
                    of Conscious Misbehavior or Recklessness .................................. 17

        C.     The Complaint Fails to Allege that Defendants *Caused* Artificial
             Prices ........................................................................................................ 22

        D.     The Complaint Fails to Allege an *Ability* to Influence the Market ........... 26

        E.     The Complaint Fails to Allege that Defendants Proximately Caused
             any Actual Damages from Trading Activity Exclusively within the
             Proposed Class Period ............................................................................... 26

   IV.   PLAINTIFFS FAIL TO STATE A SECONDARY CEA CLAIM ......................... 27

        A.     There is No Private Right of Action for Control Person Liability ............. 27

        B.     The Complaint Fails to State a Claim For Aiding and Abetting ............... 27

      C.      Plaintiffs Fail to State a Claim For Principal Agent Liability under the CEA...............................................................................................30

V.      THE COMPLAINT FAILS TO STATE AN ANTITRUST PRICE FIXING CLAIM..................................................................................................32

      A.      No Allegation of Independent Economic Actors .......................................32

      B.      No Allegation of Agreement to Fix Prices..................................................33

      C.      MFG is Specifically Excluded From the Antitrust Claim..........................34

      D.      Plaintiffs Do Not Have Antitrsut Standing ................................................35

VI.      THE COMPLAINT FAILS TO STATE A RICO CLAIM ....................................36

      A.      The Complaint Fails to Allege RICO Continuity ......................................36

      B.      Plaintiffs Fail Properly to Plead Any RICO Predicate Acts......................37

      C.      Plaintiffs Lack RICO Standing ..................................................................39

      D.      MFG is Not an Alleged Participant in Any Enterprise ..............................39

      E.      Plaintiffs Fail to State a RICO Conspiracy Claim ....................................40

CONCLUSION.....................................................................................................................40

## TABLE OF AUTHORITIES

CASES                                                                    Page(s)

*Am. Needle, Inc. v. NFL*,
    130 S. Ct. 2201 (2010)...................................................................................33

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    No. 09-2227, 2010 WL 3001746 (S.D.N.Y. Aug. 2, 2010)....................................34

*Anwar v. Fairfield Greenwich Ltd.*,
    No. 09 Civ. 0118, 2010 WL 3341636 (S.D.N.Y. Aug. 18, 2010) ..........................20

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009).....................................................................10, 11, 34

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983)........................................................................................35

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..........................................................................8, 15

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)........................................................................................23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................9, 34

*Benfield v. Mocatta Metals Corp.*,
    No. 91 Civ. 8255, 1992 WL 58879 (S.D.N.Y. Mar. 13, 1992) .........................27, 29

*Berry v. Deutsche Bank Trust Co. Am.*, No. 07 Civ. 7634, 2008 WL 4694968 (S.D.N.Y.
    Oct. 21, 2008) ...............................................................................................39

*CFTC v. Amaranth Advisors, L.L.C.*,
    554 F. Supp. 2d 523 (S.D.N.Y. 2008)................................................................11

*Chatin v. Coombe*,
    186 F.3d 82 (2d Cir. 1999)..............................................................................14

*Cleveland v. Caplaw Enters.*,
    448 F.3d 518 (2d Cir. 2006).............................................................................31

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984)...................................................................................32, 33

*Damato v. Hermanson*,
    153 F.3d 464 (7th Cir. 1998) .................................................................................28

*de Atucha v. Commodity Exch., Inc.*,
    608 F. Supp. 510 (S.D.N.Y. 1985)...................................................................35, 36

*Dent v. U.S. Tennis Ass'n*,
    No. 08 Civ. 1533, 2008 WL 2483288 (E.D.N.Y. June 17, 2008)............................6

*DiPlacido v. CFTC*,
    364 Fed. Appx. 657 (2d Cir. 2009) ............................................................... *passim*

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
    822 F.2d 1242 (2d Cir. 1987)...................................................................................9

*DNJ Logistic Group, Inc. v. DHL Express, Inc.*,
    No. 08-2789, 2010 WL 625364 (E.D.N.Y. Feb. 19, 2010) ...................................37

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................27

*FDIC v. FSI Futures, Inc.*,
    No. 88 Civ. 906, 1991 WL 224302 (S.D.N.Y. Oct. 16, 1991) .........................27, 31

*First Cap. Asset Mgmt., Inc. v. Brickelbush, Inc.*,
    219 F. Supp. 2d 576 (S.D.N.Y. 2002).....................................................................37

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004)........................................................................37, 38, 40

*Fraker v. Bayer Corp.*,
    No. 08 Civ. 1564, 2009 WL 5865687 (E.D. Cal. Oct. 6, 2009) .........................7, 18

*GICC Cap. Corp. v. Tech. Fin. Group, Inc.*,
    67 F.3d 463 (2d Cir. 1995)......................................................................................36

*Glazer Capital Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ..................................................................................18

*Gucci v. Gucci Shops, Inc.*,
    651 F. Supp. 194 (S.D.N.Y. 1986)..........................................................................33

*Gurary v. Winehouse*,
    190 F.3d 37 (2d Cir. 1999)......................................................................................23

*Guttman v. CFTC*,
    197 F.3d 33 (2d Cir. 1999)......................................................................................31

iv

*H.J., Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989)..........................................................................................36

*Harris v. Mills*,
  572 F.3d 66 (2d Cir. 2009)....................................................................9, 10, 34

*Hershey v. Energy Transfer Partners, L.P.*,
  610 F.3d 239 (5th Cir. 2010) ....................................................... 14-15, 19, 20

*Holmes v. SIPC*,
  503 U.S. 258 (1992)..........................................................................................39

*In re Agape Litig.*,
  681 F. Supp. 2d 352 (E.D.N.Y. 2010) ........................................................39, 40

*In re Alstom SA Secs. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005)........................................................21, 29

*In re Amaranth Natural Gas Commodities Litig.* ("*Amaranth*"),
  587 F. Supp. 2d 513 (S.D.N.Y. 2008)................................................... *passim*

*In re Amaranth Natural Gas Commodities Litig.* ("*Amaranth II*"),
  612 F. Supp. 2d 376 (S.D.N.Y. 2009).............................................................30

*In re Citigroup Auction Rate Sec. Litig.*,
  700 F. Supp. 2d 294 (S.D.N.Y. 2009)........................................................23, 24

*In re Crude Oil Commodities Litig.*,
  No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007)................... *passim*

*In re DiPlacido*,
  No. 01-23, 2008 WL 4831204 (CFTC Nov. 5, 2008).................................... *passim*

*In re Henner*,
  30 A.D. 1151 (Agric. Dec. 1971) .....................................................................13

*In re Ind. Farm Bureau Coop. Assoc., Inc.*,
  No. 75-14, 1982 WL 30249 (CFTC Dec. 17, 1982) ............................11, 13, 14, 19

*In re Merrill Lynch & Co.*,
  218 F.R.D. 76 (S.D.N.Y. 2003) ..................................................................5, 18

*In re Merrill Lynch & Co., Inc.*,
  273 F. Supp. 2d 351 (S.D.N.Y. 2003)...............................................................25

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  704 F. Supp. 2d 378 (S.D.N.Y. Mar. 31, 2010).................................................24

v

*In re Sumitomo Copper Litig.*,
  995 F. Supp. 451 (S.D.N.Y. 1998)..........................................................................23

*In re Title Ins. Antitrust Cases*,
  No. 08 Civ. 677, 2010 WL 1267129 (N.D. Ohio Mar. 31, 2010)............................32

*Int'l Telecom, Inc. v. Generadora Electrica Del Oriente, S.A.*,
  No. 00 Civ. 8695, 2002 WL 465291 (S.D.N.Y. Mar. 27, 2002) .............................38

*In re Zyprexa Prods. Liability Litig.*,
  549 F. Supp. 2d 496 (E.D.N.Y. 2008) ...................................................................25

*Invamed, Inc. v. Barr Labs.*,
  22 F. Supp. 2d 210 (S.D.N.Y. 1998)................................................................34, 35

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)...........................................................................15, 16

*Karasyk v. Mark Commodities Corp.*,
  770 F. Supp. 824 (S.D.N.Y. 1991).........................................................................17

*Katzman v. Victoria's Secret Catalogue*,
  167 F.R.D. 649 (S.D.N.Y. 1996) ...........................................................................36

*King County v. IKB Deutche Industriebank AG*,
  708 F. Supp. 2d 334 (S.D.N.Y. 2010)............................................................... 24-25

*Kolbeck v. LIT Am., Inc.*,
  923 F. Supp. 557 (S.D.N.Y. 1996)...................................................................28, 30

*Ledford v. Rapid-Am. Corp.*,
  No. 86 Civ. 9116, 1988 WL 3428 (S.D.N.Y. Jan. 8, 1988)......................................5

*Lerner v. Geldermann, Inc.*,
  No. 88-R116, 1991 WL 83497 (CFTC Jan. 9, 1991) .............................................18

*Lesavoy v. Lane*,
  304 F. Supp. 2d 520, 534 (S.D.N.Y. 2004), *aff'd in part and vacated on other
  grounds*, 170 Fed. Appx. 721 (2d Cir. 2006)................................................... 39-40

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976)...............................................................................5, 6

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*,
  No. 91 Civ. 2923, 1994 WL 88129 (S.D.N.Y. Mar. 15, 1994) ...............................37

*Michelson v. Merrill Lynch*,
  669 F. Supp. 1244 (S.D.N.Y. 1987).......................................................................35

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993)...........................................................................................38

*Minpeco v. ContiCommodity Servs., Inc.*,
    676 F. Supp. 486 (S.D.N.Y. 1987)................................................................................27

*Minpeco, S.A. v. Hunt*,
    718 F. Supp. 168 (S.D.N.Y. 1989)................................................................................23

*MLSMK Invs. Co. v. JP Morgan Chase & Co.*,
    No. 09 Civ. 4049, 2010 WL 2925403 (S.D.N.Y. July 15, 2010) .............................17

*Nicholas v. Saul Stone & Co.*,
    224 F.3d 179 (3d Cir. 2000)..........................................................................................28

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..........................................................................................18

*Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*,
    No. 98-4067, 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) ....................................36

*Odyssey Re (London) Ltd. v. Stirling Cook Brown Holdings Ltd.*,
    85 F. Supp. 2d 282 (S.D.N.Y. 2000).............................................................................40

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*,
    467 F.3d 283 (2d Cir. 2006)..........................................................................................35

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007)..........................................................................................35

*Qualis Care, L.P v. Hall*,
    No. 95 Civ. 4955, 1999 WL 683564 (S.D.N.Y. Sept. 1, 1999) ...............................36

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993)........................................................................................................39

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)............................................................................................25

*Schwimmer v. Sony Corp. of Am.*,
    677 F.2d 946 (2d Cir. 1982)..........................................................................................33

*SIPC v. Stratton Oakmont, Inc.*,
    234 B.R. 293 (Bankr. S.D.N.Y. 1999) ..........................................................................6

*Shahzad v. H.J. Meyers & Co.*,
    No. 95 Civ. 6196, 1997 WL 47817 (S.D.N.Y. Feb. 6, 1997) ...................................6

*Shaw v. Rolex Watch, U.S.A., Inc.*,
    673 F. Supp. 674 (S.D.N.Y. 1987)......................................................................33

*Shields v. Citytrust Bancorp., Inc.*,
    25 F.3d 1124 (2d Cir. 1994)..............................................................................9

*Spool v. Int'l Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008)................................................................36, 37, 38

*Tatum v. Legg Mason Wood Walker, Inc.*,
    83 F.3d 121 (5th Cir. 1996) ..............................................................................28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 328 (2007)...................................................................................15, 17

*Thornock v. Kinderhill Corp.*,
    749 F. Supp. 513 (S.D.N.Y. 1990)..........................................................28, 29, 30

*Tops Mkts., Inc, v. Quality Mkts., Inc.*,
    142 F.3d 90 (2d Cir. 1998)................................................................................33

*Transnor (Bermuda) Ltd. v. BP N.A. Petroleum*,
    738 F. Supp. 1472 (S.D.N.Y. 1990).................................................................15

*United States v. Capoccia*,
    503 F.3d 103 (2d Cir. 2007).............................................................................38

*United States v. D'Alessio*,
    822 F. Supp. 1134 (D.N.J. 1993) ..................................................................38-39

*United States v. Gilbert*,
    668 F.2d 94 (2d Cir. 1981).................................................................................6

*United States v. Radley*,
    659 F. Supp. 2d 803 (S.D. Tex. 2009) ..........................................................12, 14

*Virgin Atl. Airways Ltd. v. British Airways P.L.C.*,
    257 F.3d 256 (2d Cir. 2001)..............................................................................32

*Vitanza v. Bd. of Trade of City of N.Y.*,
    No. 00 Civ 7393, 2002 WL 424699 (S.D.N.Y. Mar. 18, 2002) ...........................26

*Wellnx Life Scis., Inc. v. Iovate Health Scis. Research, Inc.*,
    516 F. Supp. 2d 270 (S.D.N.Y. 2007)...............................................................33

*Williams v. Citigroup, Inc.*,
    No. 08 Civ 9208, 2009 WL 3682536.................................................................35

*Zaro Licensing, Inc. v. Cinmar, Inc.*,
   779 F. Supp. 276 (S.D.N.Y. 2001)..........................................................................37

**STATUTES**

7 U.S.C.
   § 2(a)(1)(B) ...............................................................................................................31
   § 13(a)(2) ......................................................................................................................3
   § 13c(a) .......................................................................................................................28
   § 13c(b) .......................................................................................................................27
   § 25(a)(1) ..........................................................................................................8, 26, 27

15 U.S.C.
   § 1............................................................................................................................32, 33, 34
   § 15...............................................................................................................................36
   § 26...............................................................................................................................36

18 U.S.C.
   § 1956...........................................................................................................................38
   § 1957...........................................................................................................................38
   § 1961 .................................................................................................................... *passim*
   § 1962 ....................................................................................................................39, 40

**OTHER AUTHORITIES**

Local Civil Rule 24.1 ..........................................................................................................14

Fed. R. Civ. P.
   Rule 5.1(a) ...................................................................................................................14
   Rule 8 .................................................................................................................. *passim*
   Rule 9 .................................................................................................................. *passim*
   Rule 11 ...........................................................................................................................7
   Rule 12 .................................................................................................................5, 7, 10

Fed. R. Evid. 201(b)(2) .......................................................................................................24

Larry Harris, Trading & Exchanges:  Market Microstructure for Practitioners (2003)................19

Defendants Moore Capital Management LP, Moore Capital Advisors, LLC, Moore Advisors, Ltd., Moore Macro Fund, LP, and Moore Global Fixed Income Master Fund, LP (collectively, the "Moore Defendants"), Christopher L. Pia ("Pia") and MF Global Inc. ("MFG") respectfully submit this memorandum of law in support of their Motion to Strike and Dismiss the second amended consolidated complaint (the "Complaint").

## PRELIMINARY STATEMENT

Plaintiffs filed the first of several putative class action complaints the day after the CFTC announced a settlement with certain of the Moore Defendants.  The CFTC's consent order ("CO") settled regulatory charges – that *only* the CFTC can bring – relating to *attempted* manipulation of *settlement* prices of platinum and palladium futures (based on trading during the last two minutes of NYMEX floor trading).  Yet Plaintiffs attempt unsuccessfully to mine from the CO a private cause of action for *actual* manipulation – a far more demanding claim than the regulatory violation of attempted manipulation – of *all* market prices at which platinum and palladium futures contracts traded at *all* times, on *all* days during the putative "Class Period."

The core allegation on which Plaintiffs' multistep theory is based renders it utterly implausible, and defeats each of Plaintiffs' claims.  Plaintiffs' theory is that Defendants created artificial *settlement* prices for platinum and palladium futures contracts, thereby sending a false "price beacon signal" to the futures markets that, in turn, resulted in the creation of pervasive artificial *futures contract prices* that, in turn, also resulted in the creation of artificial prices of *physical* platinum and palladium.  Yet Plaintiffs allege that Defendants achieved this alleged manipulation through "market on close" purchase orders of futures contracts during the last two minutes of NYMEX floor trading that, by definition, were real transactions with real counterparties executed at actual ***prevailing market prices***.  There is simply no basis, therefore,

to infer artificial settlement prices, any false "price beacon signal," or any artificial effect on futures contract prices or physical prices generally.  Nor, for the same reason, is there any plausible basis to infer that Defendants specifically intended to create artificial futures contract prices.  Thus, an ill-pleaded patchwork of generalities and conclusory leaps, Plaintiffs' Complaint fails to state any claim against any Defendant and must be dismissed.

## STATEMENT OF FACTS

### A.    Overview of the Futures Markets for Platinum and Palladium

Futures contracts traded on the NYMEX are standardized agreements to buy or sell a commodity, such as platinum or palladium, and to deliver that commodity at a certain date in the future.  Compl. ¶ 43.  Through the exchange, traders make "bids" to buy and "offers" to sell futures contracts.  The prevailing "bid and offer spread" is the range set by the lowest bid and highest offer price available on the exchange.

NYMEX operates "open outcry" trading sessions for platinum and palladium futures on its exchange floor in Manhattan.  Compl. ¶¶ 53, 62.  Platinum and palladium futures are also traded electronically on "Globex," an internet-based trading platform provided by NYMEX's parent (the CME), which operates nearly around-the-clock.  Platinum and palladium futures (as well as physical bullion) are also traded in various international markets throughout the day.

NYMEX calculates a daily "settlement price" for the most actively traded platinum and palladium futures contracts.[1]  The settlement price is determined by the volume-weighted average of all trading (floor and electronic) during the closing period, which is the last two minutes of the open outcry session.  Daily settlement prices are published 30 minutes after the the closing period, while trading continues on Globex and other exchanges.

---

[1] During the putative "Class Period," NYMEX Rule 6.53 governed the settlement procedures for platinum and palladium futures contracts.

2

**B.      The CFTC Settlement with Certain Moore Defendants**

The CFTC has broad regulatory authority to oversee commodities markets, including the power to investigate and pursue enforcement actions for attempted and actual manipulation of commodity futures contracts.  *See* 7 U.S.C. § 13(a)(2).  Attempted and actual manipulation are two distinct offenses, the latter of which requires proof of important additional elements.

On April 29, 2010, the CFTC announced a settlement consent order with certain Moore Defendants (the CO) regarding an "attempt[] to manipulate the settlement prices of palladium and platinum futures contracts" traded on NYMEX.[2]  Compl. Exh. A at 2.  Because it was a settlement, the CO expressly states that the settling Moore Defendants neither admit nor deny the terms or findings of the CO, and do not consent to its use by any third party.  *Id.* at 1.

The CO asserts that a former portfolio manager at Moore Capital (1) "entered or caused to be entered [market on close] buy orders during the close of trading in the palladium and platinum futures contracts" and (2) had "the intent to move higher the settlement prices of the platinum and palladium futures contracts."  *Id.* at 5.  The CO makes no assertion whatsoever that *actual* manipulation of any settlement prices occurred, or that *any artificial settlement prices or market prices ever existed*.  The CO neither alleges nor implies anything about market prices or trading of platinum and palladium futures contracts outside the settlement period, or that any trader suffered any loss.

In fact, the word "artificial" appears nowhere in the CO.  Yet, when the CFTC believes that actual manipulation has occurred and artificial prices have been created, it can and will assert it in a litigation, *see, e.g.*, Complaint, *CFTC v. Optiver US, LLC*, 08 Civ. 6560 (S.D.N.Y. July 24, 2008) ("Defendants succeeded in their manipulative scheme by causing artificial prices

---

[2] Discussion of the contents of the CO is without prejudice to Defendants' Motion to Strike those allegations of the Complaint that copy, reference or rely upon the CO.  *See infra* p. 5-7.

in certain of these energy futures contracts"), or settlement consent order.  *See, e.g.*, Consent

Order, *In the Matter of Avista Energy*, No. 01-21, 2001 WL 951736, at *2 (CFTC Aug. 21, 2001)

(charging actual manipulation in "banging the close" case:  "Avista . . . was able to create

artificial settlement prices").  With good reason, it did not do so here.[3]

### C.     The Second Amended Consolidated Complaint

While the CO alleges *attempted* manipulation of *settlement* prices of platinum and

palladium futures solely through purchases at market prices made during the closing period (*i.e.*,

"market on close" trades), Plaintiffs here purport to rely on it to allege *actual* manipulation under

the CEA of *all* market prices at which platinum and palladium futures contracts traded at *all*

times on *all* days, during the *entire* putative "Class Period."  Compl. ¶¶ 5, 9, 102-03, 168.

Plaintiffs do not allege that they or any member of the putative "Futures Sub-Class" purchased

platinum or palladium futures during the two-minute settlement period.  *Id.* ¶¶ 18-20, 94-97.

Instead, they contend that allegedly artificial settlement prices sent a false "price beacon signal"

to the market (*id.* ¶ 98) that caused *all* other market participants to buy or sell futures contracts at

artificial prices at *all* times on *all* days throughout the "Class Period."  *Id.* ¶¶ 102-03, 168.

Plaintiffs also allege as purported evidence of causation that, during the "Class Period,"

platinum and palladium futures prices increased to "all-time record levels" that were inconsistent

with "[t]he fundamentals of supply and demand."  *Id.* ¶¶ 104-14.  But Plaintiffs' allegations

ignore, *inter alia*, the dramatic bull run that took place across all commodities markets during the

first half of 2008, and the supply-side forces driving platinum prices, in particular.  *See* Decl. of

David Zensky dated November 5, 2010 ("Zensky Decl.") Exhs. A-C.

---

[3] Plaintiffs mischaracterize, misquote, and even fabricate the contents of the CO.  Compl. ¶¶ 3, 32-33, 82-83, 87, 89-91, 116.  For example, they purport to quote the CO as stating:  "[t]he [CO] found that . . . Pia . . . 'engaged in an unlawful blatantly manipulative scheme known as 'banging the close.'"  *Id.* ¶ 82.  Neither this sentence nor the word "blatantly" are in the CO.

Plaintiffs also claim that purported elevated *settlement* prices of NYMEX futures caused artificial prices in *physical* platinum and palladium markets, (*id.* ¶¶ 11-12, 156(b), 163), and that the alleged price manipulation in the physical markets was the product of an unlawful agreement in restraint of trade (with whom they do not say) that violated the Sherman Act and RICO statute.

MFG, a financial derivatives broker, is alleged to have been the brokerage firm that executed the Moore Defendants' market on close trades in platinum and palladium futures contracts through NYMEX (but was not the clearing broker that cleared and carried the trades in an account for the Moore Defendants). Compl. ¶¶ 34, 134. The CFTC has not asserted any charges against MFG and there is no consent order between the CFTC and MFG. MFG is not a party to the CO. Yet, Plaintiffs' substantive allegations against MFG derive solely from the CO.

## ARGUMENT

## I.   ALLEGATIONS BASED ON THE CONSENT ORDER MUST BE STRICKEN

As a threshold matter, those allegations that copy, reference or rely upon the CO are "immaterial," do not equate to well pleaded facts, and must be stricken from the Complaint pursuant to Rule 12(f). *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892-94 (2d Cir. 1976). Relying on *Lipsky*, courts in the Second Circuit have made it clear that "references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f)" and appropriately stricken at the motion to dismiss stage or earlier. *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003) (striking private securities complaint's references and adoption of allegations of SEC and NASD complaints); *see also Ledford v. Rapid-Am. Corp.*, No. 86 Civ. 9116, 1988 WL 3428, at *2-3 (S.D.N.Y. Jan. 8, 1988) (striking findings by state agency at motion to dismiss stage).

5

Here, no fewer than 53 paragraphs in the Complaint rely upon (and systematically distort) the CO, which explicitly provides that it was entered pursuant to "an Offer of Settlement," without any adjudication of the merits and "without [Moore Capital] admitting or denying any of the findings or conclusions" therein.  *See* Compl. Exh. A at n.1.  Courts in this District have specifically held that *Lipsky* bars allegations based on such no-admit consent judgments with government agencies.  *See e.g.*, *Shahzad v. H.J. Meyers & Co.*, No. 95 Civ. 6196, 1997 WL 47817, at *13-14 (S.D.N.Y. Feb. 6, 1997) (striking allegations that brokerage firm entered into consent order with state and federal agencies, citing *Lipsky*); *SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 336 (Bankr. S.D.N.Y. 1999) (at motion to dismiss stage, striking references to NASD and SEC consent orders, since "[t]he Second Circuit has clearly held that consent judgments such as these, are not the result of actual adjudications on the merits.").  Additionally, neither MFG, Pia, nor the Moore Funds were parties to the CO.

While references to a consent order or settlement may be allowed when enforcing that agreement or pleading knowledge of regulations, they may not be used, as here, to allege the underlying facts purportedly establishing liability.  *United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981) (citing *Lipsky*, affirming that consent decree may not be used to prove underlying facts of liability); *see also Dent v. U.S. Tennis Ass'n*, No. 08 Civ. 1533, 2008 WL 2483288, at *2 (E.D.N.Y. June 17, 2008) (striking allegations based on settlement with state attorney general, "plaintiff [impermissibly] use[d] the settlement agreement as proof of the truth of the matters that led to the settlement agreement"); *cf. In re Crude Oil Commodities Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, at *8 (S.D.N.Y. June 28, 2007) (dismissing complaint alleging CEA manipulation that recites complaints of other parties, governmental investigations, and Wall Street Journal

article as "hearsay," insufficient "substitute for factual allegations," and an attempt to "free ride off the press or the complaints of other parties").

Further, reliance on the CO does not satisfy Plaintiffs' obligation under Rule 11(b) to perform an independent inquiry and, for this independent reason, it is not appropriate to consider references to the CO when evaluating the Complaint under Rule 12. In *Fraker v. Bayer Corp*., No. 08 Civ. 1564, 2009 WL 5865687, at *5 (E.D. Cal. Oct. 6, 2009), plaintiffs based their claims of wrongdoing on the factual allegations "made in, or inferred from" a regulatory settlement order. Because reliance on the settlement order violated Rule 11(b), the court "mentally strip[ped] the complained-of paragraphs" and, finding "no independently acquired evidence that would tend to support Plaintiff's central allegations," dismissed the complaint. *Id*. This Court should similarly strike or decline to consider, at a minimum, those 50 paragraphs that copy, reference or rely upon the CO.[4]

## II.  PLAINTIFFS FAIL TO SATISFY APPLICABLE PLEADING BURDENS

Irrespective of Defendants' Rule 12(f) motion, the Complaint's allegations fail to state a private civil claim. The Futures Plaintiffs rely on a narrow provision of the CEA providing a private right of action to persons who have suffered actual damages caused by *actual* manipulation of the price of the futures contract (or commodity underlying such contract) traded by Plaintiffs. *See* 7 U.S.C. § 25(a)(1)(D). To state a valid claim, Plaintiffs must allege facts showing, *inter alia*, that "(1) the defendant possessed an ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *Crude Oil*, 2007 WL 1946553, at *3; *see also In re DiPlacido*, CFTC No. 01-23, 2008 WL 4831204 (CFTC Nov. 5, 2008), *aff'd DiPlacido v.*

---

[4] Specifically, the offending paragraphs are: ¶¶ 1-3, 5, 9, 31-33, 35, 77, 80-91, 94-97, 100-02, 114, 116, 119-23, 125, 127-28, 130-31, 134, 138-40, 142, 170, 181, 187, 210, 214-15, and 217.

*CFTC*, 364 Fed. Appx. 657, 661 (2d Cir. 2009).  Plaintiffs must further allege facts showing that the alleged manipulation proximately caused the claimed "actual damages."  7 U.S.C. § 25(a)(1).

Where, as here, the commodity market manipulation claims sound in fraud (*see, e.g.*, Compl. ¶ 100), Rule 9(b)'s heightened pleading standard must be satisfied.  *Crude Oil*, 2007 WL 1946553, at *5; *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 534 (S.D.N.Y. 2008) ("*Amaranth*").  In the securities context, the Second Circuit has held that, "[b]ecause a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b)."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007).  In *Amaranth*, the court held that *ATSI's* "logic applies equally to the commodities markets.  Just as with securities, commodities manipulation deceives traders as to the market's true judgment of the worth of the commodities."  587 F. Supp. 2d at 534.

Here, the Complaint purports to allege a deception of the market throughout the "Class Period" based on Defendants "repeatedly manipulating the NYMEX settlement prices upwards" (Compl. ¶ 100), through "manipulative acts" (*id.* ¶ 101) that resulted in sending "inflated representations and reports of an artificially inflated and manipulated price to the public." *Id.* ¶ 100(d); *see also id.* ¶¶ 5, 9.  Thus, Plaintiffs' manipulation claims are subject to Rule 9(b).  *See Crude Oil*, 2007 WL 1946553, at *5 (manipulation claim was subject to Rule 9(b) because, while plaintiffs "carefully avoided the word 'fraud' in their complaint, the crux of plaintiffs' allegations is that defendants misled the market with regard to supply and demand").

"To meet the requirements of Rule 9(b) in the context of a CEA market manipulation claim, the plaintiff must specify '[1] what manipulative acts were performed, [2] which defendants performed them, [3] when the manipulative acts were performed, and [4] what effect the scheme had on the market for the securities at issue."  *Crude Oil*, 2007 WL 1946553, at *6

8

(citation omitted).  Further, while Rule 9(b) provides that "'[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally,'" the Second Circuit requires plaintiffs to "allege facts that give rise to a strong inference of fraudulent intent."  *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  In violation of these requirements, Plaintiffs, *inter alia*:  (1) impermissibly lump Defendants together, and/or conflate  allegations concerning which Defendants performed what acts; (2) do not adequately allege manipulative acts, but merely allege frequent and large purchases of platinum and palladium futures at *existing market prices*; (3) undermine their conclusory allegation that settlement prices effected market prices by sending a purported "price beacon" signal by alleging, at the same time, that the markets for platinum and palladium futures were not efficient; and (4) fall far short of alleging facts to show specific intent to cause artificial futures prices with respect to Plaintiffs' trades or at any time as required by Rule 9(b).

Further, Plaintiffs concede that the vast majority of the allegations are not based on personal knowledge, and lack a factual basis:  "Plaintiffs complain, upon knowledge as to themselves and their own acts and upon information and belief as to all other matters[.]"  Compl. p. 1.  Fraud allegations, however, cannot be based on information and belief except with respect to facts that are "peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the facts on which the belief is based."  *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) (citing cases). Here, Plaintiffs attempt to relieve themselves of the heightened standards of Rule 9(b) by pleading on "information and belief," yet fail to even specify the basis thereof.

Plaintiffs also must satisfy Rule 8.  After *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), a court's inquiry is guided by two principles.  *Harris v. Mills*, 572 F.3d 66 (2d Cir. 2009).  "First,

although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice' . . . 'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 72 (citation omitted). The plausibility standard is not met "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," and the existence of other "more likely explanations" must be considered in determining whether a claim is plausible. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950-51 (2009). In short, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 1949 (quotation marks omitted).

In applying this two-pronged approach, it is clear that the majority of the Complaint is premised on conclusions and other assertions that cannot be taken as true, and must instead be disregarded. The Court is thus left with nothing more than factual allegations that fail as a matter of law and certainly do not "state a plausible claim for relief." *Iqbal*, 129 S. Ct. at 1950.

Tacitly acknowledging that even the CO's lone two sentences allegedly referring to MFG do not constitute the well-pleaded facts necessary to state viable claims against MFG, Plaintiffs embellish those sentences. However, Plaintiffs' embellishments are conclusions, not facts. For example, while the CO states that "[t]he Former PM often placed MOC orders with the FCM's AP with directions that indicated that he wanted to push the settlement price higher" (Compl. Exh. A at 3), Plaintiffs make an unsubstantiated leap by alleging instead that instructions were given to MFG directing it to make uneconomical purchases. Compl. ¶ 142; *see also id.* ¶ 138.

10

Not a single factual detail is alleged.  This allegation is a distortion of the CO and Plaintiffs identify no other source.

Plaintiffs further allege that "[t]rying to buy at high prices and in order to cause higher prices is highly unusual, uneconomic, and blatantly manipulative" (*id.* ¶ 85(b)), and conclude that Defendants allegedly were "intentionally paying and buying at a high price" and "uneconomically calculating and making their buy transaction at a higher price rather than at the cheapest available prices."  *Id.* ¶ 95.  Again, *not a single fact is pled to support these conclusions*. *See Iqbal*, 129 S. Ct. at 1949-50 (claims must be dismissed where complaint "tenders 'naked assertion[s]' devoid of 'further factual enhancement'").

## III.    PLAINTIFFS FAIL TO STATE A VALID CEA CLAIM

### A.    The Complaint Fails to Allege Any *Artificial* Prices

Price artificiality is a crucial element of an actual market manipulation claim.  *DiPlacido*, 2008 WL 4831204, at *27, 30; *DiPlacido*, 364 Fed. Appx. at 661-62.[5]  To allege the existence of an artificial price, Plaintiffs must plausibly allege that the market price "[did] not reflect the market or economic forces of supply and demand."  *In re Ind. Farm Bureau Coop. Assoc., Inc.*, No. 75-14, 1982 WL 30249, at *35 n.2 (CFTC Dec. 17, 1982).  Here, Plaintiffs fail to do so.

*DiPlacido*, an actual market manipulation case based on end of day trading, demonstrates that price artificiality has not been alleged here.  2008 WL 4831204, at *28.  *DiPlacido* was an administrative action by the CFTC against a NYMEX floor broker who was charged with manipulation of futures settlement prices in connection with trading during the closing period. At trial, the CFTC's Division of Enforcement offered evidence that, in order to create artificially

---

[5] This stands in stark contrast to an attempted manipulation charge, which does not require price artificiality.  Attempted manipulation requires the CFTC to allege and prove *only*:  (1) an intent to affect market prices, and (2) an overt act in furtherance thereof.  *See CFTC v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 532 (S.D.N.Y. 2008).

high (or low) settlement prices, *the floor broker entered trades that "violated" bids and offers* on four different occasions on the NYMEX floor.  The Commission found the floor broker liable for actual manipulation with respect to these four instances, holding that "the placement of uneconomic bids or offers results in artificial prices because those prices are not determined by the free forces of supply and demand on the exchange."  *Id.* at *32 (emphasis omitted).  The trader's violation of bids and offers – *i.e.*, knowingly *paying more*, or *selling for less*, than the actual prevailing prices in the market – was highlighted in the Commission's opinion and the Second Circuit's order affirming that opinion as the key factor establishing price artificiality.  *See id.* at *27, 30; *DiPlacido*, 364 Fed. Appx. at 661-62.  Significantly, the Commission *rejected* a fifth manipulation charge because, on that occasion, the broker traded during the close *but did not violate existing bids or offers*.  *Id.*

The decision in *United States v. Radley*, 659 F. Supp. 2d 803 (S.D. Tex. 2009), also demonstrates that Plaintiffs have not alleged price artificiality.  There, the court found that defendants who had engaged in open market transactions were not liable for manipulation.  The government alleged that defendants engaged in the following trade practices which resulted in artificial prices:  (a) repeatedly posting bids at the highest prevailing price, which "had the effect of increasing the price of TET propane;" (b) placing "'stacked bids' . . . in order to give the impression that more than one person desired to purchase TET propane;" and (c) withholding TET propane from the market, "which also caused the price to increase."  *Id.* at 815.

The court found that, even though these facts "do successfully allege an increase in price, they fall short of alleging an artificial price."  *Id.* (emphasis omitted).  As the court stated, "[t]he 'best bids,' even if they were higher than any others, were actually bids, and when they were accepted, defendants actually went through with the transactions."  *Id.*  With respect to the

stacked bids, the court noted that "[s]ince defendants were willing and able to follow through on all of the bids, they were not misleading."  *Id.*

Here, Plaintiffs have alleged that Defendants executed trades that were real transactions with real counterparties that were executed at prevailing market prices – *i.e.*, "market on close" trades.   There is no charge in the Complaint (or CO) that Defendants violated bids or offers. Indeed, Plaintiffs do not allege that Defendants made or posted a single bid or offer, *or did anything other than **accept market offers that already existed***.  *Compare In re Henner*, 30 A.D. 1151 (Agric. Dec. 1971) (trader manipulated egg futures settlement prices by unilaterally posting bid as closing bell was ringing at price substantially out of line with all prior trading).  Therefore, the Complaint contains no facts plausibly establishing that any futures settlement price – much less market prices at other times – "[did] not reflect the market or economic forces of supply and demand."  *Ind. Farm Bureau*, 1982 WL 30249, at *35 n.2.

Recognizing that the hallmark of a manipulation claim is trading at a price other than a prevailing market price, Plaintiffs obliquely assert that "[by] uneconomically calculating and making their buy transactions at a higher price rather than at the cheapest available prices, the Moore Defendants automatically and necessarily caused uneconomic and manipulative increases in [settlement prices]."  Compl. ¶ 95; *see also id.* ¶¶ 85(b), 94.  But tellingly, Plaintiffs do not allege a single supporting fact, and this vague allegation is flatly contradicted by Plaintiffs' other allegations that the trades were "market on close" trades – *i.e.*, executed at market prices during the close.  *Id.* ¶ 84.  Indeed, despite the requirements of Rule 9(b) (and even Rule 8), Plaintiffs do not allege *when* "cheaper" futures prices were available, and/or in what quantities.  *Crude Oil*, 2007 WL 1946553, at *6.

Plaintiffs' CEA claim thus devolves into a conclusory allegation that Defendants did not obtain the best execution for their purchases because such contracts allegedly could have been purchased at lower prices at other unspecified times, or in unspecified quantities, or on unspecified exchanges.  Plaintiffs' theory, of course, would expose any suboptimal trading to *post hoc* assertions of price artificiality by the expedient of simply alleging that the trader should have achieved better execution.  But that is not the law.

Indeed, a manipulation claim premised on Plaintiffs' theory – based on real trades executed with real counterparties executed at market prices – not only fails to allege price artificiality, but would render the CEA void for vagueness as applied to the conduct alleged here. *Radley*, 659 F. Supp. 2d 803 (absence of definition of price artificialty under CEA rendered statute unconstitutionally vague as applied); *see also Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir. 1999) (statute unconstitutionally vague as applied when it does not provide (a) "a person of ordinary intelligence a reasonable opportunity to know what is prohibited" and (b) "explicit standards for those who apply it").[6]

### B.     The Complaint Fails to Allege Manipulative *Intent*

The Complaint fails to plead facts sufficient to establish the requisite specific intent.  *See, e.g.*, *Crude Oil*, 2007 WL 1946553, at *5.  A claim for manipulation requires a showing that the "accused acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand influencing futures prices in the particular market at the time of the alleged manipulative activity."  *Ind. Farm Bureau*, 1982 WL 30249, at *7; *see also DiPlacido*, 364 Fed. Appx. at 661 ("specific intent, must . . . be satisfied to establish liability"); *Hershey v. Energy Transfer*

---

[6] Defendants will promptly comply with Local Civil Rule 24.1 and Fed. R. Civ. P. 5.1(a).

*Partners, L.P.*, 610 F.3d 239, 249 (5th Cir. 2010) ("[u]nder a specific intent standard, mere knowledge [of collateral impact of alleged manipulation] is not enough;" rather, defendants must specifically intend to artificially impact the futures markets at issue). Moreover, where a trader acts with a legitimate investment or commercial purpose, no manipulative intent can be found. *See Transnor (Bermuda) Ltd. v. BP N.A. Petroleum*, 738 F. Supp. 1472, 1495 (S.D.N.Y. 1990). Here, Plaintiffs do even attempt to allege that the trades lacked as their ultimate objective legitimate investment or commercial purposes.

To satisfy Rule 9(b), Plaintiffs must allege facts, as to each Defendant, that (1) show that the defendant "had both motive and opportunity to commit the fraud," or (2) constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *Crude Oil*, 2007 WL 1946553, at *3; *see also ATSI,* 493 F.3d at 99. Where, as here, Plaintiffs have *no* motive allegations, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted).

Courts in this District have recognized that the Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 328 (2007), provides critical guidance regarding the standard that must be met to plead specific intent in the context of a CEA claim. *See, e.g.*, *Crude Oil*, 2007 WL 1946553, at *7 n.5 (applying *Tellabs* pleading standard to CEA claim); *Amaranth*, 587 F. Supp. 2d at 529 (same). Specifically, in determining whether a complaint contains facts giving rise to a strong inference of scienter, courts must "take into account plausible opposing inferences" and determine whether a reasonable person would deem any inference of scienter "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Here, the absence of any allegations of a motive to manipulate, or to do anything other than ultimately profit from the specific trades, when coupled

with *purchases of futures contracts at existing market prices*, yields a plausible and, indeed, compelling inference of non-fraudulent investment intent.

### 1.   The Complaint Does Not Allege Intent *via* Motive

The Complaint is devoid of any allegations of a cognizable motive.  *See Kalnit*, 264 F.3d at 139 (to allege motive, "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud").  *Defendants are not aware of any case in any Circuit in which a commodities manipulation claim was brought, much less sustained, without allegations of a concrete economic benefit to be obtained as a consequence of creating an artificial price.*

*Amaranth* is a prime example of a case where allegations of motive *were* deemed adequate to establish scienter under the CEA.  There, defendants allegedly bought natural gas futures contracts "of unprecedented size" in order to sell the contracts during the closing period on the termination date of the contract, in violation of NYMEX position limits, and incurred "substantial losses" on these futures trades in order to "*benefit their positions in swaps and other derivatives*" *away from the futures market – positions that were indexed to futures settlement prices – and thus "lack[ed] any motive other than to affect the [futures] market price.*"  587 F. Supp. 2d at 524-25 (emphasis added).  Similarly, in *DiPlacido*, the NYMEX floor broker was motivated to trade outside the prevailing bid and offer spread in order to create a false settlement price because his customer owned derivative contracts pegged to the NYMEX settlement price and profited from movements in the settlement price.  2008 WL 4831204, at *27, 30; *DiPlacido*, 364 Fed. Appx. at 661-62.  In other words, purchases and sales of NYMEX futures in *Amaranth* and *DiPlacido* had no business or economic rationale except to influence market prices *for the purpose of profiting from derivative positions keyed to NYMEX settlement prices*.

Here, in contrast, there is no allegation that Defendants held any position away from the NYMEX that was tied to NYMEX settlement prices, or derived or sought to derive any concrete

and personal benefit from artificially elevated settlement prices.  In this regard, the Moore Defendants' alleged continued purchases of platinum and palladium futures over a period that saw an historic rise in commodities futures prices for these and other commodities, gives rise to an equally plausible opposing inference of legitimate investment intent.  *Tellabs*, 551 U.S. at 324.

With respect to MFG, no facts are pled establishing that MFG could have or did realize any concrete benefit by allegedly executing the trades at issue with manipulative intent.  The allegation that MFG earned revenues or commissions for performing brokerage services or stood to generate additional business from the Moore Defendants (Compl. ¶¶ 136-37) is not, by itself, enough to show motive because such activity is consistent with usual business activity.  *See Karasyk v. Mark Commodities Corp.*, 770 F. Supp. 824, 831 (S.D.N.Y. 1991) (allegations that a futures commission merchant had the purpose of "generating commissions" do not constitute motive); *see also MLSMK Invs. Co. v. JP Morgan Chase & Co.*, No. 09 Civ. 4049, 2010 WL 2925403, at *4 (S.D.N.Y. July 15, 2010) ("the fact that [defendants] stood to gain . . . by earning fees on . . . transactions does not support an inference of fraudulent intent") (citation omitted).  Plaintiffs do not allege that MFG derived or was offered any benefit from the Moore Defendants other than ordinary order flow, which is plainly insufficient.  Compl. ¶¶ 136-38.

## 2. The Complaint Does Not Allege Intent *via* Strong Evidence of Conscious Misbehavior or Recklessness

To plead "conscious misbehavior or recklessness," a plaintiff must allege specific facts demonstrating that a defendant's conduct was "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (citation omitted).  The "conscious misbehavior or recklessness" standard, however, is an exacting one which will only be met where plaintiffs allege specific facts demonstrating that

defendants:  (1) "engaged in deliberately illegal behavior;" (2) "knew facts or had access to information suggesting that their public statements were not accurate;" or (3) "failed to check information they had a duty to monitor."  *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). Here, Plaintiffs attempt to allege that Defendants engaged in deliberately illegal behavior.

First, Plaintiffs seek to infer fraudulent intent because certain Moore Defendants entered a regulatory settlement with the CFTC.  However, allegations regarding regulatory settlements are not "particularized facts giving rise to a strong inference of scienter."  *See, e.g.*, *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) ("The district court correctly held that these [settlement] agreements [with the SEC and Department of Justice] were not sufficient to meet the pleading requirements of the PSLRA."); *Merrill Lynch & Co.*, 218 F.R.D. at 78-79; *Crude Oil*, 2007 WL 1946553, at *8; *Fraker*, 2009 WL 5865687, at *5.

In any event, Plaintiffs have not alleged facts establishing deliberately illegal behavior or specific intent to artificially influence futures prices.  Relying on the CO, Plaintiffs allege that Pia "frequently" caused "large" market on close buy orders to be executed, "often with directions that indicated that he wanted to push the *settlement prices* higher."  Compl. ¶ 85-86, 88, 90 (emphasis added).  First, a "market on close" buy order, by definition, is an order to buy at **market prices**.  Second, there is nothing inherently illegal or manipulative about purchases of futures contracts in large volumes at market prices during the closing period.  Compl. ¶ 88. Third, alleging that Defendants knew trading platinum and palladium futures contracts on the close could affect the settlement prices (*id.*), without more, cannot transform otherwise legitimate trades at prices offered by the market into manipulation.  *See Lerner v. Geldermann, Inc.*, No. 88-R116, 1991 WL 83497, at *7 (CFTC Jan. 9, 1991) ("[i]n a thin market the trading activity of any participant is apt to move the price, but this is not necessarily 'manipulation.'").

Intent to influence prices by purchasing in large amounts or otherwise indicating one's belief to the market that the particular commodity appears to be undervalued does not constitute specific intent to manipulate a market.  As the CFTC has stated:

> [M]arket participants have a right to trade in their own best interests without regard to the positions of others as long as their trading activity does not have as its purpose the creation of "artificial" or "distorted" prices.  Indeed, it is this very motivation which gives lifeblood to the forces of supply and demand, the [sic] makes the price discovery function of the marketplace viable.  Moreover, since the self-interest of every market participant plays a legitimate part in the price setting process, *it is not enough to prove simply that the accused intended to influence price*.

*Ind. Farm Bureau*, 1982 WL 30249, at *6 (emphasis added); *see also* Larry Harris, Trading & Exchanges:  Market Microstructure for Practitioners 266 (2003) ("legitimate speculators also may buy instruments to show the market that confident buyers think their positions are undervalued").  Thus, Plaintiffs' contention that Defendants intended to influence the settlement prices of platinum and palladium futures contracts, standing alone, does not satisfy the intent requirement for market manipulation because the alleged facts do not establish a plausible inference that Defendants specifically intended to create *artificial* prices.

In *Hershey*, the Fifth Circuit affirmed the district court's rigorous application of the CEA's specific intent requirement, rejecting as legally insufficient claims that defendants knew or should have known that their actions in the physical market for natural gas would artificially affect the price of the natural gas futures prices traded by plaintiffs.  610 F.3d at 249; *see also id.* at 246 (defendants in private causes of action under the CEA must possess a specific intent to "create prices not responsive to the forces of supply and demand") (citations omitted).  The court held that "[u]nder a specific intent standard, mere knowledge is not enough;" rather, defendants must specifically intend to artificially impact the futures markets at issue.  *Id.*

Here, Plaintiffs' central allegation that Pia "wanted to push the *settlement prices* higher" (Compl. ¶ 85 (emphasis added)), does not allege – *as it must* – a specific intent to manipulate the underlying futures contract prices generally, let alone throughout the "Class Period." It was precisely this defect, the allegation of indirect intent, that formed the basis for the Fifth Circuit's dismissal of the complaint in *Hershey*. Similarly, Plaintiffs' allegation that the execution of instructions to buy "20 to 100 contracts" during the closing period (*id.* ¶ 87) in "relatively 'illiquid'" markets where "the amount of actual trading is low" (*id.* ¶ 77) *inevitably will affect the settlement prices* of platinum and palladium futures contracts (*id.* ¶¶ 58, 67, 95), again, is an example of indirect pleading, and does not allege the specific intent to create *artificial market prices*. *See Hershey*, 610 F.3d at 249 ("mere knowledge . . . is not enough").

Exacerbating their failure to plead conscious misbehavior, Plaintiffs also impermissibly lump all the Defendants together through group pleading. In fact, the vast majority of Plaintiffs' allegations of intent – which are based exclusively on information and belief – impermissibly lump defendants together as either "Defendants," "Moore Defendants," "Moore Funds," or "agents of Defendants." *See, e.g.*, Comp. ¶¶ 34, 79, 87, 89, 115, 174; *see also Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 0118, 2010 WL 3341636, *19 (S.D.N.Y. Aug. 18, 2010) (while "[g]roup pleading allows plaintiffs ... to connect defendants to statements[,] it does not also transitively convey scienter") (citation omitted). Alternatively, Plaintiffs conflate the Defendants by inconsistently alleging that (1) "the Moore Funds were the persons actually making the NYMEX trades," (2) *all* "Defendants intentionally gave such very large buy orders," and (3) the allegedly manipulative trades were made by Defendant Pia. Compl. ¶¶ 88, 130; *see also id.* ¶ 32. Elsewhere Plaintiffs assert, without any supporting facts, that because the alleged trading occurred over "a long period," the Moore Funds *necessarily* shared the supposed "specific intent

to manipulate the NYMEX platinum and palladium futures prices."  *Id.* ¶ 132.  Even if this pure

*ipse dixit* contention were not so obviously flawed, it is contradicted by Plaintiffs' other

allegations that the Moore Defendants' compliance procedures simultaneously prohibited

tracking or detection of trading on the close.  *Id.* ¶¶ 31(b), 116, 122-24; *see also In re Alstom SA*

*Secs. Litig.*, 406 F. Supp. 2d 433, 477 n.40 (S.D.N.Y. 2005) ("a court need not feel constrained to

accept as truth conflicting pleadings").  The pleading of intent through group pleading,

inconsistently attributed acts, and, in certain instances, plain illogic, is insufficiently detailed to

meet the dictates of Rule 9(b).

     With respect to MFG, Plaintiffs allege that MFG executed orders by Pia to buy platinum

and palladium futures contracts at market prices during the closing period, and that the orders

were executed during the last ten seconds of the close.  Compl. ¶¶ 138-39, Exh. A at 3-4.  These

allegations do not provide strong circumstantial evidence of conscious misbehavior or

recklessness upon which to find specific intent by MFG to create artificial futures price.  First,

there are no facts alleged upon which to infer that:  (1) MFG received an instruction to bid for or

buy contracts at prices higher than actual prices prevailing in the market; or (2) any single

purchase was in fact executed at a price *higher* than the prices then offered by third parties

through NYMEX.  In the absence of facts indicating that MFG intended to create artificial

prices, it is irrelevant if allegedly Pia's "directions indicated that he wanted to push the

settlement prices higher."  As *Crude Oil* found, "plaintiffs cannot point a specific instance in

which [MFG] engaged in a manipulative manner, and instead rely on conclusory statements

about actions defendants allegedly took to further the scheme."  2007 WL 1946553, at * 7.

     Second, the allegation that MFG waited until the last ten seconds of the closing period to

execute Pia's trades (Compl. ¶¶ 138-39), without more, does not give rise to a strong inference of

specific manipulative intent.  For example, in *Amaranth*, plaintiffs alleged that defendants bought and held unusually large natural gas positions and waited until the end of the 30-minute settlement period to sell the large positions in order to "smash" the settlement price, which would benefit defendants' corresponding swap positions.  587 F. Supp. 2d at 524.  The court held that "the alleged timing of the transactions" standing alone did not "give rise to a strong inference of scienter."  *Id.* at 540.  While the court went on to consider the myriad of other facts in the *Amaranth* complaint to sustain the claim (*id.* at 541), none of these additional facts are alleged here.  Thus, "the timing of the orders" is insufficient to establish specific intent.

In sum, the Complaint fails to allege that any Defendant specifically intended to manipulate futures prices during and throughout the purported "Class Period."

### C.    The Complaint Fails to Allege that Defendants *Caused* Artificial Prices

Plaintiffs do not allege that they transacted during the two-minute closing period, and nowhere allege that they were personally induced to purchase futures contracts in reliance on settlement prices.  Compl. ¶¶ 18-26.  Indeed, Plaintiffs' speculative allegations are self-defeating to their claim that artificial prices existed outside the two-minute close.

Instead, Plaintiffs allege that higher futures settlement prices were absorbed *by the market* and operated as a "price beacon signal in favor of artificially high prices."  *Id.* ¶ 98.  For a "price beacon signal" (*id.*) to, in turn, affect the market, participants would have to know of and integrate the signal as information concerning pricing of platinum and palladium futures.  Thus, the foundation for Plaintiffs' theory – a "price beacon signal" theory of disseminating false information that moved the market – by necessity, presumes reliance *by the market* on that purported signal.

In certain contexts, allegations of reliance may be based on a fraud on the market theory:

> [The] theory is based on a hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . .  Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

*Basic, Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) (quotation omitted).  A fraud on the market theory may apply to an efficient commodities market or exchange as well.  *See, e.g.*, *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 458 (S.D.N.Y. 1998).

Here, however, Plaintiffs allege that the markets for platinum and palladium futures were not well developed, and were *inefficient*:  "[t]he NYMEX palladium and platinum futures markets are not large futures markets, are relatively 'illiquid,' and are relatively 'thin depth' markets.  That is, both the amount of actual trading is low and the amount of potential trading is low in these markets."  Compl. ¶ 77; *compare Minpeco, S.A. v. Hunt*, 718 F. Supp. 168, 176 (S.D.N.Y. 1989) (allowing fraud on the market in a commodity futures case).  Thus, Plaintiffs are not entitled to rely on a fraud on the market presumption to allege that a settlement price beacon "caused" artificial prices at all times during the Class Period and that all market participants were fraudulently induced to trade at artificially high prices.  Instead, Plaintiffs must allege that they individually relied on allegedly fraudulent settlement prices in making trading decisions.  The Complaint, however, contains no such allegation.

In *In re Citigroup Auction Rate Securities Litigation*, 700 F. Supp. 2d 294, 307 (S.D.N.Y. 2009), the court explained that pleading reliance on an efficient market is necessary because "'[t]he gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators.'"  700 F. Supp. 2d at 306 (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)).  The court concluded that "Plaintiff's failure to proffer specific factual allegations as to the basis for his alleged reliance on market 'integrity' is . . . fatal to his claim for

23

market manipulation."  *Id.*  Similarly, in *In re Merrill Lynch Auction Rate Securities Litigation*, 704 F. Supp. 2d 378 (S.D.N.Y. 2010), the court dismissed a Rule 10b-5 market manipulation claim in part due to failure to plead reliance.  Specifically, the court found that the plaintiffs pled their way out of the fraud on the market presumption by (1) failing to plead an efficient market, (2) pleading facts that indicated that the market at issue did *not* incorporate "all public information," and (3) failing to allege in the alternative direct reliance.  *Id.* at 395-97.

Similarly here, Plaintiffs have pled their way out of a fraud on the market presumption by alleging that the platinum and palladium futures markets were *inefficient*, and failing to allege any putative class member's direct reliance on the purported "price beacon signal."  Compl. ¶ 98. This pleading failure and omission, respectively, renders utterly implausible Plaintiffs' contention that Defendants somehow *caused* artificial commodities prices in the relevant markets.

In addition, Plaintiffs attempt to plead causation by alleging that platinum and palladium supplies were generally in surplus in 2007, and thus prices should not have increased during the first half of 2008.  *Id.* ¶¶ 104-05, 113.  Plaintiffs include alleged pricing charts for the "front month price" of NYMEX platinum and palladium futures that reflect (1) a significant run up in prices from approximately early December 2007 to early March 2008, (2) a downward turn and ensuing volatility in pricing from early March 2008 to late July 2008, and (3) a sharp decline in pricing in late July 2008.  *Id.* ¶¶ 106, 113.

Plaintiffs' allegations that Defendants caused the market to rise in the manner it did, however, are utterly belied by the matching historic rise in commodities markets generally over the relevant period, and by well-publicized reports concerning the supply-side forces driving platinum prices, in particular.  This Court is entitled to take judicial notice of widely-publicized conditions in the commodities markets.  *See* Fed. R. Evid. 201(b)(2); *King County, Wash. v. IKB*

*Deutche Industriebank AG*, 708 F. Supp. 2d 334, 340-41 (S.D.N.Y. 2010) (notice of credit crisis, including chart illustrating yields on three-month Treasury Bills); *In re Zyprexa Prods. Liability Litig.*, 549 F. Supp. 2d 496, 500-501 (E.D.N.Y. 2008) (notice of "press releases and news articles and published analyst reports in determining what the market knew") (citing *Rothman*, 220 F.3d at 88-89); *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 383-88 (S.D.N.Y. 2003) (notice of news articles as "some of the widely broadcast explanations . . . could not have been misunderstood").

    *First*, the "Class Period" was marked by a well-publicized and dramatic bull run that took place across virtually *all* commodities markets.  Indeed, NYMEX platinum and palladium followed the same macro trends during 2007 and 2008 as gold, silver and the Goldman Sachs Commodity Index, which "is a composite index of commodity sector returns representing an unleveraged, long-only investment in commodity futures that is broadly diversified across the spectrum of commodities."[7]  *Second*, the "Class Period" was marked by widely publicized news reports documenting significant supply *shortages* in platinum production.  In particular, South Africa – the world's foremost supplier of platinum – suffered from significant power generation problems during the "Class Period" that directly affected the operation of the country's numerous platinum mines.[8]  Futures prices for palladium – a member of the "platinum group metals" family – tracked platinum prices during the "Class Period."  Compl. ¶ 69.

    In sum, whether based on Plaintiffs' flawed "price beacon signal" theory, or unsupported allegations concerning the rise in commodities futures prices, Plaintiffs do not plausibly allege that Defendants caused artificial prices at any time over the purported "Class Period."

---

[7] Goldman Sachs, *S&P GSCI Commodity Index,* http://www2.goldmansachs.com/services/ securities/products/sp-gsci-commodity-index/index.html; *see also* Zensky Decl. Exh. C.

[8] *See* Zensky Decl. Exhs. A, B.

**D.    The Complaint Fails to Allege an *Ability* to Influence the Market**

A CEA manipulation claim must allege that defendants possessed "the ability to influence market prices."  *DiPlacido*, 2008 WL 4831204, at *25.  Any trading during the close ranges of platinum and palladium can be said to "influence" – though not necessarily *artificially affect* – daily settlement prices.  *See id.* at *26 ("large traders in illiquid markets will have this ability, but that alone does not make them liable for manipulation").  Thus, at most, Plaintiffs have alleged that Defendants possessed the ability to influence *settlement* prices, which are, of course, not actually "market prices," but rather a volume-weighted *average calculation* of certain trade prices.  For that reason alone, the CEA claim must be dismissed.  *See* 7 U.S.C. § 25(a)(1)(D); *see also Vitanza v. Bd. of Trade of City of N.Y.*, No. 00 Civ. 7393, 2002 WL 424699, at *5 (S.D.N.Y. Mar. 18, 2002) ("the settlement price is not the value of the contract itself").[9]

Moreover, Plaintiffs do not allege that the trades constituted a large percentage of total daily market volume, or that Defendants held a large percentage of the open interest of futures contracts on the NYMEX.  Nor, as discussed, do Plaintiffs sufficiently allege that settlement prices were integrated into platinum or palladium futures markets.  Plaintiffs, therefore, have failed to allege facts sufficient to support the theory that Defendants not only had the ability to influence settlement prices, but also the ability to influence *market prices more generally*.

**E.    The Complaint Fails to Allege that Defendants Proximately Caused any Actual Damages from Trading Activity Exclusively within the Proposed Class Period**

Even assuming, *arguendo*, that Plaintiffs have alleged a CEA claim, the Complaint still must be dismissed in part.  Only a person who has suffered "actual damages" "resulting from" and "caused by" a violation of 7 U.S.C. § 25(a)(1) has standing to bring a private claim under the

---

[9] While the Second Circuit has held that the CFTC may pursue a regulatory action for manipulation of settlement prices, it has not extended such a theory of liability to the CEA's narrow private right of action.  *DiPlacido*, 364 Fed. Appx. at 660 n.1 (distinguishing *Vitanza*).

CEA.  *Id.*  Any claims predicated on platinum and palladium futures trades which were opened and closed entirely *during the Class Period* (*see, e.g.*, Compl. ¶ 20) would therefore still be insufficient because any artificiality present at the time positions were opened allegedly would have been present also when these positions were closed or *vice versa*, thereby offsetting any potential damage.  *See, e.g.*, *Minpeco v. ContiCommodity Servs., Inc.*, 676 F. Supp. 486, 490 (S.D.N.Y. 1987) (plaintiff must offset losses suffered as a result of manipulation with increase in value of holdings resulting from the same manipulation); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) ("as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value").  Plaintiffs admit as much by excluding the alleged trades of White, Galan and Waxman during the "Class Period" from their allegation of damages and proximate cause.  *See* Compl. ¶ 22.  Thus, all intra-Class Period claims must be dismissed.

## IV.   PLAINTIFFS FAIL TO STATE A SECONDARY CEA CLAIM

### A.   There is No Private Right of Action for Control Person Liability

Plaintiffs' Second Claim, a purported control person claim, must be dismissed because it flouts the explicit language of the CEA[10] and well-established case law providing that there is no private right of action under Section 13c(b) of the CEA."  *See, e.g.*, *FDIC v. FSI Futures, Inc.*, No. 88 Civ. 906, 1991 WL 224302, at *7 n.13 (S.D.N.Y. Oct. 16, 1991).

### B.   The Complaint Fails to State a Claim For Aiding and Abetting

 Plaintiffs' Third Claim for aiding and abetting a CEA violation is subject to Rule 9(b).  *See, e.g.*, *Benfield v. Mocatta Metals Corp.*, No. 91 Civ. 8255, 1992 WL 58879, at *6 (S.D.N.Y. Mar. 13, 1992).  Plaintiffs' conclusory allegations that Defendants "each played their component

---

[10] 7 U.S.C. § 13c(b) expressly applies *only* to "an action brought by the Commission."

role and each knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein" (Compl. ¶ 189) fall far short of satisfying Rule 9(b), or even Rule 8.

To state an aiding and abetting claim under the CEA, in addition to alleging a primary violation of the CEA,[11] Plaintiffs must sufficiently allege that Defendants:  (1) had actual knowledge of the principal violator's intent to violate the CEA; (2) specifically intended to further that violation; and (3) acted in furtherance of the principal's objective. *Nicholas v. Saul Stone & Co.*, 224 F.3d 179, 189 (3d Cir. 2000); *Damato v. Hermanson*, 153 F.3d 464, 472-73 (7th Cir. 1998); *Amaranth*, 587 F. Supp. 2d at 541.  Further, the "assistance" must be "active," or intentional; simply being the "but-for cause of the investors' losses" is insufficient. *Thornock v. Kinderhill Corp.*, 749 F. Supp. 513, 516-17 (S.D.N.Y. 1990).

In an effort to allege actual knowledge, Plaintiffs allege, on a group basis, that, "each and every Defendant had extensive knowledge" of an alleged intent to establish artificial settlement prices throughout the "Class Period."  Compl. ¶ 181.  Plaintiffs, however, provide no individualized facts that even suggest "knowledge" on the part of "each and every Defendant," or any support for the notion that the Moore Defendants or MFG had *actual knowledge* of an alleged intent to violate the CEA (*i.e.*, manipulate platinum or palladium futures markets).

With respect to the Moore Defendants, the Complaint does not allege that they had knowledge of the time of day at which Pia traded or of any purported instruction he gave concerning the alleged trades.  Indeed, Plaintiffs' conclusory allegation of "extensive knowledge" by the Moore Defendants cannot be reconciled with Plaintiffs' other allegations that

---

[11] Because Plaintiffs have not stated a primary CEA claim, any claim for aiding and abetting such violation also fails.  *See Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 123 n.3 (5th Cir. 1996).  Further, the aiding and abetting claim fails to the extent it is brought under the general aiding and abetting section, 7 U.S.C. § 13c(a), for which there is no private right of action.  *See Kolbeck v. LIT Am., Inc.*, 923 F. Supp. 557, 568 (S.D.N.Y. 1996) ("[N]ot only is there no need to resort to the general aiding and abetting section, but such resort is explicitly barred.").

Moore lacked any compliance procedures (*id.* ¶¶ 31(b), 116, 122-24), and cannot be accepted as plausible.  *See Alstom*, 406 F. Supp. 2d at 477 n.40 (rejecting conflicting allegations of fraud) (quotation omitted).

With respect to MFG, the Complaint asserts that MFG "had actual knowledge that the Moore Capital Defendants' trades . . . were intended to push prices higher."  Compl. ¶ 138.  But not a single fact is pled to support an inference that MFG was ever instructed to execute purchase orders in an uneconomic manner, to pay more than market prices, or to create artificial prices.  Rather, MFG was instructed to buy futures contracts at "market" prices during the close.  *Id.* ¶¶ 84-85.  There are no facts to support an inference of actual knowledge by MFG that Pia had an alleged intent to create artificial prices.  *Amaranth*, 587 F. Supp. 2d at 539.

Having failed to allege that the Defendants had any knowledge of the alleged manipulation, Defendants cannot have shared a principal's purported unlawful objective.  *See Benfield*, 1992 WL 58879, at *6 ("an aider and abettor must not only know of the principal's violation of law, they must willfully assist in the violation and share the principal's intent").

In an effort to plead substantial assistance, Plaintiffs allege that "[e]ach Defendant provided highly unusual assistance by engaging in acts to further the blatant manipulation whereas standard practice was to refuse to do such acts" (Compl. ¶ 182) without specifying *any* acts committed by any of these Defendants to further the alleged manipulation.  This does not suffice.  *Thornock*, 749 F. Supp. at 516 ("mere recitation of the words 'substantial assistance' does not suffice to elevate [ ] activities to the level necessary to uphold the claim").

Plaintiffs' allegation that the Moore Funds "made, paid for and financed the manipulative trades" (Compl. ¶¶ 32-33), is not sufficient to allege substantial assistance.  In *Amaranth*, the court dismissed aiding and abetting claims against defendants situated nearly identically to the

Moore Funds.  The court found inadequate the broad assertions of "the Master Fund's holding of allegedly manipulative positions and on the Feeder Funds' investment of funds in the Master Fund" because "these broad allegations are inadequate without any allegations that any of these entities knew about the manipulative scheme, intended that the manipulation would occur, and substantially assisted in the furtherance of the scheme."  *In re Amaranth Natural Gas Commodities Litig.*, 612 F. Supp. 2d 376, 390 (S.D.N.Y 2009) ("*Amaranth II*").

Finally, with respect to MFG, Plaintiffs allege only that MFG executed orders to buy platinum and palladium futures contracts.  Compl. ¶ 140.  However, the provision of usual brokerage services cannot constitute substantial assistance.  *Amaranth*, 587 F. Supp. 2d at 545 ("broker cannot be held liable as an aider and abettor simply because it performed its contracted-for services").  As in *Amaranth*, here, "there is no indication of any services provided by [the broker] that were not typical of the relationship between a futures clearing merchant and its client."  *Id.*  Plaintiffs' incantation of the "magic words" that MFG provided "unusual" or "extraordinary" service to the alleged primary violator (Compl. ¶ 140), does not elevate MFG's provision of brokerage services into nefarious conduct.  *See Thornock*, 749 F. Supp. at 516.[12]

## C.    Plaintiffs Fail to State a Claim For Principal Agent Liability under the CEA

Plaintiffs' claims for agency liability similarly fail under either Rule 9(b) or Rule 8.[13] The CEA creates agency liability if (1) the violator acted as the other's agent when he engaged in the unlawful activity, and (2) the violator's actions were within the scope of his employment or

---

[12] In *Amaranth*, the court noted that the clearing broker, JPM, had actual knowledge of all of Amaranth's trading activity, that Amaranth violated position limits, that NYMEX and the CFTC were investigating Amaranth, and that Amaranth traded in a manner avoid regulatory scrutiny. 587 F. Supp. 2d at 525-26.  Yet, the court concluded that JPM's continued provision of clearing services, including raising credit limits, constituted "normal clearing services."  *Id.* at 544-45.

[13] As with the aiding and abetting claims, as a threshold matter, if the Court dismisses the manipulation claim, there can be no vicarious liability.  *See Kolbeck*, 923 F. Supp. at 570.

office. *See Guttman v. CFTC*, 197 F.3d 33, 37 n.6 (2d Cir. 1999) (citing 7 U.S.C. § 2(a)(1)(B)). An agency relationship requires:  (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the parties' understanding that the principal is to be in control.  *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006).

Plaintiffs have not pled a sufficient agency relationship as to any of the Moore Defendants other than Moore Capital Management, *e.g.*, Pia's employer.  Plaintiffs attempt to hold each Defendant liable for the acts of every other Defendant without alleging facts to support an inference of an agency relationship between them.  *See* Compl. ¶¶ 33, 83, 87(f), 128, 170. Plaintiffs cannot establish an agency relationship between two entities by simply tracking the language of § 2(a)(1)(B).  *See Amaranth*, 587 F. Supp. 2d at 546 ("To meet their pleading burden, plaintiffs must *allege facts* that . . . support the legal conclusion that an agency relationship exists.") (emphasis added).

In particular, Plaintiffs fail to show how each alleged principal exercised "complete control" over its alleged agent.  *See FSI Futures*, 1991 WL 224302, at *7.  As discussed above, with respect to the Moore Funds, Plaintiffs merely allege that they "made, paid for and financed the manipulative trades."  Compl. ¶¶ 32, 33.  In *Amaranth*, the court dismissed an agency claim where plaintiffs alleged that the fund defendants "got the manipulation started by putting up funds for investment."  587 F. Supp. 2d at 546.  As the court stated, "[i]n no sense are…these allegations sufficient to allege a principal-agent relationship."  *Id*. at 547.  With respect to MCA and MA, Plaintiffs' allegations that Pia was their agent (Compl. ¶ 175) and that these Defendants were co-general partners and commodity pool operators of the Moore Funds (*Id.* ¶ 127) are similarly deficient as they provide no factual support that MCA and MA granted authority to or exercised control over the Funds or over Pia.  *See Cleveland*, 448 F.3d at 522; *see also Amaranth*

*II*, 612 F. Supp. at 394 (no agency relationship where plaintiffs failed to allege that traders were acting within the scope of their employment by alleged principal).

## V.      THE COMPLAINT FAILS TO STATE AN ANTITRUST PRICE FIXING CLAIM

The Fourth Claim, labeled "Sherman Act §1 for per se Price Fixing" (Compl. ¶ 192), should be dismissed because, *inter alia*, it does not allege the fundamental elements of such a violation: an agreement between otherwise independent economic actors to fix prices.

### A.      No Allegation of Independent Economic Actors

Plaintiffs purports to allege an antitrust violation involving Moore Capital Management, Moore Capital Advisors, Moore Advisors and Pia – the purported "Platinum/Palladium Price-Fixing Enterprise."  Compl. ¶ 195.  Thus, the alleged Sherman Act conspirators consist of only (1) affiliated non-competing business entities (the Moore Defendants), and (2) an employee of one of those entities (Pia).  *Id.* ¶¶ 27-33.  The Complaint does not allege that the Moore Defendants were independent competitors with separate economic interests.  In fact, the only economic interest attributed to the Moore Defendants is their common interest in co-managing the two Moore Funds.  *Id.* ¶¶ 32-33, 127(a).  These allegations are fatal.

Non-competing companies within a single business enterprise cannot constitute the plurality of independent actors necessary for a § 1 conspiracy.  *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767-68 (1984); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 263 (2d Cir. 2001).[14]  In its latest extension of *Copperweld*, the Supreme Court explained that "the relevant inquiry, therefore, is whether there is a 'contract, combination . . . or conspiracy' amongst 'separate economic actors pursuing separate economic

---

[14] Plaintiffs' counsel is familiar with this dispositive issue.  *See In re Title Ins. Antitrust Cases*, No. 08 Civ. 677, 2010 WL 1267129, at *60 (N.D. Ohio Mar. 31, 2010) (dismissing claim brought by Plaintiffs' counsel because "a parent and its subsidiaries or affiliates are not legally capable of conspiring with each other for purposes of § 1 of the Sherman Antitrust Act").

interests' . . . such that the agreement 'deprives the marketplace of independent centers of decision making,'" *Am. Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2211 (2010), quoting *Copperweld*, 467 U.S. at 769.  There are no such allegations regarding the Moore Defendants, and indeed, as noted above, Plaintiffs plead otherwise.  Moreover, regarding Pia, "[i]t is well-settled that . . . employees cannot conspire with their employer under section 1 of the Sherman Act."  *Gucci v. Gucci Shops, Inc.*, 651 F. Supp. 194, 197 (S.D.N.Y. 1986), citing *Schwimmer v. Sony Corp. of Am.*, 677 F.2d 946, 953 (2d Cir. 1982); *see also Copperweld*, 467 U.S. at 769.

Courts in this District have routinely dismissed cases involving similar facts.  *See, e.g.*, *Wellnx Life Scis., Inc. v. Iovate Health Scis. Research, Inc.*, 516 F. Supp. 2d 270, 291 n.6 (S.D.N.Y. 2007); *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 677-78 (S.D.N.Y. 1987); *Gucci*, 651 F. Supp. at 197.  In *Wellnx*, the court dismissed an antitrust conspiracy claim where, as here, the complaint affirmatively alleged that the defendant corporations were "affiliated," and the complaint did "not distinguish between the companies in any of the substantive allegations." 516 F. Supp. 2d at 291 n.6.  The court said these allegations:

> demonstrate[] plaintiff's view that the companies' "objectives are common, not disparate," and that "their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." *Copperweld*, 467 U.S. at 771.  In other words, [the two defendants] are not alleged in the amended complaint to be distinct entities capable of forming a horizontal agreement between them to restrain trade.

*Id.*  These comments apply equally here and Plaintiffs' antitrust claims should be dismissed.

### B.     No Allegation of Agreement to Fix Prices

An unlawful agreement is the core of a § 1 Sherman Act claim.  *Copperweld*, 467 U.S. at 767-68; *Tops Mkts., Inc, v. Quality Mkts., Inc.*, 142 F.3d 90, 95-96 (2d Cir. 1998).  In *Twombly*, the Supreme Court held that a defendant should not be subjected to the burden and expense of antitrust class action discovery unless a complaint contains "enough fact to raise a reasonable

expectation that discovery will reveal evidence of illegal agreement."  550 U.S. at 556; *see also Iqbal*, 129 S. Ct. at 1949-50.  Moreover, antitrust "allegations . . . must plausibly state how *each defendant* was involved in the alleged conspiracy."  *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-2227, 2010 WL 3001746, at *16 (S.D.N.Y. Aug. 2, 2010) (emphasis added).  Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient.  *Twombly*, 550 U.S. at 555; *Harris*, 572 F.3d at 72.

Here, the Complaint simply and solely parrots the statutory language:  "Defendants . . . entered into and knowingly engaged in a contract, combination or conspiracy in restraint of trade."  Compl. ¶ 195.  This is classic improper conclusory pleading, and the Complaint alleges no other facts yielding a plausible inference of an agreement between competitors to unlawfully fix prices.  As in *Twombly,* Plaintiffs' antitrust claim should be dismissed.

### C.     MFG is Specifically Excluded From the Antitrust Claim

Although the antitrust claim is nominally asserted against "All Defendants," MFG is *not referenced once therein*, and is *excluded* from the alleged "Platinum/Palladium Price-Fixing Enterprise."  Compl. ¶¶ 192-98.  Plaintiffs plead no facts from which to infer that MFG entered into an unlawful agreement in violation of the Sherman Act and thus the claim must be dismissed as against MFG.  *See Invamed, Inc. v. Barr Labs.*, 22 F. Supp. 2d 210, 220 (S.D.N.Y. 1998) (Sherman Act § 1 claim "cannot stand" against defendant where complaint presented no facts that might establish any participation in the alleged conspiracy, "*save including them within the term defendants*") (emphasis added).

The complaint elsewhere alleges that MFG acted on behalf of other Defendants in accepting and executing trade orders.  Compl. ¶¶ 34(c), 87(e)-(f), 134.  However, the execution of customary, professional services is not the "meeting of the minds" required for a Sherman Act

violation.  *Williams v. Citigroup, Inc.*, No. 08 Civ. 9208, 2009 WL 3682536, at *5 (S.D.N.Y. Nov.

2, 2009) (finding that "[i]t is certainly not illegal for one party to announce terms of dealing and

the counterparty to acquiesce to those terms absent a conscious commitment to a common

scheme designed to achieve an unlawful objective") (citation omitted); *see also Michelson v.*

*Merrill Lynch*, 669 F. Supp. 1244, 1259 (S.D.N.Y. 1987) (dismissing antitrust claim against

exchange for failure to allege that it conspired with anyone).  There is no plausible inference of a

conscious commitment by MFG to pursue an allegedly unlawful objective.

### D.      Plaintiffs Do Not Have Antitrust Standing

In order to have antitrust standing to sue, a plaintiff must allege facts showing an injury

directly resulting from an alleged antitrust violation.  *Associated Gen. Contractors of Cal., Inc..*

*v. Cal. State Council of Carpenters*, 459 U.S. 519, 536, 545 (1983) (equating "antitrust injury"

with "proximate cause;" dismissal required due to "tenuous and speculative" relationship

between alleged injury and violation*); Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d

117, 121 (2d Cir. 2007) (claim dismissed where alleged injuries were indirect); *Paycom Billing*

*Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290-93 (2d Cir. 2006) (same).

The Physical Plaintiffs nebulously allege that they traded physical commodities in the

spot market (Compl. ¶¶ 23-26) [15], while the Moore Defendants traded solely in the futures

market.  Thus, any purported injuries suffered by the Physical Plaintiffs necessarily were

secondary and indirect.  Courts in this district have dismissed antitrust complaints in

commodities trading cases where similar indirect injuries were alleged.  *See, e.g.*, *de Atucha v.*

*Commodity Exch., Inc.*, 608 F. Supp. 510, 515-16 (S.D.N.Y. 1985) (dismissing complaint for lack

of antitrust standing because plaintiff and defendant operated in two different silver markets); *see*

---

[15] Having filed three complaints, Futures Plaintiffs have yet to identify what instruments they
allegedly purchased, at what prices, in what quantities, or on which dates.  *See* Compl. ¶¶ 23-26.

*also Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*, No. 98-4067, 1999 WL 1201701, at *6 (S.D.N.Y. Dec. 15, 1999) ("In this Circuit, courts consistently have held that in cases involving commodity exchange markets, only those who actually participate in the same market as the defendant have standing under the Clayton Act.").  As in *de Atucha*, and consistent with other precedent in this Circuit, Plaintiffs' antitrust claim should be dismissed.

## VI.  THE COMPLAINT FAILS TO STATE A RICO CLAIM

Plaintiffs' RICO claim (Compl. ¶ 199) contains such glaring and fundamental defects that it calls into question Plaintiffs' decision to file it.  This claim should be dismissed before any further harm is inflicted on Defendants.  *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996), *aff'd,* 113 F.3d 1229 (2d Cir. 1997) ("Because the mere assertion of a RICO claim . . . has almost inevitable stigmatizing effect on those name as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of litigation").

### A.  The Complaint Fails to Allege RICO Continuity

To state a pattern of racketeering activity, Plaintiffs must plead at least two predicate acts (18 U.S.C. § 1961(5)) and show the acts are related and amount to or pose a threat of continuing criminal activity, *i.e.*, continuity.  *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241-42 (1989); *GICC Cap. Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 465 (2d Cir. 1995).

Plaintiffs allege a scheme that lasted only seven months, October 25, 2007 to June 6, 2008.  Compl. ¶¶ 1, 210, 214-15, 217-18.  This alleges a "closed ended" pattern of activity. *Spool v. Int'l Adoption Agency*, 520 F.3d 178, 183-84 (2d Cir. 2008) (a racketeering "pattern" with beginning and ending dates has "closed-ended" continuity).[16]  Where the pattern of activity

---

[16] Any argument that Plaintiffs' have pled open-ended continuity is contrary to their Complaint. *See* Compl. ¶¶ 1, 214, 217-18.  Moreover, the Complaint is devoid of allegations showing that the nature of the alleged enterprise itself, or external factors, gave rise to a threat of continuity. *See Qualis Care, L.P v. Hall*, No. 95 Civ. 4955, 1999 WL 683564, at *6 (S.D.N.Y. Sept. 1, 1999).

is closed-ended, continuity can be established only by "a series of related predicates extending over a substantial period of time."  *First Cap. Asset Mgmt., Inc. v. Brickelbush, Inc.*, 219 F. Supp. 2d 576, 585 (S.D.N.Y. 2002), *aff'd* 385 F.3d 159 (2d Cir. 2004).  The Second Circuit has "never held a period of less than two years to constitute a substantial period of time."  *See Spool*, 520 F.3d at 184.  Plaintiffs' alleged seven-month period is fatally short.[17]

### B.   Plaintiffs Fail Properly to Plead Any RICO Predicate Acts

First, Plaintiffs' impermissibly rely upon group pleading to allege predicate acts. Plaintiffs provide only blanket allegations that "defendants" committed predicate acts of mail fraud, wire fraud, money laundering, and transportation of stolen money.  Compl. ¶¶ 206, 217. These conclusory, undifferentiated allegations fail to indicate which Defendants are being charged with which predicate acts and fail to comply with Rule 8(a).  *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91 Civ. 2923, 1994 WL 88129, at *18, 20 (S.D.N.Y. Mar. 15, 1994) (RICO claims against multiple defendants must allege that *each* defendant committed at least two predicate acts and identify which defendant committed which acts).

Second, Plaintiffs fail to plead predicate acts with the particularity required by Rule 9(b). Plaintiffs attempt to allege mail fraud, wire fraud, and interstate transportation of stolen property obtained by fraud as predicate acts.  Compl. ¶¶ 206, 214.  Each alleged act is a fraud offense and must be pleaded with specificity.  *See First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004); *see also Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F. Supp. 276, 281 (S.D.N.Y. 2001) ("all of the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency in civil RICO actions").  The "'overwhelming trend' among the lower

---

[17] *See Spool*, 520 F.3d at 184 (16-month scheme insufficient); *DNJ Logistic Group, Inc. v. DHL Express, Inc.*, No. 08-2789, 2010 WL 625364, at *9 (E.D.N.Y. Feb. 19, 2010) (11 months was insufficient).

courts is to apply Rule 9(b) strictly in order to effect dismissal of civil RICO suits." *Int'l Telecom, Inc. v. Generadora Electrica Del Oriente, S.A.*, No. 00 Civ. 8695, 2002 WL 465291, at *7 (S.D.N.Y. Mar. 27, 2002) (citation omitted).

Thus, the allegations of mail fraud, wire fraud, and interstate transportation of stolen property "should state the contents of the communications, who was involved, where and when they took place, and [should] explain why they were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993); *see also Spool*, 520 F.3d at 185. Here, however, the Complaint is bereft of any such detail. It does not specify a single fraudulent transaction. Nor does it identify who was involved, or where and when the fraud took place. Instead, the Complaint falls back on repeated, conclusory assertions that the defendants violated the three statutes over a seven-month period. Compl. ¶¶ 206, 210-17. Plaintiffs muster only a conclusory statement that Defendants allegedly transported criminally derived proceeds without any factual detail. *Id.* ¶ 217. Moreover, there is no suggestion that Defendants used the instrumentalities of interstate commerce in carrying out the alleged predicate offenses. In their rush to the courthouse, Plaintiffs skipped over this statutory element entirely.

Plaintiffs purport to allege two acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957 (Compl. ¶¶ 216-20), which prohibit money laundering of proceeds of certain "specified unlawful activity." The specified unlawful activity in a money laundering violation includes any crime that qualifies as a predicate act under RICO's definition of "racketeering activity." 18 U.S.C. § 1956(c)(7)(A); *see also United States v. Capoccia*, 503 F.3d 103, 115 (2d Cir. 2007). But since the three predicate acts sounding in fraud are inadequately pleaded, there is no basis to support the money laundering acts. *See, e.g.*, *United States v. D'Alessio*, 822 F. Supp.

1134, 1146 (D.N.J. 1993) ("Since [the mail fraud counts] three have been dismissed, there is no

basis upon which to support the money laundering charges[.]").

### C.    Plaintiffs Lack RICO Standing

Plaintiffs have previously conceded that RICO and antitrust standing standards are the

same.[18]  Plaintiffs lack antitrust standing and, therefore, also lack RICO standing.

### D.    MFG is Not an Alleged Participant in Any Enterprise

Although the RICO claim purports to be against "All Defendants," MFG is not

mentioned even once in the Count and is not alleged to be a part of the purported

"Platinum/Palladium Price-Fixing Enterprise."  Compl. ¶¶ 195, 201, 222-27.  Yet a RICO

§ 1962(c) claim must allege that a defendant participated in the operation or management of the

alleged enterprise.  *Reves v. Ernst & Young*, 507 U.S. 170, 183, 185 (1993); *see also Berry v.*

*Deutsche Bank Trust Co. Am.*, No. 07 Civ. 7634, 2008 WL 4694968 (S.D.N.Y. Oct. 21, 2008).

No allegations are made that MFG had a role in directing the alleged enterprise's affairs.

MFG's alleged provision of brokerage services to an alleged enterprise, even if helpful,

cannot, as a matter of law, establish operation or management of an enterprise.  *See In re Agape*

*Litig.*, 681 F. Supp. 2d 352, 370 (E.D.N.Y. 2010) (RICO claim dismissed where *MFG* was

accused of providing "conventional services of a broker;" "simply alleging that a defendant

provides services which are helpful to an enterprise without any allegations that those entities

exert any control over the enterprise does not sufficiently allege a claim under RICO against

those entities"); *see also Lesavoy v. Lane*, 304 F. Supp. 2d 520, 534 (S.D.N.Y. 2004), *aff'd in*

*part and vacated on other grounds*, 170 Fed. Appx. 721 (2d Cir. 2006) (allegation that clearing

---

[18]  *See* Pls. Opp. to Motion to Stay Discovery (Docket No. 42) at 24, citing *Holmes v. SIPC*, 503
U.S. 258, 267-268 (1992) (RICO standing statute modeled after section 4 of the Clayton Act).

brokers "sent confirmations, executed trades, and paid commissions . . . does not demonstrate that an enterprise existed, or that they ever participated in its operation or management").

E.    **Plaintiffs Fail to State a RICO Conspiracy Claim**

RICO § 1962(d) makes it unlawful for any person to conspire to violate the substantive provisions of RICO.  Thus, there can be no conspiracy claim under § 1962(d) without an underlying substantive violation of RICO §§ 1962(a), (b) or (c).  *Lesavoy,* 304 F. Supp. 2d at 5345; *First Capital Asset Mgmt.*, 385 F.3d at 182.  Here, Plaintiffs' failure to plead a substantive RICO violation dooms their RICO conspiracy claim.  Further, Plaintiffs must sufficiently plead that each Defendant understood the goals of the enterprise and knowingly agreed to facilitate those goals through the commission of two predicate acts.  *See Agape Litig.*, 681 F. Supp. 2d at 370; *see also Odyssey Re (London) Ltd. v. Stirling Cook Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 303 (S.D.N.Y. 2000) ("Second Circuit case law has made it clear that . . . plaintiff must allege that each defendant knowingly agreed to personally commit at least two predicate acts").  Plaintiffs' formulaic recitation of the elements (Compl. ¶¶ 227-30) fails to establish a plausible inference that each Defendant knowingly agreed to commit two predicate acts.

## CONCLUSION

Having twice amended, the Complaint should be dismissed with prejudice.

Word Count:  14,608 (including tables)

Dated:  November 5, 2010
         New York, New York

                                    By:  ___/s/ David M. Zensky, Esq._____

                                    AKIN GUMP STRAUSS HAUER & FELD LLP
                                    David M. Zensky, Esq.
                                    Jamison A. Diehl, Esq.
                                    Peter I. Altman, Esq.

                                    Paul B. Hewitt, Esq.
                                    J. Brady Dugan, Esq.
                                    1333 New Hampshire Avenue, NW
                                    Washington, D.C. 20036
                                    *Counsel for Defendants Moore Capital Management
                                    LP, Moore Capital Advisors, LLC, Moore Advisors,
                                    Ltd., Moore Macro Fund, LP, and Moore Global
                                    Fixed Income Master Fund, LP*


                                    By:  ___/s/ Jennifer L. Rochon, Esq._____

                                    KRAMER LEVIN NAFTALIS & FRANKEL LLP
                                    Jennifer L. Rochon, Esq.
                                    Jade A. Burns, Esq.
                                    1177 Avenue of the Americas
                                    New York, New York 10036
                                    *Counsel for Defendant Christopher L. Pia*


                                    By:  ___/s/ Therese M. Doherty, Esq._____

                                    HERRICK, FEINSTEIN LLP
                                    Therese M. Doherty, Esq.
                                    LisaMarie F. Collins, Esq.
                                    2 Park Avenue
                                    New York, New York 10016
                                    *Counsel for Defendant MF Global Inc.*