UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In Re: Platinum And Palladium Commodities Litigation*<br><br>This Document Relates To:<br><br>All Actions | MASTER FILE<br>No. 10 Civ. 3617 (WHP) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE AND DISMISS THE SECOND AMENDED CONSOLIDATED COMPLAINT**

**CORRECTED COPY**

Christopher Lovell
Gary Jacobson
Ian Stoll
Christopher M. McGrath
Benjamin M. Jaccarino
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway, Suite 501
New York, New York 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4775

***Interim Class Counsel for Futures Plaintiffs and the Proposed Futures Sub-Class***

William J. Doyle, II
John A. Lowther
**DOYLE LOWTHER LLP**
9466 Black Mountain Road, Suite 210
San Diego, California 92126
Telephone: (619) 576-1700
Facsimile: (619) 573-1701

***Interim Class Counsel for Physical Plaintiffs and the Proposed Physical Sub-Class***

**ERRATA TO PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE AND DISMISS**
**THE SECOND AMENDED CONSOLIDATED COMPLAINT**

In addition to legal citation and internal reference changes, the Corrected Copy makes the following changes:

| Page; Line | Correction |
|---|---|
| | |
| Page 2; line 6 | Delete "of manipulation" |
| Page 3; line 7 | Add "month" before "period" |
| Page 6; fn. 5, line 3 | Replace "Such" with "MOC buy" |
| Page 9; line 14 | Insert "," after "gold" |
| Page 13; line 14 | Replace "volatile" with "violative" |
| Page 14; line 4 | Remove quotation marks around "on behalf of" |
| Page 15; lines 5, 9 | Replace "market" with "MOC buy" |
| Page 16; line 15-16 | Move "¶¶58,67" from line 16 to line 15 |
| Page 16; fn. 16, line 6 | Delete "the" after "overwhelmingly" |
| Page 17; line 13 | Change "manipulative" to "manipulate" |
| Page 18; line 14 | Replace "traders" with "trader" |
| Page 18; fn., 19 | Change "need" to "needed" |
| Page 20; fn. 21, line 7 | Change "five" to "four" |
| Page 21; Fn. 22 lines 10-18 | Change 'two" to "the" before "CEA"; move last paragraph into second sentence of second paragraph and delete "Similarly"; insert "was distinguished by" after ("*Natural Gas II*") and delete "distinguished *Natural Gas II*" |
| Page 22; line 9 | Delete "(1):" before "Defendants," |
| Page 22; line 12; Page 3; line 1; Page 20 line 12 | Add apostrophe after "Defendants" |
| Page 23; lines 5-6 | Move "no less than ten times" from line 6 to line 5 |
| Page 23; line 17 | Change "disclosures" to "disclosure"; add period after "*Dura*" |
| Page 24; lines 3-4 | Add "the amount of" after "changes in" |
| Page 25; line 19 | Change "Moore Manger" to "Moore Manager" |
| Page 26; line 23 | Change "an" to "a" |
| Page 27; fn. 25, lines 2, 5 | Add "here" after "claim"; change "held" to "pleaded" |

# TABLE OF CONTENTS

Page

POINT I. FRCP RULE 12(b)(6) STANDARDS ........ 1

POINT II. DEFENDANTS FAIL TO CARRY THEIR BURDEN TO DISMISS THE COMMODITY EXCHANGE ACT CLAIMS ........ 1

A. Plaintiffs Plead The Four Elements Of A Manipulation Violation ........ 2

1. Plaintiffs Competently Plead Fourteen Separate Means Of Causation ........ 3

2. Defendants Respond Only To The Fourteenth Kind Of Causation ........ 10

3. Defendants' Desperate Attempt To Engraft Securities Law Fraud Elements On To CEA Manipulation Cases, Is Wholly Unsupported And Also Is Contrary To CEA Law ........ 11

4. Defendants' Remaining Causation Arguments Misstate What The Prevailing Bid And Offer, And Market On Close Orders Are, Otherwise Violate The Controlling Standards On A Rule 12(b)(6) Motion, And Mischaracterize *DiPlacido* ........ 15

B. The CFTC Has Found, And Plaintiffs Adequately Plead Intent To Manipulate ........ 16

C. Defendants Raise No Constitutional Or Notice Problems ........ 23

D. Plaintiffs Plead Proximate Causation of Damages. ........ 23

E. The Relations Between And Among The Various Defendants Show That Each Is Primarily And Secondarily Liable For Manipulation, And All Are Liable As Aiders And Abettors ........ 24

Primary Liability and Section 2(a)(1) Liability of the Moore Manager Defendants. ........ 24

Primary Liability And Section 2(a)(1) Liability Of The Moore Fund Defendants. ........ 25

Primary Liability And Aiding And Abetting Liability Of MF Global. ........ 26

Aiding And Abetting Liability Of The Moore Defendants. ........ 28

POINT III. DEFENDANTS' MOTION TO STRIKE SHOULD BE DENIED ........ 28

POINT IV. THE PHYSICAL PLAINTIFFS ALLEGE VIABLE ANTITRUST CLAIMS ..... 32

A. MF Global's And The Other Moore Defendants' Agreement Is Evidenced By The CFTC's Findings ..... 33

B. The Complaint Alleges An Agreement Among MF Global And The Other Defendants To Restrain Trade By Engaging In Trading Intended To Cause (And Causing) Artificial Prices ..... 34

C. Plaintiffs' Claims Are Not Barred By The *Copperweld* "Intra-Enterprise" Theory ..... 35

POINT V. THE PHYSICAL PURCHASER PLAINTIFFS STATE VIABLE RICO CLAIMS ..... 36

A. Plaintiffs Plead The Requisite RICO Continuity ..... 36

B. Plaintiffs' Allegations Are Adequately Pleaded ..... 38

C. Plaintiffs Have RICO Standing ..... 39

D. Plaintiffs State A RICO Conspiracy Claim ..... 40

CONCLUSION ..... 40

**TABLE OF AUTHORITIES**

**Cases**

*In re Amaranth Natural Gas Commodities Litig.*, 612 F. Supp.2d 376 (S.D.N.Y. 2009) ...... 25, 26

*In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513 (S.D.N.Y. 2008)........................................................................ 15, 20, 27

*American Needle, Inc. v. National Football League*, 130 S. Ct. 2201 (2010)............................. 35

*Apex Oil Co. v. DiMauro*, 713 F. Supp. 587 (S.D.N.Y. 1989) ...................................................... 3

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) ..................................................................................... 1, 3

*Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................ 1, 21

*Baisch v. Gallina*, 346 F.3d 366 (2d Cir. 2003)............................................................................. 40

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 1998 U.S. Dist. LEXIS 981 (S.D.N.Y. Feb. 4, 1998)........................................................................................................ 37

*Berke v. Presstek, Inc*., 188 F.R.D. 179 (D.N.H. 1998)................................................................ 30

*Board of Trade v. Olsen*, 262 U.S. 1 (1923) .................................................................................. 13

*Cange v. Stotler & Co.*, 826 F.2d 581 (7th Cir. 1987)...................................................................... 2

*Cargill, Inc. v. Hardin*, 452 F.2d 1154 (8th Cir. 1971), *cert. denied sub nom., Cargill v. Butz*, 406 U.S. 932 (1972) ........................................... *passim*

*Chevron, U.S.A., Inc. v. Natural Res. Defense Council,* 467 U.S. 837 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ......................................................................................................... 18

*ClearOne Commc'n, Inc. v. Lumbermens Mut. Cas. Co.*, No. 04 Civ. 119, 2005 WL 2716297 (D. Utah 2005) .............................................................................................. 30

*Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC,* 554 F.Supp.2d 523, 531 (S.D.N.Y. May 21, 2008) .............................................................. 21

*Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC,* 2008 U.S. Dist. LEXIS 45638 (S.D.N.Y. June 10, 2008)....................................................... 21

*In re Copper Antitrust Litig.*, 98 F. Supp. 2d 1039, 1043 (W.D. Wis. 2000). ............................. 33

*Copperweld v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731 (1984). ....................... 35

*Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42 (2d Cir. 1991) ........................................ 30

*Billing v. Credit Suisse*, 426 F.3d 130 (2d Cir. 2006), *rev'd on other grounds sub nom., Credit Suisse Sec. (USA) v. Billing*, 551 U.S. 264 (2007) ......................................................... 12

*In re Crude Oil Commodity Litig.*, 2007 WL 1946553 (S.D.N.Y. 2007) .............................. 21, 31

*Damato v. Hermanson*, 153 F.3d 464 (7th Cir. 1998) ................................................................ 23

*DeAtucha v. Commodity Exchange, Inc.*, 608 F. Supp. 510 (S.D.N.Y. 1985) ............................ 33

*Dent v. United States Tennis Ass'n*, No. CV-08-1533, 2008 WL 2483288 (E.D.N.Y. June 17, 2008) ................................................................................................. 31

*DiPlacido v. Commodity Futures Trading Comm'n*, 364 Fed.Appx. 657 (2d Cir. 2009), *cert. denied*, 130 S.Ct. 1883 (2010) ........................................................ *passim*

*In the Matter of Anthony J. DiPlacido*, CFTC No. 10-23, 2008 WL 4861204 (CFTC Nov. 5, 2008) ........................................................................................... *passim*

*DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242 (2d Cir. 1987) ............................ 29

*Fraker v. Bayer Corp.*, No. 08 Civ. 1564, 2009 WL 5865687 (E.D. Cal. Oct. 6, 2009) ............. 31

*Frey v. Commodity Futures Trading Comm'n* (7th Cir. 1991) ..................................................... 13

*In re Global Minerals & Metals Corp.*, CFTC Docket No. 99-11, 1999 WL 1023586 (C.F.T.C. Nov. 12, 1999) ......................................................... 3, 21

*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989) .................................................... 37

*In re Henner*, 30 Agric. Dec. 1151 (1971) ............................................................................ *passim*

*In re Hohenberg Bros. Co.*, CFTC Docket No. 75-4, 1977 WL 13562 (CFTC 1977) ........... 17, 22

*In The Matter of Brian Hunter*, Docket No. IN07-26-004, 130 FERC ¶ 63,004 (FERC Jan. 22, 2010) .................................................................................... 15, 16, 20

*Hyland v. Homeservices of America, Inc.*, No. 3:05-cv-612, 2005 WL 1959157 (W.D. Ky. June 28, 2005) .................................................................................... 30

*In re Indiana Farm Bureau Coop. Assoc. Inc.*, CFTC Docket No. 75-14, 1982 WL 30249 (CFTC Dec. 17, 1982) ................................................................... 17, 18

*In re Initial Public Offering Antitrust Litig.*, 287 F..Supp.2d 497 (S.D.N.Y. 2003) .................... 12

*In re Initial Public Offering Securities Litig*., 227 F.R.D. 65 (S.D.N.Y. 2004) ............................ 4

*In re Initial Public Offering Securities Litig*., 260 F.R.D. 81 (S.D.N.Y. 2009) ............................ 6

*Ikuno v. Yip*, 912 F.2d 306, 309 (9th Cir. 1990) ................................................................ 37

*Johnson v. M&M Communications, Inc*., 242 F.R.D. 187 (D.Conn. 2007) ................................ 30

*Kohen v. Pacific Inv. Mgmt. Co. LLC*, 244 F.R.D. 469 (N.D. Ill. 2007), *aff'd*, 571 F.3d 672 (7th Cir.), *cert. denied* (130 S.Ct. 1504 (2010)...................................... 14, 23, 25

*Ledford v. Rapid-American Corp.*, 1988 WL 3428 (S.D.N.Y. 1988).......................................... 31

*Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980)...................................................................... 2, 3, 12

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) .......................................................... 39

*Levine v. Torino Jewelers, Ltd.*, 2006 U.S. Dist. LEXIS 11932 (S.D.N.Y. Mar. 22, 2006) .................................................................................................. 39

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) ....................................... 29

*Loeb Industries v. Sumitomo Corp.*, 306 F.2d 469 (7th Cir. 2002) ............................................ 32

*M'Baye v. New Jersey Sports Prods., Inc.*, 2007 U.S. Dist. LEXIS 9101 (S.D.N.Y. Feb. 7, 2007) ...................................................................................................... 39

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982).............................. 2

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig*., 218 F.R.D. 76 (S.D.N.Y. 2003) .................................................................................................................... 31

*Metropolitan Transit Auth. v. Contini*, 2005 U.S. Dist. LEXIS 13345 (E.D.N.Y. July 6, 2005) ..................................................................................................... 37

*Minpeco, S.A. v. Conticommodity Services, Inc*., *et al.*, 673 F. Supp. 684 (S.D.N.Y. 1987) ........................................................................ 11, 34

*Minpeco, S.A. v. Hunt*, 718 F.Supp. 168 (S.D.N.Y. 1989) ............................................................................ 11

*In the Matter of: Moore Capital Management, LP, Moore Capital Advisors, LLC and Moore Advisors, Ltd*., CFTC Docket No. 10-09 (CFTC Apr. 29, 2010).................. *passim*

*Morrow v. Black*, 742 F. Supp. 1199 (E.D.N.Y. 1990......................................................... 37, 38

*In re Natural Gas Commodity Litig.*, 358 F. Supp.2d 336 (S.D.N.Y. 2005) .......................... 30, 39

*In re Natural Gas Commodity Litig.*, 337 F. Supp.2d 498 (S.D.N.Y. 2005) .......................... 30, 39

*Ocean View Capital v. Sumitomo Corp.*, 1999 WL 1201701
(S.D.N.Y. Dec. 15, 1999) .......................................................................................... 33

*Option Resource Group v. Chambers Development Co.*, 967 F.Supp. 846
(W.D.Pa. 1996) .......................................................................................................... 31

*Piccolo v. Commodity Futures Trading Comm'n*, 388 F.3d 387 (2d. Cir. 2004) ......................... 18

*Premium Plus Partners, L.P. v. Davis*, 2005 WL 711591 (N.D. Ill. Mar. 28, 2005) .................. 21

*Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10 (2d Cir. 1989) .................. 38

*Quarlis Care. L.P. v. Hall*, 1999 U.S. Dist. LEXIS 13417 (S.D.N.Y. Sept. 1, 1999) .................. 38

*Rosenthal & Co. v. Commodity Futures Trading Comm'n*,
802 F.2d 963 (7th Cir. 1986) ......................................................................................... 14

*Sanner v. Board of Trade of the City of Chicago*, 62 F.3d 918 (7th Cir. 1995) .......................... 32

*Schmuck v. United States*, 489 U.S. 705 (1989) ............................................................... 38

*Securities & Exchange Comm'n v. Pentagon Capital Management PLC*,
No. 08 Civ. 3324, 2010 WL 985205 (S.D.N.Y. Mar. 17, 2010) ............................................. 30

*Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 678 (S.D.N.Y. 1987) ............................... 36

*Slayton v. American Express Co.*, 604 F.3d 758 (2d Cir. 2010) .................................................... 1

*Shahzad v. H.J. Meyers & Co., Inc.*, No. 95-Civ. 6196, 1997 WL 47817
(S.D.N.Y. Feb. 6, 1997) ................................................................................................ 31

*Sonitrol of Fresno, Inc. v. AT&T*, 1986 WL 953 (D.D.C. April 30, 1986) .................................. 36

*In re Soybean Futures Litig.*, 892 F.Supp. 1025 (N.D. Ill. 1995) ................................................. 3

*Spagnola v. Chubb Corp.*, 574 F.3d 64 (2d Cir. 2009) ................................................................. 1

*Strax v. Commodity Exchange, Inc.*, 524 F. Supp. 936 (S.D.N.Y. 1981) ..................................... 34

*In re Sulfuric Acid Antitrust Litig.*,--- F. Supp. 2d ---, 2010-2 Trade Cases ¶ 77, 194
MDL 1536, 2010 WL 3835869 (N.D. Ill. Sept. 24, 2010) ..................................................... 36

*In re Sumitomo Copper Litig.*, 995 F.Supp. 451 (S.D.N.Y. Mar. 11, 1998)................................ 11

*In re Sumitomo Copper Litig.*, 262 F.3d 134 (2d Cir. 2001) ..................................................... 12

*In re Sumitomo Copper Litig.*, 182 F.R.D. 85 (S.D.N.Y. 1998) ............................................. 9, 13

*Sumitomo Corp. v. Chase Manhattan Bank*, 2000 U.S. Dist. LEXIS 15707
(S.D.N.Y. Oct. 30, 2000) ......................................................................................... 37

*Tabor v. Bodisen Biotech, Inc.*, 579 F.Supp.2d 438 (S.D.N.Y. 2008)......................................... 30

*A. Terzi Prods. v. Theatrical Protective Union, Local No. One*,
2 F. Supp. 2d 485 (S.D.N.Y. 1998) ............................................................................ 37

*Three Crown Ltd. Partnership v. Salomon Bros., Inc.*, No. 92-CV-3142,
1995 WL 422467 (S.D.N.Y. 1995)............................................................................. 34

*Transnor (Bermuda) Ltd. v. BP North America Petroleum,*738 F.Supp. 1472
(S.D.N.Y. 1990) ......................................................................................................... 3

*United States v. Busacca*, 936 F.2d 232 (6th Cir. 1991)............................................................ 37

*United States v. Coiro*, 922 F.2d 1008 (2d Cir. 1991) ............................................................... 38

*United States v. Gilbert*, 668 F.2d 94 (2d Cir. 1981)................................................................. 31

*Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256 (2d Cir. 2001) .......................... 35

*Volkart Bros. Inc., v. Freeman*, 311 F.2d 52 (5th Cir. 1962)....................................................... 13

*Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*,
516 F. Supp.2d 270 (S.D.N.Y. 2007)......................................................................... 36

**Statutes**

Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq* ............................................................... *passim*

Commodity Exchange Act, 7 U.S.C. § 2(a)(1)(B)........................................................................ 24

Commodity Exchange Act, 7 U.S.C. § 25(a)(1) .......................................................................... 23

Securities Act of 1933, 15 U.S.C. § 77b(b) ................................................................................. 13

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4..................................................... 14

Private Securities Litigation Reform Act, 15 U.S.C. §78u-4(b)(4) ............................................. 23

**Rules**

Fed.R.Evid. 803(8)(C) ........................................................................................................... 30

**Other Authorities**

Charles Wright & Arthur Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed. 2010 Supp.)........................................................................................................... 1

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, Federal Judicial Center (2d ed. 2000) .............. 9

## POINT I. FRCP RULE 12(b)(6) STANDARDS

Plaintiffs respectfully submit this memorandum to demonstrate that Defendants' motion to dismiss and to strike should be denied in all respects. In moving pursuant to Rule 12(b)(6), Defendants bear the burden of showing that no claim has been stated.[1] This Court must take "all well-pled factual allegations as true **and draw all reasonable inferences in the plaintiff's favor** to decide whether the plaintiff has pled a **plausible** claim for relief." [Emphasis added here and in all quotes unless otherwise noted.] *Spagnola v. Chubb Corp.*, 574 F.3d 64, 67 (2d Cir. 2009).

> Asking for plausible grounds to infer [liability] . . . **does not impose a probability requirement at the pleading stage;** it simply calls for enough facts **to raise a reasonable expectation that discovery will reveal evidence of an agreement [here, of intentionally causing artificial prices or being responsible for one who intentionally causes artificial prices]** . . . .And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) ("*Iqbal*") (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("*Twombly*").

## POINT II. DEFENDANTS FAIL TO CARRY THEIR BURDEN TO DISMISS THE COMMODITY EXCHANGE ACT CLAIMS

Plaintiffs' well-pled allegations overwhelmingly raise "a reasonable expectation that discovery will reveal evidence" (*Iqbal*) (A) that Defendant Pia intentionally caused artificially high NYMEX platinum ("PL") and palladium ("PA") futures contract prices that were paid by Plaintiffs resulting in damages; (B) that the remaining Defendants either (1) participated in such primary manipulation violation; or (2) were, except for Defendant MF Global, "persons" on

---

[1] *Compare* 5B Charles Wright & Arthur Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed. 2010 supp.) ("All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists.") *with e.g.*, *Slayton v. American Express Co*., 604 F.3d 758, 773 (2d Cir. 2010) (securities fraud defendants on motion to dismiss "carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor, and they have not argued that the other factors they identified were important factors that could realistically cause results to differ materially. Absent such argument, we have no way of knowing if they were.").

behalf of whom Defendant Pia acted within the meaning of Commodity Exchange Act ("CEA")Section 2(a)(1); and/or (3) that all Defendants aided and abetted such manipulation violation. *See* II E *infra* (explaining the alleged role and liability of each Defendant).

**A. Plaintiffs Plead The Four Elements Of A Manipulation Violation**

Contrary to Defendants' efforts to engraft fraud, reliance and other elements on to CEA manipulation, there are four elements of such violation: "(1) that the accused had the ability to influence market prices; (2) that [he] specifically intended to do so; (3) that artificial prices existed; and (4) that the accused caused the artificial prices." *DiPlacido v. Commodity Futures Trading Comm'n* ("CFTC"), 364 Fed.Appx. 657, 661 (2d Cir. 2009), *cert. denied*, 130 S. Ct. 1883 (2010). In applying the foregoing elements to the pleading here, it is important to remember that the CEA is unqualifiedly remedial legislation. *See*, *Leist v. Simplot*, 638 F.2d 283, 315, n. 7 (2d Cir. 1980) ("*Leist*"), *aff'd sub nom.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357-67, 382-95 (1982) ("*Curran*") *citing* Conference Report to 1974 amendments, 120 Cong. Rec. 34997 (Oct. 10, 1974) (Sen. Talmadge). Moreover, part of Congress' efforts **to prevent manipulation** is to promote private law suits such as this one:

> Congress viewed private lawsuits as "**critical** to protecting the public and fundamental to maintaining the credibility of the futures market.

*Cange v. Stotler & Co.*, 826 F.2d 581, 594-595 (7th Cir. 1987) (*citing* to H.R. Rep. No. 565, 97th Cong., 2d Sess., pt. 1 at 56-57, *reprinted* in 1982 U.S. Code Cong. & Admin. News 3871, 3905-06).

**<u>Elements 1 and 2: Causation of Artificial Prices</u>**. Although causation is ordinarily

inappropriate even for summary judgment,[2] it is Defendants' first argument for dismissal here. D. Br. pp. 1-2, 22-25. The CFTC has stated that the manipulation violation is in the nature of a restraint of trade. *In the Matter of Global Minerals & Metals Corp.*, CFTC Docket No. 99-11, 1999 WL 1023586, *n. 51 (CFTC Nov. 12, 1999) ("[a]fter all, manipulation is an example of an illegal restraint of trade"). As is explained below, Defendant Pia restrained or impacted trade in fourteen separate ways to cause artificial prices. These restraints by Defendants over a seven-plus month period overwhelmingly raise a "reasonable expectation that discovery will reveal evidence" of causation. *Iqbal, supra.*

**1. <u>Plaintiffs Competently Plead Fourteen Separate Means Of Causation.</u>**

Commodity futures contracts are standardized bilateral executory agreements for the purchase and sale of a particular commodity. Second Consolidated Class Action Complaint ("Complaint" or "¶") ¶43. Here, the New York Mercantile Exchange ("NYMEX") PL futures contract specified that 50 ounces of 0.995% pure PL was to be delivered and the NYMEX PA futures contract specified that 100 ounces of PA was to be delivered. ¶¶54-64. In practice, delivery occurs on less than one percent of the trades. See ¶¶46-50 citing *Leist*, 638 F.2d 283, 286-323, *aff'd sub nom Curran*, 456 U.S. at 357-67, 382-95(explaining the mechanisms of commodity futures trading).

1. Futures contract trading occurs on commodity exchanges that have been approved by the federal agency that regulates commodity futures contract trading, the CFTC. ¶¶39-41.

---

[2]Causation is an inherently factual issue which is generally inappropriate for summary judgment and courts have repeatedly denied summary judgment on causation grounds against a complaint alleging commodity futures manipulation. *In re Soybean Futures Litig.*, 892 F.Supp. 1025 (N.D. Ill. 1995); *Transnor (Bermuda) Ltd. v. BP North America Petroleum*,738 F.Supp. 1472 (S.D.N.Y. 1990); *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587 (S.D.N.Y. 1989).

2. Even one large commodity futures trade can have a significant and permanent effect on prices. ¶¶92-94 (citing economic studies); *compare* D. Br. p. 18 (all trades influence prices).

3. Moreover, large buy trades, in particular, typically have a larger and longer upward impact on prices than large sell trades have a downward effect. *Id.*[3]

4. First, as the CFTC found here, Defendants made a "large" buy trade in each of PL and PA futures.[4] ¶91(a); CFTC Order p. 3.

5. Second, as the CFTC found, Defendants made not just one large buy trade, but "frequent" large buy trades in both PL and PA futures for a seven-plus month period from at least November 2007 "through" at least May 2008. ¶¶9, 90, 95; CFTC Order pp. 2-3.

6. Third, as the CFTC twice found, Defendants' large buy trades constituted "a large" or "a significant percentage of the trading volume". CFTC Order p. 3. Regardless of whether they are large trades, when trades constitute a significant percentage of the trading volume they may have a substantial effect on prices. ¶91.

7. Fourth, Plaintiffs allege that standard investment or trading conduct in the futures markets is for traders to seek to buy for the cheapest price, **NOT** the highest price. ¶85(b).

8. Indeed, in the exercise of its official expertise in industry standards and the purposes of the CEA, the CFTC has long opined that "[w]henever a buyer … intentionally pays more than [s]he has to for the purpose of causing the quoted price to be higher than it would

---

[3] For example: "Keim and Madhavan ... find that a buyer-initiated trade of only 0.16 percent of a company's outstanding stock is associated with a *permanent* price increase of 4.7 percent in the stock price." *In re Initial Public Offering Securities Litig*., 227 F.R.D. 65, 113 (S.D.N.Y. 2004)

[4]See ¶¶ 1,70; and Exhibit A to the Complaint (which contains the Order Instituting Proceedings Pursuant To Sections 6(c), 6(d) and 8a of The Commodity Exchange Act And Making Findings And Imposing Remedial Sanctions entered in *In the Matter of: Moore Capital Management, LP, Moore Capital Advisors, LLC and Moore Advisors, Ltd*., CFTC Docket No. 10-09, ("CFTC Order").

otherwise have been…the resultant price is an artificial price…”. *Compare DiPlacido,* 2008 WL 4831204 at *30 *with In re Henner*, 30 Agric. Dec. 1151, 1174-75 (1971); *see infra* re *Chevron* deference.

9. Rather than following what has officially been determined by the CFTC to be standard economic conduct in the futures markets to buy for the cheapest price, Defendant Pia typically took a complex combination of restrictive steps in order to create an imbalance between the size of Defendants' buy orders and the market's ability to absorb them in an orderly fashion. Thereby, Defendant Pia intentionally sought to overpay and buy for the highest price on each and every one of his "frequent" large purchases. ¶¶85-87.

10. Consistently seeking to overpay is wholly contrary to investment or trading conduct. In fact, it is consonant **only** with upward price manipulation. *Compare In re DiPlacido,* 2008 WL 4831204 at *27, 31, 34 *with In re Henner*, 30 Agric. Dec. at 1194 and ¶85(b). The restrictive and uneconomic aspects of Defendant Pia's buying set forth below BOTH (a) had an upward causal effect on prices, and (b) rendered whatever prices his purchases achieved, artificial prices. *DiPlacido supra* ("[w]henever a buyer….intentionally pays more…the resulting price is an artificial price")

11. Specifically, during October 25, 2007-June 6, 2008 (the "Class Period"), the amount of actual and potential trading in the NYMEX PA and PL futures markets was so low that such contracts were susceptible to a trade manipulation, *i.e.*, manipulation by the entry of trades. ¶¶62-63. This susceptibility to trade manipulation was particularly true of the floor market for NYMEX PL and PA futures. ¶96.

12. This was because the NYMEX floor market was even "thinner" (*i.e.*, less able to accommodate trade volume) than the NYMEX electronic computerized market for such trades.

¶96. CFTC Order p. 3 ("[d]uring the Relevant Period, the majority of trades in NYMEX PA and PL futures contracts were executed on the electronic trading platform, GLOBEX, rather than on the floor").

13. Fifth, rather than economically placing his large trades into the computer market, Defendant Pia uniformly directed that all his large trades be funneled into that portion of the NYMEX PA and PL futures markets that was most susceptible to trade manipulation: the "thinner" NYMEX **floor trading** market. ¶96; CFTC Order p. 3.

14. Sixth, rather than providing substantial time to allow this "thinner" market to provide offers and absorb his large trades in an orderly fashion, Defendant Pia specifically compressed the time that the market had to execute the trades into **the last ten seconds of trading**. ¶84; CFTC Order at pp. 2-4. Any shorter time would not have been sure to get an execution. (Reasonable inference.) By intentionally going to the thinnest market to make the quickest execution of the big buy trades, Defendant Pia further increased the price at which his large trades were executed, *i.e.*, he had yet another upward effect on NYMEX prices. ¶¶94-96.

15. Seventh, rather than placing a limit on how high the Defendants were willing to pay in order to buy such a large amount during such a short time in the "thinner" market, Defendant Pia consistently submitted "market on close" orders.[5] ¶¶84, 87. These orders are not

[5] Market on close or "MOC" orders are orders that are executed on the close at available prices. *Compare* CME Glossary available at http://www.cmegroup.com/education/glossary.html (definitions of "market on close" and "limit order"). MOC buy orders are to be executed by hitting available offers or, if the offers are insufficient, by paying or bidding up to whatever price level is required in order to create a large enough market to succeed in executing the number of contracts in the order. *Id; see In re Initial Public Offering Securities Litig.*, 260 F.R.D. 81, 109 (S.D.N.Y. 2009). *See* p. 16 *infra* re Defendants' incorrect and unsupported mis-description of MOC orders. Market orders "…are orders to buy at the current market price. A market order in a liquid stock will almost always be executed, but if prices are volatile the buyer might pay more than she intended." *In re Initial Public Offering Securities Litig.,* 260 F.R.D. at 109.

limited in price. They are to be executed at whatever prices were required to induce a large volume of selling in that very brief time span. *Id*.

16. Eighth, critically, Defendants did not instruct their brokers—who are referred to in the CEA as futures commission merchants ("FCMs")—to execute the orders at the best prices available. ¶85; CFTC Order p. 3.

17. On the contrary, Defendant Pia "often" accompanied Defendants' large orders with **written instructions** indicating they should be executed in a manner that pushed **prices higher**. ¶87. Expressly ordering purchases to be executed so as to overpay and cause higher prices is the **exact opposite** of standard or ordinary market behavior. ¶85; See *supra*. These written instructions constitute admissions of grossly uneconomic conduct that manipulated prices. (Actually, the CFTC Order specifies that the written instructions were to increase **settlement** prices. CFTC Order p. 3. But the prior step required to increase settlement prices is to increase futures contract prices; see explanation in ¶¶20-21 *infra*.)

18. Because Defendants' "frequent" and "large" trades had the foregoing multiple direct upward effects on NYMEX PL and PA futures contract prices, Defendants' trades also had four additional upward "computational" effects on such prices. ¶95.

19. Ninth, Defendants' trades were not just "large" trades. They also were all executed during the two minute settlement period in NYMEX PL and PA futures contracts. ¶84; CFTC Order p. 3. Such settlement period transactions prices all qualify for use in the computation of the volume weighted average price ("VWAP"). ¶¶58,67, This VWAP price of all of the trades during such two minute period was the settlement price. *Id*. Therefore, the higher prices caused by Defendants' trades, as a matter of arithmetic, automatically caused the NYMEX settlement prices to be higher. ¶95.

20.     Tenth, in both PL and PA, the NYMEX conducted during the Class Period trading in a series of successively later expirations or contracts.  ¶¶56, 65.  For each contract, the delivery date went increasingly further into the future.  *Id*.  But the prices of these different expirations are all "chained together" by mathematical market trading practices such as arbitrage spread trading, etc. ¶¶ 59, 68; *see also* Def. Br. p. 2, n.1; citing to NYMEX Rule 6.53.  Thus, by causing the prices of just one NYMEX PL and just one NYMEX PA futures contracts to be artificially high, Defendants caused the prices of the "chained-together" PL or PA futures contracts to be artificially high.  *Id*.

21.     Reciprocally however, the only way to increase settlement prices was to increase a futures contract transaction price.  ¶95.

22.     Eleventh, indeed, increasing the settlement price of the earlier expiring NYMEX PL or PA futures contract, necessarily increased the prices of the later expirations.  This is because of the way the NYMEX calculated settlement prices.  See D. Br. p. 2, n.1 citing to NYMEX Rule 6.53.  NYMEX Rule 6.53 then provided that the settlement prices of all NYMEX PL or PA futures prices other than the most actively traded contract were determined by "spread differentials" between the most actively traded contract and such other contracts based on trades executed on the NYMEX trading floor.  *See* NYMEX Rule 6.53(C).

23.     Twelfth, the settlement prices are the basis for daily computation of variation margin, which has to be posted by every trader. ¶ 99.  Unlike the first two computational effects, this computational effect directly impacts only variation margin rather than price.  *Id*. But by causing the settlement price to be higher, Defendants caused more margin (or "buying power", ¶100(c)) to be transferred to market participants with "buy" opinions, and caused margin to have

to be paid by market participants who had sold. *Id.* Thus the sellers had less selling power. This could exert further upward effects on prices. ¶¶ 69, 98, 100.

24. Those cash transfers increased the buying market participants' buying power and decreased the selling market participants' selling power in a way that could create a "positive feedback loop". ¶98. Such "buying pressure" from shorts who have to buy out of their short positions or longs who use their increased buying power to purchase more positions, could be self-reinforcing. ¶¶ 69, 98, 100.

25. **More indications of price artificiality.** Thirteenth, yet another indication of Defendants' upward causal effect on prices is that NYMEX PL and PA prices greatly increased after Defendants' "large" buy trades started, and greatly decreased after they ended. ¶¶ 104-114; *Sumitomo Copper Litig.*, 182 F.R.D. 85, 87 (S.D.N.Y. 1998) ("*Sumitomo* 1") Defendants imply that NYMEX PL and PA prices should move the same as gold and other prices. D. Br. pp. 4, 25. But, in fact, PL and PA prices increased more than gold, and platinum set all time highs. *Sumitomo* 1, 182 F.R.D. at 90 n.6 (courts look to factors such as "historical price comparisons…comparison of spreads…"); *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1173 (8th Cir. 1971) (that the record price increase in the last two trading days was not comparable to the previous nine years was an indicator of artificiality).

26. In the foregoing circumstances, Defendants' "frequent" large buy trades had "upward artificial effects" on prices of NYMEX PL and PA "for an extended period". ¶¶ 46, 94.

27. The cumulative amount of all of Defendants' foregoing upward effects on prices (and Defendants' "price beacon" effect described in ¶ 28 below) may be determined by

mathematical regression analyses.[6] Although such regressions may perhaps include the price comparisons suggested by Defendants (Def. Br. pp. 4, 25), introducing these facts and unsupported implications of parity between one futures price (gold) and other futures prices (PL and PA) are far beyond the Complaint. They are inappropriate on a FRCP Rule 12(b)(6) motion. However, at the appropriate time, these types of comparisons that have been affirmatively suggested by Defendants, will be available to determine the amount of causation on an aggregate, all-in basis. *See* fn 6 *supra*. This, obviously, will be done without any individual surveys of whether each given trader relied on a settlement price.

28. Fourteenth, by artificially inflating the settlement price, Defendants also caused the overnight reported price of NYMEX PL and PA contracts to be higher than otherwise. ¶¶ 98, 100(d). Because Defendants' manipulative conduct was not disclosed until April 9, 2010, this "price beacon" of higher prices could have influenced the beliefs and behaviors of other market participants. ¶¶ 98, 100, 101.

29. Physical PL and PA prices are closely tied to NYMEX PL and PA futures prices. ¶¶70-74; Ex. B to the Complaint. Therefore, the artificially high NYMEX futures prices caused higher physical PL and physical PA prices. *Id*.

**2. <u>Defendants Respond Only To The Fourteenth Kind Of Causation</u>**

Implicitly conceding the adequacy of Plaintiffs' foregoing overwhelming allegations of causation, Defendants do not even mention Plaintiffs' allegations that large trades may have large effects on prices; that large buy trades have greater effects on prices than large sell trades; that Defendants caused variation margin changes; and that ordinarily market participants enter

[6] *Compare* ¶147(f) *with* Reference Manual on Scientific Evidence Federal Judicial Center (2ed. 2000) at p. 171 (A regression analysis (or "regression model") attempts to combine the values of certain variables (the "independent" or "explanatory" variables) in order to get expected values for another variable (the "dependent" variable)).

their orders in a manner to buy for the lowest price. *Compare* ¶¶92-94, 85(b) *with* Def. Br. *passim.* Although Defendants do mention some of Plaintiffs' other allegations, Defendants do not do so in the context of causation except as follows. Defendants mischaracterize Plaintiffs' sole supposed basis for causation as being the fourteenth step above: the additional upward causal effect on prices of the other traders who witnessed the settlement prices reports. By failing to respond to Plaintiffs' thirteen other causation facts, Defendants have failed their movants' burden. *See* fn 1. Without more, Defendants' motion to dismiss should be denied as to the elements of causation of artificial prices. *See* numbered paragraphs *supra*. Also for the foregoing and following reasons, Defendants' other causation arguments (whether expressly mentioned herein or not) miss the mark and are extremely flawed.

### 3. Defendants' Desperate Attempt To Engraft Securities Law Fraud Elements On To CEA Manipulation Cases, Is Wholly Unsupported And Also Is Contrary To CEA Law

One example of Defendants' other causation arguments is that Defendants try to create two sub-elements of causation: reliance on the settlement prices and an efficient market requirement. Def. Br. pp. 22-25. Defendants' only support for this is their mischaracterization that Plaintiffs' supposedly sole theory of causation, is the fourteenth step recited above. Because this "support" is simply false, Defendants have not succeeded in providing any basis for this Court to become the first to import such fraud elements into a CEA manipulation claim.

No CEA manipulation claim has ever imposed these requirements.[7] Defendants' attempts to inject reliance and fraud on the market are --- along with Defendants' mistaken

---

[7] Defendants cite to *Sumitomo* and *Minpeco* for the proposition that efficient markets are somehow required in CEA manipulation claims. Def. Br. pp. 22-23. They are not. Nor did *Sumitomo* or *Minpeco* so hold.

The portions of *Sumitomo* and *Minpeco* to which Defendants cite involved RICO and common law fraud claims **not** CEA manipulation claims. *Compare* Def. Br. p. 23 *with In re*

premise that CEA manipulation claims are supposedly "narrow" and are coextensive with federal securities law fraud claims, see *e.g.*, Def. Br. pp. 7-8, 23-26 --- wholly contrary to the language and purposes of the CEA.

Thus, Congress originally enacted and has since repeatedly enhanced the CEA precisely in order to prevent price manipulation, and provide ample avenues of redress for and otherwise deter futures contract price manipulation.[8] Accordingly, the CEA prohibits all manipulation. The securities laws permit some manipulation.[9] This broader (not "narrow") prohibition of manipulation in the CEA corresponds with the differences between the respective purposes of commodity futures trading and securities trading. The socially beneficial purposes of commodity futures trading are the prices it produces. They lead to "the stabilization of

---

*Sumitomo Copper Litig.*, 995 F.Supp. 451, 458 (S.D.N.Y.) (discussing fraud on the market and reliance in the context of civil RICO claims) and *Minpeco, S.A. v. Hunt*, 718 F.Supp. 168, 176 (S.D.N.Y. 1989) (discussing fraud on the market in the context of a common law fraud claim). The CEA manipulation claims in those cases did not import reliance or efficient market into the CEA claim. However, the plaintiffs in *Sumitomo* and *Minpeco* had to deal with the elements of common law fraud and RICO.

But *in Sumitomo,* the Second Circuit upheld the District Court's ruling that reliance was not required when the common law fraud claim was brought for commodity manipulation. See *In re Sumitomo Copper Litig*., 262 F.3d 134, 143 (2d Cir. 2001). Thus, one of the only two cases that Defendants have tried to cite, specifically rejected reliance *even as to common law fraud claims*.

[8] *Compare* Section 3 of the CEA, 7 U.S.C. § 5 (core purpose of the CEA is "to deter and prevent price manipulation or any other disruptions to market integrity") *with Leist*, 638 F.2d at 304-6 n.24 (statutory evolution and history show that federal legislation and regulation have the overarching purpose to prevent commodity future price manipulation), *aff'd, Curran*, 456 U.S. at 384-85 (1982).

[9] *Compare Strobl v. New York Mercantile Exchange*, 768 F.2d 22, 28 (2d Cir. 1985) ("a little manipulation" is permitted under the federal securities laws but any and all manipulation of futures contract prices is prohibited under the CEA) *with In re Initial Public Offering Antitrust Litig*., 287 F.Supp.2d 497, 511 (S.D.N.Y. 2003)(Pauley, J.) ("the securities laws take into consideration more than just free competition, and in fact permit price manipulation in certain instances despite its effect on competition"); *Billing v. Credit Suisse,* 426 F.3d 130, 139 (2d Cir. 2006) (same), *rev'd on other grounds sub nom., Credit Suisse Sec. (USA) v. Billing*, 551 U.S. 264, (2007). Section 9(a) of the Commodity Exchange Act ("CEA"), 7 USC §§ 1, *et seq.* (prohibits any manipulation).

**commodity prices**, the provision of **reliable pricing information**, and the insurance against loss from **price fluctuation**." *Cargill*, 452 F.2d at 1173. Because price manipulation destroys all three of these benefits (*id.*) and the "futures market lends itself to such manipulation much more readily than a cash market," *Board of Trade v. Olsen*, 262 U.S. 1, 39 (1923), the CEA was originally enacted and has since repeatedly been enhanced to prohibit all price manipulation. *See* fn 8 *supra*. In contrast, the primary social benefits of the securities markets are raising capital for business, employment and permitting investment. *Id.*[10]

Consistent with the need to prohibit all manipulation, "in enacting the CEA, Congress did not define manipulation by statute; similarly, the [CFTC] and its many predecessor agencies which have had the authority to promulgate regulations under the CEA, have refrained from defining in an exclusive or other limiting fashion what constitutes manipulation." *In re Sumitomo 1*, 182 F.R.D. at 90. Following this Congressional and regulatory methodology of preventing manipulation, every Circuit court that has considered the issue has likewise avoided excluding categories of conduct—*e.g.*, conduct not involving fraud, conduct not violative of an exchange rule, conduct that does not violate bids or offers—from the definition of manipulation. Instead, they define manipulation affirmatively and consistently as intentionally causing artificial prices. [11]

[10] Thus, again, the federal securities laws and markets permit manipulation, price maintenance, etc. that facilitate raising capital. *E.g.*, Section 2(b) of the Securities Act of 1933, 15 U.S.C. § 77b(b)(SEC required in rule making to consider "public interest," including promotion of "capital formation").

[11] *E.g.*, *Frey v. CFTC*, 931 F.2d 117, 1175 (7th Cir. 1991) (manipulation "is an intentional exaction of a price determined by forces other than supply and demand"); *Cargill*, 452 F.2d at 1163 ("test of manipulation must largely be a practical one if the purposes of the Commodity Exchange Act are to be accomplished . . . . The aim [is] to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand"); *Volkart Bros. Inc., v. Freeman*, 311 F.2d 52, 58 (5th Cir. 1962) ("'**any and**

In sum, the CEA manipulation claim has only four elements (*see* p. 2 *supra*) and they do not include fraud, deception or reliance.[12] Consistent with its greater prohibition of manipulation, the CEA provides for greater deterrence of manipulation through much broader private actions than are available under the securities laws.[13] For example, the CEA permits private claims against persons who aid and abet manipulation. The securities laws do not.[14] Likewise, the CEA also permits private claims against persons on behalf of whom the manipulator acts. C*ompare Rosenthal & Co. v. Commodity Futures Trading Comm'n*, 802 F.2d 963, 966 (7th Cir. 1986) (Posner, J.) (Section 2(a)(1) "impose[s] strict liability, under the theory of *respondeat superior*, for acts within" the scope of the agency "by agents who are not necessarily employees" and is accordingly **more broad than the common law doctrine of *respondeat superior***).

Finally, the CEA does not find that there have been abuses of class actions under the CEA. But Congress, in the Private Securities Litigation Reform Act ("PSLRA") has found multiple abuses of class actions alleging fraud or manipulation under the federal securities laws.[15] On the contrary, the CEA regards private rights of actions as critical. *See* pp. 2-3 *supra*.

---

**every operation or transaction or practice . . . calculated to produce a price distortion of any kind in any market either in itself or in relation to other markets**. . . .'" )

[12] *Compare* p. 2 *supra* quoting *DiPlacido*, 2008 WL 4831204 at *9 *with Kohen v. Pacific Inv. Mgmt. Co. LLC*, 244 F.R.D. 469, 475 (N.D. Ill., 2007) ("this is not a securities fraud case and, thus the elements of proof are different…[t]herefore the Court does not find *Dura* controlling…") *aff'd*, 571 F.3d 672, 679 (defendants' "repeated, indeed obsessive, citations to [securities law and *Dura*]…suggests desperation") (Posner, J.) *cert denied*, 130 S.Ct. 1504 (U.S. February 22, 2010).

[13] *Accord*, *Curran*, 456 U.S. at 384-5 (private actions are a "valuable supplement" to regulation).

[14] *Compare* Section 22(a) of the CEA ("…aids, abets, counsels, induces, or procures…") *with Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 179 (1994) (under the federal securities laws there are **no private actions for aiding and abetting** which, the Supreme Court notes, is the opposite under the CEA).

[15] *Compare* PSLRA 15 U.S.C. § 78u-4 (Congress finds abuse of class actions in the frequent filings of federal securities law class actions) *with* CEA *passim and* (a WESTLAW search for

In sum, Defendants' attempt to engraft reliance, deception and fraud-on-the-market on to the causation element must be rejected.

**4. Defendants' Remaining Causation Arguments Misstate What The Prevailing Bid And Offer, And Market On Close Orders Are, Otherwise Violate The Controlling Standards On A Rule 12(b)(6) Motion, And Mischaracterize *DiPlacido***

Defendants, without any citations whatsoever, also attack the pleading of causation based on Defendants' assertions that the prevailing bid and offer are the highest offer and the lowest bid, and that "MOC buy" orders merely passively hit existing offers. Def. Br. pp. 1-2, 13-14. First, although this is beyond the Complaint and a matter for discovery, the prevailing bid and offer is, contrary to Defendants, the **highest** bid and the **lowest** offer. *In The Matter of Brian Hunter*, Docket Number: IN07-26-004, 130 FERC ¶ 215 (Initial Decision dated January 22, 2010) ("*In re Brian Hunter*") at ¶56. Second, "MOC buy" orders are NOT limited to passively hitting other offers or going unexecuted. *See* fn. 5 *supra* and accompanying text. Thus, there is no basis for Defendants to say they merely traded at prevailing prices when Plaintiffs here alleged that Defendants' trades **created** the prevailing prices. Third, merely hitting existing bids **is sufficient** to constitute manipulation. *Compare In re Brian Hunter* at ¶84 (finding manipulation under the Natural Gas Act where the alleged manipulator's trades "hit bids") *with*

commodity manipulation class actions yielded only 36 entries, going back to 1974. (The search of the ALLFEDS database specified the following terms: "class /3 action /p commodit! /s manip!".) When duplicate entries and non-commodity cases were culled from the list, only 15 cases remained, averaging fewer than one commodity manipulation class action filed every 2½ years). Thus, Congress requires in the securities law that scienter must be pleaded, heightened particularity is required, loss causation must be proved, and a class action complaint "shall" be dismissed if any of numerous pleading requirements are not satisfied but CEA manipulation claims are not narrowed in any of the foregoing ways. *Compare* 15 U.S.C. §78u-4(b)(4) (requiring loss causation) *with* Section 22(a) of the CEA *and* CEA *passim*.

*In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513 (S.D.N.Y. 2008) ("*Amaranth I*") (sustaining CEA manipulation claim based on the same facts).[16]

Contrary to Defendants' "specific over general" mischaracterization, violating self-interest generally, not specifically violating offers, is the teaching of *DiPlacido*. *DiPlacido* found and held that such violation of offers was a sufficient condition for manipulation, not a necessary one. Intentionally engaging in uneconomic conduct in order to move prices, rather than transacting in one's best interest on the transaction, does not add to price discovery, is uneconomic and has been determined by the CFTC (in its expertise) to be manipulative. *In re Henner,* 30 A.D. at 1174, *In re DiPlacido,* 2008 WL 4831204 at *30, *In re Brian Hunter,* ¶84 and *Cargill,* 452 F.2d at1163**.**

**Element 3: Ability To Influence Prices**. Defendants have failed their movant's burden even to try to offer any reason why Defendants did not have the ability to influence futures prices through their large trades. D. Br. *passim*. Defendants concede that Plaintiffs have alleged that Defendants had the ability to influence NYMEX settlement prices. Def. Br. p. 26. Defendants wholly fail to mention Plaintiffs' primary allegations of causation. ¶¶58, 67. Defendants concede they had the ability to influence NYMEX PA and PL futures contract prices.

### B. The CFTC Has Found, And Plaintiffs Adequately Plead Intent To Manipulate

[16] Grasping for straws, Defendants suggest that the CFTC Order, by directing Defendants to cease and desist violating the manipulation provisions but only expressly finding attempted manipulation, somehow implies that there was insufficient evidence to support causation of artificial prices. *E.g.*, Def. Br. p. 1. The CFTC Order makes no such finding. On the contrary, the numerous facts that the CFTC Order finds go far beyond the one overt act needed to show attempted manipulation. They overwhelmingly provide the means for later civil plaintiffs to allege actual inflationary impact on prices based upon multiple large buy trades and all the other facts set forth in numbered ¶¶ 1-30 *supra*.

**Intent**. The CFTC has long held that the "…specific intent to create an 'artificial' or 'distorted' price is a *sine qua non* of manipulation." *In The Matter of Indiana Farm Bureau Cooperative Association, Inc.*, No. 75-14, 1982 WL 30249, at *6 (CFTC Dec. 17, 1982). Here, Plaintiffs' competent fact allegations of all the intentional restraints that Defendant Pia imposed in order to inflate prices (see numbered par. "1"-"30" *supra*) raise "a reasonable expectation that discovery will reveal evidence" (*Iqbal*) that Defendant Pia specifically intended to cause artificially high PL and PA prices.[17] Here, Defendant Pia both intended to do something that would likely cause an artificially high price, and then "frequently" and repeatedly did the act that would likely cause an artificially higher price. Numbered par. ¶¶1-30. Thus, as in *DiPlacido*, (see fn 17 *supra*) the same corpus of facts or evidence here will tend to prove both the specific intent element and the causation of artificial price elements.

Separately, Plaintiffs' plead that the CFTC Order both finds and concludes that Defendant Pia had specific intent to manipulate.[18] ¶31(c). The CFTC Order also requires that the Moore Capital Defendants not question the findings or conclusions in the CFTC Order. CFTC Order p. 11. This means that, the Moore Capital Defendants and their agents cannot—in their motion to dismiss papers, their depositions and their other submissions in this case—deny

---

[17] The **same facts or evidence** can tend to prove, to varying degrees, two or more of the four elements of a CEA violation. Thus, the Second Circuit recently upheld the CFTC's finding that intentionally paying more than was necessary in order to influence prices, establishes **both** manipulative intent and causation of artificial prices. *DiPlacido*, 364 Fed.Appx. at 661-662.

[18] Specific intent to manipulate is an element of an attempted manipulation violation. *In re Hohenberg Bros. Co.*, 1977 WL 13562 at *7 (C.F.T.C. Feb. 18 1977). The CFTC specifically found and concluded that Defendant Pia intended to manipulate NYMEX PA and PL prices. CFTC Order pp. 4-5.

The level of specific manipulative intent is the same for a manipulation violation as for an attempted manipulation violation. *In re Hohenberg Bros. Co.*, 1977 WL 13562 at *7 (the findings required for an actual manipulation are the same as attempted manipulation except that the former requires proof that the alleged manipulator was successful in creating an artificial price).

the "findings and conclusions" in the CFTC Order. *Id*. This includes the manipulative intent finding and conclusions. *Id*. This supplies a "reasonable expectation" that during discovery the Moore Capital Defendants will even concede that Defendant Pia had manipulative intent.

Even if Defendants could deny the CFTC Order's findings and conclusions of manipulative intent (which they cannot), the CFTC obviously has an "expertise" on what constitutes standard or ordinary practices in the commodity futures trading markets and what constitutes uneconomic acts and manipulative acts. Because all these questions "implicate[] Commission expertise, we defer to the Commission's decision if it is reasonable." *DiPlacido*, 364 Fed.Appx. at 661 *quoting Piccolo v. CFTC*, 388 F.3d 387, 389 (2d. Cir. 2004) and also *citing* to *Chevron, U.S.A., Inc. v. Natural Res. Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Under the CEA, the CFTC has exercised its foregoing expertise to opine that if a trader intends to sell its contract for the highest price it can or buy a contract for the lowest price it can, the trader is (absent other indicia of manipulative intent) transacting economically in its own best interest. *E.g., Indiana Farm*, 1982 WL 30249 at *39 (selling for a high or buying for a low price is a legitimate part of the market process and adds to the economic price discovery provided by the futures markets). However, under the CEA, the CFTC has proclaimed that if a trader intentionally undersells to move prices lower in a sell transaction[19], or intentionally overpays to move prices higher in a buy transaction[20], then the trader is engaged in uneconomic behavior.

---

[19] *Compare In re Henner*, 30 A.D. at 1174, 1192 ("[t]he inference is inescapable that the respondent paid more than he had to…for the purpose of causing the closing price to be at that high level. No further proof is needed to show that the closing price…was artificially high") *with In re Indiana Farm Bureau* 1982 WL 30249 at *39, n. 2 ("[W]hen a price is affected by a factor which is not legitimate, the resulting price is necessarily artificial.")

[20] *In re DiPlacido*, 2008 WL 4831204 at *32, 34 *aff'd*, 364 Fed.Appx. at 662; *In the Matter of Avista Energy*, No. 01-21, 2001 WL 951736 (C.F.T.C. Aug. 21, 2001) ("*In re Avista*").

This hurts the price discovery process, produces an artificial prevailing price, and constitutes price manipulation in violation of the CEA. *Id.* Consistent with its foregoing exercises of its expertise, the CFTC, in the CFTC Order here, has found, concluded and determined that Defendant Pia specifically intended to cause artificial prices. Under *Chevron*, this finding and conclusion is entitled to deference if it is reasonable.

The CFTC's manipulative intent conclusion is reasonable for the reasons set forth below which, even if there were no CFTC Order, would, by themselves, justify an expectation that discovery will produce evidence of manipulative intent. Manipulative intent is typically inferred from circumstances. *In re DiPlacido*, 2008 WL 4831204 at *27 (intent may be inferred from the totality of the circumstances). Here, the circumstantial evidence alone raises a reasonable expectation that discovery will reveal evidence that Defendant Pia specifically intended to manipulate prices. The first and only explanation for all the circumstantial evidence is that Defendant Pia specifically intended an upward price manipulation.

Decisively, in their motion papers, Defendants conspicuously (a) fail to explain why someone would compress their large trade volume into a few second period in the thinner market and thereby inevitably pay the most rather than the least they could for their purchases, and (b) fail to explain how indications in writing that the person wanted to pay more than they had to pay could possibly reflect legitimate or economic behavior. D. Br. *passim*.

**Admission Or Direct Evidence Of Manipulative Intent**. Moreover, Plaintiffs have alleged that Defendants repeatedly accompanied their "bang the close" orders with instructions that they should be executed so as to cause higher prices. Numbered par. ¶17 *supra*. This uneconomic conduct is a classic badge and admission of manipulative intent. *See In re DiPlacido*, 2008 WL 4861204 at *27, 9, (taped telephone conversations indicating that sell

orders should be made "market worst" was evidence of manipulative intent), *aff'd DiPlacido*, 364 Fed.App. at 662 (finding "…no unreasonableness…in the Commission's intent finding, based in part on the referenced taped telephone calls…").

**Knowledge of Unlawfulness and Conduct to Escape Detection.** Plaintiffs have alleged that Defendants centralized all orders with one broker, Defendant MF Global, and quickly destroyed e-mails. ¶¶117, 136. These steps both reduced the chances of detection (particularly if the written instructions to cause higher prices were in the form of e-mails). This type of knowledge of unlawfulness has been recognized by the Second Circuit as further indicative of manipulative intent. *DiPlacido*, 364 Fed.App. at 660, 662 (use of code words was evidence of manipulative intent). Third, a Moore Defendant execution clerk employee was concerned about the manipulative trades. ¶121; CFTC Order p.4. But he failed to bring such concerns to the compliance personnel because of the Moore Defendants' culture. *Id*. In sum, the circumstantial evidence here goes far beyond that which was deemed to be sufficient in prior cases.[21]

---

[21] *In re Henner,* 30 A.D. at 1161, found CEA manipulation based on six trades of eight contracts entered during the one-minute closing period. The foregoing transactions were placed in the only available market (*i.e.*, the floor market) (*id*.) and were made so as to pay more than was necessary in order to cause prices to increase. *Id*. at 1174. The trades constituted 100% of the trading volume during the closing period. *Id*. at 1161.

*In re DiPlacido,* upheld proof of CEA manipulation claims where trades were entered during the closing periods on four days in a manner that intentionally paid more (or sold for less) than was necessary and constituted 28% to 52% of the volume during the closing period. *DiPlacido,* 2008 WL 4831204 at *26-27, 31-32.

*In re Avista* charged actual manipulation against Avista (the company that made the manipulative trades through floor broker DiPlacido). See above.

*Amaranth I,* 587 F. Supp. 2d at 540-541 sustained CEA manipulation claims where plaintiffs alleged that the hedge fund defendants "slammed the close" on only three expiration days where defendants didn't channel their trades into a thinner market and did not save their trades for the last ten seconds.

*In re Brian Hunter,* upheld proof of manipulation (under the Natural Gas Act, 15 U.S.C. §171c-1,) when market orders (*e.g.*, ¶146) were entered at the end of trading on three separate trading days that "hit" the prevailing bids (*e.g.*, ¶¶70, 84) and "almost guarantee[d] a lower price". These trades constituted between 14.4% and 19.4% of the trading volume during the

**Defendants' Premises for Requiring Rule 9(b) or PSLRA Heightened Particularity Are Contrary To CEA Manipulation Law.** FRCP Rule 9(b) expressly provides that matters of "intent" may be alleged generally *i.e.,* under Rule 8(a). The elements of CEA manipulation only require "intent to cause artificial prices". See p. 2 *supra.* It is superfluous to the large trades involved in this claim, whether the manipulator does or does not intend to defraud, deceive or be relied upon. The inquiry begins and ends with whether the manipulator intended to move prices to artificial levels. Also, the nature of the manipulation is a "restraint of trade." *Global, supra* at p. 3. Restraints of trade are pled under Rule 8(a). *E.g., Twombly*, 550 U.S. at 557. Cases have repeatedly held that CEA manipulation by means of large trades is governed by Rule 8(a).[22] The CEA prohibits fraud in a separate section of the CEA from that prohibiting manipulation. *Compare* CEA Section 4(b) *with* Section 9(a). Plaintiffs recognize that one CEA manipulation claim has been coterminous with the issuance of fraudulent reports. *See* fn. 22 *supra.* Rule 9(b) was appropriate to review the complaint in that case. *Id.* But this should not be permitted to

---

thirty-minute closing periods and were executed, in one instance, during the last eight minutes of trading. *Id*. at ¶73.

[22] *CFTC v. Amaranth Advisors, LLC*, 554 F.Supp.2d 523, 531 (S.D.N.Y. 2008) ("*Amaranth Advisors I*") (where large positions rather than fraudulent statements are the primary means of manipulation, Rule 8(a) applies); *CFTC v. Amaranth Advisors, LLC*, 2008 U.S. Dist. LEXIS 45638 at *5 (S.D.N.Y. June 10 2008) ("*Amaranth Advisors II*") (securities law pleading standards do not supersede CEA pleading standards); *Premium Plus Partners, L.P. v. Davis*, 2005 WL 711591 at *15 (N.D. Ill. Mar. 28, 2005) (Rule 8(a) governs where false statements are not the basis for the claim); *CFTC v. Enron*, 2004 WL 594752 at *3 (S.D.N.Y. 2004) (manipulating natural gas market by large trades was governed by Rule 8(a)). *See also, In re Global Minerals & Metals Corp*., 1999 WL 1023586 at *4 & nn. 50-52 (CFTC Nov. 12, 1999).

Defendants rely on the CEA manipulation case *In re Crude Oil Commodity Litig.*, 2007 WL 1946553 at *5 (S.D.N.Y. 2007) ("*Crude Oil*"). In *Crude Oil*, the plaintiffs failed to identify a single trade or position but did allege a conspiracy "'to *conceal* the availability, release and/or sale' of defendants' supplies of crude oil ... and also used proxies to sell their crude oil inventories 'so as to *not appear* to the market as a seller of crude oil" (quoting amended complaint) (emphasis in original)). *In re Natural Gas Commodity Litig.,* 358 F. Supp.2d 336, 343 (S.D.N.Y. 2005) ("*Natural Gas II*") was distinguished by *Amaranth Advisors I* on the grounds that the, unlike here, false statements were the primary means of manipulation (and no positions whatsoever were taken by the Defendants in the market).

swallow all the foregoing cases and factors indicating that Rule 8(a) governs manipulation by large trades or other restraints of trade.

In all events, Plaintiffs satisfy the particularity required by *In re Blech Securities Litigation*, 928 F.Supp. 1279, 1291 (S.D.N.Y. 1996) (Sweet J.). Even *Crude Oil* required only that Plaintiffs specify "[1] what manipulative acts were performed, [2] which defendants performed them, [3] when the manipulative acts were performed, and [4] what effect the scheme had on the market for the securities at issue." Def. Br. pp. 8-9. Plaintiffs' well-pled fact allegations overwhelmingly provide the first three elements by pleading that Defendants, through Defendants Pia and MF Global, made between October 25, 2007 and June 5, 2008 frequent large bang the close trades in NYMEX PL and PA during the last ten seconds of trading in the floor market of the NYMEX on "frequent" days. This gives notice and protects Defendants' (remaining) reputation from unwarranted insult. Regarding element (4), the express written purpose of those trades was to cause prices to be higher. ¶¶84-85, 89. Defendant Pia directed the manipulative trades to be made on behalf of the Moore Defendants, and MF Global accepted Defendant Pia's manipulative orders and caused them to be executed. ¶¶79, 87, 115, 134.

**Motive Is Not An Element of a CEA Manipulation Claim and The Second Circuit Has Upheld Manipulation Charges In The Absence of Motive.** Trade manipulation and other manipulation cases have consistently held that a financial motive is not required in order to show manipulative intent. *In re DiPlacido*, 2008 WL 4831204 at * 29 *citing In re Hohenberg Brothers, Cargill and quoting In re Henner* ("[p]roof of motive, however, is not a required element to establish manipulation under the Act"), *aff'd* 364 Fed.Appx. 657.

Nonetheless, Defendants assert that they "*…are not aware of any case in any Circuit in which a commodities manipulation claim was brought, much less sustained, without allegations*

*of a concrete economic benefit to be obtained as a consequence of creating an artificial price*." Def. Br. p. 16 (emphasis in original). But Defendants need not look any further than their own brief because they cite—no less than ten times—to such a case that has been upheld by the Second Circuit—*In re DiPlacido*. *Compare* Def. Br. pp. *passim with DiPlacido v. CFTC*, 364 Fed.Appx. 657 (upholding manipulation charges against floor broker defendant DiPlacido who was trading on behalf of an account for a client and thus had no "concrete economic benefit" to obtain by manipulating prices).

**C. Defendants Raise No Constitutional Or Notice Problems** because very similar acts to Defendants' were found to constitute CEA manipulation in 1971, 2001 and 2004, well before Defendants acted. *DiPlacido v. CFTC,* 364 Fed.Appx. at 659-660 (rejecting notice argument and citing to *Henner*) and cases collected in fn. 21 *supra*.

**D. Plaintiffs Plead Proximate Causation of Damages.** Defendants' sole support for their argument that any Class member who bought and sold within the Class Period supposedly has no damages as to those trades, is *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) ("*Dura*"). Def. Br. pp. 26-27. *Dura's* "loss causation" ruling arose in the context of what may be called a "static market impact" violation. That is, the securities fraud there caused no loss unless and until a corrective disclosure occurred (or the truth materialized). Courts in CEA futures manipulation cases have rejected *Dura.* This is because, unlike in the securities laws, Congress did not create a loss causation requirement in the CEA.[23] *Compare* Section 22(a)(1) of the CEA *with* 15 U.S.C. §78u-4(b)(4). Even if loss causation applied (which it clearly does not), new manipulative trades here were happening "frequently"; the open interest was changing;

[23] *E.g.*, *Kohen*, 244 F.R.D. at 475 ("this is not a securities fraud case and, thus the elements of proof are different…[t]herefore the Court does not find *Dura* controlling…") *aff'd*, 571 F.3d at 679 (defendants' "repeated, indeed obsessive, citations to [*Dura*]…suggests desperation").

future contracts were expiring (unlike in the securities markets), and other logical changes in the amount of impact (including dissipation) were occurring. *In re Initial Public Offering Securities Litig.*, 297 F.Supp.2d 668, 673-675 (S.D.N.Y. 2003) (*Dura* not controlling because price effect of manipulation may dissipate). Therefore, to infer a static amount of market price effect from the increasing violations here would be lunacy, particularly on a motion to dismiss. Accordingly, Defendants wholly fail their movants' burden on this issue as well.

**E. The Relations Between And Among The Various Defendants Show That Each Is Primarily And Secondarily Liable For Manipulation, And All Are Liable As Aiders And Abettors**

Defendants' attempts to dismiss the claims against them because their individual roles in the "manipulative scheme" supposedly do not warrant primary, secondary or aiding and abetting liability are all flawed for the reasons set forth below.

**Primary Liability and Section 2(a)(1) Liability of the Moore Manager Defendants.** In the exercise of its expertise, the CFTC found and concluded that:

a. Defendants Moore Capital Management, LP, Moore Capital Advisors, LLC and Moore Advisors, Ltd. (the "Moore Manager Defendants") violated Sections 6(c), 6(d), and 9(a)(2) of the CEA by attempting to manipulate the NYMEX PL and PA futures contracts at issue here. (CFTC Order p. 1); and

b. Defendant Pia was an employee of Defendant Moore Capital Management, LP and was an agent or other person acting on behalf of Defendants Moore Capital Advisors, LLC and Moore Advisors, Ltd. within the meaning of Section 2(a)(1) of the CEA, 7 U.S.C. 2(a)(1)(B). CFTC Order p. 5; *See* Statutory Appendix.

The CFTC's foregoing findings and conclusions, are due deference if they are reasonable. *See supra* re *Chevron* deference. Such conclusions are reasonable due to the facts alleged in the Complaint. See next paragraph. Based thereon, the Moore Manager Defendants are liable as

primary manipulators and also as persons on behalf of whom Defendant Pia acted in the manipulation violation alleged herein under CEA Section 2(a)(1). See Statutory Appendix.

Pursuant to authority granted by the Defendants Moore Macro Fund, LP and Moore Global Fixed Income Master Fund, LP (collectively the "Moore Fund Defendants"), the Moore Manager Defendants decided what trades the Moore Fund Defendants would make and made them on behalf of the Moore Funds (except that Moore Capital Management, LP is the successor in interest to Moore Capital Management LLC). *Id*.; ¶¶27-33. Defendant Christopher Pia was employed by Moore Capital Management LLC. ¶27. He was the person who the Moore Manager Defendants authorized to act on behalf of them and the Moore Funds to select and make the trades for the Moore Funds, including the alleged manipulative trades in this case. ¶¶31, 67, 174-191. Therefore, on the allegations of the Complaint as well, the Moore Manager Defendants are liable both as primary manipulators and as the persons on behalf of whom Defendant Pia acted under CEA manipulation authority. *See Amaranth I,* 587 F.Supp. at 541 (manager defendant held liable for primary manipulation because of its employee's acts); *Kohen,* 244 F.R.D. 469, 481-482 (same).

**Primary Liability And Section 2(a)(1) Liability Of The Moore Fund Defendants**. The manipulative trades were made on behalf of and for the accounts of the Moore Fund Defendants, who paid for them, and received the variation margin benefits. ¶¶32-33, 99; see numbered par. 23 *supra*. In undertaking their conduct, the Moore Manager Defendants and Defendants Pia and MF Global were all persons acting on behalf of or even as agents for the Moore Fund Defendants. ¶¶174-177. This suffices to impose civil liability for the primary manipulation violation and also Section 2(a)(1) responsibility for such violation. *Kohen* , 244 F.R.D. 469, 481-482 (holding PIMCO Funds liable as a primary manipulator and as the person

on behalf of whom the actual trader was acting under CEA Section 2(a)(1); *but see In re Amaranth Natural Gas Commodities Litig.*, 612 F.Supp. 2d 376, 394-95 (limited the liability of the Fund that held the positions to Section 2(a)(1) liability and rejected primary violation liability for the fund).

**Primary Liability And Aiding And Abetting Liability Of MF Global**.  The Moore Funds' accounts were held with Defendant MF Global.  ¶34. MF Global is a futures commission merchant ("FCM").  *Id*.  FCMs have the power to hold customer funds, accept customer orders, and act on behalf of customers to transmit orders and execute trades in the commodity futures markets.  *Id*.

Here, the Moore Defendants followed the highly unusual practice of using MF Global as its sole FCM to place their PL and PA futures trades.  ¶¶134-36.   This increased MF Global's revenues from the Moore Defendants.  Because the Moore Defendants channeled **all** of their manipulative orders here to MF Global (¶¶34, 136), this increased MF Global's knowledge of all the frequent "bang the close trades," that went on for seven plus months.  ¶¶136-40.  Exponentially increasing such knowledge, MF Global "often" received written instructions indicating that the orders should be executed to push prices higher.  ¶138.  Indeed, MF Global frequently received orders from Defendant Pia (or at his direction) that were to be effected in the thinnest part of the market during the last ten seconds of trading.  ¶ 87.  Even the Moore Manager execution clerk knew that the trades were manipulative.  ¶121.  As an established FCM (and no neophyte), MF Global knew that this pattern of "push prices higher" instructions and "bang the close" trades "frequently" for a seven plus month period was highly manipulative and prohibited by law. ¶¶136-142.

Contrary to the standard practice among FCMs, MF Global did not report the manipulation to the authorities or, at the very least, refuse the trades. *Id*. Instead, Defendant MF Global knowingly and willfully participated in and associated itself with the manipulative scheme. It did so by providing extraordinary services to effectuate the "manipulative scheme" over a seven-month period. ¶¶141-42, 185-86, 188. Indeed, **MF Global** repeatedly waited until the closing seconds to cause Defendants' "large" above-described trades which constituted a "large percentage" of the volume in the NYMEX market to be executed. *Id*. Defendant Pia kept using Defendant MF Global for seven plus months to do this. This gives rise to an inference that MF Global satisfactorily executed the manipulative scheme to Defendant Pia's liking for an extended period. Thereby, Defendant MF Global intentionally caused NYMEX PA and PL futures contract prices, to be artificially high during the Class Period. ¶91(d).[24]

In these circumstances, MF Global knowingly and intentionally participated in the manipulation of NYMEX PL and PA futures contract prices. At a minimum, MF Global knowingly and willfully aided and abetted such manipulation. *Compare DiPlacido v. CFTC,* 364 Fed.Appx. 657 (executing broker liable for manipulation) *with Amaranth Advisors I,* 587 F.Supp.2d at 542-543 (executing broker liable for aiding and abetting manipulation). Following instructions to execute trades so as to push prices higher for seven months is highly unusual assistance and in no way represents standard or ordinary FCM services. *Compare Schenk v. U.S.*, 29 U.S. 47, 52 (1919) (Holmes, J.) ("the character of every act depends upon the

[24] MF Global's reliance on *Amaranth I* only highlights the strength of the aiding and abetting claim here. Unlike in *Amaranth I,* where the FCM's "scienter" was found adequately pleaded, 587 F.Supp.2d at 544, the hedge funds funneled the "slam the close" directly to the floor brokers and the FCM was not alleged to have committed an overt act. *Id*. at 545. The floor brokers in *Amaranth I* who handled more than one such trade were adequately pleaded to have aided and abetted. *Id*. at 544. Just the opposite of JP Morgan, MF Global is alleged to have executed "frequent" "bang the close" trades over a seven-month period. Under *Amaranth I,* the Complaint sufficiently alleges aiding and abetting against it.

circumstances" in which it is performed). In the circumstances here, the standard and ordinary brokerage service was to report the customer to the authorities or, at a minimum, to refuse the trade. ¶141.

**Aiding And Abetting Liability Of The Moore Defendants**. The seven plus month duration of Defendant Pia's "manipulative scheme" (CFTC Order pp 2-4) provided ample knowledge to the Moore Funds and the Moore Manager Defendants, unless they were willfully blind, of the slam the close trades that were "frequently" being made on their behalf on two separate futures contracts. ¶187; *United States v. Brawer*, 482 F.2d 117, 128 n.14 (2d Cir. 1973) (where a "defendant deliberately closed his eyes to what otherwise would have been obvious to him … [the d]efendant's knowledge of a fact may be inferred from willful blindness."). Again, the character of every act depends upon the circumstances upon which it was performed. *Schenk v. U.S., supra.* For the Moore Fund Defendants to keep paying for and making the manipulative trades, in these circumstances, constitutes highly unusual assistance.

The Moore Manager Defendants continued managing the trades while engaging in the highly unusual practice of quickly deleting their emails and conspicuously structuring their business so as to fail to have standard compliance reviews. This constitutes antecedent and ongoing highly unusual assistance. *Compare* CFTC Order pp 5-11 (imposing extensive compliance requirements on the Moore Manager Defendants). In the exercise of its expertise, the CFTC deemed that these requirements were necessary for the Moore Manager Defendants to fulfill obligations to have compliance systems, supervise and control their operations adequately. *Id*.

**POINT III. DEFENDANTS' MOTION TO STRIKE SHOULD BE DENIED**

The CFTC Order condemns Defendants' "bang the close" trades as a "manipulative scheme". ¶1; CFTC Order p. 2. It requires the Moore Defendants to pay $25,000,000 and to cease and desist such manipulative trades and the resulting legal violations therefrom. CFTC Order pp. 5-7. The CFTC Order imposed extensive prohibitory and mandatory injunctive relief, including that the Moore Capital Defendants agree to pay for substantial compliance procedures **in order to prevent such manipulative "bang the close" trades** from happening again. ¶116; CFTC Order pp. 6-9. Also in the CFTC Order, the Moore Capital Defendants agreed and warranted:

> …that neither they nor any of their agents or employees under their authority or control **shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in this Order**, or creating, or tending to create, the impression that this Order is without a factual basis…

CFTC Order p. 11. Understandably, Defendants prefer this Court and the jury not consider the CFTC Order. In order to carry their burden to strike the Order under Rule 12(f), Defendants must show that the CFTC Order is "redundant, immaterial, impertinent, or scandalous matter." Defendants try only to show that it is "immaterial." D. Br. pp. 5-7.

**<u>Highly Material to the Complaint</u>**. However, contradicting their argument that the CFTC Order is supposedly immaterial, Defendants insist that Plaintiffs must specify **in the complaint** the bases for their information. D. Br. p. 9 (citing to *DiVittorio v. Equidyne Extractive Indus., Inc*., 822 F.2d 1242 (2d Cir. 1987)). By attaching the CFTC Order to the complaint, Plaintiffs are specifying **in the complaint** most of the bases for the information they rely upon. Therefore, the CFTC Order is extremely "material" to specifying the information Plaintiffs rely upon. *Lipsky v. Commonwealth United Corp*., 551 F.2d 887 (2d Cir. 1976) ("*Lipsky*"), a case on which Defendants heavily rely, was decided **before** *DiVittorio*.

**<u>Highly Material to the Motion to Dismiss</u>**. Second, government documents have

repeatedly been considered to be highly material to deciding a motion to dismiss. These include consent orders in which the respondent neither admitted nor denied liability,[25] and even government complaints or government quasi-findings.[26] Indeed, the law deems documents referred to in a complaint to be part of a complaint for purposes of a Rule 12(b)(6) motion such as this one. *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991). Therefore, the CFTC Order, which is the basis for much of the Complaint, is also highly material to the instant motion to dismiss.

**Highly Material at Trial**. Unlike the government documents present in the cases on which Defendants rely, here the CFTC Order (a) involves the self-same facts and occurrences as this action, and (b) will be highly material, admissible evidence at trial. The findings, including factually based conclusions and opinions, set forth in the CFTC Order will be admissible at trial as "factual findings resulting from an investigation made pursuant to authority granted by law" under Fed.R.Evid. 803(8)(C). *See Pentagon Capital Management PLC*, No. 08 Civ. 3324, 2010 WL 985205 (S.D.N.Y. Mar. 17, 2010) (SEC consent decree, entered without admission or denial of any findings therein, admissible under Rule 803(8)(C) to establish market timing defense);

---

[25] *See, e.g., In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336, 340 & n. 3 (S.D.N.Y. 2005) (discussing CFTC settlement and reports of CFTC and FERC finding "significant" commodity manipulation); *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 510 (S.D.N.Y. 2005) ("the Court would be remiss if it failed to take judicial notice of [CFTC settlements and fines], as provided by Fed. R. Evid. 201"). *See also ClearOne Commc'n, Inc. v. Lumbermens Mut. Cas. Co.*, No. 04 Civ. 119, 2005 WL 2716297 at *8 n. 10 (D.Utah Oct. 21, 2005) (SEC consent decree involved same or similar conduct by some parties); *Berke v. Presstek, Inc.*, 188 F.R.D. 179 (D.N.H. 1998) (same).
[26] *See, e.g., Tabor v. Bodisen Biotech, Inc.*, 579 F.Supp.2d 438 (S.D.N.Y. 2008) (denying issuer's motion to strike references to delisting notices); *Johnson v. M&M Communications, Inc.*, 242 F.R.D. 187, 189-90 (D.Conn. 2007) (Labor Department field audit findings may illustrate defendant's willfulness or bad faith); *Hyland v. Homeservices of America, Inc.*, No. 3:05-cv-612, 2005 WL 1959157 at *2-4 (W.D. Ky. June 28, 2005) (denying pre-discovery motion to strike price-fixing complaint's references to Justice Department complaints against Kentucky Real Estate Commission and National Association of Realtors).

*Option Resource Group v. Chambers Development Co*., 967 F.Supp. 846 (W.D.Pa. 1996) (findings and conclusions in SEC consent decree, settled without admissions or denials, admissible under Rule 803(8)(C) to establish violations of securities laws and accounting standards).

Why should this public document, which the taxpayers paid to generate, be squandered and not appropriately used in this litigation, including to help this Court in deciding the motion to dismiss? *Lipsky*, 551 F.2d at 893, says that it should be used here. In *Lipsky*, the plaintiffs **conceded** that the consent order involved different events, and was **not** admissible. *Id*. Had plaintiffs in *Lipsky* **even asserted** that the consent order there was relevant and admissible, then (as the Second Circuit took pains to emphasize) resolving that assertion would have been improper on the disfavored motion to strike, and the motion would have had to be denied.[27] *Id*. (citations omitted) ("ordinarily neither a district court nor an appellate court should strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone"). In *United States v. Gilbert*, 668 F.2d 94 (2d Cir. 1981), the Second Circuit recognized that the admissibility of a civil consent decree, as here, was governed by Rule 408, which "specifically permits use of such evidence for other purposes" than proof of liability.

[27] Defendants' inapposite authorities struck or disregarded materials from unrelated cases offered to prove the underlying allegations. *See Dent v. United States Tennis Ass'n*, No. CV-08-1533, 2008 WL 2483288 at *2 (E.D.N.Y. June 17, 2008) (settlements offered to prove "legacy" of racial discrimination); *In re Crude Oil Commodities Litig*., No. 06 Civ. 6677, 2007 WL 1946553 at *8 (S.D.N.Y. June 28, 2007) (allegations unrelated to defendants' conduct); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig*., 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (same); *Shahzad v. H.J. Meyers & Co., Inc*., No. 95-Civ. 6196, 1997 WL 47817 at *13-14 (S.D.N.Y. Feb. 6, 1997) (same); *Ledford v. Rapid-American Corp.*, 1988 WL 3428 at *2 (S.D.N.Y. 1988) (same). *See also Fraker v. Bayer Corp*., No. 08 Civ. 1564, 2009 WL 5865687 at *3 (E.D. Cal. Oct. 6, 2009) (emphasis in original) (relying on inapposite holding of "courts of this circuit" that attorney may not "rely *entirely* on another complaint as the *sole* basis for [its] allegations").

## POINT IV. THE PHYSICAL PLAINTIFFS ALLEGE VIABLE ANTITRUST CLAIMS

Where, as here, a scheme to manipulate the futures price of an underlying commodity also affects the price of the commodity itself, plaintiffs have standing to pursue antitrust claims. *Sanner v. Board of Trade of the City of Chicago*, 62 F.3d 918, 929 (7th Cir. 1995). The NYMEX futures prices for platinum and palladium and the trading prices for physical platinum and palladium on the New York "spot" market were highly correlated during the Class Period. *See* ¶¶ 73-74 and Ex. B.

In *Sanner*, the Seventh Circuit rejected the argument farmers who sold soybeans on the cash market at reduced prices due to anticompetitive conduct on a futures exchange lacked antitrust standing:

> It is clear that "[w]hen the futures market experiences a significant price change, the prices of that commodity in the cash market will usually experience a similar movement." … The reason for this is obvious: both markets involve the same commodities to be delivered currently or in the future. Since one market tends to move in lockstep with the other, participants in the cash market can be injured by anticompetitive acts committed in the futures market. The futures market and the cash market for soybeans are thus "so closely related" that the distinction between them is of no consequence to antitrust standing analysis.

*Sanner*, 62 F.3d at 929. The Seventh Circuit built upon *Sanner* in *Loeb Industries v. Sumitomo Corp.*, 306 F.2d 469 (7th Cir. 2002), where physical copper purchasers alleged harm from a conspiracy to manipulate copper futures. As in *Sanner*, the Seventh Circuit rejected the defendants' assertion physical purchasers had shown "no evidence of direct and predictable harm stemming from the defendants' conduct" in manipulating the copper futures market. *Id.* at 489. *Loeb* found the defendants' "illegal scheme" and the contract price was "directly and explicitly" based on the futures price, and price variations "moved in the same direction as the manipulation and could not have limited or mitigated this harm. For these reasons, Viacom has established the directness element." *Id.* at 489.

Exhibit B to plaintiffs' Complaint shows physical platinum and palladium rose in lockstep with the commodities futures prices as a result of defendants' manipulation. These allegations suffice to show a "direct relation between the defendants' illegal scheme and [plaintiffs'] harm." *Loeb*, 306 F.3d 489. *Accord In re Copper Antitrust Litig.*, 98 F. Supp. 2d 1039, 1043 (W.D. Wis. 2000).

Defendants rely on *Ocean View Capital v. Sumitomo Corp.*, 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999), Def. Mot. at 36, a decision at odds with *Sanner* and *Loeb Industries*. The manipulative activity in *Ocean* occurred principally on the foreign London Metals Exchange. But here, the *domestic* palladium and platinum markets "were artificially inflated because of defendants' intentional manipulation of the futures markets." *Copper Antitrust*, 98 F. Supp. 2d at 1049. Similarly, *DeAtucha v. Commodity Exchange, Inc.*, 608 F. Supp. 510, 515-16 (S.D.N.Y. 1985), involved a silver contract purchaser's transactions on the London Metals Exchange. But Congress didn't "contemplate recovery under the antitrust laws by an individual who traded, and was injured entirely outside of United States commerce." *Id* at 518. The foreign component that led to the dismissals in *Ocean View* and *DeAtucha* is absent here.

### A. MF Global's And The Other Moore Defendants' Agreement Is Evidenced By The CFTC's Findings

As the CFTC found, the Defendants, acting through defendant Pia, "often" accompanied these "bang the close" MOC purchase orders with ***written instructions*** the market orders should be executed in a manner that caused ***prices to increase***. ¶ 69(a); Ex. A, p. 3. MF Global and the Moore defendants knew the purpose and effect of the their manipulative trading and chose to participate in this unlawful activity. The Moore Defendants, acting through defendant Pia, repeatedly and expressly instructed MF Global ***in writing*** to wait until the last ten seconds of the closing period of NYMEX platinum and palladium futures trading to place their manipulative

orders. ¶ 69(a), Ex. A, p. 3. MF Global then relayed these orders to the NYMEX floor for execution during the last ten seconds or last moments of trading in NYMEX platinum and palladium futures contracts. CFTC Order pp. 2-3; ¶¶ 70-71.

The CFTC found this pattern and practice was (a) inconsistent with a desire to obtain the best possible execution price for the purchases and (b) consistent with a desire and intent to manipulate prices. *See* ¶ 69(b), 95-96; see also pp. 3-7 *supra*. Where, as here, transactions are uneconomic and designed to create artificial prices, the agreement to engage in a restraint of trade can be found from the broker's participation in the transactions. *See Minpeco*, 673 F. Supp. at 687; *Amaranth*, 587 F. Supp. 2d at 543.

**B. The Complaint Alleges An Agreement Among MF Global And The Other Defendants To Restrain Trade By Engaging In Trading Intended To Cause (And Causing) Artificial Prices**

A fair reading of the Complaint as a whole plainly shows Plaintiffs' allege MF Global acted in concert with the other defendants to effectuate the manipulative scheme. *See, e.g.*, Complaint ¶¶ 69(a), 70-71, 95-96. To the extent the Court finds MF Global should have been listed in paragraph 195 of the Complaint, it should grant leave to replead to correct it. Fed. R. Civ. P. 15(a)(2). *See* Def. Mot. at 32.

Defendants argue MF Global cannot be a part of the restraint of trade because it provided only "customary, professional services." Schemes between manipulators and those who carry out the manipulative transactions give rise to Section 1 liability. *Loeb*, 306 F.2d at 477; *Minpeco, S.A. v. Conticommodity Services, Inc.*, et al., 673 F. Supp. 684, 687; *Strax v. Commodity Exchange, Inc.*, 524 F. Supp. 936, 940 (S.D.N.Y. 1981); *see also Three Crown Ltd. Partnership v. Salomon Bros., Inc.*, No. 92-CV-3142 (RPP),1995 WL 422467 at *6 (S.D.N.Y. July 14, 1995).

Defendants cannot dispute the CFTC's findings show MF Global carried out Moore's manipulative trades.

### C. Plaintiffs' Claims Are Not Barred By The *Copperweld* "Intra-Enterprise" Theory

Defendants argue the physical plaintiffs cannot assert a Sherman Act conspiracy claim. Def. Mot. at 32. Nothing in paragraphs 27-33, on which Defendants rely, asserts any "affiliation," no do Plaintiffs allege "a single enterprise." Instead Plaintiffs plead: (1) Christopher Pia is a former MCM employee; (2) Moore Macro Fund, LP is a separate investment fund; (3) Moore Global Fixed Income Master Fund, LP is a separate investment fund; (4) MF Global, Inc. is a separate financial derivatives broker; and (5) Moore Capital Advisors, LLC is a registered Commodity Pool Operator. Further, defendants are separately incorporated and organized. They have different functions, different organizational purposes and different economic interests. Defendants' "intra-enterprise" defense under *Copperweld Corporation v. Independence Tube Corp*., 467 U.S. 752 (1984) fails.

Defendants fatally fail to show they are "controlled by a single center of decision making and they control a single aggregation of economic power" so their "[j]oint conduct … does not 'depriv[e] the marketplace of independent centers of decision making.'" *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201, 2211, 2212 (2010). *Id.* at 2212. And as the Supreme Court underscored in *American Needle*, "[a]greements made within a firm can constitute concerted action covered by § 1 when the parties to the agreement act on interests separate from those of the firm itself, and the intra-firm agreements may simply be a formalistic shell for ongoing concerted action."[28]

---

[28] Defendants' cases at page 33 are inapposite. In *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 263 (2d Cir. 2001),"Virgin acknowledge[d] in its appellate brief that"[t]his

The recent decision in *In re Sulfuric Acid Antitrust Litig.*,__ F. Supp. 2d __, 2010-2 Trade Cases ¶ 77, 194 MDL 1536, 2010 WL 3835869 (N.D. Ill. Sept. 24, 2010), rejects the arguments defendants make here and confirms plaintiffs are correct:

> Although the Supreme Court has not addressed the aforementioned issue, lower courts have found that similarly related entities can conspire with each other. *See, e.g., Sonitrol of Fresno, Inc. v. AT&T,* 1986 WL 953 (D.D.C. April 30, 1986) (holding that AT&T can conspire with corporations in which it holds a 32.6% and 23.9% interest and exerts *de facto* control). The reasoning behind *Copperweld,* elaborated on by *American Needle,* supports that conclusion. Under *American Needle,* the formal or legal assignation of parties to an agreement is not determinative of the "single entity" question. 130 S.Ct. at 2212. So long as a conspiracy joins together "separate economic actors pursuing separate economic interests," it constitutes concerted action covered by § 1 of the Sherman Act. *Id.* (quoting *Copperweld,* 467 U.S. at 768, 104 S.Ct. 2731).

Unlike *Copperweld* and its progeny, there is no showing any defendant is a 100% wholly-owned subsidiary of any other defendant. The Complaint alleges a conspiracy among separate economic actors with separate identities, functions and interests. ¶¶ 27-33. On a motion to dismiss, no more is required.

## POINT V. THE PHYSICAL PURCHASER PLAINTIFFS STATE VIABLE RICO CLAIMS

### A. Plaintiffs Plead The Requisite RICO Continuity

Defendants contend Plaintiffs fail to allege the requisite RICO continuity. Motion at 36. The continuity element "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a

---

case turns on [British Airways' ] unilateral conduct, not on any alleged conspiracy." *Gucci v. Gucci Shops, Inc.*, 651 F. Supp. 194, 198 (S.D.N.Y. 1986), concerned "officers and directors of the defendant corporations which have identical owners … are, by definition, legally incapable of conspiring with [the two corporations]." Likewise, in *Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*, 516 F. Supp. 2d 270, 291 n.6 (S.D.N.Y. 2007), the two defendants were "not alleged in the amended complaint to be distinct entities capable of forming a horizontal agreement between them to restrain trade." And in *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 678 (S.D.N.Y. 1987),"[a]s stated in the complaint, however, Rolex U.S.A. and Montres Rolex never were separate, competing entities."

threat of repetition." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 241 (1989). Plaintiffs' complaint pleads open-ended continuity.

To allege open-ended continuity, Plaintiffs need not charge Defendants with committing predicate acts over a substantial period of time. The physical purchasers need only show a threat of continuing criminal activity. *H.J.*, 492 U.S. at 242-43. An "analysis of the threat of continuity cannot be made solely from hindsight," *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991), and instead must take into account whether the predicate acts posed a threat at the time of occurrence. *Metropolitan Transit Auth. v. Contini*, 2005 U.S. Dist. LEXIS 13345, at *10 (E.D.N.Y. July 6, 2005); *A. Terzi Prods. v. Theatrical Protective Union, Local No. One*, 2 F. Supp. 2d 485, 509-10 (S.D.N.Y. 1998); *Morrow v. Black*, 742 F. Supp. 1199, 1207 (E.D.N.Y. 1990). "All racketeering activity," moreover, "must necessarily come to an end sometime. The lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict." *Busacca*, 936 F.2d at 238; *accord Ikuno v. Yip*, 912 F.2d 306, 309 (9th Cir. 1990); *accord Sumitomo Corp. v. Chase Manhattan Bank*, 2000 U.S. Dist. LEXIS 15707, at *7 (S.D.N.Y. Oct. 30, 2000); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 1998 U.S. Dist. LEXIS 981, at *15 (S.D.N.Y. Feb. 4, 1998).

The court's opinion in *Contini* is instructive. There, the plaintiffs alleged a conspiracy to defraud the Metropolitan Transit Authority "out of millions of dollars by submitting false invoices that inflated fees for services performed by elevator operators during a renovation project," 2005 U.S. Dist. LEXIS 13345, at *2-*3. Judge Trager, in finding open-ended continuity, explained "many acts of fraud were committed and that the fraud threatened to continue into the foreseeable future" and thus "the question that should be examined is what the

potential life span of the scheme was and whether the defendants' actions posed "a distinct threat of long-term racketeering activity, either implicit or explicit.'" 2005 U.S. Dist. LEXIS 13345, at *8-*9. Thus in *Contini*, "although defendants only chose to submit fraudulent invoices for eleven months, from March 1999 to February 2000, they could clearly have carried on their racketeering activity for a very long time." *Id. Accord Morrow v. Black,* 742 F.Supp. 1199, 1207 (E.D.N.Y. 1990). Here, just like *Contini*, "there was no specific end in sight" for defendants' illegal conduct. *See* p. 4, *supra*. And Defendants' money laundering predicate acts are inherently unlawful predicate acts. *See United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir. 1991); *Contini*, 2005 U.S. Dist. LEXIS 13345, at *11.

Defendants reliance on *Quarlis Care. L.P. v. Hall*, 1999 U.S. Dist. LEXIS 13417 (S.D.N.Y. Sept. 1, 1999), Def. Mot. at 36 n.1 is misplaced, because *Quarlis* recognizes open-ended continuity is satisfied where "the scheme at issue is a regular aspect of defendant's business," *id.* at *19. Here, Plaintiffs allege, based on the CFTC's factual findings, Defendants' banging the close trades were "frequent" and "often." ¶¶ 85-86, 89. These allegations more than suffice at the pleading stage. *See Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 18 (2d Cir. 1989) ("Whether defendants' actions are continuing in nature or isolated or sporadic will be the subject of proof at trial.").

**B. Plaintiffs' Allegations Are Adequately Pleaded**

Defendants argue Plaintiffs fail to meet Rule 9(b)'s particularity requirements. Motion at 37. Not every act of mail or wire fraud or interstate of stolen property need, as defendants argue, be pled with particularity. *See Schmuck v. United States*, 489 U.S. 705, 714 (1989) ("It is sufficient for the mailing to be 'incident to an essential part of the scheme' or 'a step in [the] plot.'"). This is because the scheme, not the communications in furtherance of the scheme, must

be fraudulent. *Id.* at 715. Where, as here, "the plaintiff claims that the mail or wire fraud was only used in furtherance of a scheme…, then the complaint does not have to be a specific with respect to each allegation of mail or wire fraud, so long as the RICO scheme is sufficiently pled to give notice to the defendants." *M'Baye v. New Jersey Sports Prods., Inc.*, 2007 U.S. Dist. LEXIS 9101, at *18 (S.D.N.Y. Feb. 7, 2007); *see also Levine v. Torino Jewelers, Ltd.*, 2006 U.S. Dist. LEXIS 11932, at *13 n. 3 (S.D.N.Y. Mar. 22, 2006) ("the heightened pleading requirements of Rule 9(b) do not apply to claims of money laundering"). *See also Natural Gas*, 358 F. Supp. 2d at 345 n.7 (Rule 9(b) pleading standards should be relaxed, especially where allegations are "supported by the CFTC Order.").

The physical purchaser plaintiffs sufficiently plead the RICO scheme, *see generally* ¶¶ 31(a), 79-82, 85(a); and explain the nature and manipulation of the trades. ¶¶ 2-3, 70-74, 82-100. Plaintiffs append to the CFTC's findings the transactions occurred at least during the period of October 25, 2007 through June 6, 2008. ¶¶ 1-5, 80-91. These allegations suffice even if the Court were to apply, as defendants urge, Rule 9(b) to Plaintiffs' averments. *See M'Baye*, 2007 U.S. Dist. LEXIS 9101, at *18. Finally, contrary to Defendants assertion, the physical purchaser plaintiffs simply do not engage in group pleading, as individual actors are identified and their actions are alleged. *See* ¶¶ 35, 80, 91.

**C. Plaintiffs Have RICO Standing**

Defendants argue plaintiffs lack RICO standing. Motion at 39. Here, plaintiffs plead defendants' violation of the RICO statute, injury to plaintiffs' business or property, and causation of the injury by defendants' violations. *See Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003); *see also* ¶¶ 70-74, 81-115. Plaintiffs allege defendants' commodity manipulation scheme caused them to suffer direct losses on their transactions in platinum and palladium. *Id.*

¶¶ 23-26, 200-01, 231, 234. Plaintiffs' damages were thus "proximately caused by a pattern of racketeering activity." *See Baisch v. Gallina*, 346 F.3d 366, 373 (2d Cir. 2003).

**D. Plaintiffs State A RICO Conspiracy Claim**

Defendants also contend Plaintiffs fail to state a RICO conspiracy claim, and complain the Complaint fails to establish a plausible inference defendants agreed to predicate acts. Def. Mot. at 40. But as shown above, plaintiffs' RICO allegations are sufficient to withstand defendants' motion to dismiss, because defendants' agreement was made repeatedly and in writing. *See supra* at pp. 4, 7, 33 (written instructions to commit illegal conduct). Defendants (and each of them) repeatedly and continuously used and affected the instrumentalities of interstate and foreign commerce, *id., see also* ¶¶ 128-163 131, the allegations of which are explained in detail throughout this opposition. See generally, pp. 3-10 *supra*.

**CONCLUSION**

Defendants' motion to strike and dismiss the Complaint should be denied in all respects.

Word Count: 13,608 words (excluding tables)

Dated: New York, New York
December 20, 2010

*As To The Futures Plaintiffs and The Futures Sub-Class*

*<u>/s/ Christopher Lovell</u>*
Christopher Lovell (CL-2595)
Gary Jacobson
Christopher M. McGrath
Benjamin M. Jaccarino (BJ-1273)
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway, Suite 501
New York, New York 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4775
***Class Counsel for Futures Sub-Class***

*As To The Physical Plaintiffs and The Physical Sub-Class*

*<u>/s/ John A. Lowther</u>*
William J. Doyle, II
John A. Lowther
**DOYLE LOWTHER LLP**
9466 Black Mountain Road, Suite 210
San Diego, California 92126
Telephone: (619) 576-1700
Facsimile: (619) 573-1701

***Class Counsel for Physical Sub-Class***