D8LBPLAC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3

    IN RE:  PLATINUM AND PALLADIUM
4   COMMODITIES LITIGATION,

5                                       10 CV 3617 (WHP)

6   ------------------------------x
                                        New York, N.Y.
7                                       August 21, 2013
                                        10:04 a.m.
8
    Before:
9
                    HON. WILLIAM H. PAULEY III,
10
                                        District Judge
11

12                          APPEARANCES

13  LOVELL STEWART HALEBIAN LLP
         Attorneys for Futures Plaintiffs
14  CHRISTOPHER LOVELL
    CHRISTOPHER McGRATH
15
    DOYLE LOWTHER LLP
16       Attorneys for Physical Plaintiffs
    JOHN LOWTHER
17
    CHRISTOPHER J. GRAY, P.C.
18       Attorneys for Physical Plaintiffs
    CHRISTOPHER J. GRAY, ESQ.
19
    AKIN GUMP STRAUSS HAUER & FELD LLP
20       Attorneys for Moore Defendants
    DAVID M. ZENSKY
21  NICHOLAS ADAMS

22  KRAMER LEVIN NAFTALIS & FRANKEL LLP
         Attorneys for Defendant Pia
23  JENNIFER L. ROCHON
    JADE BURNS
24
    HUGHES HUBBARD & REED LLP
25       Attorneys for Defendant Burger
    JESSE L. JENSEN

D8LBPLAC

1                APPEARANCES (Continued)

2     KOBRE & KIM, LLP
           Attorneys for Defendant Welsh
3     LEANNE A. BORTNER (Via telephone)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D8LBPLAC

 1              (In open court)

 2              THE DEPUTY CLERK:  *In Re:  Platinum and Palladium*

 3  *Commodities Litigation.*

 4              Appearances for the plaintiffs?

 5              MR. LOVELL:  Christopher Lovell and Christopher

 6  McGrath from Lovell Stuart for the futures plaintiffs.  Good

 7  morning, Judge Pauley.

 8              THE COURT:  Good morning, Mr. Lovell.

 9              MR. LOWTHER:  John Lowther, Doyle Lowther, on behalf

10  of the physical plaintiffs.  Good morning, your Honor.

11              THE COURT:  Good morning, Mr. Lowther.

12              MR. GRAY:  Chris Gray for the physical plaintiffs.

13  Good morning, your Honor.

14              THE COURT:  Good morning.

15              THE DEPUTY CLERK:  Appearances for the defendants.

16              MR. ZENSKY:  Good morning, Judge.  David Zensky and

17  with me Nick Adams of Akin Gump Strauss Hauer & Feld for the

18  Moore defendants.

19              THE COURT:  Good morning, Mr. Zensky.  Good morning,

20  Mr. Adams.

21              MS. ROCHON:  Good morning, your Honor.  Jennifer

22  Rochon for Defendant Chris Pia from Kramer Levin Naftalis &

23  Frankel.  With me is my colleague Jade Burns.

24              THE COURT:  Good morning, Ms. Rochon.

25              MR. JENSEN:  Good morning, your Honor.  Jessie Jensen

D8LBPLAC

1   from Hughes Hubbard & Reed for defendant Eugene Burger.

2              THE COURT:  Good morning, Mr. Jensen.

3              THE DEPUTY CLERK:  Appearances by telephone.

4              THE COURT:  Ms. Bortner, are you there?

5              MS. BORTNER:  Excuse me, your Honor.  Leanne Bortner,

6   attorney for Joseph Welsh, defendant.

7              THE COURT:  Good morning.

8              MS. BORTNER:  Good morning.

9              THE COURT:  Mr. Lovell, what's the status of this

10  matter?

11             MR. LOVELL:  Well, your Honor, the status is that

12  thanks to your Honor's rulings on the motion to compel --

13             THE COURT:  Why don't you take a seat and speak into

14  the mic?  Only because we have someone participating by

15  telephone and they can best hear if we're all speaking into the

16  microphones.

17             MR. LOVELL:  Thanks to your Honor's rulings on the

18  motion to compel early document discovery and the motion to

19  dismiss in which you gave plaintiffs leave to replead, and

20  thanks to your Honor's forebearance for the last four months of

21  extensions, which is not totally characteristic of your Honor's

22  rapid treatment of civil cases appropriately, the parties

23  signed a settlement agreement more than 11 minutes ago and

24  exchanged copies that provides and covers as follows, Judge.

25             The plaintiffs settled their claims with the Moore

D8LBPLAC

1   Capital defendants, who are all represented here in court, and

2   with Joseph Welsh, and Ms. Bortner's on the phone.

3           Now, there's another named defendant in the case, MF

4   Global, Inc., which has filed a suggestion of bankruptcy.  The

5   plaintiffs have filed a separate claim there and this

6   settlement does not impact that claim.  So as far as the

7   pending litigation before your Honor goes, everything is

8   covered.

9           The terms of the settlement, your Honor, provide as

10  follows:  Moore Capital is paying $48,250,000 to settle in

11  exchange for a release from a settlement class I'll describe in

12  a minute.  Moore Capital is paying $150,000 to "quiet the

13  litigation," of which $50,000 may be paid back to Moore Capital

14  if there is a collection on the third component of the

15  consideration, which I'll describe now.

16          Mr. Welsh has agreed to the entry of a judgment in the

17  amount of $35 million against Mr. Welsh on the negligence

18  claim, a claim that your Honor recently permitted plaintiffs to

19  amend the complaint to include solely to the extent of

20  collection of that judgment against Mr. Welsh's personal assets

21  consisting of his rights against certain insurers and in

22  respect to certain insurance policies and the insurer's denial

23  of coverage for that claim, as to all of which have been

24  assigned to the extent permitted by law to the futures

25  plaintiffs.

D8LBPLAC

1          Those are the three components of consideration.  On

2     the third component, I feel, having sued so many people for

3     misrepresentation over the decades, your Honor, that I have to

4     rush in and add that the insurers have asserted multiple

5     reasons for denial of coverage in these letters at the

6     beginning -- I'm sure your Honor is familiar with the standard

7     of practice followed here -- and they will have additional

8     defenses and arguments against this.

9          Mr. Welsh nor Capital defendants don't represent that

10    we can recover anything.  The futures plaintiffs' counsel --

11    nobody represents that the $35 million judgment can be

12    recovered.  On the other hand, standing here representing the

13    class, I'm saying that I think that there's arguments against

14    what the insurers have argued and we'll see what happens on the

15    $35 million.

16         Obviously-- well, not obviously.  Just to continue a

17    little bit more, your Honor, the settlement -- which we're

18    going to ask for leave to move for preliminary approval of --

19    includes recitals.  And one recital relates to Mr. Welsh's

20    provision of accurate financial information to the futures

21    plaintiffs' counsel who is confidential.

22         We're quite satisfied, your Honor, that continuing

23    this litigation in front of your Honor would cascade, if we're

24    successful -- and defense counsel can put up 18 hurdles and if

25    the plaintiffs jump over 17 of them and miss the 18th, there's

D8LBPLAC

1    no recovery for the class.  We're quite confident that if we

2    jumped over all 18, we wouldn't recover from Mr. Welsh based on

3    everything we know, what we're getting in this settlement, in

4    prospective value and what may quiet the litigation payment

5    that we've set up.

6           So switching over, your Honor set this up as a

7    premotion conference.  For all I know, sitting here, we never

8    would have settled if you hadn't done that, because we said we

9    would have it done last Friday and it took till 11 minutes

10   before we got started here.  So we're glad that you set this up

11   and we've done that and we'd like to put in a brief.

12          But if I could just go through the settlement a little

13   bit more, Judge, to talk about what I had mentioned earlier,

14   the settlement class.  In prior commodity futures

15   manipulations, your Honor, it seems to turn out that you can

16   see effects on the market and you can bring a case as to

17   certain time period alleging this is a product of manipulation.

18          It turns out, though, in the *Sumitomo* case and the

19   *Natural Gas* case, as well as others, and other instances in the

20   law outside of commodity futures manipulation, that settlement

21   classes turn out to be of a broader dimension than the

22   litigation class.  In this instance the alleged conduct, after

23   we got the documents and went through them, actually began in

24   June 2006, which is some year and a half before the litigation

25   class began.  And it ended as we-- it ended May 21st, 2008, the

D8LBPLAC

conduct.

Now, there's a body of disputes, sort of, over how long does a manipulated price stay in the market?  Does it stay in the market for a long time or a short time?  Your Honor said in this case on the motion to dismiss that it might dissipate in a hurry, citing to the IPO securities case, and there's different things.

There is a theory -- there is an economic theory from very respected Chicago School economists, who are somewhat religious about the efficiency of the market, which says that until there's disclosure to the public, explicit disclosure to the public, something might remain in the market, but those same economists will tell you how efficient the market is and how to figure out things ahead of time.  So it's a little bit contradictory.

Justifiably, in my opinion, the defendants asked for a full release.  They wanted the settlement class expanded, your Honor, to when the conduct began, June of 2006, until the filing of the CFTC complaint to cover these theories.  And we've agreed -- and this is a bit, as far as I'm concerned, business as usual.  We'll brief this in the preliminary approval papers -- and in the final approval papers if your Honor grants preliminary approval -- the authority for doing this.  And basically it covers the course of conduct and it covers the arguable effect period.

D8LBPLAC

1          We've proposed a plan of allocation, which I'll go

2     into in the-- which we'll go into probably more appropriately

3     in the preliminary approval papers.

4          I should say one thing that relates to the plan of

5     allocation and the reasonableness of the settlement, and that

6     is the amount of damages.  The Second Circuit does not want

7     your Honor to retry the case.  The Second Circuit wants your

8     Honor to be sure that the process was not tainted and was a

9     good process.  And I will submit an affirmation that this was

10    arm's length, hard-nosed bargaining.  And we had two days in

11    front of a nationally recognized mediator.  It didn't work, and

12    we went back to litigating and resumed litigating, and then

13    your Honor gave us all of these adjournments and we settled.

14    It was very contentious.  So the process is pure.

15         Then the next step, although you're not supposed to

16    retry the case, your Honor, as your Honor knows from approving

17    other cases, I'm talking about currency conversion really for

18    your standards on preliminary approval and final approval.

19    Your Honor at the preliminary approval stage, as you've held in

20    currency conversion, you're just seeing whether this is within

21    the range of reasonableness of something that could be set out

22    to the class.  You're not going to pass on it finally until the

23    final approval hearing.  At the final approval hearing you'd

24    take a closer look, but the facts aren't going to change.

25         The plaintiffs believe that based on a pure review of

D8LBPLAC

1    economic literature, we could put in a fact-supported expert

2    opinion -- I don't want to say Daubert compliant, but we have

3    gone through a million things, but I will say Daubert compliant

4    that will show over $400 million in damages here, your Honor.

5    Now, I want to just say two things -- and so it's a settlement

6    of 48,250 -- 48,4 for sure -- and then whatever we can get on

7    the other thing.

8         I just want to say a couple of things about that.

9    There's a line of cases, your Honor, *Van Gemert v. Boeing*, is a

10   Supreme Court case -- I'm smiling because, by the way, I spent

11   eight days in a hotel room to prepare for a Supreme Court

12   argument and your Honor got eight votes and I got one one time.

13   So that's why -- if there's an association problem.

14        The Supreme Court held that the class members who do

15   not claim their share of the judgment don't get any money and

16   that money reverts back to the defendants.  And that line --

17   that has not been broken up.  So we say there's over $400

18   million in damages.  Now, it's 2013.  These events happened in

19   2007/2008 focus, but over a diffused period for the longer

20   period.  How many people are going to claim at this point?

21        I've had some recent experiences in commodity futures

22   where there were not that many claims.  It's a little bit

23   perplexing, to be honest with you, your Honor.  I could --

24   we'll go into it at the final approval stage if we get past

25   preliminary approval and it's time.  We'll go into the

D8LBPLAC

attrition rates here.  So that's a real concern.

The second concern leads back to the economics.  I believe that the plaintiffs could put in an expert report for over four hundred million here, your Honor, but I saw an excellent mediation brief from the people behind me with a Nobel prize-winning economist who they say concluded that there's only six million alleged damages if you accept our premises.

Now, I think his numbers are wrong.  I think his numbers led to the conclusion of nine million.  But six million, nine million, it's a low figure.  And I've been in cases where the plaintiffs have worked with this Nobel prize-winning economist.  The way he did the work and the facts here and what could be argued with all the circumstances here -- which we can get into more in the papers, your Honor -- that is a submission that tended to show very, very low damages.  And then you have your attrition rates.

So given this battle with the experts -- and they had a good one -- I think this is a reasonable settlement under the best possible standard, which is the *Grinnell* case, and also under a later somewhat revisionist case in the Second Circuit, the *Maywalt* standard, which says the realistic likelihood is totally different from best possible.

Either standard, because of the attrition on the best possible and because of what I mentioned with the battle of the

D8LBPLAC

experts on the other one, I'm confident that your Honor-- I

don't want to prejudge, but I'm confident the plaintiffs will

put in papers to make a good argument that this is within the

range of reasonableness.

        We would ask your Honor to give us until next

Wednesday to submit the preliminary approval paper.  We've been

late on everything we've done, but we'll be on time with that,

Judge.

        THE COURT:  All right.  Obviously it's the notice and

claims process that I have found in some cases seems to break

down where the adversarial process is no longer at play.  I

want to be sure that the parties have come together on the best

possible notice provisions so that we can ensure the highest

level possible participation.  And if you recall what happened

in currency conversion, where the notice process really had to

be reengineered midstream, I'd like to avoid that in future

cases.

        MR. LOVELL:  Yes, point taken, your Honor.  And that's

what I said about perplexing.  We changed the notice process

here in the last few weeks.  While I can't go into the 408 step

with you, I'll describe the notice process, your Honor.  And

I'll think about and I'll talk to the defendants about possible

reasonable enhancements to follow up on what your Honor said.

        But just briefly, we're advertising in the *Wall Street

Journal*, we're advertising in *Futures Magazine* twice, and we're

D8LBPLAC

1       taking other steps through internet publications that futures

2       traders follows.  So there's a publication component to this.

3       But there is a reasonable mail notice that's calculated to

4       reach every class member more than once, and that works as

5       follows:  We have the names from the CFTC of the large traders.

6       Large traders usually constitute 70 to 80 percent of the

7       market, but that may be only 15 to 20 percent of the number.

8       And we should be able to mail to every one of the large traders

9       from this list notice of this case.

10              In addition, we have from the Exchange the names of

11      all of the clearing brokers.  Now, these clearing brokers have

12      duties to their customers.  And the way it works in securities

13      and commodities is that we've mailed the notice to each of the

14      clearing firms and we asked them to mail it to the customers.

15      And we're going to have to be vigilant and follow up with them

16      and watch what happens on this, because this is the one part

17      that we're depending on the clearing firms to get the

18      information out.

19              And in view of your Honor's comments, I think I'll

20      make a point to separately report to your Honor and to the

21      defendants what's happening on that part of the notice.  If

22      that part doesn't have a breakdown, and what's intended to

23      happen, there should be additional mail notice to 70 or 80

24      percent of the volume of the market who are the large traders

25      and direct mail notice to the smallest part of the market.

D8LBPLAC

1              THE COURT:  All right.  Do any of the defendants wish

2     to be heard or the physical plaintiffs?

3              MR. ZENSKY:  Who would you like to hear from first,

4     your Honor?

5              THE COURT:  Well, let me hear from the physical

6     plaintiffs on the matter.

7              MR. LOWTHER:  Just very briefly, your Honor.  As the

8     Court found out just several minutes ago, there's been a

9     settlement.  This is the first that I have heard that the

10    papers were going to be executed this morning.

11             I'll simply echo what Mr. Lovell has said.  We would

12    like some additional time, because I think we are still under

13    Rule 408 concerning our negotiations, but I believe we have the

14    substantive terms of a settlement worked out with the defense.

15    We have exchanged some preliminary papers, our deal term and

16    sheet.  We would ask the Court's indulgence, however; perhaps a

17    few weeks after the futures file their preliminary papers to

18    get our preliminary papers on file.

19             The reason being we simply want to be efficient in our

20    use of resources.  I believe the parties have essentially

21    agreed that we would use similar plan of allocation forms,

22    claims sheets.  We will have a slightly different notice

23    program than the futures plaintiffs, and we would just simply

24    ask again the Court's indulgence on getting our preliminary

25    papers on file.  But our settlement on the physical side will

D8LBPLAC

1    necessarily be smaller simply because there's a lot more

2    futures traded than there was Platinum and Palladium physical

3    trading at that time.

4            I will tell your Honor the negotiations and

5    discussions concerning what that amount was going to be was

6    hotly contested.  It was vigorous and antagonistic

7    negotiations.  Professional, but nevertheless we had attended

8    all of the mediation sessions and we went back and forth for

9    months and months and months.  The parties expending

10   significant resources on experts, both sides, to determine just

11   how many physical ounces were traded during the class period

12   and whether or not you had offsets, what were the tie-in

13   between futures damages and physical damages.  So, again,

14   Judge, all of these points were hotly contested, but I think

15   we'll be able to get our papers on file timely.

16           And I'll conclude by saying after we filed our

17   preliminary approval, we simply think it would make sense that

18   your Honor's rulings concerning approval be tracked at the same

19   time for the following reason:  I think we want to issue one

20   notice at the same time; again, to take advantage of

21   efficiencies.  This is something that we've discussed with the

22   proposed class action settlement administrator.  And, again,

23   simply because our class will be smaller, we want to take

24   advantage of those efficiencies and try and keep as much money

25   as we can for the class.

D8LBPLAC

1          THE COURT:  Who's the proposed settlement

2     administrator?

3          MR. LOVELL:  A.B. Data.  The people at A.B. Data

4     recently joined them and have done futures class action

5     manipulation settlements in the past, your Honor.  And they can

6     talk about futures and do these -- enter these cells into the

7     computer and get all the trades in.  They know how to do it.

8     There's over a hundred securities cases filed here in class

9     actions, and there used to be only one every five years in

10    commodities.  It's picked up a little bit now, your Honor, but

11    there's nobody who knows how to do this.  So they are in a

12    semi-monopoly position, but they know how to do it.

13         THE COURT:  Doesn't it make sense to have both motions

14    for preliminary approval filed at the same time, put everything

15    on the same schedule?

16         MR. LOVELL:  We can certainly wait, your Honor.  I

17    don't see why we need to go first.  I can't see any reason.

18         THE COURT:  Do you agree with that, Mr. Lowther?

19         MR. LOWTHER:  I agree.  What I need to see are the

20    papers that were executed today.  Because, again, we have some

21    agreement with the defense that we would proceed on those

22    papers.  We need our experts to take a close look at the plan

23    of allocation.  We do plan on submitting an expert report with

24    our preliminary approval application for the following reason:

25    Futures, they can look at a tape; for the physical side, these

D8LBPLAC

```
 1    are over-the-counter trades.  And, again, that was the most
 2    hotly contested issue in our settlement discussions.  So we
 3    will be submitting an expert report just concerning volumes.
 4            In a crude respect, I think once we have some expert
 5    opinion on the range of potential volumes, I do think it then
 6    becomes just a matter of multiplication as we look at the plan
 7    of allocation and we can allocate damages.
 8            THE COURT:  When do the physical plaintiffs think they
 9    would be in a position to file a motion for preliminary
10    approval?
11            MR. LOWTHER:  Originally we had said two weeks.  After
12    taking a look at the plan of allocation, I'm now thinking
13    possibly two.  I think three weeks would be better.  We've
14    retained the CPM Group, who's here in New York.  They are the
15    recognized leaders and experts in the precious metals and, in
16    particular, platinum and palladium.  Frankly, I'm happy to have
17    them because if we didn't have them, I'm not quite sure who
18    would be able to render the opinion that we need.  So we have
19    the best who's going to be assisting us with our papers.
20            So I think three weeks is a-- yes, three weeks, your
21    Honor.
22            THE COURT:  All right.
23            MR. LOVELL:  With the Court's pleasure, I don't see
24    the point not to waiting, your Honor, if you want us to wait.
25            THE COURT:  Yes.
```

D8LBPLAC

1          MR. LOVELL:  Okay.

2          THE COURT:  So three weeks from today is September

3    11th.  I'm prepared to move it to the 18th just to get beyond

4    the most significant of the Jewish holidays and other holidays

5    between now and then.  So I'll fix September 18th as the date

6    for the parties to move.

7          And I take it they'll-- will it be a joint motion

8    between the physical and futures or separate motions?

9          MR. LOVELL:  I omitted to say, your Honor-- I'm sorry

10   for interrupting, Judge, but I omitted to say that the

11   settlements are not contingent on each other.  Expressly to the

12   contrary.  If theirs is found not to be reasonable by your

13   Honor, then I would prefer to keep --

14         THE COURT:  Separate motions.

15         MR. LOVELL:  Yes, please.

16         THE COURT:  Separate motions, but to be filed on

17   September 18.

18         Now, Mr. Zensky, or any of the other counsel for the

19   defendants, do you want to be heard with respect to the status

20   of the matter?

21         MR. ZENSKY:  Yes, absolutely, your Honor.  Let me just

22   pick up starting with the issue of the physicals and the need

23   for some extra time.  The thought process was, and why the

24   physical papers are not done, obviously we have an

25   understanding and an agreement as to the economics, but there

D8LBPLAC

was little reason for us to go through the brain damage of

trying to finalize their papers until Mr. Lovell, Mr. McGrath

and the defendants finished the futures settlement.  There is

every reason to make them as uniform as possible.  The

releases, time frames, terms, et cetera.  So that's one point.

Second, although, as Mr. Lovell identified, once we

get them signed and on file, approval of one is not the

condition of the Court's approval of the other.  From the

defendant's perspective, we were not going to proceed to sign

the settlement only with the physical class until we had

finished our negotiation and signed a settlement with the

futures class.  So that's by way of further explanation as to

why the physical settlement is not ready to sign today, your

Honor.

With respect to the futures settlement, let me just

echo a couple of Mr. Lovell's comments.  It was, indeed, as

arm's length as is imaginable.  There is no point that was not

negotiated, renegotiated, over and over, by Mr. Lovell and

Mr. McGrath on behalf of the futures class.  If you had seen

the footer on the settlement agreement before it was removed

for the signature copy, the settlement itself went through 38

drafts, I believe, before it was ready for signature.  And the

eight or nine exhibits, some of them went through 10, 15, 20

drafts of their own.

So this was an arduous, complex and very hard-fought

D8LBPLAC

1    process, your Honor.  I think Mr. Lovell described in part some

2    of the range of dispute between the economists for the parties.

3              In addition, your Honor, as you know, when we first

4    brought a motion to dismiss, there were several issues that the

5    Court did not address at that point because it was dismissing

6    the complaint on the ground that it incorporated the settlement

7    with the CFTC.  And, therefore, we would have been back before

8    you with a motion to dismiss.  We think some issues would have

9    been dismissed.  We would have been back before you on summary

10   judgment with respect to issues of causation.

11             And we certainly felt and would have disputed to the

12   last the ability of the futures plaintiffs to show any damages,

13   or certainly anything near the amount that Mr. Lovell's

14   economists would like to have testified to.  But like all other

15   cases that settle, while certainly disputing the facts,

16   disputing liability, litigation is not without risk.  And given

17   the protracted and complex nature of this matter, it was our

18   judgment to settle.

19             Certainly from the defendant's perspective, we think

20   it is a generous settlement for the class and we don't believe

21   the Court will have any problem determining that the settlement

22   should be preliminarily approved and ultimately approved at a

23   fairness hearing.

24             THE COURT:  All right.  Thank you, Mr. Zensky.

25             Mr. Rochon, do you wish to be heard?

D8LBPLAC

1        MS. ROCHON:  No, your Honor.

2        THE COURT:  Mr. Jensen?

3        MR. JENSEN:  No, your Honor.

4        THE COURT:  Ms. Bortner, do you wish to be heard?

5        MS. BORTNER:  No, your Honor.  Thank you.

6        MR. ZENSKY:  I'm sorry, your Honor, if I could add

7   just one question.  It's likely the defendants would put in

8   papers in support of the settlement in contemplation of the

9   final fairness hearing.  I don't believe we would be putting in

10  papers unless the Court requires some filing from us at that

11  preliminary approval stage.  Obviously having signed the

12  settlement, the parties are now, not on the same side, but

13  certainly share a common interest in having the settlement

14  proceed through the judicial process and be approved.

15        So there would be no opposition for anything that we

16  would file unless the Court requires it.

17        THE COURT:  All right.  Let's fix a schedule and a

18  return date for the motion for preliminary approval.  If the

19  futures and physical plaintiffs file their respective motions

20  on September 18, what do you propose, Mr. Lovell?

21        MR. LOVELL:  Your Honor, usually the defendants will

22  not oppose it, but once in a while, the rare case, the

23  Microsoft case many years ago, somebody shows up and opposes

24  preliminary approval.  So I think your Honor should-- this is

25  the notice of motion, but I think we should wait the 17 days or

D8LBPLAC

1    whatever it is and it will be unopposed 99 percent of the time

2    and be submitted.  But if your Honor wanted to schedule a date

3    to come back for the-- you know, approximately a little more

4    than two weeks later, we could do that.  And then in person,

5    assuming-- and this happens like 99 percent of the time-- and

6    your Honor finds it warranted, we can accept the whole calendar

7    at that point.

8                THE COURT:  All right.  Fine.  I'll put it down for a

9    hearing on Friday, October 4 at 2:30 with a view that if no one

10   jumps up, we will simply schedule a final approval hearing and

11   a final motion for final approval.  Is that all right?

12               MR. LOVELL:  Yes, your Honor.  Makes perfect sense.

13               THE COURT:  All right.  Anything further at this time?

14               MR. LOWTHER:  Chris, do you want to talk about page

15   length?

16               MR. LOVELL:  Your Honor, the page length was just

17   raised.  We can do our papers within 25 pages for our motion.

18               MR. LOWTHER:  I believe so.

19               THE COURT:  All right.  That's fine.

20               Anything else?

21               MR. LOVELL:  Not for the futures plaintiffs, your

22   Honor.

23               MR. LOWTHER:  Nothing from the physical class, your

24   Honor.

25               THE COURT:  Well, all right.  I look forward to

D8LBPLAC

1    receiving the motion, learning more about the details of the

2    settlements and the prospective notice and claims process.  Of

3    course, any resolution of a case of this magnitude, when it's

4    in the offing it's intoxicating to judges.  So thank you for

5    all of your work.  I'll see you on October 2.

6            MR. LOVELL:  Thank you, your Honor.

7            MR. ZENSKY:  Two or four, your Honor?

8            THE COURT:  October 4.  October 4 at 2:30.  Thank you,

9    Mr. Zensky.

10            (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25