UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In Re: Platinum And Palladium Commodities Litigation* | MASTER FILE No. 10 Civ. 3617 (WHP) |
| This Document Relates To: | |
| Platinum/Palladium Futures Action | |

**FUTURES PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR <u>PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT</u>**

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................1

    A.    $48,400,000 Cash Payment; $35,000,000 Assignment and Judgment ...................1

II.    STATEMENT OF FACTS ........................................................................3

    A.    The Procedural History of the Futures Action ........................................3

    B.    Defendants' Positions During The Settlement Negotiations ..................................7

    C.    Plaintiffs' Position At The Time Of Settlement ..........................................9

    D.    The Settlement Agreement ..........................................................10

        1.    The Consideration To The Futures Class:
                $48,400,000 Cash Payment; $35,000,000
                Assignment and Judgment ........................................................10

        2.    The Settlement Class................................................................12

        3.    Right to Opt-Out ....................................................................14

        4.    The Release and Covenant Not To Sue ....................................14

        5.    Notice....................................................................................14

        6.    The Proposed Plan of Allocation ............................................15

        7.    Limited Reversion..................................................................17

III.    ARGUMENT ..........................................................................................18

    A.    Preliminary Approval Should Be Granted Because The Proposed Settlement
        Falls Well Within "The Reasonable Range of Approval" .....................................18

        1.    The Legal Standards Governing Preliminary Approval ...........................18

        2.    The Settlement Is Procedurally Fair and Is Entitled To
                A Presumption of Fairness..........................................................19

        3.    The Proposed Settlement Is Substantively Fair .......................................20

                a.    The Absence of Precedent In CEA Manipulation Cases .............21

b.     Factor 1: The Complexity, Expense And Likely
Duration Of The Litigation ............................................................22

c.     Factor 2: The Reaction Of The Class To The
Settlement .....................................................................................23

d.     Factor 3: The Stage Of The Proceedings And The
Amount Of Discovery Completed .................................................24

e.     Factors 4, 5 and 6: The Risks Of Establishing
Liability, Damages And Maintaining The Class
Action Through Trial .....................................................................24

f.     Factor 7: The Ability Of The Settling Defendants
To Withstand A Greater Judgment ................................................25

g.     Factors 8 and 9: The Range Of Reasonableness Of
The Settlement Fund In Light Of The Best Possible
Recovery And All The Attendant Risks Of Litigation .................25

B.     The Notice Plan Should Be Approved Because It Provides
"The Best Notice Practicable Under The Circumstances" ...................................29

1.     The Legal Standards Governing Notice......................................................29

2.     The Proposed Notice Includes All the Requirements of Rule
23(c)(2)(B) and Comports With Due Process............................................29

3.     The Proposed Notice Plan Is The Best Practicable Under The
Circumstances ...........................................................................................30

C.     The Futures Class Should Be Certified For Settlement Purposes Because It
Satisfies The Four Requirements of Rule 23(a) and The Two Prongs of Rule
23(b)(3) ...............................................................................................................32

1.     The Futures Class Satisfies The Four Requirements of Rule 23(a)...........32

a.     Rule 23(a)(1)—The Members of The Futures Class Are So
Numerous That Joinder Of All Members Is Impracticable ...........32

b.     Rule 23(a)(2)—There Are Numerous Questions of Law and
Fact Common To The Futures Class .............................................33

c.     Rule 23(a)(3)—The Claims and Defenses of The Futures
Class Representatives Are Typical of The Claims and
Defenses of The Class....................................................................34

    d. Rule 23(a)(4)—The Futures Class Representatives Will Fairly And Adequately Protect The Interests of The Class ..................................................................34

  2. The Futures Class Satisfies The Two Prongs of Rule 23(b)(3) ................34

    a. Common Questions of Law and Fact Predominate ......................35

    b. A Class Action Is The Superior Method To Adjudicate These Claims ..................................................................35

 D. The Court Should Appoint Lovell Stewart To Act As Class Counsel For The Futures Class ..............................................................36

CONCLUSION ..................................................................................36

## TABLE OF AUTHORITIES

**Cases**

*Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*,
222 F.3d 52 (2d Cir. 2000)..................................................................................34

*Boeing Co. v. Van Gemert*,
44 U.S. 472 (1980)....................................................................................10, 26

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)......................................................................21, 26

*Consolidated Rail Corp. v. Town of Hyde Park*,
47 F.3d 473 (2d Cir. 1995).................................................................................33

*Currency Conversion*,
263 F.R.D. 110 (S.D.N.Y. 2009) ...............................................................passim

*DiPlacido v. CFTC*,
364 Fed. Appx. 657 (2d Cir. 2009)......................................................................7, 8

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)............................................................................................13

*Global Crossing Securities and ERISA Litig.*,
255 F.R.D. 436 (S.D.N.Y. 2004) ...............................................................24, 32

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
06-MD-1775 JG VVP, 2012 WL 3138596 (E.D.N.Y. Aug. 2, 2012) ..................18, 27

*In re Amaranth Natural Gas Commodities Litig.*,
269 F.R.D. 366 (S.D.N.Y. 2010) .................................................................21, 34

*In re AOL Time Warner, Inc. Sec. Litig.*,
No. 02 Civ. 5575, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)...............................20

*In re Crude Oil Commodity Futures Litig.*,
11-cv-3600 (WHP) 2012 WL 569195 (S.D.N.Y. Feb. 14, 2012)............................36

*In re Currency Conversion Fee Antitrust Litig.*,
01 MDL 1409, 2006 WL 3247396 (S.D.N.Y. Nov. 8, 2006)...............................*passim*

*In re Giant Interactive Grp ., Inc. Sec. Litig.*,
  No. 07 Civ. 10588, 2011 WL 5244707 (S.D.N.Y. Nov. 2, 2011) ............................................. 20

*In re Global Crossing Sec. and ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y.2004) ................................................................... *passim*

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
  194 F.R.D. 166 (E.D.Pa. 2000) ................................................................................. 13

*In re Initial Public Offering Securities Litig.*,
  226 F.R.D. 186 (S.D.N.Y. 2005) .................................................................. *passim*

*In re Initial Public Offering Securities Litig.*,
  260 F.R.D. 81 (S.D.N.Y. 2009) .................................................................... 33, 34, 35

*In re MicroStrategy, Inc. Sec. Litig.*,
  148 F.Supp.2d 654 (E.D.Va. 2001) ......................................................................... 13

*In re NASDAQ Mkt. Makers Antitrust Litig.*,
  176 F.R.D. 99 (S.D.N.Y. 1997) ............................................................................ 2, 19

*In re: Nasdaq Market-Makers Antitrust Litig.*, No. 94 CIV. 3996, 1997 WL 805062
  (S.D.N.Y. Dec. 31, 1997) .......................................................................................... 13

*In re Natural Gas Commodities Litig.*,
  231 F.R.D. 171 (S.D.N.Y. 2005) .................................................................. 12, 16, 22

*In re Paine Webber Ltd. P'ships Litig.*,
  147 F.3d 132 (2d Cir. 1998) ........................................................................................ 1

*In re Painewebber Ltd. Partnerships. Litig.*,
  171 F.R.D. 104 (S.D.N.Y.1997), ............................................................................. 20

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
  163 F.R.D. 200 (S.D.N.Y.1995) ............................................................................... 23

*In re Sturm, Ruger & Co., Inc. Securities Litig.*,
  2012 WL 3589610 (D. Conn. Aug. 20, 2012) ......................................................... 19

*In re Sumitomo Copper Litig.*,
  182 F.R.D. 85 (S.D.N.Y. 1998) ........................................................................... 12, 16

*In re Sumitomo Copper Litig.*,
  189 F.R.D. 274 (S.D.N.Y. 1999) .............................................................................. 12

*In re Sumitomo Copper Litig.*,
   194 F.R.D. 480 (S.D.N.Y. 2000), ........................................................................22

*In re Sumitomo Copper Litigation*,
   74 F.Supp.2d 393 (S.D.N.Y. 1999) ...........................................................22, 23

*In re Warner Chilcott Ltd. Securities Litig.*,
   06-cv-11515 (WHP), 2008 WL 5110904  (S.D.N.Y. Nov. 20, 2008)...........................................1

*Jaffe vs. Household, et al.*, 02-cv-05893, (RAG) (N.D. Ill.) ......................................16

*Maley v. Del Global Technologies*, 186 F.Supp.2d 385 (S.D.N.Y. 2002) ....................................20

*Maywalt v. Parker & Parsley Petroleum Co.*,
   67 F.3d 1072 (2d Cir. 1995).......................................................................21, 25

*Newman v. Stein*,
   464 F.2d 689 (2d Cir. 1972)...........................................................................25

*Precision Associates, Inc. v. Panalpina World Transp. (Holding) Ltd.*,
   08-CV-42 JG VVP, 2013 WL 4525323 (E.D.N.Y. Aug. 27, 2013).........................................16

*Ramirez v. DeCoster*,
   142 F.Supp.2d 104 (D.Me. 2001) ......................................................................13

*Strobl v. New York Mercantile Exch.*,
   582 F. Supp. 770 (S.D.N.Y. 1984) ....................................................................22

*Strougo v. Bassini*,
   258 F.Supp.2d 254 (S.D.N.Y. 2003).................................................................23

*United States v. Radley*,
   659 F. Supp. 2d 803 (S.D. Tex. 2009) .............................................................8, 9

*Wal–Mart Stores, Inc. v. VISA U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005).....................................................................*passim*

## Statutes

15 U.S.C. §1 et seq. ...................................................................................7

7 U.S.C. §§ 1, et seq. ..................................................................................6

## Rules

Fed. R. Civ. P. 23....................................................................................29

Fed. R. Civ. P. 23(a) ........................................................................... 32, 35

Fed. R. Civ. P. 23(a)(1) ...................................................................... 32, 33

Fed. R. Civ. P. 23(a)(2) ........................................................................... 33

Fed. R. Civ. P. 23(a)(3) ...................................................................... 33, 34

Fed. R. Civ. P. 23(a)(4) ........................................................................... 34

Fed. R. Civ. P. 23(b) .......................................................................... 32, 35

Fed. R. Civ. P.23(b)(3) .................................................................... *passim*

Fed. R. Civ. P. 23(b)(3)(A)-(D) .............................................................. 35

Fed. R. Civ. P. 23(c) ................................................................................ 29

Fed. R. Civ. P. 23(c)(2)(B) ............................................................ 29, 30, 32

Fed. R. Civ. P. 23(e) ............................................................................ 1, 32

Fed. R. Civ. P. 23(e)(1) ........................................................................... 29

Fed. R. Civ. P. 23(g)(1) ........................................................................... 36

Fed. R. Civ. P. 23(g)(4) ........................................................................... 36

Fed. R. Civ. P. 23(g)(2) ........................................................................... 36

**Regulations**

17 C.F.R. §1.3(z)(1)................................................................................ 26

**Other Authorities**

James D. Cox & Randall S. Thomas, *Letting Billions Slip Through Your Fingers: Empirical Evidence and Legal Implications of the Failure of Financial Institutions to Participate in Securities Class Action Settlements*, 58 Stan. L. Rev. 411 (2005)............................................... 27

Jerry W. Markham, *Manipulation of Commodity Futures Prices – The Unprosecutable Crime*, 8 Yale J. on Reg. 281 (1991) ........................................................ 22

John C. Coffee, Jr. (ed.), *Litigation Governance: Taking Accountability Seriously*, 110 Colum. L. Rev. 288 (Mar. 2010) ....................................................... 27

*Newberg on Class Actions*, §11.41 (4th ed.) ................................................. 1

*Securities Class Action Settlements, 2011 Review and Analysis*, Cornerstone Research at p. 7....28

## I.     INTRODUCTION

The Futures Plaintiffs[1] (sometimes "Plaintiffs") respectfully submit this memorandum and the accompanying declaration of Christopher Lovell, Esq. in support of their motion pursuant to Rule 23(e) of the Federal Rules of Civil Procedure for preliminary approval of the Stipulation and Agreement of Settlement ("Settlement").[2]

### A.     $48,400,000 Cash Payment; $35,000,000 Assignment and Judgment

The Settlement was executed by the Futures Plaintiffs and the Settling Defendants[3] on August 20, 2013, and will provide guaranteed cash settlement funds of **$48,400,000** as well as **potential** further recoveries from insurers.  *See* fn. 4 *infra*.  If approved, the Settlement will resolve all claims that the Settling Defendants manipulated prices and caused losses in the "thin and illiquid" trading of platinum and palladium futures contracts on the New York Mercantile Exchange ("NYMEX") in this District during the Class Period.  Docket No. 133 at ¶5.  The Settlement does not involve Defendant MF Global, Inc., which filed a suggestion of bankruptcy on November 8, 2011.  Docket No. 75.  The Futures Plaintiffs are separately attempting to resolve the claims against MF Global, Inc.

The settlement of a class action requires court approval.  *Compare* Fed. R. Civ. P. 23(e) (settlements in class actions require "…the court's approval") *with In re Warner Chilcott Ltd. Securities Litig.*, 06-cv-11515 (WHP), 2008 WL 5110904 at *1 (S.D.N.Y. Nov. 20, 2008) (Pauley, J.) ("[t]he settlement of complex class action litigation is favored by the Courts")

---

[1]  "Futures Plaintiffs" refers to Plaintiffs Greg Galan and Richard White.
[2]  A copy of the Settlement Agreement and its exhibits are attached hereto to the Declaration of Christopher Lovell, Esq. ("Lovell Decl.") as Exhibit 1.  Capitalized terms herein that are defined in the Settlement Agreement have the same meaning as in the Settlement Agreement.
[3]  "Settling Defendants" refers to Moore Capital Management, LP; Moore Capital Management, LLC; Moore Capital Advisors, LLC; Moore Advisors, Ltd.; Moore Macro Fund, LP; Moore Global Fixed Income Master Fund, LP; Christopher Pia; Louis Bacon; Eugene Burger (together the "Moore Defendants"); and Joseph Welsh ("Welsh").

*citing Wal–Mart Stores, Inc. v. VISA U.S.A. Inc.,* 396 F.3d 96, 116 (2d Cir. 2005); *In re Paine Webber Ltd. P'ships Litig.,* 147 F.3d 132, 138 (2d Cir. 1998); *see also Newberg on Class Actions*, §11.41 (4th ed.) ("[t]he compromise of complex litigation is encouraged by courts and favored by public policy").

After a **proposed** class action settlement is reached, a court must determine whether the proposed settlement warrants preliminary approval. *In re Currency Conversion Fee Antitrust Litig.*, 01 MDL 1409, 2006 WL 3247396, at *5 (S.D.N.Y. Nov. 8, 2006) (Pauley, J.) ("*Currency Conversion*"). This Court has previously held that:

> where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the reasonable range of approval, preliminary approval is granted.

*Id. citing In re NASDAQ Mkt. Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997) ("*NASDAQ*").

After preliminary approval has been granted, notice is then sent to members of the class, including notice of a "fairness hearing" where class members and the parties to the settlement may be heard before the court grants final approval of the settlement. *Currency Conversion,* 2006 WL 3247396, at *5. After such fairness hearing, the District court finally determines whether the proposed class action settlement is both procedurally and substantively fair, reasonable and adequate. *Currency Conversion*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009).

The Futures Plaintiffs, on behalf of themselves and the proposed Futures Class, now respectfully move the Court to grant preliminary approval of the Settlement and enter the [Proposed] Order Preliminarily Approving Proposed Settlement, Scheduling Hearing For Final Approval Thereof, and Approving the Proposed Form and Program of Notice To The Class ("Scheduling Order") attached as Exhibit 1-D to the Declaration of Christopher Lovell, Esq.

that, among other things:

1.  finds the Settlement to be sufficiently fair, reasonable, and adequate to warrant dissemination of notice of the Settlement to the Futures Class (Lovell Decl. Ex. 1-D ¶11);
2.  certifies the proposed Futures Class for settlement purposes (*id.* ¶2);
3.  appoints Lovell Stewart Halebian Jacobson LLP ("Lovell Stewart") as class counsel for the Futures Class (*id.* ¶3);
4.  appoints Plaintiffs Greg Galan and Richard White as representatives of the Futures Class (*id.* ¶4);
5.  finds the notice plan to be the best practicable notice under the circumstances (*id.*¶10);
6.  approves the forms of and substance of the notice of the Settlement to the Futures Class (*id.*);
7.  approves A.B. Data, Ltd. as the Settlement Administrator and Escrow Agent (*id.* ¶20); and;
8.  sets a schedule leading to the Court's consideration of final approval of the Settlement, including:
    a.  the date, time, and place for a hearing to consider the fairness, reasonableness and adequacy of the Settlement ("Fairness Hearing") (*id.*¶5);
    b.  the deadline for members of the Futures Class to exclude themselves (*i.e.,* opt out) from the Settlement (*id.* ¶17);
    c.  the deadline for Futures Class Counsel to submit a petition for attorneys' fees and reimbursement of expenses (*id.* ¶13);
    d.  the deadline for members of the Futures Class to object to the Settlement and any of the related petitions (*id.* ¶14).

At the Fairness Hearing, the Futures Plaintiffs will request the entry of a final order and judgment substantially in the form of Lovell Decl. Ex. 1-E.  The proposed final judgment would dismiss the Futures Action as to the Settling Defendants except grant judgment in favor of the Futures Class against Defendant Welsh on the negligence claim,[4] and retain jurisdiction for the implementation and enforcement of the Settlement.

## II.   STATEMENT OF FACTS

### A.   The Procedural History of the Futures Action

---

[4] The $35,000,000 judgment against Defendant Welsh is enforceable solely against his personal property consisting of his rights against certain insurers, which represent the potential further recoveries mentioned on p. 1.  *See* fn. 6 *infra* and accompanying text.

3

On April 30, 2010, the Futures Plaintiffs filed an initial class action complaint in this Court.  Docket No. 1.  By order dated July 20, 2010, the Court appointed Lovell Stewart as interim class counsel "to act on behalf of all purchasers of NYMEX palladium futures contract and/or NYMEX platinum futures contracts…"  Docket No. 18 at ¶13.

On August 10, 2010, the Futures Plaintiffs filed a first amended consolidated complaint. Docket No. 25.  Relying on a government settlement order,[5] Plaintiffs alleged that Defendants manipulated NYMEX platinum and palladium futures contract prices through "bang the close" trades made at the end or "close" of trading on numerous trading days during the Class Period, which was alleged to be October 25, 2007 through June 6, 2008.  *Id.* at ¶112.

On August 26, 2010, the Defendants filed a motion seeking a stay of discovery pending a decision on their anticipated motion to dismiss the Futures Plaintiffs' consolidated complaint. Docket No. 33.  On September 14, 2010, the Futures Plaintiffs filed their opposition to Defendants' motion for a stay of discovery.  Docket No. 42.  Plaintiffs argued that Defendants had failed to make the required showing of "good cause" as to why discovery should be stayed pending a decision on their motion to dismiss.  *Id.*  The Futures Plaintiffs also argued that since the documents were previously searched for, gathered and produced to the Commodity Futures Trading Commission ("CFTC"), there was little burden on Defendants to re-produce them.  *Id.* On September 27, 2010, Defendants filed their reply in support of their motion to stay discovery. Docket No. 48.

On September 30, 2010, the Futures Plaintiffs filed their second amended consolidated complaint.  Docket No. 50.  This was essentially the same as the initial complaint but the claims were combined with those of the Physical Plaintiffs into one complaint.  On November 5, 2010,

---

[5] *See In re Moore Capital Management, LP, et al.*, CFTC Docket No. 10-9, Order Instituting Proceedings Pursuant to Sections 6(c), 6(d) and 8a of the Commodity Exchange Act and Making Findings And Imposing Remedial Sanctions (C.F.T.C. April 29, 2010).

Defendants moved to strike and dismiss the Futures Plaintiffs' second amended consolidated complaint.  Docket No. 55.

On November 30, 2010, the Court denied in part Defendants' motion to stay discovery and ordered the Defendants to provide the Futures Plaintiffs with copies of the approximately 250,000 pages of documents that Defendants previously produced to the CFTC.  Docket No. 59.

Defendants thereafter produced such documents which included tape recordings of conversations between Mr. Welsh and various persons including persons on the floor of the NYMEX.  The Futures Plaintiffs promptly began reviewing and analyzing all of these documents.

On September 13, 2011, the Court granted in part and denied in part Defendants' motion to strike and to dismiss the second amended consolidated complaint without prejudice.  Docket No. 70.  As part of the same order, the Court granted the Futures Plaintiffs leave to re-plead their allegations.  *Id*.  Based upon their completed review of the foregoing documents, Plaintiffs worked to prepare and submitted on October 31, 2011 to Defendants for review of the "under seal" portions based on the documents designated confidential, a Third Amended Complaint ("TAC"). The proposed under seal complaint was then provided to the Court.

On November 8, 2011 Defendant MF Global filed a suggestion of bankruptcy.  Docket No. 75.

After modification of the complaint to eliminate the under seal treatment of almost all portions of the TAC, the TAC was filed on November 21, 2011.  Docket No. 80.  **The TAC was 159 pages long including exhibits and added three new Defendants.**  Therein, the Futures Plaintiffs added three new Defendants, including Defendant Welsh.  Although the Class Period was between October 17, 2007 and June 6, 2008, the TAC asserted that alleged "bang the close" trades or "slam the close" (downward manipulation) trades began as early as June 1, 2006, and occurred sporadically on and off (mostly off) until Autumn 2007.  Plaintiffs alleged that "bang the

close" trades to inflate prices then occurred frequently until they stopped altogether on May 21, 2008. Plaintiffs, in detail, set forth the particulars of 95 allegedly manipulative trades in NYMEX platinum futures over 127 days, and 119 allegedly manipulative trades in NYMEX palladium futures over 139 days. Plaintiffs also alleged various *verbatim* quotes from conversations involving Defendant Welsh (among others), and correlated them with various trades and other events or strategies.

On January 20, 2012, the Defendants moved to dismiss certain of the Futures Plaintiffs' claims in their TAC. Docket No. 98. In recognition of the detailed allegations, the Moore Defendants did not move to dismiss the Futures Plaintiffs' Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1, *et seq.* claims. *Id.* But the Moore Defendants attacked the antitrust claims on the same grounds on which this Court had additionally dismissed and additional grounds as well. On February 3, 2012, Defendant Welsh did move to dismiss the CEA claims against him. Docket No. 107. On February 29, 2012, Plaintiffs filed an opposition to Defendants' motion to dismiss arguing that Plaintiffs plausibly alleged that Defendant Welsh and others violated the CEA. Docket No. 111.

On or about March 14, 2012, Plaintiffs began to receive from the CFTC production of twenty-three deposition transcripts pursuant to subpoena by Plaintiffs. On or about February 27, 2012, Plaintiffs received initial production of the NYMEX street book for the trading throughout the Class Period. The street book contained information showing the date, time, volume, price and other information for all trades of NYMEX platinum and NYMEX palladium contracts traded during the Class Period.

On July 11, 2012, this Court suspended the schedule on the pending motion to dismiss so that the parties could pursue settlement discussions. On July 27 and August 27, 2012, the parties participated in mediation sessions before The Honorable Daniel Weinstein (Ret.). These

mediation sessions did not result in a settlement.  The parties thereafter continued to negotiate and argue but finally determined to resume litigation.

On December 19, 2012, the Court entered an order allowing the Futures Plaintiffs leave to file their fourth amended consolidated complaint.  Docket No. 125.  On January 17, 2013, the Futures Plaintiffs' filed their fourth consolidated amended complaint.  Docket No. 127.

On February 7, 2013, prior to the time Defendants' motions to dismiss were due to be filed, the Court adjourned such deadline to allow the parties time to try again to negotiate a settlement.  Docket No. 128.  On July 29, 2013, the Futures Plaintiffs filed their Fifth Consolidated Amended Class Action Complaint which added a negligence claim against Defendant Welsh.  Therein, Plaintiffs alleged that Defendant Welsh negligently breached his duties as a broker, and was and is liable for negligence.  Also, Plaintiffs alleged that, between at least October 17, 2007 and June 6, 2008, Defendants combined, conspired, and agreed to inflate the prices of NYMEX platinum futures contracts and NYMEX palladium futures contracts in violation of the CEA and the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. §1 *et seq*.

On August 20, 2013, the Futures Plaintiffs and the Settling Defendants entered into the Settlement Agreement.

### B.    Defendants' Positions During The Settlement Negotiations

Except as to Defendant Welsh as specifically described in the Settlement Agreement and the proposed Final Judgment, the Settling Defendants have consistently and vigorously denied the Futures Plaintiffs' claims.  Given the relatively undeveloped state of the law with respect to proving claims under Section 22(a) of the CEA (*see* III.A.3.a *infra*), the Settling Defendants and their Counsel credibly made numerous arguments against manipulation and, assuming *arguendo* that any manipulation occurred, against all or any significant damages that were caused to the Futures Class by such manipulation.  Some examples of these arguments are set forth below.

7

In their motion to strike and dismiss Plaintiffs' second amended consolidated complaint, Defendants argued that, because their allegedly manipulative trades were made at "prevailing market prices," their trading could not have been manipulative because, according to Defendants, "the hallmark of a manipulation claim is trading at a price other than a prevailing market price." Docket No. 57 at pp. 11-14 citing to *DiPlacido v. CFTC*, 364 Fed. Appx. 657 (2d Cir. 2009) ("*DiPlacido*") and *United States v. Radley*, 659 F. Supp. 2d 803 (S.D. Tex. 2009) ('*Radley*"). In response to the Defendants' foregoing argument, the Court, at oral argument, stated that "I don't think any Court wants to be second guessing trading activity after the fact. But, the argument that you are making may be very persuasive on summary judgment. But this is a motion to dismiss." Transcript of Oral Argument dated February 4, 2011, p. 20, lines 5-8.

Defendant Welsh argued in his motion to dismiss that Plaintiffs had not alleged an actionable claim for manipulation in violation of the CEA because they supposedly failed to allege any "deceptive, misleading or illegal conduct," including rule violations. Docket No. 107 at pp. 6-12 citing *DiPlacido* and *Radley*. Defendant Welsh argued that such conduct including (at least) rule violations, were required to state a claim for manipulation. *Id.*

At the time the Settlement was reached, the Settling Defendants were preparing to move to dismiss the Futures Plaintiffs' fifth amended complaint. Assuming the Futures Plaintiffs survived the Settling Defendants' motions to dismiss their complaint, they would have faced further risks. These further risks include class certification and interlocutory appeal thereof, summary judgment and *Daubert* and other *in limine* motions. Even then, the Futures Plaintiffs would face the risk of a trial and, to the extent successful at trial, on post-trial motions and then appeal.

In addition to all the foregoing risks, during the course of the parties' settlement negotiations, the Settling Defendants and their experts have vigorously disputed and criticized

8

Plaintiffs' methodology for estimating damages.  The Settling Defendants presented expert

analysis tending to show that, even assuming, *arguendo*, that multiple risks could be overcome

and any liability could be established, then any alleged damages caused by the alleged

manipulation were either non-existent or, using methods they viewed as highly favorable to

Plaintiffs, at most $6.5 million for the entirety of the Class Period.  Absent a settlement, these

attacks would have been further developed and pursued in Court.  This created real risks for the

Futures Plaintiffs with respect to the amount of damages they might recover, several years from

now, *even if successful on the issue of liability*.

### C.    Plaintiffs' Position At The Time Of Settlement

Prior to entering the settlement, Futures Lead Counsel had reviewed and analyzed all of

the above-described discovery documents and deposition transcripts, and conducted very

extensive investigation and research.  Based on such discovery and investigation as well as

thirty-five years of experience with CEA manipulation claims, and more than fifteen months of

arguments/negotiations with Defendants' various counsel about the application of CEA

manipulation law to the facts here, Futures Lead Counsel were well informed of the prospective

risks, rewards, arguments, rejoinders, and other issues that would be involved with continued

prosecution of the claims here.

Futures Lead Counsel's position just prior to entering the settlement was that Plaintiffs

could prove the elements of trade manipulation by "bang the close" trades on most or all days

between November 1, 2007 (for palladium futures contracts) or November 19, 2007 (for

platinum futures contracts) and May 21, 2008.  Futures Lead Counsel believed that the proof of

such daily manipulation on all days could support and prove nominal damages of more than

$400 million.  As used herein, "nominal" damages refers to the amount of damages in a

judgment.  It does not refer to the amount of damages that Class members would file proofs of

claim to participate in and obtain their share of.  The latter number is a much lower amount.  *See infra* at fn. 13 regarding the low rates at which Class members submit proofs of claim.

However, Futures Lead Counsel could not disregard or ignore Defendants' legal arguments.  This included the risk that many of the allegedly manipulative trades would not be considered to be manipulative because, among many other reasons, the prevailing market price was arrived at without violation of NYMEX rules.

Nor could Futures Lead Counsel ignore or disregard Defendants' causation arguments.  Defendants' very well-credentialed economists opined that maximum damages were $6.5 million.  In the event of continued prosecution, even if the Class prevailed on all of the allegedly manipulative trades, there **was** a risk that the total damages awarded by a jury and upheld by this Court on appeal could have been a small fraction (*e.g.*, one 1/7th) of just the guaranteed cash consideration provided by this settlement.

If the Class did obtain a larger nominal verdict and sustained it on appeal, there was the further risk of the failure by Class members to claim.  For example, in fact patterns such as that in *Boeing Co. v. Van Gemert*, 444 U.S. 472, 479-81 (1980), the defendant owed a specified judgment but the entitlement to portions of that judgment by class members who failed to claim was forfeited (except for the attorneys' fee) back to the defendants because the class members did not file a proof of claim.  In this regard, Futures Class Counsel was also well aware that they had successfully negotiated that the proposed settlement prohibited any reversion to Defendants in respect of opt-outs, and provided Defendants with only a very limited reversion in respect of Class member who fail to claim.  *See* D.7 *infra*.

In the foregoing context, Futures Lead Counsel's analysis was and is that the consideration under the proposed settlement will provide fair, reasonable and adequate compensation to claiming Class members.  *See* III.A.3.g *infra* (elaborating on the settlement

recovery compared to other metrics and the likely payout to claiming Class members based on prior experience with the amounts of Class members who fail to claim).

### D.    The Settlement Agreement

The Settlement Agreement and its exhibits include the following material terms.

#### 1.    The Consideration To The Futures Class: $48,400,000 Cash Payment; $35,000,000 Assignment and Judgment

The proposed Settlement provides for (a) cash compensation in the amount of $48,250,000 to be provided by the Moore Defendants; (b) separate and additional cash compensation from the Moore Defendants of an additional $150,000 in order to quiet the litigation as to Defendant Welsh provided that the Moore Defendants will be entitled to a maximum of the first $50,000 of any recovery by the Futures Plaintiffs from Defendant Welsh's relevant insurers (see sub-paragraph (c) next); and (c) consent by Welsh to the entry of judgment against him on the negligence claim in the amount of $35,000,000 to the extent that this judgment is enforced against Welsh's personal property consisting of the assignment by Defendant Welsh of his rights against relevant insurers in the amount of $35,000,000.[6] *See* Settlement Agreement, Section 3.  Because Defendant Welsh's insurers have previously denied Defendant Welsh coverage under the policies, there might be no collection of any monies on

---

[6] Defendant Welsh has agreed as set forth in the Settlement Agreement Section 3(b) and the Proposed Judgment ¶15 and footnote 1.  The following description or summary is qualified in its entirety by the foregoing, which controls.  In essence, Welsh has consented to the entry of a judgment, in the  sum of $35,000,000 with respect to the negligence claim and in favor of the Futures Class, which may be enforced against and only against Welsh's personal property consisting of his rights against certain insurers.  Settlement Section 3(b).  This judgment shall be satisfied in full, shall cease to have any force or effect, and shall terminate when the Futures Plaintiffs' and Futures Class' claims against the Relevant Insurers have been finally resolved on the merits and all efforts to enforce any such judgment have been completed (the "Insurance Enforcement Date").

The insurers have denied coverage on multiple grounds.  There can be no assurance of any collection.  However, any sums settled or collected in excess of $50,000 (which is to be paid to the Moore Defendants) would be paid to the Settlement Fund and distributed in accordance with the plan of allocation.

such judgment.  Defendant Welsh has made representations about his financial condition and

Futures Lead Counsel has made a judgment that, even if no monies are collected from the

insurers, the consideration received from the Moore Defendants is (given the alternatives) a

reasonable and fair consideration for the Welsh settlement and with the Moore Defendants.

2.      **The Settlement Class**

For purposes of the Settlement, the parties have proposed certification of the Futures Class

defined as follows:

> All Persons that purchased or sold a NYMEX platinum futures contract or a NYMEX
> palladium futures contract during the period from June 1, 2006 through April 29, 2010,
> inclusive.  Excluded from the Futures Class are (i) the Settling Defendants, MF Global,
> Inc., any co-conspirators alleged in the Complaint or any subsequent amended complaint
> filed prior to the Exclusion Bar Date, Alan Craig Kleinstein, Dominick Frank Terrone,
> Richard Peter Trifoglio Sr., Frederick Charles Ferriola, Peter Michael Venus, Lawrence
> Frasca Favuzza, and John Anthony Sakulich and any NYMEX floor brokers or NYMEX
> floor traders who refuse to execute the certification in the Proof of Claim attesting that
> they were not co-conspirators, or aiders or abettors of the Settling Defendants or Non-
> Settling Defendants, and  (ii) Opt Outs.

Lovell Decl. Ex. 1-D at ¶2.  The above defined class is both more broad and more narrow than the

original litigation class.[7]  Settlement classes different from the litigation class have repeatedly

---

[7] It is more narrow because it excludes the named persons (who are NYMEX floor personnel)
from the Class as well as any other NYMEX floor brokers or floor traders who refuse to execute
the certification in the Proof of Claim attesting that they were not acting unlawfully with the
Settling Defendants or Non-Settling Defendants.

    The Class is more broad in that the date range has been expanded from the original
October 17, 2007 through June 6, 2008 period to June 1, 2006 through April 29, 2010.  This
expansion extends the beginning of the Class back to the first manipulative trade by Defendants
and extends the end of the Class forward to the last possible arguable date on which any artificial
impact from the manipulative trades (which ended on May 21, 2008) could have remained in the
market.

    Settlement classes that are different from the litigation class have repeatedly been
approved under Rule 23 especially where, as here, a continuous course of conduct or the potential
impact from conduct has been made clear from discovery.  Thus, settlement classes that were
more broad than the original litigation class have repeatedly been approved in prior commodity
futures manipulation cases.  *Compare In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 178
(S.D.N.Y. 2005) (certifying litigation class period of January 1, 2000 through December 31,
2002) *with In re Natural Gas Commodities Litig.,* 03-cv-6186, Order dated June 15, 2007

been approved.  *In re Initial Public Offering Securities Litig.*, 226 F.R.D. 186, 190 (S.D.N.Y. 2005) ("…a court may approve a settlement class broader than a litigation class that has already been certified") citing *In re MicroStrategy, Inc. Sec. Litig.,* 148 F.Supp.2d 654, 661 (E.D.Va. 2001) (certifying settlement class broader than previously certified litigation class); *In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 172 (E.D.Pa. 2000) (same); *cf. Ramirez v. DeCoster,* 142 F.Supp.2d 104, 111 (D.Me. 2001) (certifying settlement class even after *declining* to certify litigation class).

Here, manipulative trades allegedly occurred sporadically and in different directions (up or down) from the start of the Class Period through November 2007.  This Court observed that any artificial impact of Defendants' alleged bang the close trades "could have [] dissipated."  *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 601 (S.D.N.Y. 2011).

However, beginning in November 2007 Defendants uniformly made upward alleged manipulative trades and did so on virtually every trading day until they stopped on May 21, 2008 (when they were under investigation by regulators).  Plaintiffs estimate that artificiality was present in the market from the beginning of these concerted daily upward manipulative trades through June 18, 2008.  *See* Plan of Allocation described below.

However, for fraud based manipulation, the impact of a false statement could stay in the market until disclosure thereof.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005).  In negotiating the settlement, Defendants noted that a trader could argue under some fraud theory that the impact of Defendants' trades could have remained in the market until the CFTC order disclosed the wrongdoing on April 29, 2010.  Accordingly, the Settlement Class Period here

---

(S.D.N.Y.) (approving settlement and certifying settlement class period of June 1, 1999 through December 31, 2002; *compare In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 88 (S.D.N.Y. 1998) (certifying litigation class period of June 24, 1994 through June 15, 1996) *with In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 283, n. 1 (S.D.N.Y. 1999) (approving settlement and certifying settlement class period of June 24, 1993 through June 15, 1996).

extends from the time of the allegedly manipulative trades (June 6, 2006-May 21, 2008) until the end of the potential duration of the impact therefrom, *i.e.*, until April 29, 2010.  This is consistent with settlement classes in other cases.  *See In re: Nasdaq Market-Makers Antitrust Litig*., No. 94 CIV. 3996, 1997 WL 805062, at *3-6 (S.D.N.Y. Dec. 31, 1997) (defendants likely were not colluding during the pendency of the governmental investigation but the impact of their previous conduct continued in the circumstances of the case).  (However, as set forth in "6" below, Plaintiffs are weighting the amount of the payout for Class members whose losses occurred after September 2008 at a substantial discount to those whose losses occurred earlier.)

### 3.    Right to Opt-Out

Given the timing of the Settlement, if, notwithstanding the foregoing, any Class members do not have the same judgment about the fair compensation here as does Futures Lead Counsel, then those Class members have the right to opt out of the Settlement.

### 4.    The Release and Covenant Not To Sue

In exchange for the foregoing consideration, the Futures Plaintiffs and the Futures Class have agreed to release and discharge the Settling Defendants from any and all claims against the Settling Defendants for losses on their transactions in Class Contracts during the Class Period as fully set forth in Section 6 of the Settlement EXCEPT that the Futures Plaintiffs and Futures Class have a judgment against Defendant Welsh on their negligence claim, which may be enforced against and only against Defendant Welsh's personal property consisting of his rights against certain insurers.

### 5.    Notice

The proposed notice plan is comprehensive and calculated to reach—by direct mail alone—the approximately one hundred and twenty largest traders in NYMEX platinum and palladium futures contracts during the Class Period, all fifty-five clearing members of the

14

NYMEX, and (through the fifty-five clearing members) potentially all persons who are members of the Futures Class.  In addition, notice will provided by advertisements in *The Wall Street Journal, Futures Magazine,* and *Stocks and Commodities Magazine*.  See III.B. *infra*. Notice will also be provided by a settlement website that is searchable on the internet.[8]  *Id*.

**Direct Mail Notice**.  The proposed notice plan includes mailing notice of the Settlement, substantially in the form of Exhibit A to the Settlement, by United States first class mail, postage prepaid, to (a) the approximately one hundred and twenty large traders in NYMEX platinum and palladium futures contracts during the Class Period whose names have been obtained by the Futures Plaintiffs from the NYMEX; (b) all fifty-five clearing members on the NYMEX during the Class Period whose names have been obtained by the Futures Plaintiffs from the NYMEX (who should forward the Class Notice to their customers who transacted in NYMEX platinum and/or palladium futures contracts during the Class Period or provide the names and addresses of such customers to the Settlement Administrator); and (c) any additional reasonably identifiable members of the Futures Class.  Scheduling Order at ¶7.

**Publication Notice**.  The proposed notice program also includes publishing notice of the Settlement, substantially in the form of Exhibit B to the Settlement, as follows:  (a) for two consecutive months in Futures Magazine; (b) on the Futures Magazine website for one month; (c) for two consecutive months in Stock and Commodities Magazine (d) on the Stock and Commodities Magazine website for one month; and (e) in one edition of The Wall Street Journal. *Id* ¶8.  Finally, notice of the Settlement will also be published on a website created by the

---

[8] Everyone who transacted in NYMEX platinum or palladium futures contracts during the Class Period had to do so through a NYMEX clearing member.  The Class Notice instructs the NYMEX clearing members either to forward the Class Notice to their customers who transacted in NYMEX platinum and/or palladium contracts during the Class Period or to provide the Settlement Administrator with such customers' names and addresses.

Settlement Administrator.  *Id.* at ¶9.  The settlement website will be searchable on the internet. *Id.*

### 6. The Proposed Plan of Allocation

In this Action, the Futures Plaintiffs were prepared to propose to prove damages based on economic calculations of artificial impact that the Defendants' activities allegedly had on Class Contracts for each trading day during the Class Period.  *See Jaffe vs. Household, et al.*, 02-cv-05893, (RAG) (N.D. Ill.) Docket No. 1611 at pp. 70-95 (jury's answers to interrogatories specifying amounts of artificiality for each of the 780 trading days during the class period). Thus, as in *Household* and in previous CEA manipulation settlements, the proposed Plan of Allocation here also has a table of daily amounts of artificiality for each trading day between November 1, 2007 (for palladium futures contracts) or November 19, 2007 (for platinum futures contracts) and June 18, 2008.

Generally, under the Plan of Allocation, ninety percent (90%) of the Net Settlement Fund is reserved to pay for valid claims premised on the alleged artificiality of NYMEX platinum and NYMEX palladium futures contract prices.  *See* Lovell Decl. Exhibit 1-F (Plan of Allocation) at ¶2; *Precision Associates, Inc. v. Panalpina World Transp. (Holding) Ltd.*, 08-CV-42 JG VVP, 2013 WL 4525323, at *13 (E.D.N.Y. Aug. 27, 2013) (Gleeson, J.) (approving plan of allocation providing for 90% of payment to the specific claims, and 10% to the remaining claims).

The remaining ten percent (10%) of the Net Settlement Fund here is reserved to pay valid claims based on net trading losses.  *See* Plan of Allocation ¶14 regarding weighting.  Net Artificiality Paid is the sole method of payment in respect of trades in which at least one portion of the transaction occurred between November 1, 2007 (for palladium futures contracts) and November 19, 2007 (for platinum futures contracts) and June 18, 2008.  Net Losses are the sole

method of payout for the remaining transactions that occurred during the Class Period.  *Id*. ¶¶3, 10-14.

The Plan of Allocation provides that each Claiming Futures Class Member will receive the sum of their Net Artificiality Paid payment and their Net Losses payment.  *Id*. ¶4.  Net Artificiality Paid is defined as the amount by which a Futures Class Member's Total Artificiality Paid exceeds their Total Artificiality Received, plus ten percent (10%) and less any applicable Hedging Reduction or Swaps-Dealer Reduction.  Plan of Allocation ¶¶2, 5.  Net Losses are defined as the amount by which a Futures Class Member's Total Losses on their NL Transactions exceed their Total Gains on their NL Transactions, plus ten percent (10%) and less any applicable Hedging Reduction or Swaps-Dealer Reduction.  *Id*. at ¶¶3,10; see also Plan of Allocation ¶14 (relating to weighting of Net Losses).

With respect to Net Artificiality Paid,  Claiming Futures Class Members with Net Artificiality Paid will be entitled to receive a pro rata share of 90% of the Net Settlement Fund. This share shall be calculated for each Claiming Futures Class Member by multiplying 90% of the Net Settlement Fund by a fraction the numerator of which is the Claiming Futures Class Member's Net Artificiality Paid and the denominator of which is the sum total Net Artificiality Paid of all Claiming Futures Class Members who have positive Net Artificiality Paid.  *Id*. ¶9.  A similar *pro rata* payout entitlement applies to Net Losses.[9]

---

[9] Class action settlements have been approved in which no plan of allocation was provided to class members until after the final approval hearing had been held, all proofs of claims totaled, and a separate proposed plan of allocation was sent out to the claiming class members.  *Compare*, *e.g., In re Natural Gas Commodity Litig.*, 03-cv-6186, Order Establishing Plan of Allocation and Directing Further Proceedings dated March 29, 2010 (S.D.N.Y.) *with In re Sumitomo Copper Litig.*, 96-cv-4854, Order Establishing Plan of Allocation and Approving Administrative Fees and Expenses dated August 8, 2005 (S.D.N.Y.).

      Here, the entire plan of allocation has been provided except that the proposed weighting of the considerations for a portion of Net Losses may be proposed AFTER all proofs of claim have been received from Class members and tabulated.  Depending upon the total volume of claims

### 7.      Limited Reversion

An important additional term of the Settlement is that there will be **no reversion** to Defendants in respect of Futures Class members who opt-out.  *Contrast In re Air Cargo Shipping Servs. Antitrust Litig.*, 06-MD-1775 JG VVP, 2012 WL 3138596, at *1-2 (E.D.N.Y. Aug. 2, 2012) (settlements with reversion for opt-outs were approved).  Nor will there be any reversion in respect of Class members who fail to claim until Claiming Futures Class Members receive 110% of their net artificiality paid and 110% of their net losses.

However, because Claiming Futures Class Members are entitled to the full amount of Plaintiffs' experts' artificiality numbers under the Plan of Allocation, the Settlement also provides that, in the event that the Net Settlement Fund allocated to pay claims for Net Artificiality Paid exceeds 110% of net artificiality paid by all Claiming Futures Class Members, then there will be a reversion back to the Moore Defendants.  *See* Settlement at ¶12(b) and Plan of Allocation at ¶9(c).  Even then, the Moore Defendants will be entitled to only one-half (*i.e.*, 50%) of any reversion with respect to Net Artificiality Paid, which is how 90% of the Net Settlement is being distributed.  *See* Plan of Allocation attached as Exhibit 1-F to the Lovell Decl.  The remaining 50% of such excess above 110% would be redistributed among Claiming Futures Class Members in proportion to their respective net artificiality paid.  *Id.*

Typically, in class action settlements like this one, many class members do not file proofs of claim.  *See* fn. 13 *infra*.  Thus, the absence of reversion until 110% of the claims made are paid greatly enhances the payout to Class members who submit proofs of claim.  *See* III.A.3.g

---

and estimated administrative costs of implementing a weighting, it may be most fair and reasonable to provide higher rates of payout to losses occurring during certain pre-September 2008 time periods and increasingly lower rates of payout to losses during the post September 2008 time period.  Any such proposed weighting will be subject to approval by this Court after notice to the Claiming Futures Class Members of such weighting and their opportunity to object thereto.

*infra*.

## III.    ARGUMENT

### A.    Preliminary Approval Should Be Granted Because The Proposed Settlement Falls Well Within "The Reasonable Range of Approval"

#### 1.    The Legal Standards Governing Preliminary Approval

This Court has previously held that:

> where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the reasonable range of approval, preliminary approval is granted.

*Currency Conversion*, 2006 WL 3247396, at *5 *citing NASDAQ*, 176 F.R.D. at 102.  The Settlement has no "obvious deficiencies."  *Id*.  Indeed, unlike in many class action settlements, the Defendants have explicitly retained the right to object to Class Counsel's request for attorneys' fees.  Also, there is no improper preferential treatment.  Plaintiffs address non-collusive negotiations and the reasonableness of the consideration in detail in "2" and "3" below.

#### 2.    The Settlement Is Procedurally Fair and Is Entitled To A Presumption of Fairness

A class action settlement is entitled to a presumption of fairness, adequacy and reasonableness when "…there were arm's length negotiations between experienced counsel after meaningful discovery."  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 116 (2d Cir. 2005) *cert. denied*, 544 U.S. 1044 (2005) ("*Wal-Mart*").

The negotiations that produced the Settlement here were strictly at arm's length and free of collusion.  Lovell Decl. ¶4.  The parties to the Settlement have been represented by experienced counsel.  *Id.* ¶5.  The proposed Settlement is the product of hard-fought negotiations over a period of almost sixteen months, which involved two mediation sessions

before The Honorable Daniel Weinstein (Ret.), scores of meetings and/or telephone conferences and hundreds of e-mails.  *See In re Initial Pub. Offering Sec. Litig.,* 226 F.R.D. 186, 194 (S.D.N.Y. 2005) (finding the use of an experienced mediator supports fairness); *In re Sturm, Ruger & Co., Inc. Securities Litig.*, 2012 WL 3589610, * 4 (D. Conn. Aug. 20, 2012) (citing on motion for final approval of settlement that, "the settlement was reached by experienced, fully-informed counsel after arm's length negotiations with the assistance of a mediator and therefore the parties are entitled to a presumption that the settlement was fair, reasonable and adequate.); *In re Giant Interactive Grp ., Inc. Sec. Litig.,* No. 07 Civ. 10588, 2011 WL 5244707, at *4 (S.D.N.Y. Nov. 2, 2011) (parties were entitled to a presumption of fairness where mediator facilitated arm's length negotiations) [emphasis supplied]; *In re AOL Time Warner, Inc. Sec. Litig.,* No. 02 Civ. 5575, 2006 WL 903236, at *6 (S.D.N.Y. Apr. 6, 2006) (noting that involvement of mediator in pre-certification settlement negotiations helped "ensure that the proceedings were free of collusion and undue pressure").

　　　　In light of their considerable prior experience in complex class actions litigation involving CEA and antitrust claims, their knowledge of the strengths and weaknesses of the Futures Plaintiffs' claims and their assessment of the Futures Class's likely recovery following trial and appeal, Futures Lead Counsel concluded that the Settlement is fair, reasonable and adequate.  *Maley v. Del Global Technologies*, 186 F.Supp.2d 385, 366 (S.D.N.Y. 2002) *citing In re Painewebber Ltd. Partnerships. Litig.,* 171 F.R.D. 104, 124 (S.D.N.Y.1997), *aff'd,* 117 F.3d 721 (2d Cir. 1997) ("great weight" is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation).

### 3.　　The Proposed Settlement Is Substantively Fair

　　　　In order to determine whether a proposed class action settlement is substantively fair, reasonable and adequate **for purposes of final approval,** courts in this Circuit may consider:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Compare City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir. 1974) *with Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079-80 (2d Cir. 1995) ("*Maywalt*").  "[N]ot every factor must weigh in favor of settlement, rather the court should consider the totality of these factors in light of the particular circumstances." *In re Global Crossing Sec. and ERISA Litig.,* 225 F.R.D. 436, 456 (S.D.N.Y.2004) (internal quotation marks and citation omitted).  As set forth below, the *Grinnell* factors strongly merit preliminary approval of the Settlement.

Fundamental to a determination of whether a settlement is fair, reasonable and adequate "'is the need to compare the terms of the compromise with the *likely* rewards of litigation.'" *Maywalt,* 67 F.3d at 1079-80 (emphasis added).  In making the determination, the settlement agreement must be considered as a whole.  *Id.* at 1079.

### a.  The Absence of Precedent In CEA Manipulation Cases

Unlike with federal securities law class actions, in which more than one hundred cases per year often are filed, CEA commodity futures manipulation class actions are extremely rare, averaging approximately one commodity manipulation class action filed every two years.[10]  Thus, in the thirty-one plus years since the private right of action in Section 22 of the CEA was enacted, the U.S. Supreme Court and the Second Circuit Court of Appeals have not passed on numerous

---

[10] A WESTLAW search for commodity manipulation class actions yielded only forty-six entries, going back to 1974.  (The search of the ALLFEDS database specified the following terms: "class /3 action /p commodit! /s manip!".)  When duplicate entries and non-commodity cases were culled from the list, only twenty cases remained, averaging slightly more than one commodity manipulation class action filed every two years.

aspects of the pleading standards and have not passed on any aspects of the proof standards of a CEA manipulation claim against, as here, non-exchange Defendants.

The Second Circuit has repeatedly refused to set aside decisions certifying classes of traders asserting manipulation of commodity futures prices.[11]  And the Second Circuit has upheld a pre-Section 22(a) civil damages CEA manipulation verdict.  *Strobl v. New York Mercantile Exch.,* 582 F. Supp. 770 (S.D.N.Y. 1984), *aff'd,* 768 F.2d 22 (2d Cir. 1985), *cert. denied sub nom., Simplot* v. *Strobl,* 474 U.S. 1006 (1985).  More recently, the Second Circuit upheld an administrative finding of manipulation.  *In re Anthony J. DiPlacido*, 364 F.3d. Appx. 657, 662 (CFTC Nov. 5, 2008), *aff'd sub nom., DiPlacido v. CFTC,* 364 Fed. Appx. 657 (2d Cir. 2009), *cert. denied*, 130 S.Ct. 1883 (U.S. March 22, 2010).  But, so far, there is an absence of controlling precedent on claims under Section 22(a).

Also, there have inevitably been splits over pleading issues among the different decisions of this Court.  Thus, CEA manipulation law—wholly unlike federal securities law or federal antitrust law—is somewhat of an "open field" for Defendants to argue for what Plaintiffs view as restrictive application of the limited precedent.  There **is** potentially a wide divergence of outcomes that could result from continued litigation in many fact scenarios (including those here).

In the foregoing context, the uncertainty, risk, expense and prospective time involved in this CEA manipulation case is much greater than in the other types of cases.  Thus, in CEA manipulation cases, settlement may become a "saga" in itself.  *In re Sumitomo Copper Litig.*, 74 Supp.2d 393, 396 (S.D.N.Y. 1999).  The parties seek to use the power of the better argument (in

---

[11] *In re Amaranth Natural Gas Commodities Litig.,* 269 F.R.D. 366 (S.D.N.Y. 2010) (SAS), *petition for review denied,* 10-4110-mv (2d Cir. Dec. 30, 2010), *In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 186 (S.D.N.Y. 2005), *petition for review denied* (2d Cir. Aug. 1, 2006); *In re Sumitomo Copper Litig.*, 194 F.R.D. 480 (S.D.N.Y. 2000), *appeal denied*, 262 F.3d 134 (2d Cir. 2001).

lieu of precedent) to reach a settlement.  They use mediation.  As here, they may also use brinksmanship when they still disagree, unless and until they reach a settlement.

> **b.** **Factor 1**: **The Complexity, Expense And Likely Duration Of The Litigation**

There is a consensus that claims for manipulation in violation of the CEA are complex and difficult to prove.  *Compare* Jerry W. Markham, *Manipulation of Commodity Futures Prices – The Unprosecutable Crime*, 8 Yale J. on Reg. 281 (1991) *with In re Sumitomo Copper Litigation*, 74 F.Supp.2d 393, 397 (S.D.N.Y. 1999) (Pollack, J.) (same).  Also, "antitrust cases, by their nature, are highly complex."  *Wal-Mart Stores, Inc.*, 396 F.3d at 122.

Added to the complexity of the claims is the absence of controlling precedent for the CEA manipulation claims.  See "a" *supra*.

In the absence of this Settlement, the litigation of this complex case would likely have consumed many more years of Court resources.  *Strougo v. Bassini*, 258 F.Supp.2d 254, 261 (S.D.N.Y. 2003) ("[t]he potential for this litigation to result in great expense and to continue for a long time suggest that settlement is in the best interests of the Class").  The Settlement allows the parties and the Court system to avoid the significant expenses of continued litigation.  The costs of experts, the costs of preparing the voluminous pre-trial order, the costs of summary judgment motion practice as well as trial and appeals would have been substantial.  Further, appeals of any summary judgment decision or final judgment (which, given the size and nature of the Futures Plaintiffs' claims were almost guaranteed) all but ensured that this litigation would have dragged on without resolution or relief for many years in the absence of settlement.

The proposed Settlement eliminates the foregoing complexities, substantial expenses, the potential for additional years of continued litigation and provides a prompt recovery to the Class.

*Compare In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 210 (S.D.N.Y.1995) ("it may be preferable to take the bird in the hand instead of the prospective flock in the bush").

           **c.**        **<u>Factor 2</u>: The Reaction Of The Class To The Settlement**

At this time, the Futures Plaintiffs are not aware of any objections to the proposed Settlement.  One benefit of this Settlement at this juncture is that any Futures Class member who has a different judgment about the Settlement than Futures Lead Counsel may opt out.  After the Futures Class has been provided notice of the Settlement, the Futures Plaintiffs will address the Futures Class's reaction in their motion seeking final approval.

           **d.**        **<u>Factor 3</u>: The Stage Of The Proceedings And The Amount Of Discovery Completed**

This factor is designed to "assure the Court that counsel for the plaintiffs have weighed their position based on a full consideration of the possibilities facing them."  *In re Global Crossing Securities and ERISA Litig.,* 255 F.R.D. 436, 458 (S.D.N.Y. 2004).  Extensive fact discovery and investigation had been completed before the proposed Settlement was reached. Lovell Decl. ¶6.  Thus, at the time the Settlement was reached, Futures Lead Counsel was well informed of the factual landscape of the action and the uncertainness confronting them.  Lovell Decl. ¶6.

           **e.**        **<u>Factors 4, 5 and 6</u>: The Risks Of Establishing Liability, Damages And Maintaining The Class Action Through Trial**

As this Court has recognized, "the complexity of Plaintiffs' claims *ipso facto* creates uncertainty."  *Compare Currency Conversion*, 263 F.R.D. at 123 *with* "b" above.  Continuing this complex litigation against the Settling Defendants would entail a lengthy and highly expensive legal battle involving complex legal and factual issues.  Establishing damages herein would have required significant expert testimony.  The Settling Defendants had significant defenses which created real risk that the Futures Plaintiffs would not establish

liability for a significant period.  *See* "Defendants Positions" *supra*.  Even if the Futures Plaintiffs did establish liability for certain periods, there was a very real risk that they would not establish entitlement to damages of more than a minuscule fraction of what Plaintiffs asserted.  The Futures Plaintiffs acknowledge that, if these risks materialized, their impact would have been substantial for all parts of the claims and perhaps dispositive for most parts of the claims.

> **f.**     **Factor 7**: The Ability Of The Settling Defendants To Withstand A Greater Judgment

**Moore Defendants**.  The Futures Plaintiffs believe that the Moore Defendants could withstand a judgment greater than the $48,400,000 cash consideration it has agreed to provide as part of the Settlement.  However, this fact does not indicate that the Settlement is not fair, reasonable or adequate.  *Compare Global Crossing*, 255 F.R.D. at 460 ("[T]he fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate") *with* 225 F.R.D. at 456 ("not every factor must weigh in favor of settlement, rather the court should consider the totality of these factors in light of the particular circumstances").  **Defendant Welsh**.  Defendant Welsh has provided a confidential statement and other information to Futures Lead Counsel indicating that he does not have the funds to satisfy any significant judgment against him.  Accordingly, this factor weighs in favor of the Settlement with respect to Defendant Welsh.

> **g.**     **Factors 8 and 9**: The Range Of Reasonableness Of The Settlement Fund In Light Of The Best Possible Recovery And All The Attendant Risks Of Litigation

The determination of a reasonable settlement is not susceptible to a simple mathematical equation yielding a particular sum.  Rather, "in any case there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any

particular case and concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

The intricacies of what can and cannot be proved based on the law today are pertinent to both the "likely" recovery standard under *Maywalt*, 67 F.3d at 1079, and the "best possible" recovery standard under *Grinnell*.  Further, an apples to apples comparison of this class action settlement to the "best possible" recovery following trial, typically should consider not only nominal damages but the amount of damages to the class members who file a claim seeking to share in the proceeds of any trial judgment.  This is because, under *Boeing Co. v. Van Gemert*, 444 U.S. 472, 479-81 (1980), only class members who file claims to assert their rights to share in a judgment, typically are entitled to receive their share of the funds.  Unclaimed funds (except for the attorneys' fee thereon) are returned to the defendants.  *Id*.  Here, because years more time would pass between the time of the wrongdoing (2006-2008) and the time of any judgment herein, it is very likely that fewer Futures Class members would be in a position to claim after an eventual trial and appeals than are able to do so today.

Plaintiffs reasonably estimate that they would have been able to prove a claim for nominal damages of more than $400,000,000 at trial.[12]  The $48,400,000 cash consideration provided

---

[12] Deductions for hedging and for swap dealers could reduce the proved damages to below this $400 million level of nominal damages.  By definition, a hedger has offsetting positions to those in the futures market.  17 C.F.R. §1.3(z)(1).  To the extent that the artificiality in the futures market is transmitted to the market where the offsetting position is held, the hedger may have offsetting gains that result from the artificiality.  A typical hedging deduction in CEA manipulation class action settlements has been between 25% and 57% depending on the circumstances.  Here, the 50% deduction in the Plan of Allocation is a very reasonable estimate of the offsetting gains for hedgers.  In addition, so-called swaps dealers conduct their hedging in a manner that very closely is calculated to have had offsetting gains from a trade manipulation similar to that alleged here.  Accordingly, the proposed swaps dealer deduction in the Plan of Allocation is 91% which also is in line with prior experience.

As is explained at length in the text, the 10% nominal percentage recovery estimate is more than adequate to support the range of reasonableness.  Therefore, it is unnecessary to try to refine Futures Lead Counsel's estimate of damages to take full account of hedging deductions.

under the Settlement represents more than 10% of what Futures Lead Counsel believe that the Futures could prove in nominal damages.  *Compare City of Detroit v. Grinnell Corp.*, 495 F.2d at 455 & n. 2 (in theory, even a recovery of only a fraction of one percent of the overall damages could be a reasonable and fair settlement).  Monies (if any) collected on the Welsh judgment would add to this percentage.  Also, Defendant MF Global Inc. is not a party to this Settlement. The Futures Plaintiffs have submitted a claim on behalf of the Futures Class in the SIPA liquidation of MF Global, Inc.  Any funds recovered in the liquidation proceedings would further increase the percentage payout to Futures Class members.

The 10% nominal recovery estimate will be substantially enhanced, in fact, by important additional terms of the Settlement.  First, there will be no reversion to the Moore Defendants in respect of Futures Class members who opt-out.  *Contrast In re Air Cargo Shipping Servs. Antitrust Litig.*, 06-MD-1775 JG VVP, 2012 WL 3138596, at *1-2 (E.D.N.Y. Aug. 2, 2012) (settlements with reversion for opt-outs is approved).  Second, there is no reversion in respect of Class members who fail to claim and fail to take other action until Futures Class members receive 110% of their net artificiality paid and 110% of their net losses, as set forth in the Plan of Allocation.  Settlement, Section 12.  Typically, many class members do not file proofs of claim.[13]

Although the Moore Capital Defendants do have a reversionary right, the Settlement

---

[13] The percentage of claims submitted in opt-out class action settlements varies from below ten percent to less than thirty percent.  John C. Coffee, Jr. (ed.), *Litigation Governance: Taking Accountability Seriously*, 110 Colum. L. Rev. 288, 335, n. 150 (Mar. 2010) (Citing discussions on participation rates with professional claims administrators, including the largest of these, Garden City Group, Inc., and referring to advice received that "participation rates are highly variable, often falling below ten percent, but can reach much higher percentages when individual class members will receive a cash payment of several hundred dollars or more."); James D. Cox & Randall S. Thomas, *Letting Billions Slip Through Your Fingers:  Empirical Evidence and Legal Implications of the Failure of Financial Institutions to Participate in Securities Class Action Settlements*, 58 Stan. L. Rev. 411, 415 (2005) ("[L]ess than thirty percent of institutional investors with provable losses perfect their claims in [securities class action] settlements.").

limits that right, in the context of Net Artificiality Paid, to only 50% of the monies in excess of a 100% of Net Artificiality Paid by all Claiming Futures Class Members.  The remaining 50% will be redistributed among Class members with positive Net Artificiality paid in proportion to their respective amounts of NAP.  Based upon the rates of claims in prior CEA manipulation cases and other information (see fn. 13), Futures Lead Counsel believes that less than 40% (and perhaps significantly less than 40%) of the estimated damages will be claimed by Class members.  *E.g., In re Sumitomo Copper Litig.*, 96-cv-4584, (S.D.N.Y.) Docket No. 180 (Professor John C. Coffee, Jr. predicts that an 11% lower estimated range of payout is much too low because of failures by Class members to claim); Docket Nos. 359, 376, 410, 437 and 443 (Professor Coffee is correct, and a payout of in excess of 100% actually occurs).

In sum, this prohibition on reversions until claiming Futures Class members receive 110% of their net artificiality paid and 110% of their net losses, means that Claiming Futures Class Members will actually receive in excess of the 10% of nominal damages estimate.  If the claims rate is 33 1/3%, they will actually receive 30% of the nominal damages (before costs and fees); if the claims rate is 10% (*see* fn. 13), Class members will receive 100% of their damages (again, before costs and fees).  And each Class member's damages are based upon the full amount of Plaintiffs' estimated amounts of artificial impact **NOT** on Defendants' radically lower estimates of zero or small artificiality.

Research on class action settlements shows that the amounts of settlements generally increase as the amount of the estimated damages increases, as one would expect.  However, the amounts of the settlements as a percentage of the amount of estimated damages typically *decreases* as estimated damages increase.  *See Securities Class Action Settlements, 2011 Review*

*and Analysis*, Cornerstone Research at p. 7.[14]  Indeed, the average settlement recovery for class

action settlements during the years 1996 through 2010 involving estimated damages between

$250 million and $499 million was only 2.5 cents on the dollar.  *Id.*

Just the $48,400,000 cash compensation and 10% nominal recovery estimate here

represents a recovery of approximately **four times** the size of the average class action settlement

with comparable ranges of damages.   This metric supplements the apparently low rates of claims

in some CEA manipulation cases.  Together, the foregoing factors further show that the proposed

Settlement is procedurally and substantively fair, reasonable and adequate, and that sending

notice of the Settlement to the members of the Futures Class is well justified.

### B. The Notice Plan Should Be Approved Because It Provides "The Best Notice Practicable Under The Circumstances"

#### 1. The Legal Standards Governing Notice

After a class action settlement has been preliminarily approved, "[t]he court must direct

notice in a reasonable manner to all class members who would be bound by the proposal."  Fed.

R. Civ. P. 23(e)(1).  When a class is certified for settlement purposes under Rule 23(b)(3)

"…the court must direct to class members the best notice that is practicable under the

circumstances, including individual notice to all members who can be identified through

reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  In particular, the notice must:

> …clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c).

Fed. R. Civ. P. 23(c)(2)(B).

---

[14] Available at http://securities.stanford.edu/Settlements/REVIEW_1995-2011/Settlements_Through_12_2011.pdf

Notice regarding a proposed settlement is adequate under both Rule 23 and the Due Process Clause if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings" and it can "be understood by the average class member." *Wal- Mart*, 396 F.3d at 114-15.

## 2. The Proposed Notice Includes All the Requirements of Rule 23(c)(2)(B) and Comports With Due Process

The proposed notice includes, *inter alia*, each of the requirements of Rule 23(c)(2)(B): (i) a description of the action (Lovell Decl. Ex. 1-A at pp. 3-4); (ii) a definition of the class (*id*. p. 6); (iii) a description of the class claims, issues and defenses (*id*. pp. 3-6); (iv) a statement that a class member may enter an appearance through an attorney if the member so desires (*id*. pp. 11-12); (v) a statement that the Court will exclude from the class any member who requests exclusion (*id*. pp. 3, 13); (vi) the time and manner for requesting exclusion (*id*.); and (vii) a statement concerning the binding effect of a class judgment on class members (*id*. p. 9). *Compare* Lovell Decl. Ex. 1-A *with* Fed. R. Civ. P. 23(c)(2)(B).

The proposed notice also comports with due process. It is well organized, written in plain concise language such that it could easily be understood by the average member of the Futures Class and it fairly apprises the Futures Class of the existence of the Settlement, their options under the Settlement, the material terms of the Settlement and how they may obtain a copy of same. *Compare* Lovell Decl. Ex. 1-A *with Wal-Mart*, 396 F.3d at 114-115.

## 3. The Proposed Notice Plan Is The Best Practicable Under The Circumstances

The Futures Plaintiffs propose essentially the same program of notice that has been repeatedly approved in prior CEA manipulation class action settlements, *In re Amaranth Natural*

*Gas Commodities Litig.*, 07-cv-6377, Docket No. 376 at ¶¶7-10, (SAS) (S.D.N.Y.); *Hershey, et al., v. Pacific Investment Management Company LLC, et al.*, 05-cv-04681, Docket No. 562 at ¶¶2-4 (RAG) (N.D. Ill.), EXCEPT that this notice **also** includes publication in *The Wall Street Journal*, which was not included in previous CEA settlements.

First, the Futures Plaintiffs propose to send individual mail notice to the approximately one hundred and twenty largest traders in the Class (whose names have been obtained by subpoena from the NYMEX).

Second, everyone who transacted in NYMEX platinum or palladium futures contracts had to do so through a NYMEX clearing member.  Thus, Plaintiffs also propose that mail notice be given to all fifty-five clearing members of the NYMEX, and that such notice request that the NYMEX clearing members forward the notice to their customers who transacted in Class Contracts during the Class Period (or provide the names and addresses of such customers to the Settlement Administrator).  This should effect mail notice to all Futures Class members, and provide overlapping notice to the Class members who had the largest positions in NYMEX platinum and palladium futures contracts.

Third, Plaintiffs propose substantial notice by publication.  This publication notice includes publishing the short form notice as follows: (a) for two consecutive months in Futures Magazine (which reportedly has 37,877 subscribers and many additional readers who trade commodity futures); (b) on the Futures Magazine website (which reportedly has 86,600 unique visits per month) for one month; (c) for two consecutive months in Stock and Commodities Magazine (which reportedly has approximately 54,000 subscribers); (d) on the Stock and Commodities Magazine website for one month (which reportedly has approximately 100,000 unique visits per month); and (e) in one edition of The Wall Street Journal (which reportedly has a daily average circulation of 1,443,480).  Any members of the Futures Class that do not receive

notice through direct mail are likely to receive notice through the foregoing publications or through word of mouth.

Fourth, Futures Plaintiffs propose to provide notice through the creation of the website www.PlatinumPalladiumFuturesLitigation.com.  This website will allow Futures Class members who search the web to learn of the action, obtain their proof of claim and learn of other pertinent matters (including the date of the Fairness Hearing).

This four-pronged program of notice is reasonably calculated to reach all Futures Class members and to reach **more than once** the largest traders in NYMEX platinum and palladium futures contracts during the Class Period.  Accordingly, the proposed notice plan meets each of the requirements under Rule 23(c)(2)(B), comports with due process and is the best notice practicable under the circumstances.

> **C.    The Futures Class Should Be Certified For Settlement Purposes Because It Satisfies The Four Requirements of Rule 23(a) and The Two Prongs of Rule 23(b)(3)**

Rule 23(e) allows for settlement "of a certified class."  *Compare* Fed. R. Civ. P. 23(e) *with In re Global Crossing Securities and ERISA Litig.,* 255 F.R.D. 436, 451 (S.D.N.Y. 2004) ("[t]he Second Circuit has acknowledged the propriety of certifying a class solely for settlement purposes…").  A court may grant certification for settlement purposes where the proposed settlement class satisfies the four prerequisites of Rule 23(a) (*i.e.*, numerosity, commonality, typicality and adequacy), as well as one of the three subsections of Rule 23(b). *Id*.

CEA manipulation claim classes have repeatedly been upheld by the Second Circuit (*see* fn. 11 *supra* collecting cases).  As demonstrated below, the Futures Class meets all the requirements of Rule 23(a) as well as the two prongs of Rule 23(b)(3).

> **1.    The Futures Class Satisfies The Four Requirements of Rule 23(a)**

Rule 23(a) permits an action to be maintained as a class action if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

### a.   Rule 23(a)(1)—The Members of The Futures Class Are So Numerous That Joinder Of All Members Is Impracticable

Rule 23(a)(1)'s numerosity requirement does not mean that joinder must be impossible, but rather "…merely be difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims." *In re Initial Public Offering Securities Litig.*, 260 F.R.D. 81, 90 (S.D.N.Y. 2009) ("*IPO*").  In fact, numeroisty can be presumed at a level of forty class members or more.  *Id citing Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir. 1995).

Here, the proposed Futures Class consists of persons and entities throughout the United States who purchased NYMEX platinum and palladium futures contracts between June 1, 2006 and April 29, 2010.  Documents produced by the NYMEX reflect that there were approximately one hundred and twenty "large traders" during the Class Period.  This implies that there are, at least, hundreds more non-large traders.  Clearly, joinder of the numerous and geographically dispersed members of the Futures Class is impracticable.  Thus, Rule 23(a)(1) is satisfied.

### b.   Rule 23(a)(2)—There Are Numerous Questions of Law and Fact Common To The Futures Class

Rule 23(a)(2) commonality requires that common issues of fact or law affect all class members.  *IPO*, 260 F.R.D. at 91.  Common issues include, among others:

1.     whether Defendants manipulated NYMEX palladium and/or platinum futures contracts in violation of the CEA;

2.     whether such manipulation caused NYMEX palladium and/or platinum futures contracts to be artificial; and

3.     whether the alleged contract, combination or conspiracy existed, and, if so, who were the members.

The Futures Plaintiffs' overarching allegation is that Defendants manipulated certain standardized NYMEX platinum and palladium futures contracts causing artificial prices which affected all members of the Futures Class in the same manner.  The proof required to establish Defendants' alleged unlawful conduct is common to all members of the Futures Class.  Thus, Rule 23(a)(2) is satisfied.

        **c.**      **<u>Rule 23(a)(3)</u>—The Claims and Defenses of The Futures Class Representatives Are Typical of The Claims and Defenses of The Class**

Typicality may be satisfied under Rule 23(a)(3) where "injuries derive from a unitary course of conduct by a single system."  *IPO*, 260 F.R.D. at 91.  The injuries of the proposed Futures Class representatives are typical of the injuries of the members of the Futures Class because they arise from the same unitary course of Defendants' alleged manipulative conduct in connection with certain NYMEX platinum and palladium futures contracts.  Thus, Rule 23(a)(3) is satisfied.

        **d.**      **<u>Rule 23(a)(4)</u>—The Futures Class Representatives Will Fairly And Adequately Protect The Interests of The Class**

Rule 23(a)(4) adequacy requires that "the representative parties will fairly and adequately protect the interests of the class."  *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).  Generally, courts will consider "whether (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."  *Id*. at 61.

First, the proposed Futures Class representatives transacted in NYMEX platinum or

NYMEX palladium futures contracts during the Class Period and were thereby impacted by Defendants' conduct.  The same is true of all members of the Futures Class.  Thus, the proposed class representatives' interests in proving liability and damages are entirely aligned with that of members of the Futures Class.  Second, the class representatives are represented by experienced counsel thoroughly familiar with complex class action and commodities litigation.  See *e.g., In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. at 386 (finding that Futures Lead Counsel have substantial experience in commodity futures manipulation class actions).  Thus, Rule 23(a)(4) is satisfied.

### 2.    The Futures Class Satisfies The Two Prongs of Rule 23(b)(3)

In addition to establishing that the proposed Futures Class satisfies Rule 23(a)'s requirements, Futures Plaintiffs must also show that one of three alternative categories under Rule 23(b) has been established.  *IPO*, 260 F.R.D. at 92.  Futures Plaintiffs move pursuant to Rule 23(b)(3) and therefore must establish (1) "…that the questions of law or fact common to class members predominate over any questions affecting only individual members…" and (2) "…that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### a.    Common Questions of Law and Fact Predominate

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *IPO*, 260 F.R.D. at 92.  Here, the Futures Plaintiffs allege that Defendants manipulated certain NYMEX platinum and palladium futures contracts causing artificial prices that affected all members of the Futures Class.  Thus, issues common to the members of the Class predominate over any individual questions.

### b.    A Class Action Is The Superior Method To Adjudicate These Claims

Rule 23(b)(3)'s "superiority" requirement requires a plaintiff to show that a class action is superior to other methods available for "fairly and efficiently adjudicating the controversy." See Fed. R. Civ. P. 23(b)(3)(A)-(D) (listing four non-exhaustive factors to consider).

The damages suffered by many of the individual members of the Futures Class are likely to be relatively small such that the expense and burden of individual litigation make it virtually impossible for them to protect their rights. Moreover, the prosecution of separate actions by thousands of individual members of the Futures Class would impose heavy burdens upon the Court and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Futures Class. For these and other reasons, a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. Thus, both prongs of Rule 23(b)(3) are satisfied.

**D.      The Court Should Appoint Lovell Stewart To Act As Class Counsel For The Futures Class**

Federal Rule of Civil Procedure 23(g)(1) provides that "…a court that certifies a class must appoint class counsel." Rule 23(g)(1). Rule 23(g)(2) provides that where, as here, only one application is made seeking appointment as class counsel, "…the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4)." Rule 23(g)(2).

The Court previously appointed Lovell Stewart as interim class counsel in the Futures Action "to act on behalf of all purchasers of NYMEX palladium futures contract and/or NYMEX platinum futures contracts with respect to any claims such futures purchasers may have." See Pre-Trial Order No. 1, Docket No. 18 at ¶13. For all the same reasons the Court appointed Lovell Stewart as interim class counsel, the Court should now appoint Lovell Stewart as class counsel for the Futures Class. See also *In re Crude Oil Commodity Futures Litig.*, 11-cv-3600 (WHP) 2012 WL 569195 (S.D.N.Y. Feb. 14, 2012) (Lovell Stewart appointed co-lead

36

counsel on contested motion).

## **CONCLUSION**

For the reasons stated above, the Futures Plaintiffs respectfully request that the Court grant preliminary approval of the Settlement and enter the [Proposed] Scheduling Order attached as Exhibit 1-D to the Declaration of Christopher Lovell, Esq.

Dated:  New York, New York
          September 18, 2013

Respectfully submitted,

*/s/ Christopher Lovell*
Christopher Lovell
Christopher M. McGrath
Amanda N. Miller
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway, Suite 501
New York, New York 10006
Telephone:     (212) 608-1900
Facsimile:      (212) 719-4775

***Counsel for Futures Plaintiffs and the Futures Class***

37