UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In Re: Platinum And Palladium Commodities Litigation*<br><br>This Document Relates To:<br><br>Platinum/Palladium Futures Action | MASTER FILE<br>No. 10 Civ. 3617 (WHP) |

**FUTURES PLAINTIFFS' OPPOSITION TO SUSAN LEVY'S MOTION TO
INTERVENE, RESPONSE TO OBJECTIONS AND REPLY IN FURTHER
SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF
<u>AMENDED CLASS ACTION SETTLEMENT</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................1

BACKGROUND ..................................................................................4

ARGUMENT ......................................................................................5

I.   THE COURT SHOULD DENY MS. LEVY'S MOTION TO
     INTERVENE ..............................................................................5

     A.  Legal Standard For Intervention ..............................................5

     B.  Ms. Levy's Motion to Intervene is Unnecessary and Procedurally
         And Substantively Defective ..................................................6

II.  THE COURT SHOULD OVERRULE MS. LEVY'S OBJECTIONS AND GRANT
     PRELIMINARY APPROVAL ..........................................................7

     A.   Ms. Levy's Objections Are An Improper Attempt To Hold A Fairness
          Hearing At Preliminary Approval..........................................7

     B.   If Considered, Ms. Levy's Objections Should Be Overruled ................9

          1.  Contrary to Ms. Levy, The Amended Settlement Was
              Negotiated At Arm's-Length and Was Free of Collusion ................9

          2.  Contrary to Ms. Levy, the Plan of Allocation Has A Reasonable,
              Rational Basis .................................................................14

              a.   Standard for Preliminary Approval of Plan of Allocation ............14

              b.   Ms. Levy Benefitted From the Alleged
                   Manipulation Under the NAP Portion of the Proposed Plan of
                   Allocation ................................................................15

              c.   Ms. Levy's Objections to the Plan of Allocation Should Be
                   Overruled and Are Premature At Preliminary Approval ..............15

          3.  Contrary to Ms. Levy, The Consideration and Other Terms of The
              Amended Settlement are Fair, Reasonable and Adequate ................19

          4.  Contrary to Ms. Levy, Class Counsel Has Adequately
              Represented The Class ........................................................22

     CONCLUSION...............................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ........................................................................................ 20

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ......................................................................... 3, 20

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  06-MD-1775 JG VVP, 2012 WL 3138596 (E.D.N.Y. Aug. 2, 2012) ..................................... 10

*In re Amaranth Natural Gas Commodities Litig.*,
  07-cv-6377, Docket No. 336-1, Ex. D (S.D.N.Y.) ............................................. 21, 23

*In re Amaranth Natural Gas Commodities Litig.*,
  07-cv-6377, Docket No. 376 ............................................................................ 19

*In re Amaranth Natural Gas Commodities Litig.*,
  07-cv-6377, Docket No. 413 ............................................................................ 13

*In re AOL Time Warner, Inc. Sec. Litig.*,
  No. 02 Civ. 5575, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ................................... 8

*In re Crude Oil Commodity Futures Litig.*,
  2012 WL 569195 (S.D.N.Y. Feb. 14, 2012) ............................................... 22

*In re Crude Oil Commodity Futures Litig.*,
  913 F. Supp. 2d 41 (S.D.N.Y. 2012) ..................................................... 18

*In re Nasdaq Mkt.-Makers Antitrust Litig.*,
  176 F.R.D. 99 (S.D.N.Y. 1997) ......................................................... 7

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) ..................................................... 1, 6

*In re Natural Gas Commodity Litig.*,
   03-cv-6186 (S.D.N.Y.) ................................................................................................ 14, 23

*In re Sumitomo Copper Litigation*,
   74 F. Supp. 2d 393 (S.D.N.Y. 1999) ............................................................................. 14, 23

*In re Warner Chilcott Ltd. Sec. Litig.*,
   2008 WL 5110904 (S.D.N.Y. Nov. 20, 2008) .............................................................. 2, 7, 14

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y.2005) ................................................................................. 14

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y.2005) ................................................................................. 14

*Kohen v. Pacific Investment Management, Co., et al.*,
   05-cv-4681, Docket No. 557, .......................................................................................... 19, 23

*Matrix Realty Grp., Inc. v. Grubin*,
   08-cv-4514 (WHP), 2008 WL 4694999 (S.D.N.Y. Oct. 15, 2008) ..................................... 7

*Precision Associates, Inc. v. Panalpina World Transp. (Holding) Ltd.*,
   08-CV-42 JG VVP, 2013 WL 4525323 (E.D.N.Y. Aug. 27, 2013) .................................... 17

*S.E.C. v. Bear, Stearns & Co. Inc.*,
   03 CIV.2937 WHP, 2003 WL 22000340 (S.D.N.Y. Aug. 25, 2003) .................................... 6

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ................................................................................................. 8

**Statutes**

7 U.S.C. §1 ................................................................................................................................. 23

7 U.S.C. §25(a)(1) ....................................................................................................................... 18

## Rules

Fed. R. Civ. P. 23(e) ................................................................................................................ 1

Fed. R. Civ. P. 23(g) .............................................................................................................. 22

Fed. R. Civ. P. 23(g)(1) .......................................................................................................... 22

Fed. R. Civ. P. 23(g)(2) .......................................................................................................... 22

Fed. R. Civ. P. 23(g)(4) .......................................................................................................... 22

Fed. R. Civ. P. 24 ..................................................................................................................... 5

Fed. R. Civ. P. 24(a) ................................................................................................................ 5

Fed. R. Civ. P. 24(b) ................................................................................................................ 5

Fed. R. Civ. P. 24(c) ........................................................................................................ 5, 6,1

The Futures Plaintiffs[1] (sometimes "Plaintiffs") respectfully submit this memorandum (a) in opposition to Susan Levy's ("Ms. Levy")[2] "motion to intervene" [Dkt. No. 182]; (b) in response to Ms. Levy's "objection to preliminary approval of the proposed settlement agreement and plan of allocation" [*id.*] (collectively "Levy Objection"); and (c) in further support of their motion pursuant to Rule 23(e) of the Federal Rules of Civil Procedure for preliminary approval of the Stipulation and Agreement of Settlement executed on March 17, 2014 ("Amended Settlement").  *See* Dkt. Nos. 162 and 141.

## PRELIMINARY STATEMENT

The Court should deny Ms. Levy's motion to intervene and overrule her objections to preliminary approval of the Amended Settlement.

**<u>Ms. Levy's Motion to Intervene Should be Denied</u>**.  As a practical matter, Ms. Levy's motion to intervene should be denied as unnecessary because "[c]lass members need not formally intervene in order to raise their objections to a proposed settlement." *See, e.g., In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 491 (S.D.N.Y. 1998); *see also* I.B. below.  Procedurally and substantively, Ms. Levy's motion to intervene should further be denied because:  (1) it fails to comply with either of the two required prongs of Rule 24(c); (2) class member intervention for purposes of objecting to preliminary approval of the proposed settlement would unnecessarily delay and complicate the settlement approval process; (3) it is untimely; and (4) Ms. Levy chose to file her own action and tried to keep it separate from and out of this action.[3]  *See* I.B. below.

---

[1] "Futures Plaintiffs" refers to Richard White, Harry Ploss and The Stuart Sugarman Trust.
[2] Ms. Levy is an attorney licensed to practice law in the State of New York.
[3] As part of that effort, Ms. Levy filed a complaint in the Eastern District of New York, which acknowledged the action pending before this Court but stated that she believed she could "get a fair trial in the Eastern District of New York."  *See Levy v. Joseph Welsh, et al.*, 12-cv-2056, Dkt.

**<u>Ms. Levy's "Objections" are Premature and If Considered Should Be Overruled</u>**.

Ms. Levy's blunderbuss brief of "objections" is frequently based on misapprehensions of who is being compensated under the Proposed Plan of Allocation and other misunderstandings.  It wholly fails to mention or address any of Plaintiffs' substantial case law or other authority cited in their detailed, forty-two page memorandum of law in support of preliminary approval. *Compare* Dkt. No. 162 *with* Levy Objection, *passim*.

In stark contrast to Plaintiffs' preliminary approval brief, Ms. Levy's brief fails to cite a single case (or any other authority whatsoever) in support of her objections or positions.  *See* Levy Objection *passim*.  Even when read in the most favorable light, Ms. Levy's objections are at best a premature and improper attempt to transform this preliminary approval process into a full-fledged "fairness hearing," which is properly reserved for final approval.  *See* II.A below.

In the event that the Court wishes to consider Ms. Levy's objections at this preliminary approval stage, Plaintiffs demonstrate herein that Ms. Levy's objections fall short of rebutting Plaintiffs' strong showing that the Amended Settlement is well within "the range of possible approval."  *Compare* II.A.B below *with In re Warner Chilcott Ltd. Sec. Litig.*, 06-cv-11515(WHP), 2008 WL 5110904 at * 2 (S.D.N.Y. Nov. 20, 2008) (Pauley, J.) ("at the preliminary approval stage, 'the Court need only find that the proposed settlement fits within the range of possible approval' to proceed").

Plaintiffs believe that Ms. Levy's objections are motivated by her dissatisfaction with the estimated value of her potential claim under the Proposed Plan of Allocation.  However, Class Counsel have previously explained to Ms. Levy as follows.  She purchased New York Mercantile Exchange ("NYMEX") platinum futures contracts at low amounts of artificiality and

No. 1 at ¶6, fn. 6 (E.D.N.Y.).

then—during the same time that Defendants were making large, persistent "bang the close" close trades in front month NYMEX platinum and palladium futures contracts which allegedly caused inflated prices—sold such contracts back at higher amounts of artificiality.  *See* II.B.2.b below.  Sales of positive artificiality BENEFIT, not harm, a trader.  Even so, certain of Ms. Levy's (long) trades did result in "net artificiality paid" under the Plan of Allocation.  *Id.*  Thus, Ms. Levy's repeated misapprehension that "only the shorts" are receiving compensation under the Net Artificiality Paid (or "NAP") portion of the Plan of Allocation is woefully incorrect.

What determines the payout is the Class member's relative timing of purchases and sales.  Purchasing a long position at high artificiality and selling it later for zero artificiality provides every bit as much compensation as selling a short position at zero artificiality and buying it back later at high artificiality.[4]

In the circumstances described below, Plaintiffs do not believe it is appropriate for Ms. Levy to seek to delay sending notice of the Amended Settlement to all of the other many members of the Class (especially given that Ms. Levy has previously sought to opt out of the Class and has already separately brought her own related action, which is currently pending before this Court).

Plaintiffs respectfully submit that the proper and most efficient way to proceed given the record herein is to deny Ms. Levy's motion to intervene and grant preliminary approval of the proposed settlement, thereby allowing notice of the Amended Settlement to be disseminated to the proposed Class.  Then, pursuant to the schedule set forth in the [Proposed] Scheduling Order, Ms. Levy (like all other putative Class members) may either opt out of the Class (*see* Proposed

---

[4] Similarly, selling a short position at high artificiality and buying it back later at no artificiality provides no damages.  Just as buying a long position at low or no artificiality and selling it back later for high artificiality, provides no damages.

Scheduling Order ¶17) OR, Ms. Levy (like all other putative Class members) may remain in the Class and have the opportunity object to the Amended Settlement (*see* Proposed Scheduling Order ¶14) as part of the final approval process.

The foregoing process will allow Ms. Levy to raise her objections at the proper time (assuming she does not opt out) and will provide the Court with the benefit of considering the reaction of the Class **as a whole** to the Amended Settlement. *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) ("*Grinnell*") ("the reaction of the class to the settlement" is a factor considered by Courts for purposes of final approval of proposed class action settlements).

## BACKGROUND

On or about January 27, 2011, Ms. Levy submitted a letter to the Court requesting, among other things, to opt out of the class herein.  On or about February 3, 2011, Plaintiffs responded to Ms. Levy's January 27, 2011 letter and stated that they did not object to Ms. Levy's request to opt out.

On or about April 26, 2012, Ms. Levy filed a related complaint in the Eastern District of New York on behalf of herself against the Defendants herein and certain additional defendants. *See Levy v. Joseph Welsh, et al.*, 12-cv-2056, Dkt. No. 1 (E.D.N.Y.).  Ms. Levy's action was transferred, over her objection (*see* fn. 3), to this Court on or about March 20, 2013.  *See Levy v. Joseph Welsh, et al.*, 13-cv-1858, Dkt. No.1 (S.D.N.Y.).  At the time of this writing, Ms. Levy's action remains pending before this Court.

On September 18, 2013, the Futures Plaintiffs and the Settling Defendants submitted a motion for preliminary approval of a proposed settlement that was executed on August 20, 2013.  Dkt. No. 139.  The Court held a preliminary approval hearing concerning such proposed

settlement on October 4, 2013.  Dkt. No. 136.  Ms. Levy appeared at the October 4, 2013 preliminary approval hearing and voiced her reactions to the proposed settlement, which primarily focused on the proposed plan of allocation and Ms. Levy's potential recovery thereunder.  The Court ordered Class Counsel (Lovell Stewart Halebian Jacobson LLP) to meet with Ms. Levy after the proceeding to discuss her concerns.  Christopher Lovell, Esq. met with Ms. Levy immediately after the hearing on October 4, 2013 and also had telephone calls with Ms. Levy thereafter.

On March 17, 2014, Plaintiffs executed the Amended Settlement with the Settling Defendants, incorporating certain revisions suggested or directed by the Court at the October 4, 2013 preliminary approval hearing.  Dkt. No. 162.  On March 18, 2014, Plaintiffs moved for preliminary approval of the Amended Settlement with the Settling Defendants.  Dkt. No. 162; *see also* Dkt. No. 141.  On April 21, 2014, Ms. Levy filed her "Motion to Intervene and Objection to Preliminary Approval of the Proposed Settlement Agreement and Plan of Allocation."  Dkt. No. 182.

## ARGUMENT

## I.    THE COURT SHOULD DENY MS. LEVY'S MOTION TO INTERVENE

### A.    <u>Legal Standard for Intervention</u>

Rule 24 of the Federal Rules of Civil Procedure provides for two distinct types of intervention:  "intervention of right" under Rule 24(a) and "permissive intervention" under Rule 24(b).  Fed. R. Civ. P. 24(a), (b).[5]

---

[5] Although Ms. Levy's motion does not specify whether she moves pursuant to Rule 24(a) or 24(b), Plaintiffs believe that Ms. Levy's motion should be analyzed under the Rule 24(b) standards for permissive intervention.

Plaintiffs expressly reserve their right to respond to any belated attempt by Ms. Levy to improperly provide support for her motion to intervene for the first time in her reply papers.

Rule 24(b) provides in relevant part:

(1) *In General*.  On timely motion, the court may permit anyone to intervene who:
    (A)    is given a conditional right to intervene by a federal statute; or
    (B)    has a claim or defense that shares with the main action a common question of law or fact.
*****
(3) In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Fed. R. Civ. P. 24(b).

Rule 24(c) sets forth the notice and pleading required for a motion to intervene:

(c) *Notice and Pleading Required*.  A motion to intervene must be served on the parties as provided in Rule 5.  The motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought.

Fed. R. Civ. P. 24(c).

### B.    Ms. Levy's Motion to Intervene is Unnecessary and Procedurally and Substantively Defective

Ms. Levy's motion to intervene should be denied for each of the following reasons.

First, Ms. Levy's motion to intervene is unnecessary because "[c]lass members need not formally intervene in order to raise their objections to a proposed settlement."  *In re NASDAQ Mkt.-Makers Antitrust Litig*., 187 F.R.D. at 49.  Here, intervention is potentially even more unnecessary given that Ms. Levy has previously requested to opt out of the Class and currently has her own individual action pending before this Court.  *See* Background above.

Second, Ms. Levy's motion fails to comply with either of the two required prongs of Rule 24(c).  Specifically, Ms. Levy has failed to "state the grounds for intervention" and has further failed to accompany her motion with "a pleading that sets out the claim or defense for which intervention is sought."  *See* Levy Objection, *passim*.  This Court has previously noted that failure to follow the strictures of Rule 24(c) is sufficient to warrant dismissal of a permissive

6

intervention motion.  *S.E.C. v. Bear, Stearns & Co. Inc.*, 03 CIV.2937 WHP, 2003 WL 22000340 at *4 (S.D.N.Y. Aug. 25, 2003) (Pauley, J.).

Third, Ms. Levy's intervention in this action would likely unduly delay the settlement approval process and potentially cause unnecessary confusion and complication.  *See* Fed. R. Civ. P. 24(c) ("the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights").  Intervention by putative class members like Ms. Levy merely to object to the settlement is not only unnecessary (see above) but also has the potential to "open the floodgates to a multitude of potential intervenors with the same claim to intervention…".  *S.E.C. v. Bear, Stearns & Co. Inc.*, 2003 WL 22000340 at *4 (refusing to permit intervention in settlement approval context due in part to "the near-certainty of undue delay, complexity and confusion that would result were intervention permitted").

Fourth, although a motion to intervene must be "timely," Ms. Levy knew about this action for at least three years before she filed her motion to intervene.  *See, e.g., Matrix Realty Grp., Inc. v. Grubin*, 08-cv-4514 (WHP), 2008 WL 4694999 at *2 (S.D.N.Y. Oct. 15, 2008) (Pauley, J.) (finding no abuse of discretion for Bankruptcy Judge's denial of motion to intervene where putative intervenor knew of its interest in the case for thirteen months before it moved to intervene).  Accordingly, Ms. Levy's motion to intervene should be denied.

## II.     THE COURT SHOULD OVERRULE MS. LEVY'S OBJECTIONS AND GRANT PRELIMINARY APPROVAL

### A.     Ms. Levy's Objections Are An Improper Attempt To Hold A Fairness <u>Hearing At Preliminary Approval</u>

Ms. Levy's objections are an improper and premature attempt to transform Plaintiffs' preliminary approval motion into a full-fledged "fairness hearing."  *See, e.g., In re Nasdaq Mkt.-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997) ("In considering

preliminary approval, courts make a **preliminary evaluation** of the fairness of the settlement, prior to notice") (emphasis supplied).  Indeed, as this Court has previously held, "at the preliminary approval stage, 'the Court need only find that the proposed settlement fits within the range of possible approval' to proceed."  *In re Warner Chilcott Ltd. Sec. Litig.*, 2008 WL 5110904 at * 2.  To that end, Plaintiffs previously submitted a detailed, forty-two page memorandum of law which cited to substantial case law establishing that the Amended Settlement is well "within the range of possible approval" such that preliminary approval of the Amended Settlement is warranted.  Dkt. No. 162 *passim*.

      **Procedural Fairness**.  Among other things, Plaintiffs demonstrated that the Amended Settlement is **entitled to a presumption of fairness** because the negotiations that produced the Amended Settlement were arm's-length negotiations between experienced counsel after substantial discovery.  *Id*. pp. 24-25 citing *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 116 (2d Cir. 2005) *cert. denied*, 544 U.S. 1044 (2005).  Furthermore, the settlement negotiations involved two mediation sessions before The Honorable Daniel Weinstein (Ret.), which further supports a finding of procedural fairness.  *Id*. p. 25 collecting cases, including *In re AOL Time Warner, Inc. Sec. Litig.,* No. 02 Civ. 5575, 2006 WL 903236, at *6 (S.D.N.Y. Apr. 6, 2006) (noting that involvement of mediator in pre-certification settlement negotiations helped "ensure that the proceedings were free of collusion and undue pressure").  Also, the Amended Settlement was informed by Plaintiffs' review of approximately 250,000 pages of documents produced by the Defendants in this action, deposition transcripts and Plaintiffs' extensive work with their economists.

      **Substantive Fairness**.  Plaintiffs also demonstrated that the Amended Settlement is substantively fair by addressing each of the nine "*Grinnell* factors" that Courts consider in

order to determine whether a proposed class action settlement is substantively fair, reasonable and adequate **for purposes of final approval.** Dkt. No. 162 at pp. 26-34. Ms. Levy's brief wholly fails to address (much less rebut) any of Plaintiffs' showing and fails even to provide a single case (or any other authority) which support her objections. Levy Objection, *passim*.

Accordingly, Plaintiffs respectfully submit that the record herein strongly supports preliminary approval of the Amended Settlement such that Plaintiffs' motion should be granted and notice of the Amended Settlement should be disseminated to the proposed Class. Thereafter, in accordance with the procedures set forth in the Scheduling Order, any class member (including Ms. Levy) may either opt out or remain in the Class and THEN have the opportunity to object to the Amended Settlement as part of the final approval process. *See* Proposed Scheduling Order ¶¶14, 17.

### B.     If Considered, Ms. Levy's Objections Should Be Overruled

In the event the Court wishes to address Ms. Levy's objections at this preliminary approval stage, Plaintiffs demonstrate below that her objections should be overruled. For the convenience of the Court, Plaintiffs have attempted to organize Ms. Levy's objections into the four categories set forth in "1" – "4" below.

### 1.     Contrary to Ms. Levy, The Amended Settlement Was Negotiated At Arm's-Length and Was Free of Collusion

In addition to the procedural fairness of the negotiations described in "A" above, Class Counsel also submitted two declarations from attorneys at Lovell Stewart stating that the settlement negotiations that produced the Amended Settlement were non-collusive and strictly at arm's-length. *See* Dkt. No. 141 (Declaration of Christopher Lovell, Esq.) and Dkt. No. 163 (Declaration of Christopher M. McGrath, Esq.). To even further demonstrate the absence of collusion, counsel for the Moore Capital Defendants who led the negotiations for the Settling

Defendants, David Zensky, Esq., has now also submitted a declaration that similarly states the settlement negotiations herein were at arm's-length.  Nevertheless, Ms. Levy claims without any support that the Amended Settlement "appears to be the product of collusion" (Levy Objection, ¶2) due to the following circumstances.

First, Ms. Levy asserts that "allowing a right to reversion" is "collusive and allows the Moore Defendants to potentially recoup certain proceeds before the NL class is even made whole."  Levy Objection, ¶7.  However, class action settlements with much more expansive reversionary rights than the extremely limited reversion rights at issue here are regularly approved.  *Compare In re Air Cargo Shipping Servs. Antitrust Litig.*, 06-MD-1775 JG VVP, 2012 WL 3138596, at *1-2 (E.D.N.Y. Aug. 2, 2012) (settlements with reversion for opt-outs were approved) *with Kohen v. Pacific Investment Management, Co., et al.*, 05-cv-4681, Dkt. No. 557 (N.D. Ill.) ("*PIMCO*") *and In re Amaranth Natural Gas Commodities Litig.*, 07-cv-6377, Dkt. No. 413 (S.D.N.Y.) ("*Amaranth*").  Here, there will be **no reversion** to the Moore Defendants in respect of Class members who opt-out.  Dkt. No. 162 at p. 21.  The Amended Settlement only provides for a reversion to Moore Defendants (a) AFTER all claiming class members receive 110% of their net artificially paid; and (b) AFTER all claiming class members receive 110% of their net losses.  Settlement Agreement, Section 12.  Even then, unlike in *PIMCO* and *Amaranth* (which are prior class action settlements of claims for commodity futures manipulation) the Moore Defendants will be entitled to only **one-half** (*i.e.*, 50%) of any reversion with respect to net artificiality paid with the remaining 50% to be distributed to claiming class members based on net losses.  *See* Plan of Allocation ¶2.

Second, Ms. Levy asserts that "the collusive nature of the settlement is demonstrated by Class counsel's total abdication of their duty to take steps to secure the insurance proceeds."

Levy Objection, ¶7.  This objection is a non-sequitur based on a misapprehension of the facts.  It is a non-sequitur because the Moore Defendants are paying $48.4 million regardless of whether any insurance proceeds are ever collected; the success or failure in collecting insurance proceeds in respect of Defendant Welsh thus says nothing about collusion.  It is a misapprehension of the facts because it assumes that Defendant Welsh would have consented to a $35 million judgment no matter what.  It apparently assumes that, with such $35 million judgment agreed to, Plaintiffs could have gone into the Bankruptcy Court and tried to obtain coverage under an additional insurance policy.  But no such choice was available in the real world.  Class Counsel negotiated to obtain as much as it could from all the Settling Defendants, in both cash and the assignment of various insurance policies that Welsh had been denied coverage but under which he arguably has rights.  The alternative to the deal that Class Counsel made would have been to try to separate Welsh from the other Settling Defendants, and continue to prosecute the claims against Defendant Welsh.  This alternative would have likely resulted in continued litigation before this Court against a Defendant without the ability to pay any meaningful judgment and whose only substantial asset was a potential cause of action against certain D&O insurance carriers under the very policies that he offered to assign to the Class in connection with the Settlement.  Far from colluding with Defendant Welsh, Class Counsel negotiated to obtain what was in their judgment reasonable compensation for the Class in the real world circumstances that exist here.

As a result of Class Counsel's efforts, Defendant Welsh consented to a $35 million dollar judgment and assigned to Plaintiffs his rights under a certain "Directors & Officers" ("D&O") insurance policy.  Amended Settlement, Section 3(b).  The facts that Defendant Welsh had previously settled his coverage claim against a different carrier under a **separate** E&O policy (and is litigating against the Commodity Futures Trading Commission ("CFTC") in a separate

action before this Court) does not demonstrate collusion.[6]  Next:  Ms. Levy's position that

Welsh's prior settlement with the E&O carrier somehow impacts Defendant Welsh's assignment

under the D&O policy, which is the subject of this Settlement, is (in Plaintiffs' opinion) simply

incorrect.  *See* Plaintiffs' accompanying brief filed concurrently herewith responding to the MFG

Customer's Motion to Intervene (explaining differences between the D&O and E&O insurance

policies).

Third, Ms. Levy asserts that the expansion of the Class Period in the Complaint for

purposes of the Amended Settlement "is evidence of collusion."  Levy Objection, ¶8.  The class

period in the Complaint is October 17, 2007 through June 6, 2008.  Sixth Amended Complaint

¶308.  The Settlement Class Period is June 1, 2006 through April 29, 2010.  Amended

Settlement, Section 1(p).  As Plaintiffs explained in their preliminary approval papers, this

expansion extends the beginning of the Class period back to the first (albeit initially sporadic),

manipulative trade by Defendants alleged in the Complaint (*i.e.*, June 1, 2006) and extends the

end of the Class forward to the last possible arguable date on which any artificial impact from

the manipulative trades could have remained in the market (*i.e.*, April 29, 2010; the day the

CFTC released the Moore Capital Consent Order).  Dkt. No. 162 at p. 16.  Plaintiffs also cited

two prior commodity futures manipulation cases in this Court that have certified expanded

settlement classes even where, unlike here, a class had already been certified.  *Id*. at p. 16, n. 8.

These two earlier settlements were not objected to as being collusive, nor is this settlement

collusive; on the contrary, it is by reason of this extension of the settlement class period that Ms.

---

[6] Defendant Welsh purported to be covered under two separate insurance policies:  an E&O policy and a D&O policy.  However, carriers for both policies denied coverage to Defendant Welsh.  Defendant Welsh settled his coverage dispute with the carriers under the E&O policy. This settlement was approved by the bankruptcy court.  As part of the Settlement here, Defendant Welsh assigned his rights to Plaintiffs under the remaining D&O policy.

Levy is entitled to recover monies in connection with this settlement.  *See* "2.b" below.

Fourth, Ms. Levy misapprehends discrimination in the Plan of Allocation against longs and then equates such supposed discrimination with collusion.  She asserts that the Settlement is collusive because it will supposedly "allow a double recovery" to "short sellers during the NAP period" because "there is no requirement in the settlement agreement that these short sellers offset their gains and losses during the entire Class Period, including the NAP and NL periods." Levy Objection, ¶10.  However, there is no discrimination in favor of shorts or against longs. The Plan of Allocation provides for a "netted" recovery **inside** the NAP and NL periods for both longs and shorts.  Plan of Allocation ¶¶4, 10.  However, there is no netting or offsets between the NAP and NL results themselves for longs or shorts.  This lack of offsets between the NAP and NL periods themselves is **actually a benefit** to both longs and shorts in the Class.  In singling out "short sellers," Ms. Levy is thus triply wrong.  In reality, Ms. Levy and Class members with similar trading profiles actually benefit from the lack of offsets between the NAP and NL periods.  This is because Ms. Levy's net loss during the NL period will not be offset (or reduced) by her net gain during the NAP period.  *See* II.B.2.b below.  (Ms. Levy's claim would be cut in half.)

Fifth, Ms. Levy asserts that the attorneys' fees supposedly show the Settlement's "collusive nature."  Levy Objection, ¶14.  However, unlike many or most class action settlements, the Settlement makes clear that Class Counsel's request for an award of attorneys' fees may be objected to by Defendants and, as always, is subject to Court approval.  Settlement, Section 5.  If anything, the subject of attorneys' fees further demonstrates the extremely hard fought, arm's-length bargaining that went into the Amended Settlement:  the best deal was made for Class members by giving the Settling Defendants the right to object to the amount of

attorneys' fees in order to try to recover something from their limited, partial reversionary rights in the event that the aggregate value of the proofs of claims filed by the traders in the small, illiquid markets at issue here, do not exhaust the Net Settlement Fund.

Finally, Ms. Levy asserts that the proposed procedure for Class members to object to the Settlement is "collusive" and will result in "paper work and expensive service" such that e-mail service of objections should be accepted.  Levy Objection, ¶21.  The proposed procedure for Class member objections herein has been approved in prior CEA class action settlements.[7]  *See, e.g.*, *In re Amaranth Natural Gas Commodities Litig.*, 07-cv-6377, Docket No. 376 at ¶13.  The only specific issue Ms. Levy raises is that objectors should be allowed to e-mail their objections to Class Counsel and counsel for the Settling Defendants instead of mailing or hand delivering such objections.  Levy Objection, ¶21.  Although Class Counsel believes that mailing objections is common practice and that the mailing of objections to the five law firms here is likely to cost less than $20, Class Counsel and Settling Defendants have no objection to accepting service of Class member objections by e-mail, provided that all objections are properly filed with the Court.

### 2.   Contrary to Ms. Levy, the Plan of Allocation Has A Reasonable, Rational Basis

#### a.   Standard for Preliminary Approval of Plan of Allocation

Preliminary approval of a plan of allocation is appropriate where the plan is "within the

---

[7] The proposed procedure for Class member objections herein requires provision of the following information filed with the Court and served on Class Counsel and Counsel for the Settling Defendants no later than 23 days prior to the Fairness Hearing:  (1) written notice of intention to appear; (2) proof of membership in the Class; (3) a detailed statement of the objections to any matters before the Court; (4) a statement advising of any court proceeding in which said objector has made an objection to a proposed class action settlement within the past three years, including case name, document number, and court; (5) the grounds or reasons why the member of the Futures Class desires to appear and be heard; and (6) all documents or writings the member of the Futures Class desires the Court to consider.  Scheduling Order ¶14.

range" of what can later be found to have a "reasonable, rational basis."[8]  *Compare In re Warner Chilcott Ltd. Sec. Litig.*, 2008 WL 5110904 at * 2 (at the preliminary approval stage, the Court need only find that the Plan of Allocation is "within the range of possible approval") *with In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y.2005) ("[a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel").

> **b.      Ms. Levy Benefitted From the Alleged Manipulation Under NAP Portion of the Proposed Plan of Allocation**

Ms. Levy's real problem with the Proposed Plan of Allocation (Plaintiffs believe) is with her potential recovery.  As explained in Exhibit 1 hereto, Ms. Levy's trading pattern results in a *gain* of approximately $30,035.37 during the Net Artificiality Paid period ("NAP") and results in a *loss* of approximately $68,850.00 during the Net Loss ("NL") period.

> **c.      Ms. Levy's Objections to the Plan of Allocation Should Be Overruled and are Premature At Preliminary Approval**

To any extent the Court wishes to consider Ms. Levy's objections to the Plan of Allocation, such objections should be overruled for at least the following reasons.

First, Ms. Levy's objections include the following misapprehensions about the Plan of

---

[8] The Court may defer ruling on the Plan of Allocation at preliminary approval or even final approval and may further amend the Plan of Allocation at any time.  As Plaintiffs explained in their preliminary approval brief, class action settlements have previously been approved without a final plan of allocation.  *See* Dkt. No. 162 at p. 22, n. 10 citing *In re Natural Gas Commodity Litig.*, 03-cv-6186, Order Establishing Plan of Allocation and Directing Further Proceedings dated March 29, 2010 (S.D.N.Y.) and *In re Sumitomo Copper Litig.*, 96-cv-4854, Order Establishing Plan of Allocation and Approving Administrative Fees and Expenses dated August 8, 2005 (S.D.N.Y.).

Indeed, the proposed class notice here provides that the Court may amend the Plan of Allocation at any time without further notice to the Class (*see* Class Notice, p. 8) and the Settlement itself expressly states that the "the approval, disapproval, or modification of any proposed plan of allocation shall not affect the preliminary or final approval of the Settlement or enforceability of this Settlement Agreement."  Amended Settlement, Section 9(b).

Allocation.  Specifically, contrary to Ms. Levy, the Net Artificiality Period (or "NAP") and Net

Loss ("NL") period in the Plan of Allocation each include and provide for the potential for

compensation of **both "shorts" and "longs."** Levy Objection ¶¶11, 13.

Ms. Levy argues that the Plan of Allocation supposedly "fails terribly because it does not

take into account those traders who purchased at high artificial prices, but sold after the market

began to revert back to normal."  Levy Objection, ¶16.  In fact, the Plan does take into account

such trades and provides them with favorable compensation.  Separately, as explained in Exhibit

1 hereto, Ms. Levy purchased four October 2008 platinum futures contracts at times when such

contracts were artificially inflated.  *See* Ex. 1 hereto.  Ms. Levy later liquidated these October

2008 contacts when prices were no longer artificial.  *Id.*  These transactions resulted in "net

artificiality paid" under the Plan of Allocation of approximately $34,206.34.  *Id.*  If the foregoing

purchases and sales of these four October 2008 contracts had been the only trades Ms. Levy

made during the Class Period, then she would have have been presumptively entitled to recover

$34,206.34 in net artificiality paid subject to the other terms of the Plan of Allocation.  But the

reality is that Ms. Levy made other trades in which she sold more artificiality than she had paid

for on her purchases.  *Id.*

Second, Ms. Levy asserts that it supposedly makes no sense for the Plan of Allocation to

allow for 10% interest and no setoffs.  Levy Objection, ¶¶7, 10, 16.  However, the Plan's

allowance for 10% interest and no setoffs is a **benefit** to Class members (including Ms. Levy).

The 10% interest reduces any potential reversion to the Moore Capital Defendants by increasing

Class members' claims under the Plan of Allocation by 10% **beyond** potentially 100% of their

recovery under the Plan of Allocation.  Similarly, the lack of setoffs further reduces the potential

reversion to the Moore Capital Defendants.  In fact, setoffs between the NAP and NL periods

would negatively impact Ms. Levy, who has a gain during the NAP period (which, because there is no sett-offs, does not reduce her net loss during the NL period).  *See* "b" above.

Third, Ms. Levy asserts that the Plan of Allocation is supposedly assigning losses based on a "contrived notion of artificiality" that is not consistent with "actual loses" under 7 U.S.C. §25.  Levy Objection, ¶16.  Contrary to Ms. Levy, 7 U.S.C. §25 speaks in terms of "actual **damages**," not actual losses.  *See* 7 U.S.C. §25(a)(1) [emphasis supplied]; *see also In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 59-60 (S.D.N.Y. 2012) (Pauley, J.) ("Under section 25(a) of the CEA, a person or entity that engages in price manipulation 'shall be liable for actual damages resulting from' the manipulation").  This distinction is important because movements in actual prices do not necessarily correspond to movements in *artificiality*.  As Plaintiffs explained in their preliminary approval papers, Plaintiffs were prepared to prove damages in this case based on economic calculations of the daily artificial impact that the Defendants' activities allegedly had on NYMEX platinum and palladium prices during the Class Period.  Dkt. No. 162 at pp. 21-22.  The daily artificial impact represents the difference between the actual price observed during the Class Period and the estimated "but for" price.  Allocation plans approved in prior CEA class action settlements have similarly used daily artificiality estimates.  *See, e.g.*, *In re Amaranth Natural Gas Commodities Litig.*, 07-cv-6377, Dkt. No. 413 (S.D.N.Y.) (plan of allocation based on daily artificiality estimates); *Kohen v. Pacific Investment Management, Co., et al.*, 05-cv-4681, Dkt. No. 557, Section 10 (N.D. Ill.) (same).

Fourth, Ms. Levy asserts that the allocation of 90% of the Net Settlement Fund to the November 2007 through June 18, 2008 period and 10% of the Net Settlement Fund to the remainder of the Class Period is unfair.  Levy Objection, ¶¶3, 7, 9, 10.  The Plan of Allocation seeks to distribute 90% of the Net Settlement Fund to the November 2007 through June 18, 2008

time period.  Plan of Allocation, ¶1.[9]  This is the same time period when the Defendants were actually engaged in their allegedly manipulative "bang the close" manipulation, which ended on May 21, 2008.  Complaint, Exs. C and I.

The 90/10 allocation under the Plan of Allocation was explained in detail in Plaintiffs' preliminary approval memorandum.  *See* Docket No. 162 at pp. 21-22.  This allocation was the result of negotiations between Class Counsel and Lowey Dannenberg Cohen & Hart, P.C., who represent Plaintiff Richard White.  Plaintiff White only transacted one time during the November 2007 through June 18, 2008 period and such transaction was a sale at artificially inflated prices such that Plaintiff White has no recovery during the November 2007 through June 18, 2008 period.   Accordingly, Plaintiff White was economically incentivized to allocate the largest percentage of the Net Settlement Fund possible to the remainder of the Class Period.  Moreover, as Plaintiffs explained in their preliminary approval brief, 90/10 allocations have previously been approved in prior class action settlements and lesser allocations (*e.g.*, 92.5 to 7.5) have been approved in other cases.  Dkt. No. 162 at p. 21, citing *Precision Associates, Inc. v. Panalpina World Transp. (Holding) Ltd.*, 08-CV-42 JG VVP, 2013 WL 4525323, at *13 (E.D.N.Y. Aug. 27, 2013) (Gleeson, J.) (approving plan of allocation providing for 90% of payment to certain enumerated claims, and 10% to the remaining claims).

Finally, Ms. Levy asserts that the fact that the Plan of Allocation does not provide for artificiality after June 18, 2008 "dooms it as a fair model."  Levy Objection, ¶16.  However, Ms. Levy conspicuously fails to provide any explanation or support whatsoever for this assertion.

---

[9] The CFTC found that Moore Capital had attempted to manipulate the settlement prices of NYMEX palladium and platinum futures contracts during the period from November 2007 through May 2008.  *In the Matter of: Moore Capital Management, LP, Moore Capital Advisors, LLC and Moore Advisors, Ltd.*, CFTC Docket No. 10-09, Order Instituting Proceedings Pursuant to Sections 6(c), 6(d) and 8a of the Commodity Exchange Act and Making Findings and

*Id., passim*.  Such assertion apparently contends that artificiality had to persist in prices, as a cosmological constant, more than four weeks after Defendants ceased their "bang the close" trades.  But this was also after Defendant Welsh had been suspended from MF Global.  It was after the NYMEX and CFTC had begun investigations in connection with Moore Capital's trades.  Thus, similar to certain other of Ms. Levy's conclusory assertions, this assertion seems to contradict many well known facts.  Finally, it is very likely that if artificial prices had continued to persist after June 18, 2008, Ms. Levy's claim under the Proposed Plan of Allocation would be even less.

### 3. Contrary to Ms. Levy, The Consideration and Other Terms of The Amended Settlement are Fair, Reasonable and Adequate

Plaintiffs demonstrated in their preliminary approval brief that the $48,400,000 all-cash payment and other terms of Amended Settlement fall well within what this Court may reasonably approve by addressing each of the nine "*Grinnell* factors," which Courts consider for purposes of **final approval**.  *Id*. pp. 28-34.  Ms. Levy does not address any of the *Grinnell* factors in her brief.  She nevertheless asserts that the Settlement is not fair, reasonable or adequate for the following reasons.

First, Ms. Levy asserts, without support, that the $48,400,000 cash payment is supposedly "grossly underfunded" (Levy Objection, ¶7) because: (1) Class members during the NAP period will receive "pennies on the dollar after attorneys' fees" and NL investors "may not get one penny or maybe just a few cents" (*id*., ¶5); and (2) Moore's profits are alleged to have been approximately $50 million.  *Id*., ¶8.  As Plaintiffs explained in their preliminary approval papers, the $48,400,000 cash payment represents more than 10% of Plaintiffs' own **total** damages estimate (Dkt. No. 162 at pp. 31-34), assuming that 100% of Class members submit proofs of

Imposing Remedial Sanctions.

claim. *Compare Boeing Co. v. Van Gemert*, 444 U.S. 472, 479-81 (1980) (defendant owed a specified judgment but the entitlement to portions of that judgment by class members who failed to claim was forfeited (except for the attorneys' fee) back to the defendants because the class members did not file a proof of claim). Plaintiffs explained that, depending on the claims rate, Class members who submit proofs of claim may actually receive well in excess of the nominal 10% of Plaintiffs' own estimates of damages. *Id*. Plaintiffs also showed that this recovery is approximately **four times** the size of the average class action settlement with comparable ranges of damages. *Id*. p. 33-34. Obviously, Defendants' estimate of damages was a small fraction of Plaintiffs' estimate.

Ms. Levy fails to cite any authority for the proposition that an alleged manipulator's alleged profits are an appropriate metric by which to measure the adequacy of the consideration for a proposed class action settlement. *Compare* Levy Objection, *passim with Grinnell Corp.*, 495 F.2d 448. Plaintiffs have appropriately analyzed the Amended Settlement under the nine "*Grinnell* factors," including *Grinnell* factors 8 and 9, which consider the range of reasonableness of the settlement fund in light of the best possible recovery and all of the attendant risks of litigation. Dkt. No. 162 at pp. 31-34. Although Plaintiffs did allege that Moore Capital profited by approximately $54 million from the alleged manipulation (Complaint ¶287), the Moore Defendants have disputed this allegation such that proving it would have been difficult. *See* Declaration of David Zensky, Esq. submitted in connection with the Settling Defendants' response to Ms. Levy's Objections.

Second, Ms. Levy asserts that the Settlement is "unfair" because the Moore Defendants have not admitted to liability. Levy Objection, ¶7. Once again, Ms. Levy cites no authority for the proposition that defendants in class action settlements must admit to liability in order for the

settlement to be fair.  Levy Objection, *passim*.  Class Counsel is unaware of any such authority.

Precisely the contrary, requiring such an admission would defeat the purposes of settlement,

which is to quiet litigation and disputes notwithstanding differences between the parties.  While

no doubt such an admission would have been beneficial and most convenient for Ms. Levy in her

separate action against the Defendants, it simply was not available short of a successful trial

here.

  Third, Ms. Levy asserts that it is supposedly a "major problem" that Defendant Welsh did

not stipulate to any facts as part of the settlement.  Levy Objection, ¶7.  Ms. Levy once again

cites no authority for this proposition.  *Id., passim*.  Class Counsel respectfully disagrees with

Ms. Levy.

  Fourth, Ms. Levy asserts that it is too burdensome for class members to fill out the proof

of claim (Levy Objection, ¶7) and that class members should be allowed to authorize the

NYMEX "to allow reproduction of their paper work if they are missing it."  *Id.*[10]  The Proof of

Claim submitted in connection with the Amended Settlement is consistent with claim forms used

in prior CEA cases that have previously been approved in this District.  *See, e.g.*, *In re Amaranth

Natural Gas Commodities Litig.*, 07-cv-6377, Dkt. No. 336-1, Ex. D (S.D.N.Y.).  Also,

consistent with Ms. Levy's recommendation, the Proof of Claim already has provision that

authorizes the Settlement Administrator to obtain documents from third parties, including the

NYMEX, to the extent such documents are available.  *See* Proof of Claim, ¶9.

  Fifth, Ms. Levy takes issue with Class Counsel's decision not to add the NYMEX or the

Chicago Mercantile Exchange ("CME") as defendants in this action.  Levy Objection, ¶7.  But

---

[10] Ms. Levy also objects on the basis that it is supposedly "too burdensome" for class members to opt out of the Amended Settlement.  Levy Objection, ¶7.  The Settling Defendants have addressed this objection in a brief that is being filed concurrently herewith.

Ms. Levy does not provide a basis for any claims against the NYMEX or CME in connection with this action.  Further, Section 22(b) of the CEA imposes the pleading and proof requirement that a commodity exchange acted in "bad faith" and cause the loss.  7 U.S.C. § 25(b)(4) ("A person seeking to enforce liability under this section must establish that the registered entity registered futures association, officer, director, governor, committee member, or employee acted in bad faith in failing to take action or in taking such action as was taken, and that such failure or action caused the loss").  This is a difficult (though not impossible) standard to satisfy.

Finally, Ms. Levy asserts that the "32.8% contingency fee to Class Counsel is completely inappropriate."  Levy Objection, ¶7.  However, this request is premature.  It is based on a misapprehension of the facts.  All that Class Counsel has stated so far is that they anticipate requesting a fee of "***no more than***" 32.8% of the Settlement Fund.  Settlement Agreement, Section 5(b)  When the fee request is actually filed, no later than thirty (30) days before the fairness hearing, Class Counsel will propose the actual fee sought.  Ms. Levy and other Class members will then have a concrete application to assess and, if they chose, object to.  *See* Scheduling Order ¶¶13-14.  Again, the Amended Settlement makes clear that whatever Class Counsel's fee request turns out to be, it will be **subject to Court approval,** and that the fairness of the fee request will be determined separate and apart from the fairness of the Amended Settlement.  Amended Settlement, Section 5.

### 4.   Contrary to Ms. Levy, Class Counsel Has Adequately Represented The Class

Federal Rule of Civil Procedure 23(g)(1) provides that "…a court that certifies a class must appoint class counsel."  Rule 23(g)(1).  Rule 23(g)(2) provides that where, as here, only one application is made seeking appointment as class counsel, "…the court may appoint that applicant only if the applicant is **adequate** under Rule 23(g)(1) and (4)."  Rule 23(g)(2)

[emphasis supplied].

In this case, the Court appointed Lovell Stewart as interim class counsel and thus found that Lovell Stewart was "adequate" under Rule 23(g).  *See* Pre-Trial Order No. 1, Dkt. No. 18 at ¶13.  Furthermore, Lovell Stewart has been found to be "best able to represent the class" on contested motions in other commodity futures manipulation cases before this Court and others.  *Compare, e.g., In re Crude Oil Commodity Futures Litig.*, 11-cv-3600 (WHP) 2012 WL 569195 (S.D.N.Y. Feb. 14, 2012) (Lovell Stewart appointed co-lead counsel on contested motion) *with PIMCO*, 05-cv-4681, Docket No. 38 (N.D. Ill.) (same).  Lovell Stewart has over thirty years of experience litigating commodity futures manipulation class actions.  It successfully argued the original implied right of action therefor in the U.S. Supreme Court.  And it has recovered the first, second, third and fourth largest class action settlements in the history of the Commodity Exchange Act, 7 U.S.C. §1 *et seq*.[11]  Nevertheless, Ms. Levy asserts that Lovell Stewart has supposedly not adequately represented the Class in this case based on the following.

First, Ms. Levy asserts that Lovell Stewart is supposedly "representing and favoring short sellers over long buyers, in the Plan of Allocation."  *Id*. ¶3.  Once again, and contrary to Ms. Levy's similarly mistaken assertions, longs and shorts are being treated the same.  The Plan of Allocation compensates both shorts and longs during both the NAP and NL periods.  Plan of Allocation, ¶1.

Second, Ms. Levy asserts that Lovell Stewart has supposedly "admitted" that it only represents persons who bought and sold NYMEX platinum or palladium futures contract during

---

[11] *In re Sumitomo Copper Litigation,* 74 F. Supp.2d 393, 395 (S.D.N.Y. 1999) ("the largest class action recovery in the 75 plus year history of the" CEA); *Kohen v. PIMCO*, 05 Civ. 4681 (N.D. Ill.), Dkt. No. 570, Final Judgment and Order (filed May 2, 2011) (approving $118,750,000 settlement); *In re Natural Gas Commodities Litig.*, Index No. 03 Civ. 6186 (VM) (AJP) (S.D.N.Y.) ($100,800,000 settlement); *In re Amaranth Natural Gas Commodities Litig,* 07 Civ.

the period from October 17, 2007 to June 18, 2008 and not the entire June 1, 2006 through April 29, 2010 Class Period.  Levy Objection, ¶2.  On the contrary, Lovell Stewart also represents Plaintiff Harry Ploss who traded on behalf of himself only at times **outside** of the October 17, 2007 to June 18, 2008 time period.  The truth is that Lovell Stewart has acted to represent **all** Class members regardless of the timing of their trades.

Third, Ms. Levy asserts that Lovell Stewart has supposedly "not acted to adequately protect the insurance proceeds from MF Global and its carriers in the amount of $35,000,000." Levy Objection, ¶3.  Relatedly, Ms. Levy asserts that Lovell Stewart has "done nothing to unwind the Welsh Bankruptcy Settlement agreement so that the Class may proceed in a direct action against the carrier."  *Id.*, ¶18.  Both of these assertions seem to be based on the mistaken assumption that the Class could both (a) settle with Defendant Welsh consenting to the entry of the $35 million judgment and (b) obtain the assignment of Defendant Welsh's rights under the additional policy that Ms. Levy prefers.  This is very wrong.  The Class either had to take the risks of litigating both against Mr. Welsh and against the denials of coverage or make the Settlement that was made.  Class Counsel made the reasonable judgment it did based on these real world alternatives.  Further delays in sending out the Class notice are not beneficial to a recovery from the insurance policy for which there is an actual assignment.  Thus, Class Counsel asks the Court to overrule these objections so that the Class may have the best opportunity to timely obtain final approval the settlement, have the judgment against Defendant Welsh entered, then proceed to seek to collect on the policy for which the Class does have an assignment, or settle these claims if, as and when appropriate.  Delaying the Class from pursuing the foregoing so that Ms. Levy can try to get a settlement that is more helpful to her individual action, is

---

6377 (S.D.N.Y.), Dkt. Nos. 365, 368, and 404 ($77,100,000 settlement).

definitely not in the Class' interests (the undersigned believes).

Finally, Ms. Levy asserts that Lovell Stewart supposedly:

…cannot hide their obvious interest in sacrificing the rest of the Class who lost during the NL period of over three years.  By relegating 10% of the net settlement proceeds to the NL class (the Longs) who make up over a three year trading period, the settlement, the settlement is palpably unfair, arbitrary and capricious since all Class members need to be treated fairly and with parity.

Levy Objection, ¶9.[12]  This assertion is untrue and conspicuously fails to explain what exactly

Lovell Stewart's supposed "obvious interest" even is.  Again, even in a settlement document, the

CFTC charged Moore Capital with attempting to manipulate only for the period from November

2007 through May 2008.  Lovell Stewart is following the strength of the Claims.  And, as stated

above, Lovell Stewart represents Plaintiff Harry Ploss who did not trade for his own account at

all during the November 2007 through June 18, 2008 NAP period.

There were significant statute of limitations, causation and other difficulties in proving

the case for Class members who traded outside the NAP period that did not exist for Class

members who traded during the NAP period.  The extreme difference in the merits of the claims

and Class Counsel's experience with prior cases and their negotiations, not whether a Class

member was long or short, are the factors that informed the 90/10 allocation in the Proposed Plan

of Allocation.

## CONCLUSION

Plaintiffs respectfully request the Court (a) deny Ms. Levy's motion to intervene and (b)

overrule her objections to preliminary approval of the Amended Settlement.

---

[12] Once again, Ms. Levy misapprehends that longs are being treated differently from shorts and, moreover, that longs are equal to the NL means of recovery under the Plan of Allocation and shorts are equal to the NAP means of recovery.  This is just not correct.  As has been repeatedly stated, the Plan of Allocation compensates both long and shorts under both the NAP and NL periods.

Dated: New York, New York
      May 8, 2014

Respectfully submitted,

*/s/ Christopher Lovell*
Christopher Lovell
Jody Krisiloff
Christopher M. McGrath
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway, Suite 501,
New York, New York 10006
Telephone:    (212) 608-1900
Facsimile:     (212) 719-4775

*Counsel for Futures Plaintiffs and the Futures Class*