# Exhibit 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**FOR PUBLICATION**

In re

MF GLOBAL HOLDINGS LTD., *et al.*,

Debtors.

Case No. 11-15059 (MG)

---

# MEMORANDUM OPINION LIFTING AUTOMATIC STAY TO PERMIT PAYMENTS OF DEFENSE COSTS UNDER CERTAIN INSURANCE POLICIES

*A P P E A R A N C E S :*

MORRISON & FOERSTER LLP
*Counsel for Louis J. Freeh, Chapter 11 Trustee*
1290 Avenue of the Americas
New York, New York 10104
By:    Brett H. Miller, Esq.
        Lorenzo Marinuzzi, Esq.

HUGHES HUBBARD & REED LLP
*Counsel for James W. Giddens, Trustee for the*
*SIPA Liquidation of MF Global Inc.*
One Battery Park Plaza
New York, New York 10004
By:    James B. Kobak, Jr., Esq.
        Jeffrey S. Margolin, Esq.

ALLEN & OVERY LLP
*Counsel for MFG Assurance Company*
1221 Avenue of the Americas
New York, New York 10020
By:    Ken Coleman, Esq.
        Stephen Doody, Esq.
        Andrew Dove, Esq.

TROUTMAN SANDERS LLP
*Counsel for U.S. Specialty Insurance Company*
405 Lexington Avenue
New York, New York 10174
By:    Brett D. Goodman, Esq.
        Leslie S. Ahari, Esq.

FORD MARRIN ESPOSITO WITMEYER & GLESER, L.L.P.
*Counsel for Sapere Wealth Management LLC,*
*Granite Asset Management and Sapere CTA Fund, L.P.*
Wall Street Plaza
New York, New York 10005
By:   John J. Witmeyer III, Esq.
       Jon R. Grabowski, Esq.

COLE, SCHOTZ, MEISEL FORMAN, & LEONARD, P.A.
*Counsel for the Lead Plaintiffs*
900 Third Avenue, 16th Floor
New York, New York 10022
By:   John H. Drucker, Esq.
       Laurence May, Esq.
       Jill B. Beinstock, Esq.

NISEN & ELLIOTT, LLC
*Counsel for Henning-Carey Proprietary Trading, LLC, Charles Carey, Joseph Niciforo,*
*Robert Tierney, Brian Fisher, Shane McMahon, Michael Mette, and Timothy Zaug*
200 West Adams Street, Suite 2500
Chicago, Illinois 60606
By:   Michael H. Moriano, Esq.
       Claire E. Gorman, Esq.
       Brittany E. Kirk, Esq.

-and-

CAREY & HARTMANN
*Counsel for Henning-Carey Proprietary Trading, LLC, Charles Carey, Joseph Niciforo,*
*Robert Tierney, Brian Fisher, Shane McMahon, Michael Mette, and Timothy Zaug*
135 South LaSalle Street, Suite 2200
Chicago, Illinois 60603
By:   Peter B. Carey, Esq.
       Katherine T. Hartmann, Esq.

-and-

LAW OFFICES OF EDWARD T. JOYCE AND ASSOCIATES, P.C.
*Counsel for Henning-Carey Proprietary Trading, LLC, Charles Carey, Joseph Niciforo,*
*Robert Tierney, Brian Fisher, Shane McMahon, Michael Mette, and Timothy Zaug*
135 South LaSalle Street, Suite 2200
Chicago, Illinois 60603
By:   Edward T. Joyce, Esq.
       Rowena T. Parma, Esq.

ENTWISTLE & CAPPUCCI LLP
*Counsel for the Representative Customer Group*
280 Park Avenue, 26th Floor West
New York, New York 10017
By:    Andrew J. Entwistle, Esq.
       Joshua K. Porter, Esq.
       Jordan A. Cortez, Esq.

MARK SCHLACHET
*Counsel for the Sangani Family LP*
3637 South Green Road, 2nd Floor
Cleveland, Ohio 44122
By:    Mark Schlachet, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Two of the Debtors'[1] insurance providers have sought relief from the automatic stay, to the extent applicable, to advance or pay defense costs on behalf of present or former directors, officers, and employees of the Debtors (i) that have been named as defendants in class action lawsuits in multiple federal and state courts, or (ii) in connection with ongoing investigations.  A number of commodities customers of MFGI and securities holders of MFGH that are plaintiffs in those actions object to the use of insurance proceeds to pay such defense costs.  The parties now agree that the insurance policies at issue are property of the Debtors' estates, but they dispute whether the proceeds of the policies are property of the estates.  For the reasons explained below, the Court concludes, first, that certain commodity customers of MFGI that have asserted or threatened tort claims in the MFGH chapter 11 case have standing to object to the payment of defense costs by the insurers, and, second, that it is unnecessary at this time to determine whether policy proceeds are property of the estates as the automatic stay should be lifted so that directors, officers and employees may receive advancement or reimbursement of reasonable defense costs

---

[1]      For the purpose of this Opinion, the "Debtors" include those debtor entities that have filed petitions in these chapter 11 cases ("MFGH") and MF Global Inc. ("MFGI").

that are within the scope of the duty to defend under the applicable policies, whether or not the policy proceeds are currently determined to be property of the estates.

## BACKGROUND

Since November 2011, numerous directors, officers and employees of MF Global have been named as defendants in lawsuits filed by securities holders, commodity customers and other plaintiffs alleging violations of the securities laws, the Commodity Exchange Act, the Racketeer Influenced and Corrupt Organizations Act, state consumer protection laws, as well as breach of contract, breach of fiduciary duties and various other torts. Many of these actions have been consolidated under the caption, *DeAngelis v. Corzine,* No. 11 Civ. 7866 (VM) (S.D.N.Y. filed Nov. 3, 2011), pending before Judge Victor Marrero. Other cases have been filed in Illinois, Michigan and Montana (collectively, the numerous pending cases will be referred to as the "Underlying Cases"). The cases pending in federal courts are presently the subject of motions to transfer recently heard by the Judicial Panel on Multidistrict Litigation. Since the commencement of the Underlying Cases and various government investigations, the Debtors' insurance providers have received numerous notices seeking coverage under the Debtors' insurance policies on behalf of the Debtors' current and former directors, officers and employees (the "Individual Insureds").

In response to these requests, the Debtors' insurance providers seek a determination from the Court that the proceeds of the insurance policies at issue are not property of the Debtors' estates. Alternatively, the insurance providers seek to lift the automatic stay, to the extent it is applicable, to permit them to advance or reimburse defense costs on behalf of the Individual Insureds in connection with the Underlying Cases and pending investigations. As described below, two types of insurance policies are involved—director and officer liability insurance

4

policies ("D&O Policies") and errors and omissions (professional liability) insurance policies ("E&O Policies"). For the policy year, May 31, 2011 to May 30, 2012, the Debtors maintained a total of $225 million of D&O insurance and $150 million of E&O insurance. The objectors seek to block payment of defense costs under both types of policies. Because these motions present similar legal issues, the Court ordered a common briefing and argument schedule.

### A. Procedural History

The issues before the Court arise from (i) the *Notice of Presentment of Stipulation and Order Between the Chapter 11 Trustee and MFG Assurance Company Limited Regarding Payment of Loss and Reimbursement of Covered Expenses* (the "Assurance Stipulation") (ECF Doc. # 409) and (ii) the *Motion of U.S. Specialty Insurance Company for Relief from the Automatic Stay, to the Extent Applicable* (the "Specialty Motion") (ECF Doc. # 428).

The Assurance Stipulation relating to the E&O Policies was originally filed on presentment (with a presentment date of February 9, 2012). Certain commodities customers of MFGI (ECF Doc. ## 416, 417) and Sapere Wealth Management LLC, Granite Asset Management and Sapere CTA Fund, L.P. (collectively, "Sapere") (ECF Doc. # 419) filed objections to the Assurance Motion. The Sangani Family, LP filed a joinder to Sapere's objection on February 7, 2012. (ECF Doc. # 422.) At a hearing on February 9, 2012, the Court ordered further briefing on the Assurance Stipulation. Specifically, the Court ordered MFG Assurance Company Ltd. ("MFG Assurance") and Louis J. Freeh (the "Chapter 11 Trustee") to provide copies of the insurance policies referenced in the Assurance Stipulation and support the stipulation with legal arguments.

On March 5, 2012, MFG Assurance filed a memorandum of law in support of the Assurance Stipulation (the "MFGA Memorandum") (ECF Doc. # 516), along with the

declaration of John Oliver Heyliger (the "Heyliger Declaration") (ECF Doc. # 519). The Chapter 11 Trustee also filed a memorandum in support of the Assurance Stipulation (the "Chapter 11 Trustee Memorandum"). (ECF Doc. # 518.) On March 19, 2012, responses in support of the objections were filed by certain MFGI customers (ECF Doc. # 573), and Sapere (ECF Doc. # 574). On March 22, 2012, after the deadline for responses had passed, the Lead Plaintiffs (defined below) filed a limited response and reservation of rights with respect to the Assurance Stipulation. (ECF Doc. # 586.) On March 23, the Chapter 11 Trustee and MFG Assurance filed reply memoranda in support of the Assurance Stipulation. (ECF Doc. ## 589, 590.)

While the briefing was ongoing on the Assurance Stipulation, U.S. Specialty Insurance Company ("U.S. Specialty") filed the Specialty Motion. U.S. Specialty issued the primary level of D&O Policies. U.S. Specialty is unaffiliated with any of the Debtors. The Virginia Retirement System ("VRS") and Her Majesty the Queen in Right of Alberta, Individually and on Behalf of All Others Similarly Situated ("Alberta" and together with VRS, the "Lead Plaintiffs") (ECF Doc. # 477), certain MFGI customers (ECF Doc. # 484), and Sapere (ECF Doc. # 482), filed objections to the Specialty Motion. Additionally, James W. Giddens (the "SIPA Trustee"), as Trustee for the liquidation of the business of MFGI, filed a statement with respect to certain insurance issues (the "SIPA Statement"). (ECF Doc. # 489.) U.S. Specialty filed a reply in support of the Specialty Motion. (ECF Doc. # 503.) The Chapter 11 Trustee also filed a statement in support of the Specialty Motion. (ECF Doc. # 505.)

### B. The Terms and Language of the Policies

Copies of the D&O Policies and E&O Policies have been filed. (ECF Doc. ## 428, 519.) The policies at issue are all "wasting policies," *i.e.,* every dollar spent of policy proceeds is one

less dollar available to cover claims, that potentially provide direct coverage for the Debtors <u>and</u> the Individual Insureds. The D&O Policies and the E&O Policies provide different coverage, but both sets of policies expressly provide insurance for the Individual Insureds and provide for advancement or reimbursement of defense costs for the Individual Insureds. During the April 2, 2012 hearing, the Court was advised that lawyers have so far submitted claims for reimbursement or advancement of legal fees and expenses totaling approximately $8.3 million. As explained below, the terms and language of the policies and applicable state law control the scope of coverage.

### a. The Assurance Stipulation and MFGA Policies

Through the Assurance Stipulation, the Chapter 11 Trustee and MFG Assurance seek Court authority to permit MFG Assurance to make payments for defense costs of the Individual Insureds who are covered by the MFGA Policies.

MFG Assurance is a wholly-owned subsidiary of MFGH and was incorporated in Bermuda on April 18, 2009. MFG Assurance is registered as a Class 1 insurer under the Insurance Act of 1978 (Bermuda) and is licensed to insure or reinsure only the general business risks of MFGH and its affiliates. MFG Assurance provides professional liability insurance (also known as "errors and omissions" insurance) to MFGH, its majority-owned subsidiaries, and employees.[2] The insurance is provided under various policies (the "MFGA Policies").

The MFGA Policies cover separate and distinct time periods (each, a "Policy Period"): the year from May 31, 2009 to May 30, 2010; the year from May 31, 2010 to May 30, 2011 (the "2010-2011 Policy Period"); and the year from May 31, 2011 to May 30, 2012 (the "2011-2012 Policy Period"). Coverage terms under the policies are consistent for each of the Policy Periods

---

[2]    According to MFG Assurance, the MFGA Policies cover at least 2,800 persons or entities. (MFGA Memo ¶ 5.)

with the exception of the coverage amounts.  The MFGA Policies are "claims made" policies—coverage is triggered and limitations measured by whether a claim is made against an insured during the Policy Period.

For the 2010-2011 Policy Period,[3] MFG Assurance provided seven policies to the Debtors.  In total, those policies provide $70 million of coverage for the policy year.  MFG Assurance has reinsured all but the primary layer with various reinsurers.  The primary layer covers any loss up to the first $7.475 million on a single claim, after a deductible of $25,000 per claim.  There are six excess policies that substantially mirror the terms of the primary policy and provide excess coverage up to $70 million, on a total aggregate basis for all claims and all loss under all insurance coverage combined.  MFGH paid $8,237,722 to MFG Assurance for the primary layer of insurance (paid in installments) and $2,841,984 for the excess layers.

For the 2011-2012 Policy Period, MFG Assurance entered into eleven policies with MFGH.  Under those Policies, MFG Assurance bears the risk on the first $7.475 million, with a $25,000 per claim deductible to be paid by the insured.  MFG Assurance also issued several layers of excess insurance up to $120 million in the aggregate, and fully reinsured each of the excess layers through various third-party reinsurers.[4]  According to the Chapter 11 Trustee, MFG Assurance fully prepaid the premiums due to the reinsurers.  MFGH paid a total of $8,479,959 in

---

[3]     All disputes pertaining to the 2010-2011 Policy Period have been resolved pursuant to the *Consent Order Authorizing the Payment and Reimbursement of Defense Costs by MFG Assurance Company Limited, and Granting Related Relief.*  (ECF Doc. # 535.)

[4]     Although MFG Assurance is a "captive," wholly-owned insurer, because it has reinsured most of the risk, the reinsurers—all of whom are independent of MFGH—have the usual legal and financial incentives to monitor and minimize payouts under the Policies.

installments to MFG Assurance for the primary layer of insurance and $3,866,843 in installments for the excess layers.  MFGH made its last payment on September 23, 2011.[5]

The MFGA Policies[6] state that MFG Assurance will "pay on behalf of the insured for all loss arising out of a wrongful act which gives rise to a claim first made against an insured by a third-party during the policy period (or discovery period, if applicable) and reported in writing to the insurer . . . ."  (MFGA Policy ¶ 1.)  The MFGA Policies define "insured" as MFGH, its subsidiaries, and "individual insured(s)," which include any past, present or future employee, officer or director of MFGH or its subsidiaries.  (*Id.* ¶ 2.15.)  The term "loss" as used in the MFGA Policies includes: (1) defense costs and/or (2) damages, aggravated damages as permitted by law, judgments, restitution orders or a compensatory nature, claimant's costs, co-defendant's costs, legal costs and expenses awarded against any insured; and/or (3) settlements negotiated with the insurer's consent.  (*Id.* ¶ 2.19.)  The MFGA Policies cover two types of claims: (1) the Individual Insureds can submit claims for their defense costs and for judgments related to claims against them for their acts, errors, or omissions[7]; and (2) the Debtors can submit claims for any loss arising from payments the Debtors must make to claimants for claims that grow out of the Individuals Insureds' acts, errors, or omissions.  Additionally, as is clear from their terms, the Debtors and the Individual Insureds share in the proceeds of the MFGA Policies.

---

[5]     The SIPA Trustee further confirmed that none of the premium payments for the MFGA Policies occurred in October 2011, let alone after October 26, 2011, the date on which the SIPA Trustee "preliminarily determined that MFGI had a shortfall in commodities customer segregated funds . . . ."  (SIPA Statement ¶ 6.)  Therefore, according to the SIPA Trustee, segregated customer funds were not used to pay the Policies' premiums.

[6]     The MFGA Policies for the periods May 31, 2009 to May 31, 2010, May 31, 2010 to May 31, 2011 and May 31, 2011 to May 31, 2012 are attached to the Heyliger Declaration.  All references to the MFGA Policies are taken from the policy covering the 2011-2012 Policy Period, attached to the Heyliger Declaration as Exhibit B-3.

[7]     The term "act, error or omission" includes a breach of duty, neglect, error, misrepresentation, or breach of any statute enacted anywhere in the world.  (MFGA Policy ¶ 2.32.)

Certain Individual Insureds have filed claims to recover defense costs under the MFGA

Policies.  Additionally, during the April 2, 2012 hearing, the SIPA Trustee's counsel advised the

Court that the SIPA Trustee has submitted a claim to MFG Assurance on behalf of MFGI.

### b.  The Specialty Motion and Specialty Policies

Through the Specialty Motion, U.S. Specialty sought an order finding that U.S.

Specialty's policy is not property of the Debtors' bankruptcy estates, although it now concedes

that the policy is property of the estates.  Alternatively, U.S. Specialty seeks an order terminating

the automatic stay, to the extent applicable, permitting U.S. Specialty to reimburse the defense

costs incurred by certain Individual Insureds in connection with the Underlying Cases and

pending investigations, as well as additional matters that may arise in the future.

Prior to the Petition Date, U.S. Specialty issued Directors, Officers, and Corporate

Liability Insurance Policy No. 14-MGU-11-A23947 (the "Specialty D&O Policy") and Fiduciary

Liability Insurance Policy No. 14-MGU-11-A23948 (the "Specialty Fiduciary Policy" and

together with the D&O Policy, the "Specialty Policies" and, together with the MFGA Policies,

the "Policies")[8] to the Debtors for the period May 31, 2011 to May 31, 2012.[9]

The Specialty D&O Policy contains three insuring agreements.  First, Insuring

Agreement A provides coverage for losses incurred by the Individual Insureds if such covered

losses are not indemnified by the Debtors.  Second, Insuring Agreement B(1) provides coverage

to the Debtors to the extent they indemnify the Individual Insureds for covered losses in

connection with any claims against them.  Third, Insuring Agreement B(2) provides coverage to

---

[8]      In addition to the terms of the Policies more fully described herein, each of the Policies contains a provision
stating that the policy shall only apply as excess over other valid and collectible insurance (the "other insurance"
provisions).  The Court need not determine the applicability of these provisions in the context of this Opinion.

[9]      The Specialty Policies are attached to the Specialty Motion as Exhibits A and B.

the Debtors for losses resulting from securities claims made against them. The Specialty D&O

Policy specifically covers the Individual Insureds' defense costs, defined as "reasonable fees,

costs and expenses consented to by the Insurer (including premiums for any appeal bond,

attachment bond, or similar bond) resulting from the investigation, adjustment, defense or appeal

of a claim against an Insured Person . . . ."  (Specialty D&O Policy Definitions § (D).)

The Specialty D&O Policy also contains a "Priority of Payment" provision, providing

that the coverage potentially afforded to the Individual Insureds under Insuring Agreement A

must be paid prior to the payment of any loss on behalf of the Debtors under Insuring

Agreements B(1) or (B)(2) for amounts they might pay as indemnification to the Individual

Insureds or for claims made against the Debtors, themselves.  Specifically, the Specialty D&O

Policy provides:

> If the Insurer is obligated to pay Loss, including Defense Costs,
> under more than one INSURING AGREEMENT, whether in
> connection with a single Claim or multiple Claims, the Insurer will
> first pay any Loss payable under INSURING AGREEMENT (A)
> and, if the Insurer concludes that the amount of all Loss, including
> Defense Costs, is likely to exceed the Insurer's Limit of Liability,
> the Insurer shall be entitled to withhold some or all of any Loss
> payable under INSURING AGREEMENT (B)(l) or (B)(2) to
> ensure that as much of the Limit of Liability as possible is
> available for the payment of Loss under INSURING
> AGREEMENT (A). If no Loss is payable under INSURING
> AGREEMENT (A), or if the Insurer's obligations under
> INSURING AGREEMENT (A) have been satisfied, then, subject
> to the Insurer's Limit of Liability as set forth in Item 3 of the
> Declarations, the Insurer will pay such Loss as it is required to pay
> under INSURING AGREEMENT (B)(l) or (B)(2) in such manner
> and, in the event of multiple Claims, apportioned among such
> Claims as the Named Corporation shall direct in writing.

(Specialty D&O Policy Conditions § (D)(4).)

The Specialty Fiduciary Policy provides coverage in connection with claims against the

Individual Insureds and the Debtors relating to employee benefit plans.  According to Insuring

Agreement A in the Specialty Fiduciary Policy, U.S. Specialty will pay on behalf of the
Individual Insureds or the Debtors losses in the form of damages and defense costs arising from
claims first made against them for wrongful acts with respect to certain employee benefit plans
committed by the Individual Insureds or the Debtors or by any person for whose wrongful acts
the insured parties are legally responsible. (Specialty Fiduciary Policy Insuring Agreement (A).)
Defense costs are specifically included in the losses covered by the Specialty Fiduciary Policy
and are defined as "reasonable fees, costs and expenses, including attorneys' fees, experts' fees
and premiums for an appeal bond, attachment bond or similar bond, incurred by the Insureds in
the investigation, adjustment, defense or appeal of a Claim against an Insured." (Specialty
Fiduciary Policy Conditions § (D)(1).) The Priority of Payment provision in the Specialty
Fiduciary Policy states that with respect to any loss payable under the policy in connection with
any claim, U.S. Specialty will, subject to the limit of liability, first pay such loss to which any
Individual Insured may be entitled under the policy, and second, pay such loss to which any
employee benefit plan may be entitled under the policy, and third, pay such loss to which the
Debtors may be entitled under the policy. (Specialty Fiduciary Policy Conditions § (D)(4).)

Certain Individual Insureds have filed claims to recover defense costs under the Specialty
Policies.

### C. The Objections

The objectors represent two groups of claimants: (1) the Lead Plaintiffs in the securities
class action pending in the United States District Court for the Southern District of New York,
styled *In re MF Global Holdings Ltd. Securities Litigation,* currently proceeding under the lead

caption *Joseph DeAngelis v. John S. Corzine*, No. 11 Civ. 7866-VM and (2) certain commodity

customers of MFGH's subsidiary broker-dealer, MFGI (the "Customer Objectors").[10]

The Customer Objectors argue that the proceeds of the Policies are property of the

Debtors' estates and should not be used to pay the Individual Insureds' defense costs because

such use would diminish the availability of funds to pay claims against the Debtors.

Additionally, the Customer Objectors argue that cause does not exist to the lift the automatic stay

and allow MFG Assurance and U.S. Specialty to pay defense costs of the Individual Insureds.

Certain Customer Objectors also argue that the proceeds of the Policies should promptly be used

to satisfy MFGI's customers' claims. The Customer Objectors further argue that the payment of

defense costs on behalf of the Individual Insureds is premature while the issue of the ownership

of the Policies and whether they can be used to satisfy customer claims over all other creditors

remains unresolved.

The Lead Plaintiffs do not specifically object to the Specialty Motion and only seek to

reserve their rights to the extent that the relief sought through the Specialty Motion is modified in

any way. In fact, the Lead Plaintiffs agree that the Specialty Motion should be granted; they also

argue that the proceeds of the Policies are not property of the Debtors' estates.[11] With respect to

the Assurance Stipulation, the Lead Plaintiffs again explain that they do not object to the relief

sought therein but request that the Court decline to determine the reach of the MFGA Policies'

coverage. The Lead Plaintiffs further argue that it may be premature for the Court to determine

---

[10] The Customer Objectors include: (1) Sapere; (2) Henning-Carey Proprietary Trading, LLC, Charles Carey, Joseph Niciforo, Robert Tierney, Brian Fisher, Shane McMahon, Michael Mette, and Timothy Zaug (the "Certain Interested Parties"); (3) Paradigm Global Fund I Ltd., Paradigm Equities Ltd., Paradigm Asia Ltd., Augustus International Master Fund, L.P., William Schur, Futures Capital Management, LLC, and Ali A. Rangchi Bozorki (the "Representative Customer Group"); and (4) the Sangani Family LP ("Sangani").

[11] The Lead Plaintiffs no doubt hope that the D&O Policies will be used to provide a recovery to the securities class action plaintiffs by settlement or judgment, without any limitations arising from the bankruptcy case.

whether the proceeds of the Policies are property of the Debtors' estates, and such issue need not

be determined for the purpose of otherwise approving the Assurance Stipulation.

In response to these objections, the SIPA Trustee filed the SIPA Statement, addressing

certain points raised by the objectors. The SIPA Trustee stated that none of the premium

payments for the Policies occurred in October 2011, let alone after October 26, 2011, the date on

which the SIPA Trustee "preliminarily determined that MFGI had a shortfall in commodities

customer segregated funds . . . ." (SIPA Statement ¶ 6.) Therefore, according to the SIPA

Trustee, segregated customer funds were not used to pay the Policies' premiums. The SIPA

Trustee advocated monitoring the payment of proceeds of the Policies for defense costs of the

Indiviual Insureds because the SIPA Trustee may look to the proceeds of the Policies in any

claims he assert against the insurers.[12] The SIPA Trustee argues that some of the proceeds of the

Policies may be property of MFGI's estate "once the debtor has demonstrated an interest in those

proceeds." (*Id.* ¶ 13.) The SIPA Trustee requests that the Court reserve judgment on whether

MFGI's estate has an interest in the proceeds of the Policies.

### DISCUSSION

The underlying issue in this case is whether MFG Assurance and U.S. Specialty may

currently reimburse or advance defense costs for the Individual Insureds. If policy proceeds are

not property of Debtors' estates, MFG Assurance and U.S. Specialty could reimburse or advance

the Individual Insureds' defense costs without violating the automatic stay; if the policy proceeds

are property of the Debtors' estates, then the Court must decide whether to lift the automatic stay

to permit MFG Assurance and U.S. Specialty to pay Individual Insureds' defense costs pursuant

to the Policies' terms. Because the Court concludes that reasonable defense costs should be paid

---

[12]     During the April 2 hearing, counsel to the SIPA Trustee advised that he has submitted a claim on the E&O
Policies. The E&O insurers' counsel acknowledged receipt of the claim with a complete reservation of rights.

14

on behalf of the Individual Insureds whether or not the policy proceeds are property of the estates, the Court need not resolve at this time the issue whether policy proceeds are property of the estates. The Court finds that cause exists to lift the automatic stay; subject to the entry of appropriate orders, MFG Assurance and U.S. Specialty may reimburse or advance the Individual Insureds' reasonable defense costs without violating the automatic stay.

### A. The Objectors' Standing

As an initial matter, the Chapter 11 Trustee argues that the Customer Objectors lack standing. Nearly all of the parties that have filed objections to the Assurance Stipulation and Specialty Motion are former commodity customers of MFGI. The Chapter 11 Trustee argues that those Customer Objectors, and all similarly situated customers of MFGI, are not creditors of MFGH and thus do not have standing to object to motions brought in the chapter 11 cases of MFGH. (Chapter 11 Trustee Memo. ¶¶ 39-47.)[13] For the reasons discussed below, the Court finds that commodity customers of MFGI have standing to raise the issues presented in the Assurance Stipulation and Specialty Motion.

The Supreme Court has identified three aspects of Article III standing: (1) an "injury in fact," which is an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

---

[13] At the hearing on April 2, 2012, counsel to the Chapter 11 Trustee agreed that the Customer Objectors likely have standing as tort claimants but reserved the right to challenge the standing of any customers that file motions or objections in the future.

Section 1109 of the Bankruptcy Code broadly establishes an interested party's right to be heard in a case. Section 1109(b) provides:

> A *party in interest*, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

11 U.S.C. § 1109(b) (emphasis added).

A "party in interest" is broadly defined by the statute, but an entity that does not hold a financial stake in the case is generally excluded from the definition of "party in interest." 7 COLLIER ON BANKRUPTCY ¶ 1109.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011). However, even when a statute is broadly construed, it still has its limits. *See Krys v. Official Comm. of Unsecured Creditors (In re Refco Inc.)*, 505 F.3d 109, 118 (2d Cir. 2007). "The term 'party in interest' [in § 1109(b)] is broadly interpreted, but not infinitely expansive." *S. Blvd., Inc. v. Martin Paint Stores (In re Martin Paint Stores)*, 207 B.R. 57, 61 (S.D.N.Y. 1997). Moreover, the general principles of standing limit the scope of section 1109(b). 7 COLLIER ON BANKRUPTCY ¶ 1109.04[4]. Generally, a party in interest in a case may be precluded from participating in a particular matter for lack of standing if the party has no cognizable interest (whether directly or indirectly) in the outcome of the proceeding. *Id.*

The Chapter 11 Trustee argues that commodity customers of MFGI are not considered creditors or parties in interest in MFGH's chapter 11 cases because they have not filed proofs of claim against MFGH's estates. However, a creditor or party in interest need not file a proof of claim to obtain standing in a bankruptcy case. Specifically, Rule 3002(a) states "an unsecured creditor or an equity security holder must file a proof of claim or interest for the claim or interest to be allowed." FED. R. BANKR. P. 3002(a). A number of courts have recognized that filing a proof of claim is only required for a creditor to have voting and distribution rights. *See Official*

16

*Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 34 (S.D.N.Y. 2002);

*In re Dennis*, 230 B.R. 244, 247 (Bankr. D.N.J. 1999) ("The Code clearly requires a proof of

claim to be filed for a claim to be allowed . . . ."); *Gaudio v. Stamford Color Photo, Inc. (In re

Stamford Color Photo, Inc.)*, 105 B.R. 204, 206 (Bankr. D. Conn. 1998) (noting failure to file

proof of claim does not extinguish viability of creditor's claim or "creditor" status but merely

eliminates creditor's right to distribution); *In re Elmont Elec. Co.*, 206 B.R. 41, 43 (Bankr.

E.D.N.Y. 1997) ("Rule 3002(a) . . . requires unsecured creditors and equity security holders to

file proofs of claims in order for their claims or interests to be allowed [under § 502(a)] . . . .").

Courts have explicitly stated that a creditor need not file a proof of claim to take advantage of

other rights, such as moving to dismiss a bankruptcy petition, *In re Wells*, 227 B.R. 553, 559 n.2

(Bankr. M.D. Fla. 1998), and seeking determination as to the secured status of a third

lienholder's claim. *Brager v. Blum (In re Brager)*, 28 B.R. 966, 967 (E.D. Pa. 1983) ("The filing

of a proof of claim is permissive only, and is not required.").

For instance, in *Heyman*, 277 B.R. at 33-34, the court discussed the effect of failing to

file a claim. There, a committee brought a mass tort action and the defendant argued that the

lack of an "actual creditor" in the class barred the action. The defendant argued that as none of

the complainants had filed a proof of claim, the committee had no actual standing. The district

court held that the fact that none of the tort claimants had filed a proof of claim only precluded

them from receiving a distribution, not from actual standing as tort claimants. *Id.*

It is a well-settled premise of bankruptcy law that tort-claimants have standing as

creditors in a bankruptcy case. *See id.* at 20. Here, the Customer Objectors hold potential tort

claims against MFGH. As discussed above, these customers are not required to file a proof of

claim in order to be considered "creditors" or "parties in interest" in MFGH's chapter 11 cases.[14]

Additionally, in the context of the Specialty Motion and the Assurance Stipulation, the Customer

Objectors can point to a specific injury-in-fact that is likely to occur if the Court grants the

motions. Because the Policies are wasting policies, payment of defense costs will decrease funds

available to be paid to creditors of MFGH, including tort claimants, to the extent MFGH has an

interest in the proceeds of the Policies. Therefore, for purposes of the Assurance Stipulation and

Specialty Motion, the Customer Objectors have standing to object.

Although bankruptcy courts have liberally applied the term "party in interest" to include

most parties with a direct or indirect interest in the outcome of a case, a "party in interest" does

not necessarily have standing in all issues:

> [I]t is important that a bankruptcy court is not too facile in granting
> applications for standing. Overly lenient standards may potentially
> over-burden the reorganization process by allowing numerous
> parties to interject themselves into the case on every issue, thereby
> thwarting the goal of a speedy and efficient reorganization. . . .
> Granting peripheral parties status as parties in interest thwarts the
> traditional purpose of bankruptcy laws which is to provide
> reasonably expeditious rehabilitation of financially distressed
> debtors with a consequent distribution to creditors who have acted
> diligently.

*In re Ionosphere Clubs*, 101 B.R. 844, 850 (Bankr. S.D.N.Y. 1989). To date, some of the

motions and objections that have been brought by MFGI's customers in MFGH's chapter 11

cases lack any basis in the law and have only saddled MFGH's estates with the burden of paying

increased and unwarranted attorneys' fees, costs, and expenses. Additionally, the Court's ruling

that the Customer Objectors have standing is based on the possibility that such customers'

interests could be harmed by the Assurance Stipulation and the Specialty Motion. But the

Court's finding is limited to the particular motions addressed in this Opinion. The Court has not

---

[14]     At least one commodity customer has now filed a tort claim in MFGH's chapter 11 cases.

found that commodities customers of MFGI have standing on every issue presented in MFGH's

chapter 11 cases.

### B. The Proceeds of the Policies May Be Property of the Debtors' Estates

As explained above, the Court need not determine now whether the proceeds of the

Policies are property of the Debtors' estates. However, for purposes of this Opinion, it is

appropriate to explain the complexity surrounding the issue.

First, it is well-settled that a debtor's liability insurance is considered property of the

estate. "However, the courts are in disagreement over whether the proceeds of a liability

insurance policy are property of the estate." *In re Downey Fin. Corp.*, 428 B.R. 595, 603 (Bankr.

D. Del. 2010) (quoting *In re Allied Digital Techs. Corp.*, 306 B.R. 505, 509 (Bankr. D. Del.

2004)). Courts that have addressed whether the proceeds of a liability insurance policy are

property of the estate are guided by the language and scope of the specific policies at issue. *See*

*In re Downey Fin. Corp.*, 428 B.R. at 603; *In re Medex Reg'l Labs., LLC*, 314 B.R. 716, 720

(Bankr. E.D. Tenn. 2004) ("In making its determination, the court must analyze the facts of each

particular case, focusing primarily upon the terms of the actual policy itself.") (internal quotation

marks omitted); *In re CyberMedica, Inc.*, 280 B.R. 12, 16 (Bankr. D. Mass. 2002) ("Whether the

proceeds of a D&O liability insurance policy is (*sic*) property of the estate must be analyzed in

light of the facts of each case.").

When an insurance policy only provides direct coverage to a debtor, courts generally rule

that the proceeds are property of the estate. *See In re Allied Digital Techs. Corp.*, 306 B.R. at

512. However, when an insurance policy provides exclusive coverage to directors and officers,

courts have generally held that the proceeds are not property of the estate. *Id.* at 510; *see also*

*La. World Exposition, Inc. v. Fed. Ins. Co., (In re La. World Exposition, Inc.)*, 832 F.2d 1391,

19

1399 (5th Cir. 1987) (holding that the debtor has no ownership interest in proceeds of an

insurance policy where the obligation of the insurance company is only to the directors and

officers); *In re Daisy Sys. Sec. Litig.*, 132 B.R. 752, 755 (N.D. Cal. 1991) (finding that when a

D&O insurance policy only provides direct coverage to the directors and officers the proceeds

are not property of the estate).

Here, the issue is more complicated because the Policies potentially provide coverage to

both the Individual Insureds and the Debtors.[15]  In cases where liability insurance policies

provide direct coverage to both directors and officers and debtors, courts have held that "the

proceeds will be property of the estate if depletion of the proceeds would have an adverse effect

on the estate to the extent the policy actually protects the estate's other assets from diminution."

*In re Downey Fin. Corp.*, 428 B.R. at 603 (citing *In re Allied Digital Techs. Corp.*, 306 B.R. at

512).

So far in these cases, the SIPA Trustee has recently submitted a claim on the E&O

Policies, but no determination of coverage has been made.  The Chapter 11 Trustee has not yet

filed a claim, but he may do so.  Because the Court concludes that the automatic stay should be

lifted in any event, it is unnecessary to resolve the issue of ownership of policy proceeds at this

time.

### C. "Cause" Exists To Warrant Lifting the Automatic Stay

As explained, the Court need not determine whether the proceeds of the Policies are

property of the Debtors' estates in order to allow the insurance providers to advance or reimburse

---

[15]        Today, in *Pfizer v. Angelos (In re Quiqley Co., Inc.)*, Nos. 11-2635, 11-2767 (2d Cir. Apr. 10, 2012), the
Second Circuit found that insurance policies that provide coverage to a debtor and a non-debtor are joint property of
the non-debtor and debtor's estate.  The court specifically found that the debtor's estate was directly affected by
lawsuits against the non-debtor because the policies could be utilized by the debtor or the non-debtor to satisfy
settlements, judgments, or defense costs.  However, notwithstanding this finding, the court found that the litigation
against the non-debtor could proceed.

the Individual Insureds' defense costs. Assuming that the Debtors do have an interest in the proceeds of the Policies, MFG Assurance and U.S. Specialty have adequately shown that cause exists to the lift the automatic stay to permit advancement or reimbursement of the Individual Insureds' defense costs pursuant to the Policies.

Under section 362(d)(1) of the Bankruptcy Code, on request of a party in interest and after notice and a hearing, the court shall grant relief from the automatic stay "such as by terminating, annulling, modifying, or conditioning" the stay "for cause, including the lack of adequate protection of an interest in property." 11 U.S.C. § 362(d)(1). Although section 362(d)(1) explicitly identifies a lack of adequate protection as cause for stay relief, "there are other bases for a cause finding." 3 COLLIER ON BANKRUPTCY ¶ 362.07[3]. In determining cause to lift the stay, courts consider the following factors:

> (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interest of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's succession to other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

*Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990); *see also In re N.Y. Med. Grp., PC*, 265 B.R. 408 (Bankr. S.D.N.Y. 2001). Not all of the factors are relevant in every case, and "cause" is a broad and flexible concept that must be determined on a case-by-case basis. *See In re M.J. & K Co., Inc.*, 161 B.R. 586 (Bankr.

21

S.D.N.Y. 1993). As discussed below, the Court finds that "cause" exists for granting relief from the automatic stay to the extent it is applicable.

Courts in this Circuit and other jurisdictions have permitted the advancement of defense costs to a debtor's directors or officers even though the insurance policies provided direct coverage to the debtor. *See, e.g.*, *Adelphia Commc'ns Corp. v. Assoc. Ins. Serv., Ltd. (In re Adelphia Commc'ns Corp.)*, 285 B.R. 580, 598 (Bankr. S.D.N.Y. 2002) (granting relief from stay in order to permit primary insurer to advance defense costs) *vacated on other grounds*, 298 B.R. 49 (S.D.N.Y. 2003); *see also In re Downey Fin. Corp.*, 428 B.R. 595 (granting relief from stay for cause in order to permit use of D&O policy proceeds for payment of defense costs); *In re Enron Corp.*, No. 01-16034, 2002 WL 1008240 (Bankr. S.D.N.Y. May 17, 2002) (granting relief from stay, to the extent applicable, for payment of defense costs); *In re CyberMedica, Inc.*, 280 B.R. at 18-19 (granting relief from stay for cause because directors and officers would suffer irreparable harm if prevented from exercising their rights to defense payments under D&O policy). The District Court for the Southern District of New York has also held that where insurance proceeds are available to both a debtor and individual insureds, "the individual insureds have a right to use the policies' proceeds to cover their defense and settlement costs in litigation." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 463 (S.D.N.Y. 2004).

### 1. The Specialty Policies

The Specialty Policies provide coverage to the Debtors and the Individual Insureds for liability arising out of securities claims and fiduciary liability claims. (Specialty Mot. ¶¶ 7-10, 16.) The Specialty Policies also state that subject to certain conditions, the insurer shall advance defense costs incurred by any of the insured parties in respect of any claim prior to the final resolution of the claim. (Specialty Mot. ¶¶ 11-14, 17.) To date, U.S. Specialty has only received

requests for coverage on behalf of Individual Insureds for non-indemnifiable losses.  At the

hearing on April 2, 2012, the Debtors informed the Court that they will not be indemnifying any

of the Individual Insureds and will thus not seek coverage from the Specialty Policies for

indemnification.  Moreover, because of the automatic stay, the Debtors have not been named as

defendants in any of the Underlying Cases.  Furthermore, because the stock of MFGH was

publicly traded, it is unlikely that its broker-dealer subsidiary, MFGI, will be named a defendant

in a securities class action.  Additionally, even assuming that any securities holders file proofs of

claim in the bankruptcy proceedings, such claims would be subordinated to those of other

secured and unsecured creditors pursuant to section 510(b) of the Bankruptcy Code.  *See*

*Adelphia*, 285 B.R. at 592 n.13 (stating that entity coverage for securities claims is "rarely

meaningful in bankruptcy cases" because of section 510(b)).

   As detailed above, however, the Specialty Policies provide coverage to the Individual

Insureds who have a present need for payment of their defense costs.  At this time, the Individual

Insureds' need far outweighs the Debtors' hypothetical or speculative need for coverage.  As the

court noted in *Ochs v. Lipson (In re First Central Financial Corp.)*, 238 B.R. 9, 16 (Bankr.

E.D.N.Y. 1999), "D&O policies are obtained for the protection of individual directors and

officers . . . .  In essence and at its core, a D&O policy remains a safeguard of officer and director

interests and not a vehicle for corporate protection."  Lifting the automatic stay to permit U.S.

Specialty to advance defense costs on behalf of the Individual Insureds would not severely

prejudice the Debtors' estates.  But failure to do so would significantly injure the Individual

Insureds, whose defense costs are covered by the Specialty Policies.

   Additionally, the Specialty Policies provide the Individual Insureds with priority to any

interest that may be asserted by the Debtors.  (Specialty Fiduciary Policy Conditions § (D)(4).)

The Priority of Payment provisions in the Specialty Policies clarify that the coverage potentially

afforded to the Individual Insureds for non-indemnifiable losses must be paid prior to any

payments made for matters implicating coverage potentially provided to the Debtors for amounts

they might pay as indemnification to the Individual Insureds for covered claims made against

them.  (*Id.*)  Sapere, in its objection to the Specialty Motion, asserts that the Priority of Payment

provisions run afoul of the Bankruptcy Code.  But Sapere fails to cite any persuasive law on this

subject.  In fact, courts have given effect to priority of payment provisions in authorizing access

to policies to advance defense costs to individual insureds.  *See In re Enron*, No. 01-16034, Tr. at

13-14 (Bankr. S.D.N.Y. Apr. 11, 2002) (Gonzalez, J.) ("[T]he parties are bound by the

contractual provisions of the policy.  The Debtors' interest in the policy is limited by its

contractual provisions including a priority advancement and payment obligations contained in

those policies.  The Court cannot rewrite the provisions of the contract."); *see also In re*

*LocatePlus Holdings Corp.*, No. 11-15791, 2011 WL 5240279, at *7-9 (Bankr. D. Mass. Oct. 31,

2011).  Further, as explained by the court in *In re Downey Financial Corp.*, in construing a

substantially similar priority of payment provision:

> Section 541(a) is not intended to expand the debtor's rights against
> others beyond what rights existed at the commencement of the
> case. Courts generally closely examine the debtor's rights under
> the terms of the liability insurance policy at issue in order to
> determine whether holding that the policy proceeds are property of
> the estate would improperly expand the debtor's rights against
> others beyond what rights existed at the commencement of the
> case. In this case, the Policy provides a clear chain of priority
> among the three types of coverages.

428 B.R. at 607 (footnotes and internal quotation marks omitted).  In this case, the Priority of

Payment provisions cannot be excised because doing so would rewrite the Specialty Policies and

expand the Debtors' rights under them.  The Individual Insureds' rights are clearly delineated in

24

the Specialty Policies, and the Court cannot modify those rights pursuant to the Bankruptcy Code and New York Insurance Law, as explained below.

### 2. The MFGA Policies

The MFGA Policies provide coverage for E&O liability and state that MFG Assurance will "pay on behalf of the insured for all loss arising out of a wrongful act which gives rise to a claim first made against an insured by a third-party during the policy period (or discovery period, if applicable) and reported in writing to the insurer." The MFGA Policies provide equal status to the Individual Insureds and the Debtors. However, in essence and at their core, the MFGA Policies "were obtained for the protection of" the Individual Insureds and are "not a vehicle for corporate protection." *In re First Cent. Fin. Corp.*, 238 B.R. at 16.

Disruption of the MFGA Policies would pose immediate hardships for the Individual Insureds with open claims for defense costs. The Individual Insureds have a present necessity for the benefit of their contractual rights notwithstanding the Debtors' bankruptcy and liquidation cases. Although MFGI's commodity customers have unquestionably suffered severe financial harm, accusations of misconduct provide no basis for denying the Individual Insureds insurance protection under the MFGA Policies. *See, e.g.*, *Adelphia*, 285 B.R. 580 (dealing with individual insureds facing criminal prosecution); *see also In re Allied Digital Techs. Corp.*, 306 B.R. 505 (allowing directors and officers named as defendants in a cause of action brought by the trustee to obtain payment of their defense costs). To find otherwise would be to deny the very purpose of E&O insurance.

Specifically, if the Individual Insureds are not provided access to the MFGA Policies, the Individual Insureds would be deprived of the benefits of payment of defense costs that the insurance was intended to provide. Some Individual Insureds may also be deprived of fair and

efficient settlement opportunities and suffer increased out-of-pocket costs.[16]  Furthermore,

without adequate defense counsel, the cost of settling any of the cases against the Individual

Insureds will needlessly increase.  Moreover, in connection with the MFGA Policies, the estates

will actually benefit from a vigorous defense by the Individual Insureds and may suffer if those

Individual Insureds cannot defend themselves because the outcome of the Underlying Cases may

affect the estates' ability to defend any related claims against them should they ever be made.

Thus, the Court finds that that balance of harms weighs in favor of permitting MFG Assurance to

advance defense costs on behalf of the Individual Insureds pursuant to the MFGA Policies.

### D.  New York Insurance Law Requires that Defense Costs Be Paid

The Court further finds that New York State Insurance Law requires that U.S. Specialty

and MFG Assurance abide by the terms of the Policies, notwithstanding any other provision of

the Bankruptcy Code.  Specifically, section 3420(a)(1) of the New York Insurance Law provides

that:

> The insolvency or bankruptcy of the person insured, or the
> insolvency of the insured's estate, shall not release the insurer from
> the payment of damages for injury sustained or loss occasioned
> during the life of and within the coverage of such policy or
> contract.

N.Y. INS. LAW § 3420(a) (McKinney 2009).  Although this provision was absent from the

Policies, section 3101(a) of the New York Insurance Law provides that such mandated

provisions are deemed to appear in non-conforming contracts.

Although the applicability of this provision in bankruptcy cases seems unclear, at least

one court in this Circuit has held that section 3420 does not permit the purposes of insurance to

---

[16]  MFG Assurance acknowledged at the April 2 hearing that it would return to this Court for approval before paying any settlement amounts.

be disregarded in bankruptcy.  *See Baez v. Med. Liab. Mut. Ins. Co.*, 136 B.R. 65 (S.D.N.Y. 1992) (finding that a patient who obtained a judgment against a bankrupt physician prepetition had a vested interest in the proceeds of the insurance policy).  The court's decision in *Baez* illustrates that in bankruptcy, insurance proceeds must be used to address losses that fall within the scope of an insurance policy.  The filing of a bankruptcy petition does not alter the scope or terms of a debtor's insurance policy and preserves such proceeds for those covered by the insurance policy.  New York State Insurance Law and the McCarren-Ferguson Act clearly provide that the scope and purpose of insurance policies should be specifically adhered to in bankruptcy cases, and the Court will not stray from this premise.[17]

### E.  Proceeds of the Policies Have Not Vested in MFGI Customers

Sapere argues that proceeds of the MFGA Policies "vested" on October 31, 2011, in MFGI's commodities customers, because segregated account funds in excess of the E&O policy limit of $120,000,000 were missing on and after October 31, 2011, when the SIPA liquidation case commenced.  Furthermore, according to Sapere, section 3420(a)(1) of the New York Insurance Law protected MFGI's customers' vested rights in the proceeds of the Policies when these cases commenced.

---

[17]     The McCarren-Ferguson Act, 11 U.S.C. §§ 1011-1015, creates an exemption to normal preemption rules for federal statutes not directly related to insurance.  Specifically, the McCarren-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."  *Id.* § 1012(b).  Thus, pursuant to the McCarren-Ferguson Act, federal law, including the Bankruptcy Code, will be reverse preempted by state insurance law if: (i) the federal statute does not specifically relate to insurance; (ii) the state law at issue was enacted to regulate the business of insurance; and (iii) the federal statute at issue would invalidate, impair, or supersede the state law.  *See In re Med. Care Mgmt. Co.*, 361 B.R. 863, 871 (Bankr. M.D. Tenn. 2003) (citing *United States Dep't of Treasury v. Fabe*, 508 U.S. 491 (1993)).  Upon review of the New York Insurance Law and the Bankruptcy Code, the Court finds that all three requirements of the McCarren-Ferguson Act are met, and thus, section 3420(a)(1) of the New York Insurance Law preempts the Bankruptcy Code to the extent of any inconsistency between the two laws.

However, Sapere's reliance on the term "vested rights" and section 3420 is misplaced.
Sapere has extracted the term "vested rights" from the Supreme Court's decision in *Merchants'*
*Mutual Automobile Liability Insurance Co. v. Smart*, 267 U.S. 126, 131 (1925) ("Title to the
indemnity passes out of the bankrupt or insolvent person and vests in him in whom the contract
and the state law declare it should vest.").  However, in *Merchants'*, the Court found that the
injured person's rights to insurance proceeds of the insured vested only when the insured's actual
liability was conclusively established.  *See id.*  Moreover, in the cases cited by Sapere, the
liability of the insured was already admitted or established by the time the insurance proceeds
were pursued by the injured party.  *See id.* at 128; *see also Am. Bank & Trust Co. v. Davis (In re
F.O. Baroff Co.)*, 555 F.2d 38, 40 (2d Cir. 1977); *Baez*, 136 B.R. at 66.  Indeed, courts applying
the Second Circuit's decision in *Baroff* have held that the "reliance on *Baroff* . . . when the
insured's liability is not established, cannot be sustained." *Freed v. U.S. Aviation Underwriters,
Inc.*, 82 B.R. 9, 12 (S.D.N.Y. 1987) (emphasis added); *see also Coleman v. New Amsterdam Cas.
Co.*, 247 N.Y. 271, 275 (N.Y. 1928) (Cardozo, C.J.) ("The effect of the statute is to give to the
injured claimant . . . the same relief that would be due to a solvent principal seeking indemnity
and reimbursement *after the judgment has been satisfied*.  The cause of action is no less but also
it is no greater." (emphasis added)).  Here, Sapere and the Customer Objectors have not
conclusively established that the Debtors or the Individual Insureds are liable for any
wrongdoing that would be covered by the Policies.  Therefore, Sapere and the Customer
Objectors do not have a vested right in any of the proceeds of the Policies.

Sapere's argument also fails because the Individual Insureds who are presently seeking
payment of defense costs have not filed bankruptcy petitions, nor have the Customer Objectors
shown them to be insolvent.  Thus, section 3420(a)(1) would not apply to them because it applies

only if the "person insured" is insolvent or bankrupt, and only to the extent of the insolvent

insured's interest in the proceeds. *See Baez*, 136 B.R. at 68 (stating that only the "insured

bankrupt . . . is divested of his interest in the proceeds of the policy"). The Debtors' bankruptcy

is of no consequence under section 3420(a)(1) as it relates to the Individual Insureds' defense

costs. And, as explained above, Sapere and the Customer Objectors do not have any rights to

those proceeds pursuant to section 3420(a)(1).

### F. Equitable Concerns

In addition to the findings explained above, equity favors permitting MFG Assurance and

U.S. Specialty to pay defense costs on behalf of the Individual Insureds. The Customer

Objectors, some of whom are also the plaintiffs in the Underlying Cases, can prosecute their

cases against the Individual Insureds without the constraints of the automatic stay. But the

Customer Objectors seek to use the protections of the Bankruptcy Code to enjoin the Individual

Insureds, who are not debtors and are not protected by the automatic stay, from seeking coverage

from valid, applicable insurance policies. The Court is guided by *In re Allied Digital

Technologies, Corp.*, where the Bankruptcy Court for the District of Delaware stated that:

> [T]he Trustee brought the action against the directors and officers.
> The policy in question provides direct coverage to the directors and
> officers for claims and defense costs (which are real), and
> indemnification coverage to the company for amounts paid to the
> directors and officers (which is hypothetical). . . . The Trustee's
> real concern is that payment of defense costs may affect his rights
> as a plaintiff seeking to recover from the D&O Policy rather than
> as a potential defendant seeking to be protected by the D&O
> Policy. In this way, Trustee is no different than any third party
> plaintiff suing defendants covered by a wasting policy. No one has
> suggested that such a plaintiff would be entitled to an order
> limiting the covered defendants' rights to reimbursement of their
> defense costs.
>
> The bottom line is that the Trustee seeks to protect the amount he
> may receive in his suit against the directors and officers while

> limiting coverage for the defense costs of the directors and
> officers. This is not what the directors and officers bargained for.
> In bringing the action against the directors and officers, the Trustee
> knew that the proceeds could be depleted by legal fees and he took
> that chance. The law does not support the Trustee's request to
> regulate defense costs.

306 B.R. at 512-13 (authorizing the payment of defense costs under a D&O Policy over the objection of a trustee who sought to preserve policy proceeds to satisfy his own claims against the insureds); *see also In re Beach First Nat'l Bancshares, Inc.*, 451 B.R. 406, 411 (Bankr. D.S.C. 2011) ("[The individual insureds] cannot now be prevented from using the Policy for its intended purpose simply because Debtor wishes to save the policy limit for any potential claims of his own"); *In re First Cent. Fin. Corp.*, 238 B.R. 9, 21 (Bankr. E.D.N.Y. 1999) (rejecting argument that trustee as a claimant against the directors and officers has a superseding right to recover insurance proceeds before all others).

Without underestimating the hardships that many of MFGI's commodity customers have faced, the Individual Insureds would suffer significant hardships if the Policies were disabled. As explained by Judge Gerber in *In re Adelphia*, 285 B.R. at 598, "bankruptcy courts should be wary of impairing the contractual rights of directors and officers even in cases where the policies provide entity coverage." The Court is therefore very reluctant to constrain the usual claim submission, determination and payment processes dictated by the Policies.

### G. Imposition of Reporting Requirements and a Soft Cap

The SIPA Trustee, Chapter 11 Trustee, MFG Assurance, and U.S. Specialty agreed, in principle, to establishing procedures to monitor expenditures subject to protection of the attorney-client privilege, with disclosure limited to the insurers, the SIPA Trustee, the Chapter 11 Trustee, and the MFGH Creditors Committee. The Court, therefore, directs counsel for those parties to confer and seek to agree on procedures for monitoring expenditures. If counsel cannot

resolve this issue, the SIPA Trustee and Chapter 11 Trustee should schedule a hearing on the matter.

Additionally, at the April 2 hearing, there was discussion regarding the imposition of a cap on proceeds available to pay defense costs of the Individual Insureds. In light of the total amount of insurance available, the Court finds that a "soft cap" of $30 million for defense costs of the Individual Insureds is appropriate at this time, subject to further adjustment either by agreement among the SIPA Trustee, Chapter 11 Trustee, MFG Assurance, and U.S. Specialty, or further order of this Court. [18]

---

[18] The "soft cap" is intended as the aggregate limit payable for defense costs from the D&O Policies and E&O Policies combined, subject to adjustment by agreement or further order of the Court. As already noted, the D&O Policies and E&O Policies contain "other insurance" provisions, addressing limitations on payment of policy proceeds when other insurance protects the same insureds for same insured risks. During the April 2 hearing, the Court was advised that many of the same insurers issued insurance policies in both insurance "towers," *i.e.,* the same insurers issued both D&O and E&O Policies. As is common in such circumstances, the insurers usually agree on an allocation of policy proceeds for payment of defense costs, subject to a reservation of rights and later determination of any final allocation. The Court was advised that the insurers had not yet reached such an agreement. Nothing in this Opinion addresses allocation issues.

## CONCLUSION

For the reasons explained above, the Court finds that cause exists to lift the automatic stay to permit MFG Assurance and U.S. Specialty to reimburse or advance the Individual Insureds' defense costs pursuant to the terms of the Policies. The SIPA Trustee, Chapter 11 Trustee, MFG Assurance, and U.S. Specialty should submit proposed orders to the Court consistent with this Opinion.[19]


Dated: April 10, 2012
      New York, New York

                                        **/s/Martin Glenn**
                                            MARTIN GLENN
                     United States Bankruptcy Judge

---

[19]     The motions to lift the automatic stay were filed in the MFGH chapter 11 cases. No separate motion was filed in the MFGI SIPA case. Counsel for the SIPA Trustee acknowledged at the April 2 hearing that the decision of the Court on the pending motions would also control the issue in the MFGI SIPA case. Counsel for the SIPA Trustee and the insurers should also submit proposed orders to the Court for entry in the MFGI SIPA case consistent with this Opinion.