# Exhibit 3

```
                                                            Page 1

 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    Case No. 11-15059-mg

 4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5    In the Matter of:

 6    MF GLOBAL HOLDINGS, LTD.,

 7                  Debtor.

 8    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 9    Adversary No.: 11-02790-mg

10    In the Matter of:

11    MF GLOBAL, INC.,

12                  Debtor.

13    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

14

15                  United States Bankruptcy Court

16                  One Bowling Green

17                  New York, New York

18

19                  June 28, 2013

20                  2:03 p.m.

21

22    B E F O R E :

23    HON MARTIN GLENN

24    U.S. BANKRUPTCY JUDGE

25
```

Page 2

1    Adversary proceeding: 11-02790-mg MF Global, Inc., (CC: Doc

2    no. 6520, CC: Doc no. 6577, 6574) Hearing RE: Objections to

3    Dual Notice of Presentment of Stipulation to Lift the

4    Automatic Stay to Permit Payments of Defense Costs Under

5    Certain Insurance Policies

6

7    11-15059-mg  (Doc no. 1466) Hearing RE: Objections to Dual

8    Notice of Presentment of Stipulation to Lift the Automatic

9    Stay to Permit Payments of Defense Costs Under Certain

10   Insurance Policies.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sherri L. Breach, CERT*D-397

Page 3

```
 1   A P P E A R A N C E S :

 2   ALLEN & OVERY, LLP

 3        Attorneys for MFG Assurance

 4        1221 Avenue of the Americas

 5        New York, New York 10020

 6

 7   BY:  STEPHEN DOODY, ESQ.

 8        JOSEPH B. BERKOW, ESQ.

 9

10   HUGHES HUBBARD & REED, LLP

11        Attorneys for the SIPA Trustee

12        One Battery Park Plaza

13        New York, New York 10004-1482

14

15   BY:  JAMES B. KOBAK, JR., ESQ.

16

17   JONES DAY

18        Attorneys for MFG Ad Hoc Group
                      st
19        222 East 41  Street

20        New York, New York 10017

21

22   BY:  JENNIFER J. O'NEIL, ESQ.

23

24

25
```

Page 4

```
 1   JONES DAY

 2        Attorneys for MFG Ad Hoc Group

 3        555 South Flower Street

 4        Fiftieth Floor

 5        Los Angeles, California 90071

 6

 7   BY:  BRUCE BENNETT, ESQ.

 8

 9   FORD, MARRIN, ESPOSITO, WITMEYER & GLESER, LLP

10        Attorneys for Sapere

11        Wall Street Plaza

12        New York, New York 10005

13

14   BY:  GREGORY J. LULLO, ESQ.

15        KENNETH D. WALSH, ESQ.

16

17   TROUTMAN SANDERS, LLP

18        Attorneys for US Specialty Insurance Company &

19        XL Specialty Insurance Company

20        Tysons Corner

21        1660 International Drive, Suite 600

22        McLean, Virginia 22102

23

24   BY:  LESLIE S. AHARI, ESQ.

25
```

Page 5

```
 1   TROUTMAN SANDERS, LLP
 2        Attorneys for US Specialty Insurance Company &
 3        XL Specialty Insurance Company
 4        401 9th Street, NW
 5        Suite 1000
 6        Washington, D.C. 20004
 7
 8   BY:  MEREDITH E. WERNER, ESQ.
 9
10   HERRICK FEINSTEIN, LLP
11        Attorneys for Sumit Advani & Matthew Besgen
12        2 Park Avenue
13        New York, New York 10016
14
15   BY:  THERESE M. DOHERTY, ESQ.
16
17   PERKINS COLE, LLP
18        Attorneys for Jon Corzine
19        30 Rockefeller Plaza, 22nd Floor
20        New York, New York 10112
21
22   BY:  SCHUYLER G. CARROLL, ESQ.
23
24
25
```

Page 6

1    BINDER & SCHWARTZ, LLP

2          Attorneys for Henri Steenkamp

3          28 West 44th Street, 6th Floor

4          New York, New York 10036

5

6    BY:  NEIL S. BINDER, ESQ.

7

8    NISEN & ELLIOTT, LLC

9          Attorneys for Henning & Carey, et al.

10         200 West Adams Street, Suite 2500

11         Chicago, Illinois 60606

12

13   BY:  MICHAEL MOIRANO, ESQ.

14

15   APPEARING TELEPHONICALLY:

16   ROBERT SCHWARTZ

17

18

19

20

21

22

23

24

25

```
1                     P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              We're here in MF Global Inc., Number 11-2790.

4              Mr. Kobak, or who is going to begin here?

5              MR. KOBAK:  Good afternoon, Your Honor.  James

6    Kobak, Hughes, Hubbard & Reed.  I think technically it's the

7    insurer's --

8              THE COURT:  Okay.

9              MR. KOBAK:  -- motion.

10             THE COURT:  All right.

11             MS. AHARI:  Good afternoon, Your Honor.  Leslie

12   Ahari, Troutman Sanders, on behalf of US Specialty Insurance

13   Company and XL Specialty Insurance Company.

14             We have before the Court a dual notice of

15   presentment of stipulation to lift the automatic stay to

16   permit the payment of defense costs under certain insurance

17   policies.

18             As the Court may recall, back in April of 2012,

19   the Court entered an order permitting the insurance

20   companies to pay up to $30 million towards defense costs

21   being incurred by the insureds in connection with the MF

22   Global litigation pending against them.

23             Since that time, it's become necessary to ask --

24   to seek leave to raise the cap to $40 million.  Under the

25   Court's April 25th, 2012 order, the Court indicated that
```

DKT 619

Page 8

```
 1    this -- the soft cap of 30 million could be raised either by
 2    -- by stipulation or agreement between the SIPA trustee, the
 3    Chapter 11 trustee and the insurers, or by order of the
 4    Court.  The SIPA trustee, the Chapter 11 trustee and the
 5    insurers were able to agree a couple of months ago to raise
 6    the soft cap to $40 million and so signed the stipulation,
 7    and that has been presented to the Court.
 8            We believe the stipulation is essentially self-
 9    implementing under the terms of the Court's previous order
10    and not subject to objection because, as I recall, the Court
11    back in April really didn't want to hear anything further on
12    this, didn't want to hear further objections.
13            THE COURT:  I guess I also didn't expect 30
14    million was going to be burned through this quickly, but --
15            MS. AHARI:  Fifteen months, actually, Your Honor,
16    is -- is not that quick of a time.
17            THE COURT:  It's a lot of money.
18            MS. AHARI:  It is where there are over 50 insureds
19    who are drawing on the policies.  There are a number of
20    lawsuits pending against them.  There are a number of
21    governmental investigations, and -- and now we have a
22    governmental suit that's been filed.  So in -- I think in
23    the big scheme of things it's -- it's really not -- I don't
24    think an unreasonable amount of money that's been incurred.
25            So in light of that, there were objections that
```

1   were filed, one by Sapere.  Sapere's objection essentially

2   raises the same arguments that they raised at the time that

3   the Court considered this issue back in April of 2012, and

4   the same arguments were made before the District Court up on

5   appeal and the District Court rejected those arguments.  The

6   appeals --

7           THE COURT:  What about their argument that I don't

8   have jurisdiction to -- to deal with this?

9           MS. AHARI:  I think under the very case that they

10  cite, the Winamo Realty case, the divestiture rule with

11  respect to jurisdiction I don't believe applies when the

12  matter that's being considered doesn't alter or amend the

13  previous order.  All we're doing here is implementing and

14  enforcing the Court's previous order.  And under the exact

15  --

16          THE COURT:  Previous order is unstayed.  No -- no

17  court has stayed it either.

18          MS. AHARI:  No court has stayed this order.  No,

19  Your Honor.  This Court declined to stay its order and then

20  the District Court also declined to stay the order.

21          So we believe that the stipulation is actually

22  self-implementing under the terms of the Court's original

23  order because the Court indicated that the soft cap could be

24  adjusted by agreement of the parties, and that's exactly

25  what happened.  So we don't believe that the Court is

Page 10

1    divested of jurisdiction to sign the stipulation.

2            THE COURT:  A couple of issues that are of concern

3    to me.  The first is that -- well, how much has been spent.

4    Has all -- has the full 30 million been exhausted so far?

5            MS. AHARI:  There -- we have bills -- between all

6    of the towers, we do have bills that exceed $30 million at

7    this point.

8            THE COURT:  How much do the bills -- how much --

9    how much in bills have you received so far?

10           MS. AHARI:  We've -- well, I've literally received

11   bills every day.

12           THE COURT:  Okay.

13           MS. AHARI:  We're estimating that we have about 32

14   million in bills currently.  That amount has not yet been

15   paid because of the soft cap and the need to enter into this

16   stipulation.

17           Currently, what's been paid is -- is closer to $27

18   million.

19           THE COURT:  I guess a couple of things that -- and

20   you'll remind me about this, but I -- that it -- that have

21   changed.  I think at the time in April of 2012, neither of

22   the debtors had yet asserted claims which would have

23   provided coverage under the policies.  Am I right about

24   that?

25           MS. AHARI:  Do you mean claims that were asserted

1    against the debtors for which they would be entitled to

2    coverage or claims that they asserted against the

3    individuals?

4              THE COURT:  Well, the policies had entity

5    coverage, correct?

6              MS. AHARI:  Limited entity coverage.  Yes.

7              THE COURT:  Okay.  But I thought that at the time

8    of the initial motions the -- a claim on the entity coverage

9    hadn't yet been triggered.  It was anticipated, but had not

10   yet been triggered, and that since then it has.  Am I right

11   in that?

12             MS. AHARI:  Your Honor, under the directors and

13   officers policy, the only entity coverage that's provided is

14   for securities claims against MF Global.

15             THE COURT:  Uh-huh.

16             MS. AHARI:  And to my knowledge no securities

17   claim has been asserted against any MF Global entity that

18   would trigger the coverage.

19             THE COURT:  Well, that's because of the

20   bankruptcy, but --

21             MS. AHARI:  That's true.  But -- but I don't --

22             THE COURT:  Okay.

23             MS. AHARI:  For the -- for the ENO policies --

24             THE COURT:  Yes.

25             MS. AHARI:  -- professional liability policies --

```
 1              THE COURT:  Yes.

 2              MS. AHARI:  -- I believe at the time back in April

 3    of 2012 Sapere was claiming that MF Global Inc was liable

 4    for the missing customer funds.  I'm not aware that -- that

 5    any lawsuit has been filed against an MF Global entity,

 6    perhaps because of the stay, up until --

 7              THE COURT:  Well, but claims --

 8              MS. AHARI:  -- yesterday.

 9              THE COURT:  -- proofs of -- proofs of claim have

10    been filed in the bankruptcy.

11              MS. AHARI:  The proofs of claim have been filed.

12    That's correct.  But a proof of claim, the determination of

13    a proof of claim doesn't require a finding of wrongful

14    conduct by the debtor.

15              THE COURT:  Okay.  I'll let others address this

16    because I thought that there is a change in the posture of

17    the case between the time I first decided the insureds'

18    motion and now.

19              And the other thing that's really -- the amount --

20    the fact that the directors and officers are -- have

21    exhausted $32 million at this stage is of real concern to

22    me.  These are wasting policies and every dollar spent on --

23    and this was true at the time of the first decision.  Every

24    dollar spent on defense is one dollar less available to

25    satisfy claims.
```

 1              You know, in a bankruptcy matter, anything that

 2      will deplete the debtor's assets that involves professional

 3      fees, I've got to review the fee applications.  And here, of

 4      course, I don't, and no court has.

 5              So the insurers have received bills for $32

 6      million in claims and it paid approximately 27 million,

 7      according to you, and no court has ever reviewed those bills

 8      to determine whether the estates' assets should be depleted

 9      by that amount.  Is that a fair statement?

10              MS. AHARI:  I think it's fair to say that no court

11      has reviewed the bills.  That's correct.

12              THE COURT:  And that's of concern to me because --

13      so now you're seeking to raise it to $40 million and, you

14      know, if there isn't a resolution of claims -- you know,

15      typically, early on in litigation, you know, there's a

16      flurry of activity at the start and -- and the bills are run

17      up.  But the real bills start when discovery is going.  But

18      -- but the parties have been in mediation and they've spent

19      $32 million and they haven't taken a deposition yet.

20              Okay.  And if the litigation goes forward, the

21      burn rate -- if this much has been burned in what is

22      essentially fairly preliminary, I could only fathom what's

23      going to happen if the litigation really goes forward full

24      bore.  And they're wasting policies and the two estates are

25      potential -- you know, potentially have the right to recover

Page 14

```
 1    on those -- on some of the policies, at least.  And I'm not
 2    sure I'm inclined to just let this go, agreement among --
 3    you know, the stipulation or no stipulation, it's unchecked,
 4    unreviewed by any court.  That's what's bothering me.
 5              I'm -- look, when I wrote the opinion, I obviously
 6    -- I -- I believed that New York law was such that the
 7    officers and directors who were insureds were entitled to a
 8    defense.  But at some point -- and I thought I was being
 9    very generous with a $30 million cap because I didn't want
10    people coming back in here six months later saying, you
11    know, judge, you set $10 million as the cap.  That's --
12    that's not reasonable.  That's unrealistic.  These are huge
13    cases.  So I thought I was going overboard to keep this from
14    coming back by setting it at 30 million, given the towers
15    and the amount of insurance.
16              But here you are asking for the cap when -- when
17    it's already 32 million in bills.  Boy, they're going to be
18    at 40 million in no time at all, and I don't know that
19    that's appropriate.  I -- I -- so I want to hear argument
20    from the objectors about it, and then I also -- I want to
21    hear from --
22              Mr. Kobak, I know that -- that Mr. Giddens has
23    entered into the -- you know, authorized entering into the
24    stipulation and I would like to hear from Mr. Bennett as
25    well.  It's not all that crystal clear to me that I ought to
```

1    approve this.

2            MS. AHARI:  Your -- Your Honor, may I respond --

3            THE COURT:  Yes, you can.

4            MS. AHARI:  -- further before --

5            THE COURT:  Please.  Yes.

6            MS. AHARI:  Well --

7            THE COURT:  Go ahead.

8            MS. AHARI:  -- first, with respect to the Court's

9    concern that these bills have not been reviewed by a court,

10   the insurance companies have every incentive to control the

11   defense costs in this case.  And we have reviewed these

12   bills very, very carefully.  We have a person at my firm who

13   does the first level of review, and I pulled her time

14   records.  She has spent over 500 hours reviewing every

15   single one of these bills.  And then the bills are subjected

16   to a second and third level review, and they are also

17   subjected to a review by our insurance company clients

18   themselves.  So the law firm does the first level review.

19   The insurance company does the second level review.

20           For -- for the D&O policies, just to give you an

21   example, of about 22 million of bills that were processed

22   and reviewed, of that amount the insurance company declined

23   to pay $3.8 million, and the reason for that is that we were

24   able to negotiate rate discounts from virtually every single

25   firm that has been employed to represent the 50 plus people

1   who need counsel and who are potentially entitled to --

2           THE COURT:  How many sets of lawyers are there?

3           MS. AHARI:  There are approximately 34 law firms

4   involved.  And many of those people haven't even been sued.

5   There are 26 people who are defendants in the litigation,

6   and then there are a number of other people who are not

7   defendants in any litigation.

8           THE COURT:  So of the 32 million, how much of that

9   is reflected in the bills of the top five or the top -- you

10  know, just take the top five people?

11          MS. AHARI:  I don't know the answer to that

12  question off the top of my head, Your Honor.  But I think

13  it's fair to assume that the -- that the defendants, the

14  individual insureds who are involved in most of the

15  proceedings are obviously going to have the higher bills

16  because their attorneys are required to do much more.

17          THE COURT:  Well, I think I -- you know, I want to

18  see a chart showing who's been -- who's billed what on

19  behalf of whose behalf.  Okay.  So if Mr. Corzine's counsel,

20  for example, I don't know what their bills have been.  I

21  want to know what -- and I assume that some firms are

22  representing more than one --

23          MS. AHARI:  That's correct, Your Honor.

24          THE COURT:  -- individual.  I mean, I want to know

25  who the firms are, who they're representing, how much in

1   bills they've submitted and how much they've been paid.

2           MS. AHARI:  Okay.

3           THE COURT:  I'm not asking at this stage to look

4   at the time records, but I do want to know.  And if -- if --

5   I'll hear if -- if you or their counsel believe that that's

6   -- shouldn't be public information, I'll take it under seal.

7   But I'm not approving this motion without seeing what each

8   firm has billed and been paid.  When I see that, I may have

9   more questions.  But, I mean, I view the 32 million before

10  these cases have really gotten underway as extraordinary.

11          I -- look, there's a lot of insurance, but they're

12  wasting policies.  The claims are enormous such that there

13  isn't enough in -- if there was coverage, and I know that

14  you're -- your insurers on operating on a reservation of

15  rights.  I understand that.  But let's assume there's

16  coverage.  If the claims are anywhere near the magnitude of

17  what have been asserted, there -- the insurance barely

18  covers -- doesn't cover.  Okay.  And, you know, before any

19  counsel persuades me that I'm supposed to authorize payments

20  from insurance that will provide everybody with a defense,

21  but no money to pay claims, a lot more briefing and argument

22  is going to be required to -- to persuade me of that.

23          Okay.

24          MS. AHARI:  Your Honor, may I make a --

25          THE COURT:  Yes.

1          MS. AHARI:  -- few more points?

2          THE COURT:  Please.  Go ahead.

3          MS. AHARI:  With respect to the amount that has

4  been incurred, I -- I will say, yes.  There are a number of

5  lawsuits that are pending against the insureds.  In the

6  Federal District Court the lawsuits have been stayed since

7  February.

8          THE COURT:  For the mediation before Judge

9  Weinstein.

10         MS. AHARI:  Correct.  But what has not been stayed

11  are the governmental investigations, and the vast majority

12  of the insureds, particularly those who have not been sued,

13  their costs have been incurred in the investigations.  Those

14  are not stayed.  Those are not subject to stay.  Those have

15  been very active since the beginning.

16         THE COURT:  And I guess what I would like to see

17  is on -- on this -- on this chart with the fees is if you

18  would break it down between governmental investigations and

19  defense of litigation.  I just -- I may have a different

20  attitude about people being entitled to a defense in a

21  governmental investigation than -- what -- what I'm -- look,

22  what I'm really focused on and worrying about is, in

23  particular, the civil litigation which has barely gotten

24  going.  I don't underestimate the amount of work that gets

25  done at the start of the case, understanding the facts,

```
 1    getting the documents, reviewing the documents.  But there

 2    hasn't been a deposition taken yet.

 3          To the extent that individuals are represented in

 4    a governmental investigation and if they're called for

 5    testimony and there's preparation and, you know, that -- I

 6    have a different attitude about that.  Okay.  But I just --

 7    we're -- we're -- 32 million is extraordinary.

 8          MS. AHARI:  Your Honor --

 9          THE COURT:  And I want to see what the

10    distribution of that is among the top handful of defendants.

11          Okay.  Go ahead, Ms. Ahari.

12          MS. AHARI:  Your Honor, essentially, by -- by

13    suggesting -- by the objectors and the SIPA trustee and the

14    other -- the liquidation administrator, by suggesting that

15    the Court should cut off the defense costs, whether it's at

16    30 million or 40 million or whatever the number is, I mean,

17    they're asking the Court to do something that hasn't been

18    done before.  There have been a number of cases in front of

19    this court which are far more notorious than MF Global where

20    insurance was front and center, similar situation, limited

21    amount of insurance, many lawsuits, many governmental

22    investigations pending.

23          THE COURT:  It's the one thing I haven't -- I have

24    not said I'm cutting anybody -- I'm cutting it off, but I'm

25    not prepared to approve it without more information.  That
```

1   I'm making clear.  I sign this order, it's another 10

2   million.  If litigation goes forward, you'll all be back.

3   I'm not saying I'm not going to approve an increase.  I'm

4   not going to approve an increase without additional

5   information.  Okay.

6           This -- it would be one thing if the estates did

7   not have a claim on the insureds.  But where the insurance

8   also may be available to satisfy claims against the estates,

9   they have an interest in the proceeds.  I think I said in

10  the earlier opinion, clearly, the policies -- these were

11  policies that are property of the estate.  The issue is the

12  -- about the proceeds of the insureds, is that property of

13  the estate.

14          Well, I think given the changed circumstances

15  since the initial decision, proceeds are -- are property of

16  the estate.  That isn't to say that the insureds don't have

17  -- the individual insureds don't have a claim against it as

18  -- against the policies as well.  But at this point it

19  becomes a competition between two or more claimants against

20  the insurance.  I'm not saying I want to prove it, so don't

21  tell me that, you know, there's no other case, no cases.

22  I'm not saying it won't happen.

23          But there is -- and I -- I appreciate that your

24  firm and the insurers review the bills.  That's not the same

25  thing as a court with responsibility for overseeing the

1   assets of an estate reviews and makes a judgment as to what

2   to approve and what not to approve because every dollar paid

3   out diminishes the availability, and I'll hear from others

4   about it.  Are you disputing that -- that proceeds of the

5   policies at this stage, some amount of proceeds of the

6   policies are property of the estates?

7              MS. AHARI:  I think with respect to the D&O

8   policy, there -- there are no claims against the entities

9   that potentially are going to trigger the D&O policies.  In

10  addition, there's a priority of payments provision under the

11  D&O policy.

12             So I think with respect to the D&O policy, yes, I

13  would dispute that.

14             THE COURT:  Okay.

15             MS. AHARI:  With respect to the E&O policy, I

16  think there are going to be very serious coverage questions

17  as to any claims against MF Global Inc, including based on

18  what was made public yesterday with respect to the CFTC

19  proceeding.  There's been an admission of liability.  The

20  SIPA trustee consented to a settlement or agreed to a

21  settlement without the insurers' knowledge or consent.  So I

22  think there will be very serious coverage questions with

23  respect to the entities under the E&O policy.

24             So even assuming that the individual insureds and

25  the entities are -- are essentially co-insureds under that

Page 22

```
 1    policy, the question of whether they'll be entitled to

 2    coverage at the end of the day I think is very much an open

 3    question.

 4             THE COURT:  Open question, but not for a day and

 5    that there is no coverage of the entities and every dollar

 6    that goes out the door is one dollar less available for the

 7    -- with enormous claims against the estates.

 8             MS. AHARI:  But the estates have had the benefit

 9    of the litigation stay against them.  They haven't been

10    subjected to suits.  They haven't been -- essentially, they

11    have lawyers.  The estate's paying their lawyers fees.  With

12    respect to the individuals, that's not the case.  They have

13    been subjected to litigation.  They are not protected by the

14    automatic bankruptcy stay.  The governmental investigations

15    are proceeding.  Those are not subject to a stay.  The

16    individuals really have no choice in the matter.

17             THE COURT:  So with --

18             MS. AHARI:  And --

19             THE COURT:  Look, I made clear that with respect

20    to the governmental investigations, I'm sensitive to the

21    needs of the individuals for representation.

22             With respect to the civil actions, I know through

23    personal experience that in many cases with a lot less

24    insurance than this, with many multiple defendants all with

25    claims against the same policies, how in order to minimize
```

1   the draw on the insurance, efforts are made to avoid

2   duplication or overlap of work, agreements are reached as to

3   firms taking the lead on certain issues, a whole variety of

4   things.

5           And I've also been involved in a case where the

6   insurance ran out.  It was exhausted before the case ever

7   went to trial, and what the consequences of that are,

8   particularly for individual defendants who were not well

9   healed and don't have the resources themselves.

10          So here there's a lot of insurance, but not an

11  infinite amount.  And what concerns me -- and I don't -- I

12  don't doubt -- I respect that you've indicated your firm

13  reviews the fees, that the insurers review the fees.  We'll

14  -- I want to hear from other counsel, but at a minimum I --

15  I want to see a chart, and if you want to address whether it

16  needs to be filed under seal, that's fine.  I want to see

17  which firm's representing -- which individuals have

18  submitted bills in what amount, have been paid what amount,

19  how much for governmental investigations, how much for civil

20  litigation.

21          MS. AHARI:  We'll provide that chart, Your Honor,

22  and we do think it should be provided under seal.

23          THE COURT:  That's fine.  I recognize it's

24  sensitive information and I believe it satisfies Section

25  107(b) of the Bankruptcy Code for it to be filed under seal.

```
 1              MS. AHARI:  Okay.  And with respect to the efforts

 2      of defense counsel to coordinate, Ms. Doherty is prepared to

 3      address that.  She's in a much better position --

 4              THE COURT:  Okay.

 5              MS. AHARI:  -- to do that than I am, so I'll --

 6      I'll defer to her on that --

 7              THE COURT:  Okay.

 8              MS. AHARI:  -- particular issue.

 9              THE COURT:  All right.  Thank you.

10              MS. AHARI:  Thank you.

11              MS. DOHERTY:  Good afternoon, Your Honor.  My name

12      is Therese Doherty.  I'm with the law firm of Herrick

13      Feinstein, and I represent two of the individual insureds

14      who most people have not heard of.  One of them is Sumit

15      Advani and the other is Matthew Besgen.  And I'm going to

16      speak on behalf of those individual insureds as well as all

17      of them who have put in a response on this motion.

18              And I want to address some of your issues that

19      you've raised.

20              THE COURT:  Are they defendants in any of the

21      civil litigation?

22              MS. DOHERTY:  My clients?

23              THE COURT:  Yes.

24              MS. DOHERTY:  They are both defendants only in the

25      Sapere case --
```

```
 1              THE COURT:  Okay.

 2              MS. DOHERTY:  -- not in any of the other.

 3              THE COURT:  All right.

 4              MS. DOHERTY:  Sapere, as you know, named 26

 5     individual defendants.  They dropped seven of them and then

 6     found seven more individual defendants, so they kept the

 7     number at 26.

 8              I also represent 12 other former officers,

 9     employees of MF Global who are not defendants in any of the

10     actions, but who have put in claims and are participating as

11     witnesses and cooperating in all of the government

12     investigations.

13              So I would like to address --

14              THE COURT:  Is -- is there coverage for

15     cooperators?

16              MS. DOHERTY:  Absolutely.

17              THE COURT:  Under what provisions of the policies?

18              MS. DOHERTY:  Under the E&O and the D&O policy,

19     they provide cover to the employees, officers and directors

20     when there are governmental or regulatory investigations

21     relating to potential wrongdoing.  There are -- and it's not

22     just the E&O.  There are certain of my clients, and many of

23     the 50, because only 26 of them are defendants in the civil

24     actions, but the other 24 are involved in the regulatory and

25     governmental investigations.  They are provided with
```

```
 1    coverage under the E&O or the D&O or both, and there's

 2    allocation issues.

 3           And there's priority of payments, as we know,

 4    under the D&O policy which provides that those defense costs

 5    get paid before anything else and it gets paid as they are

 6    incurred, not to some later date.

 7           But let me just back up a little bit.

 8           You're correct that the civil litigations that are

 9    all pending before Judge Marrero have been stayed.  And Ms.

10    Ahari addressed that there are all of the governmental

11    investigations.

12           With respect to the civil litigations, in the

13    customer representative class action complaint, they've

14    limited the number of defendants there to eight.  The

15    securities class action is 11 defendants, but the Sapere has

16    26 defendants.

17           THE COURT:  And they're the one who is objecting

18    to anything at --

19           MS. DOHERTY:  Correct.  So, you know, which way

20    would they like it; would they like all of these law firms

21    defending these individuals or would they want to limit it

22    and get rid of these law firms and get rid of the fees?  I

23    personally, my clients would appreciate to be let go and --

24    and limit the fees.

25           Sumit Advani, for example, in all of this there is
```

1    one single allegation against him by Sapere; that one

2    sentence of him in the entire complaint is that he was a

3    member of the Holdings' ALCO committee.  It's not even true,

4    and even if it were true, so what.  Why is he here?  There's

5    no reason.

6           So you are correct that that's been stayed since

7    February, but what has happened, when we were here last

8    April the governmental investigations, while it was six

9    months into, seven months into the MF Global fallout, the

10    governmental investigations really only started kicking in

11    gear after we were before Your Honor and Your Honor issued

12    that order.

13           There have been, as it's all been public, there

14    have been congressional hearings by two sub-committees.

15    There have been investigations by two United States

16    Attorneys.  There's been investigations by the CFTC, by the

17    FCC, by FINRA, and it has involved depositions.

18           THE COURT:  Have your clients been deposed in any

19    of the proceedings --

20           MS. DOHERTY:  Yes.

21           THE COURT:  -- or called before a grand jury or

22    any -- any of the above?

23           MS. DOHERTY:  Interviews.  There have been plenty

24    of interviews informally, formally, and depositions by the

25    governmental agencies, yes.  And it's not just my clients.

Page 28

1     It's a huge number and on multiple, multiple occasions, and

2     the number of emails that are involved in this that have

3     been produced by the trustees to the government are

4     astronomical, and we've only been focusing on certain time

5     periods, not even, you know, a year-and-a-half before the

6     demise of MF Global.  There's been, you know, just certain

7     time periods.

8              THE COURT:  As I said, I'm more sympathetic to the

9     issue of representation in connection with governmental

10    investigations.  But go ahead.

11             MS. DOHERTY:  Well, all of these individuals, the

12    50 of them, and the vast majority of them are -- you talk

13    about the big five.  The vast majority of them, whether it

14    is people that are in the civil litigations like my clients

15    and plenty of other of the 26, they were not highly paid

16    employees.  Many of them remain unemployed as a result of

17    the MF Global debacle.  These people -- they're just simply

18    unable to bear the extraordinary costs of civil litigation

19    or the investigations.  And it's inherently unfair for the

20    customer representatives or the trustees of Sapere to go and

21    name them and then seek to prevent them from defending

22    themselves.

23             You know, the estate assets, which you're here

24    looking to protect, the same is as our -- my clients are.

25    The estate assets are --

```
1              THE COURT:  Every dollar that gets paid to

2      customers is one --

3              MS. DOHERTY:  That's correct --

4              THE COURT:  -- less dollar --

5              MS. DOHERTY:  -- but all --

6              THE COURT:  -- of potential liability.

7              MS. DOHERTY:  That's absolutely correct, but all

8      of those estate assets are being used to fund those

9      litigations, and then they're seeking to prevent the

10     individuals from tapping into the insurance whose sole --

11     one of the sole reasons for that insurance is to protect

12     them.  It's -- it's inherently unfair.  And it's --

13             THE COURT:  That's why --

14             MS. DOHERTY:  -- unprecedented.

15             THE COURT:  -- I want to see the breakdown between

16     what the costs have been in connection with governmental

17     investigations versus defense of civil litigation.  I'm more

18     sympathetic to those individuals who have -- who have and

19     may still be incurring fees in connection with governmental

20     investigations.  Okay.  I'm not saying that when they get

21     named in a civil suit they lose their entitlement, but I'm

22     suffer -- I'm suffering from sticker shock.

23             MS. DOHERTY:  I -- I appreciate that and I think

24     that Your Honor was focusing on the civil litigations and

25     not the extent of the massive investigations that have been
```

```
 1    ongoing by several governmental entities that -- and as Ms.
 2    Ahari said, I think that --
 3              THE COURT:  So I'll see the breakdown.
 4              MS. DOHERTY:  I'm not privy to that information.
 5    You can see --
 6              THE COURT:  I'll see the breakdown --
 7              MS. DOHERTY:  -- the breakdown.
 8              THE COURT:  -- and we'll see.  If I have to have
 9    -- if we have to have another hearing, we'll have another
10    hearing.
11              MS. DOHERTY:  For the individual insureds, they
12    would agree with Ms. Ahari that it's extremely, extremely
13    important that all of that information be kept under seal.
14              THE COURT:  I've told you right off the bat that
15    I'm prepared to take it under seal.
16              MS. DOHERTY:  Okay.  Just let me address the
17    reasonableness of the defense costs because Your Honor made
18    that point very clearly last year when we were before you on
19    the original motion.  The insurers have been advancing and
20    the insureds are only seeking reasonable defense costs.
21              And as Ms. Ahari said, the insurers really have
22    been diligent.  They've negotiated discounts from law firms.
23    There are several law firms that have multiple clients.  As
24    I said, Herrick Feinstein represents 14.  There's another
25    firm that has -- there's a couple of firms that have five or
```

```
 1    six individuals.  There have been guidelines that are

 2    enforced.  There is a rigorous review of those bills and --

 3             THE COURT:  Not by me.

 4             MS. DOHERTY:  Excuse me.

 5             THE COURT:  Not by me.

 6             MS. DOHERTY:  Under the policies and the

 7    guidelines that set forth in the policies, those have been

 8    strictly enforced by the insurers.

 9             THE COURT:  Go ahead.

10             MS. DOHERTY:  The defense counsel has strived to

11    be economical.  We have, certainly on the civil suit side,

12    there's a leadership structure in place where there is main

13    counsel doing the work on motions to dismiss, for example.

14    There is a cooperation among all defense counsel on both the

15    civil side as well as the regulatory side.  There is an

16    extreme effort to avoid unnecessary duplication and to

17    coordinate everything.

18             So I think that the costs and the numbers that we

19    are have to be looked at in light of the enormity of what

20    has been going on with respect to all of the civil

21    litigations that were consolidated, basically, in the MDL as

22    well as what's going on before all of the various

23    governmental entities.

24             And I would stress again that the E&O and the D&O

25    policies are there.  The individual defendant -- the
```

1   individual insureds, not just the defendants, the ones that

2   are subject to the governmental inquiries are contractually

3   entitled to have their defense costs advanced.

4           THE COURT:  Look, I -- I wrote a decision that

5   obviously, Sapere isn't happy with.  It's been affirmed by

6   the District Court.  It's on appeal in the Second Circuit.

7   But it was largely pro-individual insureds and I -- you

8   know, I believe I followed the law.  But it's not a blank

9   check, not a blank check.  And when I see $32 million, I

10  want to see the breakdown, how much of it has been spent on

11  governmental investigations versus how much on civil

12  litigation.

13          And I think if the civil litigation is not

14  resolved, 40 million -- another 10 million isn't going to

15  take you very far.  Okay.  And the debtors do have an

16  interest in the proceeds and you don't -- the individual

17  insureds may have a right to coverage.  They don't have a

18  right to a blank check.  Let me be clear about it.  I don't

19  know of any case that says the individuals get their defense

20  costs paid no matter how much they are, no matter what the

21  impact on the debtor estate will be.

22          MS. DOHERTY:  To the contrary --

23          THE COURT:  If we need to have another hearing and

24  more briefs, we'll do it.  But --

25          MS. DOHERTY:  I would just like to add that to the

1  contrary, there is no precedent for cutting off defense

2  costs in that context.

3          THE COURT:  Well, there may be.

4          MS. DOHERTY:  It would be extraordinary and

5  unprecedented and --

6          THE COURT:  Okay.

7          MS. DOHERTY:  -- I think that the obligation to

8  conserve the assets of the estate also falls on the

9  obligations of the --

10          THE COURT:  So you're saying --

11          MS. DOHERTY:  -- trustees and the plaintiffs.

12          THE COURT:  -- your argument would lead to the

13  conclusion that it doesn't matter how much is spent.  The

14  individuals are entitled to burn all of the policies if

15  that's what it takes to defend.  That's your position.

16          MS. DOHERTY:  I think that the obligation is upon

17  the plaintiffs and the trustees to also make sure --

18          THE COURT:  Is it your --

19          MS. DOHERTY:  -- that it's economically --

20          THE COURT:  Answer -- answer this question.  Is it

21  your position that the individual insureds are entitled to

22  have their defense reimbursed even if it burns the entire

23  amount of both the E&O and D&O policies?

24          MS. DOHERTY:  We have a long, long way to go

25  before --

1           THE COURT:  No.  Answer --

2           MS. DOHERTY:  -- we're there and yes --

3           THE COURT:  -- my question.

4           MS. DOHERTY:  Yes.  Yes, I do.  They're --

5           THE COURT:  Okay.

6           MS. DOHERTY:  -- entitled to have reasonable

7   defense costs under the policy.  It's not a blank check.

8   It's reasonable defense costs in accordance with those

9   policies.

10          THE COURT:  Okay.  And your view is the Court has

11  no role in determining what are reasonable expenses, this

12  Court, the Bankruptcy Court, I have no role to play; that

13  this is left to the individual defendants -- and not all

14  defendants, to the individual insureds and the insurance

15  company lawyers to determine what are reasonable costs.

16  That's end of the -- end of the subject.  That's your view?

17          MS. DOHERTY:  I'm unaware of any precedent that --

18  that puts that to the court.  Under the contractual rights

19  under the policies --

20          THE COURT:  Is it your view?

21          MS. DOHERTY:  I'm not prepared to -- to say one

22  way or the other on that, Your Honor.

23          THE COURT:  Okay.  And so where is the line drawn?

24  You don't have any precedent that -- I take it, that says

25  that the individuals have the right to have their defense

1   costs paid even if it completely exhausts all the policies?

2   Do you have authority for that?

3           MS. DOHERTY:  One way or the other.  And I --

4           THE COURT:  Okay.  So don't you -- you say it

5   would be unprecedented.  Well, you're telling me it's

6   unprecedented what you're arguing as well.  I think that

7   that's a hypothetical that we don't need to get to.

8           THE COURT:  I hope we don't.  Okay.

9           Anybody else want to argue?

10          MS. DOHERTY:  Thank you, Your Honor.

11          MR. DOODY:  Your Honor, if I may, I'm Stephen

12  Doody on behalf of MFG Assurance.  I'm the E&O policy

13  carrier, so I thought it might be proper in sequence to come

14  up for a moment?

15          THE COURT:  Please.

16          MR. DOODY:  Does that work for you?

17          THE COURT:  Yeah.

18          MR. DOODY:  Thank you.

19          THE COURT:  Come on.

20          MR. DOODY:  Thank you, Your Honor.  Again, Stephen

21  Doody on behalf of MFG Assurance, and I'm from Allen &

22  Overy.

23          I don't think I need to rehash what two prior

24  counsel have gone through.  I think they've done a very good

25  job of it and I appreciate the questions Your -- Your Honor

1    has.

2            I just wanted to try to touch on some of the

3    points that you raised.  One is that with respect to the

4    vetting of defense costs, we have professional firms.  I

5    just wanted to make mention that we have a firm called LVL

6    which does that specifically for the E&O policies.  So what

7    we really have is a doubling up by having LVL look at it and

8    Troutman, and then on top of that, because MFG Assurance is

9    under enhanced regulatory scrutiny, we also have the BMA,

10   the Bermuda Monetary Authority that is looking at the

11   expenses of -- of the MFG Assurance, generally.

12           THE COURT:  Are they getting copies of all of the

13   bills that are being submitted?

14           MR. DOODY:  Your Honor, I know that they were

15   getting copies of bills for a long time. I'm not sure if

16   that's still the current practice because I think the BMA

17   has effectively said that the Willis -- which is a

18   professional broker -- they're relying on Willis to look at

19   it.  And so we have Willis, LVL, and Troutman.  So it's

20   several layers.

21           THE COURT:  Who is getting copies of all of the

22   statement -- the detailed statements from professional

23   services?

24           MR. DOODY:  For professional services, those go to

25   Willis, to LVL, and to Troutman.  And, again, previously I

Page 37

 1    know that they had been going through at a certain rate to

 2    -- to BMA, but I can't tell you that they are currently

 3    going through there.  The BMA got satisfied that the process

 4    was appropriate.

 5              THE COURT:  Is there entity coverage under the E&O

 6    policies?

 7              MR. DOODY:  I'm sorry.  Is there entity coverage?

 8              THE COURT:  Is there entity coverage, yes.

 9              MR. DOODY:  Yes, there is, Your Honor.  In fact,

10    you've addressed that in the -- in your memorandum is that

11    there is, and that brings me on to another point, which is

12    clearly a contentious point with respect to where do you

13    draw the line.

14              And I think that the case that we might want to

15    look at -- and maybe Your Honor is correct that we'll have

16    to do more briefing on this.  But the First Century case

17    draws the line by saying that you look at present costs, you

18    look at present claims as opposed to future potential

19    claims.

20              And so what we have is defense costs that are

21    coming in now that are immediate.  We don't estimate defense

22    costs going forward.  We haven't said that defense costs are

23    going to be X millions of dollars going forward and,

24    therefore, we pay them all.  But that's essentially -- oh,

25    excuse me.

```
 1              THE COURT:  It's okay.

 2              MR. DOODY:  Sorry about that.

 3              THE COURT:  It's all right.

 4              MR. DOODY:  But that's essentially what -- what is

 5     being juxtaposed here is the potential claim, if realized,

 6     valued, et cetera, that's not yet crystallized.

 7              What First Century says is you don't preserve

 8     policy proceeds for the purpose of future potential claims.

 9     What you do instead is you -- you have to recognize that the

10     more immediate -- the immediate claims do get paid.

11              So we -- I appreciate, Your Honor, this is

12     somewhat ad hoc in terms of going back and forth on it and,

13     of course, we're happy to spend more time and give you more

14     briefing, if you wish.  But I wanted to address that --

15              THE COURT:  Okay.

16              MR. DOODY:  -- to you.

17              THE COURT:  Thank you, Mr. Doody.

18              MR. DOODY:  I -- again, I think that prior counsel

19     has really covered a lot of this in terms of the costs being

20     pushed.  We do also have this problem.  I don't -- I don't

21     want to lose track of the fact, and I appreciate that Your

22     -- Your Honor is very focused on the regulatory actions.

23     But what we also have is a number of plaintiffs, and there's

24     an overlap among the plaintiffs as to who actually owns the

25     claims.  So what we have is defense counsel spending time
```

```
 1    and effort on that as well.

 2              And so we have a multitude of complaints that have

 3    come through.  We have motions to -- excuse me -- motions to

 4    dismiss with respect to those various claims.  We haven't

 5    gotten to the worst of it yet.

 6              THE COURT:  Motions of dismiss, have they been

 7    filed?

 8              MR. DOODY:  I believe they are filed, but they're

 9    now stayed by virtue of the -- of the stay that -- on the

10    MDL stay.  And, again, counsel is correct in saying there's

11    an MDL stay.  That's pre-vicarious.  You -- you may have

12    seen that Sapere had asked for that to be disabled.  The

13    stay is now in place for another month or so, but Sapere

14    does ask for that to be disabled.  That's all there is a

15    month.

16              But, again, the --

17              THE COURT:  A month now and it could be extended

18    or maybe shortened.  I don't know.

19              MR. DOODY:  Absolutely, Your Honor.  That's

20    absolutely correct.  It could be -- it could be -- it could

21    be extended.

22              But what we don't have is a stay with respect to

23    the ongoing regulatory matters and we don't have a stay with

24    respect to the CFTC, the Chapter 11, which has now morphed

25    into the plan administrator.  There's still stuff going
```

```
 1    forward and people still have costs and expenses.  I don't

 2    need to go again through the numbers.  You've -- you've

 3    heard that.

 4              With respect to the claims themselves, that's

 5    another issue that's an open issue.  Sapere is probably a

 6    good example of it.  And maybe this is not fair just to

 7    focus on them, but initially they said we are missing X

 8    amount of dollars.  The X keeps diminishing.  As of right

 9    now --

10              THE COURT:  Fortunately.

11              MR. DOODY:  Fortunately, and I think everybody

12    should be happy about that.  There should -- that should be

13    the one thing we can all agree on.  We're now at a point

14    where the SIPA trustee is saying that we're at 96 percent

15    and --

16              THE COURT:  I think it was 94.  Is it up to 96

17    now?

18              MR. DOODY:  Well, I'll defer to Mr. Kobak, but I

19    think -- you said --

20              MR. KOBAK:  Ninety-four.

21              MR. DOODY:  Ninety-four.  Oh, I'm sorry.  I

22    misread that.

23              THE COURT:  That's okay.

24              MR. DOODY:  But we're -- we're definitely getting

25    up there and there's -- there are -- there's a debate as to
```

Page 41

```
 1    whether that number is still too conservative.  So that
 2    itself is another question about when Your Honor had said
 3    these claims are enormous.  They are enormous, but they are
 4    the melting ice cube in a very positive way.  As -- as more
 5    good work is done by the trustee and -- and monies are
 6    brought in, and they're allocated and -- and, you know, the
 7    work is done, this is getting better and better.
 8             So we, the insurers, don't yet know how bad this
 9    is or, you know, how -- whether there is actually a claim.
10    Well, there will always be a claim, I guess, but there -- we
11    don't know -- we don't know the extent of it at this point.
12    I just wanted to make sure we -- we addressed that for one
13    second.
14             THE COURT:  What's the cite to First Century?
15             MR. DOODY:  I'm sorry, Your Honor.  I don't have
16    it off my -- I know it's in your memorandum decision.
17             THE COURT:  Okay.  Mr. -- yeah.  I -- which I have
18    here, so I --
19             MR. DOODY:  If I get my book I can get it for you.
20             THE COURT:  That's okay.  I'll -- I'll find it.
21             MR. DOODY:  It's -- it's on page 30, I think, of
22    your memorandum decision, if that's helpful.
23             THE COURT:  Well, I got the Westlaw -- the West
24    version of it, so --
25             MR. DOODY:  Well, it's somewhere around 30.
```

1               THE COURT:  That's all -- I'll find it.

2               MR. DOODY:  Okay.  But he -- he's got it.  Thank

3       you.

4               THE COURT:  It's okay.

5               MR. DOODY:  Thank you.

6               THE COURT:  Go ahead.

7               MR. DOODY:  And I think, Your Honor, and I'm

8       working from recollection here to one of your earlier

9       questions, whether at the time that you wrote the memorandum

10      decision, whether there was a claim from the SIPA trustee.

11      My recollection is that the SIPA trustee had -- had put in a

12      claim, at least to the E&O tower at that point.

13              THE COURT:  Okay.

14              MR. DOODY:  And I'm working from recollection, but

15      that's my recollection --

16              THE COURT:  Okay.

17              MR. DOODY:  -- and I just wanted to try to answer

18      your question on that.

19              Again, I think that prior counsel has really

20      covered a lot of ground here and those are all my -- my

21      other comments.

22              THE COURT:  Thank you very much, Mr. Doody.

23              MR. DOODY:  Thank you.

24              MR. BINDER:  Your Honor, Neil Binder with Binder &

25      Schwartz.  I submitted -- I represent Henry Steenkamp and we

Page 43

```
 1    submitted the motion along with Ms. Doherty as part of that
 2    group.
 3              Just to -- very briefly, Your Honor, I just wanted
 4    to highlight, because my client is involved in all of the
 5    civil litigations, just to let you know what has been done
 6    because a lot of these fees -- and loud and clear Your Honor
 7    wants a breakdown and Your Honor is going to get the
 8    breakdown, I'm sure.  But liaison counsel has been working
 9    very, very cooperatively.
10              We have, in the customer action, filed a motion to
11    dismiss and then it was stayed before the plaintiffs had to
12    respond, and also in the securities action all of the
13    defendants filed a joint motion and then there were
14    supplemental briefs as well, and then there were replies.
15              In addition, the mediation itself has been -- has
16    -- there were two not full weeks, but two week sessions of
17    mediation that have involved extensive briefing on all of --
18    from Chapter 11 trustee and all the various entities as well
19    as retaining experts, working with experts, putting on very
20    substantive presentations as well.  So a lot of work has
21    been done.
22              I don't know how much has been -- what the
23    breakdown is, but I think what you're going to find when you
24    get the numbers is that on the civil side you will -- you
25    should see a lot of coordination by a smaller group of
```

1    counsel, and -- and you'll see, when you see those numbers,

2    that there is a significant amount of very real work that is

3    the result of the litigations that have been filed,

4    including the filing by the Chapter 11 trustee of a

5    complaint against three of the defendants during the

6    pendency of the stay.

7              So work continues.  There's a lot to be done.  But

8    I think --

9              THE COURT:  You filed the action, but it's stayed,

10   isn't it?

11             MR. BINDER:  There -- there is no stay in that

12   action.  There was a letter down to Judge Frances suggesting

13   that -- that there was a stay, but, obviously, work has to

14   be done when a complaint comes in.  It can't simply be set

15   aside.  So, anyway, I just wanted to alert the Court to --

16   to the extent of the cooperation and the work that is being

17   done.

18             THE COURT:  Thank you.

19             MR. BINDER:  Thank you.

20             THE COURT:  All right.  Mr. Kobak.

21             I don't know.  Are you a supporter or an opponent?

22   I --

23             MR. KOBAK:  Well, we did not oppose raising, even

24   though we think the burn rate is excessive, we do concede

25   that there is a need for defense costs to some extent, and

Page 45

```
1   so we supported going to 40, and we're not withdrawing that

2   today.  When the objection came in from the plaintiffs'

3   counsel to whom we assigned our claims that perhaps it was

4   time for the soft cap to become a hard cap, we do not oppose

5   that.  We think it may be time to do that.

6           We're very happy to have Your Honor vet the

7   expenses.  We think -- I think we've -- from early on we've

8   taken the position that we thought there ought to be some

9   kind of oversight and we appreciate that while we might like

10  to have that oversight, that might not be the most

11  appropriate thing.  But we think, given the circumstances

12  here, it would be appropriate to have the Court review that.

13  We have a hard time, despite everything that's been said,

14  understanding why the fees have been mounting the way they

15  have.

16          I would like to focus on the E&O policy.  We did

17  submit a claim under that policy back in April of 2012.

18          THE COURT:  Was that before or after my -- my

19  decision --

20          MR. KOBAK:  It was roughly --

21          THE COURT:  -- in April?

22          MR. KOBAK:  -- simultaneously.

23          THE COURT:  Okay.

24          MR. KOBAK:  I think we did it while the motion was

25  pending, probably shortly before Your Honor's decision.
```

```
 1              THE COURT:  Because my -- and this may be faulty.
 2    My recollection is that when it was argued, you hadn't
 3    submitted the --
 4              MR. KOBAK:  I think we said --
 5              THE COURT:  -- request.
 6              MR. KOBAK:  -- we were going to and we
 7    subsequently did.  And since that time we've submitted to
 8    them results of our own investigation and other materials.
 9    So that was over a year ago.  The insurer's taken no
10    position on that claim, but it's not correct that there's
11    not a claim against that policy.
12              As recently as a couple of weeks ago in the Second
13    Circuit on one of the Sapere motions, they indicated that
14    they weren't prepared to take a position either finally or
15    preliminarily.  It seems to me that it's -- part of this
16    problem could be alleviated if they were to take a position.
17    It's hard for me to see how they can disclaim coverage when
18    we now have at least four investigations, including the
19    CFTC's complaint, which seem to suggest that at the very
20    least there are serious errors and omissions that would be
21    covered by this policy.
22              I also want to dispel the idea that estate assets
23    are being used in the class action.  That's really not true
24    to any significant extent.  Part of the reason that we
25    assigned our claims to the class action plaintiffs was so
```

```
 1    they would take the laboring ore in pursuing those actions.

 2    We are cooperating with them, but that in itself is not a

 3    terrible drain on the estates' resources.  And, likewise, I

 4    don't believe the class action plaintiffs have named

 5    anything like 26 people.

 6            I'm a little surprised to hear about the expenses

 7    of the investigations.  I know there's been a lot of

 8    investigative activity.  I'm not aware that any of those

 9    investigations has been terribly active other than the

10    CFTC's, and the CFTC now seems to have named only two

11    people.  So I don't really see why we're talking about 26 or

12    50 people in the future.

13            The statement was made that there might be a

14    defense because we consented to relief by the CFTC.  Of

15    course that order is subject to Your Honor's approval.  It

16    may be that parties haven't seen it.  But it's very clear

17    that what we consented to was only for the purposes of that

18    enforcement action and was not to have any effect outside of

19    that context.  So we haven't admitted those allegations for

20    any other purpose.

21            And in short, Your Honor, I think I'll -- the

22    plaintiffs -- you really ought to hear from the plaintiffs

23    because in a sense it's really their objection, but we would

24    -- we do think it's high time that there be some real

25    scrutiny of these expenses (a), and (b) that there be some
```

1    cap put on it for certain so that we don't keep coming back

2    and little by little exhausting the policies.

3            In the E&O case, the policy is $125 million.

4    According to the latest figures I saw, I think we're up to

5    about eight or $9 million of expenses, so there's still over

6    $100 million left.  It's clear that the shortfall, however

7    you calculate it, is going to be much greater than that

8    amount and that money is going to be desperately needed at

9    some point.

10           THE COURT:  Thank you, Mr. Kobak.

11           MR. KOBAK:  Thank you, Your Honor.

12           THE COURT:  Mr. Bennett.

13           MR. BENNETT:  Thank you, Your Honor.

14           I -- I would find myself echoing an awful lot of

15   what Mr. Kobak said, and so I'm not going to do that.  I

16   just want to cover a couple of additional points from our

17   perspective.

18           Number one, the trustee before the effective date

19   did consent to the movement from 30 to 40, and so I'm not

20   going to revisit that even though I might have come out

21   differently had I been in control of -- or my clients been

22   in control of the debtors at that time.

23           And -- and I will say that two points relative to

24   a dialogue that's been going on between Your Honor and

25   counsel for the insurance companies and for the defendants.

1           Number one, it does seem to me, from what I have

2    seen, that this Court might have very different views of

3    what is levels of appropriate duplication and what is

4    reasonably necessary than apparently the insurance companies

5    do.

6           And I would secondly say it's entirely possible

7    that with all these procedures they may be going through all

8    these procedures, but they may not be working.  And I -- I

9    have the same -- for all of the same reasons Mr. Kobak told

10   Your Honor, so I won't repeat them.

11          I will say this.  There was a suggestion that this

12   was self-effectuating and, Your Honor, therefore, didn't

13   have a role in it.  We disagree with that.  But I will say

14   that unless something dramatically changes, that there won't

15   be another agreement by -- by at least the reorganized

16   debtors to an -- to an increase.  So we will not be dealing

17   with the prospects that it can't come to you.  It will come

18   to you if there is another round and another request for an

19   increase.

20          With that, I also wanted to advise the Court that

21   if I leave in the middle of the argument it's because I have

22   another appointment with the judge who has the appeal of the

23   confirmation order.  Judge Torres has a -- has a pre-motion

24   conference at 4:00, so I've got to get to -- so I may leave

25   a little early.

|   |   |
|---|---|
| 1 | THE COURT:  Thank you. |
| 2 | All right.  Let me hear from the objectors. |
| 3 | MR. MOIRANO:  Your Honor, Michael Moirano on |
| 4 | behalf of the class representatives. |
| 5 | Your Honor, just so you know, we had filed a class |
| 6 | claims in both estates at -- prior to your prior ruling. |
| 7 | Those are essentially tort claims based on breach of |
| 8 | fiduciary duty, conversion of funds.  So those claims are |
| 9 | out there and clearly trigger on behalf of the entities the |
| 10 | coverage under the E&O policy. |
| 11 | And we believe that -- that in light of the |
| 12 | development since your opinion, most significantly the |
| 13 | extensive reports that have been filed by both the SIPA |
| 14 | trustee and the Holdings' trustee, that there is really |
| 15 | little question of liability clearly on the entities' part |
| 16 | and that, therefore, there's coverage.  There's liability. |
| 17 | And as Mr. Kobak explained, there's no question that the |
| 18 | amount of damages are going to far exceed the remaining |
| 19 | limits of those policies. |
| 20 | So we think at least with respect to the E&O |
| 21 | coverage, it should be clear that -- that the estates and |
| 22 | the customers have a vested interest in those at this point, |
| 23 | and that if there is going to be additional defense costs |
| 24 | paid, it should be limited to the other policy. |
| 25 | Now with respect to that policy, Your Honor, I'm |

```
 1    sympathetic with the individual defendants' position as I

 2    think you are.  And, you know, there are certainly contract

 3    rights there.  But we're now in a position at this point

 4    where we -- we know what the facts are.  As has been

 5    explained, there's been numerous government investigations.

 6    There's been reports.  Everyone kind of knows what the facts

 7    are.

 8              THE COURT:  You'll -- you'll forgive me if I say

 9    that the government doesn't get to decide what the facts

10    are.

11              MR. MOIRANO:  Well, the facts are laid out in --

12    in the reports of the trustees and we --

13              THE COURT:  I understand that.  But, you know,

14    where there are lawsuits, the defendants do get to put on a

15    defense.

16              MR. MOIRANO:  Oh, absolute -- no -- no question

17    about it, Judge.  But the other point is is that --

18              THE COURT:  I don't accept as true what's in the

19    CFTC complaint or --

20              MR. MOIRANO:  No.

21              THE COURT:  -- or the trustees' reports or, you

22    know --

23              MR. MOIRANO:  Understood, Your Honor.

24              But what we do know is that the liability that

25    these individuals face is going to far exceed, I'm sure, any
```

Page 52

```
 1   personal assets they have, and that what they should be
 2   striving for is getting the claims against them settled
 3   within the policy limits.  And that's -- that's our goal
 4   here, Your Honor.  We think that -- that -- what the focus
 5   of everyone should be at this point is trying to get the
 6   claims settled within the policy limits that eliminates
 7   liability for most of these individual defendants, but for
 8   two it looks like, and -- and they can go on with their
 9   lives.
10           And so our suggestion is, Your Honor, that -- that
11   there is an ongoing effort and we're -- we're still hopeful
12   that there will be a settlement that involves the insurance
13   companies that will -- that will involve a global settlement
14   with all the individual defendants.
15           Our suggestion is is that, you know, you get the
16   information about the -- where this money is being spent,
17   because we're as shocked as you were about the amount that's
18   been spent.  But that we -- we defer this particular matter
19   until you've had an opportunity to review that and we've had
20   an opportunity to try to get this case settled within the
21   policy limits to minimize the impact on the estate and to
22   minimize the impact on the individual defendants.
23           THE COURT:  Are there additional sessions
24   scheduled with Judge Weinstein?
25           MR. MOIRANO:  I -- I don't believe there's --
```

1    we're waiting for a -- some communication from the insurers

2    at this point is my understanding of where it stands, Your

3    Honor, and depending on what that is, you know, hopefully we

4    can move forward.

5            But we -- we've continued the stay for 30 days to

6    allow that process to work its way out.  We're hopeful we

7    can get this done.  We're hopeful it can get done within

8    policy limits, get the customers out of the estates, and the

9    estates will be better off without us there as you've -- as

10   you've clearly indicated.

11           And -- but if we can't resolve that, Judge, then

12   we think, particular with the E&O coverage, there should be

13   a limitation, if not a bar placed on any further defense

14   fees coming out of that policy.  And then a limitation --

15   some limitation on the defense costs coming out of the other

16   coverage, particularly for individuals that have the

17   financial wherewithal to pay for their defense, and -- and

18   maybe, you know, we get down to a situation where it's an as

19   need basis, you know, for -- for individual defendants that

20   don't -- can't defend themselves.  But we are as concerned

21   with -- as you are, Your Honor, with the eroding nature of

22   these policies.

23           And we would request, also, this information that

24   you're requesting the defendants to provide, which is just a

25   summary, we would like to see that as well.

```
 1              THE COURT:  No.  It's going to be in camera.  You

 2      know, the plaintiff --

 3              MR. MOIRANO:  All right.

 4              THE COURT:  -- doesn't get to see what the

 5      defendants are spending.

 6              MR. MOIRANO:  Well, we know -- we know it's 32

 7      million.

 8              THE COURT:  Well, you do, but you don't know how

 9      it's divided up.

10              MR. MOIRANO:  No.  And --

11              THE COURT:  And the plaintiffs are not getting to

12      see what the defendants are --

13              MR. MOIRANO:  Okay.  Thank you, Your Honor.

14              THE COURT:  -- have spent.

15              MR. MOIRANO:  Thank you.

16              THE COURT:  All right.  Let me hear from the

17      objectors.

18              Is Sapere -- somebody from Sapere going to argue?

19              MR. WALSH:  Good afternoon, Your Honor.  Ken Walsh

20      on behalf of Sapere.

21              I'll be brief, but we objected to the dual

22      presentment to maintain our initial objection to lifting the

23      stay and the imposition of the $30 million soft cap.  As

24      Your Honor --

25              THE COURT:  You --
```

```
 1              MR. WALSH:  I'm sorry.

 2              THE COURT:  My original decision, you sought a

 3    stay from me.  I denied it.  The District Court denied it.

 4    You've not sought a stay from the Court of Appeal.  My

 5    original opinion is the operative governing document,

 6    correct?

 7              MR. WALSH:  Well, yes, Your Honor.

 8              THE COURT:  You appealed it, but it -- it remains

 9    in full force and effect.

10              MR. WALSH:  Correct.  But in order to increase

11    this $30 million soft cap another $10 million -- and I think

12    Your Honor was sort of getting at this earlier, this Court

13    should have some oversight as to how these funds are being

14    spent --

15              THE COURT:  That's a different issue.

16              Go ahead.  I interrupted you.  What -- what's your

17    argument?

18              MR. WALSH:  Sure.  No.  But as Your Honor noted

19    previously, the circumstances have progressed and in the --

20              THE COURT:  Sapere more than any other plaintiff

21    customer has done more to increase the costs on the defense

22    side than anybody else.

23              MR. WALSH:  We have sought our --

24              THE COURT:  You've -- you've -- no.  You've -- no.

25    I mean, your position has always been -- you've objected to
```

Page 56

1    virtually everything that's happened in the bankruptcy case.

2    You've appealed most of it.  You -- you've decided to sue a

3    lot more people than anybody else have.  That's fine.  You

4    -- you have certain rights.  But then -- then when you do

5    that, you come in and argue that nobody's entitled to a

6    defense with insurance.  I mean, you know, you're -- you've

7    been consistent throughout.  I have to say that.

8         (Laughter)

9              MR. WALSH:  Well, we have maintained that they do

10   have access to a defense under the D&O policies.  Our

11   interest lies primarily in the E&O policies.

12             And as Your Honor discussed previously, if they --

13   if the insurers and -- are able to decide amongst themselves

14   -- they've spent --they've gone through, at this point, $32

15   million.  To raise it another $8 million, we'll be back here

16   very -- very, very soon.

17             THE COURT:  I don't know.  We'll see.  I don't

18   know if I'm going to raise it, and if I do raise it, people

19   come back they're -- you know, pay your money and take your

20   chances.  I don't know.  It's --

21             MR. WALSH:  Well, as we've argued --

22             THE COURT:  That's it.

23             MR. WALSH:  -- before Your Honor previously,

24   commodities' customers, including Sapere, we do have a very

25   strong interest in these policy proceeds, the E&O policy

1    proceeds.  We have an allowed claim --

2            THE COURT:  That doesn't mean that because you

3    assert a claim you get to tie everybody's hands behind their

4    backs so that they can't afford a defense.  You know --

5            MR. WALSH:  We do have an allowed claim at this

6    point in the MFGI civil liquidation.

7            THE COURT:  And you've collected a majority of

8    that.

9            MR. WALSH:  Well, as Mr. Kobak noted, there still

10   will be a significant shortfall --

11           THE COURT:  Well, I -- I don't --

12           MR. WALSH:  -- created by --

13           THE COURT:  -- I don't underestimate that.

14           Okay.  Anything else you want to say?

15           MR. WALSH:  No.  That's all, Your Honor.

16           THE COURT:  All right.  Anybody else wish to be

17   heard?

18           All right.  Ms. Ahari, we've got the 4th of July

19   holiday coming up.  What's a reasonable time for you to

20   submit the chart, July 15th or -- we can get an earlier

21   time, but I don't know what -- you've got -- do you have all

22   the information that you --

23           MS. AHARI:  We'll need to do some -- I mean, we've

24   got the -- we've got the basic information, but we don't

25   have it in a form that would be -- that would assist the

```
 1   Court at this point.  So I probably need --

 2            THE COURT:  What do you need?

 3            MS. AHARI:  July 15th.

 4            THE COURT:  That's a Monday.  Is that -- is that

 5   enough?  Do you want more time?  Tell me.

 6            MS. AHARI:  Why don't we do the end of that week?

 7            THE COURT:  The end of that week is July 19th.

 8            MS. AHARI:  Let's do July 19th.  July 19th.  Thank

 9   you.

10            Do you want anything else at that time?  Do you

11   want additional briefing at that time or do you just want

12   the --

13            THE COURT:  No.  I think --

14            MS. AHARI:  -- bill information first?

15            THE COURT:  I want to see the information first.

16            MS. AHARI:  Okay.

17            THE COURT:  And I may be satisfied -- satisfied

18   may be the wrong term.  Look, I'm not happy.  That I've made

19   clear.  When I see that information, I'll decide.  It may be

20   that I will decide to go ahead and approve the increase in

21   the cap to $40 million.  Without more briefing -- I'll just

22   tell you all, without more briefing, I'm not going to make a

23   soft cap a hard cap.  It seems to me that to take that step,

24   I'm going to require more briefing from the parties.

25            So since the only thing that's being -- that at
```

Page 59

 1    least was asked of me was to increase the soft cap by $10

 2    million to $40 million, I think that's the decision I've

 3    got.  It may be when I see the additional information I will

 4    do that.  It may be I'll have more questions and we'll

 5    schedule another hearing.  I don't think I need more

 6    briefing at -- at this point.  I don't want -- okay.

 7             All right.  But let me make clear.  If I go ahead

 8    and approve the increase to $40 million, no one should

 9    assume that I'm going to increase it beyond that.  No one.

10    You may think it's unprecedented.  Well, there will be

11    precedent then.  Okay.  So don't assume -- I mean, I -- I

12    look at -- it may have taken 15 months or so to get to the

13    $32 million, but the litigation is barely going at this

14    point.  And if it really does move forward, the burn rate I

15    -- I sort of aghast at what it's likely to be.

16             So whoever is on the defense side, you better

17    think twice before you -- before you incur fees and think

18    that they're going to be reimbursed with this Court's

19    approval.  If I get reversed, so be it.

20             Okay.  Thank you.

21             MS. AHARI:  Thank you, Your Honor.

22             THE COURT:  All right.  We're adjourned.

23        (Whereupon, these proceedings were concluded at 3:10

24    p.m.)

25

Page 60

```
 1                    I N D E X

 2

 3                    RULINGS

 4

 5                                    Page      Line

 6   Hearing RE: Objections to Dual

 7   Notice of Presentment of

 8   Stipulation to Lift the Automatic

 9   Stay to Permit Payments of

10   Defense Costs Under Certain

11   Insurance Policies              --        --

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                C E R T I F I C A T I O N

 2

 3    I, Sherri L. Breach, CERT*D-397, certified that the

 4    foregoing transcript is a true and accurate record of the

 5    proceedings.

 6
```

Sherri L Breach

Digitally signed by Sherri L Breach
DN: cn=Sherri L Breach, o, ou,
email=digital1@veritext.com, c=US
Date: 2013.07.02 16:00:13 -04'00'

```
 8    SHERRI L. BREACH

 9

      AAERT Certified Electronic Reporter & Transcriber

10

      CERT*D -397

11

12

13

      Veritext

14

      200 Old Country Road

15

      Suite 580

16

      Mineola, NY 11501

17

18

      Date:  July 2, 2013

19

20

21

22

23

24

25
```