EXHIBIT 1

```
```

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY TO NEW YORK
-------------------------------------------------------------------X
Application of

SUSAN LEVY,

                  Petitioner,

For a Judgment Pursuant to
CPLR Article 75

     -against-

KRISTA MANCINI, FRANK RODRIGUEZ, GREG
PERLIN, JAMES GOMBAS.

                Respondents.
-------------------------------------------------------------------X

AFFIDAVIT OF BRUCE
BEHRENS IN SUPPORT OF
PETITIONER'S
APPLICATION TO VACATE
HER ARBITRAL AWARD
PURSUANT TO CPLR
§ 7511(b)

COUNTY OF FAYETTE )):
               ss::
STATE OF IOWA)):

        BRUCE BEHRENS, being duly sworn, deposes and says under penalty of perjury as follows:

        1. I reside in Oelwein, Iowa. I submit this affidavit in support of Ms. Levy's motion to vacate her NFA arbitral award.

        2. I am married to Kathleen Behrens. We have been married for 41 years.

-1-

3. My highest level of education is high school.

4. For 25 years, I was gainfully the owner and operator of Culligan Water Conditioning, a water conditioning concern. I sold that business in 1999.

5. As a result of all those years of hard work, we saved a nest egg of approximately $250,000 which represented our life savings including IRA funds. We wanted to use these savings for our retirement and sought safe and conservative investments.

6. In approximately 2007, we were introduced by some friends and neighbors in Oelwein, Iowa to Perry Comeau, a resident of Oelwein who is an anesthetist at Mercy Hospital. However, we also found out he had a business relationship with the Maxwells. He in turn introduced us to the Maxwells who ended up investing our life savings through Peregrine Financial, also known as PFG Best.

7. We decided to entrust our funds to the Maxwells and Peregrine, based on three specific misrepresentations that: (1) Only 10% of our funds would be invested at one time, and therefore at risk, (2) we would profit whether the markets went up or down, based on the strategies used, and (3) that if we lost more than 10% of our money, the trading would be stopped. Apparently, the evidence showed that Peregrine never stopped the Maxwells from trading, although there was a margin deficiency for up to six days. Rather, we were told these were safe investments. We signed on the dotted line in the basement of Perry Comeau's home.

8. Annexed to the Affidavit of Kathi Behren as Exhibit 1 are NFA print outs of our arbitration awards at the NFA. However, the information concerning the amount we lost is incorrect and misstated. The amount we lost in total was approximately $202,000.00. This amount is not accurately noted by the NFA in their forms, and should be corrected.

9. We invested in the same way as approximately 16 other families who are friends and neighbors in Oelwein, including the Schefferts. We were all convinced to give our life savings to the Maxwells to ensure a better retirement. Since we are not sophisticated investors, we thought it wise to entrust our savings to trained professionals as they held themselves out to be.

10. In October, 2008 we experienced a total loss of our investments. We were shocked. We were eventually introduced to a lawyer named Paul Thomas, Esq. by Perry Comeau who was the same person who introduced us to the Maxwells.

11. Although we signed the risk disclosures, we greatly relied on the verbal disclosures that only 10% of our money would be at risk and that these investments were safe.

12. Paul Thomas, Esq. represented us along with the other families. However, at the time of my arbitration, in February, 2010, his co-counsel in Chicago, Thomas Burke, Esq. appeared with us at our hearing. Our hearing was set for four days from a Monday through a Thursday. However, we ended up adjourning on that Tuesday and finishing by telephone on Thursday instead. At the hearing, both Kathi and I testified as to the nature of the investments presented to us and explained our understanding that only 10% of the funds would be invested and at risk at one time as well as that these were safe investments, since the strategies employed would generate a safe return whether the markets decline or not.

13. There was absolutely no testamentary evidence at the arbitration to contradict this testimony.

14. We were also questioned at the NFA hearing about our religion and whether or not we were of the Mormon Faith. We answered that we were not Mormons. We did not

think that this testimony should have been adduced or considered in any way at the hearing and to our knowledge it was never stricken from the record. We were also asked to sign a short affidavit that we were not Mormons.

15. Throughout the entire pendency of the arbitration, we believed based on conversations with our attorney that we had an excellent case. The mediation was also in our favor according to our lawyer; however, we heard in June, 2011 that we lost our case. We were shocked.

16. We learned based on a conversation with our lawyer that one of the the reason we lost our arbitratrion was based on the fact that we as Mormons who were just trying to get our money back. We are not Mormons, and believe this alone is not a basis that should have been considered at our arbitrations.

18. Most recently, our suspicion concerning the NFA was confirmed by our Attorney who stated to us in a letter annexed hereto as Exhibit 1 that "The main industry regulator NFA is also corrupt or highly incompetent for allowing this to happen." He was referring to our failed arbitrations. Our former attorney has been practicing in this area of the law for over 20 years.

17. As a result of the devastating loss of our life savings which included two IRA accounts, We have had to sell our house and downsize as a result of this loss, as well as the fact that I have had to go back to work as a forklift driver.

19. When I initially returned to work, I was working on a roof and sustained severe injuries on the job where I was injured having fallen off the roof of a two story house. I returned to work after our NFA loss because I needed more income to support my family after I

-4-

lost my life savings in the commodities markets. I sustained multiple injuries from falling off a rooftop including severe leg injuries requiring 22 days of hospitalization at the Mayo Clinic in Rochester, Minnesota. I also sustained severe injuries including a concussion, a broken back, a crushed T5 vertebra with nerve damage and two broken scapulas as well as the ribs on the left side and a right leg fracture requiring surgery with plates, rods and screws.

20. I blame my loss of my investments and the total disregard for the law by the NFA as the reason I needed to return to work where I sustained these massive injuries.

21. As a result of my injuries, I have also received blood transfusion for the seven surgeries that I have had to repair his leg and foot. It took me one year to recover to be able to do the job I currently have as a forklift operator.

22. As a result of my injuries, my medical insurer was charged approximately $250,000 by the Mayo Clinic for my multiple surgeries, and I personally was left with over $5000.00 in medical bills We expended all our savings while I was trying to heal and walk again. Because I could not cover this last bill, my medical bills fell into collections. To satisfy this debt to my medical providers, I was forced to sell many of my remaining assets including a boat as well as my hunting rifles. Out here in Iowa, hunting and fishing are very popular sports, and two sports that I enjoy and have grown up with. I was looking forward to doing these activities in my retirement, which are now only pipe dreams for me, especially since I was forced to sell my hunting equipment.

23. I believed in the NFA, but thier their behavior was disgraceful. The arbitrators rejected the crystal clear evidence presented by all involved which was uncontroverted. I have been an honest citizen my entire life as well as a business owner and I

deserved honesty and ethical business conduct in my investments.

24. I have lost faith in our System of Justice, I have lost my health, my hobbies and most of my possessions as a result of this massive institutionalized fraud including Mr. Wassendorf Sn. who was so protected by his cronies a the NFA and was himself on the NFA advisory board for over 20 years actually running the NFA in part.

25. As such, I am submitting this affidavit to set the record straight and in the hopes of supporting Ms. Levy's position that the NFA forum was wrought with misconduct and the arbitrators acted irrationally and with manifest disregard for the law. We hope that Ms. Levy prevails in vacating her NFA arbitral award.

BRUCE BEHRENS

Sworn on the 10th Day of November, 2012

NOTARY PUBLIC

PEGGI RUDEN
Commission Number 716229
My Commission Expires
4-26-14

-6-