USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/15/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - -X
                :

IN RE: PLATINUM AND PALLADIUM          10cv3617
COMMODITIES LITIGATION        :

                MEMORANDUM & ORDER

- - - - - - - - - - - - - - - - - - - - - - - - - -X
                :

THIS DOCUMENT RELATES TO:
                :

ALL ACTIONS

                :

- - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

          Futures and Physical Plaintiffs[1] in this consolidated class action have agreed to settle their commodities fraud and antitrust claims with Defendants Moore Capital Management LP, Moore Capital Management LLC, Moore Capital Advisors LLC, Moore Advisors Ltd., Moore Macro Fund LP, Moore Global Fixed Income Master Fund LP (together, the "Moore Defendants"), Christopher Pia, Louis Bacon, Eugene Burger, and Joseph Welsh (all together, the "Settling Defendants").  Plaintiffs now move to certify settlement classes and for preliminary approval of their respective settlement agreements.  The Settling Defendants join the Plaintiffs in support of their motions.  However, the trustee for the liquidation of non-settling defendant MF Global Inc. and a potential class member, Susan Levy, both object to preliminary approval.  Levy also seeks to intervene.  Finally, the lead plaintiffs in a separate class action against former officers and directors of MF Global Inc. move to intervene and object to the proposed settlements.  For the following reasons, the motions to intervene are denied, the proposed

---

[1] Futures Plaintiffs are Richard White; Harry Ploss; and The Stuart Sugarman Trust.  Physical Plaintiffs are F.W. DeVito, Inc. Retirement Trust Plan; Frederick DeVito; Mary DeVito; David W. DeVito; and Russell W. Andrews.

settlement classes are certified, and the motions for preliminary approval are granted over the objections.

## BACKGROUND

I.   Procedural History

This case, now on its sixth amended consolidated complaint, has been litigated vigorously for more than four years.  Plaintiffs bring claims for violations of the Commodity Exchange Act, the Sherman Act, the Racketeer Influenced and Corrupt Organizations Act, and common law claims for negligence and fraud arising out of the Defendants' "bang the close" transactions at the end of trading days, which they allege inflated prices in the futures and physical markets for platinum and palladium.  The alleged manipulation occurred primarily between October 2007 and June 2008.

On April 29, 2010, the Commodity Futures Trading Commission (CFTC) entered a settlement order concerning this alleged manipulation.  See In re Moore Capital Mgmt., LP, CFTC Docket No. 10-9 (C.F.T.C. Apr. 29, 2010).  The next day, with admirable alacrity, Futures Plaintiffs filed this class action alleging manipulation of the futures markets.  And in due course, the Physical Plaintiffs filed their own class action in June 2010 alleging manipulation of the physical markets.

The Futures and Physical cases were consolidated.  By the end of September 2010, Plaintiffs had filed their second amended consolidated complaint, largely tracking and incorporating the CFTC settlement order.  After a scuffle over whether to stay discovery pending Defendants' motion to dismiss, this Court ordered Defendants to produce the approximately 250,000 pages previously provided to the CFTC.

In September 2011, this Court dismissed the second amended consolidated complaint but granted Plaintiffs leave to replead. In re Platinum & Palladium Commodities Litig., 828 F. Supp. 2d 588 (S.D.N.Y. 2011). Plaintiffs filed a 159-page third amended consolidated complaint, adding three new defendants.

In November 2011, Defendant MF Global Inc. filed a suggestion of bankruptcy, staying the case as to MF Global. New motions to dismiss followed, from the Moore Defendants and Defendant Joseph Welsh. Those motions were withdrawn in July 2012 while the parties attempted, and failed, to mediate the case. In January 2013, Plaintiffs filed a fourth amended consolidated complaint, superseded by a fifth amended consolidated complaint in July.

In September 2013, Futures and Physical Plaintiffs each entered into a settlement agreement with Settling Defendants and moved for preliminary approval of those agreements. At a preliminary approval hearing on October 4, 2013, this Court suggested a number of modifications to the proposed settlements. The parties agreed to modify their agreements and return to the Court for preliminary approval. That process proved to be more protracted than anticipated, and both sets of plaintiffs signed amended settlement agreements with the Settling Defendants in March 2014 and stipulated to the filing of a sixth amended consolidated complaint. (Decl. of Christopher McGrath, Ex. 1 (Futures Class Settlement Agreement) (ECF No. 163-1); Decl. of John Lowther, Ex. A (Physical Class Settlement Agreement) (ECF No. 168-1)).

II.    The Settlements

    a.    Futures Class

    The Futures Plaintiffs and Settling Defendants jointly move to certify a settlement class consisting of

> All Persons that purchased or sold a NYMEX platinum futures contract or a NYMEX palladium futures contract during the period from June 1, 2006 through April 29, 2010, inclusive.  Excluded from the Futures Class are (i) the Settling Defendants, MF Global, Inc., any co-conspirators alleged in the Complaint or any subsequent amended complaint filed prior to the Exclusion Bar Date, [certain individuals], and (ii) Opt Outs.

The class period is significantly broader than the one Futures Plaintiffs initially sought to certify. The expanded class period covers the entire time period during which there might arguably have been artificiality in the market so Settling Defendants may obtain a "global peace" settling all claims arising from the alleged facts.

    The Moore Defendants have agreed to pay the Futures Class a total of $48.4 million.  Joseph Welsh, a former Vice President and commodities trader at MF Global, has agreed to the entry of judgment against him on the negligence claim for $35 million, with the stipulation that it can only be enforced against certain insurance policies.  Welsh is assigning his rights in a 2011 directors and officers liability policy with U.S. Specialty and any coverage from other insurers in excess to that policy (the "D&O policies") to the Futures Class.  The Moore Defendants will receive the first $50,000 obtained from those policies.  Welsh's insurers have denied coverage, so any recovery is uncertain, but because of Welsh's present financial condition, lead counsel for the Futures Class have determined this is the best option.

b.   Physical Class

The Physical Plaintiffs and Settling Defendants jointly move to certify a

settlement class consisting of

> All persons and/or entities who purchased, invested in, or otherwise acquired an interest in platinum or palladium bullion in the United States physical or "spot" market conforming to NYMEX "good delivery" requirements, and/or of at least 99.95% purity, during the period of June 1, 2006 through April 29, 2010.

Like the Futures Class period, the Physical Class period has been expanded to achieve a global

settlement.  The Moore Defendants have agreed to pay Physical Class $9.355 million.  Welsh has

also agreed to an entry of judgment against him on the Physical Plaintiffs' negligence claim in

the amount of $7 million.  Again, that judgment can only be enforced against Welsh's 2011

D&O policies, for which he has also assigned his rights in to the Physical Plaintiffs.  The Moore

Defendants will receive the first $30,000 of any recovery against the policies, which is of course

uncertain.

c.   Differences From Previous Settlement Agreements

The settlements do not materially differ from what the parties agreed to in the fall

of 2013.  The parties have made the changes this Court requested: the bulk of the settlement

funds will now be deposited in a Court Registry Investment System (CRIS) account instead of a

private bank account.  The settlement funds will be fully funded in a single payment from the

Settling Defendants instead of two separate payments, as originally agreed.  The parties have

named Professor Francis McGovern as the mediator of any disputes that may arise.  The notice

plan now includes publication in the Wall Street Journal.

d.  Proposed Plans of Allocation

i.  Futures Class

The proposed plan of allocation is complex and subject to revision by this Court. (Futures Class Settlement Agreement, Ex. F (ECF No. 163-1)).  For the Futures Class, 90% of the settlement fund is reserved for valid claims based on trades in which at least one portion of the trade occurred between November 1, 2007 (for palladium futures) or November 19, 2007 (for platinum futures) and June 18, 2008 (the "Net Artificiality Paid Period," or "NAP Period").  It was during this period that Plaintiffs allege the market was inflated, and they have prepared tables listing the amount of artificiality in the market for platinum and palladium on each trading day.  (Futures Class Proposed Plan of Allocation, Exs. A-B).  Using those charts, each Futures Class member will be eligible to receive their Net Artificiality Paid, which is 110% of the amount their total artificiality paid exceeds their total artificiality received.  Each claiming Futures Class member will receive a pro rata share of the 90% portion of the settlement fund allocated to NAP transactions based on their NAP calculation.

The other 10% of the Futures Class settlement fund is allocated to trades in the class period where no portion of the transaction occurred during the NAP Period.  Futures Class members will be eligible to receive their net losses from trades in the Net Loss Period (NL), which is 110% of the amount by which their total losses on transactions in this period exceeds their total gains.  There is no offset between the NAP and NL periods.  For example, if a claiming Futures Class member has a positive NAP calculation and a net gain on NL transactions (rendering her ineligible for an NL payment), her NL gains will not reduce her entitlement to a NAP payment.

Both the NAP and NL calculations for claiming Futures Class members are subject to deductions.  The first deduction applies if a trade was made as a hedge, as defined in the proof of claim.  Hedges are subject to a 50% reduction in their contributions to the NAP and NL calculations.  If a claiming Futures Class member is a swaps-dealer, also defined in the proof of claim, his or her NAP and NL calculations are subject to a 91% reduction.

Unhelpfully, the plan of allocation is not yet fully determined for NL payments.  The 10% of the settlement fund allocated to NL trades is separated into two pools.  The first pool consists of 3% of the settlement fund, and will be paid out pro rata based on each claiming Future Class member's total NL.  The second pool, consisting of 7% of the settlement fund, will be paid out under a plan of allocation to be proposed by Futures Class counsel and approved by this Court after proofs of claim have been received and more is known about the claiming class members, their NAP and NL calculations, and any reversion to the Moore Defendants (discussed below).  Class members will have an opportunity to object to any proposed plan of allocation for this pool before it is fixed, and like the entire allocation plan, this Court may modify the proposal.  Futures Class counsel anticipates discounting losses and gains from trades after September 17, 2008 and deducting any significant amounts of net artificiality received by claiming Futures Class members, and possibly enhancing payouts from pre-September 17, 2008 trades.

There is a reversion to the Moore Defendants if either the NAP or NL portion of the settlement fund is more than adequate.  If 90% of the settlement fund fully pays each claiming Futures Class member's NAP calculation, half of the excess will revert to the Moore Defendants with the other half distributed pro rata among claiming Futures Class members with

positive NAP calculations. Similarly, if 10% of the settlement fund pays each claiming class member's NL calculation, half the excess reverts to the Moore Defendants with the other half shared pro rata among claiming class members with positive NL calculations.

### ii. Physical Class

The Physical Class's proposed plan of allocation is similar to that of the Futures Class and relies on similar daily artificiality tables. (Lowther Decl. Ex. A-6 (ECF No. 168-7)). It too is subject to adjustment by this Court. Again, 90% of the Physical Class settlement fund is reserved for transactions in the NAP period. Physical Class members will be eligible to receive their Net Artificiality Paid for these transactions, which again is 110% of the amount by which their total artificiality paid exceeds their total artificiality received.

The other 10% of the Physical Class settlement fund is reserved for NL transactions, those which are made within the class period but no portion of the trade is within the NAP period. Like the Futures Class members, Physical Class members will be eligible to receive 110% of the amount by which their gains on NL trades exceed their losses on NL trades.

Both the NAP and NL calculations for claiming Physical Class members are subject to the same deductions that apply to the Futures Class. Hedges, as defined in the proof of claim, are subject to a 50% reduction in their contributions to the NAP and NL calculations. If a claiming Futures Class member is a swaps-dealer, also defined in the proof of claim, his or her NAP and NL calculations are subject to a 91% reduction.

Again, the plan of allocation for this portion of the settlement fund has not been fully determined. The first pool of the NL portion of the fund consists of 3% of the settlement fund, and will be paid out pro rata according to each claiming Physical Class member's NL

calculation. The second pool, consisting of 7% of the settlement fund, will be paid out according to a method proposed by Physical Class counsel and approved by this Court after proofs of claim have been received and more is known about the claiming class members, their NAP and NL calculations, and any reversion to the Moore Defendants (discussed below). As with the Futures Class, Physical Class counsel anticipates discounting losses and gains from trades after September 17, 2008, deducting any significant amounts of net artificiality received by claiming Futures Class members, and possibly enhancing payouts from pre-September 17, 2008 trades. Class members will have a chance to object, and any proposal is subject to this Court's adjustment.

      As with the Futures Class, there is a reversion to the Moore Defendants if either the portion of the settlement fund apportioned to NAP payments or the portion apportioned to NL payments is more than adequate. If 90% of the settlement fund fully pays each claiming Physical Class member's NAP calculation, half of the excess will revert to the Moore Defendants with the other half distributed pro rata among claiming Physical Class members with positive NAP calculations. And if 10% of the settlement fund pays each claiming class member's NL calculation, half the excess reverts to the Moore Defendants with the other half shared pro rata among claiming class members with positive NL calculations.

III.    <u>Objections</u>

    a.   <u>Objection of MF Global</u>

      The trustee for the liquidation of MF Global Inc. objects to the proposed settlements with Welsh. As noted above, MF Global is a defendant in this lawsuit, but an automatic stay was entered after it filed a notice of suggestion of bankruptcy on November 8,

2011.  Welsh, a former employee of MF Global, is consenting to the entry of a $35 million judgment against him in favor of the Futures Class and a $7 million judgment in favor of the Physical Class.  The trustee seeks a "clarification" that the stipulated judgment will have no collateral estoppel or preclusive effect on the Plaintiffs' claims against MF Global and that any admission by Welsh is not binding on MF Global.

"[A] non-settling defendant generally lacks standing to object to a court order approving a partial settlement because a non-settling defendant is ordinarily not affected by such a settlement."  Bhatia v. Piedrahita, ---F.3d---, 2014 WL 2883924, at *3 (2d Cir. June 26, 2014) (citing Zupnick v. Fogel, 989 F.2d 93, 98 (2d Cir. 1993)).  "However, there is a recognized exception to this general rule which permits a non-settling defendant to object where it can demonstrate that it will sustain some formal legal prejudice as a result of the settlement."  Bhatia, 2014 WL 2883924, at *3 (citing Zupnick, 989 F.2d at 98).  Formal legal prejudice "exists only in those rare circumstances when, for example, the settlement agreement formally strips a non-settling party of a legal claim or cause of action, such as a cross-claim for contribution or indemnification, invalidates a non-settling party's contract rights, or the right to present relevant evidence at a trial."  Bhatia, 2014 WL 2883924, at *3 (emphasis in original).  "[A] settlement which does not prevent the later assertion of a non-settling party's claims (although it may spawn additional litigation to vindicate such claims), does not cause the non-settling party 'formal' legal prejudice."  Bhatia, 2014 WL 2883924, at *4 (citing Agretti v. ANR Freight Sys., Inc., 982 F.2d 242, 247-48 (7th Cir. 1992)).

The trustee has not shown formal legal prejudice here and does not have standing to object.  Courts do not typically prognosticate about the res judicata effect of current orders in

some future circumstance.  The trustee has raised a number of reasons why the settlement with Welsh cannot bind MF Global.  He can raise these arguments if and when someone claims otherwise.

      b.  <u>Motion to Intervene & Objection of Lead Plaintiffs in Class Action Against Former Officers, Directors, & Employees of MF Global</u>

The lead plaintiffs ("Customer Representatives") in a class action against former officers, directors, and employees of MF Global move to intervene and object to the proposed settlements.  The Customer Representatives' lawsuit, <u>Deangelis v. Corzine</u>, 11 Civ. 7866 (VM) (S.D.N.Y.), accuses the defendants of aiding and abetting MF Global's violations of the Commodities Exchange Act and related claims.  The Customer Representatives argue the D&O policies Welsh is assigning to the Plaintiffs are the same policies the Customer Representatives intend to be the primary source of recovery in their own lawsuit, and Welsh's assignment would frustrate their claims to the policies.  Welsh is assigning his coverage under 2011 policies, but the Customer Representatives argue that the claims in this litigation would be covered, if at all, under 2010 policies.  They claim the assignment should be disallowed because it will result in wasteful litigation over the insurance coverage and who has priority to it.

What Customer Representatives essentially seek is a determination that the Plaintiffs in this litigation have no right to recover under the policies because the Customer Representatives hope to recover from the policies on a judgment they have not yet obtained.  In their reply brief, the Customer Representatives claim a much narrower purpose, stating they ask only that the Court "evaluate whether Welsh is attempting to assign coverage to the D&O Policy under the incorrect policy year, nothing more," in order to ensure the settlement is reasonable.

But it is unnecessary to consider the substance of these objections because the Customer Representatives are not entitled to intervene.

### i. Intervention as of Right

The Customer Representatives are not parties to this action.  A movant may intervene as of right when it

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2).  In addition, "[t]he motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c).

Here, the Customer Representatives' interest is in the insurance policies.  These policies are not "the property or transaction that is the subject of the action"—the subject of the action is the Defendants' alleged manipulation of the platinum and palladium markets.  An interest in assets that may satisfy a judgment but is not the subject of the litigation does not permit a movant to intervene as of right.  See Crown Fin. Corp. v. Winthrop Lawrence Corp., 531 F.2d 76, 77 (2d Cir. 1976) (movants with an interest in real property not entitled to intervene in action on promissory note resulting in judgment lien on the real property); General Star Indem. Co. v. V.I. Port Auth., 224 F.R.D. 372, 376 (D.V.I. 2004) (no intervention as of right where movants' interest was ensuring defendant had sufficient resources to satisfy a separate judgment); In re Healthsouth Corp. Ins. Litig., 219 F.R.D. 688, 691-93 (S.D. Ala. 2004) (no intervention as of right where movants interest was in ensuring insurance policy would cover movants' claims in separate action).

Moreover, "[a]n interest that is remote from the subject matter of the proceeding, or that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule." Wash. Elec. Co-op., Inc. v. Mass. Mun. Wholesale Elec. Co., 922 F.2d 92, 97 (2d Cir. 1990). Here, the Customer Representatives' interest in the insurance policies is contingent on obtaining a judgment in their class action suit. Then, they would need to show that the judgment was covered by any of the policies at issue. The Customer Representatives are not entitled to intervention as of right.

### ii. Permissive Intervention

A court may permit a party to intervene if the party "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). Customer Representatives argue they share a common question of law or fact regarding the rights to the D&O policies. As described above, the insurance rights are not a question of law or fact in this action. The insurance policies are merely how Plaintiffs intend to recover on their judgment against Welsh.

### c. Susan Levy's Motion to Intervene & Objections

Potential class member Susan Levy moves to intervene. Her motion to intervene is denied as unnecessary because "[c]lass members need not formally intervene in order to raise their objections to a proposed settlement." In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 491 (S.D.N.Y. 1998) (citing 3 Newberg on Class Actions § 16.10 at 16–61 to –62 (3d ed.1992)).

Levy filed her own lawsuit alleging substantially the same claims as this action in April 2012, which she has litigated alongside this one. See Levy v. Welsh, 13 Civ. 1858 (WHP)

(S.D.N.Y.).  Disappointed with this settlement, she intends to opt out of the Futures Class and continue to prosecute her own case.  (May 23, 2014 Tr. 38:3-6.)  Levy raises a slew of objections to the proposed settlement and makes numerous accusations against the counsel who negotiated it, repeatedly claiming it is the product of collusion and that counsel for Futures Plaintiffs must be replaced.  The lead attorneys have signed declarations affirming there was no collusion.  (McGrath Decl. ¶ 6; Decl. of Christopher Lovell ¶ 4 (ECF No. 141); Decl. of David Zensky ¶¶ 3-7 (ECF No. 190); Decl. of John Lowther ¶¶ 6-10, 27 (ECF No. 168).)  An attorney for the Moore Defendants describes the settlement negotiations as "the most drawn-out, painstaking, and arduous settlement negotiations I have been a party to in my twenty-seven years as a litigator."  (Zensky Decl. ¶ 4.)  There is no evidence of collusion, and Levy wisely withdrew her collusion claims at oral argument.  (May 23, 2014 Tr. 39:1-2.)

Levy's primary objection is that the settlement "has unfairly allocated 90% of the net settlement proceeds to compensate those investors during the NAP period who they purport to represent at the expense of those investors who invested during the NL period who will just be receiving 10% of the Net Settlement proceeds."  (Mot. to Intervene & Objection to Preliminary Approval (ECF No. 182) ¶ 3.)  As explained further below, 90% of the settlement proceeds will compensate trades made from November 2007 to June 2008 because that is the time Plaintiffs allege Defendants manipulated the market.  The NL period, on either side of the NAP period, is the time that there only <u>arguably</u> may have been manipulation in the markets.  As described below, there would be legal and factual obstacles to recovering for NL trades at trial.  It therefore makes sense to designate the vast bulk of the settlement fund to the NAP period.

Levy incorrectly argues that the 90% allocation to the NAP period favors "short" investors over those, like herself, who were "long." But the plan of allocation treats longs and shorts equally. This objection is a misunderstanding of the allocation.

In a concession to Levy's complaint that it is too burdensome for class members to object to the settlement, the parties have agreed to accept objections by email provided that they are filed with this Court. (Future Pls.' Opp. Mem. (ECF No. 194) at 14.) Much of the remainder of Levy's objections appear rooted in misunderstandings of the plan of allocation or unfounded accusations against counsel for the Futures Class. These objections are better raised at the final approval hearing rather than at this preliminary stage.

IV.   Class Certification

To certify a class, the district court must first find that it satisfies the prerequisites of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). To certify a class under Rule 23(b)(3), as the parties seek here, the court must also find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Rule 23 "does not set forth a mere pleading standard." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011). Rather, "[t]he party seeking class certification must affirmatively demonstrate compliance with the Rule, and a district court may only certify a class

if it is satisfied, after a rigorous analysis, that the requirements of Rule 23 are met." In re Am. Int'l Grp., Inc. Sec. Litig., 689 F.3d 229, 237-38 (2d Cir. 2012).

A court may certify a class for the purpose of a classwide settlement. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 619-22 (1997). In doing so, "a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." Amchem, 521 U.S. at 620 (internal citation omitted).

However, the

> other specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.

Amchem, 521 U.S. at 620.

a. Numerosity

Rule 23(a)(1)'s numerosity requirement is presumed satisfied if there are 40 class members. Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 2005). NYMEX documents show there are about 120 large traders of platinum and palladium futures contracts during the class period, which satisfies the numerosity requirement even without accounting for smaller traders. Third-party discovery shows there are hundreds of members in the Physical Class. (Lowther Decl. ¶ 24.)

b. Commonality

A party seeking certification must show "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "That language is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'" Wal-Mart, 131 S. Ct.

at 2551 (quoting Richard A. Nagareda, <u>Class Certification in the Age of Aggregate Proof</u>, 84

N.Y.U. Law Rev. 97, 131-32 (2009)).  Class claims "must depend upon a common

contention . . . capable of classwide resolution—which means that determination of its truth or

falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."

<u>Wal-Mart</u>, 131 S. Ct. at 2551.  "What matters to class certification . . . is not the raising of

common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to

generate common <u>answers</u> apt to drive the resolution of the litigation.  Dissimilarities within the

proposed class are what have the potential to impede the generation of common answers." <u>Wal-</u>

<u>Mart</u>, 131 S. Ct. at 2551 (emphasis in original) (quoting Nagareda, <u>supra</u>, at 132).

   In both proposed classes, the overarching questions are whether the Defendants

manipulated the futures or physical markets for platinum or palladium.  That will be determined

on a classwide basis without regard for evidence pertaining to individual class members.  The

same is true for determining whether the Defendants acted in an illegal combination or

conspiracy.  The antitrust claims will similarly present common questions.  "Numerous courts

have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust

conspiracy present important common questions sufficient to satisfy the commonality

requirement of Rule 23(a)(2)." <u>In re NASDAQ</u>, 169 F.R.D. at 509 (citing cases).

   c. <u>Typicality</u>

   Typicality "requires that the claims of the class representatives be typical of those

of the class, and 'is satisfied when each class member's claim arises from the same course of

events, and each class member makes similar legal arguments to prove the defendant's

liability.'" <u>Marisol A. v. Giuliani</u>, 126 F.3d 372, 376 (2d Cir. 1997) (quoting <u>In re Drexel</u>

Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992)). "The commonality and typicality requirements tend to merge into one another." Marisol, 126 F.3d at 376. "Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding." Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 155 (S.D.N.Y. 2002). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." Robidoux v. Celani, 987 F.2d 931, 936-37 (2d Cir. 1993).

Here, in both classes each class member's claims arise out of the same course of events. The same allegedly unlawful conduct caused artificiality in the relevant markets, affecting participants in those markets similarly. Both classes therefore meet the typicality requirement.

### d.  Adequacy

Adequacy requires determining whether "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000). "The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class." Damassia v. Duane Reade, Inc., 250 F.R.D. 152, 158 (S.D.N.Y. 2008). As described above, class member Susan Levy argues that the interests of class members who were "long" on futures contracts are antagonistic to those who were "short." There are class representatives that are both short and long as well as class representatives that only recover for trades in the NL period, not the NAP period. (May 23, 2014

Tr. 12:9-13:4.)  Any other class member who feels the class representatives are inadequate may raise that objection at the final approval hearing.

Lead counsel, Lovell Stewart Halebian Jacobson LLP for the Futures Class and Doyle Lowther LLP for the Physical class, are experienced attorneys who have proven themselves qualified and capable to represent the classes.  Both classes meet the adequacy requirement.

e.   Predominance

In a Rule 23(b)(3) class, "questions of law or fact common to class members" must "predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002). Here, the entire case for both classes centers on the Defendants' alleged market manipulation. Defendants have raised no defenses or arguments concerning individual class members. "Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." Amchem Prods., Inc. v. Windsor, 521 U.S. at 625.  No issues having been raised that are subject to individualized proof, classwide issues clearly predominate.

f.   Superiority

In determining whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," a court must consider

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning

> the controversy already begun by or against class members; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Individual class members are likely to recover relatively small amounts, making individual litigations impractical for most of them. They therefore have a strong interest in maintaining a class action. One class member, Levy, filed her own lawsuit, but this does not strongly weigh against certification. It is desirable to concentrate this complex and sprawling litigation in a single forum. Whatever case management problems these classes might present at trial are irrelevant in the context of a settlement class, Amchem, 521 U.S. at 620, and there are no likely difficulties in managing the class settlements. A class action settlement is therefore a superior method for disposing of this controversy.

g.  Class Counsel

The Futures and Physical Classes meet all requirements of Rule 23(a) & (b)(3) and are appropriate for certification. In certifying a class, a court must appoint class counsel after considering

> (i) the work counsel has done in identifying or investigating potential claims in
> the action; (ii) counsel's experience in handling class actions, other complex
> litigation, and the types of claims asserted in the action; (iii) counsel's knowledge
> of the applicable law; and (iv) the resources that counsel will commit to
> representing the class.

Fed. R. Civ. P. 23(g)(1)(A). While these issues must be considered, the court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

In 2010, this Court appointed Lovell Stewart Halebian Jacobson LLP and Doyle Lowther LLP as interim class counsel for the Futures and Physical Classes, respectively. Both firms are experienced in handling class actions and in cases involving claims similar to those here. They have strong knowledge of the law and sufficient resources to represent the classes. And since 2010, they have proven themselves adept at identifying and investigating potential claims, having seen this action from its initiation to these settlements four years later. Lovell Stewart is appointed lead counsel for the Futures Class and Doyle Lowther is appointed lead counsel for the Physical Class.

V.    Preliminary Approval

There is a "strong judicial policy in favor of settlements, particularly in the class action context." In re PaineWebber Ltd. P'ships Litig., 147 F.3d 132, 138 (2d Cir. 1998). Claims in a certified class action may be settled only with the court's approval "after a hearing and on finding that [the settlement] is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). This requires consideration of the "negotiating process leading up to the settlement, i.e., procedural fairness, as well as the settlement's substantive terms, i.e., substantive fairness." McReynolds v. Richards–Cantave, 588 F.3d 790, 803-04 (2d Cir. 2009) (quoting D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001)).

Preliminary approval, at issue here, "is at most a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness." In re Traffic Exec. Ass'n–Eastern R.R.s, 627 F.2d 631, 634 (2d Cir. 1980). A district court should preliminarily approve a proposed settlement which "appears to be the product of serious, informed non-collusive negotiations, has no obvious deficiencies, does

not improperly grant preferential treatment to class representatives or segments of the class and falls within the reasonable range of approval." In re NASDAQ, 176 F.R.D. at 102.

A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." Wal-Mart Stores, Inc. v. Visa U.S.A., 396 F.3d 96, 116 (2d Cir. 2005). Counsel for both the Futures and Physical Classes reviewed over 250,000 pages of discovery, 23 CFTC deposition transcripts, and thousands of email and text messages, and recorded phone conversations. (Lovell Decl. ¶¶ 5-6; Lowther Decl. ¶¶ 3-4, 11-15.) The parties held two mediation sessions which were aided by expert discovery, including a third-party expert who reviewed the parties' expert reports. (Lowther Decl. ¶¶ 6-8; Lovell Decl. ¶ 6; Zensky Decl. ¶ 5.) Counsel for the Moore Defendants characterized the settlement negotiations as painstaking and arduous. (Zensky Decl. ¶ 4.) All counsel are very able and highly experienced. The settlements are entitled to presumptions of reasonableness.

At the final approval stage, courts determine whether a settlement is substantively fair by comparing "the terms of the compromise with the likely rewards of litigation." Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1079 (2d Cir. 1995) (quoting Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982)). Courts in this circuit typically consider the nine Grinnell factors at the final approval stage:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974), abrogated on other grounds by Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000) (internal citations omitted). At preliminary approval, it is not necessary to exhaustively consider the factors applicable to final approval. However, it is clear that this litigation is complex and expensive. While it has already lasted over four years, it could continue longer before reaching trial. As in any market manipulation or antitrust case, Plaintiffs face significant challenges in establishing liability and damages.

Futures Class counsel predicts it could prove Defendants' liability and damages of $400 million at trial, a claim it is settling for $48.4 million in cash plus the $35 million judgment against Welsh and the assignment of his rights under the D&O policies. The cash settlement is a little over 12% of the Futures Class's claims, but this must be viewed in light of the substantial likelihood they would not prove liability at trial, or if they did, that they would not be able to prove or recover their full measure of damages. A study of securities class actions shows that "settlements as a percentage of 'estimated damages' tend to be smaller when 'estimated damages' are larger." Laarni T. Bulan et al., Cornerstone Research, Securities Class Action Settlements—2013 Review and Analysis at 9 (2014), available at http://www.cornerstone.com/getattachment/e1800abc-dc50-4df3-b7a9-cf8ee3fea116/Securities-Class-Action-Settlements%E2%80%942013-Review-an.aspx. For securities class actions from 1996 to 2012 with estimated damages of $250 million to $499 million, the median settlement recovered 2.4% of estimated damages. That may be a rough comparison to this commodities case, but the 12% recovery here is five times better than that benchmark and well within the range of possible approval.

Physical Class counsel predicts it could prove a claim of $59.7 million at trial, and is settling for $9.355 million plus the $7 million judgment against Welsh and the assignment of his rights under the D&O policies.  The cash settlement is over 15% of the Physical Class's estimated damages.  The same study of securities class actions shows that from 1996 to 2012, in cases with estimated damages of $50 million to $124 million, the median settlement recovered 5.3% of estimated damages.  This settlement is for nearly three times that percentage and within the range of possible approval.

But more than the dollar value of the settlements is at issue.  Just 10% of each settlement fund is set aside for NL trades.  The settlement classes were expanded in order to permit the Settling Defendants to obtain a full settlement from all possible claims.  (May 23, 2014 Tr. 16:8-19.)  "Defendants in class action suits are entitled to settle claims pending against them on a class-wide basis even if a court believes that those claims may be meritless, provided that the class is properly certified under Rules 23(a) and (b) and the settlement is fair under Rule 23(e)."  In re Am. Int'l Grp., Inc. Secs. Litig., 689 F.3d 229, 243-44 (2d Cir. 2012) (citing Sullivan v. DB Investments, Inc., 667 F.3d 273, 310 (3d Cir. 2011)).

"[W]hen real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weigh distribution of the settlement . . . in favor of plaintiffs whose claims comprise the set that was more likely to succeed."  In re PaineWebber Ltd. P'ships Litig., 171 F.R.D. 104, 133-34 (S.D.N.Y. 1997) (internal quotation marks omitted); see also Precision Assocs., Inc. v. Panalpina World Transport (Holding) Ltd., No. 08-cv-42 (JG)(VVP), 2013 WL 4525323, at *6 (E.D.N.Y. Aug. 27, 2013) (granting final approval to settlement allocating 90% of funds to particular claims).  Here, the portion of the

settlement funds accorded to NL trades is greatly reduced because Plaintiffs' counsel agree that it would be very difficult to show there was any artificiality in the market at these times, and the claims may have statute of limitations issues or other problems rendering them meritless. (May 23, 2014 Tr. 16:20-25.) "As a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." PaineWebber, 171 F.R.D. at 133. One of the class representatives of the Futures Class collects damages only for NL trades, and the plan of allocation is the result of arm's length negotiations between his own counsel and interim lead counsel, informed by extensive discovery. (May 23, 2014 Tr. 12:9-23, 16:20-17:2.) Of course, class members may raise objections to the plans of allocation at the final settlement hearing, and the plans of allocation give this Court the ability to adjust them if necessary.

To summarize, the proposed settlements appear to be the results of informed, non-collusive negotiations, have no obvious deficiencies, do not improperly grant preferential treatment to any class members, and are within a reasonable range for approval. They are therefore preliminarily approved.

VI.    Notice Plan

Following preliminary approval, notice must be sent "to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). For classes certified under Rule 23(b)(3), like those here, "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class

claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). The proposed notices meet these requirements. (See Lowell Decl. Ex. 1-A (ECF 141-1); Lowther Decl. Exs. A-1, A-2 (ECF Nos. 168-2, 168-3).)

The parties have modified the notice plan as this Court requested at the October 2013 hearing. The Futures Class is sending notice to approximately 120 large traders of NYMEX platinum and palladium futures contracts from during the class period. All investors must purchase futures contracts through NYMEX clearing members, and the Futures Class is also sending notice to all 55 NYMEX clearing members from the class period with instructions to forward the notice to relevant customers. A similar direct notice program is not feasible for the Physical Class because of the diffuse nature of the physical market.

There is also substantial notice by publication. The short-form settlement notice will be published in the Wall Street Journal, Investors Business Daily, Barron's, Futures Magazine, Stock & Commodities Magazine, and Futures & Options World Magazine, as well as on several websites.

The direct notice is calculated to reach all large traders of platinum and palladium futures contracts, and with assistance from NYMEX clearing members, could reach all Futures Class members. Given the greater difficulties in contacting Physical Class members, the proposed publication notice is the best practicable notice plan under the circumstances.

CONCLUSION

The motions of the Customer Representatives and Susan Levy to intervene are

denied, and the objections of MF Global, Inc. and Susan Levy are overruled.  The motions of the

Futures Plaintiffs and Physical Plaintiffs to preliminarily approve the amended settlements are

granted, and the Futures Class and Physical Class are certified under Rule 23(b)(3).  This Court

will hold a fairness hearing on November 7, 2014 at 11:00 a.m.  The Clerk of Court is directed to

terminate the motions pending at Docket Numbers 161, 164, 166, 174, & 182.  This Court will

enter proposed orders from the parties granting preliminary approval of the proposed settlements.

Dated: July 15, 2014
      New York, New York

SO ORDERED:

 

                               WILLIAM H. PAULEY III
                                    U.S.D.J.

*All Counsel of Record*