UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In Re: Platinum And Palladium Commodities Litigation*<br><br>This Document Relates To:<br><br>All Actions | MASTER FILE<br>No. 10 Civ. 3617 (WHP)<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**<u>SIXTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>**

The Futures Plaintiffs (¶¶ 25-27) and Physical Plaintiffs (¶¶ 28-31) complain, upon knowledge as to themselves and their own acts and upon information[1] and belief as to all other matters, as follows:

## I.   <u>NATURE OF THE ACTION</u>

1.   **<u>Manipulation</u>**. Between October 17, 2007 and June 6, 2008 ("Class Period"), Defendants (as defined in ¶¶32-43) engaged in a manipulative scheme to cause, and did cause, artificially high prices of platinum futures contracts and palladium futures contracts traded in this District on the New York Mercantile Exchange ("NYMEX"), as well as artificially high physical prices of platinum and palladium. The Moore Defendants (as defined in ¶38(b)) held both NYMEX platinum and palladium futures contracts and physical platinum and palladium.

2.   **<u>Uneconomic Conduct</u>**. Standard practice among investors or traders is to seek to purchase for the lowest price available. However, pursuant to their manipulative scheme, Defendants repeatedly engaged in a highly unusual violation of this standard practice by seeking uneconomically to overpay to purchase NYMEX platinum and palladium futures by as much as possible. Thereby, Defendants registered the highest price. The highest purchase price possible is the most expensive or worst price for a purchaser (as the Moore Defendants were). This was very uneconomic for an investor or speculator; but it was precisely the type of classic uneconomic conduct that manipulators employ.

---

[1] Plaintiffs' information primarily consists of documents produced in this action by the Defendants, transcripts of testimony and other information received from the Commodity Futures Trading Commission ("CFTC") pursuant to subpoena and publicly available information. The publicly available information includes data purchased from the CME Group (the parent company of the New York Mercantile Exchange ("NYMEX"), regarding end-of-day data, time and sales data, depth-of-market data, best bid and offer data, and other data for NYMEX platinum and palladium futures contracts.

3.    **Express Admissions of Intent to Overpay**. (a) Defendants typically tried to keep their incriminating conversations from being detected. But the Moore Defendants, through Defendant Pia (*see* ¶36) and others, and Defendant MF Global (¶41), through Defendant Joseph Welsh (¶42) and others, let slip into documents or recordings numerous express admissions of Defendants' desire to overpay to purchase NYMEX platinum and palladium futures contracts for as high a price as possible. They did so in communications in which the following phrases were used: **"bid it up," "jack it," "a new high," "do whatever I can to get it [the price] higher," "see if you can get to the"** higher price, **"make sure it close[s] up," "start to march it up," "don't bid, just f--king pay up," "try and get above," "try and get 'em moving," "getting it up on the day," "move this thing," "as long as it stays up there," "make sure they don't come in"** lower, **"banging us out here," "tell them [floor traders] f--king [a higher price] or nothing," "bid the b_tch up," "move it," "kill 'em," "buy 'em up,"** and **"get [prices] up," "100 gets you an all-time high,"** squeeze **[the shorts] make it ugly."** *See* ¶¶91-147.[2] Making new highs or breaking trend lines to the upside are frequently regarded as "buy" signals by various traders, trading programs, and market analysts. Through this conduct, Defendant Pia specifically intended to influence other persons to purchase platinum and palladium.

(b) Recognizing the unlawful nature of the manipulative conduct, prior to the Class Period, Defendants Pia and Welsh, at first, created subterfuges and false reasons to induce the floor brokers to overpay and create high prices. *E.g.*, ¶¶96, 98. However, as time passed, Defendant Pia, through Defendant Welsh, took into their confidence the floor brokers and explicitly told them to overpay. ¶¶117-139. Once corrupted, the floor brokers actively joined in and helped advise Defendant Welsh on how best to overpay and inflate prices. *Id.*

---

[2] The bracketed words and phrases throughout the Complaint have been provided by Plaintiffs.

4.     **Belated Excuses**. However, when Commodity Futures Trading Commission ("CFTC") inquires began to be made of Moore Capital during Spring 2006, Defendant Pia began to create new explanations for such trading and to direct others to "populate" the files with information about the fundamentals of metals. *See* ¶¶153-155 *infra*. Defendant Pia's explanations were based on false premises and were false. *Id*.

5.     **Circumstantial Conduct**. Consistent with their express admissions that they wanted to overpay to create higher prices, the circumstances of how Defendants made their end of day trades further suggest manipulative intent. Defendants made frequent, **large** purchases of NYMEX palladium futures contracts and NYMEX platinum futures contracts in a **compressed** time period during the last seconds of regular trading on the thin and illiquid floor market of the NYMEX. *See* ¶¶166-192. Even absent Defendants' repeated express admissions, frequently buying such large amounts of contracts during such a compressed time period in an illiquid market strongly indicates a desire to overpay to make prices higher. Consistent with this incriminating pattern of uneconomic purchases, some of the express admissions in Defendants' communications are general admissions of a general desire to inflate NYMEX platinum and palladium prices.

6.     **High Frequency**. The Moore Funds (as defined in ¶37), through Defendant Pia and the other Defendants, made such large purchases at the end of regular trading in the NYMEX platinum futures market on 95 of the 127 trading days between November 19, 2007 and May 21, 2008. *See* ¶¶177-179 below. Similarly, the Moore Funds made, through the other Defendants, such large purchases in the NYMEX palladium futures market on 117 of the 119 trading days between November 1, 2007 and May 21, 2008. *See* ¶169 below.

7.     **<u>Defendants Actually Paid Higher Prices.</u>** Defendants' manipulative conduct caused prices to be higher than they otherwise would have been on each and every one of the Moore Funds' foregoing purchases. Such manipulative purchases, the earlier manipulative purchases alleged in ¶¶91-105, the Moore Defendants' positions, and the Additional Manipulative steps alleged herein caused NYMEX platinum and palladium futures contract prices to be artificially high between (at least) October 17, 2007 and May 21, 2008.

a.     After October 31, 2007, on 117 of the 119 trading days when Defendants made end of close palladium purchases, the volume-weighted average price ("VWAP") of Moore Capital's bang the close trades was higher than or equal to the palladium settlement price. *See* ¶ 170 below.

b.     For another example, the VWAP of Moore Capital's trades was greater than or equal to the platinum settlement price on 93 out of 95 trading days on which Moore Capital made its end of trading platinum purchases. *See* ¶ 179 below.

c.     Defendants also succeeded in creating high execution prices relative to many other benchmarks but the particulars of this cannot be reliably determined until discovery; the data publicly available now, which should not be accepted as reliable, do show that Defendants, through these end of day purchases, consistently succeeded in inflating prices. *See e.g.*, ¶¶175-176, 182-187, 191.

d.     For another example, Defendants were also consistently successful in overpaying in the floor market to such an extent that **Defendants paid more in the floor market than the contemporaneously available existing offers to sell that were posted in the electronic market**. *See* ¶¶166-168; 173-175; 191. In other words, Defendants consistently and

regularly refused to purchase at the lower offers available in the electronic market in order to overpay to create higher prices in the floor market.

e.     In sum, consistent with the Defendants' express admissions that they wanted to overpay to create higher prices, and further consistent with the Defendants' pattern of making very large trades designed to overpay in a compressed time period in an illiquid market, Defendants actually did succeed in their intention to overpay and inflate prices.

8.     **Bang the Close**. Closing prices are the most important and most sensitive prices of the day in the commodity futures markets. They are the most widely reported prices of the day. They serve as the proxy to market participants for the price of the futures contract. They are the basis for the computation by the exchange (here, the NYMEX) of each trader's mark to market value of the positions of all traders. "Mark to market" means the value of the position as of the current market price. At the end of each trading day, this computation determines for each trader the entitlement to receive variation margin and more buying power from, or the obligation to pay variation margin to the exchange clearing house. Intentionally overpaying to "bang the close," as Defendants did here, is recognized as a blatantly manipulative and unlawful device that injects illegitimate demand into the commodity futures markets.

9.     **Price Artificiality and Adverse Consequences**. Regardless of whether a transaction is a bang the close transaction, intentionally seeking to purchase so as to overpay and inflate prices is illegitimate conduct that does not contribute to the legitimate demand or price discovery mission of the commodity futures markets. When large funds, for an extended period, intentionally overpay to inflate the publicly reported futures contract prices, the tendency, as occurred here, is to inflate prices for that commodity generally. This inflation causes everybody's prices for the commodity to go up. This takes from and caused indirect losses to the

public. Also, when large sources of capital engage in self-fulfilling prophecy trading to move prices around and profit, it causes losses directly to lawful traders. And it harms the futures markets' price discovery mission by causing behavioral adjustments. In these adjustments, the surviving traders tend to become trend followers rather than students of the fundamentals who contribute to price discovery. Markets cease to be intelligent, participatory markets if this conduct is permitted. If such conduct is prohibited, everybody's prices for the commodity will avoid these unwarranted increases.

10. By frequently and consistently injecting the unlawful, uneconomic and illegitimate large demand element of their purchases into the price equation for NYMEX platinum and palladium futures contracts, Defendants caused NYMEX platinum and palladium futures prices to be artificially high during the Class Period. *See* ¶¶166-195 *infra.*

11. Thereby, Defendants violated Section 9(a) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §13b, which prohibits the manipulation of commodity futures contract prices.

12. **Other Indicia of Causation of Artificial Prices**. After Defendants began their systematic practice of making such blatantly manipulative trades, NYMEX platinum and palladium futures contract prices dramatically increased to levels that were not justified by the fundamentals of supply and demand. *See* ¶¶ 247-264 *infra.* Because such prices were not justified by supply and demand, NYMEX platinum and palladium futures contract prices later— after the Class Period—plummeted back down to lower levels. *See* ¶¶ 260-264.

13. Defendants' manipulative scheme and their frequent large, manipulative bang the close trades were a substantial cause of the unjustified and artificially high prices of NYMEX platinum and palladium futures contracts during the Class Period. *See* ¶ 209 *infra.*

14. Defendants' conduct caused artificially high NYMEX prices in numerous additional ways. *See* ¶¶ 128-130, 131-155. For example, by operation of the NYMEX rules, Defendants' inflation of the NYMEX platinum and palladium futures contracts in which they traded was transmitted to the other NYMEX platinum and palladium futures contracts. *See* ¶229 *infra*. Further, the different NYMEX platinum and palladium futures contract prices are related to one another and subject to arbitrage; thus, in order to do enough to inflate the price of the contract they were trading in, Defendants had to do and did do enough to inflate all the NYMEX futures contract prices. *See* ¶¶ 64, 75 *infra*.

15. **Motive to Increase the Value of Moore's Large Position**. Plaintiffs disclaim any need to plead motive. Defendants' express admissions of their intent to overpay, Defendants' conduct calculated to overpay, and the foregoing data demonstrating that Defendants uniformly succeeded in overpaying on all their bang the close trades for an eight month period, **all** indicate Defendants' manipulative intent. However, another indication of the Moore Defendants' intent to overpay is that the Moore Defendants also had a large financial motive to overpay to inflate prices. *See* ¶¶ 196-207.

16. Specifically, Defendants held extraordinarily large net long positions in NYMEX palladium and platinum futures contracts and physical platinum and palladium contracts. These positions' value gained from increases in prices. Therefore, by inflating the NYMEX closing prices, by inflating NYMEX palladium and platinum futures prices generally through inducing others to purchase, and by otherwise inflating NYMEX prices as alleged herein, Defendants caused their positions to grow to almost a billion dollars in mark to market value and created large paper gains. Defendants' manipulation in violation of the CEA proximately caused the Futures Plaintiffs and members of the Futures Sub-Class (*see* ¶ 308 *infra*) to pay artificially high

prices for NYMEX platinum and palladium futures contracts during the Class Period and to suffer losses and actual damages.

17.     **Agreement in Restraint of Trade**. To any extent that Defendants MF Global and Welsh are not found to be agents of the Moore Defendants, then MF Global was an independent decision maker. *See* Futures' Plaintiffs' "Fourth Claim." Additionally or alternatively, the conversations and other conduct by Defendant MF Global, Defendant Joseph Welsh and others, that have now been alleged in this pleading, reflect that MF Global and Welsh breached legal duties, violated legal rules, and otherwise acted in a manner in which they each independently chose to enter a contract, combination or conspiracy with Defendant Pia and others to fix and inflate NYMEX platinum and palladium futures prices. *Id.* Based on the foregoing, Defendants MF Global and Welsh, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, entered into and engaged in a contract, combination or conspiracy with Defendant Pia and the other persons alleged in the Fourth Claim.

18.     **Physical Market**. The NYMEX futures market provided the price discovery for other platinum and palladium markets including the markets for physical platinum and palladium. By inflating NYMEX futures prices, Defendants' manipulative scheme also artificially inflated the spot prices in the physical market for platinum and palladium. These manipulative trades also caused artificial prices in physical platinum and palladium conforming to NYMEX delivery requirements sold in the physical or "spot" market (hereinafter "Class Commodities").

19.     Defendants' unlawful conspiracy and unlawful conduct created artificial high prices in Class Commodities and damaged the Physical Plaintiffs and members of the Physical Sub-Class (*see* ¶ 325 *infra*) who purchased platinum and palladium during the Class Period.

Accordingly, the Physical Plaintiffs bring this action for treble damages and injunctive relief under Sections 4 and 15 of the Clayton Act (15 U.S.C. §§ 15, 26) for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1). In addition, the Physical Plaintiffs assert violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("Civil RICO") and violations of New York State Law.

## II. <u>JURISDICTION AND VENUE</u>

20.     Palladium is a "commodity" and is the "commodity underlying" palladium futures and options contracts traded on the NYMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

21.     Platinum is a "commodity" and is the "commodity underlying" platinum futures and options contracts traded on the NYMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

22.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, 28 U.S.C. §§ 1331 and 1337 and 18 U.S.C. § 1964.

23.     Venue is proper in the Southern District of New York, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), 28 U.S.C. § 1391(b), (c) and (d), 15 U.S.C. § 22 and 18 U.S.C. § 1964. The Defendants maintain offices in the Southern District of New York, transacted business in the Southern District of New York, the claims arose in the Southern District of New York, and a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

24.     The New York Mercantile Exchange is located in this District at One North End Avenue, New York, New York. On or around March 17, 2008, the Chicago-based CME Group, Inc. acquired the parent company of NYMEX, NYMEX Holdings, Inc. Defendants' unlawful

acts manipulated the prices of NYMEX palladium futures contracts and platinum futures contracts which are traded in this District on the NYMEX.

### III. <u>PARTIES</u>

#### A. <u>Futures Plaintiffs</u>

25.     Futures Plaintiff Richard White purchased two NYMEX March 2008 palladium contracts during the Class Period on October 26, 2007 at prices of $378.65 per ounce and $378.70 per ounce, respectively. Plaintiff White sold these two contracts on November 19, 2007 at a price of $364 per ounce, resulting in losses of $1,465 and $1,470 per contract. Plaintiff White's transactions in NYMEX palladium contracts during the Class Period resulted in a net loss of $2,935.

26.     (a)     Futures Plaintiff The Stuart Sugarman Trust traded NYMEX platinum futures contracts during the Class Period in April and May 2008.  At the end of the Class Period on June 8, 2008, Futures Plaintiff The Stuart Sugarman Trust was long one July 2008 NYMEX platinum futures contract that was liquidated after the Class Period on June 12, 2008 for a loss of approximately $8,165.

(b)     Futures Plaintiff Harry Ploss, on behalf of himself and The Harry Ploss Trust, traded NYMEX platinum and palladium futures contracts during the Class Period from November 2007 through May 2008.  At the end of the Class Period on June 8, 2008, Futures Plaintiff Harry Ploss was long two July 2008 NYMEX platinum futures contracts that were liquidated after the Class Period on June 12, 2008 for a loss of approximately $16,530.

27.     Each Futures Plaintiff was proximately caused injury, loss and actual damages by Defendants' unlawful conduct for the reasons alleged herein. Each Futures Plaintiff paid artificially high prices to establish their long positions or to liquidate their short positions. Each

Futures Plaintiff also suffered net losses on all their purchases during the Class Period and related sales of NYMEX platinum or palladium futures.

**B.  Physical Plaintiffs**

28.     Plaintiff F.W. DeVito, Inc. Retirement Plan Trust ("DeVito Trust") is a retirement plan trust with its principal place of business in Stafford, Virginia. Plaintiff DeVito Trust purchased Class Commodities during the Class Period. Plaintiff DeVito Trust was damaged by Defendants' unlawful contract, enterprise, combination and conspiracy in restraint of trade as alleged herein. Plaintiff DeVito Trust made the following purchases of physical palladium and/or platinum during the class period:

(a)     February 28, 2008, purchased 153 units of Palladium for $893,214.00. The DeVito Trust purchased these units from Monex Precious Metals. At the time the DeVito Trust purchased these units, it believed the price to be free from manipulation and it relied on the integrity of the market in making said purchase.

29.     Plaintiffs Frederick W. and Mary T. DeVito are individuals as well as trustees of the F.W. DeVito, Inc. Retirement Plan Trust who reside in Stafford, Virginia. Plaintiffs Frederick W. and Mary T. DeVito purchased Class Commodities during the Class Period and were damaged by Defendants' unlawful contract, enterprise, combination and conspiracy in restraint of trade as alleged herein. Plaintiffs Frederick and Mary DeVito made the following purchases of physical palladium and/or platinum during the class period:

(a)     February 28, 2008, purchased 153 units of Palladium for $893,214.00. Frederick and Mary DeVito purchased these units from Monex Precious Metals. At the time Frederick and Mary DeVito purchased these units, they believed the price to be free from manipulation and they relied on the integrity of the market in making said purchase.

11

30.     Plaintiff David W. DeVito is an individual and resident of Virginia. Plaintiff David W. DeVito purchased Class Commodities during the Class Period and was damaged by Defendants' unlawful contract, enterprise, combination and conspiracy in restraint of trade as alleged herein. Plaintiff David DeVito made the following purchases of physical palladium and/or platinum during the class period:

(a)     February 27, 2008, purchased 4 units of Palladium for $22,220.00. David DeVito purchased these units from Monex Precious Metals. At the time David DeVito purchased these units, he believed the price to be free from manipulation and he relied on the integrity of the market in making said purchase.

31.     Plaintiff Russell W. Andrews is an individual and resident of the State of Colorado. Plaintiff Andrews purchased Class Commodities during the Class Period. Plaintiff Andrews was damaged by Defendants' unlawful contract, enterprise, combination and conspiracy in restraint of trade as alleged herein. Plaintiff Andrews made the following purchases of physical palladium and/or platinum during the class period:

(a)     July 25, 2008, purchased 10 units of platinum for $174,110.00;

(b)     January 2, 2008, purchased 20 units of palladium for $76,200.00;

(c)     January 24, 2008, purchased 5 units of palladium for $18,445.00;

(d)     February 4, 2008, purchased 20 units of palladium for $83,740.00;

(e)     February 5, 2008, purchased 5 units of palladium for $21,095.00;

(f)     February 25, 2008, purchased 15 units of palladium for $78,030.00;

(g)     February 29, 2008, purchased 5 units of palladium for $29,290.00;

(h)     March 3, 2008, purchased 17 units of palladium for $99,246.00;

(i)     July 23, 2008, purchased 25 units of palladium for $103,190.00;

(j)     August 4, 2008, purchased 5 units of palladium for $19,210.00;

(k)     August 7, 2008, purchased 5 units of palladium for $18,345.00;

(l)     August 13, 2008, purchased 8 units of palladium for $26,592.00;

(m)     August 27, 2008, purchased 5 units of palladium for $14,445.00;

(n)     September 5, 2008, purchased 15 units of palladium for $41,505.00;

(o)     October 3, 2008, purchased 10 units of palladium for $20,200.00. Plaintiff
        Andrews purchased these units from Monex Precious Metals. At the time Plaintiff
        Andrews purchased these units, he believed the price to be free from manipulation
        and he relied on the integrity of the market in making said purchase.

**C.   Defendants**

32.     Defendant Moore Capital Management, LP ("MCM") is a Delaware limited partnership with headquarters at 1251 Avenue of the Americas, New York, New York. Moore Capital Management is a multi-strategy investment firm that manages the investments of several investment funds that invest in a wide variety of instruments, including, but not limited to, commodities and commodity futures contracts. Moore Capital Management is registered with the CFTC as a commodity trading advisor and is a principal of Moore Capital Advisors. MCM is the successor in interest to Moore Capital Management LLC.

33.     Defendant Moore Capital Management, LLC ("MCM LLC") is a Delaware limited liability company. MCM LLC was registered with the CFTC as commodity trading advisor during the Class Period. Defendant Pia was an employee of MCM, LLC during the Class Period.

34.     Defendant Moore Capital Advisors, LLC is a Delaware limited liability company with headquarters at 1251 Avenue of the Americas, New York, New York. Moore Capital

Advisors is a registered commodity pool operator ("CPO") and commodity trading advisor ("CTA"). Moore Capital Advisors, along with Moore Advisors, served as the co-general partner of the Moore Macro Fund, DP and the Moore Global Fixed Income Master Fund, LP.

35.     Defendant Moore Advisors, Ltd. ("MA") is a Bahamian company. Moore Advisors is a commodity pool operator registered with the CFTC. Moore Advisors, along with Moore Capital Advisors, served as the co-general partner of Defendants Moore Macro Fund, DP and the Moore Global Fixed Income Master Fund, LP.

36.     (a) Defendant Christopher Pia is a resident of Greenwich, Connecticut. During the Class Period, Defendant Pia was a portfolio manager for Defendant Moore Capital Management and a close adviser to its founder and head, Defendant Louis Bacon. Pia also was or had been the head of the execution desk of the Moore Defendants. This gave Defendant Pia great influence over brokers and futures commissions merchants such as Defendant MF Global Inc. Defendant Pia had also been a successful trader for over a decade at Moore Capital.

(b) Defendant Pia acted as the employee and/or agent in trading on behalf of Moore Capital Funds. Under Section 2(a)(l)(B) of the Act, 7 U.S.C.§ 2(a)(I)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2009), the act, omission, or failure of any official, agent or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation or trust. Because Defendant Pia intended to inflate prices and was a person acting on behalf of the Moore Capital Defendants (or, in the instance of MCM, the legal predecessor to MCM), each Moore Capital Defendant violated Section 9(a)(2) of the CEA which prohibits persons from manipulating or attempting to manipulate prices of commodity futures contracts.

(c) For and on the behalf of the Moore Capital Defendants and the Moore Funds alleged below, Defendant Pia ordered the manipulative trades. Based upon the documents and multiple conversations that Plaintiffs have now been able to review, Plaintiffs allege that the prime mover or one prime mover of the alleged manipulation was Defendant Pia.

(d) Defendant Pia was related by marriage to Defendant Welsh. Pia is a first cousin to Defendant Welsh's wife.

(e) Defendant Pia was deposed by the CFTC on or about April 29, 2009 as part of the CFTC's investigation into, among other things, the Moore Capital Defendants' trading in NYMEX platinum and palladium futures contracts.

(f) Defendant Pia refused to answer, and instead chose to assert rights under the Fifth Amendment to the United States Constitution, in response to the following questions (among others) from the CFTC.

  i.  "You asked Mr. Welsh and others working with him also to buy at the highest price; is that correct?"

  ii.  "Your unusual instructions to Mr. Welsh and others was based on your intent to manipulate upward the settlement prices of platinum and palladium futures contracts on the New York Mercantile Exchange; is that correct?"

37. (a) Organized under the laws of the Bahamas, **Defendant Moore Macro Fund, LP** was and is a multi-billion dollar investment fund with its own constituent set of investors (which was different from the set of investors for the **Moore Global Fixed Income Fund**). Defendant Moore Macro Fund (sometimes, "Macro Fund" or "MMF") purchased the NYMEX platinum and palladium futures contracts and the physical platinum and palladium alleged hereinabove. The statements for such NYMEX futures contract transactions were addressed to

Moore Macro Fund LP, and the contracts for such purchases of the physical platinum and palladium were entered into and signed by or for Moore Macro Fund LP. Defendant Moore Macro Fund received the profits or losses from such manipulative trades and positions, which were paid for by and benefited the Fund.

(b) Organized under the laws of the Bahamas, **Defendant Moore Global Fixed Income Master Fund, LP** was and is a multi-billion dollar investment fund with its own constituent set of investors (which was different from the set of investors for the **Moore Macro Fund**). Defendant Moore Global Fixed Income Fund (sometimes, "Global Fund" or "FIF") purchased the NYMEX platinum and palladium futures contracts and the physical platinum and palladium alleged in Exhibit A hereto. The statements for such NYMEX futures contract transactions were addressed to Moore Global Fixed Income Fund and the contracts for such purchases of the physical platinum and palladium were entered into and signed by or for Moore Global Fixed Income Fund. Defendant Global Fund received the profits or losses from such manipulative trades and positions, which were paid for by and benefited the Moore Global Fixed Income Fund.

(c) The Moore Macro Fund and the Global Fund are sometimes referred to herein as the "Moore Funds." The investment decisions for the Macro Fund and the Global Fund were made by the Moore Capital Defendants. Moore Capital Management LLC served as the discretionary investment manager of the Macro Fund. Louis M. Bacon served as Chairman, Chief Executive Officer and director of Moore Capital Management, LLC. Further, the Macro Fund's and the Global Fund's co-general partners were Defendants Moore Advisors, Ltd and Moore Capital Advisors. Each Fund contractually owed payments to the Moore Capital Defendants for their

advisor and related services. The greater the profits the Moore Capital Defendants' efforts created for each Fund, the more payments that were due to the Moore Capital Defendants.

(d) In sum, the Macro Fund and the Global Fund each entrusted its investment decisions and investments at issue here to the Moore Capital Defendants who acted for and on behalf of each Fund in selecting its investments for it.

(e) In making the decisions and investments for the Macro Fund and the Global Fund at issue here, the Moore Capital Defendants acted through Defendant Pia and various other persons, who were acting for and on behalf of both the Moore Capital Defendants and the Macro Fund and Global Fund.

(f) Defendant Pia communicated with others at the Moore Capital Defendants about these decisions, including Defendants Louis Bacon and Eugene Burger. Plaintiffs do not allege that the intentionality of the manipulation originated with the Marco Fund or the Global Fund, and Plaintiffs do not allege a "top down" manipulation from the Moore Funds. Plaintiffs do allege that the intent and knowledge of Defendants Bacon, Burger and Pia are attributed to the Moore Funds.

38.     (a) In sum, the different Moore entities played different integrated roles in the alleged manipulation. The Macro Fund and the Global Fund supplied, at the very least, the investment capital. Each purchased, paid for and held its positions in its own names. Each received the profits on its positions. The Moore Capital Defendants were entrusted to manage that capital and invest for and on behalf of the Funds. They were compensated by each Fund, directly and indirectly, based upon the results that the investments generated for each Fund.

(b) Accordingly, Plaintiffs allege and refer collectively to Defendants Moore Capital Management, LP; Moore Capital Management, LLC; Moore Capital Advisors; Moore Advisors,

Ltd.; Christopher Pia; Louis Bacon; and Eugene Burger as the "Moore Capital Defendants." Plaintiffs allege and refer to the "Moore Defendants" as Moore Macro Fund, LP and Moore Global Fixed Income Master Fund, LP and the Moore Capital Defendants.

(c) Absent discovery, the Futures Plaintiffs cannot allege the degree to which either the Macro Fund or the Global Fund possessed the right to terminate investments, terminate the services of one or more Moore Capital Defendants, and/or otherwise act as an independent decision maker with respect to the manipulative trades and positions alleged herein.

(d) The Futures Plaintiffs do allege (1) that the manipulative intent and knowledge of Defendants Pia, Burger and Bacon are imputed to the Moore Capital Defendants, as well as to the Macro Fund and the Global Fund, and (2) that, given the long term manipulative conduct alleged here, the Macro Fund and the Global Fund had very ample means of complete knowledge of the conduct of Defendant Pia and the others who carried out the alleged manipulation. Among other things, the Moore Funds knowingly ratified the manipulative conduct of Defendant Pia and the other Moore Capital Defendants.

39.     (a) Defendant Louis Bacon is a resident of New York, New York. During the Class Period, Bacon was the Chairman and Chief Executive Officer of Defendant Moore Capital Management LP. In that capacity he was the beneficial owner of Defendant Moore Macro Fund LP portfolio assets and indirect beneficial owner of shares held for Moore Macro Fund LP. During the Class Period Bacon also served as Chief Executive Officer of Defendant Moore Macro Fund LP.

(b) According to various codes of conduct for asset managers as well as National Futures Association ("NFA") rules, it is important for investment funds to have a culture of compliance and to follow ethical principles. This culture of compliance begins at the top. Defendant Bacon

was the top officer when the Moore Defendants engaged in hundreds of manipulative trades and dozens of manipulative conversations over a two year long period in connection with what grew to be an almost one billion dollar investment on behalf of the Moore Funds. The Moore Defendants' conduct corrupted Defendant Welsh and floor broker personnel to agree to work to inflate public prices on a consistent basis. At a very minimum, the Moore Defendants breached the industry standards to have a culture of compliance and ethical dealings for an extended period in multiple trades involving many of hundreds of millions of dollars. *E.g.*, National Futures Association Manual/Rules §§2-2(e), 2-4 ("No Member or association shall engage in manipulative acts or practices regarding the price of a commodity futures contract") and Managed Fund Association, Sound Practices for Hedge Fund Managers, Chapter 5.

(c) But Defendant Bacon was more than merely the top officer with respect to the large NYMEX platinum and palladium futures trading. During the Class Period, the Moore Capital Defendants' internal records attributed extensive purchases of NYMEX platinum and palladium for the Global Fund and the Macro Fund to Defendant Louis Bacon. Consistent with common practice among investment funds, Plaintiffs allege that Defendant Bacon was responsible for and was, directly or indirectly, the portfolio manager for all these purchases. *See* Plaintiffs' schedule of the information from Defendants' records reflected in Exhibit A hereto.

(d) Standard practice among investment funds is that the portfolio manager or other official who is responsible for positions (1) knows about the positions, (2) is aware of how they are purchased and sold, and (3) diligently follows the particulars of the purchase, sale and other progress relating to such contracts.

(e) Plaintiffs have good grounds to believe and do allege that Defendant Bacon was, in fact, aware of (1) the positions alleged in Exhibit A hereto, (2) the methods of the purchases and

19

sales of those positions, (3) the financial profitability of such positions *and* (4) *the factors in the market and within the Moore Capital Defendants that affected the cost and perspective revenues of those positions.*

(f) Well before the Class Period, Defendant Bacon received documents reporting on facts about platinum and palladium, and persons who were interested in purchasing platinum and palladium. In late May 2008, Defendant Bacon personally and specifically authorized the continuation of the NYMEX platinum and palladium futures trading by the Moore Defendants after the CFTC investigation or inquires had begun.

(g) Defendant Bacon controlled every single platinum and palladium position in the Global Fund. The mix of the NYMEX palladium and platinum positions in the Marco Fund between Defendant Bacon and Defendant Pia is alleged in Exhibit A hereto. None of the NYMEX platinum and palladium were attributed or allocated to any other Moore Capital portfolio manager or other official.

(h) In fact, (1) the value of the NYMEX palladium and platinum positions grew to approximately $1 billion at their maximum, and (2) Defendant Bacon was the portfolio manager or other person responsible for a much larger portion of those positions than was Defendant Pia.

(i) Further, working with and for Defendant Bacon, Defendant Pia made sure to keep Defendant Bacon informed of the execution of that strategy, of the extraordinary size of the positions, and of other facts, including at least one manipulative conversation with Defendant Pia. ¶ 140.

(j) In an e-mail on September 28, 2007 between Defendant Pia and Defendant Bacon, Pia observes that Bacon was working bids. "I saw that u were looking to work bids. So sprinkled

athousand in there ples a little (redacted) short and the pall [palladium] long [buy]." Moore 0224957.

(k) Then on March 13, 2008 Pia only cancels the program on Bacon's order. Bacon email to Pia: "I think we should lighten upon the pgm's if they are bid." Pia responds to Bacon "I cancelled pgm oda." Moore0225277; Moore0225728.

(l)  On April 2, 2008 Pia emails Bacon to inform him, "you [Bacon] want rifle lonf 50 plat and 50 pall." Bacon responds he "will take he palladium [not platinum]."

(m)  Plaintiffs have good grounds to believe and do allege Defendant Bacon personally initiated or approved the strategy to purchase NYMEX platinum and palladium futures contracts and was kept apprised of the purchases and sales. Further, at least as to the Bacon account, Defendant Pia made the manipulative trades for and on behalf of Defendant Bacon who was a principal with respect to at least these trades.

(n) Finally, Defendant Pia specifically kept Defendant Bacon apprised of Defendant Pia's ability to create tightness for NYMEX platinum futures, and, Defendants' resulting ability to move NYMEX platinum futures contract prices higher. *See* ¶ 140.

(o) Defendant Bacon intentionally participated in and/or provided highly unusual assistance to Defendants' manipulative strategy. This includes knowingly allowing it to be executed by Defendant Pia for Defendant Bacon's managed account as well as Defendant Pia's managed account.

40.    Defendant Eugene Burger is a trader at Moore Capital Management LP. Burger worked with and took instructions from Defendant Pia and Defendant Moore Capital to inflate platinum and palladium prices. Defendant Burger played an essential role in the scheme to overpay for platinum and palladium futures contracts on the market close to inflate prices **both**

by transmitting the manipulative orders to Defendant MF Global and by himself directly transmitting manipulative orders to the NYMEX electronic market. *See* ¶¶ 134, 374, 395.

   a. Defendant Burger was deposed by the CFTC on or about January 28, 2009 as part of the CFTC's investigation into, among other things, the Moore Capital's trading in NYMEX platinum and palladium futures contracts.  Defendant Burger's testimony included the following.

   b. Defendant Burger testified that when Defendant Pia instructed him to buy "aggressively" or to buy "hard MOC," "it was generally my [*i.e.*, Burger's] understanding that the result he wanted was for prices to go higher."  Burger Dep. Tr. 107:22-108:18.

   c. Burger understood that Pia wanted to push NYMEX platinum and palladium futures prices higher.  Burger would try to "provide a fill that would, essentially, yes, do what Mr. Pia asked me to do."  Burger Dep. Tr. 303:21-304:14.

   d. When given instructions from Defendant Pia to "buy aggressively" or "buy hard MOC," Defendant Burger would transmit such instructions to Defendant Welsh over the telephone or via IM.  Burger Dep. Tr. 108:19-109:15; 172:16-22.

   e. On March 7, 2008, Defendant Burger had a telephone conversation with Welsh during which Welsh informed Burger that Welsh was executing Burger's order in such a way as to effectuate Pia's intent to drive the price higher.  Burger Dep. Tr. 149:5-151:8.

   f. On March 7, 2008, Burger had a conversation over Bloomberg Chat in which Pia instructed Burger to try to "jack it."  Burger understood that "jack it" meant to move the price higher. Burger Dep. Tr. 299:19-300:9.  Later in the conversation, Burger informed Pia that "it worked in palladium," meaning the price increased.  Burger Dep. Tr. 157:8-164:13.

g.      In the same March 7, 2008 Bloomberg Chat, Pia says to Burger, "lets see if your systme works in pgms." Burger Dep. Ex. 7.  Thereafter, on March 7, 2008, Burger split an order between Globex and the floor in order to push the settlement price of the June palladium contract higher. Burger Dep. Tr. 188:16-194:12.

h.      On April 30, 2008, Pia instructed Burger in an IM conversation to "buy 25 pall around here. Start to march it up from now," meaning to increase the price of palladium. Burger Dep. Ex. 8.

41.      (a) Defendant MF Global, Inc. ("MF Global") is a financial derivatives broker. Defendant MF Global's headquarters is located in this District at 717 Fifth Avenue, New York, New York 10022. MF Global was the Moore Defendants' futures commission merchant ("FCM").

(b) An FCM is a registered brokerage firm with the CFTC and a self-regulatory organization. As such, an FCM solicits or accepts orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any exchange and accepts payment from or extends credit to those persons whose orders are accepted.

(c) MF Global was the FCM for the Moore Defendants' accounts, accepted and entered their manipulative trades, and otherwise assisted the Moore Defendants. MF Global was a clearing member of the NYMEX throughout the Class Period but MF Global has represented to Plaintiffs that it did not also act as the NYMEX clearing member for the Moore Defendants.

(d) MF Global was not owned by any of the Moore Defendants. MF Global was an independent decision maker, which independently decided to work for and on behalf of the Moore Defendants to manipulate prices.

42.     Defendant Joseph Welsh is a resident of Northport, New York. During the Class Period, Defendant Welsh was senior Vice President and commodities trader for Defendant MF Global. Welsh worked with and took instructions from Defendant Pia and Defendant Moore Capital to inflate platinum and palladium prices. Defendant Welsh was groomed by Defendant Pia to play and, by the time of the start of the Class Period, did play, an essential role in the manipulation. Specifically, Defendant Welsh talked to the NYMEX floor brokers by telephone to implement the scheme to overpay for NYMEX platinum and palladium futures contracts in order to inflate the prices thereof. *See e.g.*, ¶98. Defendant Welsh, along with certain co-conspirators, would assess the depth and liquidity of the market to determine how much platinum and palladium needed to be purchased to artificially inflate the settlement prices to a certain level. Defendant Welsh is related to Defendant Pia by marriage. Pia is a first cousin with Welsh's wife. Welsh is also the Defendant in an enforcement action brought by the CFTC related to the activities that give rise to the claims herein.

a.     Defendant Welsh was deposed by the CFTC in or around April 2009 as part of the CFTC's investigation into, among other things, Moore Capital's trading in NYMEX platinum and palladium futures contracts.  Defendant Welsh's testimony included the following.

b.     Welsh repeatedly discussed the goal of higher prices with Terrone or Sakulich of World Trade Futures who then submitted the large MOC buy orders to the NYMEX platinum and palladium trading pit.  Welsh Dep. 4 443:1-2; 638:17-18; Welsh Dep. 4 390:2-391:6 and see Ex. 63; 365: 9-20.

c.     For example, in a phone conversation on October 17th, 2007, Welsh discussed prices with Terrone and tells him his purpose was to get prices "as high as I can, obviously."  Ex. 67 to Welsh Dep. 4.

d.      Welsh knew of Moore's scheme and actively worked to perpetuate it. Welsh repeatedly testified that Pia's instructions to him were intended to boost prices for NYMEX platinum and palladium.  See Welsh Dep. 3 123:11-15; 143:15-22; 187: 8-12; 210:2-13; 279:17-280:11; 321:11-20; 333:12-22; 365: 9-20.

**D. Co-Conspirators**

43.      (a) Certain floor broker personnel, financial institutions, and other persons or entities whose identities are not yet known to Plaintiffs also participated as co-conspirators in the violations alleged and performed acts and made statements during and in furtherance thereof.

(b) Defendants' co-conspirators include, among others, the NYMEX floor brokers, entities and individuals who assisted Defendants in the manipulative trading alleged herein during the Class Period, as well as individuals who exercised actual, implied or apparent decision-making authority on behalf of those entities and other individuals.

(c) **World Trade Futures, Inc.**  During the Class Period, World Trade Futures, Inc. ("World Trade") operated as the NYMEX floor broker for Moore Capital's large MOC buy orders.

(d)      Alan Kleinstein was the owner and president of World Trade.  Kleinstein was in charge of the NYMEX floor for World Trade.  Dominick Terrone was in charge of the booth for the brokerage and handled the phones on its behalf and through which Moore Capital, per Defendant Welsh and others, transmitted the NYMEX platinum and palladium market on close orders.

(e)      During the Class Period, Dominick Terrone, and John Sakulich were the telephone clerks for World Trade.  During the Class Period, Terrone was the primary telephone clerk for World Trade.

(f)     During 2007 through 2008, the floor brokers and floor traders (or "locals" ) in the NYMEX platinum and palladium futures ring included at least the following persons: Alan Kleinstein ["Nala"], Frederick Ferriola ["FCF"], Richard Trifoglio ["Ritchie" or "Trig"], Peter Venus, Lauren Ladd, Joseph Hollschultz, Toni Celli, Anthony Monti, Steven Farrell ("EST"), Rocky Esposito (or D'Esposito), and Lawrence Favuzza.

(g) The acts charged herein as having been performed by Defendants and their co-conspirators were authorized, ordered, or performed by their directors, officers, agents, employees, or representatives, while engaged in their employment or business duties and acting within the scope of their actual, implied or apparent authority.

## IV.     BACKGROUND

44.     A person may act as a futures contract exchange or board of trade only if that person is approved and designated to do so by the CFTC. The CFTC approves such a designation only if the proposed exchange sufficiently demonstrates (a) that it has rules, such as position limit rules, to prevent price manipulation, and (b) that it has procedures to enforce such anti-manipulation rules.

45.     The NYMEX is designated by the CFTC as a board of trade. NYMEX is the world's largest physical commodity futures exchange.

46.     The NYMEX applies to the CFTC for permission to trade each commodity in which the NYMEX offers a contract. The NYMEX must establish, among other things, that the proposed contract is not prone to price manipulation in order to win approval to trade such contract. NYMEX members and clearing members have to follow the rules of the NYMEX. This includes the most important rules, the rules prohibiting manipulation.

47.     Also, commodity futures professionals licensed as associated persons, futures commissions merchants, commodity trading advisors, and commodity pool operators are required to be familiar with CFTC and exchange requirements. This includes the most important requirements, those prohibiting price manipulation.

48.     A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity. *See Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.) ("*Leist*") *aff'd, Merrill Lynch Fenner & Smith v. Curran*, 456 U.S. 353, 384-85 (1982). In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.

49.     The "bilateral" aspect of the futures contract is that there is a seller and buyer. *Leist*, 638 F.2d at 322.

50.     The sellers are one-half of the bilateral futures contract and one-half of the commodity futures market. *Id.* They are referred to as "shorts." *Id.*

51.     The buyers are the other one-half, and are referred to as "longs." *Id.*

52.     One of the many differences between stock and commodity futures trading is that the commodity exchange (here, the NYMEX) publishes the amount of the open interest of "longs" and "shorts" at the end of each trading day.

53.     Open interest is defined as the total number of futures contracts in a delivery month or market that has been entered into and not yet offset or cancelled. Each open transaction has a buyer (a long) and a seller (a short).

54.     All things equal, buying pressure in a commodity futures contract will increase prices and selling pressure will decrease prices.

55.     Because the prices are publicly reported, the increased or decreased prices resulting from buying pressure or selling pressure may encourage others to act accordingly. For example, buying pressure may increase prices and induce members of the public to buy as well.

A.     **NYMEX Palladium Futures Contracts**

56.     One of the futures contracts created by the NYMEX and approved by the CFTC is the NYMEX palladium futures contract.

57.     Palladium is a silver-white metallic element in the so-called platinum group metals ("PGM").

58.     Palladium futures contracts are transacted electronically on the Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms and also through open outcry on the floor market at the NYMEX in New York. Globex is an electronic trading platform owned by the NYMEX's parent company, the CME Group. Open outcry is a method of public auction for making bids and offers in the trading pits (on the floor) of futures exchanges.

59.     The size of a NYMEX palladium futures contract is 100 troy ounces.

60.     NYMEX palladium futures contracts call for settlement by physical delivery. Palladium delivered under this contract must be a minimum of 99.95% pure.

61.     During each calendar month (the "current calendar month"), the Exchange will make available for trading contracts that provide for delivery of Palladium in the following months: 1) the current calendar month; 2) the first calendar month following the current calendar month; 3) the second calendar month following the current calendar month; and 4) each March, June, September and December during the period beginning with the first calendar month following the current calendar month through the 15th calendar month following the current calendar month.

62.     Trading in palladium futures contracts terminates on the third to last business day of the delivery month.

63.     The settlement prices for palladium futures contracts are calculated based on the volume-weighted average price of all transactions conducted both on the trading floor of the NYMEX and on Globex during the two-minute closing period.

64.     Trading in NYMEX palladium futures contracts is subject to the rules and regulations of the NYMEX, and prices are quoted per troy ounce. Typically—as was the case with palladium futures during the Class Period—the prices for different expirations of futures contracts in the same commodity are chained together by arbitrage and so-called spread trading. Thus, if one contract increases significantly in price it will cause other contracts to also increase in price (though not always by the exact same amount). This was true of palladium futures contract prices during the Class Period.

65.     Regular trading hours for NYMEX palladium futures contracts are Monday – Friday 8:30 a.m. – 1:00 p.m. eastern time. The two-minute closing period ends at 1:00 p.m. for palladium. During regular trading hours NYMEX futures palladium contracts trade on the trading floor as well as on the CME Globex and Clearport electronic trading platforms. The volume of trading was much larger in the electronic market than on the floor market. NYMEX palladium futures contracts also trade continuously from Sunday – Friday 6:00 p.m. – 5:15 p.m. eastern time on the CME's Globex and ClearPort electronic trading platforms.

66.     The volumes of trading and liquidity of trading in the electronic trading platforms were much greater than the floor volume.

**B.     <u>NYMEX Platinum Futures Contracts</u>**

67.     Another futures contract created by the NYMEX and approved by the CFTC is the NYMEX platinum futures contract.

68.     Platinum is a grey-white metallic element and PGM metal.

69.     Platinum futures contracts transact electronically on the CME Globex and CME ClearPort trading platforms and also through open outcry on the floor market in the NYMEX in New York.

70.     The size of a NYMEX platinum futures contract is 50 troy ounces.

71.     NYMEX platinum futures contracts call for settlement by physical delivery. Platinum delivered under this contract must be a minimum of 99.95% pure.

72.     During each calendar month (the "current calendar month"), the Exchange will make available for trading contracts that provide for delivery of Platinum in the following months: 1) the current calendar month; 2) the first calendar month following the current calendar month; 3) the second calendar month following the current calendar month; and 4) each January, April, July and October during the period beginning with the first calendar month following the current calendar month through the 15th calendar month following the current calendar month.

73.     Trading in platinum futures contracts terminates on the third to last business day of the delivery month. For futures contracts it is the front month that is used in establishing the settlement price of the metal.

74.     The settlement prices for platinum futures contracts are calculated based on the volume-weighted average price of all transactions conducted both on the trading floor of the NYMEX and on Globex, during the two-minute closing period. The two-minute closing period for the platinum futures contract ends at 1:05 p.m.

75.     Trading in NYMEX platinum futures contracts is subject to the rules and regulations of the NYMEX, and prices are quoted per troy ounce. Typically—as was the case with platinum futures during the Class Period—the prices for different expirations of futures contracts in the same commodity are chained together by arbitrage and so-called spread trading. Thus, if one contract increases significantly in price it will cause other contracts to also increase in price (though not always by the exact same amount). This was true of NYMEX platinum futures contract during the Class Period.

76.     Platinum and palladium are both used in catalytic converters to cause changes in the emissions from internal combustion engines into gases that are more benign for the ozone layer and environment. Both metals are also used for jewelry. The prices of NYMEX platinum futures contracts can, and did during the Class Period, influence the prices of NYMEX palladium futures contracts and *vice versa*.

77.     Regular trading hours for NYMEX platinum futures contracts are Monday-Friday 8:20 a.m.-1:05 p.m. eastern time. During regular trading hours, NYMEX futures platinum contracts trade on the trading floor as well as on the CME Globex and Clearport electronic trading platforms. The volume of trading was much larger in the electronic market than on the floor market. NYMEX platinum futures contracts also trade continuously from Sunday-Friday 6:00 p.m.-5:15 p.m. Eastern time on the CME's Globex and ClearPort electronic trading platforms.

78.     The volumes of trading and liquidity of trading in the electronic trading platforms were much greater than the floor volume. The prices on the floor were typically higher than the price on the electronic trading platforms.

C.     **The Palladium and Platinum Cash or Spot Market**

79.     The cash market for metals such as platinum and palladium also is called the "spot market." It is called the spot market because transactions take place instantaneously on the posted price, or the on the "spot."

80.     The Physical Plaintiffs' purchases were based on the New York cash, or "spot," market, plus a small transaction fee, typically 1.5% of the order. According to NYMEX, it is the "benchmark" for the metals "asset class," including platinum and palladium, the two metals Moore manipulated with its unlawful trades.

81.     NYMEX claims its superior "liquidity" translates into "tight bid-ask spreads and high-quality trade executions" in the metals market, helping customers' "business and risk management objectives."

82.     A review of the transaction histories in spot and futures prices, for both metals, confirms spot prices correlate directly with futures prices.

 




83.     A similar correlation is seen when comparing future vs. spot prices during the Class period. *See* Exhibit B attached hereto.

## V.     <u>SUBSTANTIVE ALLEGATIONS</u>

84.     Provided that there is no price manipulation, the prices produced by futures contract trading serve three legitimizing functions: (1) price discovery, (2) efficient and fair risk transfer (also known as hedging), and (3) reduction in price volatility. *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1173 (8th Cir. 1971).

85.     But price manipulation destroys all three legitimizing functions of commodity futures trading. *Id*. Indeed, specific price manipulations in the past have even destroyed or greatly impaired various commodity exchanges and specific commodity futures contracts.

86.     The NYMEX palladium and platinum futures markets are not large futures markets, are relatively "illiquid," and are relatively "thin depth" markets. *See* ¶¶ 65, 78 alleging the volumes of trading. That is, both the amount of actual trading is low and the amount of potential trading is low in these markets.

87.     Accordingly, relative to many other futures contracts, the NYMEX platinum and palladium futures contracts were extremely susceptible to a trade manipulation. A trade manipulation is a manipulation by the entry of manipulative trades.

88.     During the Class Period, Defendant Pia, the other Moore Defendants and Defendant MF Global, each acting through their agents and other persons acting on their behalf, intentionally took advantage of the foregoing extreme susceptibility to a trade manipulation of NYMEX platinum and palladium futures contracts. Defendants did so by intentionally overpaying to purchase contracts in those markets and thereby inflating the closing prices in those markets. Defendant Pia would instruct Defendant Welsh to make his purchases in the pit as opposed to Globex, even though Globex almost always offered a cheaper price for platinum and palladium. Defendant Welsh relayed this instruction to other MF Global employees and to the floor brokers. MF Global employee Michael Kerensky testified in the CFTC action against Pia and the Moore Defendants that Welsh told him that all Moore orders were to be done in the pit/floor and not Globex. Kerensky Depo. at 99:6-99:12. Kerensky further testified that over 99.5% of Moore's platinum and palladium orders were done on the pit/floor instead of Globex. *Id*. at 97:8-97:18. Floor broker, Dominick Terrone testified in the CFTC action Welsh ignored the cheaper prices on Globex and purchase platinum and palladium at higher cost on the floor. Terrone repeatedly told Welsh he could purchase platinum and palladium cheaper on Globex but Welsh always told him to purchase from the pit/floor.

89.     Rather than placing a limit on how high the Defendants were willing to pay in order to buy large amounts of contracts during a compressed time in a thin market, Defendant Pia consistently submitted "market on close" orders. Market on close or "MOC" orders are orders that are executed on the close at available prices. These orders are not limited in price.

They are to be executed at whatever prices were required to induce a large volume of selling in that very brief time span. Defendant Pia repeatedly accompanied these MOC buy orders both with specific instructions to overpay and inflate prices and with instructions that he generally wanted to overpay and inflate prices with his market on close purchases. ¶¶90-144. Pursuant to these instructions, Defendant MF Global accompanied its orders to the NYMEX floor brokers with both specific instructions on specific Moore Capital orders and general instructions that they wanted to overpay and inflate prices through MOC trades. *Id*.

90.     Defendants began MOC trading in platinum and palladium at least as early as June 2006 and it continued into May or June of 2008.

**A.** **Express Admissions Of Intentionally Overpaying To Move Prices Or Cause High Closing Prices**

**1. Pre-Class Period Admissions**

91.     From June 7, 2006 until October 17, 2006, numerous messages between the Moore Defendants, per "donnydon66", and MF Global, per Joe Welsh III ("Welsh"), express the intention and plan to overpay to purchase NYMEX palladium futures and NYMEX platinum futures at the highest price possible and otherwise inflate prices and induce others to purchase.

a. The address "donnydon66" was Defendant Pia's IM address. Deposition of Eugene Burger in Pia/Moore CFTC action at 93:9-93:12 (hereinafter "Burger Depo."). Defendant Burger and Defendant Welsh took numerous "bang the close" trade orders from Defendant Pia using this IM address. Additionally, Defendant Pia is referred to as "Don" by several bankers when Pia logs into his Bloomberg account at CPIA@Bloomberg.net, which resolves to "Christopher Pia, Moore Capital Management." Also, Defendant Pia is reportedly 45 years old, which means his birth year was likely 1966; using the birth year as part of a communication address is common. Further, the profanity and misspellings in communications sent from "donnydon66" are similar

to those used in communications attributed to Defendant Pia through an email address Cpia@bloomberg.net, which displays as an IM handle of CPIA in Bloomberg chats. Also, the substance of the communications is similar. Additionally, MF Global, per Mr. Welsh, sometimes states in its instant messages that trades were placed for "Pia" after MF Global, per Welsh, has had communications with "donnydon66." *See, e.g.*, MFG 001666 (on Jan. 3, 2007 instant message user "jf2welsh" writes to instant message user "middpizza," stating, "I did a Pall trade for Pia."), *accord* MFG 001789 (Welsh stating he bought platinum and palladium "earlier for Pia").

b. Joseph Welsh headed up the "Welsh/Marceano" Group at MF Global. Mr. Welsh reported to Tom Harte, MF Global's CEO of U.S. Business, and ultimately Kevin Davis, MF Global CEO).

**MF Global – Welsh Desk Supervisory Structure**



92.      A portion of a June 7, 2006 instant message between the Moore Defendants, per donnydon66, and MF Global, per Welsh, provides as follows (MFG 015553) regarding a palladium order:

| 12:54:00 | Joe Welsh | fyi pall close in 6 minutes |
| 12:55:14 | donnydon66 | buy 100 on th close .. **please jack it [the price] up a little . u have donr a poor job [by not getting high prices] oin the closes for me** |
| | Joe Welsh | got it |
| | Joe Welsh | plat close in 3 minutes fyi |

93.      A portion of a June 8, 2006, an instant message between the Moore Defendants, per donnydon66, and MF Global, per Welsh, states regarding palladium and platinum trades (MFG 015555):

| 12:52:48 | donnydon66 | and everything you do on close should be hard |
| 12:55:14 | Joe Welsh | yes |

94.      On June 14, 2006, the Moore Defendants, per Defendant Pia, and MF Global, per Welsh, had the following discussion regarding first, palladium and, then, apparently, selling NYMEX platinum (MFG 015565):

| 12:50:01 | donnydon66 | buy 50 pall moc [market on close]. **u need to jack it [the price] up** |
| 12:50:09 | Joe Welsh | K [okay] |
| 12:51:10 | donnydon66 | then sell 100 plat. but get me right after pal close as I want to put a limit on plat.. but really do a sloppy jb [buy at a high price] on pall |
| 12:51:18 | Joe Welsh | K [okay] |
| 1:00:05 | Joe Welsh | pall closed |

95.      On June 20, 2006 the Moore Defendants, per Defendant Pia, state to MF Global, per Welsh, (MFG 015579): ***I anly [only] like to jack things [inflate prices] on close.***"

96.     On June 27, 2006, the Moore Defendants, per Defendant Pia (at a time when, again, they were apparently selling platinum) actively discussed with MF Global, per Welsh, executing trades in palladium and platinum in a way to conceal the nature and true "move-prices" purpose of their market-on-close trades (MFG 015590):

| 12:37:44 | Joe Welsh | 313.5/316 |
| 12:38:24 | donnydon66 | 31300 bid for 10 show it |
| 12:38:44 | Joe Welsh | k |
| 12:49:39 | Joe Welsh | pall close in 10 mins |
| 12:55:56 | donnydon66 | on the close I want u to bid up pall 10 lots .. and sell out that 25 plat .. **make it look like u have an error on the 25 u bot** |
| 12:56:06 | Joe Welsh | k |
| 1:05:27 | Joe Welsh | bot 10 PAU6 at 314.52 |
| 1:05:34 | Joe Welsh | sld 25 PLN6 at 1183 |

97.     Some manipulators use action verbs with respect to their conduct towards the price, and derogatory nouns as a substitute for the price. Shortly after telling MF Global, per Welsh, on June 20 that he liked to "jack things on close," the Moore Defendants, per Pia, instructed Welsh to "***bid th bitch up***" on the close. (MFG 015592 June 29, 2006). To "bid" is to buy. To bid up, is to pay higher prices.

98.     (a) On July 19, 2006, the Moore Defendants, per Defendant Pia, and MF Global, per Welsh, wrote as follows with respect to palladium (MFG 0155596):

| 12:52:21 | Joe Welsh | close coming up in a few minutes |
| 12:53:30 | donnydon66 | buy 10 market |
| 12:53:52 | Joe Welsh | bot em at 317.50 |
| 12:53:54 | Joe Welsh | 30 total |
| 12:53:58 | donnydon66 | so far |
| 12:55:14 | Joe Welsh | still offered at 7.5 |
| 12:55:19 | Joe Welsh | maybe 10 up |
| 12:56:15 | donnydon66 | **u have 25 to buy on the close hard .. please take these guys out** |
| 12:56:22 | Joe Welsh | k [okay] |
| 12:59:14 | donnydon66 | seriously keep yourself on the line . **try to make it look llick [like] I am covering a short [i.e., rushed or panic** |

| | | **buying]** |
|---|---|---|
| 12:59:30 | Joe Welsh | k [okay] |

(b) Here, again, Defendant Pia is instructing MF Global's Welsh to stay on the line with the floor broker to make higher prices in the purchase. Defendant Pia knew his conduct was unlawful and, at this early point in his pattern of conduct, was not certain he could bring into his confidence the floor broker personnel. So Defendant Pia instructed Defendant Welsh to use subterfuges and false excuses.

99. (a) An August 1, 2006, instant message between the Moore Defendants, per donnydon66, and MF Global, per Defendant Welsh, discusses an effort to try to overpay to move palladium through the market's "trendline" by purchasing "on the close" (MFG 015609):

| 12:58:13 | donnydon66 | hey bitch buy 10 pau [palladium] |
|---|---|---|
| 12:58:21 | donnydon66 | on the close . and try and do a good job |
| 12:58:28 | Joe Welsh | ok |
| 12:58:40 | donnydon66 | get it thrui trendline |
| 1:06:48 | Joe Welsh | bot the 10 at 322 |

(b) Technical and other traders in the market follow trend lines, new highs, etc. Defendants frequently traded and tried not just to inflate prices as much as possible to cause "buy signals" but also to achieve specific buy signals such as broken trend lines, new highs, etc.

100. In an August 22, 2006, instant message between the Moore Defendants, per donnydon66, and MF Global, per Joe Welsh, Mr. Welsh reports market prices. Donnydon66 instructs Welsh to "mix n match *hard* on close" (MFG 015610):

| 12:50:55 | donnydon66 | buy l0pau6 |
|---|---|---|
| 12:51:00 | donnydon66 | and 10 dec |
| 12:51:04 | Joe Welsh | k |
| 12:54:03 | Joe Welsh | bot 10 PAZ6 at 349 |
| 12:54:18 | Joe Welsh | bot 10 PAU6 at 340.50 |
| 12:54:46 | Joe Welsh | close in 5 minutes |
| 12:55:55 | donnydon66 | **buy 30 more. mix n match hard [inflate prices] on close** |

| 12:56:20 | Joe Welsh | k |
| 12:57:08 | Joe Welsh | going to buy all sep . . . dec will settle off of that |
| 12:57:28 | donnydon66 | k |
| 1:00:48 | Joe Welsh | bot 30 PAU [palladium] 6 at 343 |
| 1:00:50 | Joe Welsh | tku |

101.    On August 30, 2006, the following messages between Moore Capital's Pia and

MF Global's Welsh, reflect the intent to overpay to inflate prices at the close:

| 12:52:38 | donnydon66 | buy l0 dec paz6 here |
| 12:52:44 | Joe Welsh | k |
| 12:53:44 | Joe Welsh | 344.50 |
| 12:54:00 | donnydon66 | how does it come back |
| 12:54:12 | Joe Welsh | 3/5 |
| 12:54:39 | donnydon66 | **lets start walking it up [increasing prices]. pay 5 on 5 or 10** |
| 12:55:34 | Joe Welsh | bot 20 total |
| 12:55:56 | Joe Welsh | 3/6 |
| 12:56:10 | Joe Welsh | offered at 5 again |
| 12:56:15 | donnydon66 | pay 6 [higher than the offer] |
| 12:56:34 | Joe Welsh | how many? |
| 1:00:50 | Joe Welsh | I think 20 at 50 now |
| 12:57:28 | Joe Welsh | going on the close in 30 seconds |
| 12:57:38 | Joe Welsh | working nothing right now |
| 12:57:47 | donnydon66 | buy 25 thru that [buy through the offer to inflate prices] |
| 12:57:50 | donnydon66 | Moc [market on close] hard |
| 12:57:55 | Joe Welsh | k |

102.    On September 7, 2006, the Moore Defendants, per Pia, writing as donnydon66,

tell MF Global, per Defendant Welsh, to "buy 10 paz6 right here," just minutes before the

market closes. Welsh asks if he should still buy "50 on close." Donnydon66 tells Welsh "yes, or

40 dunt matter. ***Which evr is biggest effect*** [to inflate prices]." Here, Defendant Pia is saying the

amount of the purchase is **not** as important as the inflation of prices; purchase **"which ever"**

amount will inflate prices the most.

103.    The next day, on September 8, 2006, the Moore Defendants, per donnydon66, just

thirty seconds before the close, tell MF Global, per Welsh, to "stay on the bid" and to "***jam*** 5 lots

on close." Just one week later, on September 15, 2006, Defendants Pia and Welsh discussed executing last-minute trades to get the market price "moving." (MFG 015427.)

104.    On September 15, 2006 the Moore Defendants, per Defendant Pia, and MF Global, per Welsh, discussed their market-moving trades, and their intent to "get it [the price] moving" just seconds before the market closed (MFG 015427):

| 12:34:33 | donnydon66 | buy another 10 |
|---|---|---|
| 12:34:40 | Joe Welsh | k |
| 12:41:08 | Joe Welsh | 311.70 |
| 12:41:10 | donnydon66 | tku |
| 12:45:29 | donnydon66 | buy 15 more |
| 12:45:35 | Joe Welsh | k |
| 12:50:53 | Joe Welsh | 314.2667 |
| 12:58:51 | donnydon66 | joe give u an oda |
| 12:58:58 | Joe Welsh | yes |
| 12:59:01 | Joe Welsh | to buy 25 |
| 12:59:10 | donnydon66 | **godd get it moving** |
| 1:02:38 | donnydon66 | didi it move |
| 1:02:48 | Joe Welsh | not really |
| 1:02:51 | Joe Welsh | got 315's [up from $314.2667] |

105.    In an October 6, 2006 message, Defendants openly discussed how their trades inflated the market (MFG 015441):

| 12:51:03 | Joe Welsh | pall close in 9 minutes |
|---|---|---|
| 12:56:09 | donnydon66 | buy 10 |
| 12:56:15 | donnydon66 | right here hhard |
| 12:56:23 | donnydon66 | doing it now |
| 12:57:20 | Joe Welsh | bot 10 at 299.50 |
| 12:58:01 | Joe Welsh | 2 minutes left |
| 12:59:03 | donnydon66 | buy 25 on the close |
| 12:59:08 | Joe Welsh | k |
| 1:00:07 | Joe Welsh | bot 25 at 300.50 |

106.     Defendants continued to enter into so-called "market on close" trades in November and December 2006, with the Moore Capital Defendants, per Pia, and MF Global, per Welsh, repeatedly discussing buying large lots "hard" on the close.

107.     On February 13, 2007, the Moore Defendants, per Defendant Pia, messaging as donnydon66, request MF Global, per Welsh, to purchase "50 pah7 [March 2007 palladium] on the close … and there are some shorts u can *squeeze to make it ugly.*" That is, get an even worse, higher price. Welsh responds, "ok." (MFG 001381).

108.     On March 18, 2007, the Moore Defendants, per Defendant Pia, communicating via his donnydon66 instant message account, requests MF Global, per Welsh, to buy 100 of platinum and palladium, and to "***close hard.***" Just several days later, the Moore Defendants, per Defendant Pia, instruct MF Global, per Welsh, to buy 100 lots of platinum and palladium on the close "***as hard as you can.***"

109.     On May 17, 2007, the Moore Defendants, per Defendant Pia, and MF Global, per Welsh, discuss as follows (MFG 001394):

| 12:45:23 | donnydon66 | buy 50 n plat here |
| 12:45:27 | Joe Welsh | k |
| 12:50:48 | donnydon66 | buy another 50 |
| 12:50:51 | Joe Welsh | k |
| 12:50:56 | donnydon66 | and u can get it moving |
| 12:51:45 | Joe Welsh | done on 100 |
| 12:54:01 | donnydon66 | ok buy 100 plat on close hard and 100 pall on close hard |
| 12:54:08 | Joe Welsh | ok |
| 12:55:58 | Joe Welsh | want 1 average on plat for 200 after the close? |
| 12:57:31 | donnydon66 | yes |

110.     (a) In an August 10, 2007 message, MF Global, per Welsh, says MF Global's market-on-close volume trades would "help" to "push it [the closing price] up," and the Moore

Defendants, per Defendant Pia, respond that "I need it to settle higher. So get ready to argue [to the NYMEX settlement committee for a high settlement price]":

| 12:55:12 | donnydon66 | buy 25 pau7 here . |
|---|---|---|
| 12:55:25 | Joe Welsh | k |
| 12:56:40 | donnydon66 | buy 50 moc [market on close] **hard** |
| 12:56:45 | Joe Welsh | k |
| 1:01:40 | Joe Welsh | bot the 25 lot at 355.70 |
| 1:06:25 | donnydon66 | u should be ablr to get it to settle under 3 lower |
| 1:08:02 | Joe Welsh | bot the 50 moc at 360.00 |
| 1:08:02 | Joe Welsh | I will pass the Pall to Eugene |
| 1:09:08 | donnydon66 | ok where are we going to settle |
| 1:09:26 | Joe Welsh | they don't know yet |
| 1:09:59 | Joe Welsh | **we traded some volume on the high of the closing range which will help push it up** |
| 1:12:08 | donnydon66 | **I need it to settle higher. so get ready to argue. that is why** . I was buying csh , and futurs in the last 15 minutes |
| 1:17:27 | Joe Welsh | 358.20 |

(b) Here, "Eugene" refers to Defendant Burger, a trading assistant at Moore Capital. Thus the "hard" market close purchase, executed by MF Global, was "passed" from MF Global to Moore Capital representative Eugene Burger. And MF Global's Welsh himself says that MF Global did "help push it up"—pushed up the closing price—with their volume of MOC trades. Pia responds he wants MF Global's Welsh to "argue" the price higher, because Pia "needs" the price to settle at a specific, inflated price.

111.   Initially, the Defendants' MOC trades were so patently uneconomic and anti-competitive that the floor/pit brokers commented "this guys is a freaking nut job … They would shake their head. You would see them shake their heads when he (Welsh) first started doing it…. they couldn't understand it, nobody did." Deposition of John Sakulich in Pia/Moore CFTC proceeding at 128:5-128:22 (hereinafter "Sakulich Depo."). Sakulich went on to testify that the Defendants just weren't interested in obtaining the best price. *Id*. at 136:4-138:9. Floor broker Lawrence Favuzza responded "Absolutely" when asked whether Moore was buying platinum

and palladium at a price higher than what was available on Globex. Deposition of Lawrence

Favuzza in Pia/Moore CFTC proceeding at 108:3-7 (hereinafter "Favuzza Depo.").

112.    The anticompetitive impact of Defendants' intentionally overpaying to artificially

inflate the closing price of platinum and palladium was readily apparent. These MOC trades

were anti-competitive and artificially inflated the closing price thereby harming consumers.

##### 2.    Class Period Admissions

113.    Based upon the foregoing manipulative conversations and manipulative trades,

the admissions of manipulative trading in the CFTC depositions, as well as the Moore Funds'

accumulated long position in NYMEX palladium futures contracts, Plaintiffs allege that

NYMEX palladium and platinum prices were artificially inflated by the beginning of the Class

Period.

114.    During the Class Period, Defendants continued to have many conversations in

which they expressed a desire to overpay by as much as possible to purchase NYMEX palladium

and platinum futures contracts at the highest (worst) possible prices in order to inflate such

prices.

115.    During and prior to the Class Period, the Moore Defendants, per Defendant Pia,

told MF Global, per Welsh, that MF Global needed to be on the telephone with the floor to

handle the market on close trades and push prices. For one example, on July 19, 2006, the

following exchange took place:

| 07/19/06 12:52:21 PM | Joe Welsh AIM:jf2welsh | Close coming up in a few minutes. . . |
|---|---|---|
| 07/19/06 12:56:15 PM | AIM:donnydon66 | U haev [have] to buy on the close hard . . please take these guys out |
| 07/19/06 12:56:22 PM | Joe Welsh AIM:jf2welsh | k |
| 07/19/06 12:59:14 PM | AIM:donnydon66 | Seriuosly [seriously] **keep yourself on the line**. Try to make it look lliek [like] I am covering a |

| | | short |
|---|---|---|
| 07/19/06 12:59:30 PM | Joe Welsh AIM:jf2welsh | K . . . |

MFG015595-597 [emphasis supplied].

116.     Pursuant to the foregoing instructions, Defendant MF Global entered numerous end of day purchase orders for the Moore Defendants by telephone calls to floor clerks for the floor brokers for MF Global. Some of these conversations are alleged below. Each of these conversations reflects that the Moore Defendants, through MF Global (per, usually, Mr. Welsh) is instructing and otherwise working with the floor clerk to overpay by as much as possible to purchase NYMEX palladium or platinum at the highest (worst) price possible.

117.     (a) On or about October 18, 2007, (between 12:56:51 p.m. and 12:58:48 p.m.), in entering an order for the Moore Defendants, MF Global, per Welsh, instructs the NYMEX floor clerk to buy 50 NYMEX palladium futures contracts and to push the price up. By this time, the start of the Class Period, the NYMEX floor clerks have been brought into the Defendants' confidence and know that, in order to continue to get Defendants' business, they have to push prices up.

| NYMEX Floor Clerk: | Yeah, 20 offered beside the offer. .. I think I can do at least 30 to 50, in that general area. **I can push it higher if it is not 50 offered**. I am telling you there 'cause you have the locals. 2, 4 . . . got 10 seconds. |
|---|---|
| Welsh: | Buy 50. **See what you can do. Push it** [higher, as the clerk had just said]. |

MFG015462\MFG MCM 020143\WAV_275B (emphasis supplied).

(b) The VWAP of Moore Capital's foregoing purchase of 50 NYMEX palladium futures contracts was $373.95 per ounce, which created and was equal to the NYMEX settlement price of NYMEX palladium on this day.

45

118.    (a) On or about October 24, 2007 between 12:55:26 p.m. and 12:58:40 p.m., Defendant MF Global, per Welsh, enters for the Moore Defendants an order to buy 25 palladium contracts during the last 10 seconds of trading on the NYMEX floor. MFG015462_MFG MCM020143_WAV_27CC.

(b) The VWAP of Moore Capital's foregoing last second, large purchase of 25 NYMEX palladium futures contracts was $363.4 per ounce, which was greater than and pulled up the settlement price of NYMEX palladium on this day ($362.65 per ounce).

119.    (a) On or about October 25, 2007 between 12:56:29 p.m. and 12:59:25 p.m. MF Global, per Welsh, enters an order to purchase 25 palladium contracts during the last 10 seconds of trading on the NYMEX floor. MFG015462_MFG   MCM020143_WAV_27EC; MFG015461_MFG MCM020143_WAV_27ED.

(b) The VWAP of Moore Capital's foregoing purchase of 25 NYMEX palladium futures contracts was $370 per ounce, which was greater than and pulled up the settlement price of NYMEX palladium on this day ($369.50 per ounce).

120.    On November 7, 2007, the Moore Defendants, per Defendant Pia, request MF Global, per Joe Welsh, to "buy 25 here and 25 **moc hard** [inflate prices]," to which MF Global, per Joe Welsh responds, "ok." (MFG 001273.).

121.    On or about November 13, 2007, a recorded conversation (between 12:54:34 p.m. and 12:58:39 p.m.), reflects that MF Global, per Welsh, in purchasing for the Moore Defendants, candidly instructs the floor clerk:

| Floor Clerk | we got about 45 seconds before the close…one minute guy…got 10 seconds |
| --- | --- |
| Welsh | buy 50 |
| Floor Clerk | buy half a hundred, market, buy 'em up |
| Welsh | **market don't bid just buy just f--king pay up [increase prices]** |

| Floor Clerk | just pay up [increase prices], buy'em buy'em |

MFG015419_MFG MCM 00947_welsh_Wav_F58. "Market" means market order.

122.    On or about November 29, 2007 (between 12:48:26 p.m. and 12:50:15 p.m.), MF Global, per Welsh, enters yet another end of trading order for the Moore Defendants. This one is to a NYMEX floor clerk to purchase 25 March NYMEX palladium futures contracts.

| Floor Clerk | 46, 50. Its 5 offered at 50 . . . that's showing right now. |
| Welsh | Where is it again? |
| Floor Clerk | 46,50. . . |
| Welsh | March, 4650. And what did you say it was, 5 lots? . . . **Buy 25 market, try to get above 50, try and get 'em [prices] moving [up]**. |
| Floor Clerk | . . . You bought 25 at 351.90. |
| Welsh | 351.90. . . |
| Floor Clerk | Its gonna 5, **its [the price] gonna go up [5] at 50 and [20 at] 51.90.** |

MFG015419_MFG MCM 00947_welsh_Wav_D0D. Here, the Floor Clerk is seeking a happy customer by saying that the price will be higher.

123.    On or about December 10, 2007 (between 1:00:15 p.m. and 1:02:51 p.m.), MF Global, per Welsh, enters another end of trading order for the Moore Defendants. This one is to a NYMEX floor clerk to purchase 50 NYMEX platinum futures contracts, and such clerk indicates that he will do whatever he can to make the price worse for the purchaser, *i.e.,* higher.

| Floor Clerk: | 30 seconds…20 seconds. |
| Welsh: | Offered at 7 and a half. |
| Floor Clerk: | **Best I can get but will do whatever I can to get it [the price] higher. 10 seconds** |
| Welsh: | buy 50 |

MFG01272_MFG MCM 01726_welsh_nycomms Wav_2141. Persons who purchase for investment or speculation **do want** to buy cheaply. Persons who purchase to overpay and

manipulate want the floor broker to rush in at the end of trading in order to "do whatever I can to get the price higher."

124.    On or about December 28, 2007, MF Global, per Welsh, enters another end of trading order for the Moore Defendants. This one is to a NYMEX floor clerk to buy 50 NYMEX platinum and 50 NYMEX palladium contracts. MF Global, per Welsh, indicates that it did not want the floor traders to lower the price and that it wanted to push prices to a higher level.

125.    The recorded conversation (between 12:56:01 p.m. and 12:58:15 p.m.) on a telephone line designated by MF Global as belonging to Welsh includes the following:

| Floor Clerk: | 68 bid at 6980. . . . |
|---|---|
| Welsh: | Where are weris |
| Floor Clerk: | Wow, the 9 offers are gone. Its offered at 71. 68, 71. |
| Welsh: | Its offered at 899, 990, 995, 995.5. |
| Floor Clerk: | I know. |
| Welsh: | **So. Are they going to lower [reduce the price of] the offer in the pit?** |
| Floor Clerk: | **No. You want them to?** |
| Welsh: | **No!** |
| Floor Clerk: | I hope they don't. Offer traded 9. |
| Welsh: | Still offered at 71? |
| Floor Clerk: | 71. |
| Welsh: | Should I buy those 71's? |
| Floor Clerk: | 30 seconds. You mean as a speculation? |
| Welsh: | I want to make sure they don't come in at like 8. [reduce in price to 8, so as to permit a more attractive purchase but thereby reduce prices] |
| Floor Clerk: | 8 bid for March; 8.25 bid at 1. You got **15 seconds**. |
| Welsh: | **Buy me 50 lots**, see if you can get to the 1's [buy as high as 71]. |
| Floor Clerk: | You bought 50 March at 1 I believe. |
| Welsh: | Okay. |

MFG MCM 001726\Welsh\NYCOMMS_WAV_246C.wav.

126.    On or about January 4, 2008, MF Global, per Welsh, enters for the Moore Defendants yet another end of trading order which reflects the corrupting influence of the misuse

of large sums of money to inflate prices. The order is to a NYMEX floor broker to purchase 50 NYMEX palladium and platinum futures contracts on the close. The clerk, who has clearly been working with Defendants for months by this point, then **volunteers** that trading 100 lots would help get the price **higher**. The clerk knows that the person who Defendant Welsh enters orders for wants to inflate prices higher.

        a.     The recorded conversation (between 12:49:41 p.m. and 12:49:51 p.m.) on a telephone line designated by MF Global as belonging to Welsh includes the following:

| Welsh: | **Let's buy 50 each platinum and palladium on the close and we'll see.** |
|---|---|
| Floor Clerk: | Gotcha. |

MFG MCM 001715\Welsh\ NYCOMMS_WAV_37B6.wav.

        b.     The recorded conversation (between 12:54:38 p.m. and 1:02:50 p.m.) on a telephone line designated by MF Global as belonging to Mr. Welsh reveals Defendants' consistent and general intent to inflate prices, as discussed by the Floor Clerk and Mr. Welsh:

| Floor Clerk: | . . . **Okay, here we are on the close. On the March**. . . |
|---|---|
| Floor Clerk: | 74 [374], 78 [378]. Its come off at 8, some at 880 and then its just the 0. The last trade was 73 [373] on this, on my board here. Let me see what it traded here on the electronic. .. Its 74 bid at 75, then its offered at 76, 77, 7[. . .]. Yeah, you can get 8, 880's and 0's maybe, I don't know if there's anything in between. **Today, a good 100 lots would really help, get you really up there if you wanted.** |
| Welsh: | **Yeahhh, well.** |
| Floor Clerk: | **I am just saying! I know the guy likes it higher, that's the only reason. I'm trying to make you happy. . . .** |
| Welsh: | Okay. Hasn't traded yet on the floor? |

| | |
|---|---|
| Floor Clerk: | Hasn't traded. At 8 [378]. 20 seconds, guy. . . 15 seconds. |
| Welsh: | Floor bid at 8[378]? |
| Floor Clerk: | **Floor 8. 10 seconds!** |
| Welsh: | **Buy 50.** |
| Floor Clerk: | . . . I'm trying to bid higher than 8 [that is, say more than 378 but], looks like everybody wants to sell 8's here. [Bell ringing.] . . . |
| Welsh: | Its 7's [377] and 8's [378], so we are gonna get whatever our price is settlement, our average. . . So it doesn't matter that our prints went up late its still part of the close 'cause it was on the floor. .. So we should get it, whatever our average is, should be settled at. Unless we didn't get them. |
| Floor Clerk: | I hope not for your sake! I hope only a couple traded there and the rest them are all 50 or at 8, that makes you upset. . . |
| Floor Clerk: | You got 5 at 377.90, and you got 45 at 378. The 5 at 7 [explaining why they got a lower price buy], somebody else, you know. So, its going to be three prices up there.... |
| Welsh: | 377.90 is the exact. |
| Floor Clerk: | . . . Okay, I'll just put "Joe" on it so Dave knows. |

MFG MCM 001715\Welsh\NYCOMMS_WAV_37B7.wav.

        c.     The recorded conversation (between 12:54:38 p.m. and 1:02:50 p.m.) on a telephone line designated by MF Global as belonging to Welsh also includes the following:

| | |
|---|---|
| Welsh: | What do you got,10 seconds to the close, right? |
| Floor Clerk: | **Yeah, 10 seconds, right. 10 seconds. Hold on.** |
| Welsh: | **Here we go! . . .** You got 30 seconds? |
| Floor Clerk: | I show 30. […] **10 seconds**, buddy! |
| Welsh: | Where is it? |
| Floor Clerk: | Its at 0, maybe 1, get up there. |
| Welsh: | Alright, buy 50. |
| Floor Clerk: | [To the trading floor:] **Buy 50, April's 50**! [Bell ringing.] At 8? |
| Floor Clerk: | Monty came out and offered them at 8, bought 50 at 8. |
| Welsh: | I wrote 50 at 1548. |
| Floor Clerk: | Yeah. 50 April at 1548. |

MFG MCM 001715\Welsh\NYCOMMS_WAV_37B7.wav.

127.    (a) On or about January 8, 2007 (between 1:01:24 p.m. and 1:04:37 p.m.), MF Global, per Welsh, enters an end of trading order for the Moore Defendants. This one is in a conversation with a NYMEX floor clerk that includes the following additional indication of corruption:

| Welsh: | Where is it now? |
|---|---|
| Floor Clerk: | . .. April? 53 [1553] bid at 5760. No size, its all local, so. 30 seconds. 7 bids out, 53, 60. Got 20 seconds. **15 seconds**. |
| Welsh: | There's nobody selling, right? |
| Floor Clerk: | No. Its offered at 0 but I don't see that many. |
| Welsh: | Alright, **buy 50**. |
| Floor Clerk: | [To floor]: Al. [Bell ringing] Come on! Buy it, I don't care. **Pay up to f--kin' 90 [1590], I don't give a sh-t.** [indecipherable] |
| Floor Clerk: | How was that? |
| Welsh: | What's that? |
| Floor Clerk: | I told him, he says **I gotta pay up to 2. I said I don't give a shit, pay up to 90. .. .** |
| Floor Clerk: | 15 at 0 . . . and 35 at 62. . . |
| Welsh: | and 35 at 1562. |

MFG MCM 001715\Welsh\ NYCOMMS_WAV_3823.wav.

(b) Persons who purchase for investment or speculation do want to buy at 1562 rather than 1590 per ounce. Persons who purchase to overpay and manipulate, rush in at the end of trading and purposely pay more. Persons who have corrupted the floor personnel, talk openly about their manipulative intent.

128.    On or about January 10, 2008, MF Global per Welsh, is instructed to purchase 50 NYMEX palladium and platinum futures contracts on the closes for the Moore Defendants "aggressively."

a.    The recorded conversation (between 12:46:28 p.m. and 12:46:41 p.m.) on a telephone line designated by MF Global as belonging to Welsh is as follows:

| Unidentified Person: | Let's buy 50 platinum here, **aggressively [***i.e.*, get prices up.**]** |
|---|---|
| Welsh: | Okay. |
| Unidentified Person: | **And let's buy 50 platinum and 50 palladium on the closes.** |
| Welsh: | Okay. |

MFG MCM 001715\Welsh\ NYCOMMS_WAV_38A4.wav.

      b.     MF Global, per Welsh, then transmits the instructions to a NYMEX floor clerk. The desire of the Moore Defendants and MF Global **to cause new highs** in platinum futures by intentionally overpaying, and the corruption of the floor clerks, are further reflected in that conversation (1:01:10 p.m. to 1:03:59 p.m.). It is between MF Global, per Welsh, and the NYMEX floor clerk:

| Floor Clerk: | Nah, he's telling me something **but I don't want to tell you because I'm not sure they could do it. He says he thinks he can get you the 64's and make a new high. And he asked that.** |
|---|---|
| Welsh: | Okay. But? |
| Floor Clerk: | But I don't want to tell you that and he doesn't do it. . . |
| Floor Clerk: | [To floor]: April! |
| Floor Clerk: | 2 bids. . . Two bids at 4, I'll mark you off on 4's. . . It's a small offer at 4. |
| Welsh: | Where you at? **A couple of seconds?** |
| Floor Clerk: | 2, 4. |
| Welsh: | **Buy 50**. Got it? |
| Floor Clerk: | . . . [Bell ringing] . . . I knew they weren't gonna get it through fours. |
| Welsh: | Bought 1564's? |
| Floor Clerk: | I don't know, he bought 390's and 4's or. As soon as the guy [cried offer], 390's, I knew he had four offers although they're all paper; as soon as he offered 390's. . . |
| Welsh: | What's with the 1539 print, though? . . |
| Welsh: | Make sure its not calculated in. [the closing volume-weighted average price and the spread settlements] |

MFG MCM 001715\Welsh\ NYCOMMS_WAV_38A7.wav.

129.    On or about January 17, 2008, MF Global, per Welsh, enters for the Moore Defendants an end of trading purchase order by instructing an unidentified NYMEX floor clerk to purchase 100 NYMEX palladium futures contracts. The primary concern of Defendants Pia, Moore Capital and MF Global in this conversation is that **prices go to a high level and stay high** during the palladium and platinum closes.

a.    The recorded conversation (between 12:55:14 p.m. and 12:58:12 p.m.) on a telephone line designated by MF Global as belonging to Welsh includes the following:

| Welsh: | So where are we now? |
|---|---|
| Floor Clerk | 6875. The only reason I'm giving you 68 bid is because nobody's bid. I have no idea where it is. I know its offered at 75 because that's where I am. [Bell ringing.] 6875. |
| Floor Clerk | . . . 7075. . . 0 bid at 5. . . 30 seconds. One bid at 5. . . 20 seconds . . . **10 seconds**. |
| Welsh: | Alright, **buy 100**. |
| Floor Clerk | [To trading floor:] Buy 100. [Bell ringing.] |
| Floor Clerk | [Laughs] You hear me say a price? |
| Welsh: | No. |
| Floor Clerk | I'll call you right back. Its gonna get as high as 580. . . . 78 high. |
| Welsh: | Okay, good. |
| Floor Clerk | Does that work for you or no good? |
| Welsh: | No, that's fine. |
| Floor Clerk | That's fine? Okay. |
| Welsh: | **As long as it stays up there.** |

MFG MCM 001715\Welsh\NYCOMMS_WAV_3A36.wav.

b.    The intent of Defendants to overpay as much as possible is then further reflected in a recorded conversation (between 1:00:38 p.m. and 1:03:09 p.m.), a portion of which is as follows:

| Floor Clerk | Okay. April! 0 bid at 65. 8 bid at 7865. . . 58 bid at 65. . . . |
| Welsh: | They're not gonna play with a 20 lot at 390? They are not gonna jump ahead of that, are they? |
| Floor Clerk | 390. |
| Welsh: | On the screen its 20 at 390; they are not gonna sit in front of that, are they? |
| Floor Clerk | 58 [bid at] 65. Not as far as I know. I don't think anybody's got an order anyway. |
| Welsh: | Alright, good. |
| Floor Clerk | [To trading floor:] April. 8 bid at 5? At 5? I got 5 at 5 on the deck. 5's and 580's, I got. |
| Floor Clerk | I got 30, a little less than 30 seconds. 07's on yours. |
| Welsh: | Has it traded yet? |
| Floor Clerk | No. |
| Welsh: | 377 in the palladium? |
| Floor Clerk | . . . **10 seconds**. |
| Welsh: | Alright, **buy 100**. |
| Floor Clerk | [To trading floor:] **Trig!** Buy 100 April. |
| Welsh: | **Trig?!** Wow, what are you doing with **Trig?** |
| Floor Clerk | . . . **He's the one that makes the good high prints [laughs knowingly].** |
| Welsh: | Yeah. [Okay.] Trig's **banging us out here**, that's nice. |
| Floor Clerk | That's what you want, right? |
| Welsh: | Yeah. |
| Floor Clerk | I know. |
| Welsh: | I'm not complaining! . . . |
| Floor Clerk | You bought 100 at 6.5. |
| Welsh: | 100 at 1566.5. . . . |

MFG MCM 001715\Welsh\ NYCOMMS_WAV_3A38.wav.

c. The corruption of the floor personnel is further indicated here because they brag to MF Global that a floor broker named "Trig" is the one that "makes the good high prints," *i.e.*, the inflated, manipulated price prints.

130.    In an IM (MFG001018) between the Moore Defendants, per Donnydon66 (Defendant Pia) and MF Global, per Welsh, on January 18, 2008, the Moore Defendants, per Defendant Pia, again emphasize that they want to use the purchase to cause a higher closing:

| 12:55:05 | Donnydon66 | Buy 50 hard [force prices up] |

| 12:55:07 | Donnydon66 | Moc |
|---|---|---|
| 12:55:14 | Joe Welsh | K |
| 12:57:12 | Donnydon66 | Make it 100 |
| 12:57:15 | Joe Welsh | K |
| 12:57:21 | Donnydon66 | Make sure it [the price] cloese up |

131. **Additional Means of Manipulation**. In a Bloomberg (Moore-0211077) conversation on January 22, 2008, the Moore Defendants, per Defendant Pia, using the "handle" cpia, instruct Marwan Shakarchi of MKS Finance SA, who went by the "handle" Marwan78 to buy in order to **bid up** the physical platinum closing price:

| 16:47:43 | Chris Pia | U will be around for comex closes? |
|---|---|---|
| 16:47:58 | Marwan Shakarchi | yes |
| 17:57:27 | Chris Pia | Buy 5k plat right on close. I want **to bid it [the platinum price] up** |
| 17:57:45 | Chris Pia | U there big boy |
| 17:58:05 | Marwan Shakarchi | Ok |
| 17:58:11 | Marwan Shakarchi | Tku |
| 18:07:57 | Marwan Shakarchi | U done |
| 18:08:04 | Marwan Shakarchi | 1556 ur price |
| 18:08:19 | Chris Pia | Thannk u |
| 18:08:19 | Marwan Shakarchi | Shall afshin call joe? |

132. (a) Another example of intentionally increasing prices (the "higher the better") by overpaying is demonstrated by a portion of a phone conversation in which MF Global, per Welsh, on or about January 24, 2008 (between approximately 12:55:38 p.m. and 12:58:26 p.m.), enters an end of trading order for the Moore Defendants as follows:

| Welsh: | **How do we get a new high?** |
|---|---|
| Floor Clerk: | In March? |
| Welsh: | Yeah. |
| Floor Clerk: | …. March just traded 71. How do you get a new |

| | |
|---|---|
| | high? You buy 10 at 5 and then . . . |
| Floor Clerk: | [To trading floor:] Tell him the March is at 6; kill 'em. Hey, Ritchie, Ritchie, so 5 March at 6; put 'em in at 6 and, put 'em [indecipherable]; cross 'em out…. |
| Floor Clerk: | 10 offered at 5. What's that? |
| Welsh: | Nothing's changing, right? |
| Floor Clerk: | Nothing changed. Ten offered at 5. |
| Welsh: | Hmm. |
| Floor Clerk: | Yeah, its like a told you. 20 seconds. Ten offered at 5, 5 offered at 7, and then 880's. |
| Welsh: | Okay. |
| Floor Clerk: | You've got 50 seconds, ah, **10 seconds**.[until close] |
| Welsh: | Okay. **Buy a hundred, March**. |
| Floor Clerk: | [To trading floor:] Ritchie! [Bell ringing.] |
| Welsh: | Hmm. |
| Floor Clerk: | I'll let you know. |
| Welsh: | What did we get to? |
| Floor Clerk: | I don't know. |
| Floor Clerk: | [To trading floor:] No, no! Did you get it higher? 7 or 8? I don't care. |
| Welsh: | **Higher, the better.** |
| Floor Clerk: | **I'll try and get as high as I could. Alright, I'll call you right back.** |

MFG001261/MFG MCM 001715\Welsh\nycomms_wav_3B88.wav (emphasis supplied).

(b) The above conversation demonstrates disregard for market fundamentals and standard investment or speculation practices of buying low and selling high. On the contrary, the Moore Defendants, through Defendant Pia and MF Global, were willing to, and intended to make any effort to overpay as much as possible in order to cause NYMEX palladium futures contracts to increase the "**higher the better**" and to make "**a new high.**"

(c)        Here again, (1) many market participants follow the trends of market prices and regard new highs as "buy" signals, and (2) Defendants continue to intend to inflate prices in order to cause more purchases by the public and, hence, additional price increases.

133.   Later in the day (between approximately 1:00:59 p.m. and 1:03:12 p.m.), a conversation between Welsh and a NYMEX floor clerk reveals the Defendants' continued effort to manipulate prices, including by prearranging trades and offers (which is a serious rule violation):

| | |
|---|---|
| Welsh: | 6.5![referring to the price of the prior palladium trade] |
| Floor Clerk: | That the highest I get it. |
| Welsh: | That's bullshit. |
| Floor Clerk: | I know. I couldn't bid up the volume. They were [indecipherable] the offer. They didn't tell me about the 6.5 offers. |
| Welsh: | That's bullshit. |
| Floor Clerk: | I tried. |
| Welsh: | **F--k those guys. Get in there and tell them fucking 7.5's or nothing! They don't want to sell it higher?** |
| Floor Clerk: | Can't. |
| Welsh: | Why? |
| Floor Clerk: | Violations and orders. |
| Welsh: | **F--k those guys. F--k compliance.** |
| Floor Clerk: | [Laughs] At least I can put the volume at 6.5. . . 100 at 6.5. |
| Welsh: | They're 100 at? 100 at 376.50 |
| Floor Clerk: | 6.5. . . |
| Floor Clerk: | [To floor]: April! What April? What 10 bid? What? |
| Welsh: | Time? |
| Floor Clerk: | . . . at 1180. Time is another 20 seconds. Its all over, its offered at 11 80, its offered at 18 80. But its small. I'm offering 'em though. **10 seconds**. |
| Welsh: | **Buy 100**. |
| Floor Clerk: | [Bell ringing.] I'll call you back with the platinum. Palladium is 76.5. I'll call you back on the platinum. |

MFG 000128-15765\MFG 001261\MFG MCM 001715\Welsh\ NYCOMMS_WAV_3B89.wav (emphasis supplied). The conversation again shows (1) that Defendants intentionally overpay and want to pay as high as they can, (2) that Defendants disrespect compliance, and (3) that

Defendants will violate rules and corrupt the floor personnel to the greatest extent the Defendants can in order to overpay and inflate prices.

134.    In a recorded conversation between Welsh and Burger, Defendant Welsh states that the purpose of buying in the pit was so that when the individuals who sold the plat or pall would off-lay their risk on Globex after the close, those lower priced buys would not count toward the settlement price. Burger Depo. at 147:15-149:4. Defendant Burger testified that the purpose of this was to ensure a higher settlement price resulted. Burger Depo. at 149:12-149:17.

135.    Deposition testimony taken during the CFTC investigation confirms the purpose of the MOC trades was to affect settlement prices. Moore employee, Joseph Guinta stated when Pia directed to "buy hard" he meant to purchase platinum or palladium without regard to price and that this was done with the intent of pushing the settlement price upward. Deposition of Joseph Guinta in Pia/Moore CFTC proceeding at 464:18-465:9 (hereinafter "Guinta Depo."). Terrone, the World Trades broker who carried out most of these trades testified that when Welsh directed him to "buy me 25 market worst" he was instructing Terrone to purchase at the worst price (highest price). Deposition of Dominick Terrone in Pia/Moore CFTC proceeding at 302:16-302:25 (hereinafter "Terrone Depo.").

136.    Moore employee Luke San Filipo testified the purpose of Pia's MOC trades was to drive the settlement price of platinum and palladium higher. Deposition of Luke San Filipo in Pia/Moore CFTC proceeding at 95:2-95:12 (hereinafter "San Filipo Depo."). Defendant Burger testified that it was "the intention of Mr. Pia was to get the price higher. Mr. Welsh was doing it in a manner that would result in a settlement price that was higher." Burger Depo. at 149:14-149:17.

137.    Many of the floor brokers knew Defendants were attempting to influence settlement prices with their "bang the close" trades. Allan Kleinstein, the owner of World Trade Futures, which acted as the floor broker for the majority of the Defendants' "bang the close" trades, when asked what was the purpose of these trades, stated, "[t]o me, being in the business for as long as I have, he's trying to get the settlement price higher." Deposition of Allan Kleinstein at 157:19-159:12 (hereinafter "Kleinstein Depo.").

138.    The floor clerks were easily corrupted as not only did they benefit directly from the execution of the Defendants' MOC trades, but indirectly by allowing the floor brokers to sell as much platinum and palladium as possible to Moore because they could turn around and buy it back cheaper on Globex making a profit. Sakulich Depo. at 101:14-102:2.

139.    Defendants "bang the close" trades were so routine that during the last 10 seconds of the platinum or palladium close, the pit came to anticipate the trade and would look to floor broker, Dominick Terrone for the entry of these orders. Kleinstein Depo. at 297:12-298:22.

140.    **Another Additional Means Of Manipulation.** On February 6, 2008, the Moore Defendants purchased millions of dollars of the platinum exchange traded fund ("ETF"), which tended to cause that ETF to purchase more platinum. In an email from Defendant Pia to Louis Bacon (Moore-0225040), Defendant Pia states:

> "I bought about. 20 mio of this etf..Two weeks ago for u. If I see that plat. Is tight . I am not. Going to buy more plat .. Unless u want to. But I am going to efp out of our futures into cash, but also into more of the etf .. this should all **cause a tightness** in the front."

By Moore Capital's "causing a tightness in the front [or shortest duration futures contracts]," Moore Capital had an additional means to inflate prices in favor of the huge positions.

141.    On or about February 15, 2008, on Welsh's phone line, between approximately 12:55:55 p.m. and 12:58:39 p.m., Mr. Welsh is recorded entering an order for the Moore

Defendants to a NYMEX floor clerk. The corrupting influence on the floor is reflected here as

the floor clerk gives advice on the lack of liquidity (or available trading interest) and guesses

how much has to be purchased in order best to inflate palladium futures contract prices.

Defendants follow that advice:

| Floor Clerk | I got some news breaking information. There's like 30 to 50 offered between 45 and 46. And then after that there is nothing [inaudible] till 8 dollars. **He thinks 100 lots gets you up to 8 dollars.** That is what you need to know. Cause I am offering 5s and 6s but there are a couple other offers…in palladium. |
|---|---|
| Floor Clerk | 20 seconds |
| Welsh phone line: | Let's get through this f--king thing[buy through the offers to increase prices], buy me 100 |
| Floor Clerk | I got to wait. |
| Welsh phone line: | Buy 100 come on |
| Floor Clerk | 56 bid |
| Welsh phone line: | 56 Bid? You mean 46 |
| Floor Clerk | 56 bid…yeah I told you. I don't know how many I bought. Is that what he wanted? |
| Welsh phone line: | Yeah.. surprised did not think it went out up there |

MFG001251_MFG MCM 001439_welsh_nycomms_WAV_1F17 (emphasis supplied). This

conversation demonstrates, again, that Defendants intended to overpay and increase prices ("gets

you up to 8 dollars") and that the floor clerk knew this and was corrupted into working with

Defendants to do so including by revealing to the floor clerk's confidential orders.

142.   On or about March 5, 2008, between approximately 12:56:46 p.m. and 12:58:22

p.m. and then again between approximately 1:00:49 p.m. and 1:04:25 p.m., MF Global, per

Welsh, flaunts the Defendants' desire to inflate palladium and platinum contract prices while

giving an order on behalf of the Moore Defendants:

| Welsh phone line: | **Think we can move this thing today[make the prices increase], get a little action** |
|---|---|
| Floor Clerk | 60 bid at 66…got to buy on market or it is going to be rugged. 15 seconds, ok can do 1000 |
| Welsh phone line: | **Buy 100[palladium] market** |
| Floor Clerk | Tried to get as high as 66 got to get to 4 |
| Welsh phone line: | That sucks they are stupid |

MFG000250_MFG MCM00123_jw7E9 (emphasis supplied).

143.    On March 7, 2008, Defendant Burger of Moore Capital and Defendant Pia had a conversation on Bloomberg that included the following:

| 17:44:23 | Chris Pia | And buy 100 pam8 moc |
|---|---|---|
| 17:44:46 | Chris Pia | U can use joe if you want. Tey to jack it…lets see if your system works in pgms |
|  | … |  |
| 18:05:26 | Eugene Burger | It worked in pall |
| 18:05:47 | Eugene Burger | 50 plat wasn't enough |
| 18:06:05 | Eugene Burger | I buy it on the screen while Joe does some on the floor |
| 18:08:22 | Eugene Burger | Where do you want it to go |

144.    Also, on or about March 7, 2008, an MF Global conversation about causing higher prices was recorded on both Welsh's and Michael Kerensky's ("Kerensky") phone lines between 12:43:39 p.m. and 12:44:49 p.m. This conversation describes how the Moore Defendants' high priced overpayments and purchases at the end of the day were designed to make the lower priced electronic market transactions not count in the VWAP calculations.

| Unnamed person | How does platinum and palladium work? Its like, how long is the closing range? |
|---|---|
| Welsh or Kerensky line | Two minutes each |
| Unnamed | Oh, two minutes really? |

| person | |
|---|---|
| Welsh or Kerensky line | **Yeah two minutes. What happens is it kinda sits there dead and I buy it on the floor because the spreads are so much wider. What happens a lot of the time is the [inaudible] will not take us and then go and buy it on the screen. So I do it right at the very end so all the screen prints don't count** |
| Unnamed person | So all the screen prints don't count |
| Welsh or Kerensky line | So the **lower** prints don't count |
| Unnamed person | They do it by volume weighted average? |
| Welsh or Kerensky line | Volume weighted average unlike the grains |

MFG000250_MFG MCM00123_j284F; MFG000918_MFG

MC0051106_Kerensky_nycomms_Wav_131B (emphasis supplied).

145.    On or about March 31, 2008 between approximately 12:54 p.m. and 1:01:53 p.m.,

MF Global, per Welsh, discusses whether a 100 contract purchase for Moore Capital would be

sufficiently large to overpay to the extent of causing a new high price for the contract. Once

again, the floor clerk knows that Defendants want to cause higher prices, including new high

prices which induce yet more people to purchase palladium and platinum.

| Floor C | **100 gets you a new high. There are a few here and there but that is it** |
|---|---|
| Welsh phone line | **A new high, like above 52[inaudible]** |
| Floor Clerk | **A new high, 45. Higher than 48. Got 20 seconds. It is 24, 50** |
| Welsh phone line | Buy 100 july[palladium] |
| Welsh phone line | **What are the chances of getting it [price] up on the day?** |
| Floor Clerk | Probably none. June trades at 45….30 seconds. 10 |
| Welsh phone line | K, buy 100[platinum] |

MFG000250_MFG MCM00123_jwB77; MFG000250_MFG MCM00123_jwB7A;

MFG000250_MFG MCM00123_jwB79 (emphasis supplied).

146.    On or about April 17, 2008, two conversations, recorded on Joseph Welsh's phone line, at approximately 12:53:47 p.m., show that Defendants knew that what they were systematically doing was unlawful.

| Welsh | **Buy 50[palladium]. Come on! Move it[higher]! Come on move it baby, move it.** |
|---|---|
| Floor Clerk | **Bought 35 lots, buy compliance guys will not let me do more** |
| Welsh | **Really, so I have to buy 15 lots** |
| Floor Clerk | **You bought 15 lots on screen?** |
| Welsh | **Yeah, we always can we just opt to use you.** |
| Floor Clerk | **I just told him to be more aggressive with it, buy more off quickly.** |
| Welsh | Beyond that |
| | I cannot ask they[compliance people] are all around |
| Welsh | What |
| Floor Clerk | I can't ask |
| Welsh | YOU Can't ask depth of market |
| Floor Clerk | I can't ask depth of market, no I can't ask depth of market |
| Welsh | Why |
| Floor Clerk | Because they allow on Globex. On Globex they allow you to do that here they don't. |
| Welsh | Why |
| Floor Clerk | **They always did that. You know better than that Joe [Welsh] you've been here four years. That is asking where all the orders are. Not allowed to do that. You know that been here long enough** |
| Welsh | **We always ask** |
| Floor Clerk | **(whisper) I ask because I can tell you but I cannot ask now because the guys[compliance] are down here. You got my point…15 seconds** |
| Welsh | Aight buy 50[platinum] |

MFG000250_MFG MCM00123_jw1008; MFG000250_MFG MCM00123_jw1009 (emphasis supplied). The above conversation demonstrates the Defendants' intent to inflate prices by making end of day trades and violating NYMEX rules and broker duties.

147.     In a Bloomberg chat on April 30, 2008, Defendant Pia instructs Defendant Burger and Craig Berendowski of Moore to "march it [the price] up" (Moore-0212153)

| 16:35:49 | Chris Pia | Ok Eurgne,, buy 25 pall around here. Start to **march it up from now**. |
|---|---|---|

Defendant Pia then instructs Defendant Burger to buy 25 more, and then buy 25 on the close. The trading pattern, along with Pia's instructions, indicates an intent to raise the price of the commodity and continue to pay higher, artificial prices. When questioned about this chat, Defendant Burger testified that he interpreted "march it up" to mean he (Burger) should engage in a strategy to push the price of palladium higher. Burger Depo. at 216:7-216:22.

148.     On May 9, 2008, Defendant Pia emailed Christion Levett of Clive Capital and tells him that he pushed platinum on the close:

| 7:01 AM | Chris Pia | Looks like it [platinum] broke yesterday….I pushed it abit on close yesterday. |
|---|---|---|

149.     By March 26 or May 22, 2008 and continuing into June 2008, in response to inquiries (including two written inquiries from the CFTC), Moore Capital had begun to investigate its end of day trading.

150.     The Moore Defendants continued to purchase NYMEX platinum and palladium futures.

151.     From late May 2008 forward, there is no record (produced to Plaintiffs) of Defendant Pia saying that he wanted to overpay in order to inflate prices. Nor did Defendant Pia refer to prices by derogatory words (such as "bitch"). And Defendant Pia conspicuously did not use verbs such as that he wanted to "jack up" the close, "march it higher," "move it," etc.

152.     Instead, Defendant Pia reversed course. Now, with the CFTC investigation or inquiring, he began to provide new attempted justifications for his long term manipulative conduct—justifications that were false.

153.     One attempted justification was that Defendant Pia stated, on May 22, 2008, that he bought platinum and palladium on the closes of trading, and sold them on the opens of trading. CLP-000172 - 173. In this explanation, Defendant Pia implicitly acknowledged his price impact by saying that he regularly lost money on such daily in and out trades. CLP-000172. However, this explanation only makes things worse for Moore Capital because its records do not reflect that Defendant Pia made daily buy and sell trades.

154.     During the ten month time period for which trading records were produced (*i.e.*, August 13, 2007 – May 29, 2008) Moore Capital either only bought or only sold palladium futures contracts on more than 80% of the trading days on which it traded palladium futures contracts. Similarly, Moore Capital either only bought or only sold platinum futures contracts on more than 87% of the trading days on which it traded platinum futures contracts. Thus, Moore Capital could not have been daily buying and selling during 80% - 87% of the time that it was trading platinum and palladium futures contracts. In fact, Moore Capital opened and closed a position of equal size on the same trading day only **once** in palladium futures contracts and only **once** in platinum futures contracts throughout the entire ten month time period for which trading records were produced.

155.     Also, in this explanation, Defendant Pia stated that the close was the most liquid time of day. However, if liquidity were truly the concern of Defendant Pia, then trading volume is one measure of liquidity. According to NYMEX records for the period January 2, 2008 through April 24, 2008, the daily average volume for the April 2008 NYMEX platinum futures

contract was 2,520, of which 499 traded, on average, on the floor, and 2,021 traded, on average, on the electronic platform.

156.   **July 2008 Contract**. According to NYMEX records for the period January 2, 2008 through May 30, 2008, the daily average volume for the July 2008 NYMEX platinum futures contract was 1,103, of which 208 traded, on average, on the floor, and 894 traded, on average, on the electronic platform. If the Moore Defendants' end of day trades in NYMEX platinum futures contracts on the floor are subtracted, then the platinum volume on the floor is approximately one-seventh of that on the electronic market.

157.   **March 2008 Contract**. According to NYMEX records for the period January 3, 2008 through March 26, 2008, the daily average volume for the March 2008 NYMEX palladium futures contract was 1,776, of which 517 traded, on average, on the floor, and 1,259 traded, on average, on the electronic platform.

158.   **June 2008 Contract**. According to NYMEX records for the period January 1, 2008 through May 30, 2008, the daily average volume for the June 2008 NYMEX palladium futures contract was 1,453, of which 353 traded, on average, on the floor, and 1,100 traded, on average, on the electronic platform. If Moore Capital's end of day trades were subtracted from the floor volume during the closing period, these numbers would be much smaller.

159.   If Defendant Pia's concerns were liquidity, then the volume of trading in the electronic market compared to the floor market was approximately four times as great in platinum and approximately two and a half times as great in palladium. Yet Defendant Pia focused overwhelming, although not exclusively, on the NYMEX floor market.

160.   Also, if Defendant Pia's concerns were liquidity, he would have traded a very small amount of contracts and spread them out over a longer time. Instead, Defendant Pia waited

until the very end of trading to do a large number of contracts in a very short compressed time period. This deprived his purchases of the relative liquidity they would have enjoyed if they had been carved up and spread out over a reasonable time period during which they would have constituted a much lower percentage of the market.

161.   Moore Capital's large orders of between 20 and 100 contracts in the last seconds of trading NYMEX platinum and palladium contracts constituted between approximately 6% and 28% of the average floor volume in platinum FOR THE ENTIRE DAY, and 5% and 23% of the average daily floor volume in palladium FOR THE ENTIRE DAY.

162.   Thus, Defendant Pia did not want liquidity. He wanted **ill**iquidity. Therefore, Defendant Pia consistently avoided the electronic market. Instead, he consistently put his large purchase orders into the much smaller floor market and at a compressed time at the very end of trading. Therefore, Defendant Pia's attempted liquidity justification is an incorrect afterthought. There was no legitimate explanation for Defendants' bang the close trades and the Moore Defendants did not and cannot provide one.

163.   On or about April 17, 2008, two conversations, recorded on Joseph Welsh's phone line, at approximately 12:53:47 p.m., further demonstrate that Defendant MF Global knew that what it was systematically doing was unlawful. *See* ¶ 137, *supra*.

164.   Further, as MF Global well knew, the NYMEX floor brokers were not supposed to divulge their orders from customers other than MF Global, to MF Global. However, Defendants MF Global and Welsh habitually induced the floor brokers to violate this confidentiality of the floor brokers' other orders. Defendants MF Global and Welsh induced this breach in order to learn the structure of orders in the market and cause prices to move as high as possible.

165.     Defendant Pia, on November 13, 1991 signed a document which stated that he read the Policies And Code Of Ethics And Conduct of Moore. Further, Pia stated the he would "comply in each and every respect with the rules and regulations of the Commodity Futures Trading Commission, the National Futures Association, the exchanges with which Moore may be associated, state securities regulations, and any and all other laws, rules and regulations applicable to Moore." Moore-0005935.

## B.     DEFENDANTS, IN FACT, MADE FREQUENT, LARGE BANG THE CLOSE TRADES THAT, IN FACT, INFLATED PRICES

### 1.     NYMEX Palladium Futures

166.     Moore Capital made bang the close trades in NYMEX palladium futures contracts on 119 days out of the 139 trading days between November 1, 2007 and May 21, 2008. On many of these 119 days Moore Capital made more than one bang the close trade.

167.     The table in the following paragraph alleges the following particulars:

    a.   the trade date of each Moore Capital bang the close trade in Column A;

    b.   the NYMEX palladium futures contract that Moore Capital purchased in Column B;

    c.   the price of each bang the close trade in Column C;

    d.   the volume of each bang the close trade in Column D;

    e.   the VWAP of the bang the close trade(s) in Column E;

    f.   the Moore Fund for which the trade was made in Column F;

    g.   the Moore Portfolio Manager for which the trade was made in Column G.

168.

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| Trade Date | Contract | Price | Volume | VWAP | MMF / FIF | Pia / Bacon |

| 11/01/07 | 07Z | 376 | 5 | - | FIF | Bacon |
|---|---|---|---|---|---|---|
| 11/01/07 | 07Z | 375.9 | 5 | - | FIF | Bacon |
| 11/01/07 | 07Z | 375.5 | 5 | - | FIF | Bacon |
| 11/01/07 | 07Z | 377.9 | 2 | - | FIF | Bacon |
| 11/01/07 | 07Z | 377 | 2 | - | FIF | Bacon |
| 11/01/07 | 07Z | 376.9 | 2 | - | FIF | Bacon |
| 11/01/07 | 07Z | 378 | 1 | - | FIF | Bacon |
| 11/01/07 | 07Z | 375.5 | 1 | - | FIF | Bacon |
| 11/01/07 | 07Z | 375.9 | 1 | - | FIF | Bacon |
| 11/01/07 | 07Z | 376 | 1 | 376.228 | FIF | Bacon |
| 11/05/07 | 07Z | 375.5 | 12 | - | Not clear | Not clear |
| 11/05/07 | 07Z | 375 | 10 | - | Not clear | Not clear |
| 11/05/07 | 07Z | 374.8 | 2 | - | Not clear | Not clear |
| 11/05/07 | 07Z | 375.9 | 1 | 375.258 | Not clear | Not clear |
| 11/06/07 | 07Z | 380 | 50 | 380 | MMF | Bacon |
| 11/07/07 | 07Z | 378 | 20 | - | FIF | Bacon |
| 11/07/07 | 07Z | 376 | 5 | 377.6 | FIF | Bacon |
| 11/08/07 | 07Z | 377.8 | 25 | 377.8 | MMF | Bacon |
| 11/09/07 | 07Z | 377 | 25 | 377 | Not clear | Not clear |
| 11/12/07 | 07Z | 371.5 | 6 | - | FIF | Bacon |
| 11/12/07 | 07Z | 370 | 5 | - | FIF | Bacon |
| 11/12/07 | 07Z | 369.8 | 3 | - | FIF | Bacon |
| 11/12/07 | 07Z | 368.7 | 2 | - | FIF | Bacon |
| 11/12/07 | 07Z | 371.5 | 1 | - | FIF | Bacon |
| 11/12/07 | 07Z | 371.4 | 1 | - | FIF | Bacon |
| 11/12/07 | 07Z | 371 | 1 | - | FIF | Bacon |
| 11/12/07 | 07Z | 370.9 | 1 | - | FIF | Bacon |
| 11/12/07 | 07Z | 370.8 | 1 | - | FIF | Bacon |
| 11/12/07 | 07Z | 370.7 | 1 | - | FIF | Bacon |
| 11/12/07 | 07Z | 369.6 | 1 | - | FIF | Bacon |
| 11/12/07 | 07Z | 369.6 | 1 | - | FIF | Bacon |
| 11/12/07 | 07Z | 369.1 | 1 | 370.4 | FIF | Bacon |
| 11/13/07 | 07Z | 374.5 | 50 | 374.5 | MMF | Bacon |
| 11/14/07 | 07Z | 374 | 21 | - | FIF | Bacon |
| 11/14/07 | 07Z | 373.9 | 4 | 373.984 | FIF | Bacon |
| 11/15/07 | 07Z | 371 | 25 | 371 | MMF | Pia |
| 11/20/07 | 07Z | 364.5 | 21 | - | Not clear | Not clear |
| 11/20/07 | 07Z | 363.8 | 4 | 364.388 | Not clear | Not clear |
| 11/21/07 | 08H | 365 | 25 | 365 | Not clear | Not clear |

| 11/23/07 | 08H | 366.5 | 25 | 366.5 | MMF | Pia |
|---|---|---|---|---|---|---|
| 11/26/07 | 08H | 365 | 25 | 365 | Not clear | Bacon |
| 11/27/07 | 08H | 355 | 50 | 355 | MMF | Bacon |
| 11/28/07 | 08H | 351 | 5 | - | MMF | Bacon |
| 11/28/07 | 08H | 352 | 45 | 351.9 | MMF | Bacon |
| 11/29/07 | 08H | 350 | 25 | 350 | Not clear | Bacon |
| 11/30/07 | 08H | 353.8 | 100 | 353.75 | MMF | Bacon |
| 12/03/07 | 08H | 352 | 25 | 352 | FIF | Bacon |
| 12/04/07 | 08H | 353.5 | 21 | - | FIF | Bacon |
| 12/04/07 | 08H | 353 | 4 | 353.42 | FIF | Bacon |
| 12/05/07 | 08H | 355 | 50 | 355 | FIF/MMF | Bacon |
| 12/06/07 | 08H | 351.8 | 50 | 351.8 | MMF | Bacon |
| 12/10/07 | 08H | 349.5 | 50 | 349.5 | MMF/FIF | Pia/Bacon |
| 12/12/07 | 08H | 353 | 40 | - | FIF | Bacon |
| 12/12/07 | 08H | 352.9 | 5 | - | FIF | Bacon |
| 12/12/07 | 08H | 352 | 5 | 352.89 | FIF | Bacon |
| 12/13/07 | 08H | 351.9 | 50 | 351.9 | MMF | Bacon |
| 12/14/07 | 08H | 357.8 | 50 | 357.8 | MMF | Bacon |
| 12/17/07 | 08H | 362 | 50 | 362 | FIF | Bacon |
| 12/18/07 | 08H | 363 | 50 | 363 | MMF | Pia |
| 12/21/07 | 08H | 361.8 | 50 | 361.75 | MMF | Bacon |
| 12/24/07 | 08H | 364 | 45 | - | MMF | Pia |
| 12/24/07 | 08H | 363 | 5 | 363.9 | MMF | Pia |
| 12/26/07 | 08H | 368.5 | 50 | 368.5 | FIF | Bacon |
| 12/27/07 | 08H | 368.5 | 50 | 368.5 | MMF | Bacon |
| 12/28/07 | 08H | 371 | 30 | - | FIF | Bacon |
| 12/28/07 | 08H | 370.8 | 20 | 370.92 | FIF | Bacon |
| 12/31/07 | 08H | 379 | 100 | 379 | MMF | Bacon |
| 01/02/08 | 08H | 380 | 50 | 380 | FIF | Bacon |
| 01/03/08 | 08H | 380 | 45 | - | FIF | Bacon |
| 01/03/08 | 08H | 379.9 | 5 | 379.99 | FIF | Bacon |
| 01/04/08 | 08H | 378 | 45 | - | MMF | Bacon |
| 01/04/08 | 08H | 377.9 | 5 | 377.99 | MMF | Bacon |
| 01/07/08 | 08H | 377 | 46 | - | MMF | Pia |
| 01/07/08 | 08H | 376.8 | 4 | 376.984 | MMF | Pia |
| 01/08/08 | 08H | 381.9 | 50 | 381.9 | MMF | Bacon |
| 01/09/08 | 08H | 383 | 50 | 383 | FIF | Bacon |
| 01/10/08 | 08H | 381 | 50 | 381 | MMF/FIF | Bacon |
| 01/11/08 | 08H | 381.5 | 50 | 381.5 | MMF | Bacon |

70

| 01/14/08 | 08H | 388 | 90 | - | MMF/FIF | Pia/Bacon |
|---|---|---|---|---|---|---|
| 01/14/08 | 08H | 387.8 | 5 | - | MMF/FIF | Pia/Bacon |
| 01/14/08 | 08H | 387 | 5 | 387.94 | MMF/FIF | Pia/Bacon |
| 01/15/08 | 08H | 384.8 | 50 | 384.75 | FIF | Bacon |
| 01/17/08 | 08H | 377 | 100 | 377 | MMF | Bacon |
| 01/18/08 | 08H | 375.5 | 100 | 375.5 | Not clear | Not clear |
| 01/22/08 | 08H | 371.8 | 50 | 371.75 | MMF | Bacon |
| 01/23/08 | 08H | 369.8 | 50 | 369.75 | FIF | Bacon |
| 01/24/08 | 08H | 376.5 | 100 | 376.5 | FIF | Bacon |
| 01/25/08 | 08H | 386 | 100 | 386 | MMF/FIF | Bacon |
| 01/28/08 | 08H | 392 | 100 | 392 | | Bacon |
| 01/29/08 | 08H | 393.8 | 100 | 393.8 | MMF | Bacon |
| 02/04/08 | 08H | 432 | 35 | - | MMF | Pia |
| 02/04/08 | 08H | 431 | 10 | - | MMF | Pia |
| 02/04/08 | 08H | 431.9 | 5 | 431.79 | MMF | Pia |
| 02/05/08 | 08H | 424 | 45 | - | MMF | Bacon |
| 02/05/08 | 08H | 423.9 | 5 | 423.99 | MMF | Bacon |
| 02/06/08 | 08H | 423.5 | 92 | - | MMF/FIF | Bacon |
| 02/06/08 | 08H | 423.6 | 8 | 423.508 | MMF/FIF | Bacon |
| 02/07/08 | 08H | 429 | 50 | 429 | MMF | Pia |
| 02/08/08 | 08H | 441.5 | 90 | - | MMF | Bacon |
| 02/08/08 | 08H | 441.4 | 10 | 441.49 | MMF | Bacon |
| 02/11/08 | 08H | 443.4 | 50 | 443.4 | MMF | Pia |
| 02/12/08 | 08H | 434 | 50 | 434 | MMF | Pia |
| 02/13/08 | 08H | 440 | 50 | 440 | MMF | Bacon |
| 02/14/08 | 08H | 442 | 89 | - | FIF | Bacon |
| 02/14/08 | 08H | 440 | 11 | 441.78 | FIF | Bacon |
| 02/15/08 | 08H | 456 | 95 | - | MMF | Bacon |
| 02/15/08 | 08H | 448 | 5 | 455.6 | MMF | Bacon |
| 02/19/08 | 08H | 502 | 95 | - | FIF | Bacon |
| 02/19/08 | 08H | 500 | 5 | 501.9 | FIF | Bacon |
| 02/20/08 | 08H | 495 | 85 | - | MMF | Bacon |
| 02/20/08 | 08H | 494 | 10 | - | MMF | Bacon |
| 02/20/08 | 08H | 493 | 5 | 494.8 | MMF | Bacon |
| 02/21/08 | 08H | 516 | 90 | - | FIF | Bacon |
| 02/21/08 | 08H | 514 | 10 | 515.8 | FIF | Bacon |
| 02/22/08 | 08H | 517 | 98 | - | FIF | Bacon |
| 02/22/08 | 08H | 515 | 2 | 516.96 | FIF | Bacon |
| 02/25/08 | 08H | 525 | 85 | - | MMF | Bacon |

| 02/25/08 | 08H | 524.9 | 5 | - | MMF | Bacon |
| 02/25/08 | 08H | 524 | 5 | - | MMF | Bacon |
| 02/25/08 | 08H | 523 | 5 | 524.845 | MMF | Bacon |
| 02/26/08 | 08H | 537 | 95 | - | MMF | Bacon |
| 02/26/08 | 08H | 534 | 5 | 536.85 | MMF | Bacon |
| 02/27/08 | 08M | 561 | 80 | - | MMF/FIF | Bacon |
| 02/27/08 | 08M | 560.9 | 10 | - | MMF/FIF | Bacon |
| 02/27/08 | 08M | 560 | 10 | 560.89 | MMF/FIF | Bacon |
| 02/29/08 | 08M | 577.9 | 100 | 577.9 | MMF | Bacon |
| 03/03/08 | 08M | 587 | 100 | 587 | FIF | Bacon |
| 03/04/08 | 08M | 574.7 | 100 | 574.7 | FIF | Bacon |
| 03/05/08 | 08M | 564 | 100 | 564 | FIF | Bacon |
| 03/06/08 | 08M | 533 | 99 | - | MMF | Bacon |
| 03/06/08 | 08M | 525 | 1 | 532.92 | MMF | Bacon |
| 03/07/08 | 08M | 502 | 50 | - | FIF | Bacon |
| 03/07/08 | 08M | 497 | 22 | - | FIF | Bacon |
| 03/07/08 | 08M | 494.9 | 3 | 500.24733 | FIF | Bacon |
| 03/10/08 | 08M | 488 | 98 | - | Not clear | Bacon |
| 03/10/08 | 08M | 480 | 2 | 487.84 | Not clear | Bacon |
| 03/11/08 | 08M | 504.5 | 50 | 504.5 | Not clear | Bacon |
| 03/12/08 | 08M | 511.8 | 50 | 511.75 | MMF | Pia |
| 03/14/08 | 08M | 515 | 94 | - | MMF | Not clear |
| 03/14/08 | 08M | 512 | 6 | 514.82 | MMF | Not clear |
| 03/17/08 | 08M | 490 | 95 | - | FIF | Bacon |
| 03/17/08 | 08M | 485 | 3 | - | FIF | Bacon |
| 03/17/08 | 08M | 489 | 2 | 489.83 | FIF | Bacon |
| 03/20/08 | 08M | 448 | 99 | - | FIF | Bacon |
| 03/20/08 | 08M | 446.7 | 1 | 447.987 | FIF | Bacon |
| 03/24/08 | 08M | 437 | 50 | 437 | MMF | Bacon |
| 03/25/08 | 08M | 466 | 100 | 466 | MMF | Bacon |
| 03/26/08 | 08M | 460 | 75 | - | FIF | Bacon |
| 03/26/08 | 08M | 459.9 | 25 | 459.975 | FIF | Bacon |
| 03/28/08 | 08M | 458 | 50 | 458 | FIF | Bacon |
| 03/31/08 | 08M | 444 | 8 | - | MMF | Bacon |
| 03/31/08 | 08M | 441.9 | 3 | - | MMF | Bacon |
| 03/31/08 | 08M | 443.5 | 4 | - | MMF | Bacon |
| 03/31/08 | 08M | 443.9 | 3 | - | MMF | Bacon |
| 03/31/08 | 08M | 443.5 | 1 | - | MMF | Bacon |
| 03/31/08 | 08M | 443.1 | 1 | - | MMF | Bacon |

| 03/31/08 | 08M | 443 | 1 | - | MMF | Bacon |
|---|---|---|---|---|---|---|
| 03/31/08 | 08M | 442.6 | 1 | - | MMF | Bacon |
| 03/31/08 | 08M | 453.5 | 100 | 451.68279 | MMF | Bacon |
| 04/01/08 | 08M | 450 | 89 | - | FIF | Bacon |
| 04/01/08 | 08M | 449.9 | 10 | - | FIF | Bacon |
| 04/01/08 | 08M | 448.7 | 1 | 449.977 | FIF | Bacon |
| 04/02/08 | 08M | 445 | 97 | - | MMF | Bacon |
| 04/02/08 | 08M | 444.5 | 3 | 444.985 | MMF | Bacon |
| 04/03/08 | 08M | 450 | 95 | 449.851 | MMF | Bacon |
| 04/03/08 | 08M | 447 | 2 | - | MMF | Bacon |
| 04/03/08 | 08M | 449.7 | 1 | - | MMF | Bacon |
| 04/03/08 | 08M | 446.7 | 1 | - | MMF | Bacon |
| 04/03/08 | 08M | 444.7 | 1 | - | MMF | Bacon |
| 04/04/08 | 08M | 445 | 50 | - | MMF | Bacon |
| 04/04/08 | 08M | 443.5 | 18 | - | MMF | Bacon |
| 04/04/08 | 08M | 443.8 | 13 | - | MMF | Bacon |
| 04/04/08 | 08M | 444.5 | 12 | - | MMF | Bacon |
| 04/04/08 | 08M | 443.8 | 4 | - | MMF | Bacon |
| 04/04/08 | 08M | 444 | 3 | 444.4295 | MMF | Bacon |
| 04/07/08 | 08M | 458.5 | 50 | 458.5 | MMF | Bacon |
| 04/09/08 | 08M | 463.5 | 50 | 463.5 | MMF | Pia |
| 04/10/08 | 08M | 469 | 98 | - | MMF | Bacon |
| 04/10/08 | 08M | 468 | 2 | 468.98 | MMF | Bacon |
| 04/11/08 | 08M | 475.5 | 50 | 475.5 | MMF | Bacon |
| 04/14/08 | 08M | 463 | 50 | 463 | MMF | Bacon |
| 04/15/08 | 08M | 454 | 40 | - | MMF | Bacon |
| 04/15/08 | 08M | 453 | 10 | 453.8 | MMF | Bacon |
| 04/16/08 | 08M | 460 | 50 | 460 | MMF/FIF | Pia/Bacon |
| 04/17/08 | 08M | 461.8 | 35 | - | MMF/FIF | Pia/Bacon |
| 04/17/08 | 08M | 461.8 | 12 | - | MMF/FIF | Pia/Bacon |
| 04/17/08 | 08M | 461 | 2 | - | MMF/FIF | Pia/Bacon |
| 04/17/08 | 08M | 461 | 1 | 461.704 | MMF/FIF | Pia/Bacon |
| 04/18/08 | 08M | 475 | 100 | 475 | MMF/FIF | Pia/Bacon |
| 04/21/08 | 08M | 463.8 | 50 | 463.75 | MMF | Pia |
| 04/22/08 | 08M | 463.8 | 50 | 463.8 | MMF | Pia |
| 04/25/08 | 08M | 449.5 | 75 | 449.5 | MMF | Bacon |
| 04/29/08 | 08M | 432 | 100 | 432 | FIF | Bacon |
| 04/30/08 | 08M | 424 | 25 | 424 | FIF | Bacon |
| 05/01/08 | 08M | 416 | 50 | 416 | MMF | Bacon |

| 05/02/08 | 08M | 420.8 | 50 | 420.8 | MMF | Bacon |
| 05/05/08 | 08M | 424.8 | 50 | 424.75 | FIF | Bacon |
| 05/06/08 | 08M | 431.8 | 100 | 431.75 | MMF | Bacon |
| 05/07/08 | 08M | 426 | 50 | 426 | MMF | Pia |
| 05/08/08 | 08M | 436 | 50 | 436 | FIF | Bacon |
| 05/09/08 | 08M | 444 | 50 | 444 | MMF | Bacon |
| 05/12/08 | 08M | 448.8 | 50 | 448.8 | MMF | Bacon |
| 05/13/08 | 08M | 441 | 100 | 441 | MMF | Bacon |
| 05/14/08 | 08M | 438 | 75 | 438 | MMF | Pia |
| 05/15/08 | 08M | 443 | 100 | 443 | MMF | Bacon |
| 05/16/08 | 08M | 453.8 | 100 | 453.75 | FIF/MMF | Bacon/Pia |
| 05/19/08 | 08M | 452 | 100 | 452 | MMF | Pia |
| 05/20/08 | 08M | 451 | 100 | 451 | FIF | Bacon |
| 05/21/08 | 08M | 465 | 100 | 465 | MMF | Bacon |

169.    On 117 out of the 119 (98%) bang the close trading days, the VWAP of Moore

Capital's purchase(s) of NYMEX palladium futures contracts alleged in ¶¶167-168 above was

higher than or equal to the VWAP settlement price of such contract as reported by the NYMEX.

Sub-paragraphs "a" – "mmmmm" below allege each of these 117 days.

|     |     |
| --- | --- |
| a. | November 1, 2007 |
| b. | November 5, 2007 |
| c. | November 6, 2007 |
| d. | November 7, 2007 |
| e. | November 8, 2007 |
| f. | November 9, 2007 |
| g. | November 13, 2007 |
| h. | November 14, 2007 |
| i. | November 15, 2007 |
| j. | November 20, 2007 |
| k. | November 21, 2007 |
| l. | November 23, 2007 |
| m. | November 26, 2007 |
| n. | November 27, 2007 |
| o. | November 28, 2007 |
| p. | November 30, 2007 |
| q. | December 3, 2007 |
| r. | December 4, 2007 |
| s. | December 5, 2007 |
| t. | December 6, 2007 |

| | |
|---|---|
| u. | December 10, 2007 |
| v. | December 12, 2007 |
| w. | December 13, 2007 |
| x. | December 14, 2007 |
| y. | December 17, 2007 |
| z. | December 18, 2007 |
| aa. | December 21, 2007 |
| bb. | December 24, 2007 |
| cc. | December 26, 2007 |
| dd. | December 27, 2007 |
| ee. | December 28, 2007 |
| ff. | December 31, 2007 |
| gg. | January 2, 2008 |
| hh. | January 3, 2008 |
| ii. | January 4, 2008 |
| jj. | January 7, 2008 |
| kk. | January 8, 2008 |
| ll. | January 9, 2008 |
| mm. | January 10, 2008 |
| nn. | January 11, 2008 |
| oo. | January 14, 2008 |
| pp. | January 15, 2008 |
| qq. | January 17, 2008 |
| rr. | January 18, 2008 |
| ss. | January 22, 2008 |
| tt. | January 23, 2008 |
| uu. | January 24, 2008 |
| vv. | January 25, 2008 |
| ww. | January 28, 2008 |
| xx. | January 29, 2008 |
| yy. | February 4, 2008 |
| zz. | February 5, 2008 |
| aaa. | February 6, 2008 |
| bbb. | February 7, 2008 |
| ccc. | February 8, 2008 |
| ddd. | February 11, 2008 |
| eee. | February 12, 2008 |
| fff. | February 13, 2008 |
| ggg. | February 14, 2008 |
| hhh. | February 15, 2008 |
| iii. | February 19, 2008 |
| jjj. | February 20, 2008 |
| kkk. | February 21, 2008 |
| lll. | February 22, 2008 |
| mmm. | February 25, 2008 |
| nnn. | February 26, 2008 |

| | |
|---|---|
| ooo. | February 27, 2008 |
| ppp. | February 29, 2008 |
| qqq. | March 3, 2008 |
| rrr. | March 4, 2008 |
| sss. | March 5, 2008 |
| ttt. | March 6, 2008 |
| uuu. | March 7, 2008 |
| vvv. | March 10, 2008 |
| www. | March 11, 2008 |
| xxx. | March 12, 2008 |
| yyy. | March 14, 2008 |
| zzz. | March 17, 2008 |
| aaaa. | March 20, 2008 |
| bbbb. | March 24, 2008 |
| cccc. | March 25, 2008 |
| dddd. | March 26, 2008 |
| eeee. | March 28, 2008 |
| ffff. | March 31, 2008 |
| gggg. | April 1, 2008 |
| hhhh. | April 2, 2008 |
| iiii. | April 3, 2008 |
| jjjj. | April 4, 2008 |
| kkkk. | April 7, 2008 |
| llll. | April 9, 2008 |
| mmmm. | April 10, 2008 |
| nnnn. | April 11, 2008 |
| oooo. | April 14, 2008 |
| pppp. | April 15, 2008 |
| qqqq. | April 16, 2008 |
| rrrr. | April 17, 2008 |
| ssss. | April 18, 2008 |
| tttt. | April 21, 2008 |
| uuuu. | April 22, 2008 |
| vvvv. | April 25, 2008 |
| wwww. | April 29, 2008 |
| xxxx. | April 30, 2008 |
| yyyy. | May 1, 2008 |
| zzzz. | May 2, 2008 |
| aaaaa. | May 5, 2008 |
| bbbbb. | May 6, 2008 |
| ccccc. | May 7, 2008 |
| ddddd. | May 8, 2008 |
| eeeee. | May 9, 2008 |
| fffff. | May 12, 2008 |
| ggggg. | May 13, 2008 |
| hhhhh. | May 14, 2008 |

iiiii.          May 15, 2008
jjjjj.          May 16, 2008
kkkkk.       May 19, 2008
lllll.          May 20, 2008
mmmmm.    May 21, 2008

170.    On 117 out of the 119 (98%) bang the close trading days, one or more of Moore

Capital's purchases of NYMEX palladium futures contracts alleged in ¶¶166-168 above was

higher than or equal to the VWAP settlement price of such contract as reported by the NYMEX.

Sub-paragraphs "a" – "mmmmm" below allege each of these 117 days.

a.       November 1, 2007
b.       November 5, 2007
c.       November 6, 2007
d.       November 7, 2007
e.       November 8, 2007
f.       November 9, 2007
g.       November 13, 2007
h.       November 14, 2007
i.       November 15, 2007
j.       November 20, 2007
k.       November 21, 2007
l.       November 23, 2007
m.       November 26, 2007
n.       November 27, 2007
o.       November 28, 2007
p.       November 30, 2007
q.       December 3, 2007
r.       December 4, 2007
s.       December 5, 2007
t.       December 6, 2007
u.       December 10, 2007
v.       December 12, 2007
w.       December 13, 2007
x.       December 14, 2007
y.       December 17, 2007
z.       December 18, 2007
aa.       December 21, 2007
bb.       December 24, 2007
cc.       December 26, 2007
dd.       December 27, 2007
ee.       December 28, 2007
ff.       December 31, 2007

| gg.   | January 2, 2008   |
|-------|-------------------|
| hh.   | January 3, 2008   |
| ii.   | January 4, 2008   |
| jj.   | January 7, 2008   |
| kk.   | January 8, 2008.  |
| ll.   | January 9, 2008   |
| mm.   | January 10, 2008  |
| nn.   | January 11, 2008  |
| oo.   | January 14, 2008  |
| pp.   | January 15, 2008  |
| qq.   | January 17, 2008  |
| rr.   | January 18, 2008  |
| ss.   | January 22, 2008  |
| tt.   | January 23, 2008  |
| uu.   | January 24, 2008  |
| vv.   | January 25, 2008  |
| ww.   | January 28, 2008  |
| xx.   | January 29, 2008  |
| yy.   | February 4, 2008  |
| zz.   | February 5, 2008  |
| aaa.  | February 6, 2008  |
| bbb.  | February 7, 2008  |
| ccc.  | February 8, 2008  |
| ddd.  | February 11, 2008 |
| eee.  | February 12, 2008 |
| fff.  | February 13, 2008 |
| ggg.  | February 14, 2008 |
| hhh.  | February 15, 2008 |
| iii.  | February 19, 2008 |
| jjj.  | February 20, 2008 |
| kkk.  | February 21, 2008 |
| lll.  | February 22, 2008 |
| mmm.  | February 25, 2008 |
| nnn.  | February 26, 2008 |
| ooo.  | February 27, 2008 |
| ppp.  | February 29, 2008 |
| qqq.  | March 3, 2008     |
| rrr.  | March 4, 2008     |
| sss.  | March 5, 2008.    |
| ttt.  | March 6, 2008     |
| uuu.  | March 7, 2008     |
| vvv.  | March 10, 2008    |
| www.  | March 11, 2008    |
| xxx.  | March 12, 2008    |
| yyy.  | March 14, 2008    |
| zzz.  | March 17, 2008    |

| | |
|---|---|
| aaaa. | March 20, 2008 |
| bbbb. | March 24, 2008 |
| cccc. | March 25, 2008 |
| dddd. | March 26, 2008 |
| eeee. | March 28, 2008 |
| ffff. | March 31, 2008 |
| gggg. | April 1, 2008 |
| hhhh. | April 2, 2008 |
| iiii. | April 3, 2008 |
| jjjj. | April 4, 2008 |
| kkkk. | April 7, 2008 |
| llll. | April 9, 2008 |
| mmmm. | April 10, 2008 |
| nnnn. | April 11, 2008 |
| oooo. | April 14, 2008 |
| pppp. | April 15, 2008 |
| qqqq. | April 16, 2008 |
| rrrr. | April 17, 2008 |
| ssss. | April 18, 2008 |
| tttt. | April 21, 2008 |
| uuuu. | April 22, 2008 |
| vvvv. | April 25, 2008 |
| wwww. | April 29, 2008 |
| xxxx. | April 30, 2008 |
| yyyy. | May 1, 2008 |
| zzzz. | May 2, 2008 |
| aaaaa. | May 5, 2008 |
| bbbbb. | May 6, 2008 |
| ccccc. | May 7, 2008 |
| ddddd. | May 8, 2008 |
| eeeee. | May 9, 2008 |
| fffff. | May 12, 2008 |
| ggggg. | May 13, 2008 |
| hhhhh. | May 14, 2008 |
| iiiii. | May 15, 2008 |
| jjjjj. | May 16, 2008 |
| kkkkk. | May 19, 2008 |
| lllll. | May 20, 2008 |
| mmmmm. | May 21, 2008 |

171.    An overwhelming inference of causation of higher prices by each of Defendants'

bang the close trades arises from the two above comparisons of the NYMEX VWAP settlement

price to (1) the VWAP of Moore Capital's purchases during the two minute settlement period (¶

160) and (2) Moore Capital's purchase(s) during the two-minute settlement period (¶ 161). Defendants' causation of higher prices is also reflected in other NYMEX prices but further evidence of these prices must await discovery from NYMEX. Although neither as reliable nor nearly as directly relevant to causation as the two foregoing NYMEX VWAP settlement price comparisons, the unreliable information that is now publicly available from the NYMEX provides additional, albeit much less important, indications that Defendants were successful in overpaying to cause a high price.

172.    On 116 out of the 119 (97%) bang the close trading days, one or more of Moore Capital's purchases of NYMEX palladium futures contracts alleged in ¶¶ 166-168 above was higher than or equal to the high price during the two-minute settlement period of such contract as reported by the publicly available NYMEX time and sales data. Sub-paragraphs "a" - "lllll" below allege each of the 116 days on which this occurred:

| | |
|---|---|
| a. | November 1, 2007 |
| b. | November 5, 2007 |
| c. | November 6, 2007 |
| d. | November 7, 2007 |
| e. | November 8, 2007 |
| f. | November 9, 2007 |
| g. | November 12, 2007 |
| h. | November 13, 2007 |
| i. | November 14, 2007 |
| j. | November 15, 2007 |
| k. | November 20, 2007 |
| l. | November 21, 2007 |
| m. | November 23, 2007 |
| n. | November 27, 2007 |
| o. | November 28, 2007 |
| p. | November 30, 2007 |
| q. | December 3, 2007 |
| r. | December 4, 2007 |
| s. | December 5, 2007 |
| t. | December 6, 2007 |
| u. | December 10, 2007 |
| v. | December 12, 2007 |

| | |
|---|---|
| w. | December 13, 2007 |
| x. | December 14, 2007 |
| y. | December 17, 2007 |
| z. | December 18, 2007 |
| aa. | December 21, 2007 |
| bb. | December 24, 2007 |
| cc. | December 26, 2007 |
| dd. | December 28, 2007 |
| ee. | December 31, 2007 |
| ff. | January 2, 2008 |
| gg. | January 3, 2008 |
| hh. | January 4, 2008 |
| ii. | January 7, 2008 |
| jj. | January 8, 2008 |
| kk. | January 9, 2008 |
| ll. | January 10, 2008 |
| mm. | January 11, 2008 |
| nn. | January 14, 2008 |
| oo. | January 15, 2008 |
| pp. | January 17, 2008 |
| qq. | January 18, 2008 |
| rr. | January 22, 2008 |
| ss. | January 23, 2008 |
| tt. | January 24, 2008 |
| uu. | January 25, 2008 |
| vv. | January 28, 2008 |
| ww. | January 29, 2008 |
| xx. | February 4, 2008 |
| yy. | February 5, 2008 |
| zz. | February 6, 2008 |
| aaa. | February 7, 2008 |
| bbb. | February 8, 2008 |
| ccc. | February 11, 2008 |
| ddd. | February 12, 2008 |
| eee. | February 13, 2008 |
| fff. | February 14, 2008 |
| ggg. | February 15, 2008 |
| hhh. | February 19, 2008 |
| iii. | February 20, 2008 |
| jjj. | February 21, 2008 |
| kkk. | February 22, 2008 |
| lll. | February 25, 2008 |
| mmm. | February 26, 2008 |
| nnn. | February 27, 2008 |
| ooo. | February 29, 2008 |
| ppp. | March 3, 2008 |

qqq.      March 4, 2008
rrr.      March 5, 2008
sss.      March 6, 2008
ttt.      March 7, 2008
uuu.      March 10, 2008
vvv.      March 11, 2008
www.      March 12, 2008
xxx.      March 14, 2008
yyy.      March 17, 2008
zzz.      March 20, 2008
aaaa.     March 24, 2008
bbbb.     March 25, 2008
cccc.     March 26, 2008
dddd.     March 28, 2008
eeee.     March 31, 2008
ffff.     April 1, 2008
gggg.     April 2, 2008
hhhh.     April 3, 2008
iiii.     April 4, 2008
jjjj.     April 7, 2008
kkkk.     April 9, 2008
llll.     April 10, 2008
mmmm.     April 11, 2008
nnnn.     April 14, 2008
oooo.     April 15, 2008
pppp.     April 16, 2008.
qqqq.     April 17, 2008.
rrrr.     April 18, 2008
ssss.     April 21, 2008
tttt.     April 22, 2008
uuuu.     April 25, 2008
vvvv.     April 29, 2008
wwww.     April 30, 2008
xxxx.     May 1, 2008
yyyy.     May 2, 2008
zzzz.     May 5, 2008
aaaaa.    May 6, 2008
bbbbb.    May 7, 2008
ccccc.    May 8, 2008
ddddd.    May 9, 2008
eeeee.    May 12, 2008
fffff.    May 13, 2008
ggggg.    May 14, 2008
hhhhh.    May 15, 2008
iiiii.    May 16, 2008
jjjjj.    May 19, 2008

kkkkk.     May 20, 2008
lllll.     May 21, 2008

173.     On 73 out of the 119 (61%) bang the close trading days, one or more of Moore

Capital's purchases of NYMEX palladium futures contracts alleged in ¶¶ 166-168 above was

higher than or equal to the high price for such contract during regular trading hours (*i.e.*, 8:30

a.m. through 1:00 p.m.) as reported by the publicly available NYMEX time and sales data. Sub-

paragraphs "a" – "uuu" below allege each of these 73 days. The fact that one or more of Moore

Capital's purchases constituted the high trade on 61% of these 119 bang the close trading days is

extraordinary considering that all of these highs were set in the same small two-minute closing

period, which constituted less than one percent of the regular trading day (*i.e.*, during two-

minutes of the 270 minute regular trading day.)

| | |
|---|---|
| a. | November 1, 2007 |
| b. | November 9, 2007 |
| c. | November 15, 2007 |
| d. | November 20, 2007 |
| e. | November 23, 2007 |
| f. | November 28, 2007 |
| g. | November 30, 2007 |
| h. | December 4, 2007 |
| i. | December 5, 2007 |
| j. | December 6, 2007 |
| k. | December 10, 2007 |
| l. | December 13, 2007 |
| m. | December 17, 2007 |
| n. | December 18, 2007 |
| o. | December 21, 2007 |
| p. | December 24, 2007 |
| q. | December 28, 2007 |
| r. | December 31, 2007 |
| s. | January 3, 2008 |
| t. | January 7, 2008 |
| u. | January 9, 2008 |
| v. | January 10, 2008 |
| w. | January 11, 2008 |
| x. | January 14, 2008 |
| y. | January 17, 2008 |

| z. | January 22, 2008 |
| aa. | January 28, 2008 |
| bb. | January 29, 2008 |
| cc. | February 4, 2008 |
| dd. | February 5, 2008 |
| ee. | February 6, 2008 |
| ff. | February 7, 2008 |
| gg. | February 8, 2008 |
| hh. | February 13, 2008 |
| ii. | February 15, 2008 |
| jj. | February 19, 2008 |
| kk. | February20, 2008 |
| ll. | February 22, 2008 |
| mm. | February26, 2008 |
| nn. | February 29, 2008 |
| oo. | March 5, 2008 |
| pp. | March 10, 2008 |
| qq. | March 11, 2008 |
| rr. | March12, 2008 |
| ss. | March17, 2008 |
| tt. | March20, 2008 |
| uu. | March 24, 2008 |
| vv. | March 25, 2008 |
| ww. | March 26, 2008 |
| xx. | March 28, 2008 |
| yy. | March 31, 2008 |
| zz. | April 1, 2008 |
| aaa. | April 2, 2008 |
| bbb. | April 3, 2008 |
| ccc. | April 4, 2008 |
| ddd. | April 9, 2008 |
| eee. | April 10, 2008 |
| fff. | April 11, 2008 |
| ggg. | April 17, 2008 |
| hhh. | April 18, 2008 |
| iii. | April 21, 2008 |
| jjj. | April 22, 2008 |
| kkk. | April 25, 2008 |
| lll. | April 30, 2008 |
| mmm. | May 2, 2008 |
| nnn. | May 8, 2008 |
| ooo. | May 9, 2008 |
| ppp. | May 12, 2008 |
| qqq. | May 13, 2008 |
| rrr. | May 15, 2008 |
| sss. | May 19, 2008 |

| | |
|---|---|
| ttt. | May 20, 2008 |
| uuu. | May 21, 2008 |

174.    On 118 out of the 119 (99%) bang the close trading days, one or more of Moore Capital's purchases of NYMEX palladium futures contracts alleged in ¶¶ 166-168 above was higher than or equal to the price for such contract immediately prior to the two-minute settlement period as reported by the publicly available NYMEX time and sales data. Sub-paragraphs "a" – "nnnnn" below allege each of these 118 days.

| | |
|---|---|
| a. | November 1, 2007 |
| b. | November 5, 2007 |
| c. | November 6, 2007 |
| d. | November 7, 2007 |
| e. | November 8, 2007 |
| f. | November 9, 2007 |
| g. | November 12, 2007 |
| h. | November 13, 2007 |
| i. | November 14, 2007 |
| j. | November 15, 2007 |
| k. | November 20, 2007 |
| l. | November 21, 2007 |
| m. | November 23, 2007 |
| n. | November 26, 2007 |
| o. | November 27, 2007 |
| p. | November 28, 2007 |
| q. | November 29, 2007 |
| r. | November 30, 2007 |
| s. | December 3, 2007 |
| t. | December 4, 2007 |
| u. | December 5, 2007 |
| v. | December 6, 2007 |
| w. | December 10, 2007 |
| x. | December 12, 2007 |
| y. | December 13, 2007 |
| z. | December 14, 2007 |
| aa. | December 17, 2007 |
| bb. | December 18, 2007 |
| cc. | December 21, 2007 |
| dd. | December 24, 2007 |
| ee. | December 26, 2007 |
| ff. | December 27, 2007 |
| gg. | December 28, 2007 |

| | |
|---|---|
| hh. | December 31, 2007 |
| ii. | January 2, 2008 |
| jj. | January 3, 2008 |
| kk. | January 4, 2008 |
| ll. | January 7, 2008 |
| mm. | January 8, 2008 |
| nn. | January 9, 2008 |
| oo. | January 10, 2008 |
| pp. | January 11, 2008 |
| qq. | January 14, 2008 |
| rr. | January 15, 2008 |
| ss. | January 17, 2008 |
| tt. | January 18, 2008 |
| uu. | January 22, 2008 |
| vv. | January 24, 2008 |
| ww. | January 25, 2008 |
| xx. | January 28, 2008 |
| yy. | January 29, 2008 |
| zz. | February 4, 2008 |
| aaa. | February 5, 2008 |
| bbb. | February 6, 2008 |
| ccc. | February 7, 2008 |
| ddd. | February 8, 2008 |
| eee. | February 11, 2008 |
| fff. | February 12, 2008 |
| ggg. | February 13, 2008 |
| hhh. | February 14, 2008 |
| iii. | February 15, 2008 |
| jjj. | February 19, 2008 |
| kkk. | February 20, 2008 |
| lll. | February 21, 2008 |
| mmm. | February 22, 2008 |
| nnn. | February 25, 2008 |
| ooo. | February 26, 2008 |
| ppp. | February 27, 2008 |
| qqq. | February 29, 2008 |
| rrr. | March 3, 2008 |
| sss. | March 4, 2008 |
| ttt. | March 5, 2008 |
| uuu. | March 6, 2008 |
| vvv. | March 7, 2008 |
| www. | March 10, 2008 |
| xxx. | March 11, 2008 |
| yyy. | March 12, 2008 |
| zzz. | March 14, 2008 |
| aaaa. | March 17, 2008 |

bbbb.   March 20, 2008
cccc.   March 24, 2008
dddd.   March 25, 2008
eeee.   March 26, 2008
ffff.   March 28, 2008
gggg.   March 31, 2008
hhhh.   April 1, 2008
iiii.   April 2, 2008
jjjj.   April 3, 2008
kkkk.   April 4, 2008
llll.   April 7, 2008
mmmm.   April 9, 2008
nnnn.   April 10, 2008
oooo.   April 11, 2008
pppp.   April 14, 2008
qqqq.   April 15, 2008
rrrr.   April 16, 2008.
ssss.   April 17, 2008.
tttt.   April 18, 2008
uuuu.   April 21, 2008
vvvv.   April 22, 2008
wwww.   April 25, 2008
xxxx.   April 29, 2008
yyyy.   April 30, 2008
zzzz.   May 1, 2008
aaaaa.   May 2, 2008
bbbbb.   May 5, 2008
ccccc.   May 6, 2008
ddddd.   May 7, 2008
eeeee.   May 8, 2008
fffff.   May 9, 2008
ggggg.   May 12, 2008
hhhhh.   May 13, 2008
iiiii.   May 14, 2008
jjjjj.   May 15, 2008
kkkkk.   May 16, 2008
lllll.   May 19, 2008
mmmmm. May 20, 2008
nnnnn.   May 21, 2008

175.    In addition to the sheer number of MOC trades made by Moore Capital during the class period, the volume of their MOC trades relative to the other "non-Moore" trades during the two-minute closing period was staggering. During the class period, Moore Capital's MOC trades

comprised more than 50% of the volume-weighted Palladium futures trades during the two-minute close period more than 60% of the trading days. Thus, Moore Capital's trades were responsible for determining 50% or more of the settlement price on 60% of the trading days. The following examples show the percentage of the volume-weighted average during the two-minute close in palladium futures that Moore Capital's MOC trades were responsible for:

    a.      October 22, 2007 – 80% of the closing volume;
    b.      November 6, 2007 – 98% of the closing volume;
    c.      November 16, 2007 – 89.3% of the closing volume;
    d.      December 6, 2007 – 95% of the closing volume;
    e.      January 2, 2008 – 95% of the closing volume;
    f.      February 27, 2008 – 96% of the closing volume;
    g.      March 14, 2008 – 94.4% of the closing volume;
    h.      March 26, 2008 – 86% of the closing volume;
    i.      March 27, 2008 – 96.4% of the closing volume;
    j.      April 4, 2008 – 90% of the closing volume;
    k.      April 9, 2008 – 88% of the closing volume;
    l.      April 10, 2008 – 91% of the closing volume;
    m.      April 11, 2008 – 94.4% of the closing volume;
    n.      April 14, 2008 – 89.3% of the closing volume;
    o.      April 15, 2008 – 96% of the closing volume;
    p.      April 18, 2008 – 85.5% of the closing volume;
    q.      April 25, 2008 – 87% of the closing volume;
    r.      May 7, 2008 – 92.6% of the closing volume;
    s.      May 9, 2008 – 96% of the closing volume;
    t.      May 13, 2008 – 100% of the closing volume;
    u.      May 16, 2008 – 87% of the closing volume;
    v.      May 19, 2008 – 99% of the closing volume;
    w.      May 20, 2008 – 89.3% of the closing volume;
    x.      May 29, 2008 – 77.5% of the closing volume.

176.    The aforementioned shows Moore Capital's trades not only artificially inflated, but were the dominant factor in determining, the settlement price in palladium futures for the above dates.

    **2.**    **NYMEX Platinum Futures**

177.    Moore Capital made bang the close trades in NYMEX platinum futures contracts on 95 days out of the 127 trading days between November 19, 2007 and May 21, 2008. On many of these 95 days Moore Capital made more than one bang the close trade.

178.    The table in the following paragraph alleges the following particulars:

a.    the trade date of each Moore Capital bang the close trade in Column A;

b.    the NYMEX platinum futures contract that Moore Capital purchased in Column B;

c.    the price of each bang the close trade in Column C;

d.    the volume of each bang the close trade in Column D;

e.    the VWAP of the bang the close trade(s) in Column E;

f.    the Moore Fund for which the trade was made in Column F;

g.    the Moore Portfolio Manager for which the trade was made in Column G.

179.

| A Trade Date | B Contract | C Price | D Volume | E VWAP | F MMF / FIF | G Pia / Bacon |
|---|---|---|---|---|---|---|
| 11/19/07 | 08F | 1458 | 50 | 1458 | MMF & FIF | Bacon & Pia |
| 11/20/07 | 08F | 1471 | 20 | - | MMF & FIF | Bacon |
| 11/20/07 | 08F | 1469 | 5 | 1470.6 | MMF & FIF | Bacon |
| 11/21/07 | 08F | 1472 | 50 | 1472 | MMF | Bacon |
| 11/27/07 | 08F | 1455 | 25 | 1455 | MMF | Bacon |
| 11/28/07 | 08F | 1442 | 30 | - | MMF | Pia |
| 11/28/07 | 08F | 1440 | 20 | 1441.2 | MMF | Pia |
| 11/30/07 | 08F | 1445 | 50 | 1445 | MMF | Bacon & Pia |
| 12/03/07 | 08F | 1462.5 | 20 | - | MMF | Pia |
| 12/03/07 | 08F | 1461.8 | 5 | 1462.36 | MMF | Pia |
| 12/04/07 | 08F | 1473 | 25 | - | FIF | Bacon |
| 12/04/07 | 08F | 1472 | 25 | 1472.5 | FIF | Bacon |

| 12/05/07 | 08F | 1470 | 50 | 1470 | MMF | Pia |
|---|---|---|---|---|---|---|
| 12/06/07 | 08F | 1471.8 | 40 | - | MMF | Bacon |
| 12/06/07 | 08F | 1469 | 5 | - | MMF | Bacon |
| 12/06/07 | 08F | 1471.5 | 3 | - | MMF | Bacon |
| 12/06/07 | 08F | 1471.8 | 1 | - | MMF | Bacon |
| 12/06/07 | 08F | 1471.4 | 1 | 1471.49 | MMF | Bacon |
| 12/07/07 | 08F | 1463 | 50 | 1463 | MMF | Pia |
| 12/10/07 | 08F | 1467.5 | 50 | 1467.5 | MMF & FIF | Bacon & Pia |
| 12/12/07 | 08F | 1467.5 | 50 | - | MMF | Bacon & Pia |
| 12/12/07 | 08F | 1480 | 50 | 1480 | MMF | Bacon & Pia |
| 12/14/07 | 08F | 1480 | 75 | 1480 | MMF | Bacon |
| 12/17/07 | 08F | 1504 | 50 | 1504 | MMF | Pia |
| 12/18/07 | 08F | 1516 | 50 | 1516 | MMF | Pia |
| 12/21/07 | 08F | 1540 | 100 | 1540 | MMF | Bacon |
| 12/26/07 | 08J | 1544 | 40 | - | FIF | Bacon |
| 12/26/07 | 08J | 1543.5 | 10 | 1543.9 | FIF | Bacon |
| 12/27/07 | 08J | 1538 | 50 | 1538 | MMF | Bacon |
| 12/28/07 | 08J | 1542 | 25 | - | FIF | Bacon |
| 12/28/07 | 08J | 1541.8 | 25 | 1541.9 | FIF | Bacon |
| 12/31/07 | 08J | 1534.8 | 80 | - | MMF | Bacon |
| 12/31/07 | 08J | 1530 | 20 | 1533.84 | MMF | Bacon |
| 01/02/08 | 08J | 1548 | 50 | 1548 | MMF | Pia |
| 01/03/08 | 08J | 1552 | 89 | - | FIF | Bacon |
| 01/03/08 | 08J | 1550 | 11 | 1551.89 | FIF | Bacon |
| 01/04/08 | 08J | 1548 | 50 | 1548 | MMF | Bacon |
| 01/07/08 | 08J | 1533 | 50 | 1533 | MMF | Pia |
| 01/08/08 | 08J | 1562 | 30 | - | MMF | Bacon |
| 01/08/08 | 08J | 1560 | 15 | - | MMF | Bacon |
| 01/08/08 | 08J | 1561.9 | 5 | 1561.39 | MMF | Bacon |
| 01/09/08 | 08J | 1559 | 50 | 1559 | FIF | Bacon |
| 01/10/08 | 08J | 1564 | 45 | - | MMF | Bacon |
| 01/10/08 | 08J | 1563.9 | 5 | 1563.99 | MMF | Bacon |
| 01/11/08 | 08J | 1570 | 40 | - | MMF | Bacon & Pia |
| 01/11/08 | 08J | 1569 | 10 | 1569.8 | MMF | Bacon & Pia |
| 01/14/08 | 08J | 1588 | 80 | - | MMF & FIF | Bacon & Pia |

| | | | | | | |
|---|---|---|---|---|---|---|
| 01/14/08 | 08J | 1584 | 20 | 1587.2 | MMF & FIF | Bacon & Pia |
| 01/15/08 | 08J | 1587.5 | 50 | 1587.5 | FIF | Bacon |
| 01/17/08 | 08J | 1566.5 | 100 | 1566.5 | MMF | Bacon |
| 01/18/08 | 08J | 1567 | 85 | - | FIF | Bacon |
| 01/18/08 | 08J | 1564 | 10 | - | FIF | Bacon |
| 01/18/08 | 08J | 1566.9 | 5 | 1566.7 | FIF | Bacon |
| 01/22/08 | 08J | 1560 | 100 | 1560 | MMF | Bacon |
| 01/23/08 | 08J | 1560 | 75 | - | MMF | Pia |
| 01/23/08 | 08J | 1558.5 | 25 | 1559.63 | MMF | Pia |
| 01/24/08 | 08J | 1615 | 100 | 1615 | FIF | Bacon |
| 01/25/08 | 08J | 1683 | 100 | 1683 | MMF & FIF | Bacon |
| 01/28/08 | 08J | 1733 | 100 | 1733 | MMF | Bacon |
| 01/29/08 | 08J | 1725 | 100 | 1725 | MMF | Bacon |
| 01/30/08 | 08J | 1690 | 40 | - | MMF | Bacon |
| 01/30/08 | 08J | 1689.9 | 10 | 1689.98 | MMF | Bacon |
| 02/04/08 | 08J | 1798 | 50 | 1798 | FIF | Bacon |
| 02/05/08 | 08J | 1786 | 95 | - | MMF | Bacon |
| 02/05/08 | 08J | 1785.9 | 5 | 1786 | MMF | Bacon |
| 02/06/08 | 08J | 1820 | 93 | - | MMF & FIF | Bacon |
| 02/06/08 | 08J | 1819.9 | 7 | 1819.90 | MMF & FIF | Bacon |
| 02/07/08 | 08J | 1852 | 100 | 1852 | MMF | Pia |
| 02/08/08 | 08J | 1884.9 | 100 | 1884.9 | MMF | Bacon |
| 02/11/08 | 08J | 1939.9 | 50 | 1939.9 | | Bacon |
| 02/12/08 | 08J | 1924 | 100 | 1924 | MMF | Pia |
| 02/13/08 | 08J | 1985 | 50 | 1985 | MMF | Bacon |
| 02/14/08 | 08J | 2007 | 80 | - | MMF | Bacon |
| 02/14/08 | 08J | 2005 | 20 | 2006.6 | MMF | Bacon |
| 02/15/08 | 08J | 2064 | 100 | 2064 | MMF | Bacon |
| 02/20/08 | 08J | 2140 | 100 | 2140 | MMF | Bacon |
| 02/21/08 | 08J | 2190 | 100 | 2190 | FIF | Bacon |
| 02/22/08 | 08J | 2170 | 100 | 2170 | FIF | Bacon |
| 02/25/08 | 08J | 2155 | 100 | 2155 | MMF | Bacon |
| 02/26/08 | 08J | 2150 | 100 | 2150 | MMF | Bacon |
| 02/27/08 | 08J | 2155 | 100 | 2155 | MMF & FIF | Bacon |
| 02/29/08 | 08J | 2185 | 95 | - | MMF | Bacon |
| 02/29/08 | 08J | 2180 | 5 | 2184.75 | MMF | Bacon |

| 03/03/08 | 08J | 2245 | 100 | 2245 | FIF | Bacon |
| 03/04/08 | 08J | 2275 | 50 | 2275 | MMF | Pia |
| 03/05/08 | 08J | 2286 | 100 | 2286 | FIF | Bacon |
| 03/06/08 | 08J | 2215 | 100 | 2215 | MMF | Bacon |
| 03/10/08 | 08J | 2049 | 85 | - | MMF | Bacon |
| 03/10/08 | 08J | 2035 | 10 | - | MMF | Bacon |
| 03/10/08 | 08J | 2040 | 5 | 2047.15 | MMF | Bacon |
| 03/20/08 | 08J | 1880 | 91 | - | MMF | Bacon |
| 03/20/08 | 08J | 1875 | 6 | - | MMF | Bacon |
| 03/20/08 | 08J | 1878 | 3 | 1879.64 | MMF | Bacon |
| 03/24/08 | 08J | 1890 | 50 | 1890 | FIF | Bacon |
| 03/26/08 | 08N | 2025 | 100 | 2025 | MMF | Bacon |
| 03/28/08 | 08N | 2055 | 95 | - | MMF | Pia |
| 03/28/08 | 08N | 2043 | 5 | 2054.4 | MMF | Pia |
| 03/31/08 | 08N | 2050 | 100 | 2050 | MMF | Pia |
| 04/01/08 | 08N | 1940 | 81 | - | FIF | Pia |
| 04/01/08 | 08N | 1939.5 | 10 | - | FIF | Pia |
| 04/01/08 | 08N | 1936 | 9 | 1939.59 | FIF | Pia |
| 04/03/08 | 08N | 2015 | 50 | 2015 | FIF | Bacon |
| 04/04/08 | 08N | 2035 | 25 | 2035 | MMF | Pia |
| 04/07/08 | 08N | 2048 | 50 | 2048 | MMF | Pia |
| 04/09/08 | 08N | 2048 | 100 | 2048 | FIF | Bacon |
| 04/10/08 | 08N | 2047 | 50 | 2047 | MMF | Bacon |
| 04/11/08 | 08N | 2029 | 50 | 2029 | MMF | Pia |
| 04/16/08 | 08N | 2040 | 50 | 2040 | MMF & FIF | Bacon & Pia |
| 04/17/08 | 08N | 2063 | 50 | 2063 | MMF & FIF | Bacon & Pia |
| 04/18/08 | 08N | 2077.8 | 50 | 2077.8 | MMF & FIF | Bacon & Pia |
| 04/21/08 | 08N | 2030 | 50 | 2030 | MMF | Pia |
| 04/22/08 | 08N | 2037.8 | 50 | 2037.8 | MMF | Pia |
| 04/29/08 | 08N | 1942 | 48 | - | FIF | Bacon |
| 04/29/08 | 08N | 1940 | 2 | 1941.92 | FIF | Bacon |
| 04/30/08 | 08N | 1938 | 25 | 1938 | FIF | Bacon |
| 05/01/08 | 08N | 1886 | 33 | - | MMF | Pia |
| 05/01/08 | 08N | 1882 | 17 | 1884.64 | MMF | Pia |
| 05/02/08 | 08N | 1910 | 50 | 1910 | FIF | Bacon |
| 05/06/08 | 08N | 1974 | 50 | 1974 | MMF | Pia |
| 05/07/08 | 08N | 1970 | 50 | 1970 | FIF | Bacon |

| 05/08/08 | 08N | 2045 | 100 | 2045 | FIF | Bacon |
|---|---|---|---|---|---|---|
| 05/09/08 | 08N | 2110 | 100 | 2110 | FIF | Bacon |
| 05/12/08 | 08N | 2130 | 100 | 2130 | MMF | Bacon |
| 05/13/08 | 08N | 2073.5 | 50 | 2073.5 | MMF | Bacon |
| 05/14/08 | 08N | 2039.5 | 75 | 2039.5 | MMF | Bacon & Pia |
| 05/15/08 | 08N | 2077.5 | 100 | 2077.5 | MMF | Bacon |
| 05/16/08 | 08N | 2132 | 100 | 2132 | MMF | Bacon & Pia |
| 05/19/08 | 08N | 2165 | 50 | 2165 | FIF | Bacon |
| 05/20/08 | 08N | 2150 | 100 | 2150 | FIF | Bacon |
| 05/21/08 | 08N | 2224 | 50 | 2224 | MMF & FIF | Bacon |

180.    On 93 out of the 95 (98%) bang the close trading days, the VWAP of Moore Capital's purchase(s) of NYMEX platinum futures contracts alleged in ¶¶ 177-179 above was higher than or equal to the VWAP settlement price of such contract as reported by the NYMEX. Sub-paragraphs "a" – "oooo" below allege each of these 93 days.

a.    November 19, 2007
b.    November 20, 2007
c.    November 21, 2007
d.    November 27, 2007
e.    November 28, 2007
f.    November 30, 2007
g.    December 3, 2007
h.    December 4, 2007
i.    December 5, 2007
j.    December 6, 2007
k.    December 7, 2007
l.    December 10, 2007
m.    December 12, 2007
n.    December 14, 2007
o.    December 17, 2007
p.    December 18, 2007
q.    December 21, 2007
r.    December 26, 2007
s.    December 27, 2007
t.    December 28, 2007
u.    December 31, 2007
v.    January 2, 2008

| | |
|---|---|
| w. | January 4, 2008 |
| x. | January 7, 2008 |
| y. | January 8, 2008 |
| z. | January 9, 2008 |
| aa. | January 10, 2008 |
| bb. | January 11, 2008 |
| cc. | January 14, 2008 |
| dd. | January 15, 2008 |
| ee. | January 17, 2008 |
| ff. | January 18, 2008 |
| gg. | January 22, 2008 |
| hh. | January 23, 2008 |
| ii. | January 24, 2008 |
| jj. | January 25, 2008 |
| kk. | January 28, 2008 |
| ll. | January 29, 2008 |
| mm. | January 30, 2008 |
| nn. | February 4, 2008 |
| oo. | February 5, 2008 |
| pp. | February 6, 2008 |
| qq. | February 7, 2008 |
| rr. | February 8, 2008 |
| ss. | February 11, 2008 |
| tt. | February 12, 2008 |
| uu. | February 13, 2008 |
| vv. | February 14, 2008 |
| ww. | February 15, 2008 |
| xx. | February 20, 2008 |
| yy. | February 21, 2008 |
| zz. | February 22, 2008 |
| aaa. | February 25, 2008 |
| bbb. | February 27, 2008 |
| ccc. | February 29, 2008 |
| ddd. | March 3, 2008 |
| eee. | March 4, 2008 |
| fff. | March 5, 2008 |
| ggg. | March 6, 2008 |
| hhh. | March 10, 2008 |
| iii. | March 20, 2008 |
| jjj. | March 24, 2008 |
| kkk. | March 26, 2008 |
| lll. | March 28, 2008 |
| mmm. | March 31, 2008 |
| nnn. | April 1, 2008 |
| ooo. | April 3, 2008 |
| ppp. | April 4, 2008 |

| | |
|---|---|
| qqq. | April 7, 2008 |
| rrr. | April 9, 2008 |
| sss. | April 10, 2008 |
| ttt. | April 11, 2008 |
| uuu. | April 16, 2008 |
| vvv. | April 17, 2008 |
| www. | April 18, 2008 |
| xxx. | April 21, 2008 |
| yyy. | April 22, 2008 |
| zzz. | April 29, 2008 |
| aaaa. | April 30, 2008 |
| bbbb. | May 1, 2008 |
| cccc. | May 2, 2008 |
| dddd. | May 6, 2008 |
| eeee. | May 7, 2008 |
| ffff. | May 8, 2008 |
| gggg. | May 9, 2008 |
| hhhh. | May 12, 2008 |
| iiii. | May 13, 2008 |
| jjjj. | May 14, 2008 |
| kkkk. | May 15, 2008 |
| llll. | May 16, 2008 |
| mmmm. | May 19, 2008 |
| nnnn. | May 20, 2008 |
| oooo. | May 21, 2008 |

181.    On 94 out of the 95 (99%) bang the close trading days, one or more of Moore Capital's purchases of NYMEX platinum futures contracts alleged in ¶¶ 177-179 above was higher than or equal to the VWAP settlement price of such contract as reported by the NYMEX. Sub-paragraphs "a" – "pppp" below allege each of these 94 days.

| | |
|---|---|
| a. | November 19, 2007 |
| b. | November 20, 2007 |
| c. | November 21, 2007 |
| d. | November 27, 2007 |
| e. | November 28, 2007 |
| f. | November 30, 2007 |
| g. | December 3, 2007 |
| h. | December 4, 2007 |
| i. | December 5, 2007 |
| j. | December 6, 2007 |
| k. | December 7, 2007 |
| l. | December 10, 2007 |

m.      December 12, 2007
n.      December 14, 2007
o.      December 17, 2007
p.      December 18, 2007
q.      December 21, 2007
r.      December 26, 2007
s.      December 27, 2007
t.      December 28, 2007
u.      December 31, 2007
v.      January 2, 2008
w.      January 3, 2008
x.      January 4, 2008
y.      January 7, 2008
z.      January 8, 2008
aa.     January 9, 2008
bb.     January 10, 2008
cc.     January 11, 2008
dd.     January 14, 2008
ee.     January 15, 2008
ff.     January 17, 2008
gg.     January 18, 2008
hh.     January 22, 2008
ii.     January 23, 2008
jj.     January 24, 2008
kk.     January 25, 2008
ll.     January 28, 2008
mm.     January 29, 2008
nn.     January 30, 2008
oo.     February 4, 2008
pp.     February 5, 2008
qq.     February 6, 2008
rr.     February 7, 2008
ss.     February 8, 2008
tt.     February 11, 2008
uu.     February 12, 2008
vv.     February 13, 2008
ww.     February 14, 2008
xx.     February 15, 2008
yy.     February 20, 2008
zz.     February 21, 2008
aaa.    February 22, 2008
bbb.    February 25, 2008
ccc.    February 27, 2008
ddd.    February 29, 2008
eee.    March 3, 2008
fff.    March 4, 2008

| | |
|---|---|
| ggg. | March 5, 2008 |
| hhh. | March 6, 2008 |
| iii. | March 10, 2008 |
| jjj. | March 20, 2008 |
| kkk. | March 24, 2008 |
| lll. | March 26, 2008 |
| mmm. | March 28, 2008 |
| nnn. | March 31, 2008 |
| ooo. | April 1, 2008 |
| ppp. | April 3, 2008 |
| qqq. | April 4, 2008 |
| rrr. | April 7, 2008 |
| sss. | April 9, 2008 |
| ttt. | April 10, 2008 |
| uuu. | April 11, 2008 |
| vvv. | April 16, 2008 |
| www. | April 17, 2008 |
| xxx. | April 18, 2008 |
| yyy. | April 21, 2008 |
| zzz. | April 22, 2008 |
| aaaa. | April 29, 2008 |
| bbbb. | April 30, 2008 |
| cccc. | May 1, 2008 |
| dddd. | May 2, 2008 |
| eeee. | May 6, 2008 |
| ffff. | May 7, 2008 |
| gggg. | May 8, 2008 |
| hhhh. | May 9, 2008 |
| iiii. | May 12, 2008 |
| jjjj. | May 13, 2008 |
| kkkk. | May 14, 2008 |
| llll. | May 15, 2008 |
| mmmm. | May 16, 2008 |
| nnnn. | May 19, 2008 |
| oooo. | May 20, 2008 |
| pppp. | May 21, 2008 |

182.    An overwhelming inference of causation of higher prices by each of Defendants'

bang the close trades arises from the two above comparisons of the NYMEX VWAP settlement

price to (1) the VWAP of Moore Capital's purchases during the two-minute settlement period (¶

186) and (2) Moore Capital's purchase(s) during the two-minute settlement period (¶ 187).

Defendants' causation of higher prices is also reflected in other NYMEX prices but further

evidence of these prices must await discovery from NYMEX. Although neither as reliable nor nearly as directly relevant to causation as the two foregoing NYMEX VWAP settlement price comparisons, the unreliable information that is now publicly available from the NYMEX provides additional, albeit much less important, indications that Defendants were successful in overpaying to cause a high price.

183.    On 86 out of the 95 (91%) bang the close trading days, one or more of Moore Capital's purchases of NYMEX platinum futures contracts alleged in ¶¶ 177-179 above was higher than or equal to the high price during the two-minute settlement period of such contract as reported by the publicly available NYMEX time and sales data. Sub-paragraphs "a" – "hhhh" below allege each of these 86 days.

| | |
|---|---|
| a. | November 19, 2007 |
| b. | November 20, 2007 |
| c. | November 21, 2007 |
| d. | November 27, 2007 |
| e. | November 30, 2007 |
| f. | December 3, 2007 |
| g. | December 4, 2007 |
| h. | December 5, 2007 |
| i. | December 10, 2007 |
| j. | December 14, 2007 |
| k. | December 17, 2007 |
| l. | December 21, 2007 |
| m. | December 26, 2007 |
| n. | December 28, 2007 |
| o. | December 31, 2007 |
| p. | January 2, 2008 |
| q. | January 3, 2008 |
| r. | January 4, 2008 |
| s. | January 7, 2008 |
| t. | January 8, 2008 |
| u. | January 9, 2008 |
| v. | January 10, 2008 |
| w. | January 11, 2008 |
| x. | January 14, 2008 |
| y. | January 15, 2008 |
| z. | January 17, 2008 |

| | |
|---|---|
| aa. | January 18, 2008 |
| bb. | January 22, 2008 |
| cc. | January 23, 2008 |
| dd. | January 24, 2008 |
| ee. | January 25, 2008 |
| ff. | January 28, 2008 |
| gg. | January 29, 2008 |
| hh. | January 30, 2008 |
| ii. | February 4, 2008 |
| jj. | February 5, 2008 |
| kk. | February 6, 2008 |
| ll. | February 7, 2008 |
| mm. | February 8, 2008 |
| nn. | February 11, 2008 |
| oo. | February 12, 2008 |
| pp. | February 13, 2008 |
| qq. | February 15, 2008 |
| rr. | February 20, 2008 |
| ss. | February 21, 2008 |
| tt. | February 22, 2008 |
| uu. | February 25, 2008 |
| vv. | February 27, 2008 |
| ww. | February 29, 2008 |
| xx. | March 3, 2008 |
| yy. | March 4, 2008 |
| zz. | March 5, 2008 |
| aaa. | March 6, 2008 |
| bbb. | March 10, 2008 |
| ccc. | March 20, 2008 |
| ddd. | March 24, 2008 |
| eee. | March 26, 2008 |
| fff. | March 28, 2008 |
| ggg. | March 31, 2008 |
| hhh. | April 1, 2008 |
| iii. | April 3, 2008 |
| jjj. | April 4, 2008 |
| kkk. | April 7, 2008 |
| lll. | April 9, 2008 |
| mmm. | April 10, 2008 |
| nnn. | April 11, 2008 |
| ooo. | April 16, 2008 |
| ppp. | April 17, 2008 |
| qqq. | April 18, 2008 |
| rrr. | April 21, 2008 |
| sss. | April 22, 2008 |
| ttt. | April 29, 2008 |

uuu.       April 30, 2008
vvv.       May 1, 2008
www.       May 2, 2008
xxx.       May 6, 2008
yyy.       May 7, 2008
zzz.       May 8, 2008
aaaa.      May 9, 2008
bbbb.      May 12, 2008
cccc.      May 13, 2008
dddd.      May 14, 2008
eeee.      May 15, 2008
ffff.      May 16, 2008
gggg.      May 19, 2008
hhhh.      May 21, 2008

184.    On 39 out of the 95 (41%) bang the close trading days, one or more of Moore

Capital's purchases of NYMEX platinum futures contracts alleged in ¶¶ 177-179 above was

higher than or equal to the high price for such contract during regular trading hours (*i.e.*, 8:20

a.m. through 1:05 p.m.) as reported by the publicly available NYMEX time and sales data. Sub-

paragraphs "a" – "mm" below allege each of these 39 days. The fact one or more of Moore

Capital's purchases constituted the high trade on 41% of these 95 bang the close trading days is

extraordinary considering that all of these highs were set in the same small two-minute closing

period, which constituted less than one percent of the regular trading day (*i.e.*, during two-

minutes of the 270 minute regular trading day.)

a.       November 30, 2007
b.       December 3, 2007
c.       December 14, 2007
d.       December 17, 2007
e.       December 21, 2007
f.       December 28, 2007
g.       December 31, 2007
h.       January 3, 2008
i.       January 8, 2008
j.       January 18, 2008
k.       January 22, 2008
l.       January 28, 2008
m.       January 29, 2008

|   |   |
|---|---|
| n. | February 4, 2008 |
| o. | February 5, 2008 |
| p. | February 6, 2008 |
| q. | February 7, 2008 |
| r. | February 20, 2008 |
| s. | February 21, 2008 |
| t. | February 22, 2008 |
| u. | February 27, 2008 |
| v. | February 29, 2008 |
| w. | March 3, 2008 |
| x. | March 5, 2008 |
| y. | March 10, 2008 |
| z. | March 24, 2008 |
| aa. | March 26, 2008 |
| bb. | March 31, 2008 |
| cc. | April 4, 2008 |
| dd. | April 9, 2008 |
| ee. | April 10, 2008 |
| ff. | April 18, 2008 |
| gg. | April 22, 2008 |
| hh. | May 2, 2008 |
| ii. | May 7, 2008 |
| jj. | May 8, 2008 |
| kk. | May 9, 2008 |
| ll. | May 12, 2008 |
| mm. | May 21, 2008 |

185.    On 88 out of the 95 (93%) bang the close trading days, one or more of Moore

Capital's purchases of NYMEX platinum futures contracts alleged in ¶¶ 177-179 above was

higher than or equal to the price for such contract immediately prior to the two-minute settlement

period as reported by the publicly available NYMEX time and sales data. Sub-paragraphs "a" –

"jjjj" below allege each of these 88 days.

|   |   |
|---|---|
| a. | November 19, 2007 |
| b. | November 21, 2007 |
| c. | November 27, 2007 |
| d. | November 30, 2007 |
| e. | December 3, 2007 |
| f. | December 4, 2007 |
| g. | December 5, 2007 |
| h. | December 6, 2007 |
| i. | December 7, 2007 |

| | |
|---|---|
| j. | December 10, 2007 |
| k. | December 14, 2007 |
| l. | December 17, 2007 |
| m. | December 18, 2007 |
| n. | December 21, 2007 |
| o. | December 26, 2007 |
| p. | December 27, 2007 |
| q. | December 28, 2007 |
| r. | December 31, 2007 |
| s. | January 2, 2008 |
| t. | January 3, 2008 |
| u. | January 7, 2008 |
| v. | January 8, 2008 |
| w. | January 10, 2008 |
| x. | January 11, 2008 |
| y. | January 14, 2008 |
| z. | January 15, 2008 |
| aa. | January 17, 2008 |
| bb. | January 18, 2008 |
| cc. | January 22, 2008 |
| dd. | January 23, 2008 |
| ee. | January 24, 2008 |
| ff. | January 25, 2008 |
| gg. | January 28, 2008 |
| hh. | January 29, 2008 |
| ii. | January 30, 2008 |
| jj. | February 4, 2008 |
| kk. | February 5, 2008 |
| ll. | February 6, 2008 |
| mm. | February 7, 2008 |
| nn. | February 8, 2008 |
| oo. | February 11, 2008 |
| pp. | February 12, 2008 |
| qq. | February 14, 2008 |
| rr. | February 15, 2008 |
| ss. | February 20, 2008 |
| tt. | February 21, 2008 |
| uu. | February 22, 2008 |
| vv. | February 25, 2008 |
| ww. | February 26, 2008 |
| xx. | February 27, 2008 |
| yy. | February 29, 2008 |
| zz. | March 3, 2008 |
| aaa. | March 4, 2008 |
| bbb. | March 5, 2008 |
| ccc. | March 6, 2008 |

| | |
|---|---|
| ddd. | March 10, 2008 |
| eee. | March 20, 2008 |
| fff. | March 24, 2008 |
| ggg. | March 26, 2008 |
| hhh. | March 28, 2008 |
| iii. | March 31, 2008 |
| jjj. | April 1, 2008 |
| kkk. | April 3, 2008 |
| lll. | April 4, 2008 |
| mmm. | April 7, 2008 |
| nnn. | April 9, 2008 |
| ooo. | April 10, 2008 |
| ppp. | April 11, 2008 |
| qqq. | April 16, 2008 |
| rrr. | April 17, 2008 |
| sss. | April 18, 2008 |
| ttt. | April 21, 2008 |
| uuu. | April 22, 2008 |
| vvv. | April 29, 2008 |
| www. | April 30, 2008 |
| xxx. | May 1, 2008 |
| yyy. | May 2, 2008 |
| zzz. | May 6, 2008 |
| aaaa. | May 7, 2008 |
| bbbb. | May 8, 2008 |
| cccc. | May 9, 2008 |
| dddd. | May 12, 2008 |
| eeee. | May 13, 2008 |
| ffff. | May 14, 2008 |
| gggg. | May 15, 2008 |
| hhhh. | May 19, 2008 |
| iiii. | May 20, 2008 |
| jjjj. | May 21, 2008 |

186.    In addition to the sheer number of MOC trades made by Moore Capital during the class period, the volume of their MOC trades relative to the other "non-Moore" trades during the two-minute closing period was staggering. During the class period, Moore Capital's MOC trades comprised more than 50% of the volume-weighted Palladium futures trades during the two-minute close period more than 60% of the trading days. The following examples show the

percentage of the volume-weighted average during the two-minute close in platinum futures that

Moore Capital's MOC trades were responsible for:

> a. December 4, 2007 – 83.3% of the closing volume;
> b. January 3, 2008 – 83.3% of the closing volume;
> c. January 16, 2008 – 79.1% of the closing volume;
> d. January 17, 2008 – 83.3% of the closing volume;
> e. January 25, 2008 – 79% of the closing volume;
> f. February 1, 2008 – 83% of the closing volume;
> g. February 5, 2008 – 77% of the closing volume;
> h. February 15, 2008 – 85.5% of the closing volume;
> i. February 16, 2008 – 84% of the closing volume;
> j. February 21, 2008 – 84% of the closing volume;
> k. February 22, 2008 – 82% of the closing volume;
> l. April 3, 2008 – 86.2% of the closing volume;
> m. April 22, 2008 – 87% of the closing volume;
> n. May 15, 2008 – 82% of the closing volume;

187.   The aforementioned shows that Moore Capital's trades not only artificially

inflated the price of platinum futures, but were the dominant factor in determining the settlement

price in platinum futures for the above dates.

188.   By frequently and consistently injecting the unlawful, uneconomic and

illegitimate large demand element of their purchases into the price equation for NYMEX

platinum and palladium futures contracts at the times of their closing, Defendants caused

NYMEX platinum and palladium futures prices to be artificially high during the Class Period.

*See* ¶¶ 209-258, *infra.*

189.   Plaintiffs allege in the schedules attached as Exhibits C - G hereto the specific

amounts by which the Moore Capital NYMEX palladium futures purchases were higher than or

equal to the five price benchmarks set forth in ¶¶ 166-174 above.

190.   Plaintiffs allege in the schedules attached as Exhibits F - L hereto the specific

amounts by which the Moore Capital NYMEX platinum futures purchases were higher than or

equal to the five price benchmarks set forth in ¶¶ 179-185 above.

### 3. Admissions that Defendants' "Bang the Close" Trades Inflated Prices

191.    Defendant Burger and Moore employee Luke San Filipo admitted in their CFTC depositions that these "bang the close" trades did indeed artificially raise the price of platinum and palladium. Moore employee Luke San Filipo testified that he began to notice that Defendant Pia's "bang the close" trades began to have effect the settlement price of platinum and palladium. San Filipo Depo. at 94:6-94:15. Defendant Burger repeatedly admitted the "bang the close" trades artificially pushed up the price of platinum and palladium. Discussing on particular "bang the close" trade, Defendant Burger was instructed to buy 100 palladium by Pia who told him to "try to jack it up" which Burger took to mean inflate the price. After executing the trade, Burger responded to Pia by stating "it worked in Palladium." When asked what he meant by this statement Burger responded "we tried to jack it and I'm saying we jacked it." Burger Depo. at 161:8-164:10.

192.    Pit trader John Sakulich testified on the impact of the MOC trades on the platinum and palladium market stating he noticed a tremendous sudden increase in price in the market. Sakulich Depo. at 101:14-102:2. When pit trader Peter Venus was asked about the effect of the MOC orders on the platinum and palladium markets, Venus testified, "They would drive the price higher." Deposition of Peter Venus in Pia/Moore CFTC proceeding at 137:3-137:10 (hereinafter "Venus Depo.").

### 4. Important Further Inferences of Causation of Inflated Prices Arise from Defendants' Consistent Violation of Pending Offers

193.    Defendants' conduct, as alleged above, artificially inflated NYMEX palladium and platinum futures contracts prices, and also artificially inflated and pulled up the VWAP closing or settlement prices for such contracts.

194.    (a) Plaintiffs disclaim any burden to plead **or prove** that Defendant's execution prices were also so high that they even exceeded (or "violated") actual offers to sell that were present in the NYMEX market at the times that Defendants' transactions were executed. There are no publicly available data for the NYMEX floor offers. Therefore, it is impossible to plead this comparison now (and, Plaintiffs allege, unnecessary to prove any violation of offers at any time in this case).

(b) However, there are publicly available NYMEX data on best bid and ask for its electronic markets. Comparing Defendants' execution prices to the offers available in the NYMEX electronic market during the two-minute closing period shows that Defendants' execution prices repeatedly exceeded (or "violated") the contemporaneous offers to sell available on the NYMEX electronic market.

195.    Between November 1, 2007 and May 27, 2008, the lowest execution price for the Moore Defendants' end of day purchases in platinum and palladium futures contracts was higher than the highest offer to sell and the last offer to sell reflected on NYMEX data for best bids and asks in the electronic market during the two-minute closing period on the following 115 days for, in each case, the commodity or commodities indicated:

a.    November 6, 2007 – palladium
b.    November 8, 2007 – palladium
c.    November 9, 2007 – palladium
d.    November 13, 2007 – palladium
e.    November 14, 2007 – palladium
f.    November 15, 2007 – palladium
g.    November 19, 2007 – platinum
h.    November 20, 2007 – palladium/platinum
i.    November 21, 2007 – palladium/platinum
j.    November 23, 2007 – palladium
k.    November 26, 2007 – palladium
l.    November 27, 2007 – palladium/platinum
m.    November 28, 2007 –palladium
n.    November 30 , 2007 – palladium/platinum

o.      December 3, 2007 - platinum
p.      December 4, 2007 – platinum
q.      December 5, 2007 - palladium
r.      December 6, 2007 – palladium
s.      December 7, 2007 – platinum
t.      December 10, 2007 - palladium
u.      December 13, 2007 – palladium
v.      December 14, 2007 - palladium/platinum
w.      December 17, 2007 - palladium/platinum
x.      December 18, 2007 - palladium/platinum
y.      December 21, 2007 - palladium/platinum
z.      December 24, 2007 – palladium
aa.     December 26, 2007 - palladium
bb.     December 27, 2007 – palladium
cc.     December 28, 2007 - palladium/platinum
dd.     December 31, 2007 - palladium/platinum
ee.     January 2, 2008 - palladium/platinum
ff.     January 3, 2008 - palladium/platinum
gg.     January 4, 2008 – palladium
hh.     January 7, 2008 - palladium
ii.     January 8, 2008 - palladium/platinum
jj.     January 9, 2008 - palladium
kk.     January 10, 2008 - platinum
ll.     January 11, 2008 - palladium/platinum
mm.     January 14, 2008 - palladium/platinum
nn.     January 15, 2008 - palladium/platinum
oo.     January 17, 2008 - palladium/platinum
pp.     January 18, 2008 - palladium/platinum
qq.     January 22, 2008 - palladium/platinum
rr.     January 23, 2008 - palladium/platinum
ss.     January 24, 2008 - palladium/platinum
tt.     January 25, 2008 - palladium/platinum
uu.     January 28, 2008 - palladium/platinum
vv.     January 29, 2008 - palladium/platinum
ww.     January 30, 2008 – platinum
xx.     February 4, 2008 - platinum
yy.     February 5, 2008 palladium
zz.     February 6, 2008 – palladium
aaa.    February 7, 2008 - palladium/platinum
bbb.    February 8, 2008 - palladium/platinum
ccc.         February 11, 2008 - palladium
ddd.         February 12, 2008 - palladium/platinum
eee.         February 13, 2008 - palladium/platinum
fff.         February 14, 2008 - palladium
ggg.         February 15, 2008 - palladium/platinum
hhh.         February 19, 2008 – palladium

| | |
|---|---|
| iii. | February 20, 2008 - palladium/platinum |
| jjj. | February 21, 2008 - platinum |
| kkk. | February 22, 2008 - palladium/platinum |
| lll. | February 25, 2008 - platinum |
| mmm. | February 26, 2008 - palladium |
| nnn. | February 27, 2008 - palladium/platinum |
| ooo. | February 29, 2008 - palladium/platinum |
| ppp. | March 3, 2008 - palladium/platinum |
| qqq. | March 4, 2008 - palladium/platinum |
| rrr. | March 5, 2008 - palladium/platinum |
| sss. | March 6, 2008 - palladium/platinum |
| ttt. | March 10, 2008 - platinum |
| uuu. | March 11, 2008 – palladium |
| vvv. | March 12, 2008 - palladium |
| www. | March 14, 2008 - palladium |
| xxx. | March 17, 2008 - palladium |
| yyy. | March 20, 2008 – palladium/platinum |
| zzz. | March 24, 2008 - palladium/platinum |
| aaaa. | March 25, 2008 – palladium |
| bbbb. | March 26, 2008 - palladium/platinum |
| cccc. | March 28, 2008 - palladium/platinum |
| dddd. | March 31, 2008 - palladium/platinum |
| eeee. | April 1, 2008 - palladium/platinum |
| ffff. | April 2, 2008 – palladium |
| gggg. | April 3, 2008 - palladium/platinum |
| hhhh. | April 4, 2008 - platinum |
| iiii. | April 7, 2008 - palladium/platinum |
| jjjj. | April 9, 2008 - palladium/platinum |
| kkkk. | April 10, 2008 - palladium/platinum |
| llll. | April 11, 2008 - palladium/platinum |
| mmmm. | April 14, 2008 – palladium |
| nnnn. | April 15, 2008 – palladium |
| oooo. | April 16, 2008 - platinum |
| pppp. | April 17, 2008 - platinum |
| qqqq. | April 18, 2008 - palladium/platinum |
| rrrr. | April 21, 2008 - palladium/platinum |
| ssss. | April 22, 2008 - palladium/platinum |
| tttt. | April 25, 2008 – palladium |
| uuuu. | April 29, 2008 - palladium |
| vvvv. | April 30, 2008 - platinum |
| wwww. | May 1, 2008 - palladium/platinum |
| xxxx. | May 2, 2008 - palladium/platinum |
| yyyy. | May 5,2008 – palladium |
| zzzz. | May 6, 2008 – palladium/platinum |
| aaaaa. | May 7, 2008 - palladium/platinum |
| bbbbb. | May 8, 2008 - palladium/platinum |

| ccccc. | May 9, 2008 - palladium/platinum |
| ddddd. | May 12, 2008 - palladium/platinum |
| eeeee. | May 13, 2008 - palladium/platinum |
| fffff. | May 14, 2008 - palladium/platinum |
| ggggg. | May 15, 2008 - palladium |
| hhhhh. | May 16, 2008 - palladium |
| iiiii. | May 19, 2008 - palladium/platinum |
| jjjjj. | May 20, 2008 - palladium/platinum |
| kkkkk. | May 21, 2008 - palladium/platinum |

**C.**     **Defendants Had A Large Financial Motive To Inflate The Prices of Platinum and Palladium Futures Contracts**

**1.**     **The Moore Funds**

196.     **Palladium Futures**. On October 3, 2007, the Moore Funds held 835 palladium futures contracts. Such position increased to 2,730 palladium futures contracts by November 1, 2007 and steadily increased to 4,250 contracts by February 3, 2008. Thereafter, the Moore Funds quickly and substantially liquidated their long futures positions by means of exchange for physical (or "EFP") transactions during the first week of February. *See* MFG 001204-5. These EFP transactions simultaneously reduced the Moore Funds' long futures positions and increased their cash market or bullion position in palladium. Starting at the end of February, the Moore Funds slowly started to rebuild their long position in palladium futures until the end of March when the position reached 1,650 contracts. From that point forward the Moore Funds' long position declined until going flat at the end of April.

197.     **Palladium Bullion**. Between November 1, 2007 and February 3, 2008, the Moore Funds held short positions in cash palladium between 10,000 ounces and 65,000 ounces. Beginning on February 4, 2008, the Moore Funds began to hold substantial long positions in cash palladium as a result of several large EFP transactions whereby they sold palladium futures on the NYMEX and acquired cash positions in palladium. On February 4, 2008, the Moore Funds held 135,000 ounces of cash palladium. This long cash position steadily grew to 500,500

ounces by March 3, 2008. Thereafter, the Moore Funds' cash palladium position declined slowly to 135,500 ounces by May 31, 2008.

198.   **Platinum Futures**. On November 19, 2007, the Moore Funds held 50 platinum futures contracts. This long position steadily increased to 1,775 contracts by February 3, 2008. Over the next few trading days, the Moore Funds quickly and substantially liquidated their long futures positions by means of exchange for physical (or "EFP") transactions. *See* MFG 001204-5. These EFP transactions simultaneously reduced the Moore Funds' long futures positions and increased its cash market or bullion position in platinum. Between February 5 and May 31, 2008, the Moore Funds platinum futures position fluctuated between 0 and 850 contracts.

199.   **Platinum Bullion**. On November 16, 2007, the Moore Funds held 40,000 ounces of cash platinum. Beginning on February 4, 2008, the Moore Funds began to hold substantial long positions in cash platinum as a result of large EFP transactions whereby they sold platinum futures contracts on the NYMEX and simultaneously acquired cash positions in platinum. On February 5, 2008, the Moore Funds held 148,750 ounces of cash platinum. The Moore Funds' cash position in platinum increased to 182,250 ounces by March 4, 2008. This large position slowly declined until the beginning of April. Between April 2, 2008 and May 31, 2008, the Moore Funds' platinum cash position fluctuated between 22,500 ounces short and 77,500 ounces.

200.   The Moore Funds' holdings of more than one hundred thousand ounces of platinum or palladium meant that the Moore Funds experienced great gains on their overall holdings from increases in prices. Thus, the Moore Fund and all Moore Defendants had a large incentive to inflate these prices by inducing or enabling others to purchase, through the bang the close purchases and through other means.

201.    For example, on November 1, 2007, the Moore Funds were long 2,730 palladium futures contracts (or approximately 273,000 troy ounces of palladium). Accordingly, the Moore Funds would experience a large mark to market gain on the value of their palladium holdings from any increase in the price of palladium futures contracts. "Mark to market" means the value of the position as of the current market price. Mark to market is the standard metric for valuation of positions for many purposes including computation of exchange margins and of management fees for advisors to funds. A $10 increase (less than 3%) in the price of the palladium futures contract would have increased the value of the Moore Funds' long futures position in such contract by approximately $2,730,000 on November 1, 2007. The Moore Funds were short 10,000 ounces of palladium in the cash market on November 1, which would only reduce the Moore Funds' profit in the foregoing example by $100,000 assuming the cash market price fell by $10 an ounce.

   a.   By February 3, 2008, the Moore Funds' palladium futures long position had increased to 4,250 contracts. This large increase in the Moore Funds' long position similarly increased the Moore Funds' financial motive to increase the price of palladium futures. At this point, a $100 per ounce increase meant $425,000,000 in profits for the Moore Funds.

202.    For another example, on February 3, 2008, the Moore Funds' platinum futures long position had increased to 1,775 contracts or 88,750 ounces. This large increase in the Moore Funds' long position similarly increased the Moore Funds' financial motive to increase the price of platinum futures contracts. Additionally, the Moore Funds' holding of 57,500 ounces of platinum bullion on February 3, 2008, for a total of 146,250 ounces, would also benefit from an

increase in platinum prices. Therefore, a $100 per ounce increase in platinum prices meant that the Moore Funds would experience a $14,625,000 gain.

### a. Defendants Moore Macro Fund LLP and Moore Global Fixed Income Fund LLP Held the Manipulative Positions and Profited From the Manipulative Scheme

203.    Defendant Pia and Mr. Bacon traded platinum and palladium for the Moore Macro Fund LLP ("MMF"). Mr. Bacon traded platinum and palladium for the Moore Global Fixed Income Fund LP ("FIF").

204.    During the Class Period, MMF and FIF held large long positions in platinum and palladium futures and derivatives contracts. *See* Exhibit A attached hereto (reflecting the daily platinum and palladium positions of MMF and FIF from November 1 2007 – May 31, 2008). The large long positions held by MMF and FIF would benefit from increases in platinum and palladium prices.

205.    (a)    The Moore Macro Fund and Fixed Income Fund enjoyed large gains during December 2007 – February 2008 as platinum and palladium prices continued to climb to record highs. For example, from November 2007 to February 2008: (i) the portion of the Moore Macro Fund for which Defendant Pia was the portfolio manager went from a loss of $3,165,016 for the month of November 2007 to a gain of $31,855,726 for the month of February 2008; (ii) the portion of the Moore Macro Fund for which Defendant Bacon was the portfolio manager went from a loss of $3,800,501 for the month of November 2007 to a gain of $70,507,499 for the month of February 2008; and (iii) the portion of the Fixed Income Fund for which Defendant Bacon was the portfolio manager went from a loss of $1,935,492 for the month of November 2007 to a gain of $40,314,677 for the month of February 2008. Thus, the total platinum and palladium investments for the Moore Macro Fund and the Fixed Income Fund went from a loss

of $8,901,009 for the month of November 2007 to a gain of $142,677,902 for the month of February 2008.

       (b)     However, when platinum and palladium prices began to collapse in March 2008, the Moore Macro Fund and Fixed Income Fund suffered large losses. For example, from February 2008 to May 2008: (i) the portion of Moore Macro Fund for which Defendant Pia was the portfolio manager went from a gain of $31,855,726 for the month of February 2008 to a gain of $2,321,744 for the month of May 2008; (ii) the portion of the Moore Macro Fund for which Defendant Bacon was the portfolio manager went form a gain of $70,507,499 for the month of February 2008 to a loss of $3,338,518 for the month of May 2008; and (iii) the portion of the Fixed Income Fund for which Defendant Bacon was the portfolio manager went from a gain of $40,314,677 for the month of February 2008 to a loss of $517,848 for the month of May 2008. Thus, the total platinum and palladium investments for the Moore Macro Fund and the Fixed Income Fund went from a gain of $142,677,902 for the month of February 2008 to a loss of $1,534,622 for the month of May 2008.

### 2.    Moore Capital and Pia

       206.    The Moore Capital Defendants, directly or indirectly, received large actual monetary compensation and further prospective revenues from achieving profits in the Moore Funds that they managed. Such monetary compensation includes but is not limited to (a) an incentive management fee consisting, typically or frequently, of 20% of the profits; (b) the attraction of additional business which, along with the incremental capital from the profits, produced further compensation in the form of management fees (which, typically or frequently were between 1 and 2% of the funds under management); (c) enhanced credibility and stature from having completed a large successful trade over many months. Defendant Pia's

compensation was largely incentive or bonus based. It largely depended on the amount of profits his trading contributed to the Moore Funds and/or the amounts of incentive in management fees his conduct created for the Moore Capital Defendants. Therefore, Defendant Pia had the largest relative financial motive of the Moore Defendants to successfully manipulate NYMEX platinum and palladium futures prices.

### 3.   MF Global

207.   MF Global received revenues for its assistance in entering trades and causing them to be executed on behalf of the Moore Funds, the Moore Capital Defendants and Defendant Pia. By continuing for a two-year period to enter manipulative trades and make the efforts alleged herein to cause the execution prices alleged hereof to be as high as possible, Defendant MF Global received substantial business and revenues from the Moore Funds. Such revenues were unusual because hedge funds and large investors typically distribute their business to multiple FCM's in order to be able to check on executions, market information, etc. By providing the extraordinary and unlawful assistance it did, Defendant MF Global was able to capture all of the FCM revenues from the Moore Funds for at least their extensive palladium and platinum futures trading.

### D.   Ability to Cause Artificial Prices

### 1.   Intentionally Overpaying to Cause High Prices

208.   Defendants' ability to cause artificial prices is demonstrated by the previous allegations of the artificially high prices at which Defendants caused the bang the close transactions to be executed.

### 2.   Defendants Intentionally Created the Maximum Imbalance to Cause the Maximum Overpayment

209.     Even a single large buy order can have a long term upward impact on prices. *See* Robert E. Holthausen, Richard Leftwich and David Mayers, *The Effects of Large Block Transactions on Security Prices: A Cross-Sectional Analysis*, 19 J. OF FIN. ECON. 237, 240 (1987) ("Block transactions have permanent price effects if trades convey information, even if there are sufficient close substitutes to produce perfectly elastic excess demand curves."); Myron Scholes, *The Market for Securities: Substitution Versus Price Pressure and the Effects of Information on Share Prices*, 2 J. OF BUSINESS 179, 193-94 (1972); Andrei Shleifer, *Do Demand Curves Slope Down?*, J. OF FINANCE 579, 580-582 (1986).

210.     Typically, the upward effects on prices of a large buy order do stay in the market for substantially longer than the downward effect on prices of a large sell order. *Id*.

211.     Orders and executions of 20-100 contracts are very large for the floor market of the NYMEX platinum and palladium futures contracts.

212.     Defendants made such large trades. For platinum, on 5 days the orders were for 25 contracts, on 46 days the orders were for 50 contracts, on 2 days the orders were for 75 contracts, and on 42 days the orders were for 100 contracts.

213.     For palladium, on 16 days the orders were for 25 contracts, on 54 days the orders were for 50 contracts, on 3 days the orders were for 75 contracts, on 45 days the orders were for 100 contracts, and on 1 day the orders were for 122 contracts.

214.     Further, Defendants made large buy trades in NYMEX platinum or palladium futures starting before and continuing after the Class Period began. Defendants made not just one large buy trade, but frequent large buy trades in platinum or palladium futures for an eight-plus month period from at least October 3, 2007, through at least May 2008.

215.     Defendants' large buy trades constituted a large or a significant percentage of the trading volume when they were made. Regardless of whether they are large trades, when trades constitute a significant percentage of the trading volume they may have a substantial effect on prices.

216.     Defendants engaged in a manipulative scheme to execute market on close orders (MOC orders) during the Class Period on the days specifically alleged herein.

217.     Thus, Defendants' blatantly manipulative trades were not merely large buy trades. They were also large "bang the close" trades that impacted the closing price. By intentionally paying and buying at a high price, the Moore Defendants also directly and automatically caused the closing or settlement price to be higher than it otherwise would have been. This is because the closing or settlement price is a volume-weighted average price. By uneconomically calculating and making their buy transaction at a higher price rather than at the cheapest available prices, the Moore Defendants automatically and necessarily caused uneconomic and manipulative increases in such volume-weighted average price to higher levels than economic behavior would have produced.

218.     By making their "bang the close" transactions in the NYMEX floor market, which was a thinner market, Defendants further increased the prices at which they purchased their NYMEX palladium and palladium futures contracts. This automatically increased the upward effect on the volume weighted average price of their manipulative trades.

219.     So frequent and large were Defendants' "bang the close" trades that they not only caused NYMEX closing prices to be higher than they would have been but for the manipulation. They also caused NYMEX prices to be higher than all the benchmarks alleged above.

220.     Standard investment or trading conduct in the futures markets is for traders to seek to buy for the cheapest price, **NOT** the highest price.

221.     Rather than following standard practice, Defendants typically took a complex combination of restrictive steps in order to create an imbalance between the size of Defendants' buy orders and the market's ability to absorb them in an orderly fashion. Thereby, Defendants intentionally sought to overpay and buy for the highest price on each and every one of their end of day purchases previously alleged herein.

222.     The NYMEX floor market was even thinner (*i.e.*, less able to accommodate trade volume) than the NYMEX electronic computerized market for such trades. Rather than economically placing their large trades into the computer market, Defendants uniformly directed that all their large trades be funneled into that portion of the NYMEX palladium and platinum futures markets that was most susceptible to trade manipulation: the thinner NYMEX **floor trading** market.

223.     Rather than providing substantial time to allow this thinner market to provide offers and absorb their large trades in an orderly fashion, Defendants specifically compressed the time that the market had to execute the trades into **the last seconds of trading**. By intentionally going to the thinnest market to make the quickest execution of the large buy trades, Defendants further increased the price at which their large trades were executed, *i.e.,* they had yet another upward effect on NYMEX prices.

224.     Further, Defendants accompanied Defendants' large orders with **written instructions** indicating they should be executed in a manner that pushed **prices higher**. Expressly ordering purchases to be executed so as to overpay and cause higher prices is the **exact**

**opposite** of standard or ordinary market behavior. These written instructions constitute admissions of grossly uneconomic conduct that manipulated prices.

225.    Also, the Moore Defendants, per Defendant Pia, told MF Global to stay on the telephone with the floor clerk to get the highest price possible. Testimony from the Floor brokers confirms that the Defendants created conditions designed to ensure they were purchasing platinum and/or palladium at inflated prices. The Floor brokers confirmed this type of uneconomic activity was unusual and contrary to the Floor Broker's usual order which was to ensure the purchaser gets the lowest possible price. (Kleinstein Depo. at 83:7-83:14).

226.    Defendants also ensured that all of their "bang the close" trades counted toward settlement by utilizing the same floor broker for these trades. Defendant Welsh would frequently ensure that the floor broker would analyze the volume to determine how much platinum and palladium would need to be purchased to move the settlement price to certain benchmarks.

227.    Because Defendants' frequent and large trades had the foregoing multiple direct upward effects on NYMEX platinum and palladium futures contract prices, Defendants' trades also had four additional upward "computational" effects on such prices.

228.    Defendants' trades were not just large trades. They also were all executed during the two-minute settlement period in NYMEX platinum and palladium futures contracts. Such settlement period transactions prices all qualify for use in the computation of the volume weighted average price. This VWAP price of all of the trades during such two-minute period was the settlement price. *Id*. Therefore, the higher prices caused by Defendants' trades, as a matter of arithmetic, automatically caused the NYMEX settlement prices to be higher.

229.    In both platinum and palladium, the NYMEX conducted during the Class Period trading in a series of successively later expirations or contracts. For each contract, the delivery

date went increasingly further into the future. But the prices of these different expirations are all "chained together" by mathematical market trading practices such as arbitrage spread trading, etc. Thus, by causing the prices of just one NYMEX platinum and just one NYMEX palladium futures contracts to be artificially high, Defendants caused the prices of the "chained-together" platinum or palladium futures contracts to be artificially high.

230.    Reciprocally, however, the only way to increase settlement prices was to increase a futures contract transaction price.

231.    Indeed, increasing the settlement price of the earlier expiring NYMEX platinum or palladium futures contract necessarily increased the prices of the later expirations. This is because of the way the NYMEX calculated settlement prices. NYMEX Rule 6.53. NYMEX Rule 6.53 then provided that the settlement prices of all NYMEX platinum or palladium futures prices other than the most actively traded contract were determined by "spread differentials" between the most actively traded contract and such other contracts based on trades executed on the NYMEX trading floor. *See* NYMEX Rule 6.53(C).

232.    The settlement prices are the basis for daily computation of variation margin, which has to be posted by every trader. Unlike the first two computational effects, this computational effect directly impacts only variation margin rather than price. But by causing the settlement price to be higher, Defendants caused more margin (or "buying power") to be transferred to market participants with "buy" opinions, and caused margin to have to be paid by market participants who had sold. Thus the sellers had less selling power. This could exert further upward effects on prices.

233.    Those cash transfers increased the buying market participants' buying power and decreased the selling market participants' selling power in a way that could create a "positive

feedback loop." Such "buying pressure" from shorts that have to buy out of their short positions or longs that use their increased buying power to purchase more positions could be self-reinforcing.

234.    Yet another indication of Defendants' upward causal effect on prices is that NYMEX platinum and palladium prices greatly increased after Defendants' large buy trades started, and greatly decreased after they ended.

235.    In the foregoing circumstances, Defendants' frequent large buy trades had upward artificial effects on prices of NYMEX platinum and palladium futures for an extended period.

236.    By artificially inflating the settlement price, Defendants also caused the overnight reported price of NYMEX platinum and palladium contracts to be higher than otherwise. Because Defendants' manipulative conduct was not disclosed until April 9, 2010, this "price beacon" of higher prices could have influenced the beliefs and behaviors of other market participants.

237.    Physical platinum and palladium prices are closely tied to NYMEX platinum and palladium futures prices. Therefore, the artificially high NYMEX futures prices caused higher physical platinum and physical palladium prices.

238.    Here, the upward artificial effect of Defendants' frequent large "bang the close" trades clearly did stay in the market for an extended period. By repeatedly entering such large buy orders in very illiquid futures contracts at the end of trading, Defendants, through their agents and/or co-conspirators, intentionally caused the prices at which they transacted NYMEX platinum and palladium futures contracts to be artificially higher than they otherwise would have been.

239.    Defendants' upward manipulation of, first, the NYMEX platinum and palladium contract prices at which they transacted and, second, the resulting NYMEX closing or settlement prices did cause and create positive feedback loops of artificial price increases. For example, as previously alleged, large buy trades have a longer impact on prices than large sell trades. Second, settlement prices of the NYMEX platinum and palladium futures contracts were used, as Defendants well knew, by the market as the most important price information of each day. By repeatedly manipulating the closing or settling prices higher, Defendants unlawfully and repeatedly sent a price beacon signal in favor of artificially high prices, and against and contrary to natural prices.

240.    Defendants' manipulative acts and their concussive effect on prices were not disclosed publicly to the market during the Class Period or otherwise until on or about April 29, 2010, when Defendants' CFTC settlement was made public. Therefore, during the Class Period, Defendants caused artificially inflated NYMEX prices in numerous ways. These include (a) through Defendants' "large" buy trades themselves, (b) through the long impact on prices these large buy trades had, (c) through the inclusion of those large buy trades in the volume-weighted average settlement price, (d) through the resulting inflated representations and reports of an artificially inflated and manipulated price to the public, as though it were a normal price, (e) through the trading margin impacts that, effectively, altered the conduct of every other participant in the market by giving those participants with a "buy" opinion more buying power and those with a "sell" opinion less selling power and (f) by sending general "buy" signals to the market through higher prices, including by (but not limited to), making new highs, breaking trend lines, etc.

241.     As a result of all the foregoing, Defendants' frequent large manipulative "bang the close" trades caused NYMEX platinum and palladium prices to be artificially high during the Class Period.

### 3.     Defendants' Large Positions Also Caused Artificially High Prices

242.     An additional means of increasing prices was the large positions that Defendants held.

243.     **Reports of Large Positions**. In order (among other things) to prevent price manipulation, NYMEX and CFTC rules require that large positions be reported to the exchange on the daily basis in the form of "large trader reports."

a.     **Palladium**. During the Class Period, the anti-manipulative reporting level for NYMEX platinum futures contracts was 25 contracts. During the time period for which trading records were produced (*i.e.*, August 13, 2007 through May 29, 2008), Moore Capital held positions in NYMEX palladium futures contracts that were greater than the anti-manipulative large trader reporting level of 25 contracts on every single day except for two. *See* Exhibit A hereto. In fact, During the Class Period, Moore Capital held NYMEX palladium futures positions as large as **170 times** the minimum manipulation concern level, *i.e.*, 24 contracts. *Id*. Indeed, Defendants allocated their capital so as to have more effect on the small market, palladium, which, indirectly, would case higher platinum prices.

b.     **Platinum**. During the Class Period, the anti-manipulative reporting level for NYMEX platinum futures contracts was 25 contracts. During the time period for which trading records were produced (*i.e.*, November 19, 2007 through May 29, 2008), Moore Capital held positions in NYMEX platinum futures contracts that were greater than the anti-manipulative large trader reporting level of 25 contracts on every single day except for six. *See* Exhibit A

hereto. In fact, during the Class Period, Moore Capital held NYMEX platinum futures positions as large as **71 times** the minimum manipulation concern level, *i.e.*, 24 contracts. *Id*.

244.   **Position Accountability Levels**. Also in order (among other things) to prevent price manipulation, NYMEX rules also require that any person who owns or controls positions subject to position accountability rules to provide information relating to such person's positions.

a.   **Palladium**. During the Class Period, the all month and any one month position accountability levels for NYMEX palladium futures contracts were 1,500 contracts. On 114 trading days during the Class Period Moore Capital held positions in palladium futures contracts that were subject to the 1,500 contract NYMEX position accountability rules.

b.   **Platinum**. During the Class Period, the all month and any one month position accountability levels for NYMEX platinum futures contracts were 1,500 contracts. On six trading days during the Class Period Moore Capital held positions in platinum futures contracts that were subject to the 1,500 contract NYMEX position accountability rules.

245.   **Palladium**. Moore Capital held large positions in NYMEX palladium futures contracts during the Class Period. At times, Moore Capital held NYMEX palladium futures positions in a particular contract that constituted as much as 33% of the total open interest in that particular contract. In fact, on approximately **sixty** occasions during the Class Period, Moore Capital held NYMEX palladium futures contracts that were in excess of 20% of the total open interest of that contract.

246.   **Platinum**. Moore Capital held large positions in NYMEX platinum futures contracts during the Class Period. At times, Moore Capital held NYMEX platinum futures positions in a particular contract that constituted as much as 37% of the total open interest in that particular contract. In fact, on approximately six occasions during the Class Period, Moore

Capital held NYMEX platinum futures contracts that were in excess of 20% of the total open interest of that contract.

### 4. **Excess Increase in Prices During the Class Period Followed by the Excess Decrease in Prices After the Class Period**

247.    Separately, Defendants caused NYMEX platinum and palladium futures contracts to be artificially high as examined through other measures or respects during the Class Period.

248.    NYMEX platinum futures contracts prices increased to all-time record levels during the Class Period. For example, between October 26, 2007 and March 5, 2008, there were 89 trading days in NYMEX platinum futures contracts. Such contracts set new all-time record highs on 28 of those trading days. Thereby, NYMEX platinum futures contracts rapidly increased from an all-time record high of $1472.10 per ounce on October 26, 2007 to the all-time record high made during the Class Period, which occurred on March 5, 2008, of $2276.10 per ounce. This was an increase of almost 55%.

249.    The fundamentals of the supply and demand for platinum did not warrant such dramatic increases. For the first time in numerous years, the platinum market entered 2007 with a surplus and, as 2007 progressed, the deficit projected between current consumption and current production was less than that of various prior years. Moreover, such deficit was far less than the inventories of platinum held in Switzerland and other locations.

250.    Confirming that the extraordinarily high NYMEX platinum futures prices were not justified by supply and demand and were artificial during the Class Period, NYMEX platinum futures contract prices thereafter plummeted to under $1400 by August 19, 2008, and $957 per ounce by October 3, 2008.



251.   As highly unusual and artificial as the NYMEX platinum futures contract price behavior was, the NYMEX palladium futures contract price behavior was as or almost as artificial.

252.   Spot platinum prices tracked the October 5, 2007 to August 19, 2008 move-for-move:



253. In October 2007, there was already held a very substantial existing excess supply overhang of palladium of in excess of 6,000,000-8,000,000 ounces. This was approximately equal to 33 1/3 % in excess of a year's consumption of palladium.

254. Further, during 2007-2008, there was projected to be (and the projections were realized) an additional 25% excess of new production of palladium over the consumption needs.

255. As the excess palladium supply overhang grew during the Class Period, NYMEX palladium futures prices should have declined during the Class Period.

256. However, NYMEX palladium futures contract prices did not decline. Rather, such prices closed, prior to the start of the Class Period on October 16, 2007, at $375.30 per ounce.

257. During the Class Period, NYMEX palladium futures prices rapidly increased to a six-year high on February 28, 2008 of $585.25 per ounce, an increase of 57%.

258. Because these price increases were wholly unjustified by supply and demand, the artificially high NYMEX palladium futures prices thereafter quickly plummeted to $300 per

ounce by August 19, 2008, $201.85 on October 3, 2008 and $162.10 on December 5, 2008.



259.    Between January 3, 2006 and October 17, 2007, platinum prices increased by 47.44 percent, palladium prices increased by 38.92 percent and gold prices increased by 42.25 percent. However, between October 17, 2007 and March 3, 2008, platinum prices increased by 55.81 percent, palladium prices increased by 54.84 percent and gold prices increased by 29.93 percent.

260.    Between March 3, 2008 and December 1, 2008, platinum prices fell by 63.87%, palladium prices fell by 70.02% and gold prices fell by 21.30%.

261.    Defendants continued trading platinum and palladium into June 2008 (Plaintiffs do not have records of trading by Defendants in platinum and palladium from June 2008

forward). Platinum and palladium prices plummeted from July 2008 forward. Between July 1 and December 1, 2008, platinum prices fell by 61.18 %, palladium prices fell by 63.09% and gold prices fell by 17.99%.

262.    In all the circumstances, the increases in NYMEX platinum and palladium futures contract prices during the Class Period were unjustified by the fundamentals, were artificial, and were in one substantial part caused by Defendants' manipulative scheme to make frequent, large "bang the close" trades.

263.    Spot palladium prices tracked from October 5, 2007 to August 19, 2008 futures prices move-for-move:



264.    By reason of the foregoing, the Moore Defendants, through Defendant Pia and other employees, and Defendant MF Global, through Joseph Welsh and other employees, specifically intended to and did cause NYMEX palladium and platinum futures contract prices, and the physical platinum and palladium prices, to be artificially high during the Class Period.

### E.    Other Manipulative Acts by Defendants

265.    Defendants were able to manipulate the platinum and palladium market because it is an illiquid market that bases the settlement prices on a volume weighted average price of trades performed in the last two minutes of the trading day.

266.    (a) Defendants, however, made numerous attempts to manipulate other commodities markets by engaging in "bang the close" trades. Pia frequently made "bang the close" trades in wheat, cattle, lumber, silver, gold, and zinc among others.  See below table.

| Date | Commodity | Volume |
|------|-----------|--------|
| 4/2/2007 | Gold | 250 |
| 7/25/2007 | Silver | -100 |
| 7/25/2007 | Gold | 250 |
| 7/27/2007 | Silver | -100 |
| 8/8/2007 | Gold | 250 |
| 9/17/2007 | Silver | 70 |
| 9/17/2007 | Silver | 70 |
| 11/2/2007 | Gold | 350 |
| 11/2/2007 | Gold | 350 |
| 11/5/2007 | Gold | 200 |
| 11/16/2007 | Silver | -100 |
| 11/19/2007 | Aluminum | -100 |
| 11/19/2007 | Aluminum | -100 |
| 11/19/2007 | Silver | -200 |
| 11/30/2007 | Lumber | 50 |
| 11/30/2007 | Corn | 250 |

| | | |
|---|---|---|
| 11/30/2007 | Corn | 250 |
| 12/31/2007 | Aluminum | -100 |
| 12/31/2007 | Silver | -250 |
| 12/31/2007 | Sugar | 100 |
| 12/31/2007 | Zinc | 100 |
| 1/22/2008 | Silver | 300 |
| 1/22/2008 | Wheat | 317 |
| 1/25/2008 | Corn | 500 |
| 2/25/2008 | Zinc | 100 |
| 2/26/2008 | Cotton | 250 |
| 2/29/2008 | Corn | 500 |
| 2/29/2008 | Cotton | 200 |
| 2/29/2008 | Wheat | 200 |
| 2/29/2008 | Live Cattle | 200 |
| 2/29/2008 | Lumber | 50 |
| 2/29/2008 | Soybean Meal | -250 |
| 3/4/2008 | Zinc | 50 |
| 3/5/2008 | Aluminum | 100 |
| 3/5/2008 | Zinc | 50 |
| 3/7/2008 | Aluminum | 200 |
| 3/7/2008 | Cattle | 200 |
| 3/7/2008 | Coffee | 500 |
| 3/7/2008 | Zinc | 100 |
| 3/28/2008 | Cattle | -11 |
| 5/9/2008 | Zinc | 50 |

(b)     Although Defendant Pia "experimented" with attempting to manipulate the prices of the above various commodities through bang the close trades, he ultimately focused his attention on manipulating the prices of NYMEX platinum and palladium futures contracts.

267.   In a March 7, 2008 Bloomberg Chat Transcript, Defendant Pia asks Defendant Burger if he "[c]an jam natty or is it too big?" Defendant Burger states that Pia is asking whether

the natural gas market is too liquid for "bang the close" trades to have any effect on pricing. Burger Depo. at 168:15-168:21.

268.    In addition to "bang the close" trades, Defendants engaged or attempted to engage in other acts designed to manipulate the platinum and palladium market. Defendant Welsh attempted to persuade the floor broker to violate the bid ask spread. At least on this occasion the broker refused and responded, "If you do that we will both be doing time." Terrone Depo. at 314:16-315:20.

> Q: Did you notice how this affected the market in the last ten seconds?
>
> A: Yeah, I seen what happened.
>
> Q: What was the effect on the market, or in the floor in the ring?
>
> A: All the locals wanted to sell everything they could because they could buy it
>
> back cheaper on the computer.

Sakulich Depo. at 101:14-102:2.

### F.    Evidence Defendants Knew They Were Engaging in Illegal Market Manipulation

269.    In May of 2008, Moore held a compliance seminar which discussed market manipulation. While feigning ignorance of the MOC trades being illegal prior to this seminar, Defendant Burger testified:

> Q: Were you concerned that Mr. Pia's orders might be construed as manipulating
>
> or attempting to manipulate the market?
>
> A: After I had this presentation, yes, I was concerned about that.
>
> Burger Depo. at 306:3-306:7.

270.    Burger's feigned ignorance about market manipulation until "after" the "presentation" is belied by Burger's signature on Moore compliance documents forbidding

market manipulation. The compliance manual states in pertinent part, "Employee may not engage in any transactions for the purpose of raising, lowering, or maintaining the price of a security or creating a false appearance of active trading in a security." Burger Depo. at Exhibit 22. Despite this prohibition and Burger's signature acknowledging market manipulation is prohibited, Defendant Burger continued to play a pivotal role in executing the market manipulation.

271.    A similar large, MOC trade in wheat on January 22, 2008 by the Defendants resulted in a CFTC investigation into the trade for potential market manipulation. Like the vast majority of the MOC trades at issue in this matter, the wheat buy order was given by Pia to Burger, who relayed the order to Welsh, who then relayed the order to floor broker Terrone. All of these individuals were questioned by compliance regarding this trade.

272.    Defendants Welsh and Burger, as well as floor broker Terrone, each admitted the purpose of the MOC trades was to increase the settlement price of platinum and palladium. Burger Depo. at 149:5-149:17. Welsh frequently requested Terrone analyze the market to determine the optimum amount of platinum or palladium to be purchased MOC to increase the prices to certain benchmarks. Terrone Depo. at 172-174; 264.

273.    The Defendants' intent to manipulate the markets via MOC trades was also apparent to a number of the floor brokers and other Moore and/or MF Global employees. Dominic Terrone testified that he knew the purpose of the MOC trades was to increase the settlement prices. Moore employee, Luke San Filipo testified that it was Pia's intent in making these MOC trades to drive the settlement price of platinum and palladium higher. San Filipo Depo. at 95:2-95:12. When questioned by NYMEX as to why the Defendants were making MOC trades in the last 10 seconds before close, World Trade Futures owner, Allan Kleinstein stated,

"To me, being in the business for as long as I have, he's trying to get the settlement price higher. Does anybody disagree with that?" Kleinstein Depo. at 157:19-159:12.

> ### G.   Creation of a "Price Mirage"

274.   In addition to the direct manipulative impact the Defendants' MOC trades had on the price of platinum and palladium, the Defendants intended to create the mirage among other commodity buyers that there was far more interest in platinum and palladium than actually existed. The purpose was to trigger a "herd effect" wherein other potential buyers would see that platinum and palladium were trading at higher than expected prices and join in the rush to purchase platinum and palladium at this inflated price. Floor broker John Sakulich also testified Defendant Welsh's purpose in placing these "bang the close" orders was to "let people think there's more business around here than there is." Sakulich Depo. at 88:24-89:7. Sakulich then confirmed the Defendants' market manipulation activity had just such an effect on the market.

275.   Defendants also executed the "bang the close" trades in ways to create the maximum buzz among the floor brokers, sellers and potential buyers by splitting up large buys among more than one broker. As Defendant Burger testified to the CFTC, the goal was to indicate to as many people as possible there were buyers around. Burger Depo. at 258:4-258:21. Burger went on to state his desire in doing this was to help push up the price of platinum and palladium. *Id*. This helped create the mirage there was more buyer interest than actually existed.

> ### H.   Other Indicia Of Manipulative Intent

276.   During the Class Period, the Moore Capital Defendants had an unusual absence of any compliance procedures to prevent detection of wrongdoing.

277.   Since 2007, the Moore Capital brand has been subject to various allegations or findings of unlawful conduct in the markets including, but not limited to:

a.   The CFTC settled charges that Moore Capital Management, LP, Moore Capital Advisors, LLC, and Moore Advisors, Ltd., attempted to manipulate the settlement prices of platinum and palladium futures contracts on the NYMEX, and failed to diligently supervise the handling of Moore's commodity interest business.

b.   In September 2008, Steven Harrison, a former top Moore Capital Trader in London paid a £52,500 fine as well as agreeing not to work as a trader or fund manager for 12 months to settle a "market abuse" investigation by British regulators. The Financial Services Authority found Harrison had received inside information before telling another trader to buy Rhodia SA corporate bonds.

c.   In March 2010, Julian Rifat, a London based trader with Moore Capital Management LLC was arrested by UK authorities as part of a crackdown on insider trading.

d.   Twice in the past two years, female employees working in Moore Capital's New York office sued in federal court, charging the firm and some of its executives with employment discrimination. Both suits were settled out of court.

278.   Regardless of whether the persons at the Moore Defendants who were actually committing the frequent "bang the close" orders reported them to anyone, even the most rudimentary compliance system would have spit out as exceptions the repeated "bang the close" trades entered near or at the close of trading.

279.   This would have occurred within two weeks or one month of the start of such practice. Only by intentionally failing to have the most rudimentary compliance and trade monitoring system in place could the Moore Defendants avoid automatic and actual knowledge of these frequent large "bang the close" trades.

280.    The rudimentary compliance system that the Moore Defendants intentionally avoided installing would not have allowed such blatantly manipulative trades to continue for more than a one month period (let alone for a seven-plus month period).

281.    Even the absence of such a rudimentary compliance system does not mean that the Moore Defendants were not actually aware of or lacked actual knowledge of Defendants' manipulative scheme. On the contrary, such blatantly manipulative trades were entered almost daily for about eight months, and frequently for sixteen months before that.

282.    Further, Defendant Pia entered most of the market on close trades for an account—the Moore Macro Fund account—Defendant Bacon, the top executive and owner of the fund, controlled and for which he served as portfolio manager. Therefore, the top executive of the Moore Capital Defendants and numerous other responsible executives actually knew of these trades regardless of whether other employees of the Moore Defendants did or did not actually tell the top executives.

283.    Indeed, the blatantly manipulative scheme alleged here could not have continued for so long unless the Moore Defendants and the Moore Fund Defendants specifically intended it to.

284.    The Defendants were able to persuade the floor brokers to assist in the scheme to manipulate based on the immense financial benefit they garnered. Not only did they benefit directly from selling platinum or palladium to Moore, they would immediately turn around and offset by purchasing platinum and palladium on Globex at a much lower price. Many of these brokers earned double or triple their typical salaries during the class period.

285.   As agents of the Moore Funds, the Moore Defendants, Defendant Pia and various other persons caused those funds to make the manipulative large "bang the close" trades in platinum and palladium futures trades detailed herein.

286.   The intent of the Moore Defendants and Defendant Pia is imputed to Defendant Moore Macro Fund, LP and Defendant Moore Global Fixed Income Master Fund, LP.

287.   Further, the Moore Funds were the persons actually making the NYMEX trades, actually holding the NYMEX positions, and actually paying for and financing such manipulation. They were the persons that stood to benefit from their frequent large "bang the close" trades. They made approximately $54,000,000 in profits from the platinum and palladium trading.

288.   Pia and the Moore Funds would also seek to increase their stock of physical platinum and palladium by engaging in a lot of EFP (Exchange for Physical) transactions which involves a privately negotiated and simultaneous exchange of a futures position for a corresponding position in the physical market.

289.   Additionally, Defendant Pia improperly earned huge bonuses based on his P&L statements. Defendant Pia made approximately $▇▇ million in compensation for FY 2008, the vast majority of which was incentive based compensation. There was a disproportionate amount of this earned during the February, March and April 2008 timeframe when the price of platinum and palladium exploded. Upon information and belief, Pia's compensation was tied to end of month and end of quarter status of his P&L. Pia had huge amounts of physical platinum and palladium the value of which for purposes of the P&L was determined by the notional value of the metals on the date the P&L was calculated. Pia would engage in a pattern of heavy MOC trading at the very end of the month and the quarter to drive up the notional value of the

commodities owned by his fund. An analysis of Pia's platinum and palladium trades during the class period shows grossly disproportionate purchases of platinum and palladium contracts in the last few days of the month. There is a pattern of large increases in the frequency and volume of Pia's MOC trades at the end of the month. This indicates Pia wanted to greatly increase the end of the month settlement prices of these metals so that his Monthly P&L would increase. This type of end of month manipulation did not occur solely with platinum and palladium but extended to other commodities market. A February 29, 2008 order from Pia to Welsh to buy large amounts of wheat, cattle, lumber and soy wherein Pia states: "You need to do a bad job. It is month's end." Deposition of Joseph Welsh at Exhibit 63 (hereinafter "Welsh Depo."). This indicates Pia wanted to increase the end of month settlement prices of other commodities as well.

290.    The Moore Funds actually knew or had means of knowledge that the Moore Defendants and Defendant Pia were engaged in a long term manipulative scheme to manipulate NYMEX platinum and palladium futures contract prices by causing such funds to repeatedly make large manipulative "bang the close" trades.

291.    By acting over a long period of almost two years as the purchaser of and making these large, frequent manipulative trades, the Moore Funds intended and ratified the Moore Capital Defendants' and Defendant Pia's objective and specific intent to manipulate the NYMEX platinum and palladium futures prices higher.

292.    Thereby, the Moore Funds knowingly participated in or aided and abetted the Moore Defendants' and Defendant Pia's manipulation, willfully intended to assist the manipulation, and had the motive and intent to cause the artificial prices.

293.    In order to make their blatantly manipulative "bang the close" trades in NYMEX platinum and palladium futures alleged herein, the Moore Defendants had to enter trades to the

NYMEX through an FCM or otherwise. Defendant MF Global was the FCM that accepted and entered all of Moore's manipulative orders for the purchase of NYMEX platinum and palladium futures contracts.

294.   Funds typically use more than one FCM to execute their trades. This includes using more than one FCM when making significant amounts of trades in the same or similar futures contracts. Such use of multiple FCMs can help prevent any one broker from being aware of the firm's trading strategy. Also, it incentivizes good executions. This occurs both through competition and the increased ability of the fund to check with other brokers on the executions compared to the contemporaneous prices and other information relating to execution quality.

295.   In contrast to this standard practice to use multiple FCMs, the Moore Defendants put all of their manipulative orders in NYMEX platinum and palladium futures through the same registered FCM and broker, Defendant MF Global. This departure from standard practice afforded more revenues to MF Global. Reciprocally, it limited to only one firm, MF Global, the risk that an FCM would report the Moore Defendants for doing manipulative trades. FCMs and exchange members have a duty not to assist their customers in unlawful conduct and to report such unlawful conduct.

296.   Receiving the revenues on all of the Moore Capital Defendants' frequent, large manipulative trades in both the NYMEX platinum and palladium futures contracts was not the sole non-standard financial benefit that was actually and potentially received by Defendant MF Global. As previously alleged, Defendant Pia had long controlled or strongly influenced who received the brokerage business from Moore Capital. Defendant Pia was in a real or apparent position to provide more business to MF Global if the Moore Defendants' manipulative instructions and manipulative trades were followed by MF Global.

297.    Executing trades to push prices up is not a normal broker service. In fact, it is a highly unusual and clearly unlawful service. MF Global had actual knowledge that the Moore Capital Defendants' trades previously alleged herein were intended to push prices higher. This knowledge, in one part, came from the Moore Capital Defendants' repeated express instructions to Defendant MF Global, through MF Global's employee, Defendant Welsh and others, to enter and execute the orders so as to push prices higher. As set forth above, Defendant Welsh admitted he knew the purpose of the MOC trades was to artificially inflate the settlement price of platinum and palladium and admitted he assisted in effectuating this intent.

298.    With such knowledge, Defendant MF Global, per Defendant Welsh and others, purposely worked to cause the Moore Defendants to overpay and purchase at the highest prices possible on the 200-plus end of trading transactions alleged herein.

299.    Thus, Defendant MF Global provided extraordinary assistance to the Moore Defendants by repeatedly entering and executing these highly manipulative "bang the close" trades. Even more unusual, MF Global repeatedly did so even after being often told in writing and otherwise by the Moore Defendants to execute such trades so as to inflate prices. And Defendant MF Global, per Defendant Welsh, repeatedly sought to push prices higher and drove floor brokers to breach their duties and violate market rules.

300.    Standard practice among FCMs and clearing members was to refuse to enter, to execute or to forward for execution manipulative trades. Indeed, NYMEX rules and federal law prohibited such trades.

301.    But MF Global knowingly and willfully associated itself with the manipulative scheme and provided extraordinary assistance to that scheme and the manipulative trades. It did so by repeatedly and knowingly entering and executing or forwarding for execution over a long

time period such blatantly manipulative trades. This included when the written or other instructions accompanying such trades directed that the "buys" were to be made uneconomically, *i.e.,* intentionally, so as to cause higher prices. MF Global, through Welsh, actively ignored compliance and pushed the NYMEX floor brokers to obtain the highest price possible.

302.     MF Global Vice Joseph Texido, who was Defendant Welsh's supervisor, testified MOC trades intended to effect the settlement price would violate the law.

Q: In your mind, would trying to affect the settlement price with your order violate the law:

A: Yes.

Deposition of Joe Texido in Pia/Moore CFTC proceeding at 180:20-181:1 (hereinafter "Texido Depo.")

303.     The illegal and anticompetitive nature of Defendants' trades also was apparent to some of the floor brokers. Allan Kleinstein testified:

Q: Do you think there's any violation or anything wrong with trying to execute orders that are designed to get the settlement price higher?

A: Yes. I think there something wrong with that.

Q: What's wrong with that?

A: You're supposed to execute your orders by buying it as cheap as possible and selling it as high as possible. That's the way I did it in the eighties, the nineties and in the early 2000s, and that's just the way I've done it.

Kleinstein Depo. at 163:11-163:17.

304.     Defendants engaged in efforts to conceal their illegal activity. One day when a Moore employee questioned Defendant Pia about an MOC trade caused a large sudden increasei

140

in price in platinum or palladium prices, Pia responded by stating he has already spoken to the lawyers about this and told the lawyers that he buys MOC everyday. Burger Depo. at 119:6-120:19.

305.    The concealment of the market manipulation also existed at a corporate level with the lack of any compliance protocol at MF Global. Defendant Burger testified:

Q: Okay. But is there any protocol at your firm if you think you have concerns about someone manipulating the market, whether you should bring that to the attention of anyone else?

A: I don't believe there's any protocol, and in this specific instance, I think the reason I did not go to anybody is because I was — I had met, I believe, with Akin, Gump and they told me not to discuss the case with anybody.

Burger Depo. at 306:8-306:16.

306.    The Futures Plaintiffs originally filed this action on April 30, 2010. This was within two years of learning of these claims and, also, within two years of the end of the unlawful conduct.

307.    As a direct, foreseeable and proximate result of Defendants' ongoing violation of Section 9(a) of the CEA, the Futures Plaintiffs and members of the Futures Sub-Class paid artificial prices, suffered losses and are entitled to recover actual damages under Section 22(a) of the CEA, 7.U.S.C. §25.

## VI.    CLASS ALLEGATIONS

### A.    SUB-CLASS 1: FUTURES PLAINTIFFS' CLASS ALLEGATIONS

308.    Plaintiffs allege two separate sub-classes herein. The Futures Plaintiffs bring this action on behalf of themselves, and all others similarly situated, pursuant to Rules 23(a),

23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure. The Futures Sub-Class consists of:

> All persons or entities that purchased during the period from at least October 17, 2007 through at least June 6, 2008 ("Class Period") a palladium futures contract or a platinum futures contract traded on the NYMEX.[3] Excluded from the Futures Sub-Class are the Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.

309.    The Futures Sub-Class is so numerous that joinder of all members is impracticable. Due to the nature of the commerce involved, the members of the Futures Sub-Class are geographically dispersed throughout the United States. The number and identity of Futures Sub-Class members is unknown to the Futures Plaintiffs, but can be ascertained from readily available information. The Futures Plaintiffs believe that there are hundreds or perhaps thousands or more members of the Futures Sub-Class.

310.    Common questions of law and fact exist as to all members of the Futures Sub-Class and predominate over any questions solely affecting individual members of the Futures Sub-Class. Among the questions of law and fact common to the Futures Sub-Class are:

a.    whether Defendants manipulated NYMEX palladium and/or platinum futures contracts in violation of the CEA;

b.    whether Defendants are liable under CEA Section 2 (a)(1) or otherwise for such manipulation;

c.    whether Defendants are liable for aiding and abetting such manipulation;

d.    whether such manipulation caused NYMEX palladium and/or platinum futures contracts to be artificial;

e.    whether such manipulation caused cognizable legal injury under the CEA;

---

[3] The Futures Plaintiffs reserve their rights to amend or modify the class definition, add class representatives, or otherwise supplement these allegations in the class motion papers.

f. whether such injury or the extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, , econometric formula, or other economic tests;

g. whether (1) the alleged contract, combination or conspiracy existed, and, (2) if so, who were the members, and (3) for what duration did it exist.

h. the operative time period and extent of Defendants' foregoing violations.

311. The Futures Plaintiffs' claims are typical of the claims of the other members of the Futures Sub-Class they seek to represent. The Futures Plaintiffs and members of the Futures Sub-Class were injured by the same course of manipulative conduct and make the same legal claim.

312. The Futures Plaintiffs will fully and adequately protect the interests of all members of the Class. The Futures Plaintiffs have retained counsel experienced in complex antitrust and commodity futures manipulation class actions. The Futures Plaintiffs have no interests which are adverse to or in conflict with other members of the Futures Sub-Class.

313. The questions of law and fact common to the members of the Futures Sub-Class predominate over any questions which may affect only individual members.

314. A class action is superior to other available methods (if any) for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. The prosecution of separate actions by individual members of the Futures Sub-Class would impose heavy burdens upon the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Futures Sub-Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure

uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

315.    The interest of members of the Futures Sub-Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Futures Sub-Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The damages suffered by the individual Futures Sub-Class members may be relatively small; and therefore, the expense and burden of individual litigation make it virtually impossible for them to redress the wrongs done to them. The Futures Plaintiffs anticipate no difficulty in the management of this action as a class action.

### B.    SUB-CLASS 2: PHYSICAL PLAINTIFFS' CLASS ALLEGATIONS

316.    The Physical Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23. The Physical Sub-Class consists of:

> All persons and entities who purchased Class Commodities during the period October 25, 2007 through August 22, 2008 (the "Class Period"). Excluded from the Physical Sub-Class are defendants, their employees, affiliates and co-conspirators.[4]

317.    Thousands of transactions in physical platinum and palladium conforming to NYMEX delivery requirements occurred during the Class Period. The number of persons and entities who purchased and/or sold Class Commodities during the Class Period is in the hundreds and/or thousands, and those persons and entities are geographically dispersed. Thus, joinder is impracticable pursuant to Federal Rule of Civil Procedure 23(a)(1).

318.    Common issues of fact or law predominate over individual issues within the meaning of Federal Rule of Civil Procedure 23(a)(2).

---

[4] The Physical Plaintiffs reserve the right to amend or modify the class definition, and add or revise class representatives, at the time of their motion for class certification.

319.    Common issues of law and fact include:

    a.     whether the manipulative activities in connection with the contract,

combination and conspiracy alleged herein existed;

    b.     whether such unlawful activities had the result of creating artificial

prices in Class Commodities; and, if so, to what extent prices were

artificial;

    c.     whether defendants' conduct violated the antitrust laws; and

    d.     the sum of damages.

320.    The Physical Plaintiffs' interests are typical of, and not antagonistic to, the Physical Sub-Class's interests.

321.    The Physical Plaintiffs have retained competent counsel experienced with class actions and complex litigation including litigation under the antitrust and commodities laws and intend to vigorously prosecute this action.

322.    Common issues predominate. A class action is superior to all other methods for the fair and efficient adjudication of this controversy. Indeed, a class action is the only method by which the Physical Plaintiffs and the Physical Sub-Class can efficiently seek redress and obtain a uniform adjudication of their claims. The size of individual damages is small in comparison to the complexity and scope of the defendants' alleged manipulation and unlawful conduct.

323.    The Physical Sub-Class members' identities and their trades generally can be identified by members of the NYMEX clearing house and the futures brokers clearing through them and the records of dealers in physical platinum and palladium conforming to NYMEX delivery requirements (as well as the records of NYMEX concerning delivery made and taken).

324.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Physical Sub-Class members is impracticable. Further, as the damages suffered by most individual Physical Sub-Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for most Physical Sub-Class members individually to redress the wrongs done to them. There will be no significant difficulties in managing this action as a class action.

**Injury to Physical Plaintiffs**

325.    Defendants' anticompetitive market manipulation conduct has directly and proximately caused plaintiffs to suffer injury in their business and property. The Physical Plaintiffs' injuries are of the type the antitrust laws were designed to prevent, and those injuries flow directly from the aspects of defendants' conduct rendering it unlawful.

326.    As a result of Defendants' market manipulation scheme, the Physical Plaintiffs have purchased and sold Class Commodities at artificial prices during the Class Period.

## THE RELEVANT MARKETS

327.    Defendants' antitrust violations have occurred in the market for Class Commodities, which is the market for physical platinum and palladium conforming to the NYMEX's requirements for physical delivery in connection with NYMEX platinum and palladium futures contracts.

328.    Concerning platinum, the relevant market includes physical platinum at least 99.95% pure and consisting of ingots or plates weighing at least ten ounces, each of which is incised with the lot or bar number, weight, grade, name or logo of the assayer, and symbol identifying the metal.

329.     Concerning palladium, the relevant market includes physical palladium at least 99.95% pure and consisting of ingots or plates weighing at least ten ounces, each of which is incised with the lot or bar number, weight, grade, name or logo of the assayer, and symbol identifying the metal.

## VII.   FUTURES PLAINTIFFS' CLAIMS

### AS AND FOR A FIRST CLAIM

### AGAINST ALL DEFENDANTS

**(Manipulation In Violation of The Commodity Exchange Act, 7 U.S.C. §§1 *et seq*.)**

330.     The Futures Plaintiffs re-allege and incorporate the allegations of this Complaint in ¶¶ 1-27 and ¶¶ 32-315 with the same force and effect as if fully restated herein.

331.     Defendants, through their acts alleged herein, from at least October 17, 2007 through at least June 6, 2008, specifically intended to and did cause unlawful and artificial prices of NYMEX palladium and platinum futures contracts in violation the CEA, 7 U.S.C. §1, *et seq*. These included artificially high prices.

332.     The Moore Defendants acted for one another, including as alleged herein. In all the circumstances previously alleged, each Defendant had the ability to cause and did cause artificial prices, including artificially high prices.

333.     Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts or omissions of their agents, employees or other persons acting on their behalf. The Moore Defendants all acted through Defendant Pia, Defendant Burger, MF Global and Welsh. MF Global worked through Defendant Welsh and others.

334.     Defendants' conduct proximately caused injury to the Futures Plaintiffs and other persons who purchased NYMEX palladium or platinum futures contracts during the Class

Period. The Futures Plaintiffs and the Futures Class members paid artificial and unlawful prices, and transacted in an artificial and manipulated market, during the Class Period.

335.    As a direct result, the Futures Plaintiffs and Futures Sub-Class members who transacted in NYMEX palladium and platinum futures contracts during the Class Period were injured and suffered actual damages.

## AS AND FOR A SECOND CLAIM

## AGAINST ALL DEFENDANTS

### (Principal-Agent Liability In Violation of The Commodity Exchange Act, 7 U.S.C. §§1 *et seq.*)

336.    The Futures Plaintiffs re-allege and incorporate the allegations of the First Claim as if fully set forth herein.

337.    Defendants Moore Capital Advisors and Moore Advisors—acting through Defendant Pia and others—directed the manipulative trades alleged herein as agents of Defendants Moore Capital Management and the Moore Funds.

338.    Defendants Pia and Burger were employees and agents of Defendant Moore Capital Management, and also were agents or another person acting for and on behalf of Defendants Moore Capital Advisors, Moore Advisors, the Moore Funds and Bacon. Also, Defendant Burger acted on behalf of Defendant Pia.

339.    Defendants Moore Capital Management, Moore Capital Advisors and Moore Advisors and Defendant Pia—all acting through Defendant Pia and Burger—were agents or other persons acting on behalf of the Moore Funds.

340.    Defendant MF Global acted as an FCM, agent or other person for and on behalf of the Moore Defendants. This included when Defendant MF Global, through Defendant Welsh,

entered and placed the manipulative orders and caused them to be executed during the last seconds of trading. Defendant Welsh was a registered AP and was employed by MF Global during the Class Period. He was its agent or another person acting for or on behalf of MF Global and the Moore Defendants.

341.    Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B), each of the aforementioned Defendants is liable for the acts of its agents or another person acting for it.

342.    The Futures Plaintiffs and members of the Futures Sub-Class are each entitled to damages for the violations alleged herein.

**AS AND FOR A THIRD CLAIM**

**AGAINST ALL DEFENDANTS**

**(Aiding and Abetting Manipulation In Violation of The Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*)**

343.    The Futures Plaintiffs re-allege and incorporate the allegations of the Second Claim as though fully set forth herein.

344.    Each and every Defendant had extensive knowledge of the manipulation and, with such knowledge, materially assisted the manipulation by the other Defendants.

345.    Each Defendant provided highly unusual assistance by engaging in acts to further the blatant manipulation whereas standard practice was to refuse to do such acts.

346.    Defendant Moore Capital Management acted as the commodity trading advisor to the Moore Funds and, as a principal of Defendant Moore Capital Advisors, shared in the financial benefits from the manipulation. Also, it willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by the Moore Defendants.

347.     Defendants Moore Capital Advisors and Moore Advisors were co-general partners of the Moore Funds and directed (though Defendant Pia and others) manipulative investments in the Moore Funds alleged herein. They thereby willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by the Moore Defendants.

348.     Defendant MF Global acted as FCM for Defendants Moore Capital Advisors and Moore Advisors and entered the manipulative trades and orders alleged herein (as directed by Defendant Pia and others). Defendant MF Global substantially assisted in the aforesaid manipulations by MF Global's repeated efforts, through Defendant Welsh and others, to force prices as high as possible while entering and obtaining executions of the Moore Defendants' trades. Defendant MF Global was fully aware of the overall manipulative purpose and, indeed, the overall manipulative pattern of the trading engaged in by the Moore Defendants.

349.     Thereby, Defendant MF Global repeatedly provided extraordinary assistance for extra revenues with actual knowledge of the manipulative trades over a long duration. It, too, knowingly and willfully aided and abetted the manipulation. Through the foregoing means and other facts pleaded herein, Defendants MF Global and Welsh willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by the Moore Defendants.

350.     The Moore Funds held the manipulative positions, paid for same, and financed the manipulation. This is highly unusual conduct. Based on the long duration and blatant nature of the "frequent" large manipulative trades in the two separate markets, and other facts previously alleged, the Moore Funds knew of and aided and abetted or knowingly willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by the other Moore Defendants.

351.   (a) Defendants Pia and Burger implemented the manipulative trading strategies alleged herein acting for and on behalf of the Moore Defendants and directed that manipulative trades and orders be placed through Defendant MF Global. Thereby Defendant Pia willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by the other Defendants.

(b) Defendant Bacon provided highly unusual assistance and had knowledge of the manipulation. This included by allowing the manipulation to start, allowing the capital devoted to it to grow, and allowing the manipulation to continue.

352.   Defendants each played their component role and each knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.

353.   Under Section 13c(a) of the CEA, 7 U.S.C. §13, each of the aforementioned Defendants is liable for willfully intending to assist the manipulation.

354.   The Futures Plaintiffs and the Futures Sub-Class are each entitled to actual damages for the violation of the CEA alleged herein.

## AS AND FOR A FOURTH CLAIM

## AGAINST DEFENDANTS PIA, WELSH, MF GLOBAL, BURGER, MOORE CAPITAL MANAGEMENT, LP, MOORE CAPITAL MANAGEMENT, LLC, MOORE CAPITAL ADVISORS LLC, AND MOORE ADVISORS, LTD.

### (Contract, Combination or Conspiracy In Restraint of Trade—*Per Se* And Other Violations of Section 1 of the Sherman Act, 15 U.S.C. §§ 1 *et seq*.)

355.   The Futures Plaintiffs re-allege and incorporate the allegations of the Third Claim as though fully set forth herein.

356.    To the extent such definition may be necessary, the relevant market is that for platinum futures contracts and palladium futures contracts traded on the NYMEX.

357.    (1) Moore Capital Management, LP, Moore Capital Management, LLC, Moore Capital Advisors LLC, and Moore Advisors, Ltd., Pia, and Burger, (2) Macro Fund; (3) Global Fund; (4) MF Global and Welsh, and (5) the NYMEX floor brokers are five independent entities and independent centers of decision-making.

358.    These Defendants and persons made and/or constituted a combination, conspiracy or contract to fix and inflate prices for platinum futures contracts and palladium futures contracts traded on the NYMEX in violation of Section 1 of the Sherman Act.

359.    MF Global, Welsh and the floor brokers acted with full awareness of the anticompetitive purpose of the trades they were entering and the manner thereof. MF Global, Welsh and the floor brokers exercised their independent judgment and skill to effectuate the purposes of the restraint of trade, *e.g.*, to execute end-of-day purchases of NYMEX platinum and palladium futures to create artificially high prices. To the extent that MF Global and Welsh are determined not to be agents of the Moore Defendants, then the alleged contract, combination or conspiracy violates Section 1 of the Sherman Act.

360.    (a)  In the alternative, even if MF Global and Welsh are agents, then such status does not immunize an arrangement to inflate prices on a public market through the manipulative conduct and conversations by such Defendants that have now been alleged.

(b)     In the alternative, Defendants Pia and Bacon were separate legal persons and independent centers of decision-making.

(i)     Defendants the Global Fund and Macro Fund were independent centers of decision making.  Defendant Bacon and others at Moore Capital have testified to the

effect that the Global Fund and the Macro Fund were specifically designed as independent centers of decision making.  For example, Defendant Bacon testified that Global Fund and the Macro Fund had "separate mandates," "separate traders," "different outlooks" and were "different vehicles" such that the Global Fund "was a more long-term, less frequently-traded vehicle."  In fact, Defendant Bacon testified that treating the Global Fund and the Macro Fund similarly in terms of allocating trades could result in a "conflict of interest" between the two funds.  In other words, the objectives of the Global Fund and the Macro Fund were not common and the financial performance of one fund did not necessarily rise or fall with the performance of the other.  Furthermore, the Global Fund and the Macro Fund competed in the market for financial returns.

(ii)     An agreement in restraint of trade was made to inflate and fix the prices of NYMEX platinum and palladium futures contract prices between the Global Fund and the Macro Fund, including through Defendant Bacon (who was the only person trading NYMEX platinum and palladium futures contracts on behalf of the Global Fund) and Defendant Pia (who only traded NYMEX platinum and palladium futures contracts for the Macro Fund).

(c)     In the alternative, World Trade Futures was aware of Moore Capital's scheme to inflate NYMEX platinum and palladium futures contract prices.  For example, Mr. Kleinstein (president of World Trade Futures) testified that his opinion was that the large market on close buy orders were intended to create a higher settlement price.

(i)     Members of the exchange have a duty not to assist customers in unlawful conduct and to report such unlawful conduct.

(ii)     Instead of reporting this repeated unlawful conduct, World Trade Futures continued to help facilitate Moore Capital's blatantly manipulative scheme.

(iii)    World Trade Futures did so by engaging in acts beyond that of a mere agent, including, for example, by creating "flat markets" in order for World Trade Futures to trade (directly or indirectly) opposite of Moore Capital.  By trading opposite Moore Capital, World Trade Futures helped facilitate the artificially high prices that Moore Capital desired while at the same time allowing World Trade Futures to profit from selling at the artificially high prices Moore Capital was willing to pay.  Defendant Welsh believed that World Trade Futures was trading against Moore Capital.

(iv) World Trade Futures engaged in the foregoing behavior pursuant to an agreement in restraint of trade with Defendant Welsh acting as the hub of such agreement.

361.    Defendants' conduct further violates Section 1 because all the NYMEX platinum and palladium futures contracts they entered were specifically intended by Defendants to, and were specifically misused by them to, restrain trade unreasonably and inflate publicly-reported prices.

**AS AND FOR A FIFTH CLAIM**

**AGAINST DEFENDANT WELSH**

**(Common Law Negligence)**

362.    Strictly and solely in the alternative to Claim One through Claim Four above and repeating only the allegations contained in paragraphs 20-24, 25-27, 308-315, and Exhibits C-L,

Defendant Joseph Welsh[5], as an Associated Person and otherwise, owed a duty of care to the Futures Plaintiffs and members of the Futures Sub-Class to follow the rules and regulations of the NYMEX and otherwise take reasonable care to prevent price manipulation on the NYMEX.

363.    Throughout the Class Period, Defendant Welsh repeatedly entered the Moore Capital Defendants' "bang the close" orders in NYMEX platinum and palladium futures contracts at or near the end of the trading day.  *See* Exhibits C-L.  In the exercise of reasonable care, Defendant Welsh should have declined or refused to enter such bang the close orders. Defendant Welsh's entry of these "bang the close" orders breached the duty of care he owed to the Futures Plaintiffs and members of the Futures Sub-Class and was thereby negligent.

364.    Defendant Welsh's foregoing breach of his duty of care caused NYMEX platinum and palladium futures contract prices to be artificial, including artificially high, and thereby proximately caused the injuries and losses suffered by the Futures Plaintiffs and members of the Futures Sub-Class.

365.    Under the common law, Defendant Welsh is liable to the Futures Plaintiffs and members of the Futures Sub-Class for his foregoing negligence.

366.    The Futures Plaintiffs and members of the Futures Sub-Class are each entitled to damages for the violations alleged herein.

## EFFECTS ON INTERSTATE COMMERCE AND INJURY

## TO FUTURE PLAINTIFFS AND FUTURES CLASS MEMBERS

367.    Defendants' violations substantially affected interstate trade and commerce and caused antitrust injury to Plaintiffs and all Class members.

---

[5] Defendant Welsh a resident of Northport, New York.  During the Class Period, Defendant Welsh was senior Vice President and commodities trader for Defendant MF Global, Inc. and had responsibility for, among other things, entering orders for platinum and palladium futures contracts on behalf of the Moore Defendants.

368.     NYMEX platinum and palladium futures contract prices are publicly reported throughout the United States in interstate commerce. During the Class Period, purchasers in interstate commerce of NYMEX platinum and palladium futures contracts, including Plaintiffs and other members of the Futures Sub-Class, paid the artificially high prices caused by Defendants.

369.     During the Class Period, Defendants bought and sold NYMEX platinum and palladium futures contracts directly in interstate commerce. Defendants' unlawful acts alleged herein have had a substantial anticompetitive effect on interstate commerce within the United States.

370.     Defendants' unlawful agreement and other anticompetitive conduct unreasonably restrained interstate commerce, inflated NYMEX platinum and palladium futures contract prices, and caused misleading signals to be sent to market participants.

371.     As a direct result of Defendants' violations, the Futures Plaintiffs and the members of the Futures Sub-Class have been damaged in their property or business, and have paid supra-competitive prices.

### VIII.        PHYSICAL PLAINTIFFS' CLAIMS

### AS AND FOR A SIXTH CLAIM

### AGAINST ALL DEFENDANTS

### (Sherman Act § 1 Restraint of Trade)

372.    Plaintiffs reallege and incorporate by reference paragraphs 1-329 above. As used in the Fourth Claim and Fifth Claim "Plaintiffs" means the "Physical Plaintiffs" and "Class" means the Physical Sub-Class.

373.    The Sherman Antitrust Act's purpose is to preserve or advance our system of free, competitive enterprise, and to encourage to the fullest extent practicable, free and open competition in the market place so the public may receive better goods and services at the lowest obtainable cost.

374.    Any unreasonable interference, by contract, combination or conspiracy, with the ordinary, usual and freely competitive pricing or distribution system of the open market in interstate trade and commerce, constitutes an unreasonable restraint of interstate trade.

375.    Defendants possessed market power for Class Commodities. Defendants' conspiracy, and resulting impact on the market for Class Commodities, occurred in or affected interstate and international commerce. Unquestionably defendants' frequent bang the close trades inflated both future and spot prices, and further, Defendants Moore Capital Management, LP, Moore Capital Advisors, LLC, Moore Advisors, Ltd., Moore Macro Fund, LP, Moore Global Fixed Income Master Fund, LP, and Christopher Pia, themselves owned platinum and palladium bullion, hence their trades in the futures markets allowed them to artificially inflate the spot market, resulting in enormous ill-gotten gains. ¶¶ 196-206 (detailing how overpaying for a

futures contract would result in millions of dollars in gains on their spot/physical holdings). Further, the Moore Defendants purposefully bid up physical platinum.

376.     Defendants Moore Capital Management, LP, Moore Capital Advisors, LLC, Moore Advisors, Ltd., Moore Macro Fund, LP, Moore Global Fixed Income Master Fund, LP, and Christopher Pia, Defendant Eugene Burger (a trader who worked with Pia on the subject manipulative trades and restraint of trade in platinum and palladium, hereinafter "Burger"), Defendant MF Global, Inc., Defendant Joseph F. Walsh III (the MF Global personnel who executed the subject manipulative trades), together with significant nonparties Michael K. Kerensky and Joseph Terrone and entered into and knowingly engaged in a contract, combination or conspiracy in restraint of trade (the "Commodities Price-Fixing Enterprise"). In formulating and effectuating the contract, combination, or conspiracy, defendants engaged in anticompetitive activities, the purpose and effect of which were to restrain trade in, fix or manipulate prices of Class Commodities. These activities in furtherance of the conspiracy and to effect the objects thereof included (inter alia) the following:

a.     agreeing among themselves to artificially fix and inflate the price of platinum and palladium;

b.     agreeing among themselves to manipulate the settlement prices of palladium and platinum futures contracts traded on the NYMEX by engaging in a trading practice known as "banging the close";

c.     causing to be entered market-on-close ("MOC") buy orders executed in the last ten seconds of the closing period for NYMEX palladium and platinum contracts to exert upward pressure on the futures contract settlement prices and thus on Class Commodities prices;

d. creating artificial prices in Class Commodities and damaging the plaintiffs and other class members; and

e. agreeing among themselves to prevent regulatory and other public agencies from learning about their illegal price-fixing activities;

377. The purpose and effect of defendants' Commodities Price-Fixing Enterprise was to manipulate, raise, fix or otherwise cause artificial prices in the market for Class Commodities during the Class Period. Notably, the Commodities Price-Fixing Enterprise maintained large positions in the actual, physical platinum and palladium metals (as did the Physical Sub-Class) and thus had a significant financial motive to inflate the futures price, and then covert, or liquidate, its futures position for physical, or "EFP," transactions, thereby increasing the Moore Defendants' cash or bullion position. *See* ¶¶ 196-206. This contract, combination, and conspiracy is illegal per se under Section 1 of the Sherman Act, 15 U.S.C. § 1.

378. MF Global had actual knowledge of the essential nature and general scope of the conspiracy alleged. MF Global, per Kerensky and Welsh, communicated with Defendant Pia and Burke concerning the specifics of how MF Global would place and execute the trades of the Commodities Price-Fixing Enterprise so as to maximize the upward price impact of such trades. *See* ¶¶ 209-246 (detailed allegations concerning the Commodities Price-Fixing Enterprise intentionally creating the maximum imbalance to cause the maximum overpayment, in part due to their exceptionally large buy trades within the closing seconds or minutes of the market). MF Global thus conspired with the Moore Defendants to restrain trade, intended trade be restrained, and materially contributed to the restraint. MF Global thus knowingly participated in a conspiracy with the Moore Defendants and had conscious commitment to a common scheme to achieve an unlawful objective. MF Global, Welsh and the floor brokers acted with full awareness

of the anticompetitive purpose of the trades they were entering and the manner thereof. MF Global, Welsh and the floor brokers exercised their independent judgment and skill to effectuate the purposes of the restraint of trade, *e.g.*, to execute end-of-day purchases of NYMEX platinum and palladium futures to create artificially high prices.

379.   MF Global's agreement with the Moore Defendants to restrain trade can be inferred, and in fact is directly proved, from the course of dealing between MF Global and the Moore Defendants' personnel, including without limitation, the numerous communications between MF Global and the Moore Defendants, warranting the conclusion the conspirators had a common design, a meeting of the minds, and were acting in concert. This meeting of the minds of the Commodities Price-Fixing Enterprise has been detailed at length throughout this complaint, including ¶¶ 91-165. Indeed, Moore Capital's Pia told Eugene Burger of Moore Capital that to "jack it" (Moore-0221827), *i.e.* increase the price, Pia would purchase platinum and palladium futures on the *electronic market* while MF Global's Welsh simultaneously bids on the *floor market*:

| 17:44:23 | Chris Pia | And buy 100 pam8 moc |
|---|---|---|
| 17:44:46 | Chris Pia | U can use joe if you want. Tey to **jack it**…lets see if your system works in pgms |
| 17:45:06 | Eugene Burger | ok |
| | … | |
| 18:05:26 | Eugene Burger | **It worked in pall** |
| 18:05:47 | Eugene Burger | 50 plat wasn't enough |
| 18:06:05 | Eugene Burger | **I buy it on the screen while Joe does some on the floor** |
| 18:08:22 | Eugene Burger | Where do you want it to go |

This conversation highlights defendants' intention to price fix and restrain trade in the market, by placing repeated and continuous market-on-close orders to artificially "jack," or increase, the entire market price, to the severe detriment of the spot physical purchasers.

380.   Further, MF Global acted with awareness of the anticompetitive purpose for which it was being used, and MF Global exercised its independent judgment and skill to effectuate the purposes of the restraint of trade, *i.e.*, to time end-of-day purchases of platinum and palladium futures to create artificially high prices, especially while artificially "jacking" prices higher on the floor while the Moore Defendants simultaneously executed electronic trades.

381.   This awareness of the anticompetitive purpose of the trades it was executing for the Moore Defendants is evidenced by the myriad communications between MF Global personnel and NYMEX floor brokers evidencing Kerensky and Welsh's specific instructions concerning the specifics of how the NYMEX floor brokers should place and execute the trades for the Moore Defendants so as to maximize the upward price impact of such trades, ¶¶ 91-165, as well as communications concerning the floor brokers' need to evade supervision by compliance personnel in placing the orders of the Commodities Price-Fixing Enterprise and attempting to surreptitiously determine what orders from other customers were outstanding (in violation of NYMEX rules). *See, e.g.*, ¶ 133 (MF Global's Welsh stating, "fuck those guys . . . fuck compliance"), ¶ 146 (MF Global working with floor brokers to avoid compliance officers), and many similar express desires to restrain trade. *See* ¶ 3 ("bid it up," "jack it," "a new high," "do whatever I can to get it [the price] higher," "see if you can get to the" higher price, "make sure it close[s] up," "start to march it up," "don't bid, just fucking pay up," "try and get above," "try and get 'em moving," "getting it up on the day," "move this thing," "as long as it stays up

there," "make sure they don't come in" lower, "banging us out here," "tell them [floor traders] fucking [a higher price] or nothing," "move it," "kill 'em," buy'em up," and "get [prices] up."

382.   Indeed, the Commodities Price-Fixing Enterprise intentionally overpaid to boost the price of the spot, or physical, market. ¶¶ 209-241 (illegal trades in futures boosted the spot price of physical metals held by the Commodities Price-Fixing Enterprise). The Commodities Price-Fixing Enterprise intentional overpayments of platinum and palladium in an effort to artificially increase the settlement price were inherently anti-competitive and un-economic and resulted in harm to consumers and the market. The anti-competitive and un-economic nature of these trades would be apparent to the average consumer.

383.   Based on the foregoing, it is plain MF Global had actual knowledge of the essential nature and general scope of the conspiracy alleged and acted independently and knowingly to further the purposes and effects of such conspiracy.

384.   MF Global also had an independent economic interest in engaging in a restraint of trade with the Moore Defendants. ¶ 207. Defendants' manipulative acts and effects on prices were not publicly disclosed until on or after April 29, 2010. ¶ 240. Thus the agreement between MF Global and the Moore Defendants clearly constitutes a contract, combination and conspiracy of separate actors pursuing separate economic interests. ¶¶ 293-305. (MF Global did not provide mere brokerage services).

385.   Defendants Moore Capital Management, LP, Moore Capital Advisors, LLC, Moore Advisors, Ltd., Pia, and Defendant Eugene Burger had actual knowledge of the essential nature and general scope of the conspiracy alleged. Such knowledge is evidenced by their direction of the manipulative trading and their myriad communications with MF Global, per Kerensky and Defendant Welsh, concerning the specifics of how MF Global would place and

execute the trades of the Commodities Price-Fixing Enterprise so as to maximize the upward price impact of such trades.

386.   Defendants Moore Macro Fund, LP and Moore Global Fixed Income Master Fund, LP also conspired with the other members of the Commodities Price-Fixing Enterprise. Moore Macro Fund, LP and Moore Global Fixed Income Master Fund, LP operated as independent centers of decision-making in connection with their association with the other defendants and participation in the Commodities Price-Fixing Enterprise by virtue of their status as investment funds separate from the Moore management entities, separate legal existence and maintenance of separate offices (in the Bahamas and the Netherlands Antilles, respectively) and separate directorates.

387.   Moore Macro Fund, LP and Moore Global Fixed Income Master Fund, LP also acted operated as independent centers of decision-making in furtherance of the conspiracy by engaging in the manipulative trading alleged and financing patently manipulative trading, confirmed by the written messages and recorded calls. Further, defendants Moore Macro Fund, LP and Moore Global Fixed Income Master Fund, LP were completely independent of Defendant MF Global and operated as independent centers of decision making from MF Global. Indeed, MF Global not only separately directed trades to artificially boost prices, Moore Capital would place electronic bids while MF Global separately placed floor bids, to effectuate the Commodities Price-Fixing Enterprise.

388.   Defendants' Commodities Price-Fixing Enterprise, a contract, combination, conspiracy and common purpose to reap significant ill-gotten profits and gains, artificially raised the prices on Class Commodities during the Class Period to plaintiffs' and the Class's detriment.

389.    Defendants' contract, combination, or conspiracy has caused substantial anticompetitive effects and harm in the market for Class Commodities and has affected interstate commerce. It has done so by causing plaintiffs, and other Physical Sub-Class Class Commodities purchasers, to pay artificial prices higher than what they would have paid in the absence of defendants' illegal activity.

390.    Defendants' restraint of trade and anticompetitive conduct had severe adverse consequences on competition and price discovery. Plaintiffs and other Physical Sub-Class members who transacted in Class Commodities during the Class Period were deprived of normal, competitive trading patterns and instead were subjected to artificially determined prices as a result of the Commodities Price-Fixing Enterprise's unlawful and manipulative conduct. As a consequence thereof, Plaintiffs and the Physical Sub-Class suffered financial losses and were, therefore, injured in their business or property, in an amount not presently known, but which is, at minimum, hundreds of thousands of dollars, prior to trebling.

## AS AND FOR A SEVENTH CLAIM

## AGAINST ALL DEFENDANTS

## (Violations of the Racketeer Influenced and Corrupt Organizations Act

## 18 U.S.C. §§ 1961 *et seq.* ("Civil RICO"))

391.    The Physical Plaintiffs reallege and incorporate by reference paragraphs 1-329 above.

392.    The Moore Defendants, defendant Christopher Pia, defendant MF Global, Joseph Terrone and other Pit Floor Brokers, and each of them, conspired and combined together to artificially raise the prices on platinum and palladium futures and the spot/physical market

during the Class Period. Defendants' conduct impacted the physical commodities market for platinum and palladium.

393.   The Moore Defendants, defendant Christopher Pia, defendant MF Global, Joseph Terrone and other Pit Floor Brokers constitute the Commodities Price-Fixing Enterprise, which had the known, express, and common purpose of reaping significant illicit profits and gains. The Commodities Price-Fixing Enterprise achieved its illegal goals by repeatedly, continually, and for at least a two-year period artificially raising the prices on platinum and palladium before and during the Class Period, to the detriment of the plaintiffs and the Physical Sub-Class they seek to represent.

394.   The Moore Defendants, defendant Pia, defendant MF Global, Joseph Terrone and other Pit Floor Brokers, for at least a two-year period of continuous racketeering activity, were distinct legal corporate entities who, via conspiracy, agreement and understanding, engaged in a continuous pattern of illegal conduct spanning at least two years, which is confirmed by the evidentiary record and shows the Commodities Price-Fixing Enterprise used the United States wires, mails and the commodities market to effectuate the fraud.

395.   These distinct entities within the racketeering enterprise carried out their multi-year illegality in the platinum and palladium markets by taking agreed upon, intentional, and concerted actions and efforts to effectuate the racketeering. For example, MF Global would repeatedly tell NYMEX floor brokers to "fucking pay up" to artificially inflate prices, ¶ 121; instruct floor brokers to "get it higher," ¶ 132; "make a new high" by intentionally overpaying, ¶ 128; defendants like to "[only] like to jack things on close," ¶ 95, and circumvent compliance. ¶ 96. Plaintiffs allege, and the record is replete, with scores of blatantly illegal price-fixing and rule-violating conduct spanning the entire two-year period. *See* ¶¶ 92-305.

396.    So pervasive was the racketeering activity, floor clerks knew to make the defendants "happy" the clerks knew defendants "like[d] the price higher" and "that's the only reason" trades were placed market on close, as they told MF Global's Welsh. ¶ 126. In fact conversations held by the Commodities Price-Fixing Enterprise confirm, beyond any doubt, the Commodities Price-Fixing Enterprise knew its racketeering activity was illegal. *See, e.g.*, ¶ 146 (purposefully evading compliance personnel to "come on move it baby, move it." *Accord* ¶¶ 91-176, which chronicles the details, i.e. the who, what, when, where, and how, of at least two years of ongoing, systemic racketeering activity by defendants. Joseph Terrone and the other Floor Brokers/Clerks were fully aware of the Defendants desire to artificially manipulate the price of platinum and palladium; were aware such manipulation was illegal; yet assisted the Defendants in carrying out the artificial manipulation.

397.    So brazen was the continuous racketeering that MF Global's Welsh would berate floor clerks to "fuck compliance" when their intentional bids didn't sufficiently inflate the market so that the Commodities Price-Fixing Enterprise could reap its ill-gotten gains. ¶ 133.

398.    Contrary to its representations, MF Global was not merely providing ordinary brokerage services. And as alleged, the Commodities Price-Fixing Enterprise benefitted by artificially boosting the spot price of physical platinum and palladium, and MF Global was afforded more revenues by continually placing trades. ¶ 207,.

399.    As alleged, executing trades to artificially raise prices simply is not normal brokerage service. ¶¶ 293-301. Yet MF Global explains why the Commodities Price-Fixing Enterprise waited until the last minutes of the trading day to place orders, because to "do it right at the very end so all the screen prints don't count." ¶ 144. Defendant Welsh also testified that the purpose of buying in the pit was so that when the individuals who sold the plat or pall would

off-lay their risk on Globex after the close, those lower priced buys would not count toward the settlement price. Burger Depo. at 147:15-149:4.

**Defendants used instrumentalities of interstate and foreign commerce**

400. Similarly, Moore Capital's Pia told Eugene Burger of Moore Capital that to "jack it" (Moore-0221827), *i.e.* increase the price, Pia would purchase platinum and palladium futures on the electronic market while MF Global's Welsh simultaneously bids on the floor:

| 17:44:23 | Chris Pia | And buy 100 pam8 moc |
| 17:44:46 | Chris Pia | U can use joe if you want. Tey to **jack it**…lets see if your system works in pgms |
| 17:45:06 | Eugene Burger | ok |
| | … | |
| 18:05:26 | Eugene Burger | **It worked in pall** |
| 18:05:47 | Eugene Burger | 50 plat wasn't enough |
| 18:06:05 | Eugene Burger | **I buy it on the screen while Joe does some on the floor** |
| 18:08:22 | Eugene Burger | Where do you want it to go |

This conversation highlights defendants' racketeering activity and motive in placing repeated and continuous market-on-close orders was to artificially "jack," or increase, the entire market price, to the severe detriment of the spot physical purchasers.

401. An integral part of the continuing conspiracy and course of conduct alleged herein, the defendants and their Commodities Price-Fixing Enterprise repeatedly and continuously used and affected the instrumentalities of interstate and foreign commerce in, to and from the United States, including the mails, wires, air travel and other forms of interstate and foreign commerce the defendants used to engage in their unlawful trading and price-fixing activities in and with the United States, within the meaning of 18 U.S.C. § 1962.

402.    The conduct, acts and omissions of the defendants set forth above and herein were an integral part of the overall pattern and practices described herein, including using the facilities of United States interstate and foreign commerce to artificially raise the prices on platinum and palladium during the Class Period.

403.    The conduct, acts and omissions of the defendants set forth above and herein were an integral part of the overall pattern and practices described herein.

404.    It also was an integral, essential part of the conspiracy this same conduct was used to unlawfully earn tens of millions of dollars at the expense of the plaintiffs and the class they represent and to deprive the plaintiffs and the class of their funds and property.

405.    In furtherance of their unlawful conduct and these acts and omissions, the defendants knowingly:

  a.  used the mails in U.S. or foreign commerce to commit fraud in violation of 18 U.S.C.§ 1341;

  b.  used the wires in U.S. or foreign commerce to commit fraud in violation of 18 U.S.C. § 1343;

  c.  engaged in money laundering in violation of 18 U.S.C. §§ 1956, 1957; and

  d.  engaged in transactions with money derived from unlawful activity in violation of 18 U.S.C. § 1957.

406.    All these constitute "predicate acts" under 18 U.S.C. § 1961.

**Defendants engaged in a "pattern" of racketeering activity that started as early as June 2006**

407.    Defendants' conduct involved "at least two acts of racketeering activity … the last of which occurred within ten years after the commission of a prior act of racketeering activity" and therefore constituted a "pattern of racketeering" within the meaning of 18 U.S.C. § 1961(b).

408.    As set forth above and herein, in truth the record confirms the pattern of racketeering activity consisted of express, intentional, repeated, and continuous acts for at least a two-year period that had the near-identical purpose, result, participants, victims, and method of commission, and are interrelated by distinguishing characteristics rather than isolated events.

409.    The facts confirm beyond any doubt the Commodities Price-Fixing Enterprise, in particular the Moore Capital defendants, defendant Christopher Pia, and MF Global, intended to overpay for platinum and palladium to illegally inflate prices. *See* ¶¶ 91-165 (express admissions the Enterprise intended to artificially inflate prices); ¶¶ 165-192 (bang the close trades); ¶¶ 191-264 (illegal trades in futures boosted the spot price of physical metals held by the Commodities Price-Fixing Enterprise), and ¶¶ 166-195 (defendants knew or should have known their conduct was illegal, in part because defendant Pia entered most of the market on close trades using the Moore Macro Fund account, which Louis Bacon, the top executive, controlled and managed).

410.    As a direct result of the Commodities Price-Fixing Enterprise's intention and conduct to inflate prices, the volume-weighted average price of Moore Capital's "bang the close" trades was greater than either the platinum settlement price or the prevailing price for platinum immediately before the two-minute closing period on each of the trading days for platinum and palladium, the precise details of which are alleged in ¶¶166-195. The VWAP of Moore Capital's bang the close trades was greater than both the platinum settlement price and the prevailing price for platinum immediately before the closing periods, as previously alleged. *Id.*

169

411.   In fact, so pervasive was defendants' racketeering activity, their frequent "bang the close" trades during the closing minutes and seconds of the palladium and platinum futures markets, that, for example, between November 1, 2007 and May 21, 2008, as a direct result of defendants' illegal manipulation of the market, on 119 of the 139 trading days, the volume-weighted average price of Moore Capital's "bang the close" trades was higher than either the palladium or platinum settlement price or the prevailing price for palladium or platinum immediately before the two-minute closing period. ¶¶ 166, 180. Similarly high correlations, sometimes as high as 98%, are alleged for the platinum and palladium markets throughout the Class Period, which the Physical Sub-Class express incorporates by reference, ¶¶166-195.

412.   By frequently and consistently injecting the unlawful, uneconomic and illegitimate large demand element of their purchases into the price equation for NYMEX platinum and palladium futures contracts at the times of their closing, defendants caused platinum and palladium spot prices to be artificially inflated during the Class Period. *See* ¶¶ 196-206 (Moore Defendants making ill-gotten gains on the increase in their physical, or bullion, ownership of platinum and palladium). Further, the Physical Class further incorporate by reference the charts, graphs and pricing data showing the tight trading correlation between the future and spot markets. ¶¶ 82-83, 224-244.

413.   The purpose of defendants' pattern and practice was to engage in the unlawful conduct alleged herein. As part of their pattern and practice, and in furtherance of their illegal and fraudulent acts, the defendants used and caused to be used wire communications in interstate and foreign commerce, by both making and causing to be made wire communications.

414.   Each such use of a wire communication in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. § 1343.

Defendants engaged in various means of interstate wire communication in furtherance of the aforementioned schemes. The enterprise committed approximately 200 "bang the close" trades, which targeted two separate financial markets.[6] Communications in furtherance of the racketeering activity were sent via the telephone, email and instant message, and occurred over a two-year period. Plaintiffs identify communications designed to conceal the "bang the close" trades by making false excuses for defendants' trading activities, and evading NYMEX compliance personnel. These "concealment" wires constitute separate and additional acts of wire fraud because they were designed to make the transactions less suspect and evade suspicion by compliance and the market in general.

415.    Defendants' racketeering conduct spans a time frame larger than the Class Period. Beginning at least as early as June 7, 2006 and continuing through June 6, 2008, in furtherance of and for the purpose of executing and attempting to execute the described schemes and artifices to defraud, the Commodities Price-Fixing Enterprise, on numerous occasions, did knowingly and willfully transport and cause to be transported in interstate and foreign commerce money of the value of $5,000 or more knowing said money had been obtained by fraud or knowing said money was generated as the result of one or more fraudulent transactions. Each such act constitutes a separate and distinct violation of 18 U.S.C. § 2314.

416.    The evidence of defendants' ongoing corrupt practices spans years. Numerous messages between "donnydon66"[7] and MF Global employee Joe Welsh III ("Welsh"), who

---

[6] In actuality, in furtherance of this scheme, the Defendants committed MOC trades in numerous other commodities markets in an effort to determine which market(s) were most susceptible to manipulation by "bang the close" trading.

[7] On information and belief, the Physical Sub-Class alleges "donnydon66" is Moore defendant Christopher Pia, based on the fact defendant Pia is referred to as "Don" by several bankers when Pia was logged into his Bloomberg account at CPIA@Bloomberg.net, which corresponds to "Christopher Pia, Moore Capital Management." Further, MF Global's Welsh states in his instant

headed up the "Welsh/Marceano" Group at MF Global (Welsh reported to Tom Harte, MF Global's CEO of U.S. Business, and ultimately Kevin Davis, MF Global CEO), confirm illegal trades in platinum and palladium were made as early as 2006.

417.    The documentary evidence establishes repeated and continuous illegal trades for at least a two-year period starting in June 2006 and through the Class Period, ending with June 6, 2008 (the market manipulative effects lasted beyond the last MOC trade). ¶¶ 92-306.

418.    The record is replete with myriad written communications via the use of wire, electronic messages, and phone calls, between the Moore Defendants, defendant Christopher Pia, and defendant MF Global and its employee Joe Welsh, as well as various floor brokers, and many related market actors. These voluminous electronic communications and messages establish an ongoing, continuous, and systemic pattern of racketeering activity, lasting at least two years, in violation of U.S. law. ¶¶ 92-306. Hence the record is filled with evidence of defendants' racketeering activity, including messages starting on June 7, 2006 and continuing throughout the class period. *See* ¶¶ 92-165, which provides the details of the conversations, the speakers, and their relevance to defendants' racketeering activity.

419.    Thus defendants understood the purpose and intent of their enterprise and trades: to artificially inflate the markets on the close, and in fact actively discussed executing trades in a way to conceal the true purpose of their market-on-close trades.

420.    The voluminous messages, sent via the United States wires, make plain MF Global was not executing ordinary trades, nor was MF Global performing routine brokerage

---

messages that trades were placed for "Pia." *See, e.g.*, MFG 001666 (on Jan. 3, 2007 instant message user "jf2welsh" writes to instant message user "middpizza," stating, "I did a Pall trade for Pia."), *accord* MFG 001789 (Welsh stating he bought platinum and palladium "earlier for Pia").

services. Instead defendants actively discussed how their large market-on-close trades were moving the market.

421.    Hence the record is replete with ample evidence of the racketeering activity conducted by the Commodities Price-Fixing Enterprise, and it was continuous and ongoing throughout 2006, 2007 and into 2008, confirming the continuity of defendants' scheme, which spanned at least two years of continuous fraudulent trading activity.

422.    The written record from 2006 and 2007 confirms as early as June 8, 2006 Defendant Christopher Pia, the Moore Capital Defendants, and MF Global sought to artificially inflate the platinum and palladium markets with "bang the close" trades, with express instructions to "close it hard," "bid it up," "jack the close" "close as hard as you can," "walk it up," boost the platinum and palladium prices "through the trendline" and keep defendants Moore Capital and Pia informed "every day" about the palladium market. This racketeering activity is ongoing, repeated and continuous in 2006, 2007 and 2008. ¶¶ 92-306.

423.    As alleged in significant detail, these trades were market-moving because the defendants (a) made large purchases on the close a high percentage of the trading days, (b) the market-on-close purchases were very large, a fact known and discussed by the Commodities Price-Fixing Enterprise, (c) the Commodities Price-Fixing Enterprise actually paid higher, inflated prices for platinum and palladium, (d) the Commodities Price-Fixing Enterprise succeeded in creating the highest price during the close, and in fact created the highest prices during the entire trading day, (e) the Commodities Price-Fixing Enterprise regularly paid more in the floor market than they did in the contemporaneous electronic market, and (f) defendants had motive to increase the value of Moore's large platinum and palladium positions. This evidence is detailed at ¶¶ 92-164 (express admissions the Enterprise intended to artificially inflate prices); ¶¶

165-195 (bang the close trades); ¶¶ 209-241 (illegal trades in futures boosted the spot price of physical metals held by the Commodities Price-Fixing Enterprise), and ¶¶ 269-306 (defendants knew or should have known their conduct was illegal, in part because defendant Pia entered most of the market on close trades using the Moore Macro Fund account, which Louis Bacon, the top executive, controlled and managed). As alleged, MF Global did not provide mere brokerage services, but instead provided "extraordinary assistance" in rigging the market. ¶ 301.

424.    Further, the Commodities Price-Fixing Enterprise maintained large positions in the actual, physical metal, confirming the Commodities Price-Fixing Enterprise harmed the spot, or physical, class purchasers, and thus had a significant financial motive to inflate the futures price, and then covert, or liquidate, its futures position for physical, or "EFP," transactions, thereby increasing the Commodities Price-Fixing Enterprise cash or bullion position. *See* ¶¶ 203-207.

425.    Hence in furtherance of their scheme to defraud, and in an effort to conceal and promote their criminal enterprise, from at least as early as June 8, 2006 and continuing through June 6, 2008, defendants Moore Capital, Christopher Pia, MF Global and Joe Welsh knowingly engaged in multiple, repeated financial transactions from 2006 until 2008 in criminally derived property and/or monetary transactions in such property, derived as a result of the schemes and artifices to defraud, in violation of 18 U.S.C. §§ 1341, 1343, 2314, as alleged in detail throughout this complaint. These monetary transactions each had a value of more than $10,000, and often significantly more.

426.    Defendants are United States persons within the meaning of 18 U.S.C. § 1957(d). A substantial part of the acts and omissions described above was conducted within the United States or by a United States person, each act or omission was engaged in for the purposes

described in the preceding paragraph and each constitutes a separate and distinct activity indictable under 18 U.S.C. §§ 1956, 1957 and 2314.

427.    From at least as early as June 8, 2006 and continuing through June 6, 2008, the defendants repeatedly engaged in acts indictable under 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1956 (laundering of monetary instruments), 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity) and 18 U.S.C. § 2314 (transportation of stolen money), used the United States mails as well as wire and other communications in interstate and foreign commerce in connection with these acts and thereby continually engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B) in the course of their described criminal schemes.

428.    The repeated violations by the defendants of 18 U.S.C. §§ 1341, 1343 and 2314 extended over a period of at two years and involved distinct and independent criminal acts. They were neither isolated nor sporadic events, but involved the regular and repeated violation of law to accomplish the defendants' desired ends in the course of the continuing business of the Commodities Price-Fixing Enterprise.

429.    These acts were related to each other by virtue of (a) common participants, (b) common victims, (c) common methods of commission through concerted action and (d) the common purpose and common result of enriching themselves at the expense of the plaintiffs and the class they represent while concealing their criminal activities. As such, this conduct constitutes a pattern of racketeering activity within the meaning of is 18 U.S.C. § 1961(5).

430.    These repeated and continuing violations of 18 U.S.C. § 1956, 18 U.S.C. § 1957 and 18 U.S.C. § 2314 were neither isolated nor sporadic events, but involved a callous and calculated series of repeated violations of law in order to conceal and promote criminal activity

in the course of the continuing business of the Commodities Price-Fixing Enterprise. These activities therefore constitute a further component of a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

431.    Defendants were employed by or active participants in the Commodities Price-Fixing Enterprise and all of them violated or aided violations of 18 U.S.C. § 1962(c) by directly or indirectly conducting or participating in the conduct of the affairs of the Commodities Price-Fixing Enterprise through a pattern of racketeering activity.

432.    Defendants' violating 18 U.S.C. § 1962(c) caused the plaintiffs and Class members to suffer direct injury to their business and property in the millions of dollars in losses over the course of time beginning at least as early as October 25, 2007 and continuing through June 6, 2008.

**Defendants controlled and operated the Commodities Price-Fixing Enterprise for at least two years**

433.    The Moore Capital Defendants, defendant Chris Pia, and defendant MF Global were and are "persons" within the meaning of 18 U.S.C. § 1961(3).

434.    Defendants operated and controlled an "enterprise" consisting of themselves, the Pit Floor Brokers and affiliated companies described above, the Commodities Price-Fixing Enterprise, within the meaning of 18 U.S.C. § 1961(4).

435.    The evidence shows and confirms their common purpose in using and operating the Commodities Price-Fixing Enterprise to defraud and cause the plaintiffs and the class they represent to lose millions of dollars in losses from owning and trading platinum and palladium.

**Defendants conducted the affairs of the Commodities Price-Fixing Enterprise via a pattern of racketeering**

436.    The evidentiary record shows and confirms defendants managed, operated, conducted and participated in the Commodities Price-Fixing Enterprise's affairs via an established pattern of at least two years of ongoing and continuous racketeering activity within the meaning of 18 U.S.C. § 1962(c). This evidence is detailed at ¶¶ 92-164 (express admissions the Enterprise intended to artificially inflate prices); ¶¶ 165-195 (bang the close trades); ¶¶ 209-241 (illegal trades in futures boosted the spot price of physical metals held by the Commodities Price-Fixing Enterprise), and ¶¶ 296-306 (defendants knew or should have known their conduct was illegal, in part because defendant Pia entered most of the market on close trades using the Moore Macro Fund account, which Louis Bacon, the top executive, controlled and managed).

**Defendants conspired in managing and operating the Commodities Price-Fixing Enterprise in violation of 18 U.S.C. § 1962(d)**

437.    From at least as early as June 7, 2006 and continuing through June 6, 2008, the defendants knowingly agreed to facilitate the scheme and conspiracy to manage, operate, conduct and participate in the conduct of the affairs of the Commodities Price-Fixing Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(d).

438.    From at least as early as June 7, 2006 and continuing through June 6, 2008, defendants were persons intimately involved in transactions carried on by and the affairs of the Commodities Price-Fixing Enterprise. The Enterprise and its transactions affected, interstate and foreign commerce. Defendants unlawfully and willfully combined, conspired, confederated and agreed with each other to violate 18 U.S.C. § 1962(c), *i.e.* to conduct and participate, directly and indirectly, in the conduct of the affairs of the Commodities Price-Fixing Enterprise via a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

439.     The evidentiary record confirms each of the defendants personally committed and agreed to commit two or more fraudulent and illegal racketeering acts and conducted and agreed to conduct the affairs of the Commodities Price-Fixing Enterprise through a two-year ongoing, continuous and intended pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), as alleged in detail above.

440.     In furtherance of the conspiracy and to effect the objects thereof, the defendants committed and caused to be committed an ongoing and continuous series of overt acts, including repeatedly and persistently:

   a.   agreeing among themselves to artificially fix and inflate the price of platinum and palladium;

   b.   agreeing among themselves to manipulate the settlement prices of palladium and platinum futures contracts traded on the NYMEX by engaging in a trading practice known as "banging the close";

   c.   causing to be entered market-on-close ("MOC") buy orders executed in the last ten seconds of the closing period for NYMEX palladium and platinum contracts to exert upward pressure on the futures contract settlement prices and thus on Class Commodities prices;

   d.   creating artificial prices in Class Commodities and damaging the plaintiffs and other class members;

   e.   agreeing among themselves to prevent regulatory and other public agencies from learning about their illegal price-fixing activities; and

   f.   agreeing among themselves to defraud and cause the plaintiffs and the Physical Sub-Class they represent to lose substantial sums of money.

441. Plaintiffs and Class members have been directly injured in their business and property by defendants' violation of 18 U.S.C. § 1962(d). Plaintiffs' losses, in the millions of dollars, are a direct result of defendants' conspiracy.

**Defendants acted with criminal intent**

442. The evidentiary record confirms Defendants' conduct was ***not*** merely reckless or negligent.

443. Instead the record and evidentiary allegations confirm the Commodities Price-Fixing Enterprise defendants engaged in the conduct, acts and omissions described above intentionally, willfully, and with actual knowledge of their illegality and actual purpose (including expressly violating rules and regulations), to the detriment of plaintiffs and the Physical Sub-Class.

**Plaintiffs and the Physical Sub-Class are entitled to damages under 18 U.S.C. § 1964(c)**

444. Plaintiffs and the Physical Sub-Class have been directly and proximately injured in their business and property by reason of the defendants' violations of 18 U.S.C. §§ 1962(c) and (d) in an amount to be proven at trial.

**AS AND FOR A EIGHTH CLAIM**

**AGAINST ALL DEFENDANTS**

**(Common Law Fraud Under New York Common Law)**

445. The Physical Plaintiffs reallege and incorporate by reference paragraphs 1-329 above.

446. This Count is asserted against all Defendants based on common law principles of fraud under New York law.

447.     As alleged herein, the Defendants engaged in a scheme to manipulate the physical platinum and palladium market by artificially raising the physical price of platinum and palladium. The Defendants manipulation resulted in the creation of a "price mirage." Specifically, that the artificially created price was not the result of illegal market manipulation but rather natural supply and demand, absent any price manipulation.

448.     Through the aforesaid market manipulation, the Defendants created a "price mirage" designed to deceive the Physical Plaintiffs and other market participants into believing that the "cash" or "spot" prices for platinum and palladium were the result of natural market forces. To help create the "price mirage" the Defendants would frequently split up larger buy orders among different sellers with the intention that this would create a buzz among sellers there was a large interest in platinum and palladium. Defendant Burger admits to engaging in such actions. Burger Depo. at 258:4-258:22.

449.     Floor broker John Sakulich confirmed the purpose of the Defendants' "bang the close" trades was to effectuate a "price mirage" and create the false impression of investor interest in buying platinum and palladium. Sakulich testified the purpose of the MOC orders was to "let people think there's more business around here than there is." Sakulich Depo. at 88:24-89:7. Sakulich confirmed Defendants' market manipulation activity had just such an effect on the market.

450.     The Defendants' market manipulation scheme was designed to, and did indeed, deceive the Physical Plaintiffs and other market participants. The scheme to artificially inflate the price of platinum and palladium could only succeed if it appeared to consumers that the changes in price were the result of natural market altering factors, absent manipulation.

451.    The aforesaid market manipulation by the Defendants was done intentionally, to induce reliance thereon by the Physical Plaintiffs and the investing public when making investment decisions. The aforesaid scheme to manipulate the physical platinum and palladium market constitutes fraud under New York common law.

452.    The Physical Plaintiffs relied on the integrity of the market, that the physical price established by the market was based on natural supply and demand and not the product of manipulation, in purchasing physical platinum and palladium during the class period. The Defendants actions in creating an artificial price for physical platinum and palladium lured the Physical Plaintiffs into the market to their detriment. If the Physical Plaintiffs had known of the Defendants manipulation of the physical platinum and palladium market, they would not have purchased physical platinum and palladium during the class period.

453.    As a direct and proximate result of the market manipulation and the creation of a "price mirage" by the Defendants, Plaintiffs suffered damages in connection with their purchases of physical platinum and palladium during the class period.

454.    The market manipulation committed by Defendants was intentional and/or involved conscious acts that willfully and wantonly disregarded the rights of others, including not only the Physical Plaintiffs but the investing public. As a result, the Defendants should be required to pay punitive damages to the Physical Plaintiffs.

## AS AND FOR A NINTH CLAIM

## AGAINST ALL DEFENDANTS

### (Aiding and Abetting Common Law Fraud Under New York Law)

455.    The Physical Plaintiffs reallege and incorporate by reference paragraphs 1-329 above.

456.     As alleged above, the Physical Plaintiffs were the victims of a common law fraud market manipulation scheme carried out by the Defendants.

457.     Each and every Defendant had extensive knowledge of the manipulation and, with such knowledge, materially assisted the manipulation by the other Defendants.

458.     Each Defendant provided highly unusual assistance by engaging in acts to further the blatant manipulation whereas standard practice was to refuse to do such acts.

459.     Defendant Moore Capital Management acted as the commodity trading advisor to the Moore Funds and, as a principal of Defendant Moore Capital Advisors, shared in the financial benefits from the manipulation. Also, it willfully aided, abetted, counseled, induced, or procured the commission of scheme to manipulate the platinum and palladium markets by the Moore Defendants.

460.     Defendants Moore Capital Advisors and Moore Advisors were co-general partners of the Moore Funds and directed (though Defendant Pia and others) manipulative investments in the Moore Funds alleged herein. They thereby willfully aided, abetted, counseled, induced, or procured the commission of scheme to manipulate the platinum and palladium markets by the Moore Defendants.

461.     Defendant MF Global acted as FCM for Defendants Moore Capital Advisors and Moore Advisors and entered the manipulative trades and orders alleged herein (as directed by Defendant Pia and others). Defendant MF Global substantially assisted in the aforesaid manipulations by MF Global's repeated efforts, through Defendant Welsh and others, to force prices as high as possible while entering and obtaining executions of the Moore Defendants' trades. Defendant MF Global was fully aware of the overall manipulative purpose and, indeed, the overall manipulative pattern of the trading engaged in by the Moore Defendants. MF Global,

through Defendant Welsh, ensured the MOC trades were executed at the time, price and volume to have the maximum impact on the settlement price.

462.   Thereby, Defendants MF Global and Welsh repeatedly provided extraordinary assistance for extra revenues with actual knowledge of the manipulative trades over a long duration. Through the foregoing means and other facts pleaded herein, Defendants MF Global and Welsh willfully aided, abetted, counseled, induced, or procured the scheme to manipulate the platinum and palladium markets by the Moore Defendants. Defendants MF Global and Welsh were active and integral participants in the market manipulation activities by:

(a)     assisting the Moore Defendants and Pia in carrying out the "bang the close" trades by ensuring the trades were carried out in the last two-minutes of trading and usually only seconds before close;

(b)     ensuring that the "bang the close" trades had the most impact on pricing by assisting the Moore Defendants and Pia in selecting the most opportune time to purchase and volume to purchase;

(c)     assisting the Moore Defendants and Pia in overpaying as much as possible for platinum and palladium contracts, in contravention of traditional economic principles, to ensure the price of physical platinum and palladium artificially increased;

(d)     during the early stages of the manipulation scheme, MF Global and Welsh created subterfuges and false reasons to induce the floor brokers to overpay for platinum and palladium contracts to create artificially high prices;

(d)     later, MF Global and Welsh assisted the Moore Defendants and Pia in informing the Floor Brokers of the scheme to overpay and expressly informing

them to do so;

(e)    assisting the Moore Defendants and Pia in shielding their market manipulative trades from compliance officials.

463.    The Moore Funds held the manipulative positions, paid for same, and financed the manipulation. This is highly unusual conduct. Based on the long duration and blatant nature of the "frequent" large manipulative trades in the two separate markets, and other facts previously alleged, the Moore Funds knew of and aided and abetted or knowingly willfully aided, abetted, counseled, induced, or procured the scheme to manipulate the platinum and palladium markets by the other Moore Defendants.

(a)    Defendants Pia and Burger implemented the manipulative trading strategies alleged herein acting for and on behalf of the Moore Defendants and directed that manipulative trades and orders be placed through Defendant MF Global. Thereby Defendant Pia willfully aided, abetted, counseled, induced, or procured the scheme to manipulate the platinum and palladium markets by the other Defendants.

(b)    Defendant Bacon provided highly unusual assistance and had knowledge of the manipulation. This included by allowing the manipulation to start, allowing the capital devoted to it to grow, and allowing the manipulation to continue.

(c)    The Moore Defendants and Pia were intentionally manipulating the physical price of platinum and palladium via the execution of their "bang the close" trades. Thereby the Moore Defendants and Defendant Pia willfully aided, abetted, counseled, induced, or procured the scheme to manipulate the platinum and palladium markets by the other Defendants.

(d)      Defendants Pia and the Moore Defendants made illegitimate trades not in accordance with legal and regulatory requirements. Thereby the Moore Defendants and Defendant Pia willfully aided, abetted, counseled, induced, or procured the scheme to manipulate the platinum and palladium markets by the other Defendants.

(f)      Defendants Pia and the Moore Defendants actively concealed their unlawful and illegitimate trades from compliance officials. Thereby the Moore Defendants and Defendant Pia willfully aided, abetted, counseled, induced, or procured the scheme to manipulate the platinum and palladium markets by the other Defendants.

(g)      Defendants Pia and the Moore Defendants intentionally overpaid for platinum and palladium contracts, in contravention of traditional, sound economic principles. Thereby the Moore Defendants and Defendant Pia willfully aided, abetted, counseled, induced, or procured the scheme to manipulate the platinum and palladium markets by the other Defendants.

464.   Defendants each played their component role and each knowingly aided, abetted, counseled, induced, and/or procured the scheme to manipulate the platinum and palladium markets alleged herein.

465.   Communications between the Defendants clearly establish that each Defendant had actual knowledge of the market manipulation scheme described supra. Further, communications expressly show that each Defendant intended to, and did indeed, substantially assist in carrying out the market manipulation scheme to artificially increase the physical price of platinum and palladium. This included when the written or other instructions accompanying such

trades directed that the "buys" were to be made uneconomically, *i.e.*, intentionally so as to cause higher prices. This also includes other forms of communications which expressly reveal the purpose and intent of these trades was to artificially increase the physical price of platinum and palladium.

425.    As a direct and natural result of the market manipulation scheme, Defendants' aiding and abetting that fraudulent scheme, the Physical Plaintiffs have suffered substantial damages.

## AS AND FOR A TENTH CLAIM

## AGAINST ALL DEFENDANTS

### (Conspiracy to Commit Fraud Under New York Common Law)

426.    The Physical Plaintiffs reallege and incorporate by reference paragraphs 1-329 above.

427.    Defendants Pia, Bacon, Burger, MF Global, Welsh and the Moore Defendants, in combination with others (including the Pit Floor Brokers), agreed to carry out a plan, scheme and course of conduct to manipulate the platinum and palladium market and artificially inflate the price of physical platinum and palladium.

428.    Defendants knew, or should have known, the Physical Plaintiffs would rely on the integrity of the NYMEX platinum and palladium market in purchasing physical platinum and palladium.

429.    As detailed above, Defendants knowingly and intentionally participated in furtherance of the plan to manipulate the platinum and palladium market by:

**<u>Defendants Pia, Burger and the Moore Defendants</u>**

(a)      executing unlawful "bang the close" trades so that the trades had the maximum impact on pricing;

(b)      selecting the timing and volume of trades so that they had the maximum impact on pricing;

(c)      overpaying as much as possible for platinum and palladium contracts, in contravention of traditional economic principles, to ensure the price of physical platinum and palladium artificially increased to the greatest extent possible; and

(d)      concealing the "bang the close" trades and uneconomic trades from compliance officials.

**Defendant Bacon**

(a)      In late May 2008, Defendant Bacon personally and specifically authorized the continuation of the NYMEX platinum and palladium futures trading by the Moore Defendants after the CFTC investigation or inquires had begun;

(b)      Defendant Bacon knew of, and approved of, the Defendant Pia's "bang the close" trading activity.

**Defendants MF Global and Welsh**

(a)      assisting the Moore Defendants and Pia in carrying out the "bang the close" trades by ensuring the trades were carried out in the last two minutes of trading and usually only seconds before close;

(b)      ensuring that the "bang the close" trades had the most impact on pricing by assisting the Moore Defendants and Pia in selecting the most opportune time to purchase and volume to purchase;

(c)      assisting the Moore Defendants and Pia in overpaying as much as possible for platinum and palladium contracts, in contravention of traditional economic principles, to ensure the price of physical platinum and palladium artificially increased;

(d)      during the early stages of the manipulation scheme, MF Global and Welsh created subterfuges and false reasons to induce the floor brokers to overpay for platinum and palladium contracts to create artificially high prices;

(d)      later, MF Global and Welsh assisted the Moore Defendants and Pia in informing the Floor Brokers of the scheme to overpay and expressly informing them to do so;

(e)      assisting the Moore Defendants and Pia in shielding their market manipulative trades from compliance officials.

430.      As set forth above, Defendants intentionally engaged in these activities to manipulate the platinum and palladium market and to artificially raise the physical price of platinum and palladium. Communications among the Defendants expressly evince their intent to unlawfully manipulate the market.

431.      The Physical Plaintiffs relied on the integrity of the NYMEX platinum and palladium market in purchasing their physical platinum and palladium.

432.      As a proximate result of the Defendants' conspiracy to commit common law fraud via market manipulation, the Physical Plaintiffs relied on the integrity of the NYMEX platinum and palladium market, purchased physical platinum and palladium and suffered damages.

**New York Law Applies to the Physical Plaintiffs' Common Law Claims**

433. New York common law applies to all physical purchases of platinum and palladium during the class period. All of the manipulative acts (the "bang the close" trades) occurred on the New York Mercantile Exchange and were done with the express intent of manipulating the NYMEX spot price. Further, the market manipulation described hereinabove did indeed artificially inflate the NYMEX spot price of physical platinum and palladium. All of the purchases of physical platinum and palladium during the class period were based on the New York Spot Price.

434. Defendants Pia, Welsh and Burger are all based in New York and the manipulation was carried out of their respective offices in New York and effectuated on the pit floor of NYMEX.

435. Defendant Moore Capital Management is headquartered in New York. Moore Capital Advisors, LLC is also headquartered in New York.

436. Defendant MF Global, Inc. is headquartered in New York.

437. Defendants Bacon, Burger and Welsh were, at all times relevant hereto, residents of New York. Upon information and belief, Pia was a resident of New York at all times relevant hereto.

438. The primary floor brokers who aided and abetted the market manipulation are residents or headquartered in New York. All of the Defendants worked in New York and carried out the illegal manipulative acts in New York.

439. The manipulated settlement prices of platinum and palladium were established at NYMEX based on activity that occurred on or at NYMEX. The futures plaintiffs purchased their contracts from NYMEX. All of the purchases of physical platinum and palladium during the class period were based on the "spot" or "cash" price set at NYMEX.

440.    This case revolves around market manipulation conduct on the NYMEX. All of the Defendants worked in New York and carried out the illegal manipulative acts on the NYMEX.

434.    New York is considered the financial capital of the world. New York is where most of the largest hedge funds, banks and other institutional investors are headquartered. New York is the location of NYMEX, COMEX and the NYSE. As such the State of New York has a very strong interest in assuring that NYMEX and COMEX (as well as other financial markets based in New York) operate consistent with fair and just economic principles and are not the subject of any unlawful manipulation.

## AS AND FOR A ELEVETH CLAIM

## AGAINST DEFENDANT WELSH

### (Common Law Negligence)

466.    Strictly and solely in the alternative to Claim Six through Claim Ten above and repeating only the allegations contained in paragraphs 20-24, 28-31, 316-326, and Exhibits C-L, Defendant Joseph Welsh[8], as an Associated Person and otherwise, owed a duty of care to the Physical Plaintiffs and members of the Physical Sub-Class to follow the rules and regulations of the NYMEX and otherwise take reasonable care to prevent price manipulation on the NYMEX.

467.    Throughout the Class Period, Defendant Welsh repeatedly entered the Moore Capital Defendants' "bang the close" orders in NYMEX platinum and palladium futures contracts at or near the end of the trading day.  *See* Exhibits C-L.  In the exercise of reasonable care, Defendant Welsh should have declined or refused to enter such bang the close orders.

---

[8] Defendant Welsh a resident of Northport, New York.  During the Class Period, Defendant Welsh was senior Vice President and commodities trader for Defendant MF Global, Inc. and had responsibility for, among other things, entering orders for platinum and palladium futures contracts on behalf of the Moore Defendants.

Defendant Welsh's entry of these "bang the close" orders breached the duty of care he owed to the Physical Plaintiffs and members of the Physical Sub-Class and was thereby negligent.

468.    Defendant Welsh's foregoing breach of his duty of care caused NYMEX platinum and palladium futures contract prices (and thereby prices for physical platinum and physical palladium) to be artificial, including artificially high, and thereby proximately caused the injuries and losses suffered by the Physical Plaintiffs and members of the Physical Sub-Class.

469.    Under the common law, Defendant Welsh is liable to the Physical Plaintiffs and members of the Physical Sub-Class for his foregoing negligence.

470.    The Physical Plaintiffs and members of the Physical Sub-Class are each entitled to damages for the violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, the Futures Plaintiffs pray for relief as follows:

A. for a declaratory judgment that Defendants manipulated NYMEX platinum and palladium futures prices in violation of the CEA Section 9(a), 7 U.S.C. Section 13(b) (First Claim);

B. for a declaratory judgment that Defendants are also liable for such manipulation under Section 2(a)(1) of the CEA; (Second Claim);

C. for a declaratory judgment that Defendants are liable for aiding and abetting such manipulation under Section 13c(a) of the CEA, 7 U.S.C. Section 13 (Third Claim);

D. for a declaratory judgment that Defendants Pia, Welsh, MF Global, Burger, Moore Capital Management, LP, Moore Capital Management, LLC, Moore Capital Advisors LLC, And Moore Advisors, Ltd. made a contract, combination or conspiracy in violation of the Sherman Act.

E.  for an order granting all appropriate injunctive relief on the antitrust claim;

F.  for an order certifying the Commodity Exchange Act claims as a class action on behalf of the Futures Sub-Class pursuant to the Federal Rules of Civil Procedure;

G.  for a judgment awarding the Futures Plaintiffs and the Futures Sub-Class damages against Defendants for Defendants' violations of the CEA and Sherman Act together with trebling, attorneys' fees and prejudgment interest to the maximum extent allowable by law; and

H.  for such other and further relief as the Court may deem just and proper.

WHEREFORE, the Physical Sub-Class request the Court:

A.  declare, adjudge, and decree the Defendants have committed the violations of federal law alleged herein;

B.  permanently enjoin and restrain Defendants, their directors, officers, employees, agents, successors, and assigns from, in any manner, directly or indirectly, violating Section 1 of the Sherman Act, or other statutes having a similar purpose and effect;

C.  award damages sustained by the Plaintiffs and the Physical Sub-Class from Defendants' violations of Section 1 of the Sherman Act and Civil RICO in an amount to be proven at trial, to be trebled according to law, plus interest (including prejudgment interest);

D.  award damages sustained by the Plaintiffs and the Physical Sub-Class from Defendants' violations of New York Common law, specifically Common Law Fraud, Aiding and Abetting and Conspiracy to Commit Fraud, in an amount to be proven at trial, plus interest (if applicable);

E. order disgorgement of Defendants' unjust enrichment and award the sums disgorged to the Class as damages; and

F. grant such other and further relief as it deems just and proper.

## DEMAND FOR JURY

Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, all Plaintiffs demand a trial by jury.

Dated: New York, New York
March 17, 2014

*As To Allegations By the Futures Plaintiffs and The Futures Sub-Class*

Christopher Lovell
Ian T. Stoll
Christopher M. McGrath
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway, Suite 501
New York, New York 10006
Telephone:     (212) 608-1900
Facsimile:     (212) 719-4775

***Interim Futures Sub-Class Counsel***

*As To Allegations By the Physical Plaintiffs and The Physical Sub-Class*

William J. Doyle, II
John A. Lowther
**DOYLE LOWTHER LLP**
10200 Willow Creek Road, Suite 150
San Diego, California 92138
Telephone:     (858) 935-9960
Facsimile:     (858) 939-1939

***Interim Physical Sub-Class Counsel***

# Exhibit A

| Date | FIF Position with LMB | | | | | MMF Position with CLP | | | | | MMF Position with LMB | | | | | Total Position all funds and traders | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Palladium Bullion Ounces | Palladium Futures Contracts | Platinum Bullion Ounces | Platinum Futures Contracts | | Palladium Bullion Ounces | Palladium Futures Contracts | Platinum Bullion Ounces | Platinum Futures Contracts | | Palladium Bullion Ounces | Palladium Futures Contracts | Platinum Bullion Ounces | Platinum Futures Contracts | | Palladium Bullion Ounces | Palladium Futures Contracts | Palladium Net Ounces | Platinum Bullion Ounces | Platinum Futures Contracts | Platinum Net Ounces |

| Date | FIF Position with LMB | | | | | MMF Position with CLP | | | | | MMF Position with LMB | | | | | Total Position all funds and traders | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Palladium Bullion Ounces | Palladium Futures Contracts | Platinum Bullion Ounces | Platinum Futures Contracts | | Palladium Bullion Ounces | Palladium Futures Contracts | Platinum Bullion Ounces | Platinum Futures Contracts | | Palladium Bullion Ounces | Palladium Futures Contracts | Platinum Bullion Ounces | Platinum Futures Contracts | | Palladium Bullion Ounces | Palladium Futures Contracts | Palladium Net Ounces | Platinum Bullion Ounces | Platinum Futures Contracts | Platinum Net Ounces |

| Date | FIF Position with LMB | | | | | MMF Position with CLP | | | | | MMF Position with LMB | | | | | Total Position all funds and traders | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Palladium Bullion Ounces | Palladium Futures Contracts | Platinum Bullion Ounces | Platinum Futures Contracts | | Palladium Bullion Ounces | Palladium Futures Contracts | Platinum Bullion Ounces | Platinum Futures Contracts | | Palladium Bullion Ounces | Palladium Futures Contracts | Platinum Bullion Ounces | Platinum Futures Contracts | | Palladium Bullion Ounces | Palladium Futures Contracts | Palladium Net Ounces | Platinum Bullion Ounces | Platinum Futures Contracts | Platinum Net Ounces |

| Date | FIF Position with LMB | | | | | MMF Position with CLP | | | | | MMF Position with LMB | | | | | Total Position all funds and traders | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Palladium Bullion Ounces | Palladium Futures Contracts | Platinum Bullion Ounces | Platinum Futures Contracts | | Palladium Bullion Ounces | Palladium Futures Contracts | Platinum Bullion Ounces | Platinum Futures Contracts | | Palladium Bullion Ounces | Palladium Futures Contracts | Platinum Bullion Ounces | Platinum Futures Contracts | | Palladium Bullion Ounces | Palladium Futures Contracts | Palladium Net Ounces | Platinum Bullion Ounces | Platinum Futures Contracts | Platinum Net Ounces |

| Date | FIF Position with LMB | | | | | MMF Position with CLP | | | | | MMF Position with LMB | | | | | Total Position all funds and traders | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Palladium Bullion Ounces | Palladium Futures Contracts | Platinum Bullion Ounces | Platinum Futures Contracts | | Palladium Bullion Ounces | Palladium Futures Contracts | Platinum Bullion Ounces | Platinum Futures Contracts | | Palladium Bullion Ounces | Palladium Futures Contracts | Platinum Bullion Ounces | Platinum Futures Contracts | | Palladium Bullion Ounces | Palladium Futures Contracts | Palladium Net Ounces | Platinum Bullion Ounces | Platinum Futures Contracts | Platinum Net Ounces |

# Exhibit B

## Palladium Class Period Market Prices

| | futures | | physical |
|---|---|---|---|
| November 1, 2007 | 375.9 | November 1, 2007 | 372 |
| November 2, 2007 | 377.4 | November 2, 2007 | |
| November 5, 2007 | 375.1 | November 5, 2007 | |
| November 6, 2007 | 379.7 | November 6, 2007 | |
| November 7, 2007 | 376.65 | November 7, 2007 | **379** |
| November 8, 2007 | 377.5 | November 8, 2007 | |
| November 9, 2007 | 376.25 | November 9, 2007 | |
| November 12, 2007 | 372.25 | November 12, 2007 | |
| November 13, 2007 | 373.5 | November 13, 2007 | |
| November 14, 2007 | 373.8 | November 14, 2007 | |
| November 15, 2007 | 370.95 | November 15, 2007 | |
| November 16, 2007 | 365.85 | November 16, 2007 | |
| November 19, 2007 | 361.3 | November 19, 2007 | 364 |
| November 20, 2007 | 364.3 | November 20, 2007 | |
| November 21, 2007 | 357.95 | November 21, 2007 | |
| November 22, 2007 | | November 22, 2007 | 355 |
| November 23, 2007 | 361.5 | November 23, 2007 | |
| November 26, 2007 | 359.1 | November 26, 2007 | |
| November 27, 2007 | 349.3 | November 27, 2007 | |
| November 28, 2007 | 346.25 | November 28, 2007 | 343 |
| November 29, 2007 | 344.85 | November 29, 2007 | |
| November 30, 2007 | 348.65 | November 30, 2007 | 349 |
| December 3, 2007 | 346.95 | December 3, 2007 | 347 |
| December 4, 2007 | 348.9 | December 4, 2007 | |
| December 5, 2007 | 350.1 | December 5, 2007 | 348 |
| December 6, 2007 | 347.35 | December 6, 2007 | |
| December 7, 2007 | 343.3 | December 7, 2007 | |
| December 10, 2007 | 345 | December 10, 2007 | 345 |
| December 11, 2007 | 347.4 | December 11, 2007 | 345 |
| December 12, 2007 | 348.1 | December 12, 2007 | 349 |
| December 13, 2007 | 347.45 | December 13, 2007 | |
| December 14, 2007 | 353.5 | December 14, 2007 | 350 |
| December 17, 2007 | 357.55 | December 17, 2007 | 350 |
| December 18, 2007 | 359.65 | December 18, 2007 | |
| December 19, 2007 | 358 | December 19, 2007 | |
| December 20, 2007 | 355.35 | December 20, 2007 | |
| December 21, 2007 | 357.65 | December 21, 2007 | |
| December 24, 2007 | 360 | December 24, 2007 | 355 |
| December 25, 2007 | | December 25, 2007 | |
| December 26, 2007 | 365 | December 26, 2007 | |
| December 27, 2007 | 365.05 | December 27, 2007 | 364 |
| December 28, 2007 | 370.05 | December 28, 2007 | |
| December 31, 2007 | 378.2 | December 31, 2007 | **370** |
| January 1, 2008 | | January 1, 2008 | |
| January 2, 2008 | 379.9 | January 2, 2008 | 370 |
| January 3, 2008 | 379.65 | January 3, 2008 | |
| January 4, 2008 | 377.75 | January 4, 2008 | 372 |
| January 7, 2008 | 376.85 | January 7, 2008 | |
| January 8, 2008 | 381.8 | January 8, 2008 | |
| January 9, 2008 | 382.6 | January 9, 2008 | |
| January 10, 2008 | 380.8 | January 10, 2008 | |
| January 11, 2008 | 381.3 | January 11, 2008 | |

| | futures | | physical |
|---|---|---|---|
| January 14, 2008 | 387.45 | January 14, 2008 | 382 |
| January 15, 2008 | 384.5 | January 15, 2008 | |
| January 16, 2008 | 377.85 | January 16, 2008 | |
| January 17, 2008 | 376.25 | January 17, 2008 | |
| January 18, 2008 | 375.05 | January 18, 2008 | |
| January 21, 2008 | | January 21, 2008 | |
| January 22, 2008 | 371.1 | January 22, 2008 | 363 |
| January 23, 2008 | 369.45 | January 23, 2008 | |
| January 24, 2008 | 376.05 | January 24, 2008 | |
| January 25, 2008 | 385.45 | January 25, 2008 | 381 |
| January 28, 2008 | 391.35 | January 28, 2008 | |
| January 29, 2008 | 393.3 | January 29, 2008 | |
| January 30, 2008 | 390.8 | January 30, 2008 | |
| January 31, 2008 | 394.5 | January 31, 2008 | 388 |
| February 1, 2008 | 417.05 | February 1, 2008 | 402 |
| February 4, 2008 | 431 | February 4, 2008 | 420 |
| February 5, 2008 | 423.1 | February 5, 2008 | |
| February 6, 2008 | 423.45 | February 6, 2008 | |
| February 7, 2008 | 428.45 | February 7, 2008 | |
| February 8, 2008 | 440.85 | February 8, 2008 | 430 |
| February 11, 2008 | 443.4 | February 11, 2008 | 443 |
| February 12, 2008 | 431.5 | February 12, 2008 | |
| February 13, 2008 | 439.05 | February 13, 2008 | |
| February 14, 2008 | 441.15 | February 14, 2008 | |
| February 15, 2008 | 451.7 | February 15, 2008 | 450 |
| February 18, 2008 | | February 18, 2008 | |
| February 19, 2008 | 499.3 | February 19, 2008 | 484 |
| February 20, 2008 | 494.2 | February 20, 2008 | 460 |
| February 21, 2008 | 515.5 | February 21, 2008 | 519 |
| February 22, 2008 | 515.85 | February 22, 2008 | |
| February 25, 2008 | 524.7 | February 25, 2008 | |
| February 26, 2008 | 536.35 | February 26, 2008 | |
| February 27, 2008 | 555.55 | February 27, 2008 | 554 |
| February 28, 2008 | 585.25 | February 28, 2008 | |
| February 29, 2008 | 571.95 | February 29, 2008 | 568 |
| March 3, 2008 | 581.2 | March 3, 2008 | 577 |
| March 4, 2008 | 565.45 | March 4, 2008 | 588 |
| March 5, 2008 | 559.55 | March 5, 2008 | 532 |
| March 6, 2008 | 525.3 | March 6, 2008 | |
| March 7, 2008 | 491.8 | March 7, 2008 | |
| March 10, 2008 | 480.95 | March 10, 2008 | 463 |
| March 11, 2008 | 496.25 | March 11, 2008 | |
| March 12, 2008 | 507.55 | March 12, 2008 | |
| March 13, 2008 | 513.2 | March 13, 2008 | 514 |
| March 14, 2008 | 511.7 | March 14, 2008 | |
| March 17, 2008 | 482.6 | March 17, 2008 | |
| March 18, 2008 | 487.3 | March 18, 2008 | |
| March 19, 2008 | 462.1 | March 19, 2008 | |
| March 20, 2008 | 444.75 | March 20, 2008 | 425 |
| March 21, 2008 | | March 21, 2008 | |
| March 24, 2008 | 435.1 | March 24, 2008 | |
| March 25, 2008 | 461.85 | March 25, 2008 | |

| | futures | | physical |
|---|---|---|---|
| March 26, 2008 | 458.4 | March 26, 2008 | |
| March 27, 2008 | 452.5 | March 27, 2008 | |
| March 28, 2008 | 454.9 | March 28, 2008 | |
| March 31, 2008 | 450.2 | March 31, 2008 | 445 |

## Platinum Class Period Market Prices

| | physical | | futures |
|---|---|---|---|
| November 1, 2007 | 1448 | November 1, 2007 | 1450.8 |
| November 2, 2007 | 1439 | November 2, 2007 | 1462.7 |
| November 5, 2007 | 1458 | November 5, 2007 | 1466.5 |
| November 6, 2007 | 1476 | November 6, 2007 | 1483.7 |
| November 7, 2007 | | November 7, 2007 | 1462.3 |
| November 8, 2007 | | November 8, 2007 | 1473.6 |
| November 9, 2007 | 1434 | November 9, 2007 | 1426 |
| November 12, 2007 | 1389 | November 12, 2007 | 1390.8 |
| November 13, 2007 | 1400 | November 13, 2007 | 1412.3 |
| November 14, 2007 | 1440 | November 14, 2007 | 1446.1 |
| November 15, 2007 | | November 15, 2007 | 1425.4 |
| November 16, 2007 | 1450 | November 16, 2007 | 1453.2 |
| November 19, 2007 | | November 19, 2007 | 1457.1 |
| November 20, 2007 | | November 20, 2007 | 1469.7 |
| November 21, 2007 | 1469 | November 21, 2007 | 1467.2 |
| November 22, 2007 | | November 22, 2007 | |
| November 23, 2007 | | November 23, 2007 | 1480.5 |
| November 26, 2007 | **1484** | November 26, 2007 | 1468.6 |
| November 27, 2007 | | November 27, 2007 | 1453.5 |
| November 28, 2007 | 1420 | November 28, 2007 | 1438.3 |
| November 29, 2007 | | November 29, 2007 | 1439.5 |
| November 30, 2007 | 1440 | November 30, 2007 | 1444.1 |
| December 3, 2007 | 1450 | December 3, 2007 | 1461.4 |
| December 4, 2007 | | December 4, 2007 | 1472.3 |
| December 5, 2007 | 1472 | December 5, 2007 | 1468.3 |
| December 6, 2007 | 1458 | December 6, 2007 | 1470.2 |
| December 7, 2007 | | December 7, 2007 | 1462.2 |
| December 10, 2007 | | December 10, 2007 | 1466.3 |
| December 11, 2007 | | December 11, 2007 | 1467.3 |
| December 12, 2007 | 1470 | December 12, 2007 | 1479.8 |
| December 13, 2007 | 1478 | December 13, 2007 | 1471.6 |
| December 14, 2007 | 1462 | December 14, 2007 | 1479.2 |
| December 17, 2007 | 1502 | December 17, 2007 | 1503.6 |

| | | | |
|---|---|---|---|
| December 18, 2007 | 1510 | December 18, 2007 | 1515.3 |
| December 19, 2007 | | December 19, 2007 | 1523.8 |
| December 20, 2007 | | December 20, 2007 | 1517.5 |
| December 21, 2007 | | December 21, 2007 | 1536.3 |
| December 24, 2007 | 1526 | December 24, 2007 | 1536.2 |
| December 25, 2007 | | December 25, 2007 | |
| December 26, 2007 | | December 26, 2007 | 1549.3 |
| December 27, 2007 | **1544** | December 27, 2007 | 1538.8 |
| December 28, 2007 | | December 28, 2007 | 1540.5 |
| December 31, 2007 | 1530 | December 31, 2007 | 1528.4 |
| January 1, 2008 | | January 1, 2008 | |
| January 2, 2008 | 1541 | January 2, 2008 | 1547 |
| January 3, 2008 | | January 3, 2008 | 1541.8 |
| January 4, 2008 | | January 4, 2008 | 1539.1 |
| January 7, 2008 | 1529 | January 7, 2008 | 1524.2 |
| January 8, 2008 | 1543 | January 8, 2008 | 1553.6 |
| January 9, 2008 | 1555 | January 9, 2008 | 1552.9 |
| January 10, 2008 | 1538 | January 10, 2008 | 1558.3 |
| January 11, 2008 | | January 11, 2008 | 1568.2 |
| January 14, 2008 | 1589 | January 14, 2008 | 1582.8 |
| January 15, 2008 | | January 15, 2008 | 1592.5 |
| January 16, 2008 | | January 16, 2008 | 1570.6 |
| January 17, 2008 | | January 17, 2008 | 1569.3 |
| January 18, 2008 | | January 18, 2008 | 1566.5 |
| January 21, 2008 | | January 21, 2008 | |
| January 22, 2008 | 1522 | January 22, 2008 | 1547.6 |
| January 23, 2008 | 1546 | January 23, 2008 | 1557.5 |
| January 24, 2008 | 1580 | January 24, 2008 | 1614.9 |
| January 25, 2008 | 1681 | January 25, 2008 | 1680.7 |
| January 28, 2008 | | January 28, 2008 | 1752.2 |
| January 29, 2008 | 1716 | January 29, 2008 | 1736.9 |
| January 30, 2008 | | January 30, 2008 | 1687.4 |
| January 31, 2008 | **1731** | January 31, 2008 | 1737.4 |
| February 1, 2008 | 1741 | February 1, 2008 | 1770.2 |
| February 4, 2008 | | February 4, 2008 | 1797.6 |
| February 5, 2008 | 1808 | February 5, 2008 | 1785.5 |
| February 6, 2008 | 1813 | February 6, 2008 | 1819 |
| February 7, 2008 | 1852 | February 7, 2008 | 1851.4 |
| February 8, 2008 | 1860 | February 8, 2008 | 1884 |
| February 11, 2008 | 1924 | February 11, 2008 | 1939.4 |
| February 12, 2008 | 1951 | February 12, 2008 | 1921.8 |
| February 13, 2008 | 1907 | February 13, 2008 | 1983.7 |
| February 14, 2008 | 2010 | February 14, 2008 | 2005.9 |
| February 15, 2008 | 2060 | February 15, 2008 | 2063.7 |

| | | | |
|---|---|---|---|
| February 18, 2008 | | February 18, 2008 | |
| February 19, 2008 | 2260 | February 19, 2008 | 2153.1 |
| February 20, 2008 | 2073 | February 20, 2008 | 2138.8 |
| February 21, 2008 | 2180 | February 21, 2008 | 2188.2 |
| February 22, 2008 | | February 22, 2008 | 2167.8 |
| February 25, 2008 | | February 25, 2008 | 2153.5 |
| February 26, 2008 | | February 26, 2008 | 2155.9 |
| February 27, 2008 | | February 27, 2008 | 2152.3 |
| February 28, 2008 | 2093 | February 28, 2008 | 2154.8 |
| February 29, 2008 | **2150** | February 29, 2008 | 2180.7 |
| March 3, 2008 | 2174 | March 3, 2008 | 2241.6 |
| March 4, 2008 | **2276** | March 4, 2008 | 2267 |
| March 5, 2008 | 2189 | March 5, 2008 | 2276.1 |
| March 6, 2008 | 2249 | March 6, 2008 | 2200.8 |
| March 7, 2008 | | March 7, 2008 | 2041.7 |
| March 10, 2008 | 2039 | March 10, 2008 | 2039.1 |
| March 11, 2008 | | March 11, 2008 | 2052.4 |
| March 12, 2008 | | March 12, 2008 | 2070 |
| March 13, 2008 | 2100 | March 13, 2008 | 2097.5 |
| March 14, 2008 | 2100 | March 14, 2008 | 2076 |
| March 17, 2008 | 2000 | March 17, 2008 | 1973.4 |
| March 18, 2008 | | March 18, 2008 | 1968 |
| March 19, 2008 | | March 19, 2008 | 1887 |
| March 20, 2008 | 1823 | March 20, 2008 | 1877.3 |
| March 21, 2008 | | March 21, 2008 | |
| March 24, 2008 | 1954 | March 24, 2008 | 1889.2 |
| March 25, 2008 | | March 25, 2008 | 1985.9 |
| March 26, 2008 | | March 26, 2008 | 2012.6 |
| March 27, 2008 | | March 27, 2008 | 2043.7 |
| March 28, 2008 | | March 28, 2008 | 2037.8 |
| March 31, 2008 | 2040 | March 31, 2008 | 2024.4 |

# Exhibit C

| Trade Date | PL / PA | Contract | Moore VWAP | Sum Of Volume | Settlement Price | Moore VWAP - Settlement Price |
|---|---|---|---|---|---|---|
| 11/1/2007 | PA | December '07 | 376.228 | 25 | 375.9 | 0.328 |
| 11/5/2007 | PA | December '07 | 375.258 | 25 | 375.1 | 0.158 |
| 11/6/2007 | PA | December '07 | 380 | 50 | 379.7 | 0.3 |
| 11/7/2007 | PA | December '07 | 377.6 | 25 | 376.65 | 0.95 |
| 11/8/2007 | PA | December '07 | 377.8 | 25 | 377.5 | 0.3 |
| 11/9/2007 | PA | December '07 | 377 | 25 | 376.25 | 0.75 |
| 11/13/2007 | PA | December '07 | 374.5 | 50 | 373.5 | 1 |
| 11/14/2007 | PA | December '07 | 373.984 | 25 | 373.8 | 0.184 |
| 11/15/2007 | PA | December '07 | 371 | 25 | 370.95 | 0.05 |
| 11/20/2007 | PA | December '07 | 364.388 | 25 | 364.3 | 0.088 |
| 11/21/2007 | PA | March '08 | 365 | 25 | 362.95 | 2.05 |
| 11/23/2007 | PA | March '08 | 366.5 | 25 | 366.5 | 0 |
| 11/26/2007 | PA | March '08 | 365 | 25 | 364.25 | 0.75 |
| 11/27/2007 | PA | March '08 | 355 | 50 | 354.45 | 0.55 |
| 11/28/2007 | PA | March '08 | 351.9 | 50 | 351.5 | 0.4 |
| 11/30/2007 | PA | March '08 | 353.75 | 100 | 353.35 | 0.4 |
| 12/3/2007 | PA | March '08 | 352 | 25 | 351.65 | 0.35 |
| 12/4/2007 | PA | March '08 | 353.42 | 25 | 353.4 | 0.02 |
| 12/5/2007 | PA | March '08 | 355 | 50 | 354.45 | 0.55 |
| 12/6/2007 | PA | March '08 | 351.8 | 50 | 351.7 | 0.1 |
| 12/10/2007 | PA | March '08 | 349.5 | 50 | 349.35 | 0.15 |
| 12/12/2007 | PA | March '08 | 352.89 | 50 | 352.45 | 0.44 |
| 12/13/2007 | PA | March '08 | 351.9 | 50 | 351.8 | 0.1 |
| 12/14/2007 | PA | March '08 | 357.8 | 50 | 357.4 | 0.4 |
| 12/17/2007 | PA | March '08 | 362 | 50 | 361.35 | 0.65 |
| 12/18/2007 | PA | March '08 | 363 | 50 | 362.95 | 0.05 |
| 12/21/2007 | PA | March '08 | 361.75 | 50 | 361.15 | 0.6 |
| 12/24/2007 | PA | March '08 | 363.9 | 50 | 363.4 | 0.5 |
| 12/26/2007 | PA | March '08 | 368.5 | 50 | 368.3 | 0.2 |
| 12/27/2007 | PA | March '08 | 368.5 | 50 | 368.35 | 0.15 |
| 12/28/2007 | PA | March '08 | 370.92 | 50 | 370.05 | 0.87 |
| 12/31/2007 | PA | March '08 | 379 | 100 | 378.2 | 0.8 |

| Trade Date | PL / PA | Contract | Moore VWAP | Sum Of Volume | Settlement Price | Moore VWAP - Settlement Price |
|---|---|---|---|---|---|---|
| 1/2/2008 | PA | March '08 | 380 | 50 | 379.9 | 0.1 |
| 1/3/2008 | PA | March '08 | 379.99 | 50 | 379.65 | 0.34 |
| 1/4/2008 | PA | March '08 | 377.99 | 50 | 377.75 | 0.24 |
| 1/7/2008 | PA | March '08 | 376.984 | 50 | 376.85 | 0.134 |
| 1/8/2008 | PA | March '08 | 381.9 | 50 | 381.8 | 0.1 |
| 1/9/2008 | PA | March '08 | 383 | 50 | 382.6 | 0.4 |
| 1/10/2008 | PA | March '08 | 381 | 50 | 380.8 | 0.2 |
| 1/11/2008 | PA | March '08 | 381.5 | 50 | 381.3 | 0.2 |
| 1/14/2008 | PA | March '08 | 387.94 | 100 | 387.45 | 0.49 |
| 1/15/2008 | PA | March '08 | 384.75 | 50 | 384.5 | 0.25 |
| 1/17/2008 | PA | March '08 | 377 | 100 | 376.25 | 0.75 |
| 1/18/2008 | PA | March '08 | 375.5 | 100 | 375.05 | 0.45 |
| 1/22/2008 | PA | March '08 | 371.75 | 50 | 371.1 | 0.65 |
| 1/23/2008 | PA | March '08 | 369.75 | 50 | 369.45 | 0.3 |
| 1/24/2008 | PA | March '08 | 376.5 | 100 | 376.05 | 0.45 |
| 1/25/2008 | PA | March '08 | 386 | 100 | 385.45 | 0.55 |
| 1/28/2008 | PA | March '08 | 392 | 100 | 391.35 | 0.65 |
| 1/29/2008 | PA | March '08 | 393.8 | 100 | 393.3 | 0.5 |
| 2/4/2008 | PA | March '08 | 431.79 | 50 | 431 | 0.79 |
| 2/5/2008 | PA | March '08 | 423.99 | 50 | 423.1 | 0.89 |
| 2/6/2008 | PA | March '08 | 423.508 | 100 | 423.45 | 0.058 |
| 2/7/2008 | PA | March '08 | 429 | 50 | 428.45 | 0.55 |
| 2/8/2008 | PA | March '08 | 441.49 | 100 | 440.85 | 0.64 |
| 2/11/2008 | PA | March '08 | 443.4 | 50 | 443.4 | 0 |
| 2/12/2008 | PA | March '08 | 434 | 50 | 431.5 | 2.5 |
| 2/13/2008 | PA | March '08 | 440 | 50 | 439.05 | 0.95 |
| 2/14/2008 | PA | March '08 | 441.78 | 100 | 441.15 | 0.63 |
| 2/15/2008 | PA | March '08 | 455.6 | 100 | 451.7 | 3.9 |
| 2/19/2008 | PA | March '08 | 501.9 | 100 | 499.3 | 2.6 |
| 2/20/2008 | PA | March '08 | 494.8 | 100 | 494.2 | 0.6 |
| 2/21/2008 | PA | March '08 | 515.8 | 100 | 515.5 | 0.3 |
| 2/22/2008 | PA | March '08 | 516.96 | 100 | 515.85 | 1.11 |

| Trade Date | PL / PA | Contract | Moore VWAP | Sum Of Volume | Settlement Price | Moore VWAP - Settlement Price |
|---|---|---|---|---|---|---|
| 2/25/2008 | PA | March '08 | 524.845 | 100 | 524.7 | 0.145 |
| 2/26/2008 | PA | March '08 | 536.85 | 100 | 536.35 | 0.5 |
| 2/27/2008 | PA | June '08 | 560.89 | 100 | 560.75 | 0.14 |
| 2/29/2008 | PA | June '08 | 577.9 | 100 | 576.65 | 1.25 |
| 3/3/2008 | PA | June '08 | 587 | 100 | 585.7 | 1.3 |
| 3/4/2008 | PA | June '08 | 574.7 | 100 | 570.45 | 4.25 |
| 3/5/2008 | PA | June '08 | 564 | 100 | 563.6 | 0.4 |
| 3/6/2008 | PA | June '08 | 532.92 | 100 | 529.2 | 3.72 |
| 3/7/2008 | PA | June '08 | 500.2473333 | 75 | 495 | 5.247333333 |
| 3/10/2008 | PA | June '08 | 487.84 | 100 | 484.15 | 3.69 |
| 3/11/2008 | PA | June '08 | 504.5 | 50 | 500.05 | 4.45 |
| 3/12/2008 | PA | June '08 | 511.75 | 50 | 510.9 | 0.85 |
| 3/14/2008 | PA | June '08 | 514.82 | 100 | 514.4 | 0.42 |
| 3/17/2008 | PA | June '08 | 489.83 | 100 | 485.3 | 4.53 |
| 3/20/2008 | PA | June '08 | 447.987 | 100 | 446.05 | 1.937 |
| 3/24/2008 | PA | June '08 | 437 | 50 | 436.4 | 0.6 |
| 3/25/2008 | PA | June '08 | 466 | 100 | 463.15 | 2.85 |
| 3/26/2008 | PA | June '08 | 459.975 | 100 | 459.7 | 0.275 |
| 3/28/2008 | PA | June '08 | 458 | 50 | 454.9 | 3.1 |
| 3/31/2008 | PA | June '08 | 451.6827869 | 122 | 450.2 | 1.482786885 |
| 4/1/2008 | PA | June '08 | 449.977 | 100 | 448.6 | 1.377 |
| 4/2/2008 | PA | June '08 | 444.985 | 100 | 443.75 | 1.235 |
| 4/3/2008 | PA | June '08 | 449.851 | 100 | 447.4 | 2.451 |
| 4/4/2008 | PA | June '08 | 444.4295 | 100 | 444.4 | 0.0295 |
| 4/7/2008 | PA | June '08 | 458.5 | 50 | 457.15 | 1.35 |
| 4/9/2008 | PA | June '08 | 463.5 | 50 | 463.2 | 0.3 |
| 4/10/2008 | PA | June '08 | 468.98 | 100 | 468.75 | 0.23 |
| 4/11/2008 | PA | June '08 | 475.5 | 50 | 475.35 | 0.15 |
| 4/14/2008 | PA | June '08 | 463 | 50 | 462.8 | 0.2 |
| 4/15/2008 | PA | June '08 | 453.8 | 50 | 453.75 | 0.05 |
| 4/16/2008 | PA | June '08 | 460 | 50 | 460 | 0 |
| 4/17/2008 | PA | June '08 | 461.704 | 50 | 461.2 | 0.504 |

| Trade Date | PL / PA | Contract | Moore VWAP | Sum Of Volume | Settlement Price | Moore VWAP - Settlement Price |
|---|---|---|---|---|---|---|
| 4/18/2008 | PA | June '08 | 475 | 100 | 473.4 | 1.6 |
| 4/21/2008 | PA | June '08 | 463.75 | 50 | 462.5 | 1.25 |
| 4/22/2008 | PA | June '08 | 463.8 | 50 | 463.4 | 0.4 |
| 4/25/2008 | PA | June '08 | 449.5 | 75 | 448.95 | 0.55 |
| 4/29/2008 | PA | June '08 | 432 | 100 | 431.65 | 0.35 |
| 4/30/2008 | PA | June '08 | 424 | 25 | 422.75 | 1.25 |
| 5/1/2008 | PA | June '08 | 416 | 50 | 415.5 | 0.5 |
| 5/2/2008 | PA | June '08 | 420.8 | 50 | 420 | 0.8 |
| 5/5/2008 | PA | June '08 | 424.75 | 50 | 424.45 | 0.3 |
| 5/6/2008 | PA | June '08 | 431.75 | 100 | 431.4 | 0.35 |
| 5/7/2008 | PA | June '08 | 426 | 50 | 425.75 | 0.25 |
| 5/8/2008 | PA | June '08 | 436 | 50 | 435.9 | 0.1 |
| 5/9/2008 | PA | June '08 | 444 | 50 | 443.85 | 0.15 |
| 5/12/2008 | PA | June '08 | 448.8 | 50 | 446.8 | 2 |
| 5/13/2008 | PA | June '08 | 441 | 100 | 440.85 | 0.15 |
| 5/14/2008 | PA | June '08 | 438 | 75 | 437.7 | 0.3 |
| 5/15/2008 | PA | June '08 | 443 | 100 | 440.6 | 2.4 |
| 5/16/2008 | PA | June '08 | 453.75 | 100 | 453.3 | 0.45 |
| 5/19/2008 | PA | June '08 | 452 | 100 | 451.35 | 0.65 |
| 5/20/2008 | PA | June '08 | 451 | 100 | 450.25 | 0.75 |
| 5/21/2008 | PA | June '08 | 465 | 100 | 463.2 | 1.8 |

# Exhibit D

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Settlement Price | Moore Purchase Price - Settlement Price |
|---|---|---|---|---|---|---|
| 11/01/07 | PA | December '07 | 375.9 | 5 | 375.9 | 0 |
| 11/01/07 | PA | December '07 | 375.95 | 1 | 375.9 | 0.05 |
| 11/01/07 | PA | December '07 | 376 | 5 | 375.9 | 0.1 |
| 11/01/07 | PA | December '07 | 376.85 | 2 | 375.9 | 0.95 |
| 11/01/07 | PA | December '07 | 377 | 2 | 375.9 | 1.1 |
| 11/01/07 | PA | December '07 | 377.9 | 2 | 375.9 | 2 |
| 11/01/07 | PA | December '07 | 377.95 | 1 | 375.9 | 2.05 |
| 11/05/07 | PA | December '07 | 375.5 | 12 | 375.1 | 0.4 |
| 11/05/07 | PA | December '07 | 375.85 | 1 | 375.1 | 0.75 |
| 11/06/07 | PA | December '07 | 380 | 50 | 379.7 | 0.3 |
| 11/07/07 | PA | December '07 | 378 | 20 | 376.65 | 1.35 |
| 11/08/07 | PA | December '07 | 377.8 | 25 | 377.5 | 0.3 |
| 11/09/07 | PA | December '07 | 377 | 25 | 376.25 | 0.75 |
| 11/13/07 | PA | December '07 | 374.5 | 50 | 373.5 | 1 |
| 11/14/07 | PA | December '07 | 373.9 | 4 | 373.8 | 0.1 |
| 11/14/07 | PA | December '07 | 374 | 21 | 373.8 | 0.2 |
| 11/15/07 | PA | December '07 | 371 | 25 | 370.95 | 0.05 |
| 11/20/07 | PA | December '07 | 364.5 | 21 | 364.3 | 0.2 |
| 11/21/07 | PA | March '08 | 365 | 25 | 362.95 | 2.05 |
| 11/23/07 | PA | March '08 | 366.5 | 25 | 366.5 | 0 |
| 11/26/07 | PA | March '08 | 365 | 25 | 364.25 | 0.75 |
| 11/27/07 | PA | March '08 | 355 | 50 | 354.45 | 0.55 |
| 11/28/07 | PA | March '08 | 352 | 45 | 351.5 | 0.5 |
| 11/30/07 | PA | March '08 | 353.75 | 100 | 353.35 | 0.4 |
| 12/03/07 | PA | March '08 | 352 | 25 | 351.65 | 0.35 |
| 12/04/07 | PA | March '08 | 353.5 | 21 | 353.4 | 0.1 |
| 12/05/07 | PA | March '08 | 355 | 50 | 354.45 | 0.55 |
| 12/06/07 | PA | March '08 | 351.8 | 50 | 351.7 | 0.1 |
| 12/10/07 | PA | March '08 | 349.5 | 50 | 349.35 | 0.15 |
| 12/12/07 | PA | March '08 | 352.9 | 5 | 352.45 | 0.45 |
| 12/12/07 | PA | March '08 | 353 | 40 | 352.45 | 0.55 |
| 12/13/07 | PA | March '08 | 351.9 | 50 | 351.8 | 0.1 |
| 12/14/07 | PA | March '08 | 357.8 | 50 | 357.4 | 0.4 |
| 12/17/07 | PA | March '08 | 362 | 50 | 361.35 | 0.65 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Settlement Price | Moore Purchase Price - Settlement Price |
|---|---|---|---|---|---|---|
| 12/18/07 | PA | March '08 | 363 | 50 | 362.95 | 0.05 |
| 12/21/07 | PA | March '08 | 361.75 | 50 | 361.15 | 0.6 |
| 12/24/07 | PA | March '08 | 364 | 45 | 363.4 | 0.6 |
| 12/26/07 | PA | March '08 | 368.5 | 50 | 368.3 | 0.2 |
| 12/27/07 | PA | March '08 | 368.5 | 50 | 368.35 | 0.15 |
| 12/28/07 | PA | March '08 | 370.8 | 20 | 370.05 | 0.75 |
| 12/28/07 | PA | March '08 | 371 | 30 | 370.05 | 0.95 |
| 12/31/07 | PA | March '08 | 379 | 100 | 378.2 | 0.8 |
| 01/02/08 | PA | March '08 | 380 | 50 | 379.9 | 0.1 |
| 01/03/08 | PA | March '08 | 379.9 | 5 | 379.65 | 0.25 |
| 01/03/08 | PA | March '08 | 380 | 45 | 379.65 | 0.35 |
| 01/04/08 | PA | March '08 | 377.9 | 5 | 377.75 | 0.15 |
| 01/04/08 | PA | March '08 | 378 | 45 | 377.75 | 0.25 |
| 01/07/08 | PA | March '08 | 377 | 46 | 376.85 | 0.15 |
| 01/08/08 | PA | March '08 | 381.9 | 50 | 381.8 | 0.1 |
| 01/09/08 | PA | March '08 | 383 | 50 | 382.6 | 0.4 |
| 01/10/08 | PA | March '08 | 381 | 50 | 380.8 | 0.2 |
| 01/11/08 | PA | March '08 | 381.5 | 50 | 381.3 | 0.2 |
| 01/14/08 | PA | March '08 | 387.8 | 5 | 387.45 | 0.35 |
| 01/14/08 | PA | March '08 | 388 | 90 | 387.45 | 0.55 |
| 01/15/08 | PA | March '08 | 384.75 | 50 | 384.5 | 0.25 |
| 01/17/08 | PA | March '08 | 377 | 100 | 376.25 | 0.75 |
| 01/18/08 | PA | March '08 | 375.5 | 100 | 375.05 | 0.45 |
| 01/22/08 | PA | March '08 | 371.75 | 50 | 371.1 | 0.65 |
| 01/23/08 | PA | March '08 | 369.75 | 50 | 369.45 | 0.3 |
| 01/24/08 | PA | March '08 | 376.5 | 100 | 376.05 | 0.45 |
| 01/25/08 | PA | March '08 | 386 | 100 | 385.45 | 0.55 |
| 01/28/08 | PA | March '08 | 392 | 100 | 391.35 | 0.65 |
| 01/29/08 | PA | March '08 | 393.8 | 100 | 393.3 | 0.5 |
| 02/04/08 | PA | March '08 | 431 | 10 | 431 | 0 |
| 02/04/08 | PA | March '08 | 431.9 | 5 | 431 | 0.9 |
| 02/04/08 | PA | March '08 | 432 | 35 | 431 | 1 |
| 02/05/08 | PA | March '08 | 423.9 | 5 | 423.1 | 0.8 |
| 02/05/08 | PA | March '08 | 424 | 45 | 423.1 | 0.9 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Settlement Price | Moore Purchase Price - Settlement Price |
|---|---|---|---|---|---|---|
| 02/06/08 | PA | March '08 | 423.5 | 92 | 423.45 | 0.05 |
| 02/06/08 | PA | March '08 | 423.6 | 8 | 423.45 | 0.15 |
| 02/07/08 | PA | March '08 | 429 | 50 | 428.45 | 0.55 |
| 02/08/08 | PA | March '08 | 441.4 | 10 | 440.85 | 0.55 |
| 02/08/08 | PA | March '08 | 441.5 | 90 | 440.85 | 0.65 |
| 02/11/08 | PA | March '08 | 443.4 | 50 | 443.4 | 0 |
| 02/12/08 | PA | March '08 | 434 | 50 | 431.5 | 2.5 |
| 02/13/08 | PA | March '08 | 440 | 50 | 439.05 | 0.95 |
| 02/14/08 | PA | March '08 | 442 | 89 | 441.15 | 0.85 |
| 02/15/08 | PA | March '08 | 456 | 95 | 451.7 | 4.3 |
| 02/19/08 | PA | March '08 | 500 | 5 | 499.3 | 0.7 |
| 02/19/08 | PA | March '08 | 502 | 95 | 499.3 | 2.7 |
| 02/20/08 | PA | March '08 | 495 | 85 | 494.2 | 0.8 |
| 02/21/08 | PA | March '08 | 516 | 90 | 515.5 | 0.5 |
| 02/22/08 | PA | March '08 | 517 | 98 | 515.85 | 1.15 |
| 02/25/08 | PA | March '08 | 524.9 | 5 | 524.7 | 0.2 |
| 02/25/08 | PA | March '08 | 525 | 85 | 524.7 | 0.3 |
| 02/26/08 | PA | March '08 | 537 | 95 | 536.35 | 0.65 |
| 02/27/08 | PA | June '08 | 560.9 | 10 | 560.75 | 0.15 |
| 02/27/08 | PA | June '08 | 561 | 80 | 560.75 | 0.25 |
| 02/29/08 | PA | June '08 | 577.9 | 100 | 576.65 | 1.25 |
| 03/03/08 | PA | June '08 | 587 | 100 | 585.7 | 1.3 |
| 03/04/08 | PA | June '08 | 574.7 | 100 | 570.45 | 4.25 |
| 03/05/08 | PA | June '08 | 564 | 100 | 563.6 | 0.4 |
| 03/06/08 | PA | June '08 | 533 | 99 | 529.2 | 3.8 |
| 03/07/08 | PA | June '08 | 497 | 22 | 495 | 2 |
| 03/07/08 | PA | June '08 | 502 | 50 | 495 | 7 |
| 03/10/08 | PA | June '08 | 488 | 98 | 484.15 | 3.85 |
| 03/11/08 | PA | June '08 | 504.5 | 50 | 500.05 | 4.45 |
| 03/12/08 | PA | June '08 | 511.75 | 50 | 510.9 | 0.85 |
| 03/14/08 | PA | June '08 | 515 | 94 | 514.4 | 0.6 |
| 03/17/08 | PA | June '08 | 489 | 2 | 485.3 | 3.7 |
| 03/17/08 | PA | June '08 | 490 | 95 | 485.3 | 4.7 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Settlement Price | Moore Purchase Price - Settlement Price |
|---|---|---|---|---|---|---|
| 03/20/08 | PA | June '08 | 446.7 | 1 | 446.05 | 0.65 |
| 03/20/08 | PA | June '08 | 448 | 99 | 446.05 | 1.95 |
| 03/24/08 | PA | June '08 | 437 | 50 | 436.4 | 0.6 |
| 03/25/08 | PA | June '08 | 466 | 100 | 463.15 | 2.85 |
| 03/26/08 | PA | June '08 | 459.9 | 25 | 459.7 | 0.2 |
| 03/26/08 | PA | June '08 | 460 | 75 | 459.7 | 0.3 |
| 03/28/08 | PA | June '08 | 458 | 50 | 454.9 | 3.1 |
| 03/31/08 | PA | June '08 | 453.5 | 100 | 450.2 | 3.3 |
| 04/01/08 | PA | June '08 | 448.7 | 1 | 448.6 | 0.1 |
| 04/01/08 | PA | June '08 | 449.9 | 10 | 448.6 | 1.3 |
| 04/01/08 | PA | June '08 | 450 | 89 | 448.6 | 1.4 |
| 04/02/08 | PA | June '08 | 444.5 | 3 | 443.75 | 0.75 |
| 04/02/08 | PA | June '08 | 445 | 97 | 443.75 | 1.25 |
| 04/03/08 | PA | June '08 | 449.7 | 1 | 447.4 | 2.3 |
| 04/03/08 | PA | June '08 | 450 | 95 | 447.4 | 2.6 |
| 04/04/08 | PA | June '08 | 444.5 | 12 | 444.4 | 0.1 |
| 04/04/08 | PA | June '08 | 445 | 50 | 444.4 | 0.6 |
| 04/07/08 | PA | June '08 | 458.5 | 50 | 457.15 | 1.35 |
| 04/09/08 | PA | June '08 | 463.5 | 50 | 463.2 | 0.3 |
| 04/10/08 | PA | June '08 | 469 | 98 | 468.75 | 0.25 |
| 04/11/08 | PA | June '08 | 475.5 | 50 | 475.35 | 0.15 |
| 04/14/08 | PA | June '08 | 463 | 50 | 462.8 | 0.2 |
| 04/15/08 | PA | June '08 | 454 | 40 | 453.75 | 0.25 |
| 04/16/08 | PA | June '08 | 460 | 50 | 460 | 0 |
| 04/17/08 | PA | June '08 | 461.75 | 35 | 461.2 | 0.55 |
| 04/17/08 | PA | June '08 | 461.75 | 12 | 461.2 | 0.55 |
| 04/18/08 | PA | June '08 | 475 | 100 | 473.4 | 1.6 |
| 04/21/08 | PA | June '08 | 463.75 | 50 | 462.5 | 1.25 |
| 04/22/08 | PA | June '08 | 463.8 | 50 | 463.4 | 0.4 |
| 04/25/08 | PA | June '08 | 449.5 | 75 | 448.95 | 0.55 |
| 04/29/08 | PA | June '08 | 432 | 100 | 431.65 | 0.35 |
| 04/30/08 | PA | June '08 | 424 | 25 | 422.75 | 1.25 |
| 05/01/08 | PA | June '08 | 416 | 50 | 415.5 | 0.5 |
| 05/02/08 | PA | June '08 | 420.8 | 50 | 420 | 0.8 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Settlement Price | Moore Purchase Price - Settlement Price |
|---|---|---|---|---|---|---|
| 05/05/08 | PA | June '08 | 424.75 | 50 | 424.45 | 0.3 |
| 05/06/08 | PA | June '08 | 431.75 | 100 | 431.4 | 0.35 |
| 05/07/08 | PA | June '08 | 426 | 50 | 425.75 | 0.25 |
| 05/08/08 | PA | June '08 | 436 | 50 | 435.9 | 0.1 |
| 05/09/08 | PA | June '08 | 444 | 50 | 443.85 | 0.15 |
| 05/12/08 | PA | June '08 | 448.8 | 50 | 446.8 | 2 |
| 05/13/08 | PA | June '08 | 441 | 100 | 440.85 | 0.15 |
| 05/14/08 | PA | June '08 | 438 | 75 | 437.7 | 0.3 |
| 05/15/08 | PA | June '08 | 443 | 100 | 440.6 | 2.4 |
| 05/16/08 | PA | June '08 | 453.75 | 100 | 453.3 | 0.45 |
| 05/19/08 | PA | June '08 | 452 | 100 | 451.35 | 0.65 |
| 05/20/08 | PA | June '08 | 451 | 100 | 450.25 | 0.75 |
| 05/21/08 | PA | June '08 | 465 | 100 | 463.2 | 1.8 |

# Exhibit E

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | High Price During Closing Period | Moore Purchase Price - High Price During Close |
|---|---|---|---|---|---|---|
| 11/01/07 | PA | December '07 | 377.95 | 1 | 377.95 | 0 |
| 11/05/07 | PA | December '07 | 375.85 | 1 | 375.85 | 0 |
| 11/06/07 | PA | December '07 | 380 | 50 | 380 | 0 |
| 11/07/07 | PA | December '07 | 378 | 20 | 376.5 | 1.5 |
| 11/08/07 | PA | December '07 | 377.8 | 25 | 377 | 0.8 |
| 11/09/07 | PA | December '07 | 377 | 25 | 375.6 | 1.4 |
| 11/12/07 | PA | December '07 | 371.5 | 6 | 371.5 | 0 |
| 11/13/07 | PA | December '07 | 374.5 | 50 | 373.75 | 0.75 |
| 11/14/07 | PA | December '07 | 374 | 21 | 374 | 0 |
| 11/15/07 | PA | December '07 | 371 | 25 | 369.45 | 1.55 |
| 11/20/07 | PA | December '07 | 363.8 | 4 | 362.05 | 1.75 |
| 11/20/07 | PA | December '07 | 364.5 | 21 | 362.05 | 2.45 |
| 11/21/07 | PA | March '08 | 365 | 25 | 360.95 | 4.05 |
| 11/23/07 | PA | March '08 | 366.5 | 25 | 0 | 366.5 |
| 11/27/07 | PA | March '08 | 355 | 50 | 355 | 0 |
| 11/28/07 | PA | March '08 | 352 | 45 | 352 | 0 |
| 11/30/07 | PA | March '08 | 353.75 | 100 | 353.75 | 0 |
| 12/03/07 | PA | March '08 | 352 | 25 | 351 | 1 |
| 12/04/07 | PA | March '08 | 353.5 | 21 | 353.5 | 0 |
| 12/05/07 | PA | March '08 | 355 | 50 | 354 | 1 |
| 12/06/07 | PA | March '08 | 351.8 | 50 | 351.8 | 0 |
| 12/10/07 | PA | March '08 | 349.5 | 50 | 349 | 0.5 |
| 12/12/07 | PA | March '08 | 352 | 5 | 352 | 0 |
| 12/12/07 | PA | March '08 | 352.9 | 5 | 352 | 0.9 |
| 12/12/07 | PA | March '08 | 353 | 40 | 352 | 1 |
| 12/13/07 | PA | March '08 | 351.9 | 50 | 350.2 | 1.7 |
| 12/14/07 | PA | March '08 | 357.8 | 50 | 357 | 0.8 |
| 12/17/07 | PA | March '08 | 362 | 50 | 358.25 | 3.75 |
| 12/18/07 | PA | March '08 | 363 | 50 | 362 | 1 |
| 12/21/07 | PA | March '08 | 361.75 | 50 | 359.4 | 2.35 |
| 12/24/07 | PA | March '08 | 363 | 5 | 0 | 363 |
| 12/24/07 | PA | March '08 | 364 | 45 | 0 | 364 |
| 12/26/07 | PA | March '08 | 368.5 | 50 | 368.45 | 0.05 |
| 12/28/07 | PA | March '08 | 370.8 | 20 | 369.9 | 0.9 |
| 12/28/07 | PA | March '08 | 371 | 30 | 369.9 | 1.1 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | High Price During Closing Period | Moore Purchase Price - High Price During Close |
|---|---|---|---|---|---|---|
| 12/31/07 | PA | March '08 | 379 | 100 | 377.75 | 1.25 |
| 01/02/08 | PA | March '08 | 380 | 50 | 379.5 | 0.5 |
| 01/03/08 | PA | March '08 | 379.9 | 5 | 378.8 | 1.1 |
| 01/03/08 | PA | March '08 | 380 | 45 | 378.8 | 1.2 |
| 01/04/08 | PA | March '08 | 377.9 | 5 | 0 | 377.9 |
| 01/04/08 | PA | March '08 | 378 | 45 | 0 | 378 |
| 01/07/08 | PA | March '08 | 376.8 | 4 | 376 | 0.8 |
| 01/07/08 | PA | March '08 | 377 | 46 | 376 | 1 |
| 01/08/08 | PA | March '08 | 381.9 | 50 | 378 | 3.9 |
| 01/09/08 | PA | March '08 | 383 | 50 | 381.5 | 1.5 |
| 01/10/08 | PA | March '08 | 381 | 50 | 379.15 | 1.85 |
| 01/11/08 | PA | March '08 | 381.5 | 50 | 380.75 | 0.75 |
| 01/14/08 | PA | March '08 | 388 | 90 | 388 | 0 |
| 01/15/08 | PA | March '08 | 384.75 | 50 | 384.75 | 0 |
| 01/17/08 | PA | March '08 | 377 | 100 | 373.5 | 3.5 |
| 01/18/08 | PA | March '08 | 375.5 | 100 | 372.95 | 2.55 |
| 01/22/08 | PA | March '08 | 371.75 | 50 | 370 | 1.75 |
| 01/23/08 | PA | March '08 | 369.75 | 50 | 368.9 | 0.85 |
| 01/24/08 | PA | March '08 | 376.5 | 100 | 373.95 | 2.55 |
| 01/25/08 | PA | March '08 | 386 | 100 | 384.5 | 1.5 |
| 01/28/08 | PA | March '08 | 392 | 100 | 390 | 2 |
| 01/29/08 | PA | March '08 | 393.8 | 100 | 393.5 | 0.3 |
| 02/04/08 | PA | March '08 | 431 | 10 | 431 | 0 |
| 02/04/08 | PA | March '08 | 431.9 | 5 | 431 | 0.9 |
| 02/04/08 | PA | March '08 | 432 | 35 | 431 | 1 |
| 02/05/08 | PA | March '08 | 423.9 | 5 | 423 | 0.9 |
| 02/05/08 | PA | March '08 | 424 | 45 | 423 | 1 |
| 02/06/08 | PA | March '08 | 423.5 | 92 | 421.95 | 1.55 |
| 02/06/08 | PA | March '08 | 423.6 | 8 | 421.95 | 1.65 |
| 02/07/08 | PA | March '08 | 429 | 50 | 429 | 0 |
| 02/08/08 | PA | March '08 | 441.5 | 90 | 441.5 | 0 |
| 02/11/08 | PA | March '08 | 443.4 | 50 | 442.6 | 0.8 |
| 02/12/08 | PA | March '08 | 434 | 50 | 434 | 0 |
| 02/13/08 | PA | March '08 | 440 | 50 | 438 | 2 |
| 02/14/08 | PA | March '08 | 440 | 11 | 437.75 | 2.25 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | High Price During Closing Period | Moore Purchase Price - High Price During Close |
|---|---|---|---|---|---|---|
| 02/14/08 | PA | March '08 | 442 | 89 | 437.75 | 4.25 |
| 02/15/08 | PA | March '08 | 448 | 5 | 445 | 3 |
| 02/15/08 | PA | March '08 | 456 | 95 | 445 | 11 |
| 02/19/08 | PA | March '08 | 500 | 5 | 498 | 2 |
| 02/19/08 | PA | March '08 | 502 | 95 | 498 | 4 |
| 02/20/08 | PA | March '08 | 493 | 5 | 492 | 1 |
| 02/20/08 | PA | March '08 | 494 | 10 | 492 | 2 |
| 02/20/08 | PA | March '08 | 495 | 85 | 492 | 3 |
| 02/21/08 | PA | March '08 | 514 | 10 | 514 | 0 |
| 02/21/08 | PA | March '08 | 516 | 90 | 514 | 2 |
| 02/22/08 | PA | March '08 | 515 | 2 | 511.6 | 3.4 |
| 02/22/08 | PA | March '08 | 517 | 98 | 511.6 | 5.4 |
| 02/25/08 | PA | March '08 | 523 | 5 | 522.95 | 0.05 |
| 02/25/08 | PA | March '08 | 524 | 5 | 522.95 | 1.05 |
| 02/25/08 | PA | March '08 | 524.9 | 5 | 522.95 | 1.95 |
| 02/25/08 | PA | March '08 | 525 | 85 | 522.95 | 2.05 |
| 02/26/08 | PA | March '08 | 537 | 95 | 535 | 2 |
| 02/27/08 | PA | June '08 | 560 | 10 | 559.25 | 0.75 |
| 02/27/08 | PA | June '08 | 560.9 | 10 | 559.25 | 1.65 |
| 02/27/08 | PA | June '08 | 561 | 80 | 559.25 | 1.75 |
| 02/29/08 | PA | June '08 | 577.9 | 100 | 576 | 1.9 |
| 03/03/08 | PA | June '08 | 587 | 100 | 583 | 4 |
| 03/04/08 | PA | June '08 | 574.7 | 100 | 565 | 9.7 |
| 03/05/08 | PA | June '08 | 564 | 100 | 562 | 2 |
| 03/06/08 | PA | June '08 | 525 | 1 | 524.75 | 0.25 |
| 03/06/08 | PA | June '08 | 533 | 99 | 524.75 | 8.25 |
| 03/07/08 | PA | June '08 | 497 | 22 | 497 | 0 |
| 03/07/08 | PA | June '08 | 502 | 50 | 497 | 5 |
| 03/10/08 | PA | June '08 | 488 | 98 | 480.9 | 7.1 |
| 03/11/08 | PA | June '08 | 504.5 | 50 | 498.05 | 6.45 |
| 03/12/08 | PA | June '08 | 511.75 | 50 | 509.05 | 2.7 |
| 03/14/08 | PA | June '08 | 512 | 6 | 510.7 | 1.3 |
| 03/14/08 | PA | June '08 | 515 | 94 | 510.7 | 4.3 |
| 03/17/08 | PA | June '08 | 485 | 3 | 484 | 1 |
| 03/17/08 | PA | June '08 | 489 | 2 | 484 | 5 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | High Price During Closing Period | Moore Purchase Price - High Price During Close |
|---|---|---|---|---|---|---|
| 03/17/08 | PA | June '08 | 490 | 95 | 484 | 6 |
| 03/20/08 | PA | June '08 | 446.7 | 1 | 444.95 | 1.75 |
| 03/20/08 | PA | June '08 | 448 | 99 | 444.95 | 3.05 |
| 03/24/08 | PA | June '08 | 437 | 50 | 434.5 | 2.5 |
| 03/25/08 | PA | June '08 | 466 | 100 | 454.9 | 11.1 |
| 03/26/08 | PA | June '08 | 459.9 | 25 | 454.75 | 5.15 |
| 03/26/08 | PA | June '08 | 460 | 75 | 454.75 | 5.25 |
| 03/28/08 | PA | June '08 | 458 | 50 | 453.8 | 4.2 |
| 03/31/08 | PA | June '08 | 453.5 | 100 | 445.7 | 7.8 |
| 04/01/08 | PA | June '08 | 448.7 | 1 | 445.95 | 2.75 |
| 04/01/08 | PA | June '08 | 449.9 | 10 | 445.95 | 3.95 |
| 04/01/08 | PA | June '08 | 450 | 89 | 445.95 | 4.05 |
| 04/02/08 | PA | June '08 | 444.5 | 3 | 443.25 | 1.25 |
| 04/02/08 | PA | June '08 | 445 | 97 | 443.25 | 1.75 |
| 04/03/08 | PA | June '08 | 444.7 | 1 | 443.5 | 1.2 |
| 04/03/08 | PA | June '08 | 446.7 | 1 | 443.5 | 3.2 |
| 04/03/08 | PA | June '08 | 447 | 2 | 443.5 | 3.5 |
| 04/03/08 | PA | June '08 | 449.7 | 1 | 443.5 | 6.2 |
| 04/03/08 | PA | June '08 | 450 | 95 | 443.5 | 6.5 |
| 04/04/08 | PA | June '08 | 445 | 50 | 445 | 0 |
| 04/07/08 | PA | June '08 | 458.5 | 50 | 455.25 | 3.25 |
| 04/09/08 | PA | June '08 | 463.5 | 50 | 461.8 | 1.7 |
| 04/10/08 | PA | June '08 | 468 | 2 | 468 | 0 |
| 04/10/08 | PA | June '08 | 469 | 98 | 468 | 1 |
| 04/11/08 | PA | June '08 | 475.5 | 50 | 474 | 1.5 |
| 04/14/08 | PA | June '08 | 463 | 50 | 461 | 2 |
| 04/15/08 | PA | June '08 | 453 | 10 | 452 | 1 |
| 04/15/08 | PA | June '08 | 454 | 40 | 452 | 2 |
| 04/16/08 | PA | June '08 | 460 | 50 | 460 | 0 |
| 04/17/08 | PA | June '08 | 461 | 2 | 461 | 0 |
| 04/17/08 | PA | June '08 | 461.75 | 35 | 461 | 0.75 |
| 04/17/08 | PA | June '08 | 461.75 | 12 | 461 | 0.75 |
| 04/18/08 | PA | June '08 | 475 | 100 | 459 | 16 |
| 04/21/08 | PA | June '08 | 463.75 | 50 | 459 | 4.75 |
| 04/22/08 | PA | June '08 | 463.8 | 50 | 463.8 | 0 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | High Price During Closing Period | Moore Purchase Price - High Price During Close |
|---|---|---|---|---|---|---|
| 04/25/08 | PA | June '08 | 449.5 | 75 | 447 | 2.5 |
| 04/29/08 | PA | June '08 | 432 | 100 | 430 | 2 |
| 04/30/08 | PA | June '08 | 424 | 25 | 423.4 | 0.6 |
| 05/01/08 | PA | June '08 | 416 | 50 | 416 | 0 |
| 05/02/08 | PA | June '08 | 420.8 | 50 | 420.8 | 0 |
| 05/05/08 | PA | June '08 | 424.75 | 50 | 424.75 | 0 |
| 05/06/08 | PA | June '08 | 431.75 | 100 | 431.75 | 0 |
| 05/07/08 | PA | June '08 | 426 | 50 | 426 | 0 |
| 05/08/08 | PA | June '08 | 436 | 50 | 436 | 0 |
| 05/09/08 | PA | June '08 | 444 | 50 | 444 | 0 |
| 05/12/08 | PA | June '08 | 448.8 | 50 | 448.8 | 0 |
| 05/13/08 | PA | June '08 | 441 | 100 | 441 | 0 |
| 05/14/08 | PA | June '08 | 438 | 75 | 437 | 1 |
| 05/15/08 | PA | June '08 | 443 | 100 | 443 | 0 |
| 05/16/08 | PA | June '08 | 453.75 | 100 | 453.75 | 0 |
| 05/19/08 | PA | June '08 | 452 | 100 | 452 | 0 |
| 05/20/08 | PA | June '08 | 451 | 100 | 451 | 0 |
| 05/21/08 | PA | June '08 | 465 | 100 | 465 | 0 |

# Exhibit F

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | High Price During Regular Trading | Moore Purchase Price - High Price During Regular Trading |
|---|---|---|---|---|---|---|
| 11/01/07 | PA | December '07 | 377.95 | 1 | 377.95 | 0 |
| 11/09/07 | PA | December '07 | 377 | 25 | 375.6 | 1.4 |
| 11/15/07 | PA | December '07 | 371 | 25 | 370.45 | 0.55 |
| 11/20/07 | PA | December '07 | 364.5 | 21 | 364 | 0.5 |
| 11/23/07 | PA | March '08 | 366.5 | 25 | 366.5 | 0 |
| 11/28/07 | PA | March '08 | 352 | 45 | 352 | 0 |
| 11/30/07 | PA | March '08 | 353.75 | 100 | 353.75 | 0 |
| 12/04/07 | PA | March '08 | 353.5 | 21 | 353.5 | 0 |
| 12/05/07 | PA | March '08 | 355 | 50 | 354 | 1 |
| 12/06/07 | PA | March '08 | 351.8 | 50 | 351.8 | 0 |
| 12/10/07 | PA | March '08 | 349.5 | 50 | 349 | 0.5 |
| 12/13/07 | PA | March '08 | 351.9 | 50 | 351.5 | 0.4 |
| 12/17/07 | PA | March '08 | 362 | 50 | 359.5 | 2.5 |
| 12/18/07 | PA | March '08 | 363 | 50 | 362.75 | 0.25 |
| 12/21/07 | PA | March '08 | 361.75 | 50 | 360.5 | 1.25 |
| 12/24/07 | PA | March '08 | 364 | 45 | 364 | 0 |
| 12/28/07 | PA | March '08 | 371 | 30 | 369.9 | 1.1 |
| 12/28/07 | PA | March '08 | 370.8 | 20 | 369.9 | 0.9 |
| 12/31/07 | PA | March '08 | 379 | 100 | 377.75 | 1.25 |
| 01/03/08 | PA | March '08 | 380 | 45 | 379.5 | 0.5 |
| 01/03/08 | PA | March '08 | 379.9 | 5 | 379.5 | 0.4 |
| 01/07/08 | PA | March '08 | 377 | 46 | 376.5 | 0.5 |
| 01/07/08 | PA | March '08 | 376.8 | 4 | 376.5 | 0.3 |
| 01/09/08 | PA | March '08 | 383 | 50 | 381.5 | 1.5 |
| 01/10/08 | PA | March '08 | 381 | 50 | 380 | 1 |
| 01/11/08 | PA | March '08 | 381.5 | 50 | 380.85 | 0.65 |
| 01/14/08 | PA | March '08 | 388 | 90 | 388 | 0 |
| 01/17/08 | PA | March '08 | 377 | 100 | 376.95 | 0.05 |
| 01/22/08 | PA | March '08 | 371.75 | 50 | 370.1 | 1.65 |
| 01/28/08 | PA | March '08 | 392 | 100 | 391.5 | 0.5 |
| 01/29/08 | PA | March '08 | 393.8 | 100 | 393.5 | 0.3 |
| 02/04/08 | PA | March '08 | 432 | 35 | 431 | 1 |
| 02/04/08 | PA | March '08 | 431.9 | 5 | 431 | 0.9 |
| 02/04/08 | PA | March '08 | 431 | 10 | 431 | 0 |
| 02/05/08 | PA | March '08 | 424 | 45 | 424 | 0 |
| 02/06/08 | PA | March '08 | 423.6 | 8 | 422.1 | 1.5 |
| 02/06/08 | PA | March '08 | 423.5 | 92 | 422.1 | 1.4 |
| 02/07/08 | PA | March '08 | 429 | 50 | 429 | 0 |
| 02/08/08 | PA | March '08 | 441.5 | 90 | 441.5 | 0 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | High Price During Regular Trading | Moore Purchase Price - High Price During Regular Trading |
|---|---|---|---|---|---|---|
| 02/13/08 | PA | March '08 | 440 | 50 | 438 | 2 |
| 02/15/08 | PA | March '08 | 456 | 95 | 445 | 11 |
| 02/15/08 | PA | March '08 | 448 | 5 | 445 | 3 |
| 02/19/08 | PA | March '08 | 502 | 95 | 498 | 4 |
| 02/19/08 | PA | March '08 | 500 | 5 | 498 | 2 |
| 02/20/08 | PA | March '08 | 495 | 85 | 492.95 | 2.05 |
| 02/20/08 | PA | March '08 | 494 | 10 | 492.95 | 1.05 |
| 02/20/08 | PA | March '08 | 493 | 5 | 492.95 | 0.05 |
| 02/22/08 | PA | March '08 | 517 | 98 | 512 | 5 |
| 02/22/08 | PA | March '08 | 515 | 2 | 512 | 3 |
| 02/26/08 | PA | March '08 | 537 | 95 | 535 | 2 |
| 02/29/08 | PA | June '08 | 577.9 | 100 | 576 | 1.9 |
| 03/05/08 | PA | June '08 | 564 | 100 | 562.9 | 1.1 |
| 03/10/08 | PA | June '08 | 488 | 98 | 485 | 3 |
| 03/11/08 | PA | June '08 | 504.5 | 50 | 502.5 | 2 |
| 03/12/08 | PA | June '08 | 511.75 | 50 | 509.05 | 2.7 |
| 03/17/08 | PA | June '08 | 490 | 95 | 489.95 | 0.05 |
| 03/20/08 | PA | June '08 | 448 | 99 | 446 | 2 |
| 03/20/08 | PA | June '08 | 446.7 | 1 | 446 | 0.7 |
| 03/24/08 | PA | June '08 | 437 | 50 | 436.5 | 0.5 |
| 03/25/08 | PA | June '08 | 466 | 100 | 454.9 | 11.1 |
| 03/26/08 | PA | June '08 | 460 | 75 | 460 | 0 |
| 03/28/08 | PA | June '08 | 458 | 50 | 453.8 | 4.2 |
| 03/31/08 | PA | June '08 | 453.5 | 100 | 451 | 2.5 |
| 04/01/08 | PA | June '08 | 450 | 89 | 445.95 | 4.05 |
| 04/01/08 | PA | June '08 | 449.9 | 10 | 445.95 | 3.95 |
| 04/01/08 | PA | June '08 | 448.7 | 1 | 445.95 | 2.75 |
| 04/02/08 | PA | June '08 | 445 | 97 | 443.25 | 1.75 |
| 04/02/08 | PA | June '08 | 444.5 | 3 | 443.25 | 1.25 |
| 04/03/08 | PA | June '08 | 450 | 95 | 446 | 4 |
| 04/03/08 | PA | June '08 | 449.7 | 1 | 446 | 3.7 |
| 04/03/08 | PA | June '08 | 447 | 2 | 446 | 1 |
| 04/03/08 | PA | June '08 | 446.7 | 1 | 446 | 0.7 |
| 04/04/08 | PA | June '08 | 445 | 50 | 445 | 0 |
| 04/09/08 | PA | June '08 | 463.5 | 50 | 461.8 | 1.7 |
| 04/10/08 | PA | June '08 | 469 | 98 | 468 | 1 |
| 04/10/08 | PA | June '08 | 468 | 2 | 468 | 0 |
| 04/11/08 | PA | June '08 | 475.5 | 50 | 474 | 1.5 |
| 04/17/08 | PA | June '08 | 461.75 | 35 | 461 | 0.75 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | High Price During Regular Trading | Moore Purchase Price - High Price During Regular Trading |
|---|---|---|---|---|---|---|
| 04/17/08 | PA | June '08 | 461.75 | 12 | 461 | 0.75 |
| 04/17/08 | PA | June '08 | 461 | 2 | 461 | 0 |
| 04/18/08 | PA | June '08 | 475 | 100 | 459 | 16 |
| 04/21/08 | PA | June '08 | 463.75 | 50 | 463.75 | 0 |
| 04/22/08 | PA | June '08 | 463.8 | 50 | 463.8 | 0 |
| 04/25/08 | PA | June '08 | 449.5 | 75 | 447 | 2.5 |
| 04/30/08 | PA | June '08 | 424 | 25 | 424 | 0 |
| 05/02/08 | PA | June '08 | 420.8 | 50 | 420.8 | 0 |
| 05/08/08 | PA | June '08 | 436 | 50 | 436 | 0 |
| 05/09/08 | PA | June '08 | 444 | 50 | 444 | 0 |
| 05/12/08 | PA | June '08 | 448.8 | 50 | 448.8 | 0 |
| 05/13/08 | PA | June '08 | 441 | 100 | 441 | 0 |
| 05/15/08 | PA | June '08 | 443 | 100 | 443 | 0 |
| 05/19/08 | PA | June '08 | 452 | 100 | 452 | 0 |
| 05/20/08 | PA | June '08 | 451 | 100 | 451 | 0 |
| 05/21/08 | PA | June '08 | 465 | 100 | 465 | 0 |

Exhibit G

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Price Before Settlement Period | Moore Purchase Price - Price Before Settlement Period |
|---|---|---|---|---|---|---|
| 11/01/07 | PA | December '07 | 375.45 | 1 | 374.95 | 0.5 |
| 11/01/07 | PA | December '07 | 375.5 | 5 | 374.95 | 0.55 |
| 11/01/07 | PA | December '07 | 375.85 | 1 | 374.95 | 0.9 |
| 11/01/07 | PA | December '07 | 375.9 | 5 | 374.95 | 0.95 |
| 11/01/07 | PA | December '07 | 375.95 | 1 | 374.95 | 1 |
| 11/01/07 | PA | December '07 | 376 | 5 | 374.95 | 1.05 |
| 11/01/07 | PA | December '07 | 376.85 | 2 | 374.95 | 1.9 |
| 11/01/07 | PA | December '07 | 377 | 2 | 374.95 | 2.05 |
| 11/01/07 | PA | December '07 | 377.9 | 2 | 374.95 | 2.95 |
| 11/01/07 | PA | December '07 | 377.95 | 1 | 374.95 | 3 |
| 11/05/07 | PA | December '07 | 375 | 10 | 375 | 0 |
| 11/05/07 | PA | December '07 | 375.5 | 12 | 375 | 0.5 |
| 11/05/07 | PA | December '07 | 375.85 | 1 | 375 | 0.85 |
| 11/06/07 | PA | December '07 | 380 | 50 | 379.5 | 0.5 |
| 11/07/07 | PA | December '07 | 376 | 5 | 376 | 0 |
| 11/07/07 | PA | December '07 | 378 | 20 | 376 | 2 |
| 11/08/07 | PA | December '07 | 377.8 | 25 | 376.5 | 1.3 |
| 11/09/07 | PA | December '07 | 377 | 25 | 375.5 | 1.5 |
| 11/12/07 | PA | December '07 | 371 | 1 | 371 | 0 |
| 11/12/07 | PA | December '07 | 371.4 | 1 | 371 | 0.4 |
| 11/12/07 | PA | December '07 | 371.45 | 1 | 371 | 0.45 |
| 11/12/07 | PA | December '07 | 371.5 | 6 | 371 | 0.5 |
| 11/13/07 | PA | December '07 | 374.5 | 50 | 372.45 | 2.05 |
| 11/14/07 | PA | December '07 | 373.9 | 4 | 372 | 1.9 |
| 11/14/07 | PA | December '07 | 374 | 21 | 372 | 2 |
| 11/15/07 | PA | December '07 | 371 | 25 | 370.1 | 0.9 |
| 11/20/07 | PA | December '07 | 363.8 | 4 | 363.25 | 0.55 |
| 11/20/07 | PA | December '07 | 364.5 | 21 | 363.25 | 1.25 |
| 11/21/07 | PA | March '08 | 365 | 25 | 363 | 2 |
| 11/23/07 | PA | March '08 | 366.5 | 25 | 360.6 | 5.9 |
| 11/26/07 | PA | March '08 | 365 | 25 | 361.55 | 3.45 |
| 11/27/07 | PA | March '08 | 355 | 50 | 355 | 0 |
| 11/28/07 | PA | March '08 | 351 | 5 | 349.45 | 1.55 |
| 11/28/07 | PA | March '08 | 352 | 45 | 349.45 | 2.55 |
| 11/29/07 | PA | March '08 | 350 | 25 | 348.5 | 1.5 |
| 11/30/07 | PA | March '08 | 353.75 | 100 | 350.5 | 3.25 |
| 12/03/07 | PA | March '08 | 352 | 25 | 351 | 1 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Price Before Settlement Period | Moore Purchase Price - Price Before Settlement Period |
|---|---|---|---|---|---|---|
| 12/04/07 | PA | March '08 | 353 | 4 | 353 | 0 |
| 12/04/07 | PA | March '08 | 353.5 | 21 | 353 | 0.5 |
| 12/05/07 | PA | March '08 | 355 | 50 | 352.5 | 2.5 |
| 12/06/07 | PA | March '08 | 351.8 | 50 | 351.75 | 0.05 |
| 12/10/07 | PA | March '08 | 349.5 | 50 | 348.55 | 0.95 |
| 12/12/07 | PA | March '08 | 352 | 5 | 351.95 | 0.05 |
| 12/12/07 | PA | March '08 | 352.9 | 5 | 351.95 | 0.95 |
| 12/12/07 | PA | March '08 | 353 | 40 | 351.95 | 1.05 |
| 12/13/07 | PA | March '08 | 351.9 | 50 | 349.85 | 2.05 |
| 12/14/07 | PA | March '08 | 357.8 | 50 | 354 | 3.8 |
| 12/17/07 | PA | March '08 | 362 | 50 | 358.25 | 3.75 |
| 12/18/07 | PA | March '08 | 363 | 50 | 362.2 | 0.8 |
| 12/21/07 | PA | March '08 | 361.75 | 50 | 359 | 2.75 |
| 12/24/07 | PA | March '08 | 364 | 45 | 363.5 | 0.5 |
| 12/26/07 | PA | March '08 | 368.5 | 50 | 367.5 | 1 |
| 12/27/07 | PA | March '08 | 368.5 | 50 | 368.4 | 0.1 |
| 12/28/07 | PA | March '08 | 370.8 | 20 | 369 | 1.8 |
| 12/28/07 | PA | March '08 | 371 | 30 | 369 | 2 |
| 12/31/07 | PA | March '08 | 379 | 100 | 375.9 | 3.1 |
| 01/02/08 | PA | March '08 | 380 | 50 | 378 | 2 |
| 01/03/08 | PA | March '08 | 379.9 | 5 | 377.5 | 2.4 |
| 01/03/08 | PA | March '08 | 380 | 45 | 377.5 | 2.5 |
| 01/04/08 | PA | March '08 | 377.9 | 5 | 375 | 2.9 |
| 01/04/08 | PA | March '08 | 378 | 45 | 375 | 3 |
| 01/07/08 | PA | March '08 | 376.8 | 4 | 376 | 0.8 |
| 01/07/08 | PA | March '08 | 377 | 46 | 376 | 1 |
| 01/08/08 | PA | March '08 | 381.9 | 50 | 380.25 | 1.65 |
| 01/09/08 | PA | March '08 | 383 | 50 | 381 | 2 |
| 01/10/08 | PA | March '08 | 381 | 50 | 379.15 | 1.85 |
| 01/11/08 | PA | March '08 | 381.5 | 50 | 380.25 | 1.25 |
| 01/14/08 | PA | March '08 | 387 | 5 | 384.1 | 2.9 |
| 01/14/08 | PA | March '08 | 387.8 | 5 | 384.1 | 3.7 |
| 01/14/08 | PA | March '08 | 388 | 90 | 384.1 | 3.9 |
| 01/15/08 | PA | March '08 | 384.75 | 50 | 381.5 | 3.25 |
| 01/17/08 | PA | March '08 | 377 | 100 | 371 | 6 |
| 01/18/08 | PA | March '08 | 375.5 | 100 | 372.75 | 2.75 |
| 01/22/08 | PA | March '08 | 371.75 | 50 | 370.1 | 1.65 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Price Before Settlement Period | Moore Purchase Price - Price Before Settlement Period |
|---|---|---|---|---|---|---|
| 01/24/08 | PA | March '08 | 376.5 | 100 | 373.45 | 3.05 |
| 01/25/08 | PA | March '08 | 386 | 100 | 383.5 | 2.5 |
| 01/28/08 | PA | March '08 | 392 | 100 | 388 | 4 |
| 01/29/08 | PA | March '08 | 393.8 | 100 | 391.75 | 2.05 |
| 02/04/08 | PA | March '08 | 431 | 10 | 428 | 3 |
| 02/04/08 | PA | March '08 | 431.9 | 5 | 428 | 3.9 |
| 02/04/08 | PA | March '08 | 432 | 35 | 428 | 4 |
| 02/05/08 | PA | March '08 | 423.9 | 5 | 422 | 1.9 |
| 02/05/08 | PA | March '08 | 424 | 45 | 422 | 2 |
| 02/06/08 | PA | March '08 | 423.5 | 92 | 420.75 | 2.75 |
| 02/06/08 | PA | March '08 | 423.6 | 8 | 420.75 | 2.85 |
| 02/07/08 | PA | March '08 | 429 | 50 | 427.25 | 1.75 |
| 02/08/08 | PA | March '08 | 441.4 | 10 | 438.1 | 3.3 |
| 02/08/08 | PA | March '08 | 441.5 | 90 | 438.1 | 3.4 |
| 02/11/08 | PA | March '08 | 443.4 | 50 | 443 | 0.4 |
| 02/12/08 | PA | March '08 | 434 | 50 | 431.5 | 2.5 |
| 02/13/08 | PA | March '08 | 440 | 50 | 437 | 3 |
| 02/14/08 | PA | March '08 | 440 | 11 | 434.1 | 5.9 |
| 02/14/08 | PA | March '08 | 442 | 89 | 434.1 | 7.9 |
| 02/15/08 | PA | March '08 | 448 | 5 | 443.95 | 4.05 |
| 02/15/08 | PA | March '08 | 456 | 95 | 443.95 | 12.05 |
| 02/19/08 | PA | March '08 | 500 | 5 | 469.35 | 30.65 |
| 02/19/08 | PA | March '08 | 502 | 95 | 469.35 | 32.65 |
| 02/20/08 | PA | March '08 | 493 | 5 | 491 | 2 |
| 02/20/08 | PA | March '08 | 494 | 10 | 491 | 3 |
| 02/20/08 | PA | March '08 | 495 | 85 | 491 | 4 |
| 02/21/08 | PA | March '08 | 514 | 10 | 512 | 2 |
| 02/21/08 | PA | March '08 | 516 | 90 | 512 | 4 |
| 02/22/08 | PA | March '08 | 515 | 2 | 509.95 | 5.05 |
| 02/22/08 | PA | March '08 | 517 | 98 | 509.95 | 7.05 |
| 02/25/08 | PA | March '08 | 523 | 5 | 520.55 | 2.45 |
| 02/25/08 | PA | March '08 | 524 | 5 | 520.55 | 3.45 |
| 02/25/08 | PA | March '08 | 524.9 | 5 | 520.55 | 4.35 |
| 02/25/08 | PA | March '08 | 525 | 85 | 520.55 | 4.45 |
| 02/26/08 | PA | March '08 | 534 | 5 | 531.9 | 2.1 |
| 02/26/08 | PA | March '08 | 537 | 95 | 531.9 | 5.1 |
| 02/27/08 | PA | June '08 | 560 | 10 | 559.4 | 0.6 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Price Before Settlement Period | Moore Purchase Price - Price Before Settlement Period |
|---|---|---|---|---|---|---|
| 02/27/08 | PA | June '08 | 560.9 | 10 | 559.4 | 1.5 |
| 02/27/08 | PA | June '08 | 561 | 80 | 559.4 | 1.6 |
| 02/29/08 | PA | June '08 | 577.9 | 100 | 570.5 | 7.4 |
| 03/03/08 | PA | June '08 | 587 | 100 | 583.05 | 3.95 |
| 03/04/08 | PA | June '08 | 574.7 | 100 | 559.7 | 15 |
| 03/05/08 | PA | June '08 | 564 | 100 | 559.1 | 4.9 |
| 03/06/08 | PA | June '08 | 525 | 1 | 522.15 | 2.85 |
| 03/06/08 | PA | June '08 | 533 | 99 | 522.15 | 10.85 |
| 03/07/08 | PA | June '08 | 494.85 | 3 | 491 | 3.85 |
| 03/07/08 | PA | June '08 | 497 | 22 | 491 | 6 |
| 03/07/08 | PA | June '08 | 502 | 50 | 491 | 11 |
| 03/10/08 | PA | June '08 | 480 | 2 | 479 | 1 |
| 03/10/08 | PA | June '08 | 488 | 98 | 479 | 9 |
| 03/11/08 | PA | June '08 | 504.5 | 50 | 498 | 6.5 |
| 03/12/08 | PA | June '08 | 511.75 | 50 | 508 | 3.75 |
| 03/14/08 | PA | June '08 | 512 | 6 | 506.8 | 5.2 |
| 03/14/08 | PA | June '08 | 515 | 94 | 506.8 | 8.2 |
| 03/17/08 | PA | June '08 | 485 | 3 | 472.05 | 12.95 |
| 03/17/08 | PA | June '08 | 489 | 2 | 472.05 | 16.95 |
| 03/17/08 | PA | June '08 | 490 | 95 | 472.05 | 17.95 |
| 03/20/08 | PA | June '08 | 446.7 | 1 | 442.25 | 4.45 |
| 03/20/08 | PA | June '08 | 448 | 99 | 442.25 | 5.75 |
| 03/24/08 | PA | June '08 | 437 | 50 | 434.4 | 2.6 |
| 03/25/08 | PA | June '08 | 466 | 100 | 453.85 | 12.15 |
| 03/26/08 | PA | June '08 | 459.9 | 25 | 453.1 | 6.8 |
| 03/26/08 | PA | June '08 | 460 | 75 | 453.1 | 6.9 |
| 03/28/08 | PA | June '08 | 458 | 50 | 449 | 9 |
| 03/31/08 | PA | June '08 | 442.55 | 1 | 442.4 | 0.15 |
| 03/31/08 | PA | June '08 | 443 | 1 | 442.4 | 0.6 |
| 03/31/08 | PA | June '08 | 443.05 | 1 | 442.4 | 0.65 |
| 03/31/08 | PA | June '08 | 443.45 | 1 | 442.4 | 1.05 |
| 03/31/08 | PA | June '08 | 443.5 | 4 | 442.4 | 1.1 |
| 03/31/08 | PA | June '08 | 443.9 | 3 | 442.4 | 1.5 |
| 03/31/08 | PA | June '08 | 444 | 8 | 442.4 | 1.6 |
| 03/31/08 | PA | June '08 | 453.5 | 100 | 442.4 | 11.1 |
| 04/01/08 | PA | June '08 | 448.7 | 1 | 443.6 | 5.1 |
| 04/01/08 | PA | June '08 | 449.9 | 10 | 443.6 | 6.3 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Price Before Settlement Period | Moore Purchase Price - Price Before Settlement Period |
|---|---|---|---|---|---|---|
| 04/01/08 | PA | June '08 | 450 | 89 | 443.6 | 6.4 |
| 04/02/08 | PA | June '08 | 444.5 | 3 | 441.5 | 3 |
| 04/02/08 | PA | June '08 | 445 | 97 | 441.5 | 3.5 |
| 04/03/08 | PA | June '08 | 444.7 | 1 | 441.25 | 3.45 |
| 04/03/08 | PA | June '08 | 446.7 | 1 | 441.25 | 5.45 |
| 04/03/08 | PA | June '08 | 447 | 2 | 441.25 | 5.75 |
| 04/03/08 | PA | June '08 | 449.7 | 1 | 441.25 | 8.45 |
| 04/03/08 | PA | June '08 | 450 | 95 | 441.25 | 8.75 |
| 04/04/08 | PA | June '08 | 443.5 | 18 | 443 | 0.5 |
| 04/04/08 | PA | June '08 | 443.75 | 13 | 443 | 0.75 |
| 04/04/08 | PA | June '08 | 443.8 | 4 | 443 | 0.8 |
| 04/04/08 | PA | June '08 | 444 | 3 | 443 | 1 |
| 04/04/08 | PA | June '08 | 444.5 | 12 | 443 | 1.5 |
| 04/04/08 | PA | June '08 | 445 | 50 | 443 | 2 |
| 04/07/08 | PA | June '08 | 458.5 | 50 | 453 | 5.5 |
| 04/09/08 | PA | June '08 | 463.5 | 50 | 461 | 2.5 |
| 04/10/08 | PA | June '08 | 468 | 2 | 464.05 | 3.95 |
| 04/10/08 | PA | June '08 | 469 | 98 | 464.05 | 4.95 |
| 04/11/08 | PA | June '08 | 475.5 | 50 | 473.3 | 2.2 |
| 04/14/08 | PA | June '08 | 463 | 50 | 460.7 | 2.3 |
| 04/15/08 | PA | June '08 | 453 | 10 | 452 | 1 |
| 04/15/08 | PA | June '08 | 454 | 40 | 452 | 2 |
| 04/16/08 | PA | June '08 | 460 | 50 | 460 | 0 |
| 04/17/08 | PA | June '08 | 460.95 | 1 | 458 | 2.95 |
| 04/17/08 | PA | June '08 | 461 | 2 | 458 | 3 |
| 04/17/08 | PA | June '08 | 461.75 | 35 | 458 | 3.75 |
| 04/17/08 | PA | June '08 | 461.75 | 12 | 458 | 3.75 |
| 04/18/08 | PA | June '08 | 475 | 100 | 458 | 17 |
| 04/21/08 | PA | June '08 | 463.75 | 50 | 456.5 | 7.25 |
| 04/22/08 | PA | June '08 | 463.8 | 50 | 458.75 | 5.05 |
| 04/25/08 | PA | June '08 | 449.5 | 75 | 443.8 | 5.7 |
| 04/29/08 | PA | June '08 | 432 | 100 | 429 | 3 |
| 04/30/08 | PA | June '08 | 424 | 25 | 422 | 2 |
| 05/01/08 | PA | June '08 | 416 | 50 | 412 | 4 |
| 05/02/08 | PA | June '08 | 420.8 | 50 | 418.4 | 2.4 |
| 05/05/08 | PA | June '08 | 424.75 | 50 | 423 | 1.75 |
| 05/06/08 | PA | June '08 | 431.75 | 100 | 429.95 | 1.8 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Price Before Settlement Period | Moore Purchase Price - Price Before Settlement Period |
|---|---|---|---|---|---|---|
| 05/07/08 | PA | June '08 | 426 | 50 | 423.7 | 2.3 |
| 05/08/08 | PA | June '08 | 436 | 50 | 435.7 | 0.3 |
| 05/09/08 | PA | June '08 | 444 | 50 | 442.35 | 1.65 |
| 05/12/08 | PA | June '08 | 448.8 | 50 | 444 | 4.8 |
| 05/13/08 | PA | June '08 | 441 | 100 | 438.9 | 2.1 |
| 05/14/08 | PA | June '08 | 438 | 75 | 434.85 | 3.15 |
| 05/15/08 | PA | June '08 | 443 | 100 | 436.4 | 6.6 |
| 05/16/08 | PA | June '08 | 453.75 | 100 | 452.1 | 1.65 |
| 05/19/08 | PA | June '08 | 452 | 100 | 446.5 | 5.5 |
| 05/20/08 | PA | June '08 | 451 | 100 | 448 | 3 |
| 05/21/08 | PA | June '08 | 465 | 100 | 456.95 | 8.05 |

# Exhibit H

| Trade Date | PL / PA | Contract | Moore Purchase VWAP | SumOfVolume | Settlement Price | Moore Purchase VWAP - Settlement Price |
|---|---|---|---|---|---|---|
| 11/19/2007 | PL | Jan-08 | 1458 | 50 | 1457.1 | 0.9 |
| 11/20/2007 | PL | Jan-08 | 1470.6 | 25 | 1469.7 | 0.9 |
| 11/21/2007 | PL | Jan-08 | 1472 | 50 | 1467.2 | 4.8 |
| 11/27/2007 | PL | Jan-08 | 1455 | 25 | 1453.5 | 1.5 |
| 11/28/2007 | PL | Jan-08 | 1441.2 | 50 | 1438.3 | 2.9 |
| 11/30/2007 | PL | Jan-08 | 1445 | 50 | 1444.1 | 0.9 |
| 12/3/2007 | PL | Jan-08 | 1462.36 | 25 | 1461.4 | 0.96 |
| 12/4/2007 | PL | Jan-08 | 1472.5 | 50 | 1472.3 | 0.2 |
| 12/5/2007 | PL | Jan-08 | 1470 | 50 | 1468.3 | 1.7 |
| 12/6/2007 | PL | Jan-08 | 1471.494 | 50 | 1470.2 | 1.294 |
| 12/7/2007 | PL | Jan-08 | 1463 | 50 | 1462.2 | 0.8 |
| 12/10/2007 | PL | Jan-08 | 1467.5 | 50 | 1466.3 | 1.2 |
| 12/12/2007 | PL | Jan-08 | 1480 | 50 | 1479.8 | 0.2 |
| 12/14/2007 | PL | Jan-08 | 1480 | 75 | 1479.2 | 0.8 |
| 12/17/2007 | PL | Jan-08 | 1504 | 50 | 1503.6 | 0.4 |
| 12/18/2007 | PL | Jan-08 | 1516 | 50 | 1515.3 | 0.7 |
| 12/21/2007 | PL | Jan-08 | 1540 | 100 | 1536.3 | 3.7 |
| 12/26/2007 | PL | Apr-08 | 1543.9 | 50 | 1543 | 0.9 |
| 12/27/2007 | PL | Apr-08 | 1538 | 50 | 1536.6 | 1.4 |
| 12/28/2007 | PL | Apr-08 | 1541.9 | 50 | 1539.5 | 2.4 |
| 12/31/2007 | PL | Apr-08 | 1533.84 | 100 | 1525.4 | 8.44 |
| 1/2/2008 | PL | Apr-08 | 1548 | 50 | 1546 | 2 |
| 1/4/2008 | PL | Apr-08 | 1548 | 50 | 1547.1 | 0.9 |
| 1/7/2008 | PL | Apr-08 | 1533 | 50 | 1531.1 | 1.9 |
| 1/8/2008 | PL | Apr-08 | 1561.39 | 50 | 1560.5 | 0.89 |
| 1/9/2008 | PL | Apr-08 | 1559 | 50 | 1558.3 | 0.7 |
| 1/10/2008 | PL | Apr-08 | 1563.99 | 50 | 1563.7 | 0.29 |
| 1/11/2008 | PL | Apr-08 | 1569.8 | 50 | 1569.4 | 0.4 |
| 1/14/2008 | PL | Apr-08 | 1587.2 | 100 | 1584 | 3.2 |
| 1/15/2008 | PL | Apr-08 | 1587.5 | 50 | 1585.5 | 2 |
| 1/17/2008 | PL | Apr-08 | 1566.5 | 100 | 1565.8 | 0.7 |
| 1/18/2008 | PL | Apr-08 | 1566.695 | 100 | 1565.5 | 1.195 |
| 1/22/2008 | PL | Apr-08 | 1560 | 100 | 1558.6 | 1.4 |
| 1/23/2008 | PL | Apr-08 | 1559.625 | 100 | 1559.1 | 0.525 |

| Trade Date | PL / PA | Contract | Moore Purchase VWAP | SumOfVolume | Settlement Price | Moore Purchase VWAP - Settlement Price |
|---|---|---|---|---|---|---|
| 1/24/2008 | PL | Apr-08 | 1615 | 100 | 1613 | 2 |
| 1/25/2008 | PL | Apr-08 | 1683 | 100 | 1680.1 | 2.9 |
| 1/28/2008 | PL | Apr-08 | 1733 | 100 | 1728.7 | 4.3 |
| 1/29/2008 | PL | Apr-08 | 1725 | 100 | 1721.9 | 3.1 |
| 1/30/2008 | PL | Apr-08 | 1689.98 | 50 | 1687.4 | 2.58 |
| 2/4/2008 | PL | Apr-08 | 1798 | 50 | 1797.6 | 0.4 |
| 2/5/2008 | PL | Apr-08 | 1785.995 | 100 | 1785.5 | 0.495 |
| 2/6/2008 | PL | Apr-08 | 1819.993 | 100 | 1819 | 0.993 |
| 2/7/2008 | PL | Apr-08 | 1852 | 100 | 1851.4 | 0.6 |
| 2/8/2008 | PL | Apr-08 | 1884.9 | 100 | 1884 | 0.9 |
| 2/11/2008 | PL | Apr-08 | 1939.9 | 50 | 1939.4 | 0.5 |
| 2/12/2008 | PL | Apr-08 | 1924 | 100 | 1921.8 | 2.2 |
| 2/13/2008 | PL | Apr-08 | 1985 | 50 | 1983.7 | 1.3 |
| 2/14/2008 | PL | Apr-08 | 2006.6 | 100 | 2005.9 | 0.7 |
| 2/15/2008 | PL | Apr-08 | 2064 | 100 | 2063.7 | 0.3 |
| 2/20/2008 | PL | Apr-08 | 2140 | 100 | 2138.8 | 1.2 |
| 2/21/2008 | PL | Apr-08 | 2190 | 100 | 2188.2 | 1.8 |
| 2/22/2008 | PL | Apr-08 | 2170 | 100 | 2167.8 | 2.2 |
| 2/25/2008 | PL | Apr-08 | 2155 | 100 | 2153.5 | 1.5 |
| 2/27/2008 | PL | Apr-08 | 2155 | 100 | 2152.3 | 2.7 |
| 2/29/2008 | PL | Apr-08 | 2184.75 | 100 | 2180.7 | 4.05 |
| 3/3/2008 | PL | Apr-08 | 2245 | 100 | 2241.6 | 3.4 |
| 3/4/2008 | PL | Apr-08 | 2275 | 50 | 2267 | 8 |
| 3/5/2008 | PL | Apr-08 | 2286 | 100 | 2276.1 | 9.9 |
| 3/6/2008 | PL | Apr-08 | 2215 | 100 | 2200.8 | 14.2 |
| 3/10/2008 | PL | Apr-08 | 2047.15 | 100 | 2039.1 | 8.05 |
| 3/20/2008 | PL | Apr-08 | 1879.64 | 100 | 1877.3 | 2.34 |
| 3/24/2008 | PL | Apr-08 | 1890 | 50 | 1889.2 | 0.8 |
| 3/26/2008 | PL | Jul-08 | 2025 | 100 | 2022.9 | 2.1 |
| 3/28/2008 | PL | Jul-08 | 2054.4 | 100 | 2048.8 | 5.6 |
| 3/31/2008 | PL | Jul-08 | 2050 | 100 | 2043.4 | 6.6 |
| 4/1/2008 | PL | Jul-08 | 1939.59 | 100 | 1937.8 | 1.79 |
| 4/3/2008 | PL | Jul-08 | 2015 | 50 | 2012.9 | 2.1 |
| 4/4/2008 | PL | Jul-08 | 2035 | 25 | 2030.5 | 4.5 |

| Trade Date | PL / PA | Contract | Moore Purchase VWAP | SumOfVolume | Settlement Price | Moore Purchase VWAP - Settlement Price |
|---|---|---|---|---|---|---|
| 4/7/2008 | PL | Jul-08 | 2048 | 50 | 2046.9 | 1.1 |
| 4/9/2008 | PL | Jul-08 | 2048 | 100 | 2044.6 | 3.4 |
| 4/10/2008 | PL | Jul-08 | 2047 | 50 | 2045 | 2 |
| 4/11/2008 | PL | Jul-08 | 2029 | 50 | 2028.1 | 0.9 |
| 4/16/2008 | PL | Jul-08 | 2040 | 50 | 2037.3 | 2.7 |
| 4/17/2008 | PL | Jul-08 | 2063 | 50 | 2061.5 | 1.5 |
| 4/18/2008 | PL | Jul-08 | 2077.8 | 50 | 2071.3 | 6.5 |
| 4/21/2008 | PL | Jul-08 | 2030 | 50 | 2027.3 | 2.7 |
| 4/22/2008 | PL | Jul-08 | 2037.8 | 50 | 2037.4 | 0.4 |
| 4/29/2008 | PL | Jul-08 | 1941.92 | 50 | 1940.1 | 1.82 |
| 4/30/2008 | PL | Jul-08 | 1938 | 25 | 1935.2 | 2.8 |
| 5/1/2008 | PL | Jul-08 | 1884.64 | 50 | 1882.3 | 2.34 |
| 5/2/2008 | PL | Jul-08 | 1910 | 50 | 1908.2 | 1.8 |
| 5/6/2008 | PL | Jul-08 | 1974 | 50 | 1969.8 | 4.2 |
| 5/7/2008 | PL | Jul-08 | 1970 | 50 | 1969 | 1 |
| 5/8/2008 | PL | Jul-08 | 2045 | 100 | 2042.3 | 2.7 |
| 5/9/2008 | PL | Jul-08 | 2110 | 100 | 2101.8 | 8.2 |
| 5/12/2008 | PL | Jul-08 | 2130 | 100 | 2123.3 | 6.7 |
| 5/13/2008 | PL | Jul-08 | 2073.5 | 50 | 2073.4 | 0.1 |
| 5/14/2008 | PL | Jul-08 | 2039.5 | 75 | 2039.1 | 0.4 |
| 5/15/2008 | PL | Jul-08 | 2077.5 | 100 | 2076.9 | 0.6 |
| 5/16/2008 | PL | Jul-08 | 2132 | 100 | 2132 | 0 |
| 5/19/2008 | PL | Jul-08 | 2165 | 50 | 2158.2 | 6.8 |
| 5/20/2008 | PL | Jul-08 | 2150 | 100 | 2147.8 | 2.2 |
| 5/21/2008 | PL | Jul-08 | 2224 | 50 | 2221.1 | 2.9 |

# Exhibit I

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Settlement Price | Moore Purchase Price - Settlement Price |
|---|---|---|---|---|---|---|
| 11/19/07 | PL | Jan-08 | 1458 | 50 | 1457.1 | 0.9 |
| 11/20/07 | PL | Jan-08 | 1471 | 20 | 1469.7 | 1.3 |
| 11/21/07 | PL | Jan-08 | 1472 | 50 | 1467.2 | 4.8 |
| 11/27/07 | PL | Jan-08 | 1455 | 25 | 1453.5 | 1.5 |
| 11/28/07 | PL | Jan-08 | 1440 | 20 | 1438.3 | 1.7 |
| 11/28/07 | PL | Jan-08 | 1442 | 30 | 1438.3 | 3.7 |
| 11/30/07 | PL | Jan-08 | 1445 | 50 | 1444.1 | 0.9 |
| 12/03/07 | PL | Jan-08 | 1461.8 | 5 | 1461.4 | 0.4 |
| 12/03/07 | PL | Jan-08 | 1462.5 | 20 | 1461.4 | 1.1 |
| 12/04/07 | PL | Jan-08 | 1473 | 25 | 1472.3 | 0.7 |
| 12/05/07 | PL | Jan-08 | 1470 | 50 | 1468.3 | 1.7 |
| 12/06/07 | PL | Jan-08 | 1471.4 | 1 | 1470.2 | 1.2 |
| 12/06/07 | PL | Jan-08 | 1471.5 | 3 | 1470.2 | 1.3 |
| 12/06/07 | PL | Jan-08 | 1471.8 | 40 | 1470.2 | 1.6 |
| 12/06/07 | PL | Jan-08 | 1471.8 | 1 | 1470.2 | 1.6 |
| 12/07/07 | PL | Jan-08 | 1463 | 50 | 1462.2 | 0.8 |
| 12/10/07 | PL | Jan-08 | 1467.5 | 50 | 1466.3 | 1.2 |
| 12/12/07 | PL | Jan-08 | 1480 | 50 | 1479.8 | 0.2 |
| 12/14/07 | PL | Jan-08 | 1480 | 75 | 1479.2 | 0.8 |
| 12/17/07 | PL | Jan-08 | 1504 | 50 | 1503.6 | 0.4 |
| 12/18/07 | PL | Jan-08 | 1516 | 50 | 1515.3 | 0.7 |
| 12/21/07 | PL | Jan-08 | 1540 | 100 | 1536.3 | 3.7 |
| 12/26/07 | PL | Apr-08 | 1543.5 | 10 | 1543 | 0.5 |
| 12/26/07 | PL | Apr-08 | 1544 | 40 | 1543 | 1 |
| 12/27/07 | PL | Apr-08 | 1538 | 50 | 1536.6 | 1.4 |
| 12/28/07 | PL | Apr-08 | 1541.8 | 25 | 1539.5 | 2.3 |
| 12/28/07 | PL | Apr-08 | 1542 | 25 | 1539.5 | 2.5 |
| 12/31/07 | PL | Apr-08 | 1530 | 20 | 1525.4 | 4.6 |
| 12/31/07 | PL | Apr-08 | 1534.8 | 80 | 1525.4 | 9.4 |
| 01/02/08 | PL | Apr-08 | 1548 | 50 | 1546 | 2 |
| 01/03/08 | PL | Apr-08 | 1552 | 89 | 1551.8 | 0.2 |
| 01/04/08 | PL | Apr-08 | 1548 | 50 | 1547.1 | 0.9 |
| 01/07/08 | PL | Apr-08 | 1533 | 50 | 1531.1 | 1.9 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Settlement Price | Moore Purchase Price - Settlement Price |
|---|---|---|---|---|---|---|
| 01/08/08 | PL | Apr-08 | 1561.9 | 5 | 1560.5 | 1.4 |
| 01/08/08 | PL | Apr-08 | 1562 | 30 | 1560.5 | 1.5 |
| 01/09/08 | PL | Apr-08 | 1559 | 50 | 1558.3 | 0.7 |
| 01/10/08 | PL | Apr-08 | 1563.9 | 5 | 1563.7 | 0.2 |
| 01/10/08 | PL | Apr-08 | 1564 | 45 | 1563.7 | 0.3 |
| 01/11/08 | PL | Apr-08 | 1570 | 40 | 1569.4 | 0.6 |
| 01/14/08 | PL | Apr-08 | 1584 | 20 | 1584 | 0 |
| 01/14/08 | PL | Apr-08 | 1588 | 80 | 1584 | 4 |
| 01/15/08 | PL | Apr-08 | 1587.5 | 50 | 1585.5 | 2 |
| 01/17/08 | PL | Apr-08 | 1566.5 | 100 | 1565.8 | 0.7 |
| 01/18/08 | PL | Apr-08 | 1566.9 | 5 | 1565.5 | 1.4 |
| 01/18/08 | PL | Apr-08 | 1567 | 85 | 1565.5 | 1.5 |
| 01/22/08 | PL | Apr-08 | 1560 | 100 | 1558.6 | 1.4 |
| 01/23/08 | PL | Apr-08 | 1560 | 75 | 1559.1 | 0.9 |
| 01/24/08 | PL | Apr-08 | 1615 | 100 | 1613 | 2 |
| 01/25/08 | PL | Apr-08 | 1683 | 100 | 1680.1 | 2.9 |
| 01/28/08 | PL | Apr-08 | 1733 | 100 | 1728.7 | 4.3 |
| 01/29/08 | PL | Apr-08 | 1725 | 100 | 1721.9 | 3.1 |
| 01/30/08 | PL | Apr-08 | 1689.9 | 10 | 1687.4 | 2.5 |
| 01/30/08 | PL | Apr-08 | 1690 | 40 | 1687.4 | 2.6 |
| 02/04/08 | PL | Apr-08 | 1798 | 50 | 1797.6 | 0.4 |
| 02/05/08 | PL | Apr-08 | 1785.9 | 5 | 1785.5 | 0.4 |
| 02/05/08 | PL | Apr-08 | 1786 | 95 | 1785.5 | 0.5 |
| 02/06/08 | PL | Apr-08 | 1819.9 | 7 | 1819 | 0.9 |
| 02/06/08 | PL | Apr-08 | 1820 | 93 | 1819 | 1 |
| 02/07/08 | PL | Apr-08 | 1852 | 100 | 1851.4 | 0.6 |
| 02/08/08 | PL | Apr-08 | 1884.9 | 100 | 1884 | 0.9 |
| 02/11/08 | PL | Apr-08 | 1939.9 | 50 | 1939.4 | 0.5 |
| 02/12/08 | PL | Apr-08 | 1924 | 100 | 1921.8 | 2.2 |
| 02/13/08 | PL | Apr-08 | 1985 | 50 | 1983.7 | 1.3 |
| 02/14/08 | PL | Apr-08 | 2007 | 80 | 2005.9 | 1.1 |
| 02/15/08 | PL | Apr-08 | 2064 | 100 | 2063.7 | 0.3 |
| 02/20/08 | PL | Apr-08 | 2140 | 100 | 2138.8 | 1.2 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Settlement Price | Moore Purchase Price - Settlement Price |
|---|---|---|---|---|---|---|
| 02/21/08 | PL | Apr-08 | 2190 | 100 | 2188.2 | 1.8 |
| 02/22/08 | PL | Apr-08 | 2170 | 100 | 2167.8 | 2.2 |
| 02/25/08 | PL | Apr-08 | 2155 | 100 | 2153.5 | 1.5 |
| 02/27/08 | PL | Apr-08 | 2155 | 100 | 2152.3 | 2.7 |
| 02/29/08 | PL | Apr-08 | 2185 | 95 | 2180.7 | 4.3 |
| 03/03/08 | PL | Apr-08 | 2245 | 100 | 2241.6 | 3.4 |
| 03/04/08 | PL | Apr-08 | 2275 | 50 | 2267 | 8 |
| 03/05/08 | PL | Apr-08 | 2286 | 100 | 2276.1 | 9.9 |
| 03/06/08 | PL | Apr-08 | 2215 | 100 | 2200.8 | 14.2 |
| 03/10/08 | PL | Apr-08 | 2040 | 5 | 2039.1 | 0.9 |
| 03/10/08 | PL | Apr-08 | 2049 | 85 | 2039.1 | 9.9 |
| 03/20/08 | PL | Apr-08 | 1878 | 3 | 1877.3 | 0.7 |
| 03/20/08 | PL | Apr-08 | 1880 | 91 | 1877.3 | 2.7 |
| 03/24/08 | PL | Apr-08 | 1890 | 50 | 1889.2 | 0.8 |
| 03/26/08 | PL | Jul-08 | 2025 | 100 | 2022.9 | 2.1 |
| 03/28/08 | PL | Jul-08 | 2055 | 95 | 2048.8 | 6.2 |
| 03/31/08 | PL | Jul-08 | 2050 | 100 | 2043.4 | 6.6 |
| 04/01/08 | PL | Jul-08 | 1939.5 | 10 | 1937.8 | 1.7 |
| 04/01/08 | PL | Jul-08 | 1940 | 81 | 1937.8 | 2.2 |
| 04/03/08 | PL | Jul-08 | 2015 | 50 | 2012.9 | 2.1 |
| 04/04/08 | PL | Jul-08 | 2035 | 25 | 2030.5 | 4.5 |
| 04/07/08 | PL | Jul-08 | 2048 | 50 | 2046.9 | 1.1 |
| 04/09/08 | PL | Jul-08 | 2048 | 100 | 2044.6 | 3.4 |
| 04/10/08 | PL | Jul-08 | 2047 | 50 | 2045 | 2 |
| 04/11/08 | PL | Jul-08 | 2029 | 50 | 2028.1 | 0.9 |
| 04/16/08 | PL | Jul-08 | 2040 | 50 | 2037.3 | 2.7 |
| 04/17/08 | PL | Jul-08 | 2063 | 50 | 2061.5 | 1.5 |
| 04/18/08 | PL | Jul-08 | 2077.8 | 50 | 2071.3 | 6.5 |
| 04/21/08 | PL | Jul-08 | 2030 | 50 | 2027.3 | 2.7 |
| 04/22/08 | PL | Jul-08 | 2037.8 | 50 | 2037.4 | 0.4 |
| 04/29/08 | PL | Jul-08 | 1942 | 48 | 1940.1 | 1.9 |
| 04/30/08 | PL | Jul-08 | 1938 | 25 | 1935.2 | 2.8 |
| 05/01/08 | PL | Jul-08 | 1886 | 33 | 1882.3 | 3.7 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Settlement Price | Moore Purchase Price - Settlement Price |
|---|---|---|---|---|---|---|
| 05/02/08 | PL | Jul-08 | 1910 | 50 | 1908.2 | 1.8 |
| 05/06/08 | PL | Jul-08 | 1974 | 50 | 1969.8 | 4.2 |
| 05/07/08 | PL | Jul-08 | 1970 | 50 | 1969 | 1 |
| 05/08/08 | PL | Jul-08 | 2045 | 100 | 2042.3 | 2.7 |
| 05/09/08 | PL | Jul-08 | 2110 | 100 | 2101.8 | 8.2 |
| 05/12/08 | PL | Jul-08 | 2130 | 100 | 2123.3 | 6.7 |
| 05/13/08 | PL | Jul-08 | 2073.5 | 50 | 2073.4 | 0.1 |
| 05/14/08 | PL | Jul-08 | 2039.5 | 75 | 2039.1 | 0.4 |
| 05/15/08 | PL | Jul-08 | 2077.5 | 100 | 2076.9 | 0.6 |
| 05/16/08 | PL | Jul-08 | 2132 | 100 | 2132 | 0 |
| 05/19/08 | PL | Jul-08 | 2165 | 50 | 2158.2 | 6.8 |
| 05/20/08 | PL | Jul-08 | 2150 | 100 | 2147.8 | 2.2 |
| 05/21/08 | PL | Jul-08 | 2224 | 50 | 2221.1 | 2.9 |

# Exhibit J

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | High Price During Settlement Period | Moore Purchase Price - High During Settlement Period |
|---|---|---|---|---|---|---|
| 11/19/07 | PL | Jan-08 | 1458 | 50 | 1454.9 | 3.1 |
| 11/20/07 | PL | Jan-08 | 1469 | 5 | 1467 | 2 |
| 11/20/07 | PL | Jan-08 | 1471 | 20 | 1467 | 4 |
| 11/21/07 | PL | Jan-08 | 1472 | 50 | 1468.1 | 3.9 |
| 11/27/07 | PL | Jan-08 | 1455 | 25 | 1453 | 2 |
| 11/30/07 | PL | Jan-08 | 1445 | 50 | 1445 | 0 |
| 12/03/07 | PL | Jan-08 | 1461.8 | 5 | 1461.5 | 0.3 |
| 12/03/07 | PL | Jan-08 | 1462.5 | 20 | 1461.5 | 1 |
| 12/04/07 | PL | Jan-08 | 1472 | 25 | 1472 | 0 |
| 12/04/07 | PL | Jan-08 | 1473 | 25 | 1472 | 1 |
| 12/05/07 | PL | Jan-08 | 1470 | 50 | 1469.3 | 0.7 |
| 12/10/07 | PL | Jan-08 | 1467.5 | 50 | 1465.6 | 1.9 |
| 12/14/07 | PL | Jan-08 | 1480 | 75 | 1477 | 3 |
| 12/17/07 | PL | Jan-08 | 1504 | 50 | 1502.9 | 1.1 |
| 12/21/07 | PL | Jan-08 | 1540 | 100 | 1534 | 6 |
| 12/26/07 | PL | Apr-08 | 1543.5 | 10 | 1541.3 | 2.2 |
| 12/26/07 | PL | Apr-08 | 1544 | 40 | 1541.3 | 2.7 |
| 12/28/07 | PL | Apr-08 | 1541.8 | 25 | 1540 | 1.8 |
| 12/28/07 | PL | Apr-08 | 1542 | 25 | 1540 | 2 |
| 12/31/07 | PL | Apr-08 | 1530 | 20 | 1529.9 | 0.1 |
| 12/31/07 | PL | Apr-08 | 1534.8 | 80 | 1529.9 | 4.9 |
| 01/02/08 | PL | Apr-08 | 1548 | 50 | 1546 | 2 |
| 01/03/08 | PL | Apr-08 | 1550 | 11 | 1549.2 | 0.8 |
| 01/03/08 | PL | Apr-08 | 1552 | 89 | 1549.2 | 2.8 |
| 01/04/08 | PL | Apr-08 | 1548 | 50 | 1545 | 3 |
| 01/07/08 | PL | Apr-08 | 1533 | 50 | 1528 | 5 |
| 01/08/08 | PL | Apr-08 | 1560 | 15 | 1560 | 0 |
| 01/08/08 | PL | Apr-08 | 1561.9 | 5 | 1560 | 1.9 |
| 01/08/08 | PL | Apr-08 | 1562 | 30 | 1560 | 2 |
| 01/09/08 | PL | Apr-08 | 1559 | 50 | 1558 | 1 |
| 01/10/08 | PL | Apr-08 | 1563.9 | 5 | 1563 | 0.9 |
| 01/10/08 | PL | Apr-08 | 1564 | 45 | 1563 | 1 |
| 01/11/08 | PL | Apr-08 | 1569 | 10 | 1569 | 0 |
| 01/11/08 | PL | Apr-08 | 1570 | 40 | 1569 | 1 |
| 01/14/08 | PL | Apr-08 | 1588 | 80 | 1588 | 0 |
| 01/15/08 | PL | Apr-08 | 1587.5 | 50 | 1587.5 | 0 |
| 01/17/08 | PL | Apr-08 | 1566.5 | 100 | 1562 | 4.5 |
| 01/18/08 | PL | Apr-08 | 1564 | 10 | 1561 | 3 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | High Price During Settlement Period | Moore Purchase  Price - High During Settlement Period |
|---|---|---|---|---|---|---|
| 01/18/08 | PL | Apr-08 | 1566.9 | 5 | 1561 | 5.9 |
| 01/18/08 | PL | Apr-08 | 1567 | 85 | 1561 | 6 |
| 01/22/08 | PL | Apr-08 | 1560 | 100 | 1555.5 | 4.5 |
| 01/23/08 | PL | Apr-08 | 1558.5 | 25 | 1558.5 | 0 |
| 01/23/08 | PL | Apr-08 | 1560 | 75 | 1558.5 | 1.5 |
| 01/24/08 | PL | Apr-08 | 1615 | 100 | 1612.5 | 2.5 |
| 01/25/08 | PL | Apr-08 | 1683 | 100 | 1676 | 7 |
| 01/28/08 | PL | Apr-08 | 1733 | 100 | 1725 | 8 |
| 01/29/08 | PL | Apr-08 | 1725 | 100 | 1714.9 | 10.1 |
| 01/30/08 | PL | Apr-08 | 1689.9 | 10 | 1687.9 | 2 |
| 01/30/08 | PL | Apr-08 | 1690 | 40 | 1687.9 | 2.1 |
| 02/04/08 | PL | Apr-08 | 1798 | 50 | 1792 | 6 |
| 02/05/08 | PL | Apr-08 | 1785.9 | 5 | 1780 | 5.9 |
| 02/05/08 | PL | Apr-08 | 1786 | 95 | 1780 | 6 |
| 02/06/08 | PL | Apr-08 | 1819.9 | 7 | 1818 | 1.9 |
| 02/06/08 | PL | Apr-08 | 1820 | 93 | 1818 | 2 |
| 02/07/08 | PL | Apr-08 | 1852 | 100 | 1850.5 | 1.5 |
| 02/08/08 | PL | Apr-08 | 1884.9 | 100 | 1883.5 | 1.4 |
| 02/11/08 | PL | Apr-08 | 1939.9 | 50 | 1938 | 1.9 |
| 02/12/08 | PL | Apr-08 | 1924 | 100 | 1923 | 1 |
| 02/13/08 | PL | Apr-08 | 1985 | 50 | 1981.1 | 3.9 |
| 02/15/08 | PL | Apr-08 | 2064 | 100 | 2060 | 4 |
| 02/20/08 | PL | Apr-08 | 2140 | 100 | 2136.9 | 3.1 |
| 02/21/08 | PL | Apr-08 | 2190 | 100 | 2180 | 10 |
| 02/22/08 | PL | Apr-08 | 2170 | 100 | 2165 | 5 |
| 02/25/08 | PL | Apr-08 | 2155 | 100 | 2147.9 | 7.1 |
| 02/27/08 | PL | Apr-08 | 2155 | 100 | 2139.8 | 15.2 |
| 02/29/08 | PL | Apr-08 | 2180 | 5 | 2173 | 7 |
| 02/29/08 | PL | Apr-08 | 2185 | 95 | 2173 | 12 |
| 03/03/08 | PL | Apr-08 | 2245 | 100 | 2240 | 5 |
| 03/04/08 | PL | Apr-08 | 2275 | 50 | 2257 | 18 |
| 03/05/08 | PL | Apr-08 | 2286 | 100 | 2255.9 | 30.1 |
| 03/06/08 | PL | Apr-08 | 2215 | 100 | 2179.9 | 35.1 |
| 03/10/08 | PL | Apr-08 | 2035 | 10 | 2019.9 | 15.1 |
| 03/10/08 | PL | Apr-08 | 2040 | 5 | 2019.9 | 20.1 |
| 03/10/08 | PL | Apr-08 | 2049 | 85 | 2019.9 | 29.1 |
| 03/20/08 | PL | Apr-08 | 1875 | 6 | 1873 | 2 |
| 03/20/08 | PL | Apr-08 | 1878 | 3 | 1873 | 5 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | High Price During Settlement Period | Moore Purchase  Price - High During Settlement Period |
|---|---|---|---|---|---|---|
| 03/20/08 | PL | Apr-08 | 1880 | 91 | 1873 | 7 |
| 03/24/08 | PL | Apr-08 | 1890 | 50 | 1885 | 5 |
| 03/26/08 | PL | Jul-08 | 2025 | 100 | 2012 | 13 |
| 03/28/08 | PL | Jul-08 | 2043 | 5 | 2034 | 9 |
| 03/28/08 | PL | Jul-08 | 2055 | 95 | 2034 | 21 |
| 03/31/08 | PL | Jul-08 | 2050 | 100 | 2029 | 21 |
| 04/01/08 | PL | Jul-08 | 1936 | 9 | 1936 | 0 |
| 04/01/08 | PL | Jul-08 | 1939.5 | 10 | 1936 | 3.5 |
| 04/01/08 | PL | Jul-08 | 1940 | 81 | 1936 | 4 |
| 04/03/08 | PL | Jul-08 | 2015 | 50 | 2005 | 10 |
| 04/04/08 | PL | Jul-08 | 2035 | 25 | 2035 | 0 |
| 04/07/08 | PL | Jul-08 | 2048 | 50 | 2045 | 3 |
| 04/09/08 | PL | Jul-08 | 2048 | 100 | 2037 | 11 |
| 04/10/08 | PL | Jul-08 | 2047 | 50 | 2025.3 | 21.7 |
| 04/11/08 | PL | Jul-08 | 2029 | 50 | 2023 | 6 |
| 04/16/08 | PL | Jul-08 | 2040 | 50 | 2037 | 3 |
| 04/17/08 | PL | Jul-08 | 2063 | 50 | 2063 | 0 |
| 04/18/08 | PL | Jul-08 | 2077.8 | 50 | 2051.4 | 26.4 |
| 04/21/08 | PL | Jul-08 | 2030 | 50 | 2030 | 0 |
| 04/22/08 | PL | Jul-08 | 2037.8 | 50 | 2035.5 | 2.3 |
| 04/29/08 | PL | Jul-08 | 1942 | 48 | 1942 | 0 |
| 04/30/08 | PL | Jul-08 | 1938 | 25 | 1938 | 0 |
| 05/01/08 | PL | Jul-08 | 1882 | 17 | 1882 | 0 |
| 05/01/08 | PL | Jul-08 | 1886 | 33 | 1882 | 4 |
| 05/02/08 | PL | Jul-08 | 1910 | 50 | 1905 | 5 |
| 05/06/08 | PL | Jul-08 | 1974 | 50 | 1974 | 0 |
| 05/07/08 | PL | Jul-08 | 1970 | 50 | 1966 | 4 |
| 05/08/08 | PL | Jul-08 | 2045 | 100 | 2045 | 0 |
| 05/09/08 | PL | Jul-08 | 2110 | 100 | 2110 | 0 |
| 05/12/08 | PL | Jul-08 | 2130 | 100 | 2120 | 10 |
| 05/13/08 | PL | Jul-08 | 2073.5 | 50 | 2073.4 | 0.1 |
| 05/14/08 | PL | Jul-08 | 2039.5 | 75 | 2039 | 0.5 |
| 05/15/08 | PL | Jul-08 | 2077.5 | 100 | 2075 | 2.5 |
| 05/16/08 | PL | Jul-08 | 2132 | 100 | 2132 | 0 |
| 05/19/08 | PL | Jul-08 | 2165 | 50 | 2165 | 0 |
| 05/21/08 | PL | Jul-08 | 2224 | 50 | 2200 | 24 |

# Exhibit K

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | High Price During Reg Trading | Moore Purchase Price - High Price During Reg Trading |
|---|---|---|---|---|---|---|
| 11/30/07 | PL | Jan-08 | 1445 | 50 | 1445 | 0 |
| 12/03/07 | PL | Jan-08 | 1462.5 | 20 | 1462 | 0.5 |
| 12/14/07 | PL | Jan-08 | 1480 | 75 | 1478 | 2 |
| 12/17/07 | PL | Jan-08 | 1504 | 50 | 1503.5 | 0.5 |
| 12/21/07 | PL | Jan-08 | 1540 | 100 | 1535 | 5 |
| 12/28/07 | PL | Apr-08 | 1541.8 | 25 | 1540 | 1.8 |
| 12/28/07 | PL | Apr-08 | 1542 | 25 | 1540 | 2 |
| 12/31/07 | PL | Apr-08 | 1534.8 | 80 | 1534.5 | 0.3 |
| 01/03/08 | PL | Apr-08 | 1552 | 89 | 1550.9 | 1.1 |
| 01/08/08 | PL | Apr-08 | 1560 | 15 | 1560 | 0 |
| 01/08/08 | PL | Apr-08 | 1561.9 | 5 | 1560 | 1.9 |
| 01/08/08 | PL | Apr-08 | 1562 | 30 | 1560 | 2 |
| 01/18/08 | PL | Apr-08 | 1566.9 | 5 | 1564.9 | 2 |
| 01/18/08 | PL | Apr-08 | 1567 | 85 | 1564.9 | 2.1 |
| 01/22/08 | PL | Apr-08 | 1560 | 100 | 1560 | 0 |
| 01/24/08 | PL | Apr-08 | 1615 | 100 | 1612.5 | 2.5 |
| 01/28/08 | PL | Apr-08 | 1733 | 100 | 1725 | 8 |
| 01/29/08 | PL | Apr-08 | 1725 | 100 | 1717 | 8 |
| 02/04/08 | PL | Apr-08 | 1798 | 50 | 1794.8 | 3.2 |
| 02/05/08 | PL | Apr-08 | 1785.9 | 5 | 1785 | 0.9 |
| 02/05/08 | PL | Apr-08 | 1786 | 95 | 1785 | 1 |
| 02/06/08 | PL | Apr-08 | 1819.9 | 7 | 1818 | 1.9 |
| 02/06/08 | PL | Apr-08 | 1820 | 93 | 1818 | 2 |
| 02/07/08 | PL | Apr-08 | 1852 | 100 | 1851 | 1 |
| 02/20/08 | PL | Apr-08 | 2140 | 100 | 2139.9 | 0.1 |
| 02/21/08 | PL | Apr-08 | 2190 | 100 | 2189.9 | 0.1 |
| 02/22/08 | PL | Apr-08 | 2170 | 100 | 2169 | 1 |
| 02/27/08 | PL | Apr-08 | 2155 | 100 | 2154 | 1 |
| 02/29/08 | PL | Apr-08 | 2180 | 5 | 2174 | 6 |
| 02/29/08 | PL | Apr-08 | 2185 | 95 | 2174 | 11 |
| 03/03/08 | PL | Apr-08 | 2245 | 100 | 2240 | 5 |
| 03/05/08 | PL | Apr-08 | 2286 | 100 | 2259.9 | 26.1 |
| 03/10/08 | PL | Apr-08 | 2040 | 5 | 2039.9 | 0.1 |
| 03/10/08 | PL | Apr-08 | 2049 | 85 | 2039.9 | 9.1 |
| 03/24/08 | PL | Apr-08 | 1890 | 50 | 1885 | 5 |
| 03/26/08 | PL | Jul-08 | 2025 | 100 | 2012 | 13 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | High Price During Reg Trading | Moore Purchase Price - High Price During Reg Trading |
|---|---|---|---|---|---|---|
| 04/04/08 | PL | Jul-08 | 2035 | 25 | 2035 | 0 |
| 04/09/08 | PL | Jul-08 | 2048 | 100 | 2037 | 11 |
| 04/10/08 | PL | Jul-08 | 2047 | 50 | 2044 | 3 |
| 04/18/08 | PL | Jul-08 | 2077.8 | 50 | 2052.5 | 25.3 |
| 04/22/08 | PL | Jul-08 | 2037.8 | 50 | 2036 | 1.8 |
| 05/02/08 | PL | Jul-08 | 1910 | 50 | 1908.9 | 1.1 |
| 05/07/08 | PL | Jul-08 | 1970 | 50 | 1967.9 | 2.1 |
| 05/08/08 | PL | Jul-08 | 2045 | 100 | 2045 | 0 |
| 05/09/08 | PL | Jul-08 | 2110 | 100 | 2110 | 0 |
| 05/12/08 | PL | Jul-08 | 2130 | 100 | 2120 | 10 |
| 05/21/08 | PL | Jul-08 | 2224 | 50 | 2210.9 | 13.1 |

# Exhibit L

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Price Before Settlement Period | Moore Purchase Price - Price Before Settlement Period |
|---|---|---|---|---|---|---|
| 11/19/07 | PL | Jan-08 | 1458 | 50 | 1454.1 | 3.9 |
| 11/21/07 | PL | Jan-08 | 1472 | 50 | 1462.5 | 9.5 |
| 11/27/07 | PL | Jan-08 | 1455 | 25 | 1450 | 5 |
| 11/30/07 | PL | Jan-08 | 1445 | 50 | 1440 | 5 |
| 12/03/07 | PL | Jan-08 | 1461.8 | 5 | 1461.5 | 0.3 |
| 12/03/07 | PL | Jan-08 | 1462.5 | 20 | 1461.5 | 1 |
| 12/04/07 | PL | Jan-08 | 1472 | 25 | 1471 | 1 |
| 12/04/07 | PL | Jan-08 | 1473 | 25 | 1471 | 2 |
| 12/05/07 | PL | Jan-08 | 1470 | 50 | 1465.3 | 4.7 |
| 12/06/07 | PL | Jan-08 | 1469 | 5 | 1466.8 | 2.2 |
| 12/06/07 | PL | Jan-08 | 1471.4 | 1 | 1466.8 | 4.6 |
| 12/06/07 | PL | Jan-08 | 1471.5 | 3 | 1466.8 | 4.7 |
| 12/06/07 | PL | Jan-08 | 1471.8 | 40 | 1466.8 | 5 |
| 12/06/07 | PL | Jan-08 | 1471.8 | 1 | 1466.8 | 5 |
| 12/07/07 | PL | Jan-08 | 1463 | 50 | 1460.5 | 2.5 |
| 12/10/07 | PL | Jan-08 | 1467.5 | 50 | 1465.6 | 1.9 |
| 12/12/07 | PL | Jan-08 | 1480 | 50 | 1476.5 | 3.5 |
| 12/14/07 | PL | Jan-08 | 1480 | 75 | 1476.9 | 3.1 |
| 12/17/07 | PL | Jan-08 | 1504 | 50 | 1497.2 | 6.8 |
| 12/18/07 | PL | Jan-08 | 1516 | 50 | 1510.5 | 5.5 |
| 12/21/07 | PL | Jan-08 | 1540 | 100 | 1535 | 5 |
| 12/26/07 | PL | Apr-08 | 1543.5 | 10 | 1542.2 | 1.3 |
| 12/26/07 | PL | Apr-08 | 1544 | 40 | 1542.2 | 1.8 |
| 12/27/07 | PL | Apr-08 | 1538 | 50 | 1535.1 | 2.9 |
| 12/28/07 | PL | Apr-08 | 1541.8 | 25 | 1534.5 | 7.3 |
| 12/28/07 | PL | Apr-08 | 1542 | 25 | 1534.5 | 7.5 |
| 12/31/07 | PL | Apr-08 | 1530 | 20 | 1527.8 | 2.2 |
| 12/31/07 | PL | Apr-08 | 1534.8 | 80 | 1527.8 | 7 |
| 01/02/08 | PL | Apr-08 | 1548 | 50 | 1543.5 | 4.5 |
| 01/03/08 | PL | Apr-08 | 1550 | 11 | 1549 | 1 |
| 01/03/08 | PL | Apr-08 | 1552 | 89 | 1549 | 3 |
| 01/07/08 | PL | Apr-08 | 1533 | 50 | 1527.4 | 5.6 |
| 01/08/08 | PL | Apr-08 | 1560 | 15 | 1559.9 | 0.1 |
| 01/08/08 | PL | Apr-08 | 1561.9 | 5 | 1559.9 | 2 |
| 01/08/08 | PL | Apr-08 | 1562 | 30 | 1559.9 | 2.1 |
| 01/10/08 | PL | Apr-08 | 1563.9 | 5 | 1563 | 0.9 |
| 01/10/08 | PL | Apr-08 | 1564 | 45 | 1563 | 1 |

| Trade Date | PL / PA | Contract | Moore Purchase Price | Volume | Price Before Settlement Period | Moore Purchase Price - Price Before Settlement Period |
|---|---|---|---|---|---|---|
| 01/11/08 | PL | Apr-08 | 1569 | 10 | 1568 | 1 |
| 01/11/08 | PL | Apr-08 | 1570 | 40 | 1568 | 2 |
| 01/14/08 | PL | Apr-08 | 1584 | 20 | 1575.5 | 8.5 |
| 01/14/08 | PL | Apr-08 | 1588 | 80 | 1575.5 | 12.5 |
| 01/15/08 | PL | Apr-08 | 1587.5 | 50 | 1578.6 | 8.9 |
| 01/17/08 | PL | Apr-08 | 1566.5 | 100 | 1562.4 | 4.1 |
| 01/18/08 | PL | Apr-08 | 1564 | 10 | 1560.9 | 3.1 |
| 01/18/08 | PL | Apr-08 | 1566.9 | 5 | 1560.9 | 6 |
| 01/18/08 | PL | Apr-08 | 1567 | 85 | 1560.9 | 6.1 |
| 01/22/08 | PL | Apr-08 | 1560 | 100 | 1557 | 3 |
| 01/23/08 | PL | Apr-08 | 1558.5 | 25 | 1554.6 | 3.9 |
| 01/23/08 | PL | Apr-08 | 1560 | 75 | 1554.6 | 5.4 |
| 01/24/08 | PL | Apr-08 | 1615 | 100 | 1608.5 | 6.5 |
| 01/25/08 | PL | Apr-08 | 1683 | 100 | 1666.6 | 16.4 |
| 01/28/08 | PL | Apr-08 | 1733 | 100 | 1719.5 | 13.5 |
| 01/29/08 | PL | Apr-08 | 1725 | 100 | 1708 | 17 |
| 01/30/08 | PL | Apr-08 | 1689.9 | 10 | 1689.8 | 0.1 |
| 01/30/08 | PL | Apr-08 | 1690 | 40 | 1689.8 | 0.2 |
| 02/04/08 | PL | Apr-08 | 1798 | 50 | 1792 | 6 |
| 02/05/08 | PL | Apr-08 | 1785.9 | 5 | 1785 | 0.9 |
| 02/05/08 | PL | Apr-08 | 1786 | 95 | 1785 | 1 |
| 02/06/08 | PL | Apr-08 | 1819.9 | 7 | 1815 | 4.9 |
| 02/06/08 | PL | Apr-08 | 1820 | 93 | 1815 | 5 |
| 02/07/08 | PL | Apr-08 | 1852 | 100 | 1850.5 | 1.5 |
| 02/08/08 | PL | Apr-08 | 1884.9 | 100 | 1880.2 | 4.7 |
| 02/11/08 | PL | Apr-08 | 1939.9 | 50 | 1937 | 2.9 |
| 02/12/08 | PL | Apr-08 | 1924 | 100 | 1916.2 | 7.8 |
| 02/14/08 | PL | Apr-08 | 2005 | 20 | 2000 | 5 |
| 02/14/08 | PL | Apr-08 | 2007 | 80 | 2000 | 7 |
| 02/15/08 | PL | Apr-08 | 2064 | 100 | 2058.5 | 5.5 |
| 02/20/08 | PL | Apr-08 | 2140 | 100 | 2128.1 | 11.9 |
| 02/21/08 | PL | Apr-08 | 2190 | 100 | 2183 | 7 |
| 02/22/08 | PL | Apr-08 | 2170 | 100 | 2162 | 8 |
| 02/25/08 | PL | Apr-08 | 2155 | 100 | 2145.1 | 9.9 |
| 02/26/08 | PL | Apr-08 | 2150 | 100 | 2145.2 | 4.8 |
| 02/27/08 | PL | Apr-08 | 2155 | 100 | 2138.2 | 16.8 |
| 02/29/08 | PL | Apr-08 | 2180 | 5 | 2165 | 15 |

| Trade Date | PL / PA | Contract | Moore Purchase  Price | Volume | Price Before Settlement Period | Moore Purchase Price - Price Before Settlement Period |
|---|---|---|---|---|---|---|
| 02/29/08 | PL | Apr-08 | 2185 | 95 | 2165 | 20 |
| 03/03/08 | PL | Apr-08 | 2245 | 100 | 2240 | 5 |
| 03/04/08 | PL | Apr-08 | 2275 | 50 | 2252 | 23 |
| 03/05/08 | PL | Apr-08 | 2286 | 100 | 2250 | 36 |
| 03/06/08 | PL | Apr-08 | 2215 | 100 | 2170 | 45 |
| 03/10/08 | PL | Apr-08 | 2035 | 10 | 2017 | 18 |
| 03/10/08 | PL | Apr-08 | 2040 | 5 | 2017 | 23 |
| 03/10/08 | PL | Apr-08 | 2049 | 85 | 2017 | 32 |
| 03/20/08 | PL | Apr-08 | 1875 | 6 | 1873 | 2 |
| 03/20/08 | PL | Apr-08 | 1878 | 3 | 1873 | 5 |
| 03/20/08 | PL | Apr-08 | 1880 | 91 | 1873 | 7 |
| 03/24/08 | PL | Apr-08 | 1890 | 50 | 1882.5 | 7.5 |
| 03/26/08 | PL | Jul-08 | 2025 | 100 | 2005.2 | 19.8 |
| 03/28/08 | PL | Jul-08 | 2043 | 5 | 2024.9 | 18.1 |
| 03/28/08 | PL | Jul-08 | 2055 | 95 | 2024.9 | 30.1 |
| 03/31/08 | PL | Jul-08 | 2050 | 100 | 2023 | 27 |
| 04/01/08 | PL | Jul-08 | 1936 | 9 | 1931.9 | 4.1 |
| 04/01/08 | PL | Jul-08 | 1939.5 | 10 | 1931.9 | 7.6 |
| 04/01/08 | PL | Jul-08 | 1940 | 81 | 1931.9 | 8.1 |
| 04/03/08 | PL | Jul-08 | 2015 | 50 | 2005 | 10 |
| 04/04/08 | PL | Jul-08 | 2035 | 25 | 2025 | 10 |
| 04/07/08 | PL | Jul-08 | 2048 | 50 | 2041.9 | 6.1 |
| 04/09/08 | PL | Jul-08 | 2048 | 100 | 2034 | 14 |
| 04/10/08 | PL | Jul-08 | 2047 | 50 | 2025.3 | 21.7 |
| 04/11/08 | PL | Jul-08 | 2029 | 50 | 2019.9 | 9.1 |
| 04/16/08 | PL | Jul-08 | 2040 | 50 | 2031 | 9 |
| 04/17/08 | PL | Jul-08 | 2063 | 50 | 2056 | 7 |
| 04/18/08 | PL | Jul-08 | 2077.8 | 50 | 2048.1 | 29.7 |
| 04/21/08 | PL | Jul-08 | 2030 | 50 | 2019.5 | 10.5 |
| 04/22/08 | PL | Jul-08 | 2037.8 | 50 | 2035.3 | 2.5 |
| 04/29/08 | PL | Jul-08 | 1940 | 2 | 1932.5 | 7.5 |
| 04/29/08 | PL | Jul-08 | 1942 | 48 | 1932.5 | 9.5 |
| 04/30/08 | PL | Jul-08 | 1938 | 25 | 1935 | 3 |
| 05/01/08 | PL | Jul-08 | 1882 | 17 | 1878.5 | 3.5 |
| 05/01/08 | PL | Jul-08 | 1886 | 33 | 1878.5 | 7.5 |
| 05/02/08 | PL | Jul-08 | 1910 | 50 | 1905 | 5 |
| 05/06/08 | PL | Jul-08 | 1974 | 50 | 1958.5 | 15.5 |

| Trade Date | PL / PA | Contract | Moore Purchase  Price | Volume | Price Before Settlement Period | Moore Purchase Price - Price Before Settlement Period |
|---|---|---|---|---|---|---|
| 05/07/08 | PL | Jul-08 | 1970 | 50 | 1960.1 | 9.9 |
| 05/08/08 | PL | Jul-08 | 2045 | 100 | 2025.5 | 19.5 |
| 05/09/08 | PL | Jul-08 | 2110 | 100 | 2085.6 | 24.4 |
| 05/12/08 | PL | Jul-08 | 2130 | 100 | 2115 | 15 |
| 05/13/08 | PL | Jul-08 | 2073.5 | 50 | 2073 | 0.5 |
| 05/14/08 | PL | Jul-08 | 2039.5 | 75 | 2037 | 2.5 |
| 05/15/08 | PL | Jul-08 | 2077.5 | 100 | 2075 | 2.5 |
| 05/19/08 | PL | Jul-08 | 2165 | 50 | 2146.7 | 18.3 |
| 05/20/08 | PL | Jul-08 | 2150 | 100 | 2136.9 | 13.1 |
| 05/21/08 | PL | Jul-08 | 2224 | 50 | 2194.8 | 29.2 |