UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In Re: Platinum And Palladium Commodities Litigation*<br><br>This Document Relates To:<br><br>Platinum/Palladium Futures Action | MASTER FILE<br>No. 10 Civ. 3617 (WHP) |

**FUTURES PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT WITH
<u>THE MOORE DEFENDANTS AND DEFENDANT JOSEPH WELSH</u>**

# TABLE OF CONTENTS

I.   If Finally Approved, The Moore Settlement And The MF Global Settlement Will Resolve All Claims In This Complex Litigation And Provide Approximately $68,000,000-$70,000,000 To The Class ............................................................................... 1

II.   The $49,150,000 From The Moore Settlement Represents Approximately 12% Of Estimated Damages, And The $68-$70,000,000 In Total Consideration Represents Approximately 17% Of Likely Damages, Which Far Exceed The Pertinent Average Class Action Recovery  ......................................................................................................... 2

III.   The Specific Claims Here Were More, Not Less Risky Than Securities Fraud And Most Other Types Of Claims ................................................................................................. 3

IV.   In Addition To The Monetary Compensation, The Settlement Contains Limitations On Reversions That Will Enhance The Actual Pay-Out To Class Members Who File Valid Proofs Of Claim ............................................................................................................ 4

V.   Final Approval Of The Moore Settlement Is Further Warranted By The Low Amount Of Opt-Outs ......................................................................................................................... 4

VI.   Plaintiffs' Claims Against The Defendants  ................................................................... 5

VII.   Procedural History  ......................................................................................................... 5

VIII.   The Release  ..................................................................................................................... 5

IX.   The Standards for Final Approval of a Class Action Settlement Are Satisfied  ................. 6

    A.   The Settlement Is Procedurally Fair  ..................................................................... 6

        1.   The Settlement Was Negotiated At Arm's-Length And, According To Defendants' Lead Counsel, The Settlement Negotiations Were The Most "Arduous" Of His Twenty-Five Year Career  ............................................ 6

        2.   The Settlement Was Negotiated By Experienced, Capable Counsel ......... 6

        3.   The Settlement Was Reached After Substantial and Meaningful Discovery, Investigation, Information Exchanges and Analysis Thereof  . 7

    B.   The *Grinnell* Factors Strongly Weigh In Favor of Finding That The Settlement is Substantively Fair, Reasonable and Adequate  ..................................................... 9

        1.   Factor 1: The Complexity, Expense and Likely Duration of The Litigation ............................................................................................... 10

i

2. <u>Factor 2</u>: The Reaction Of The Class To The Settlement ........................ 11

3. <u>Factor 3</u>: The Stage Of The Proceedings And The Amount Of Discovery Completed ............................................................................................. 11

4. <u>Factors 4, 5 and 6</u>: The Risks Of Establishing Liability, Damages and Maintaining The Class Action Through Trial ........................................... 12

    a. Why The Risks Were Extreme And The Negotiations The Most Arduous ....................................................................................... 12

5. <u>Factor 7</u>: The Ability Of The Defendants To Withstand A Greater Judgment ................................................................................................. 13

6. <u>Factors 8 and 9</u>: The Range Of Reasonableness Of The Settlement Fund In Light Of The Best Possible Recovery And All The Attendant Risks Of Litigation ............................................................................................. 14

X. The Proposed Plan of Allocation Has A Reasonable And Rational Basis And Should Be Approved ................................................................................................. 15

XI. The Notice Plan ................................................................................................. 17

XII. The Class Has Been Preliminarily Certified And Still Satisfies the Prerequisites of Rule 23(a) and Rule 23(b)(3) Such That It Should Be Certified For Purposes of Final Approval ........................................................................................................ 18

XIII. Conclusion ....................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ............................................................................................ 4

*Chatelain v. Prudential-Bache Securities, Inc.*,
  805 F. Supp. 209 (S.D.N.Y. 1992) ...................................................................... 7

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ........................................................................ 10, 14

*D'Amato v. Deutsche Bank,*
  236 F.3d 78 (2d Cir. 2001) .................................................................................. 6

*Goldberger v. Integrated Res., Inc.*,
  209 F.3d 43 (2d Cir. 2000) ................................................................................ 10

*In re Currency Conversion Fee Antitrust Litig.*,
  263 F.R.D. 110 (S.D.N.Y. Oct. 22, 2009) .......................................................... 11

*In re Global Crossing Sec. and ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ................................................................*passim*

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y.1997) ........................................................................ 16

*In re PaineWebber Ltd. P'ships Litig.*,
  147 F.3d 132 (2d Cir. 1998) .......................................................................... 6, 17

*In re Platinum & Palladium Commodities Litig.*,
  No. 10 CV 3617, 2014 WL 3500655 (S.D.N.Y. July 15, 2014) ......................*passim*

*In re Sumitomo Copper Litig.*,
  74 F.Supp.2d 393 (S.D.N.Y. 1999) ...................................................................... 3

*In re Sumitomo Copper Litig.*,
  96-cv-4584 (S.D.N.Y.) ......................................................................................... 3

iii

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) ................................................................... 15

*Mavwalt v. Parker & Parsley Petroleum Co.*,
    67 F.3d 1072 (2d Cir. 1995) ................................................................................ 9

*Merrill Lynch, Pierce, Fenner & Smith v. Curran*,
    456 U.S. 353 (1982) .......................................................................................... 10

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972) ................................................................................ 14

*Precision Assocs., Inc. v. Panalpina World Transport (Holding) Ltd.*,
    No. 08–cv–42 (JG)(VVP), 2013 WL 4525323 (E.D.N.Y. Aug. 27, 2013) ............. 17

*Priceline.com, Inc. v. Silberman*,
    405 F. App'x 532 (2d Cir. 2010) ......................................................................... 11

*Sakiko Fujiwara v. Sushi Yasuda Ltd.*,
    No. 12CV8742, 2014 WL 5840700 (S.D.N.Y. Nov. 12, 2014) ..................... 5, 11, 14

**Rules**

Fed. R. Civ. P. 23(c)(2)(B) ........................................................................................ 17

Fed. R. Civ. P. 23(e) ............................................................................................... 18

Fed. R. Civ. P. 23(e)(1) ............................................................................................ 17

Fed. R. Civ. P. 23(e)(2) ............................................................................................ 6

**Other Authorities**

http://securities.stanford.edu/Settlements/REVIEW_1995-
    2011/Settlements_Through_12_2011.pdf ............................................................... 2

*Securities Class Action Settlements, 2011 Review and Analysis*, Cornerstone Research ............... 2

www.lshllp.com ..................................................................................................... 7

The Futures Plaintiffs[1] ("Plaintiffs") respectfully submit this memorandum, and the accompanying Declarations of Christopher M. McGrath, Esq. ("McGrath Fairness Decl."), Professor Gerald Markham ("Markham Decl.") and Eric Miller ("Miller Decl.") in support of Plaintiffs' motion pursuant to Rule 23(e) of the Federal Rules of Civil Procedure for final approval of the Stipulation and Agreement of Settlement ("Settlement")[2] among Plaintiffs, and Defendants Moore[3] and Joseph Welsh.

## I.    If Finally Approved, The Moore Settlement And The MF Global Settlement Will Resolve All Claims In This Complex Litigation And Provide Approximately $68,000,000-$70,000,000 To The Class

The Moore Settlement will provide $49,150,000 in cash[4] to the Class[5] from Moore ($48,400,000) and Welsh ($750,000).  McGrath Fairness Decl. ¶¶5(b)-(c), 93, 96 (describing, among other things (a) the stipulated entry of a $35,000,000 judgment against Defendant Welsh enforceable only against his assets consisting of his rights and claims (all of which he has

---

[1] "Futures Plaintiffs" refers to Richard White, Harry Ploss and The Stuart Sugarman Trust.

[2] A copy of the Settlement was previously filed with the Court.  *See* Dkt. No. 163-1.

[3] "Moore Defendants" refers to Moore Capital Management, LP; Moore Capital Management, LLC; Moore Capital Advisors, LLC; Moore Advisors, Ltd.; Moore Macro Fund, LP; Moore Global Fixed Income Master Fund, LP; Christopher Pia; Louis Bacon; and Eugene Burger.

[4] Moore has now deposited $48,100,000 into a Court Registry Investment Service ("CRIS") account and $300,000 into an escrow account at Huntington National Bank, for a total cash payment of $48,400,000 for the benefit of the Futures Class.  Dkt. No. 214.

[5] The Court has certified, for purposes of settlement only, the Futures Class, defined as:

> All Persons that purchased or sold a NYMEX platinum futures contract or a NYMEX palladium futures contract during the period from June 1, 2006 through April 29, 2010, inclusive.  Excluded from the Futures Class are (i) the Settling Defendants, MF Global, Inc., any co-conspirators alleged in the Complaint or any subsequent amended complaint filed prior to the Exclusion Bar Date, Alan Craig Kleinstein, Dominick Frank Terrone, Richard Peter Trifoglio Sr., Frederick Charles Ferriola, Peter Michael Venus, Lawrence Frasca Favuzza, and John Anthony Sakulich and any NYMEX floor brokers or NYMEX floor traders who refuse to execute the certification in the Proof of Claim attesting that they were not co-conspirators, or aiders or abettors of the Settling Defendants or Non-Settling Defendants, and  (ii) Opt Outs.

Dkt. No. 212, ¶2.

assigned to Plaintiffs) against certain insurers ("Welsh Assignment"), and (b) Plaintiffs' agreement to sell the Welsh Assignment[6] to MF Global Holdings for $800,000 which produces a net consideration to the Class of $750,000 after deducting $50,000 therefrom which is paid to Moore.

By separate Memorandum and pursuant to separate Order of this Court (ECF No. 245), Plaintiffs are moving for final approval of their proposed settlement with James W. Giddens, as Trustee for the liquidation for Defendant MF Global, Inc., MF Global Holdings, Ltd. and MFG Assurance Company Ltd. ("MF Global Settlement"). Each settlement is subject to final approval (or disapproval) on its own merits.

However, Plaintiffs respectfully note here that they believe the MF Global Settlement will provide the Class with $17,700,000 - $19,700,000 more in additional cash consideration. McGrath Fairness Decl. ¶6(c). Thus, if this Settlement and the MF Global Settlement are finally approved, they would resolve all claims in the Futures Action and provide in excess of $68,000,000-$70,000,000 in cash consideration to the Class.

## II.   The $49,150,000 From The Moore Settlement Represents Approximately 12% Of Estimated Damages, And The $68-$70,000,000 In Total Consideration Represents Approximately 17% Of Likely Damages, Which Far Exceed The Pertinent Average Class Action Recovery

Plaintiffs estimate total damages at $400,000,000. Research on class action settlements shows that the amounts of settlements as a percentage of the amount of estimated damages typically ***decreases*** as estimated damages increase. *See Securities Class Action Settlements, 2011 Review and Analysis*, Cornerstone Research at p. 7.[7] Indeed, the average settlement

---

[6] Class Counsel determined that Defendant Welsh could not satisfy any significant judgment that Plaintiffs might, by continuing to prosecute the claims, be able to obtain against him. McGrath Fairness Decl. ¶92.

[7] Available at http://securities.stanford.edu/Settlements/REVIEW_1995-

recovery for class action settlements during the years 1996 through 2010 involving estimated damages (as here) between $250 million and $499 million was only 2.5 cents on the dollar.  *Id*.

Just the $49,150,000 cash compensation from the Moore Settlement and 12% nominal recovery estimate, represents a recovery of almost **five times** the size of the average class action settlement with comparable ranges of damages.  Including the additional consideration from the MF Global Settlement, the recovery from final approval here increases to almost **seven times** the size of the average class action settlement with comparable ranges of damages.

### III.   The Specific Claims Here Were More, Not Less Risky Than Securities Fraud And Most Other Types Of Claims

The claims here for manipulation in violation of the CEA have been recognized as "notoriously difficult to prove" and "more difficult and risky than securities fraud cases".  *In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393, 395 (S.D.N.Y. 1999) ("The case involves claims of commodity price manipulation in violation of the CEA.  Such claims have been notoriously difficult to prove…."), 397 (CEA "manipulation cases are notoriously risky and are more difficult and risky than securities fraud cases), 398 ("risks to counsel in this action were extremely high").

CEA manipulation claims generally are more uncertain and risky than securities fraud claims.  Markham Decl. ¶¶24-49.  The specific claims here are unique, and even more risky than most prior CEA manipulation claims.  *Id.* ¶¶34; *see* IX.B.4a *infra* ("Why The Risks Were Extreme And The Negotiations The Most Arduous").

---

2011/Settlements_Through_12_2011.pdf. Based upon the rates of claims in prior CEA manipulation cases and other information Lovell Stewart believes that less than 40% (and perhaps significantly less than 40%) of the estimated damages will be claimed by Futures Class members. *E.g., In re Sumitomo Copper Litig.*, 96-cv-4584, (S.D.N.Y.) Docket No. 180 (Professor John C. Coffee, Jr. predicts that an 11% lower estimated range of payout is much too low because of failures by class members to claim); Docket Nos. 359, 376, 410, 437 and 443

IV. **In Addition To The Monetary Compensation, The Settlement Contains Limitations On Reversions That Will Enhance The Actual Pay-Out To Class Members Who File Valid Proofs Of Claim**

Under *Boeing Co. v. Van Gemert*, 444 U.S. 472, 479-81 (1980), only class members who file claims to assert their rights to share in a judgment  are entitled to receive their share of the funds.  Unclaimed funds (except for the attorneys' fee thereon) "revert" to the defendants.  *Id*.

However, the Settlement limited Moore's "reversion" rights in several respects. Settlement ¶12.  First, there is no reversion with respect to Class members who opt out.  Nor will there be any reversion in respect of Class members who fail to submit a proof of claim **until** Class members who do submit proofs of claim receive 110% of their net artificiality paid and 110% of their net losses, as set forth in the Plan of Allocation.  *Id*.   Third, even then, the amount of the reversion to Moore will be limited to 50%.  That is, 50 cents on each dollar of payment over and above a 110% payout, will **still** be paid to claiming Class members, but 50% will be paid to Moore.

V. **Final Approval Of The Moore Settlement Is Further Warranted By The Low Amount Of Opt-Outs**

Notice has now been provided as the Court ordered. Only four members of the Class have requested to opt-out (Susan Levy who had filed a separate action and purported to opt out long ago, has also opted out again.) More than 5,000 forms of notice had been mailed to the sophisticated banks, trading firms and other members of the Class (including direct mail notice to all "large traders").  Thus, the extremely small number of new opt-outs represents one tenth of one percent of the estimated 4,500 potential members of the Class --- which includes 3,500 members who did clear trades through just Defendant MF Global, Inc.  Dkt. No. 220, p. 4.

The opt-out rate of one-tenth of 1% is yet another (albeit less direct) indication that the

---

(Professor Coffee is correct, and a payout of in excess of 100% actually occurs).

Settlement is fair, reasonable and adequate.  *Sakiko Fujiwara v. Sushi Yasuda Ltd.*, No.

12CV8742, 2014 WL 5840700, at *4 (S.D.N.Y. Nov. 12, 2014) (Pauley, J.).

## VI.    Plaintiffs' Claims Against the Defendants

Plaintiffs allege that Defendants engaged in unlawful conduct between June 1, 2006 and

May 21, 2008, which allegedly created an artificial impact on New York Mercantile Exchange

("NYMEX") platinum and palladium futures prices beginning at least in or around October 2007

and continuing to and after May 21, 2008.  This includes allegations that, between at least

October 17, 2007 and June 6, 2008, certain Defendants manipulated or combined, conspired, and

agreed to inflate the prices of NYMEX platinum futures contracts and NYMEX palladium

futures contracts.

The alleged manipulation violated the Commodity Exchange Act ("CEA"), 7 U.S.C. §§

1, *et seq.* The alleged agreement violated the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C.

§1 *et seq.*  More specifically, the Futures Plaintiffs allege that defendants repeatedly overpaid to

purchase NYMEX platinum futures contracts and NYMEX palladium futures contracts at or near

the end of numerous trading days.  The Futures Plaintiffs also allege that Defendant Welsh

negligently breached duties and is liable for negligence.  The Futures Plaintiffs contend that the

foregoing unlawful conduct caused them and others similarly situated to pay artificial prices in

order to purchase NYMEX platinum futures contracts and NYMEX palladium futures contracts.

## VII.   Procedural History

A detailed procedural history of the action is set forth in ¶¶9-54 of the McGrath Fairness

Decl.

## VIII.  The Release

The full release language is set forth in Section 6 of the Settlement was attached to the

proof of claim form, and is set forth as Ex. A hereto.  The Class releases Moore (and certain related entities and individuals) and Welsh from certain claims arising from or related to transactions in NYMEX platinum or palladium futures contracts during the Class Period.  *Id.* The Settlement does not provide for a release of the negligence claims against Defendant Welsh. *Id.*

## IX.    The Standards for Final Approval of a Class Action Settlement Are Satisfied

Class action claims may be settled only with district court approval "after a hearing and on finding that [the settlement] is fair, reasonable, and adequate."  *Compare* Fed.R.Civ.P. 23(e)(2) *with In re PaineWebber Ltd. P'ships Litig.,*147 F.3d 132, 138 (2d Cir. 1998) (there is a "strong judicial policy in favor of settlements, particularly in the class action context").  Such a finding requires consideration of the "negotiating process leading up to the settlement, *i.e.*, procedural fairness, as well as the settlement's substantive terms, *i.e.*, substantive fairness." *D'Amato v. Deutsche Bank,* 236 F.3d 78, 85 (2d Cir. 2001).

### A.    The Settlement Is Procedurally Fair
### 1.    The Settlement Was Negotiated At Arm's-Length And, According To Defendants' Lead Counsel, The Settlement Negotiations Were The Most "Arduous" Of His Twenty-Five Year Career

The Court previously found that the Settlement is entitled to a "presumption of reasonableness" because the Settlement was reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.  *In re Platinum & Palladium Commodities Litig.*, 2014 WL 3500655, at *11. David Zensky, Esq., principal counsel for Moore, took the trouble to attest that the negotiations that produced the Settlements were the most "painstaking, and arduous settlement negotiations I have been a party to in my twenty-seven years as a litigator."  Dkt. No. 190, ¶4.

### 2.    The Settlement Was Negotiated By Experienced, Capable Counsel

Class Counsel are experienced and capable in handling Commodity Exchange Act manipulation claims and federal antitrust claims.  *Compare* www.lshllp.com *with Chatelain v. Prudential-Bache Securities, Inc.*, 805 F. Supp. 209, 212 (S.D.N.Y. 1992) ("[a] substantial factor in determining the fairness of the settlement is the opinion of counsel involved in the settlement").  The Settling Defendants are well-respected by the national law firms of Akin Gump Strauss Hauer & Feld LLP, Kramer Levin Naftalis & Frankel LLP, Hughes Hubbard & Reed LLP and Kobre & Kim LLP.  The Settlement was negotiated by experienced, capable counsel.

### 3. The Settlement Was Reached After Substantial and Meaningful Discovery, Investigation, Information Exchanges and Analysis Thereof

**Formal Discovery**.  As the Court recognized in its July 15, 2014 Memorandum & Order, prior to executing the Settlement, Class Counsel "…reviewed over 250,000 pages of discovery, 23 CFTC deposition transcripts, and thousands of email and text messages, and recorded phone conversations."  *In re Platinum & Palladium Commodities Litig.*, 2014 WL 3500655, at *11; McGrath Fairness Decl. ¶17, 45, 61.  Class Counsel also obtained through subpoena from the NYMEX its chronological records of the transactions on a daily basis of platinum and palladium contracts during the subject period as well as large trader information. *Id.* ¶25, 63.

**Information Gathering and Correlation of Formal Discovery With Other Information.**  Class Counsel obtained substantial documents from public sources on daily prices, volumes, and other statistics for platinum, palladium, silver, gold, and other futures contracts as well as extensive other economic information relating to potential benchmarks against which to measure and dilute the movements of platinum and palladium prices.  Class Counsel correlated the transactions undertaken by Moore Capital with the publicly available data

7

so as to be able to analyze and judge the effects on prices of Moore's two hundred plus alleged transactions.

**Documents And Further Information Obtained From Defendants Relating To Moore's Trades, Welsh's Dealings With The Insurers, And Welsh's Assets And Ability To Pay A Judgment**.  During Settlement discussion, Plaintiffs requested and obtained from Moore and Welsh additional pertinent documents and information.  They related, among other things, to (i) Moore's sales and transactions of platinum and palladium during and outside of the original class period, (ii) Welsh's and MF Global's dealings and contracts with insurers, and (iii) Welsh's personal assets and ability to pay a judgment.

Class Counsel consulted with experienced insurance counsel and, also, bankruptcy counsel in order to analyze the significance of various aspects of the insurance agreement, the communications relating to the insurance contracts, the events that had transpired in the MF Global bankruptcy, and whether a specific claim was more recoverable from MF Global or Welsh.

**Extensive Exchanges Of Views, Negotiations, And Arguments Of Defendants' Counsel And Review Of Defendants' Mediation Presentations**.  Very informatively, Plaintiffs received significant additional information in the form of information exchanges, arguments, Defendants' mediation statements, Defendants' expert analyses and other Defendant input.  This information attempted to mimic parts of depositions, trials, summary judgment, opposition to class certification or other parts of the later proceedings through which the parties and Court will not go as a result of this Settlement. Plaintiffs went back, checked their data, and obtained further information through investigation or from public sources.  In certain instances, Plaintiffs re-did and substantially improved their analyses to respond to Defendants' information and

critiques.

Plaintiffs then made presentations and responses to Defendants.  After two separate mediations, the parties were still very far apart in the settlement process. Class Counsel obtained extensive information through these mediations and the subsequent negotiations and arguments with Defendants.

**Information Regarding Rates of Filing Proofs of Claim**.  Class Counsel have handled most of the previous settlements involving CEA manipulation claims. Through this and other experience, Class Counsel have gained information about the metrics for the actual claims rate such case.  Because the passage of time and further litigation tends to reduce the number of proofs of claim that will actually be filed by class members, continued prosecution introduces an equitable or legal consideration of the risk that less Class members will claim their share of any Settlement. In Class Counsel's judgment, the actual claims rate is a significant fact in determining the risks and rewards of further litigation.

As a result of all the foregoing discovery, investigation, information gathering and information exchanges with Defendants, Class Counsel was well-informed of the prospective risks, rewards, potential payouts to claiming class members, arguments, rejoinders, and other issues involved with the making of this Settlement now or continuing to prosecute the claims. McGrath Fairness Dec., ¶78, 119.

B. **The *Grinnell* Factors Strongly Weigh In Favor of Finding That The Settlement is Substantively Fair, Reasonable and Adequate**

Courts determine whether a proposed settlement is substantively fair by comparing "the terms of the compromise with the *likely* rewards of litigation."  *Mavwalt v. Parker & Parsley Petroleum Co.,* 67 F.3d 1072, 1079 (2d Cir. 1995) (emphasis supplied).  In making the determination, the settlement agreement must be considered as a whole.  *Id.*  Courts in the

Second Circuit typically consider the following nine "*Grinnell*" factors at the final approval stage:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.,* 209 F.3d 43 (2d Cir. 2000) (internal citations omitted). "[N]ot every [*Grinnell*] factor must weigh in favor of settlement, rather the court should consider the totality of these factors in light of the particular circumstances." *In re Global Crossing Sec. and ERISA Litig.,* 225 F.R.D. 436, 456 (S.D.N.Y. 2004).

## 1. <u>Factor 1</u>: The Complexity, Expense and Likely Duration of The Litigation

In its July 15, 2014 Memorandum & Order, this Court expressly found that "…it is clear that this litigation is complex and expensive." *In re Platinum & Palladium Commodities Litig.*, 2014 WL 3500655, at *12.

The commodity futures markets are "esoteric". *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456U.S. 353, 356 (1982) (citation omitted). Claims for manipulation of prices in those markets plunge into exactly such esoteria. Within the esoteria of such markets, Plaintiffs must prove that Defendants caused the intangible of "artificial" prices. Markham Decl. ¶¶38-41. Third, in civil cases involving damages such as this one, Plaintiffs must go much further. They must also prove the **amounts** and **duration** of the artificial portion of the impact of a given defendant's conduct in these esoteric markets.

Because there is no settled precedent, proof of CEA manipulation claims generally is much more complex than, for example, even securities fraud claims.  E.g. Markham Decl. ¶¶24-49.  In this particular case, Plaintiffs would have had to go further.  In this case, Plaintiffs alleged a claim of first impression in the civil context.  Markham Decl. ¶¶30.  That is, mere purchases (and without building up a large futures contract position or controlling cash market supplies) had a measurable, artificial impact on prices.  This notwithstanding the fact that the contracts being purchased were also later being sold.  Here, Plaintiffs would have had to show that a purchase by Moore, and a later offsetting sale by Moore still had a net inflationary impact on the market.  Proving this and Plaintiffs' additional damages contentions (*see* sub-point "4") would have been extremely complex.

## 2.   Factor 2: The Reaction Of The Class To The Settlement

So far, the reaction of the Class has been positive because only one tenth of one percent have opted out.  *Compare* McGrath Fairness Dec. ¶73, 114-115 *with Sakiko Fujiwara*, 2014 WL 5840700, at *4 (Pauley, J); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 123 (S.D.N.Y. Oct. 22, 2009) (Pauley, J.) (reaction of the class was "extraordinarily positive" where a small fraction of one percent of the class opted out or objected to the settlement) *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010).  Plaintiffs respectfully request leave to supplement this showing in their reply papers based upon the extent of objections (which are due January 21st) from Class members.  Again, so far, there have not been any objections received by Class Counsel or filed with the Court.

## 3.   Factor 3: The Stage Of The Proceedings And The Amount Of Discovery Completed

This third *Grinnell* factor is designed to "assure the Court that counsel for the plaintiffs have weighed their position based on a full consideration of the possibilities facing them."  *In re*

11

*Global Crossing Securities and ERISA Litig.,* 255 F.R.D. 436, 458 (S.D.N.Y. 2004).  As has

been recounted above, Plaintiffs obtained substantial formal discovery.  They engaged in very

significant investigation.  They received important information from Defendants.  They made

critical information exchanges with Defendants.  They witnessed Defendants' arguments during

two mediations.  And they conducted almost one year's worth of argument and further

negotiation after the unsuccessful mediations.

At the time the Settlement was reached, Plaintiffs were well informed, and this Court had

already devoted significant work to these complex claims.   McGrath Fairness Decl. ¶76-78.

### 4.   <u>Factors 4, 5 and 6</u>: The Risks Of Establishing Liability, Damages And Maintaining The Class Action Through Trial

The risks of establishing liability against Defendants on Plaintiffs' CEA manipulation

claims and Sherman Act claims are set forth in detail at ¶¶79-81 of the McGrath Fairness Decl

and ¶¶24-49 of the Markham Decl.

Plaintiffs faced extreme risks in (a) establishing the elements of their claims so as to

show a violation, (b) proving the **fact** of artificial impact, the **amounts** of artificial impact, and

the **duration** of artificial impact on prices, and (c) proving the $4,000,000 in damages and other

issues at trial.  *Id.*  Moore was not alleged to have controlled the cash market supplies nor built

up a dominant long position.

#### a.  Why The Risks Were Extreme And The Negotiations The Most Arduous

Instead, Moore made both a purchase in the futures market and a later sale.  Yet the

Plaintiffs contended that the net artificial effect of Moore's purchase transaction survived not

only Moore's subsequent sales.  The artificial impact even lasted until after the futures contracts

in which the transactions were made had expired.

That is, the net inflationary impact of the purchase and sale by Moore assertedly had such

appreciable artificial impact on prices that it not only caused the prices of that futures contract expiration (*e.g.* December 2007) to become artificially high.  It also spread to other futures contract expirations and lived on in them until well **after** the expiration of the futures contract in which the transactions were made.  For example, the artificiality caused by Moore's purchase and sale transaction in the January 2008 contract continued until well after the January 2008 contract had expired and all trading therein ceased.  The artificiality lived on in the form of artificial inflation in later expiring futures contracts, *e.g.*, the April 2008 contract.  Only through these contentions, were Plaintiffs able to estimate $400,000,000 in damages.  Only in this way, did Plaintiffs ultimately obtain the $68,000,000-$70,000,000 in estimated Settlement consideration.

Thus, this was an extremely high risk case with respect to damages.  Defendants estimated, at most, $6.5 million in damages. Plaintiffs reviewed the documents, consulted with experts, negotiated with Defendants, responded to Defendants' expert reports, and took many other steps.  In the process, Plaintiffs believe they developed viable means to overcome all the foregoing risks and prove their foregoing contentions.  But Plaintiffs acknowledge that the risks nonetheless were extreme.  In a "battle of the experts," a jury may have been persuaded that there was no artificial impact or, as Defendants' analysis showed, that at most, based on what Defendants considered to be "plaintiff friendly assumptions," there were $6.5 million in damages to the Class.

All litigation is risky.  But because of prior success in maintaining class actions alleging claims of manipulation, Plaintiffs do not see significant risks with respect to class certification.

5.  **<u>Factor 7</u>: The Ability Of The Defendants To Withstand A Greater Judgment**

As previously recounted, Class counsel obtained from Defendant Welsh a confidential

statement and other information.  *See* fn. 6 *supra*.  Based thereon, Class Counsel's judgment is

that Welsh does not have the ability to withstand a monetary judgment against him as great as

the $750,000 in the cash consideration that the Class is obtaining in respect of the claims against

Welsh.  *See* fn. 6 *supra*.  Moore does have such ability.  *Compare Sakiko Fujiwara*, 2014 WL

5840700, at *4 *with Global Crossing*, 255 F.R.D. at 460 ("[T]he fact that a defendant is able to

pay more than it offers in settlement does not, standing alone, indicate that the settlement is

unreasonable or inadequate").

6. <u>**Factors 8 and 9**</u>**: The Range Of Reasonableness Of The Settlement Fund In Light Of The Best Possible Recovery And All The Attendant Risks Of Litigation**

"In any case, there is a range of reasonableness with respect to a settlement – a range

which recognizes the uncertainties of law and fact in any particular case and concomitant risks

and costs necessarily inherent in taking any litigation to completion."  *Newman v. Stein*, 464

F.2d 689, 693 (2d Cir. 1972).  The intricacies of what can and cannot be proved based on the law

today are pertinent to the "likely" recovery standard under *Maywalt,* 67 F.3d at 1079; *see*

*Grinnell,* 495 F.2d at 455 & n. 2 (in theory, even a recovery of only a fraction of one percent of

the overall damages could be a reasonable and fair settlement).

As was set forth at I-III *supra,* the Settlement provides Class members with reasonable

consideration.  The Moore Defendants seriously contested Plaintiffs' damages estimate.[8]

*Compare* Dkt. No. 162, pp. 31-32.  Another important factor is the extremely limited right to

reversion.  *See* "IV" *supra.*  This limitation on reversions and the fact that there will be **less** than

a 100% claims rate, mean that Class members who do submit claims will likely receive well in

---

[8] Deductions for hedging and for swap dealers could reduce the proved damages to below this $400 million level of nominal damages.  By definition, a hedger has offsetting positions to those in the futures market.  17 C.F.R. §1.3(z)(1).  *See* Dkt. No. 162, p. 32.

excess of the 17% estimate.

Finally, years more time would pass between the time of the wrongdoing (2006-2008) and the time of any judgment on the merits herein.  Accordingly, it is very likely that fewer Class members would be in a position to claim after an eventual trial and appeals than are able to do so today.

**X.     The Proposed Plan of Allocation Has A Reasonable and Rational Basis And Should Be Approved**

A plan of allocation "…need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel").  *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005).

The proposed Plan of Allocation covers transactions in NYMEX platinum and palladium futures contracts during the entire June 1, 2006 through April 29, 2010 Class Period.  Dkt. No. 211, pp. 6-7.  Generally, ninety percent (90%) of Net Settlement Funds are reserved to pay for valid claims premised on the alleged artificiality of NYMEX platinum and NYMEX palladium futures contract prices from November 1, 2007 (for palladium futures contracts) and November 19, 2007 (for platinum futures contracts) through June 18, 2008.  Plan of Allocation, ¶1(b). However, to any extent that 90% of the Net Settlement Fund exceeds 110% of the "net artificiality paid" (or "NAP") of all Class members who submitted valid claims, then 50% of any such excess amount shall be added to the 10% of the Net Settlement Fund to be distributed to "net loss" (or "NL") transactions unless and until 100% of the NL has been paid to Class members who have submitted valid claims.

The remaining ten percent (10%) of the Net Settlement Funds are reserved to pay valid claims based on net trading losses (to be determined and weighted as described in the Plan of Allocation) for transactions executed outside of the foregoing "net artificiality period" but during

the June 1, 2006 through April 29, 2010 Class Period.  From this, three percent (3%) of the Net

Settlement Fund will be distributed based on net trading losses and will be paid out *pro rata*

based on each Claiming Futures Class Members' total Net Losses as described in the Plan of

Allocation ("First Pool").  The remaining part—seven percent (7%) of the Net Settlement

Fund—will be distributed pursuant to a method of distribution that will be proposed by Futures

Class Counsel after (a) all the Proofs of Claim have been analyzed, (b) the Net Artificiality Paid

and Net Losses have been determined, (c) any reversion to the Moore Defendants has been fixed,

and (d) the profile of Claiming Futures Class Members' results from such prospective method of

distribution is known or substantially known to Futures Class Counsel ("Second Pool").[9]

The 90%-10% division was the result of an arm's-length negotiation between Lovell

Stewart and Lowey Dannenberg Cohen & Hart, P.C.  Lowey Dannenberg represents Plaintiff

Richard White, who, based on the pattern of his trading, only stands to potentially collect under

the plan of allocation for his trades during the net loss period.  Accordingly, Lowey Dannenberg

and Plaintiff White were incentivized to maximize the portion of the Net Settlement Fund

attributable to NL trades.  The resulting 90-10 split was ultimately a function of the fact that the

likelihood of success on the claims during the "net loss" portion of the Class Period would be

---

[9] Depending on the timing of the approved transactions in the proofs of claims timely received
and the resulting actual distribution profiles to claiming Class members, it is presently
anticipated that the distribution of this "Second Pool" will be (i) positively weighted in respect of
losses or transactions during the period immediately following June 18, 2008; (ii) negatively
weighted so as to eliminate or greatly reduce any incremental payout due in respect of losses or
transactions after September 17, 2008; and (iii) positively weighted in respect of losses or
transactions impacted by Defendants' transactions in NYMEX platinum and/or palladium futures
contracts during the period prior to November 15, 2007, including on or about June 7, 2006, June
8, 2006, June 14, 2006, June 20, 2006, June 27, 2006, July 19, 2006, August 1, 2006, August 22,
2006, August 30, 2006, September 7, 2006, September 8, 2006, September 15, 2006, October 6,
2006, February 13, 2007, March 18, 2007, May 17, 2007, August 10, 2007, October 18, 2007,
October 24, 2007 and October 25, 2007.

very difficult to establish relative to the much stronger "net artificially paid" portion of the Class Period.[10]  The proposed Plan of Allocation should be finally approved.

## XI.    The Notice Plan

Before a proposed class action settlement can be finally approved, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).  When, as here, a class is certified for under Rule 23(b)(3) "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  Notice regarding a proposed settlement is adequate under both Rule 23 and the Due Process Clause if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings" and it can "be understood by the average class member."  *Wal-Mart*, 396 F.3d at 114-15.

Plaintiffs proposed a multi-pronged program of notice.  The Court's July 15, 2014 Memorandum and Order found that this notice plan was the best practicable notice plan under the circumstances.  *Compare In re Platinum & Palladium Commodities Litig.*, 2014 WL 3500655, at *13-14 *with* Dkt. No. 212, ¶10.  The Court's July 15, 2014 Order directed the Settlement Administrator to execute the program of notice.  Dkt. No. 212, ¶¶7-9.

---

The Mediator under the Settlement, Professor Frances McGovern, will supervise such remaining allocation decisions.

[10] *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133–34 (S.D.N.Y.1997) ("when real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weigh distribution of the settlement ... in favor of plaintiffs whose claims comprise the set that was more likely to succeed"); *see also Precision Assocs., Inc. v. Panalpina World Transport (Holding) Ltd.*, No. 08–cv–42 (JG)(VVP), 2013 WL 4525323, at *6 (E.D.N.Y. Aug. 27, 2013) (granting final approval to settlement allocating 90% of funds to particular claims).

Pursuant to ¶18 of the Court's July 15, 2014 Order, Plaintiffs have submitted the Miller Decl. attesting to the Settlement Administrator's compliance with the provisions of the Court-approved notice program.[11]  As described in the status report submitted by the Plaintiffs on October 1, 2014, in addition to the Court-approved notice plan, the Settlement Administrator also caused notice of the settlement to be sent by e-mail to (1) all persons who have provided e-mail information to Stock & Commodities magazine and/or Stock & Commodities website, www.traders.com; and (2) all persons who have provided e-mail information to Futures Magazine or the Futures Magazine website, www.futuresmag.com.  Dkt. No. 220, p. 6.  The Settlement Administrator estimates that this resulted in notice of the Settlement being sent to approximately 300,000 e-mail addresses.  *Id*.

The notice of the Settlement provided to the Futures Class satisfies the requirements of Rule 23, due process and constitutes the best notice practicable under the circumstances.

## XII.   The Class Has Been Preliminarily Certified And Still Satisfies the Prerequisites of Rule 23(a) and Rule 23(b)(3) Such That It Should Be Certified For Purposes of Final Approval

Rule 23(e) allows only for the settlement of "a certified class."  *Compare* Fed. R. Civ. P. 23(e) *with Global Crossing*, 225 F.R.D. at 451 ("[t]he Second Circuit has acknowledged the propriety of certifying a class solely for settlement purposes").  A district court may grant

---

[11] The multi-pronged program of notice included:  (1) mail notice to all "large traders" in New York Mercantile Exchange ("NYMEX") platinum and palladium futures contracts during the Class Period whose names were obtained pursuant to subpoena to the NYMEX; (2) mail notice to all clearing brokers on the NYMEX during the Class Period whose names were obtained pursuant to subpoena to the NYMEX (with the direction that such firms should forward the notice to their relevant customers **or** provide the names and addresses of any such relevant customers to the Settlement administrator); (3) published notice in Futures Magazine (twice), Stock and Commodities Magazine (twice) and The Wall Street Journal (twice) and further published notice on the websites of Futures Magazine and Stock and Commodities Magazine for one month each; and (4) the establishment of a settlement website which is searchable on the internet and which allows members of the Futures Class to obtain information about the

certification for settlement purposes where the proposed settlement class satisfies the four prerequisites of Rule 23(a) (*i.e.*, numerosity, commonality, typicality and adequacy), as well as one of the three subsections of Rule 23(b).  *Id.*

On July 15, 2014, the Court issued a Memorandum and Order preliminarily certifying the Futures Class under Rule 23(b)(3) for purposes of the Settlement.  *In re Platinum & Palladium Commodities Litig.*, 2014 WL 3500655, at *8-11.  The Court addressed each of the four perquisites of Rule 23(a) and found that each had been satisfied.  *Id.*, **8-10.  The Court further found that Rule 23(b)(3)'s predominance and superiority requirements were satisfied.  *Id.*, *10. The Court also appointed Lovell Stewart as class counsel for the Futures Class, finding that the requirements of Rule 23(g) were satisfied.  *Id.*, *11.  The Futures Class should be certified for purposes of final approval.

## XIII.   CONCLUSION

Plaintiffs respectfully request that the Court grant final approval of the Settlement with the Moore Defendants and Defendant Welsh.

Dated: New York, New York
          January 14, 2015

Respectfully submitted,

*/s/ Christopher Lovell*

Christopher Lovell
Christopher McGrath
Jody Krisiloff
Amanda Miller
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway, Suite 501,
New York, New York 10006
Telephone: (212) 608-1900
Facsimile:  (212) 719-4775
***Counsel for Futures Plaintiffs and the Futures Class***

---

proposed Settlement.  *Id.*, ¶¶7-9.