UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In Re: Platinum And Palladium Commodities Litigation*<br><br>This Document Relates To:<br><br>Platinum/Palladium Futures Action | MASTER FILE<br>No. 10 Civ. 3617 (WHP) |

## DECLARATION OF CHRISTOPHER M. MCGRATH IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENTS

I, Christopher M. McGrath, pursuant to 28 U.S.C. §1746, hereby declare as follows:

1.      I am a partner with the law firm of Lovell Stewart Halebian Jacobson LLP ("Lovell Stewart").  The statements herein are true to the best of my personal knowledge, information and belief.

2.      I respectfully submit this declaration in order to demonstrate the fairness of the proposed settlements and in further support of the Futures Plaintiffs' ("Plaintiffs") motions for final approval of:  (a) Plaintiffs' proposed settlement with the Moore Defendants and Defendant Joseph Welsh ("Moore Settlement") [Dkt. No. 163-1]; and (b) Plaintiffs' proposed settlement with James W. Giddens, as Trustee for the liquidation for Defendant MF Global, Inc. ("MF Global Settlement").  Dkt. No. 231-1.

3.      On July 20, 2010, the Court appointed Lovell Stewart to act as sole interim class counsel for the class in the Futures Action.  Dkt. No. 18.  Lovell Stewart represents plaintiffs Harry Ploss and the Stuart Sugarman Trust.

4.      Set forth in Section "I" below is a procedural history of the action from inception (*i.e.*, April 2010) through the submission of this declaration.

5.      (a)      Section "II" below concerns the Moore Settlement.  The Moore Settlement provides for (1) a payment of $48,250,000 by the Moore Defendants; (2) a further payment of $150,000 by the Moore Defendants in order to quiet the claims against the Moore Defendants and Defendant Welsh (provided that the Moore Defendants will receive the first $50,000 back from any proceeds that the Futures Class recovers on the judgment and related assignment stipulated to by Defendant Welsh described next); and (3) a judgment of $35,000,000 agreed to by Defendant Welsh for the benefit of the Futures Class, which the Futures Class agreed to seek to collect solely from Defendant Welsh's assets consisting of his rights in respect of certain insurance policies.

(b)      As part of the separate MF Global Settlement, MF Global Holdings has agreed to purchase the foregoing Welsh Judgment for $800,000.  Accounting for the aforementioned Moore Defendants' interest, the net benefit to the Futures Class would be $750,000.

(c)      Accordingly, the total cash value of the consideration provided for by the Moore Settlement is $49,150,000.

6.      (a) Section "III" below concerns the MF Global Settlement.  The MF Global Settlement provides for (i) an $18,753,571.43 allowed general unsecured creditor claim against the estate of Defendant MF Global; and (ii) a $4,672,500 all-cash payment by MF Global Assurance.  In addition, MF Global Holdings is making the above described $800,000 all-cash payment to purchase the Welsh Assignment from Plaintiffs.

(b) An initial 39% payment in respect of allowed general unsecured creditor claims has already been ordered.  *See* October 30, 2014 Press Release.[1]  If the MF Global Settlement is finally approved, then the Class will be entitled to receive immediate payment of such 39% of its

---

[1] *See* http://dm.epiq11.com/MFG/Project

$18,753,571.43 allowed claim. This equals $7,313,892.86, which will be paid into the Court Registry Investment Services ("CRIS") escrow account. With the original $4,672,000 cash from the insurers, final approval of the MF Global Settlement will bring the cash portion of the consideration in this settlement up to $11,985,892.86.

(c) In the same October 30 press release as referenced above, MF Global's Trustee also stated that he "anticipates being able to make **further substantial distributions** to general creditors as claims are resolved and further assets become available for distribution." [Emphasis added] *Id*. As to the remaining 61% of the allowed unsecured general creditor claim, Class Counsel have good reason to believe that between $7,700,000 and $9,500,000 or more in cash will be received. In sum, Class Counsel have good reason to believe that between $19,500,000 and $21,500,000 cash consideration will be received for the MF Global Settlement.

7. Adding the $49,150,000 from the Moore Settlement to the $19,500,000 - $21,500,000 from the MF Global Settlement, produces a sum total cash consideration to the Class of in excess of $68,000,000-$70,000,000 if both Settlements are finally approved.

8. Class Counsel expects the Moore Settlement and MF Global Settlement to produce cash consideration totaling in excess of $68,000,000.

## I.   PROCEDURAL HISTORY

### A. The Initial Complaint and This Court's Decision Directing Early Production By Defendants of the Documents They Had Previously Provided to the Commodity Futures Trading Commission

9. On April 30, 2010, Lovell Stewart, on behalf of Plaintiffs, filed an initial class action complaint in the United States District Court for the Southern District of New York. Dkt. No. 1. The complaint alleged that, between November 1, 2007 and May 31, 2008, defendants engaged in pattern of manipulative "bang the close" trades in order to manipulate the prices of

platinum and palladium futures contracts traded on the New York Mercantile Exchange ("NYMEX") in violation of the Commodity Exchange Act, 7 U.S.C. §1 *et seq*. ("CEA").

10.     After Lovell Stewart filed the initial complaint therein, only one further law firm filed a class action complaint alleging violations of the CEA.

11.     On July 20, 2010, the Court appointed Lovell Stewart to act as sole interim class counsel for the class in the Futures Action.  Dkt. No. 18.

12.     On August 10, 2010, Plaintiffs filed a first amended complaint, which added MF Global, Inc. as a defendant.  Dkt. No. 22.

13.     On August 26, 2010, the Moore Defendants and Defendant MF Global filed a motion seeking a stay of all discovery pending a decision on their anticipated motion to dismiss Plaintiffs' complaint.  Dkt. No. 34.  Among other things, the motion sought to prevent Plaintiffs from obtaining copies of the documents the Moore Defendants and Defendant MF Global previously produced to the Commodity Futures Trading Commission's ("CFTC") in connection with its investigation into trading in the NYMEX platinum and palladium futures markets.  *Id*.

14.     On September 14, 2010, Plaintiffs filed a memorandum of law opposing the motion to stay.  Dkt. No. 42.  Among other things, Plaintiffs argued as follows.  Copies of the documents that the Moore Defendants and MF Global previously gathered and produced to the CFTC were sitting in files gathering dust.  *Id*.  It would not impose any significant burden on the Moore Defendants or MF Global to produce copies of same to Plaintiffs but such production would greatly advance this litigation.  *Id*.

15.     On September 30, 2010, Plaintiffs filed a consolidated complaint, which included allegations and claims of the so-called "physical plaintiffs," who are represented by separate counsel.  Dkt. No. 50.

16.     On November 5, 2010, the Moore Defendants and Defendant MF Global moved to strike a portion of, and also to dismiss, the consolidated complaint.  Dkt No. 57.  Plaintiffs filed a memorandum of law in opposition on December 17, 2010.  Dkt. No. 61.

17.     On November 30, 2010, the Court issued an order denying defendants' motion to stay as to the approximately 250,000 pages of documents that defendants previously produced to the CFTC.  Dkt. No. 59.  The Court ordered defendants to produce copies of the documents previously produced to the CFTC by January 7, 2011.  *Id.*

**B.     The Production By Defendants Of The CFTC Documents, This Court's Grant Of The Motion To Dismiss And Plaintiffs' Re-Pleading Of The Complaint Based Upon The Document Production**

18.     By approximately January 7, 2011, the foregoing CFTC document productions had been made.  The production included approximately 261,103 pages of documents produced by the Moore Defendants and 15,765 pages of documents produced by MF Global.  The MF Global production included over 1,000 audio files of recordings of telephone calls.

19.     On February 4, 2011, the Court heard oral argument on defendants' motion to dismiss the consolidated complaint, and strike a portion thereof.  Dkt. No. 66.

20.     On September 13, 2011, the Court issued a Memorandum and Order granting in part and denying in part defendants' motion to strike and granting defendants' motion to dismiss the consolidated complaint for failure to state a claim.  *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588 (S.D.N.Y. 2011) (Pauley, J.).  The Court granted Plaintiffs leave to re-plead their allegations.  *Id.*

21.     Based upon their ongoing document review since January 2011, the Plaintiffs, on November 1, 2011, filed their third consolidated amended class action complaint.  Dkt. No. 80. Based upon Plaintiffs' review of the discovery ordered by the Court, Plaintiffs were able to

submit an extremely detailed complaint, which was approximately 160 pages long and included 405 paragraphs.  The complaint named Joseph Welsh defendant and added a claim alleging violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §*1 et seq*. ("Sherman Act").  *Id*.

22.     The third consolidated amended complaint pled, in detail, over 200 particular instances of defendants' allegedly manipulative trades, including the contract, size price and volume of same.  *Id*.  The complaint also included dozens of excerpts of defendants' instant messages, e-mails and telephone conversations.  *Id*.

### C.     MF Global's Bankruptcy, The Limited Motion To Dismiss, Non-Party Discovery And The Litigation "Time Out"

23.     On November 8, 2011, Defendant MF Global filed a suggestion of bankruptcy. Dkt. No. 75.

24.     On January 20, 2012, the defendants moved to dismiss certain (but not all) of Plaintiffs' claims in the third consolidated amended complaint.  Dkt. No. 98.  Specifically, the Moore Defendants did not move to dismiss the Plaintiffs' CEA claims.  *Id*.  Defendant Welsh did move to dismiss Plaintiffs' CEA claims.  Dkt. No. 107.

25.     On February 27, 2012, the NYMEX produced documents in response to a subpoena issued by Plaintiffs.  Such document production included the NYMEX "Streebook," which is an electronic record reflecting the details of each and every trade in platinum and palladium futures contracts during the relevant period.

26.     On February 28, 2012, Plaintiffs filed a memorandum of law in opposition to defendants' motions to dismiss the third consolidated amended complaint.  Dkt. No. 111.

27.     On or about March 9, 2012, the Plaintiffs and the Moore Defendants submitted a letter to the Court requesting a "litigation time out" in order to pursue settlement negotiations.

28.     On March 14, 2012, the CFTC produced documents in response to a subpoena issued by Plaintiffs.  The document production included, among other things, approximately twenty-three deposition transcripts and the exhibits thereto.

29.     On May 31, 2012, Plaintiffs, on behalf of the Futures Class, filed a bankruptcy proof of claim against the estate of Defendant MF Global.

30.     On July 27, 2012, Lovell Stewart, counsel for the Moore Defendants and counsel for Defendant Welsh participated in a mediation session before the Honorable Daniel Weinstein (Ret.).  A second mediation session was held on August 27, 2012.  These mediations did not result in a settlement.

### D.     The Litigation "Time" In and the Filing of Further Complaints

31.     On January 17, 2013, Plaintiffs filed their fourth consolidated amended complaint.  Dkt. No. 127.  The complaint added allegations based on Plaintiffs' review of the substantial document production by the CFTC.

### E.     Resumption of Settlement Negotiations and Filing of Fifth Amended Complaint

32.     Plaintiffs and the Moore Defendants continued their settlement negotiations.

33.     On July 29, 2013, the Plaintiffs filed their fifth consolidated amended class action complaint.  Dkt. No. 133.  The complaint added, in the alternative, a negligence claim against Defendant Welsh.  *Id.*

### F.     The Moore and Welsh Settlement, Preliminary Approval, The First Amendment To the Settlement and Preliminary Approval Over Three Sets of Objections

34.     On August 20, 2013, after continued settlement negotiations following the mediations, Plaintiffs, the Moore Defendants and Defendant Welsh executed a settlement agreement.  Dkt. No. 140-1.

35.     On September 18, 2013, Plaintiffs filed a motion seeking preliminary approval of the proposed settlement with the Moore Defendants and Defendant Welsh.  Dkt. No. 140.

36.     On October 4, 2013, the Court held a preliminary approval hearing concerning the Moore Settlement.  Dkt. No. 159.  At the hearing, the Court raised certain questions about the proposed settlement and suggested certain changes be made.

37.     On March 17, 2014, Plaintiffs, the Moore Defendants and Defendant Welsh executed an amended settlement that incorporated the Court's suggested changes.  Dkt. No. 163-1.  On March 18, 2014, Plaintiffs filed a revised motion for preliminary approval of the amended settlement.  Dkt. No. 162.

38.     On April 7, 2014, the lead plaintiffs in the MF Global commodity customer class action and the Trustee for the estate of Defendant MF Global, filed certain objections to Plaintiffs' preliminary approval motion.  Dkt. Nos. 174-175.  The commodity customers also sought to intervene.  Dkt. No. 174.

39.     On April 17, 2014, Plaintiffs filed a reply memorandum of law in further support of their motion for preliminary approval.  Dkt. No. 180.

40.     On April 21, 2014, Susan Levy filed a motion to intervene, which also raised certain objections to the proposed settlement with the Moore Defendants and Defendant Welsh. Dkt. No. 182.

41.     On May 8, 2014, Plaintiffs and Defendants filed an opposition to Ms. Levy's motion to intervene that also addressed Ms. Levy's objections to the proposed settlement.  Dkt. Nos. 189, 194.  Plaintiffs also filed an opposition to the commodity customers' motion to intervene that also addressed their limited objections to the proposed settlement.  Dkt. No. 197.

42.     On May 23, 2014, the Court held a hearing on Plaintiffs' motion seeking preliminary approval of the amended settlement with the Moore Defendants and Defendant Welsh.  Dkt. No. 208.

43.     On June 4 and 5, 2014, Lovell Stewart and counsel for the Trustee for the estate of Defendant MF Global participated in a two day mediation session before the Honorable Daniel Weinstein (Ret.).  The mediation also involved certain insurance companies.  The mediation did not result in a settlement.

44.     After the mediation, Plaintiffs continued settlement negotiations with the MF Global Trustee.  This included in person meetings on or about July 23, August 4, 11, and October 15, 2014.

45.     On July 15, 2014, the Court issued a Memorandum & Order denying the motions to intervene and granting preliminary approval of the Moore Settlement over the objections.  *In re Platinum & Palladium Commodities Litig.*, No. 10-CV-3617, 2014 WL 3500655 (S.D.N.Y. July 15, 2014) (Pauley, J.).

> **G.     The Sixth Amended Complaint and Notice To the Class of the Moore Settlement**

46.     On August 15, 2014, the Plaintiffs filed their sixth amended complaint.  Dkt. No. 218.  The complaint added Harry Ploss and the Stuart Sugarman Trust as plaintiffs.  *Id.*

47.     On October 1, 2014, Plaintiffs filed a status report with the Court concerning notice to the Class of the Moore Settlement.  Dkt. No. 220.  Notice of the Moore Settlement included mail notice to "large traders" in NYMEX platinum and palladium futures contracts and to NYMEX clearing firms.  *Id.*  Notice also included two publications in two magazines (Futures Magazine and Stock and Commodities Magazine), publication for one month on the websites of

such magazines, two publications in the Wall Street Journal and the creation of a settlement website searchable on the internet.  *Id*.

### H.    The Settlement with MF Global

48.    Following further settlement negotiations, on October 21, 2014, Plaintiffs and the Trustee for the estate of Defendant MF Global executed the MF Global Settlement.   Dkt. No. 230-1.  MF Global Holdings, Ltd. and MFG Assurance Company Ltd. were also signatories to the settlement.

49.    On October 29, 2014, Plaintiffs filed a motion seeking preliminary approval of the proposed MF Global Settlement.  Dkt. No. 231.

50.    On November 12, 2014, the Court held a preliminary approval hearing concerning the proposed MF Global Settlement.  Dkt. No. 246.

51.    On November 14, 2014, the Court promptly entered an order directing that notice of the MF Global Settlement be disseminated to the Futures Class.  Dkt. No. 245.

52.    On January 1, 2015, Plaintiffs filed a status report with the Court concerning notice to the Class of the MF Global Settlement.  Dkt. No. 252.  Notice of the MF Global included mail notice to "large traders" in NYMEX platinum and palladium futures contracts and to NYMEX clearing firms.  *Id*.  Notice also included two publications in two magazines (Futures Magazine and Stock and Commodities Magazine), publication for one month on the websites of such magazines, two publications in the Wall Street Journal and the creation of a settlement website searchable on the internet.  *Id*.

53.    Plaintiffs are filing, concurrently herewith, separate motions seeking final approval of the Moore Settlement and the MF Global Settlement.

54.     The fairness hearing for both settlements is currently scheduled for February 13, 2015 at 11:00 a.m.  Dkt. Nos. 225, ¶1; 245, ¶5.

## II.     THE MOORE SETTLEMENT

### A.     The Settlement Negotiations Were At Arm's Length and Free of Collusion

55.     The settlement negotiations with the Moore Defendants and Defendant Welsh continued (on and off) for approximately eighteen months from March 2012 through August 2013.  Such negotiations included two mediation sessions before a neutral mediator.

56.     The principal negotiators of the Moore Settlement were Christopher Lovell, Esq. (for the Plaintiffs) and David Zensky, Esq. of Akin Gump Straus Hauer & Feld LLP (for the Moore Defendants).  Andrew Lourie, Esq. of Kobre & Kim LLP (for Defendant Welsh) led the negotiations for the portions of the Moore Settlement that related specifically to Defendant Welsh.

57.     Mr. Lovell and Mr. Zensky each previously submitted declarations affirming that the settlement negotiations which produced the Moore Settlement were at arm's length and free of collusion.  Dkt. Nos. 114, 190.   Mr. Zensky stated in his declaration that the negotiations were the most "painstaking, and arduous settlement negotiations I have been a party to in my twenty-seven years as a litigator."  Dkt. No. 190, ¶4.

58.     Along with Mr. Lovell, I also conducted the negotiations for Plaintiffs.  Based upon my involvement in the settlement negotiations, I can also affirm that such negotiations were at arm's length and free of collusion.

### B.     The Settlement Negotiations Were Between Experienced and Capable Counsel

59.     Lovell Stewart (including its predecessors) has over thirty years of experience litigating commodity futures manipulation cases and, as sole lead or co-lead counsel, has

obtained the first, second and third largest settlements in the history of the CEA.[2]  Lovell Stewart

has also previously obtained the largest class action recovery (at that time) under two additional

federal statutes.[3]

60.     The Moore Defendants and Defendant Welsh are represented by four highly

respected and nationally recognized law firms:  Akin Gump Strauss Hauer & Feld LLP, Kramer

Levin Naftalis & Frankel LLP, Hughes Hubbard & Reed LLP and Kobre & Kim LLP.

### C.     The Settlement Was Reached After Substantial Discovery

61.     Prior to exercising its judgment to enter into the Moore Settlement, Lovell

Stewart had obtained and analyzed the 250,000-plus page CFTC document production.  This

document production included defendants' e-mails and instant messages, information concerning

the Moore Defendants' trading in NYMEX platinum and palladium futures contracts, and other

documents and information.

62.     Lovell Stewart also obtained and reviewed approximately twenty-three deposition

transcripts and the exhibits to such transcripts that were obtained by subpoena to the CFTC.

These transcripts included testimony by Defendant Welsh, Defendant Pia, Defendant Bacon,

Defendant Burger and other persons.

---

[2] *In re Sumitomo Copper Litigation*, 74 F. Supp. 2d 393, 395 (S.D.N.Y. 1999) ("The recovery [$149,600,000] is the largest class action recovery in the 75 plus year history of the Commodity Exchange Act"); *Hershey v. Pacific Investment Management Co.*, 05-cv-4681, Dkt. No. 571 (N.D. Ill.) (Lovell Stewart served as sole lead counsel in this action in which the second largest class action recover in the history of the CEA ($118,750,000) was obtained); and *In re Natural Gas Commodity Litigation*, Index No. 03 CV 6186 (VM) (AJP) (S.D.N.Y.) (Lovell Stewart served as co-lead counsel in this action in which the third largest class action recovery in the history of the CEA ($100,800,000) was obtained).

[3] *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 465, 471 (S.D.N.Y. 1998) ("this all-cash settlement [for $1,027,000,000], achieved through 'four years of hard-fought litigation,' apparently is the largest recovery (class action or otherwise) in the hundred year history of the state and federal antitrust laws"); *Blatt v. Merrill Lynch Fenner & Smith Inc.*, 94 Civ. 2348 (JAG) (D.N.J.) ("by far the largest settlement" of class action claims under the Investment Company Act, *Securities Class Action Alert* letter dated August 17, 2000).

63.     Lovell Stewart also had access to the NYMEX Streebook.  The NYMEX Streetbook contains information (*e.g.*, timing, price, volume, etc.) concerning each and every trade in NYMEX platinum and palladium futures contracts during the relevant period.

64.     Further supporting the fairness of the Moore Settlement is the fact that Lovell Stewart performed extensive analysis of the facts as reflected in the highly-detailed, 165-page complaint, which lists every challenged trade, quotes relevant e-mails, instant messages, telephone calls and details the particulars of hundreds of the Moore Defendants' allegedly manipulative trades.  *See* Dkt. No. 218.

65.     In addition to fact discovery, Lovell Stewart also retained and undertook substantial work with four economists, an insurance law expert, a hedge fund expert and a private investigator.

66.     A large part of Lovell Stewart's work with the experts it retained focused on establishing causation and impact.  That is, establishing the fact that Moore Defendants' trading caused prices of NYMEX platinum and palladium futures contracts to be "artificial" and further quantifying the amounts and direction of such artificial impact.  The Moore Defendants seriously disputed that causation of artificial prices could be established.

67.     These complex expert methodologies and models were exchanged and debated between and among Plaintiffs and the Moore Defendants, who had their own experts.  These expert analyses were the subject of much dispute between the parties during the mediation and otherwise during the settlement negotiating process.  The mediator retained a neutral economist in order to review and analyze the parties' respective expert methodologies.  That economist shared his views with the parties over the course of the mediation.

**D.     The Complexity, Expense and Likely Duration of the Litigation**

13

68.     *Complexity*.  The United States Supreme Court has recognized that commodity futures markets are "esoteric."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 US 353, 356 (1981).  This Court has stated that the prosecution of manipulation claims in violation of the CEA is "complex and difficult."  *In re Sumitomo Copper Litigation,* 74 F.Supp.2d 393, 397 (S.D.N.Y. 1999) (Pollack, J.).  Experts in the field of CEA manipulation have detailed the difficulties associated with establishing a manipulation in violation of the CEA.  *See, e.g.,* Jerry W. Markham, *Manipulation of Commodity Futures Prices – The Unprosecutable Crime*, 8 Yale J. on Reg. 281 (1991).

69.     Similarly, this Court has recognized that antirust cases are complex.  *In re Currency Conversion Fee Antitrust Litig.,* 263 F.R.D. 110, 123 (S.D.N.Y. Oct. 22, 2009) (Pauley, J.) ("Antitrust cases, by their nature, are highly complex.") (*quoting Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 122 (2d Cir. 2005)); *Park v. The Thomson Corp*., No. 05 Civ. 2931, 2008 WL 4684232, at *3 (S.D.N.Y. Oct. 22, 2008) (Pauley, J.) (same); *see also Weseley v. Spear, Leeds & Kellogg*, 711 F.Supp. 713, 719 (E.D.N.Y. 1989) (antitrust class actions "are notoriously complex, protracted, and bitterly fought").

70.     Notably, Lovell Stewart believes that this case involves an issue of first impression.  The Moore Defendants were not alleged to have controlled the cash market supplies nor built up a dominant long position.  Instead, the Moore Defendants made both a purchase in the futures market, and, later a sale.  Yet Plaintiffs contended that the net artificial effect of the Moore Defendants' purchase transaction survived not only Moore's subsequent sales.  The artificial impact even lasted until after the futures contracts in which the transactions were made had expired.

14

71.     *Expense*.  The parties would incur substantial expenses if litigation resumed. Lovell Stewart has already incurred more than $650,000 in expenses and would incur substantial further expert and other expenses in connection with the continued prosecution of this action.

72.     *Likely Duration*.  The action has been pending for more than four and one-half years.  Any estimate of the likely duration of the litigation absent the settlement should (at the very least) take account of the time needed for a resolution of the second round of the defendants' motions to dismiss, full fact and expert discovery, Plaintiffs' motion for class certification, the potential for interlocutory appeal of the Court's class certification ruling, summary judgment, trial and appeals.  Absent dismissal, or another adverse litigation event, this action would almost certainly continue for many additional years.

### E.     The Reaction of the Class to the Settlement

73.     The deadline for members of the Futures Class to seek to exclude themselves (or, "opt out") of the Moore Settlement was January 9, 2015.  Dkt. No. 225, ¶2.  As of the filing of this declaration, Plaintiffs are aware of only five members of the Futures Class who have requested to be excluded from the Moore Settlement.[4]  Three of the five persons who requested exclusion submitted trading information.  Based upon a review of this information, the volume of trades associated with these persons who have requested exclusion is small.

---

[4] The five requests for exclusion from the Moore Settlement were submitted by the following individuals:  (1) Susan J. Levy, (2) Seema Trehan, (3) Nick A. Kephalos, (4) Gregory T. Farrell, and (5) Stefan Stedra.

Mr. Farrell submitted both a proof of claim and a request for exclusion.  I attempted to reach Mr. Farrell by telephone and e-mail but he has yet to respond.  The Settlement Administrator has similarly tried to reach Mr. Farrell.  Lovell Stewart will promptly report to the Court with further information after speaking with Mr. Farrell and clarifying his intent as to whether he wishes to exclude himself from the settlement.

Similarly, Mr. James H. Nguyen filed both a proof of claim and a request for exclusion.  I spoke with Mr. Nguyen by telephone and he confirmed that the request for exclusion was submitted by him in error.  Mr. Nguyen confirmed same by email.  Accordingly, Mr. Nguyen has not been identified as an "opt out."

74.     Given that MF Global's records alone reveal that there could be at least 3,500 potential members of the Futures Class, five requests for exclusions is an extremely small number.  It represents less than two-tenths of one percent of just the potential members of the Futures Class who used MF Global as a broker.

75.     The deadline for members of the Futures Class to submit objections to the Moore Settlement is January 21, 2015.  Dkt. No. 225, ¶4.  As of the filing of this declaration, no objections to the Moore Settlement have been received by Lovell Stewart.

**F.     The Stage of the Proceedings and the Amount of Discovery Completed**

76.     *Stage of the Proceedings*.  At the time the Moore Settlement was reached, this action had been pending for approximately three years and ten months, the Court had held oral argument and issued an opinion on defendants' first round of motions to dismiss, Plaintiffs had filed many increasingly detailed complaints, a second round of motions to dismiss had been filed, the parties had begun fact discovery and Plaintiffs had received and extensively reviewed (a) more than 250,000 pages of documents produced by defendants, (b) more than 1,000 MF Global audio files, (c) twenty-three deposition transcripts produced by the CFTC, and (d) substantial further non-party discovery, including the NYMEX Streetbook, which details every platinum and palladium futures trade made on the exchange during the relevant period.

77.     *Amount of Discovery Completed*.  As set forth above, Plaintiffs had obtained substantial amounts of important discovery before the settlement was reached.  *See also* ¶¶61-67 above (describing the amount of discovery completed).

78.     I respectfully submit that Lovell Stewart was well informed of the material facts and risks associated with continued litigation throughout the settlement negotiations and when the settlement was executed.

G.   **The Risks of Establishing Liability, Damages and Maintaining the Class Action Through Trial**

79.    *Risks of Establishing Liability*.  The four elements for a CEA manipulation claim are "(1) [t]he [defendant] had the ability to influence market prices; (2) [t]he [defendant] specifically intended to do so; (3) [t]he 'artificial' prices existed; and (4) [t]he [defendant] caused the artificial prices."  *Platinum and Palladium Commodities Litig*., 828 F. Supp. 2d at 598.

80.    Class Counsel believe that they uncovered substantial evidence in the discovery record indicating that Defendants intended to cause artificial prices.  However, Class Counsel recognizes that proof of causation or impact on prices, the existence of an artificial price and the amount and duration of any price artificiality would be more difficult and hotly contested.

81.    The issue of first impression presented by this case (*see* ¶70 above), required Class Counsel to correlate the best coordinates in the limited precedent to guide such a claim with new coordinates from the economic sub-specialty of market microstructure and traditional regression analyses, along with careful analysis of all the facts, to produce a new type of persuasive and cogent factual and legal argument.

82.    To the extent that there was impact for any given amount of time, Plaintiffs would have to show the extent such impact was "artificial."  Obviously, an artificial price is not a tangible item.  Plaintiffs and Defendants substantially differed on the issue of whether Defendants' conduct created artificial prices.  Resolving whether there was an artificial price and, if so, by what amount, would have involved the complexities of the workings of the platinum and palladium futures (and potentially cash) markets, statistical regression analyses and various abstract economic and other principles.

83.    Defendants had colorable legal arguments on the issue of artificial prices.  For example, in their motion to strike and dismiss Plaintiffs' second amended consolidated

complaint, the defendants argued that, because their allegedly manipulative trades were made at "prevailing market prices," their trading could not have been manipulative.  Dkt. No. 57 at pp. 11-14 citing to *DiPlacido v. CFTC*, 364 Fed. Appx. 657 (2d Cir. 2009) ("*DiPlacido*") and *United States v. Radley*, 659 F. Supp. 2d 803 (S.D. Tex. 2009) ("*Radley*").  According to defendants, "the hallmark of a manipulation claim is trading at a price other than a prevailing market price."  *Id*.

84.     In response to the defendants' foregoing argument, the Court, at oral argument on the first motion to dismiss, stated "I don't think any Court wants to be second guessing trading activity after the fact.  But, the argument that you are making may be very persuasive on summary judgment.  But this is a motion to dismiss."  Transcript of Oral Argument dated February 4, 2011, p. 20, lines 5-8.

85.     Similarly, Defendant Welsh argued in his motion to dismiss that Plaintiffs had not alleged an actionable claim for manipulation in violation of the CEA because they supposedly failed to allege any "deceptive, misleading or illegal conduct," including rule violations.  Dkt. No. 107 at pp. 6-12 citing *DiPlacido* and *Radley*.

86.     The risks of establishing a CEA manipulation claim are greatly enhanced because of the relatively (compared to federal securities and antitrust law) undeveloped state of the law with respect to proving claims under Section 22(a) of the CEA.  This provides a relatively "open field" for the defendants and their capable counsel to argue for what Plaintiffs view as restrictive applications of the limited precedent.

87.     Lovell Stewart believes that this Class could have overcome these risks but a successful outcome was by no means certain.  Nevertheless, Lovell Stewart acknowledges that

Defendants' arguments created risk for Plaintiffs and if such risks materialized, their impact may have been substantial and perhaps dispositive.

88.     Similarly, Class Counsel acknowledge that defendants had reasonable arguments that, if accepted, could result in the dismissal of the Sherman Act claims.  For one example, on the first motion to dismiss, the defendants prevailed on their "no conspiracy among independent actors" argument.  Specifically, the Court held that the complaint failed to include plausible allegations of an agreement among "independent centers of decision making."  *Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d at 596.

89.     Defendant Welsh (who as an employee of Defendant MF Global) was the broker for the Moore Defendants and thus was arguably not the primary mover of the alleged manipulation.  Defendants argued that this factual context prevented an actionable conspiracy under the Sherman Act.

90.     *Risks of Establishing Damages*.  Establishing damages in this action would almost certainly involve regression analyses, complex economic principles and other expert testimony. Plaintiffs would likely rely upon expert testimony in order to establish, on a daily basis, the amount of artificial impact caused by defendants' conduct.  Defendants, would almost certainly submit their own credible expert testimony.  In fact, during the settlement negotiations, the Moore Defendants and their well-credentialed experts vigorously disputed and criticized Plaintiffs' expert methodology for establishing causation, impact and damages.  Thus, the issue of damages in this action would likely result in a "battle of the experts" and *Daubert* motions seeking to exclude expert testimony.

91.     *Risks of Maintaining Action Through Trial*.  Plaintiffs have the burden of establishing that the prerequisites of Rule 23 are satisfied such that class certification is proper.

Fed. R. Civ. P. 23.  At the time the settlement was reached, Plaintiffs had not moved for class certification.  Although Lovell Stewart has consistently been successful in certifying classes in other types of CEA manipulation cases, Lovell Stewart recognizes that there are inherent risks regarding class certification in high-stakes litigation, that certification is fact specific, the risk of interlocutory appeal and that counsel for defendants are highly competent attorneys.

**H.   The Ability of the Defendants To Withstand A Greater Judgment**

92.   *Defendant Welsh*.  As part of the settlement negotiations, Defendant Welsh provided a confidential statement concerning his finances to Lovell Stewart.  This information indicated to Lovell Stewart that Defendant Welsh did not have the ability to withstand any significant monetary judgment against him.

93.   *Moore Defendants*.  Based upon the information available, Lovell Stewart believes that the Moore Defendants would be able to withstand a judgment greater than the $48,400,000 all-cash consideration it has agreed to provide under the settlement.

**I.   The Range of Reasonableness of The Settlement In Light of the Best Possible Recovery and All The Attendant Risks of Litigation**

94.   *The Consideration Provided By the Settlement*.  Pursuant to the terms of the settlement, the Moore Defendants have agreed to pay $48,250,000 for the benefit of the Futures Class.  Moore Settlement, Section 3(a).  Further, in order to quiet the litigation involving claims against the Moore Defendants and Defendant Welsh, the Moore Defendants have agreed to pay an additional $150,000, provided that they will receive the first $50,000 back from any proceeds that the Futures Class recovers on the judgment and related assignment stipulated to by Defendant Welsh described below.  *Id*.

95.   Pursuant to the terms of the settlement, Defendant Welsh has agreed to a judgment of $35,000,000 for the benefit of the Futures Class, which the Futures Class agreed to

seek to collect solely from Welsh's assets consisting of his rights in respect of certain insurance policies. Moore Settlement, Section 3(b). The relevant insurers denied coverage to Defendant Welsh for the claims herein for multiple reasons. Defendant Welsh assigned all of his rights in the relevant insurance policies and his claims against the relevant insurers to Plaintiffs. *Id.*

96.     As part of the separate MF Global Settlement, MF Global Holdings agreed to purchase from the Plaintiffs the Welsh judgment and assignment for $800,000. MF Global Settlement, Section 3(c). As set forth above, the Moore Defendants are entitled to the first $50,000 of such $800,000 such that the net benefit to the Futures Class for the Welsh judgment and assignment would be $750,000.

97.     Thus, if both settlements are approved, a settlement fund totaling $49,150,000 will be created for the benefit of the Futures Class as a result of the Moore Settlement.

98.     *The Best Possible or Likely Recovery*. Lovell Stewart reasonably estimates that they would have been able to prove a claim for nominal damages of more than $400,000,000 at trial. Thus, the $49,150,000 all-cash considered produced by the Moore Settlement represents more than 12% of what Lovell Stewart believes that they could prove in nominal damages at trial. Importantly, Defendants vigorously contested Plaintiffs' damages estimate and asserted that maximum damages herein would be $6.5 million or less. The additional monies provided for by the separate MF Global Settlement should increase the foregoing percentage to approximately 17% prior to any adjustments based on claim rates, which, based on prior experience, could be material. *See* ¶¶127 below.

99.     *The Risks of Continued Litigation*. The risks of continued litigation include the following:

        a.   Defendants' second round of motions to dismiss could be granted.

     b.   Plaintiffs' motion for class certification could be denied or, if granted, could be reversed on appeal or could be decertified.

     c.   Defendants could obtain summary judgment.

     d.   Defendants could successfully exclude expert testimony Plaintiffs need to establish causation or damages.

     e.   Plaintiffs could lose at trial, or, if successful at trial, could lose on a motion for judgment notwithstanding the verdict, or on appeals.

     f.   Even if the Plaintiffs survived all of the foregoing risks, the amount of damages awarded and sustained post-trial and on appeals, could be less than the $49,150,000 provided by the settlement.  Plaintiffs theory of damages or model for those damages could be successfully challenged prior to trial or on appeal.

100.    Lovell Stewart would have tried to overcome all the foregoing risks.  However, Lovell Stewart acknowledges if these risks materialized the impact would be substantial, including situations in which there would be no recovery at all for the Futures Class.

101.    Based upon Lovell Stewart's considerable prior experience in complex class actions litigation involving CEA and antitrust claims, Lovell Stewart's knowledge of the strengths and weaknesses of the Plaintiffs' claims and Lovell Stewart's assessment of the Futures Class's likely recovery following trial and appeal in light of the attendant risks, Lovell Stewart believes that the Moore Settlement is fair, reasonable and adequate.

**III.    THE MF GLOBAL SETTLEMENT**

    **A.    <u>The Settlement Negotiations Were At Arm's Length and Free of Collusion</u>**

102.     The settlement negotiations with the MF Global Trustee continued for more than one year from approximately October 2013 to October 2014.  Such negotiations included a two day mediation sessions before a neutral mediator.

103.     The principal negotiators of the MF Global Settlement were Christopher Lovell, Esq. (for the Plaintiffs) and Vilia Hayes, Esq. (for the MF Global Trustee).

104.     Mr. Lovell previously submitted a declaration affirming that the settlement negotiations which produced the MF Global Settlement were at arm's length and free of collusion.  Dkt. No. 230, ¶5.

105.     Along with Mr. Lovell, I also conducted the negotiations for Plaintiffs.  Based upon my involvement in the settlement negotiations, I can also affirm that such negotiations were at arm's length and free of collusion.

**B.     The Settlement Negotiations Were Between Experienced and Capable Counsel**

106.     As set forth in detail at ¶59 above, Lovell Stewart is extremely experienced with the types of claims asserted in this action and is equally experienced in handling class actions.

107.     The MF Global Trustee is represented by the highly capable law firm of Hughes Hubbard & Reed LLP.

**C.     The Settlement Was Reached After Substantial Discovery and Analysis**

108.     Prior to exercising its judgment to enter into the MF Global Settlement, Lovell Stewart had obtained and analyzed substantial discovery.  This includes all the same discovery described at ¶¶61-67 above (discussing 250,000 page CFTC document production, twenty-three CFTC deposition transcripts, NYMEX Streetbook, etc.).  Specifically relating to MF Global, Lovell Stewart listened to and analyzed hundreds of audio files produced by MF Global.  Many of these conversations are detailed in the complaint.  *See, e.g.*, Dkt. No. 218, ¶121-146.

109.     Lovell Stewart further reviewed and analyzed pertinent information related to the MF Global bankruptcy proceeding, including multiple interim reports filed by the MF Global Trustee detailing the status of the MF Global estate and the claims made against same.

110.     In addition to all the substantial expert work described at ¶¶66-67 above, Lovell Stewart retained two experts in bankruptcy law in order to assist Lovell Stewart with the complexities of the MF Global bankruptcy.

**D.      The Complexity, Expense and Likely Duration of the Litigation**

111.     *Complexity*.  In addition to the complexities described at ¶68 above, the MF Global Settlement had the added complexity of MF Global's ongoing SIPA bankruptcy proceeding.  The SIPA proceeding involved another set of procedural rules and statutes, including potential limitations on Plaintiffs' claims.

112.     *Expense*.  As previously stated above, the parties would incur substantial expenses if litigation resumed.  Lovell Stewart has already incurred more than $650,000 in expenses and would incur substantial further expert and other expenses in connection with the continued prosecution of this action.

113.     *Likely Duration*.  The action has been pending for more than 4.5 years. Continued litigation against the MF Global Trustee in the SIPA proceeding or before this Court would likely be a lengthy process.  Such process would include litigating the MF Global Trustee's objections to Futures Class' proof of claim submitted in the SIPA proceeding, litigating the issue of whether the Futures Class could proceed in the SIPA proceeding on a class basis and eventually a trial before the bankruptcy court or this Court.  The likely duration could also be impacted by the speed at which the MF Global Trustee is able to wrap up the business of the estate.

### E.     The Reaction of the Class to the Settlement

114.    The deadline for members of the Futures Class to seek to exclude themselves (or, "opt out") of the MF Global Settlement was January 9, 2015.  Dkt. No. 245, ¶16.  As of the filing of this declaration, Plaintiffs are aware of only four members of the Futures Class who have requested to be excluded from the MF Global Settlement.[5]  Two of the four persons who requested exclusion submitted trading information.  Based upon a review of this information, the volume of trades associated with these persons who have requested exclusion is small.

115.    Given that MF Global's records alone reveal that there could be at least 3,500 potential members of the Futures Class, four requests for exclusions is an extremely small number.  It represents less than two-tenths of one percent of just the potential members of the Futures Class who used MF Global as a broker.

116.    The deadline for members of the Futures Class to submit objections to the MF Global Settlement is January 21, 2015.  Dkt. No. 245, ¶13.  As of the filing of this declaration, no objections to the MF Global Settlement have been received by Lovell Stewart.

### F.     The Stage of the Proceedings and the Amount of Discovery Completed

117.    *Stage of the Proceedings*.  At the time the MF Global Settlement was reached, this action had been pending before this Court for approximately four and one-half years.  The MF Global SIPA proceeding had been pending for almost three years.

---

[5] The four requests for exclusion from the MF Global Settlement were submitted by the following individuals:  (1) Susan J. Levy, (2) Nick A. Kephalos, (3) Beverly D. White, and (4) Gregory T. Farrell.

Mr. Farrell submitted both a proof of claim and a request for exclusion.  As previously stated, Lovell Stewart will promptly report to the Court with further information after speaking with Mr. Farrell and clarifying his intent as to whether he wishes to exclude himself from the settlement.

118.     *Amount of Discovery Completed*.  There was a substantial amount of important discovery completed before the settlement was reached.  *See* ¶¶108-110 above (describing the amount of discovery completed, including discovery concerning the financial condition of the MF Global estate).

119.     I respectfully submit that Lovell Stewart was well informed of the material facts and risks associated with continued litigation throughout the settlement negotiations and when the settlement was executed.

**G.     The Risks of Establishing Liability, Damages and Maintaining the Class Action Through Trial**

120.     *Risks of Establishing Liability*.  The risks of establishing MF Global's liability include all the same risks of establishing liability against the Moore Defendants described at ¶¶68-70 above and certain further risks.  One such further risk includes establishing liability against MF Global within the confines of the SIPA proceeding.

121.     *Risks of Establishing Damages*.  The risks of establishing damages against MF Global include all the same risks of establishing damages against the Moore Defendants described at ¶90 above and the further risks of establishing damages against an entity subject to a SIPA proceeding.  Furthermore, the MF Global Trustee took the position that treble damages and other types of exemplary damages are not available in SIPA bankruptcy proceedings.

122.     *Risks of Maintaining Class Action Through Trial*.  In addition to the inherent risks of maintaining a class action through trial in a district court, Plaintiffs faced the additional risks of proceeding against the MF Global estate on the basis of a class proof of claim.  The MF Global Trustee has taken the position that, absent settlement, he would oppose certification of the Futures Class in the SIPA Proceeding, object to any claims by class members (except those of

26

the named plaintiffs who filed the proof of claim) as time barred, and otherwise seek

disallowance of the Plaintiffs' claims.

### H.    The Ability of the Defendants To Withstand A Greater Judgment

123.    Defendant MF Global is bankrupt.  This fact alone limits the ability of MF Global

to withstand a greater judgment as other claimants against the estate are competing for recovery

of the estate's remaining assets.

### I.    The Range of Reasonableness of The Settlement In Light of the Best Possible Recovery and All The Attendant Risks of Litigation

124.    *The Consideration Provided By the Settlement*.  Pursuant to the terms of the

settlement, the MF Global Trustee has agreed to provide an $18,753,571.43 allowed general

unsecured creditor claim against the estate of Defendant MF Global.  MF Global Settlement,

Section 3(a).  Further, MF Global Assurance has agreed to make an all-cash payment of

$4,672,500 for the benefit of the Future Class.  *Id*., Section 3(b).  Finally, MF Global Holdings

agreed to make an all-cash payment of $800,000 for the benefit of the Futures Class in exchange

for the Plaintiffs' agreement to assign the Welsh Judgment to MF Global Holdings.

125.    As set forth above, assuming the MF Global Settlement becomes effective,

Plaintiffs will entitled to receive immediate payment on the already approved 39% initial interim

distribution, worth approximately $7,313,892.86.

126.    As to the remaining 61% of the allowed unsecured general creditor claim, Class

Counsel have good reason to believe that between $7,700,000 and $9,500,000 or more in cash

will be received. In sum, Class Counsel have good reason to believe that between $19,500,000

and $21,500,000 cash consideration will be received for the MF Global Settlement.

127.    *The Best Possible or Likely Recovery*.  Lovell Stewart reasonably estimates that

they would have been able to prove a claim for nominal damages of more than $400,000,000 at

trial.  Thus, the above estimated cash-value of the MF Global Settlement represents more than 5% of what Lovell Stewart believes that they could prove at trial.  The additional $49,150,000 all-cash consideration provided for by the Moore Settlement would increase the foregoing percentage to approximately 17%.

128.    *The Risks of Continued Litigation*.  The risks of continued litigation against the MF Global Trustee include the following:

a.    Plaintiffs may have been prevented from proceeding against the MF Global estate on a class-wide basis.  If the MF Global Trustee was successful in this regard, the claim filed against the MF Global estate would likely be limited to those of the three named plaintiffs.

b.    The MF Global Trustee and other persons who hold claims against the MF Global estate could successful object to Plaintiffs' claims on a variety of other grounds. Such objections could result in reducing, limiting or even perhaps even disallowing Plaintiffs' claims in full.

c.    Even if the Plaintiffs survived all of the foregoing risks, the amount of damages awarded and sustained post-trial and on appeals, could result in a recovery that was less than that provided by the MF Global Settlement.

129.    Lovell Stewart would have tried to overcome all the foregoing risks.  However, Lovell Stewart acknowledges if these risks materialized the impact would be substantial and perhaps dispositive.  This includes a situation in which there would be no recovery at all for the Futures Class.

130.    Based upon Lovell Stewart's considerable prior experience in complex class actions litigation involving CEA and antitrust claims, Lovell Stewart's knowledge of the

strengths and weaknesses of the Plaintiffs' claims and Lovell Stewart's assessment of the Futures

Class's likely recovery following trial and appeal in light of the attendant risks (including MF

Global's bankrupt status), Lovell Stewart believes that the MF Global Settlement is fair,

reasonable and adequate.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Executed on January 14, 2015

*/s/ Christopher M. McGrath*
Christopher M. McGrath