UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| *In Re: Platinum and Palladium Commodities* | ) | MASTER FILE |
| *Litigation* | ) | No. 10 Civ. 3617 (WHP) |
| | ) | |
| | ) | |
| _____ | ) | |

## DECLARATION OF JERRY W. MARKHAM
## IN SUPPORT OF PROPOSED CLASS SETTLEMENTS

### I

### Introduction

1.      I am a Professor of Law at the Florida International University in Miami. I have been asked by the law firm of Lovell Stewart Halebian Jacobson LLP, counsel for the plaintiffs, to express my expert opinion on the risks associated with litigating the manipulation claims under the Commodity Exchange Act of 1936 (CEA) (7 U.S.C. §1 *et seq.*) that are set forth in the sixth amended complaint in this action. My qualifications for expressing that opinion are set forth in Part II of this Declaration.

2.      The sixth amended complaint charges defendants with price manipulation under the CEA through alleged "bang the close" transactions executed on numerous trading days. The complaint alleges that this conduct inflated prices in the futures market for platinum and palladium. The alleged manipulation occurred during the period between October 2007 and May 2008.

1

3.     As described in Part III of this Declaration, it is my opinion that the class members in this action would face a serious and substantial risk of no recovery at all if this matter proceeds to trial. Litigation risks for plaintiffs in CEA manipulation cases are extremely high. CEA manipulation claims are notoriously hard to prove. Most such claims fail at or before trial. Indeed, the Commodity Futures Trading Commission (CFTC), the federal agency responsible for bringing such claims in civil proceedings, has been successful in only one contested manipulation case in its nearly forty-year history. The Justice Department has had a similar lack of success. Private litigants also usually fail in bringing CEA manipulation claims to trial.

4.     My opinion in this matter is based on a review of the documents set forth in Exhibit 1 to this Declaration, my general experience in the commodity futures industry, my prior research and writing and my experience as an expert witness and consultant.

## II

## Qualifications

5.     My experience includes service as Chief Counsel for the Division of Enforcement at the CFTC (1975-1978); Secretary & Counsel for the Chicago Board Options Exchange Inc. (1974-1975); and as an attorney in the Office of the General Counsel at the U.S. Securities and Exchange Commission (1972-1974).

6.     Also, I was an attorney in private practice from 1978 to 1991 at the law firm of Rogers & Wells (now Clifford Chance) where I was a partner. While in private

practice, I represented clients in cases involving CEA manipulation issues. In one case, which was litigated over a period of several years, I represented two large brokerage firms in connection with the trading of their clients in the historic manipulation of the silver market in 1979-1980 by the Hunt family of Dallas, Texas.

7. I also lectured on commodity trading and securities industry practices in most of my classes after becoming a full-time academic in 1991 at the University of North Carolina at Chapel Hill (UNC), where I was a tenured Professor of Law. During my tenure at UNC, I trained thousands of commodity and securities professionals on industry practices through live training and computer-based courses that I wrote. That training was conducted through the Securities Education Institute Inc. and Futures Education Inc., which I co-founded.

8. I also taught classes on the commodity markets to students prior to my work at UNC. I began my academic career as an Adjunct Professor at the Georgetown Law Center in Washington, D.C., where I taught a course on commodity trading and its regulation (1981-1991). My lectures in those courses addressed CEA manipulation claims.

9. I now am a tenured Professor of Law at Florida International University in Miami (FIU), where I have taught since 2003. I lecture on commodity regulatory issues in most of my classes at FIU.

10. In the process of the foregoing experience, I have conducted extensive scholarly research on the commodity markets. My publications have been cited in over 300 law review articles including those of most major schools. Numerous courts have

also cited my publications.[1]

11.     I am the author of a book that describes the growth of the commodity futures industry. That book provides a description of some of the historically important commodity price manipulations that ultimately led to the enactment of the CEA. *See, Jerry W. Markham, The History of Commodity Futures Trading and Its Regulation* (1987). The Supreme Court cited industry practices that I described in that book with approval. *See, Dunn v. Commodity Futures Trading Commission*, 519 U.S. 465, 472 (1997). I updated that book, and it has been translated into Chinese for publication in China.

12.     In 2014, I authored a book on commodity and stock market price manipulations. That book examines in depth the difficulties of proving commodity price manipulations. *See, Jerry W. Markham, Law Enforcement and The History of Financial Market Manipulation* (2014).

13.      I am also the author of an article that describes manipulation practices in the commodity industry and the difficulties encountered in the prosecution such cases. *See*, Jerry W., Markham, *The Manipulation of Commodity Futures Prices - The Unprosecutabie Crime*, 8 Yale J. on Reg. 281 (1991). That article has been cited as

---

[1] *See e.g., Dunn v. CFTC*, 519 U.S. 465, 472 (1997); *Leist v. Simplot*, 638 F.2d 283, 298 (2d Cir. 1980); *CFTC v. Equity Fin. Group LLC*, 572 F.3d 150, 155 (3d Cir. 2009), *cert. denied, sub nom., Shimer v. CFTC*, 130 S. Ct. 1737 (2010); *Point Landing, Inc., v. Omni Capital Int'l*, 795 F.2d 415, 420 (5th Cir. 1986); Karlen v. Ray E. Friedman & Co., 688 F.2d 1193, 1198 (8th Cir. 1982); Hill v. Bache, 790 F.2d 817, 824, 828 (10th Cir. 1986); Clayton Brokerage Co. v. CFTC, 794 F.2d 573, 578, 581, 582 (11th Cir. 1986); *CFTC v. Zelener*, 373 F.3d 861, 865 (7th Cir. 2004); *Chicago Mercantile Exchange v. SEC*, 883 F.2d 537, 544 (7th Cir. 1989); *Stephenson v. Citco Group Ltd*., No. 09-CV-00716, 2010 U.S. Dist. LEXIS 32321, at *34 n.14 (S.D.N.Y.); *United States v. Radley*, 558 F. Supp.2d 865, 874 n.8 (N.D. Ill. 2008); *In re Methyl Butyl Ether Prods. Liab. Litg*., 559 F. Supp.2d 424, 436 n.75 (S.D.N.Y. 2008); *CFTC v. UForex Consulting*, 551 F. Supp.2d 513, 534 (W.D. La. 2007*); United States v. Reliant Energy Services*, 420 F. Supp.2d 1043, 1054 n.1 (N.D. Cal. 2006); *In re Sumitomo Copper Litg*., 189 F.R.D. 274, 277 n.3  and 182 F.R.D. 85, 90 (S.D.N.Y. 1998 & 1999); *Nagel v. ADM Investor Services,* 65 F. Supp.2d 740, 751 (N.D. Ill. 1999); *In re Soybean Futures Litg.* 892 F. Supp. 1025, 1032 n.5 (N.D. Ill. 1995); and *Burns v. Ritchfield Sec.*, 809 F. Supp. 860, 864 n.3  (D. Utah 1992).

authoritative in manipulation cases.[2]

14.     I have co-authored two other articles on manipulative practices in commodity

trading. *See*, Jerry W.  Markham & Lawrence H. Hunt Jr., *The California Energy*

*Crisis-Enron's Gaming of Governor Gray's Imperfect Market*. 24 Fut. & Derv. L.

Rep. 1 (2004); Jerry W. Markham, Lawrence H. Hunt Jr., & Michael S. Sackheim,

*Market Manipulation-From Star Chamber to Lone Star*, 23 Fut. & Derv. L. Rep. 7

(2003).

15.     I am the co-author of a casebook on the regulation of commodity markets, which

contains materials on manipulation. *Ronald H. Filler & Jerry W. Markham,*

*Regulation of Derivative Financial Instruments (Swaps, Options and Futures)*

(2014).

16.     I have authored a two-volume treatise on the regulation of the commodities futures

industry that I update annually. That treatise contains chapters on manipulation

that comprehensively describe cases and trading practices involving commodity

futures price manipulations. *See*, 13 & 13A *Jerry W. Markham, Commodities*

*Regulation: Fraud, Manipulation & Other Claims* (2014).

17.     I am also the principal co-author of a two-volume treatise on broker-dealer

operations under commodities and securities laws, which also describes

commodity price manipulations. That treatise is updated annually. *See*, 23 & 23A

*Jerry W. Markham & Thomas Lee Hazen, Broker Dealer Operations Under*

---

[2] *See,* United States v. Radley, 558 F. Supp.2d 865 874, n.8 (N.D. Ill. 2008); United States v. Reliant Energy
Services, 420 F. Supp.2d 1043, 1054 (N.D. Cal. 2006), *remanded*, 2006 U.S. App. LEXIS 16995 (9th Cir. 2006);
In re Sumitomo Copper Litigation, 189 F.R.D. 274, 277, n.3 (S.D.N.Y. 1999); In re Sumitomo Copper
Litigation, 182 F.R.D. 85, 90 (S.D.N.Y. 1998); and In re Soybean Futures Litigation, 892 F. Supp. 1025, 1032
(N.D. Ill. 1995).

*Securities and Commodities Law: Financial Responsibilities. Credit Regulation, and Customer Protection* (2014).

18.     I am the author of a three-volume series on the financial history of the United States that traces the growth of the securities and commodity markets. That series describes several historically important commodity price manipulations. *See*, *Jerry W. Markham, A Financial History of the United States, From Christopher Columbus to the Robber Barons (1492–1900)* (2002); *A Financial History of the United States, From J.P. Morgan to the Institutional Investors (1900–1970)* (2002); and *A Financial History of the United States, From the Age of Derivatives into the New Millennium (1970–2001)* (2002). That work was selected as a *Choice* Outstanding Academic Title for 2002 in the field of Economics. [3]

19.     I have since added three volumes to my Financial History series. Those books also describe several high profile manipulation cases. *See*, *Jerry W. Markham, A Financial History of Modern U.S. Corporate Scandals: From Enron to Reform,* (2005); *A Financial History of the United States, From Enron Era Scandals to the Subprime Crisis (2004–2006)* (2011); *A Financial History of the United States, From the Subprime Crisis to the Great Recession (2006–2009)* (2011).

20.      I am the principal author of a casebook on corporate finance and the co-author of casebooks on banking regulation and corporate law that address commodity futures trading and its regulation. [4]

---

[3] *Choice* is a publication that reviews current works for academic libraries. Outstanding Academic Titles are selected by *Choice* for their excellence in scholarship, the significance of their contribution to the field and their value as an important treatment of the subject.

[4] *See, Lissa L. Broome & Jerry W. Markham, Regulation of Banking Financial Service Activities, Cases and Materials* (4th ed. 2011); *Jerry W. Markham, Jose Gabilondo & Thomas L. Hazen, Corporate Finance: Debt,*

21.    I am the author of numerous law review articles and book chapters that address commodity industry regulatory issues.

22.    I have also served as a consultant and expert witness on a broad range of commodity industry issues, including several manipulation claims.

23.    A more complete list of my qualifications and publications is set forth in Exhibit 2 to this Declaration.


### III

### Manipulation Cases are Difficult to Prove and Success is Rare

24.    Starting with my service as Chief Counsel for the CFTC Division of Enforcement, and in my experience since then, I have observed that the most complex and difficult claim to bring and prove under the CEA is a claim for commodity price manipulation.

25.    My article in the *Yale Journal on Regulation* contains an extensive discussion and review of every manipulation case brought under the CEA to the date of that publication.[5] That article (as indicated by its title: *Manipulation of Commodity Futures Prices – The Unprosecutable Crime*) demonstrates how difficult it is to prove a manipulation case under the CEA. That article contains a table of CEA manipulation cases, which demonstrates that litigation success in such actions has been extremely limited. That table of cases also shows that contested cases take

---

*Equity, and Derivative Markets and Their Intermediaries* (3d ed. 2011); *Jerry W. Markham & Thomas L. Hazen, Corporations and Other Business Organizations, Cases and Materials* (3d ed. 2009).
[5] Jerry W., Markham, *The Manipulation of Commodity Futures Prices - The Unprosecutabie Crime*, 8 Yale J. on Reg. 281 (1991).

many years to litigate, which results in tremendous expense, coupled with a very low likelihood of success.

26.    My treatise on commodity regulation updates the manipulation cases brought after the publication of the above article. It establishes that the success rate for manipulation claims under the CEA did not improve in subsequent years. *See*, 13 *Jerry W. Markham, Commodities Regulation: Fraud, Manipulation & Other Claims*, Ch. 16 (2012).

27.    In sum, very few manipulation claims have ever been successful at trial. Virtually all manipulation cases have been dismissed before trial or settled for amounts that are only a fraction of the claimed damages. Indeed, in the entire history of the CEA only a few cases of manipulation have ever been brought to trial and most of those were unsuccessful.

28.    The CFTC was created by Congress in 1974 in an effort to strengthen the government's ability to prosecute manipulation claims under the CEA.[6] However, the CFTC has had a remarkable lack of success in litigated manipulation cases.[7] Indeed, in its nearly forty-year history, the CFTC has successfully prosecuted through trial and appeal only one contested CEA manipulation case. *In the Matter*

---

[6] Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389. *See, Jerry W. Markham, The History of Commodity Futures Trading and Its Regulation,* 48-72 (1987) (describing the background of that legislation).

[7] See e.g., In re Hohenberg Bros., [1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶20,271 (C.F.T.C. 1977); In re Indiana Farm Bureau Cooperative Ass'n, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶21,796 (C.F.T.C. 1982); In re Stoller, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶24,356 (C.F.T.C. 1988), *aff'd*, [1990~1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶24,834 (C.F.T.C. 1990); In re Sundheimer, [1980-1982 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶21,245(C.F.T.C. 1981), *aff'd*, 688 F.2d 150 (2d Cir. 1982), *cert. denied*, 460 U.S. 1022 (1983); In re Cox, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶23,786 (C.F.T.C. 1987); In re Dial, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶23,772 {C.F.T.C. 1987); In re Abrams, [1987-1990 Transfer BinderJ Comm. Fut. L. Rep, (CCH) ¶¶ 24,408 and 24,577 (C.F.T.C. 1989); In re Abrams, Comm. Fut. L. Rep. (CCH) ¶26,479 (C.F.T.C. 1995); CFTC v. Delay, 2006 WL 3359076 (D. Neb. 2006); CFTC v. Dizona, 594 F.3d 408 (5th Cir. 2010).

*of Diplacido*, Comm. Fut. L. Rep. ¶30,970 (C.F.T.C. 2008), *aff'd sub nom.*, *DiPlacido v. CFTC*, No. 08-5559-ag, 2009 U.S. App. LEXIS 22692 (2d Cir. 2009), *cert. denied*, 2010 U.S. LEXIS 2461 (2010).

29.    Even though the CFTC eventually prevailed in the *DiPlacido* case, that litigation provides a useful case study on the complexity and difficulty of proving CEA manipulation claims. Although the trading at issue in *DiPlacido* was limited and occurred on only five trading days, it took nearly twelve years from the date of the trading to the final resolution of the case. In contrast, the trading in the present case involves numerous trades conducted over a period of some nine months. This will create magnitudes of complexity, difficulty, delay and expense in reaching trial on those charges.

30.    The CFTC also noted in its decision in the *DiPlacido* case that cases based on trading activity are rare. Most CEA manipulation claims involve market power exercised through dominant positions in both the futures and cash markets. The present case is novel in seeking civil damages for manipulation under the CEA primarily or exclusively for bang the close trading activities. Such a novel claim increases the uncertainty of success in any litigation.

31.    The allegations in the present case also vary from those in *DiPlacido*, where the trader was charged with violating bids and offers. The plaintiffs in the present case do not allege that bids or offers were actually violated through the alleged bang-the-close trades. *See*, Sixth Amended Complaint ¶194. The absence of such conduct will make this case more difficult to prove.

32.    The complaint in this case also raises an unsettled issue of whether so-called "open

market" trades, such as those charged here, can be manipulative. An open market trade is one that is executed openly in the market with manipulative intent. An open-market transaction "involves real parties and real economic risk" while a closed-market trade is a non–bona fide transaction, such as a wash trade. *Jerry W. Markham, Law Enforcement and The History of Financial Market Manipulation* 378 (2014) (citation omitted).

33.     In *CFTC v. Delay*, 2006 U.S. Dist. LEXIS 85068, at *9-*10 (D. Neb.), the court held, in the context of a manipulation charge under the CEA, that:

> Simply stated, it is not a violation of the statute to report feeder cattle sales to the USDA with the intention of moving the CME index up or down--rather, to be unlawful, the reported sales must be sham or nonexistent transactions, or the reports must be knowingly false or misleading. In this case, it turns out that the sales were real and the reports were true.

34.     For all the foregoing reasons, the novelty of the specific claims here, significantly adds to the general risks and uncertainties involved in proving a CEA manipulation claim.

35.     Like the CFTC, the Justice Department has had a remarkable lack of success in contested manipulation cases under the CEA. Historically, there have been only a few criminal prosecutions under the CEA for manipulation. The Justice Department tried to bring more such cases in recent years, but received some embarrassing setbacks. *See, Jerry W. Markham, Law Enforcement and The History of Financial Market Manipulation* 282-285 (2014) (describing those setbacks).

36.     Awards in private actions for damage claims under the CEA are also rare. Such actions are usually dismissed or settled before trial for small fractions of the actual damages claimed. Even when successful at trial, collection may be frustrated. I

have witnessed such a problem first hand.

37.     One difficulty in proving manipulation under the CEA is due to the fact that there

is no statutory definition of or regulation defining what constitutes such a

violation. Although there are case law definitions, one commentator states:

> Problematically, . . . the Act does not define the words 'manipulation,'
> 'corner,' or 'squeeze,' despite the fact that Congress explicitly deemed such
> activity harmful. Furthermore, the legislative history fails to provide useful
> information for clarifying what Congress believed would constitute
> 'manipulation.' Consequently, the task of interpreting manipulation has been
> left in the hands of the courts, administrative agencies such as the CFTC, and
> academic commentators. Accordingly, any student of commodity manipulation
> law will discover a body of law that is 'a murky miasma of questionable
> analysis and unclear effect.'

Benjamin E. Kozinn, *The Great Copper Caper: Is Market Manipulation Really a
Problem in the Wake of the Sumitomo Debacle?* 69 Fordham L. Rev. 243, 248
(2000) (footnotes omitted); *See also Jerry W. Markham, Law Enforcement and
The History of Financial Market Manipulation* 204-211 (2014) (surveying
academic literature on this subject).

38.     The courts and the CFTC have created a four-part test for determining whether a

manipulation has occurred. That test requires the following elements to be proved:

     1.  The trader had the ability to influence market prices;

     2.  The trader specifically intended to do so;

     3.  An artificial price occurred; and

     4.  The trader caused the artificial price.

*See, e.g.*, *In re Cox*, Comm. Fut. L. Rep. (CCH) ¶23,786 (CFTC 1982).

39.     Each of these elements poses formidable obstacles to a plaintiff in a CEA

manipulation case. The first element (*i.e.,* that the trader had the ability to

influence market prices) will be especially difficult to prove in the context of this case. "Platinum and palladium are both used in catalytic converters to cause changes in the emissions from internal combustion engines into gases that are more benign for the ozone layer and environment. Both metals are also used for jewelry." Sixth Amended Complaint at ¶ 76. Platinum and palladium are also precious metals that have a worldwide market in which traders speculate or seek to hedge against inflation and political uncertainty. It will be difficult to show that the defendants had the ability to overcome the market power of other market participants throughout the world, which presumably includes the suppliers of the giant automakers.

40.     The second element (*i.e.,* specific intent to create an artificial price) poses an even more formidable barrier to plaintiffs. As the CFTC has held:

> We are unable to discern any justification for a weakening of the manipulative intent standard which does not wreak havoc with the market place. It is the intent of the parties which separates otherwise lawful business conduct from unlawful manipulative activity. This being so, a clear line between lawful and unlawful activity is required in order to ensure that innocent trading activity not be regarded with the advantage of hindsight as unlawful manipulation. . . .

> Accordingly, we hold that in order to prove the intent element of a manipulation or attempted manipulation of a futures contract price under §§ 6(b) and 6(c) of the Commodity Exchange Act, as amended, it must be proven that the accused acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand influencing futures prices in the particular market at the time of the alleged manipulative activity.

*In re Indiana Farm Bureau Cooperative Association*, Comm. Fut. L. Rep. (CCH) ¶21,796 (C.F.T.C. 1982).

41.     The defendants here could claim any number of motivations for their trading,

without having the specific intent of creating an artificial price. In that regard, the

CFTC has held that:

> market participants have a right to trade in their own best interests without regard to the positions of others as long as their trading activity does not have as its purpose the creation of 'artificial' or 'distorted' prices. Indeed, it is this very motivation which gives lifeblood to the forces of supply and demand, and makes the price discovery function of the marketplace viable. Moreover, since the self-interest of every market participant plays a legitimate part in the price setting process, *it is not enough to prove simply that the accused intended to influence price.*

*In re Indiana Farm Bureau Cooperative Association*, Comm. Fut. L. Rep. (CCH) ¶21,

796 (C.F.T.C. 1982) (emphasis supplied).

42.     The third and fourth elements required to prove a CEA manipulation (*i.e.,* that an

artificial price occurred as a result of the defendant's trading activities) pose

equally daunting challenges. The precious metals markets are volatile and are

affected by a large number of factors that range from supply and demand for the

industrial use of those metals to demand by traders seeking protection from

inflation and political unrest. Any number of factors can thus affect prices,

including increases in automobile production, mining practices in Russia and

South Africa, or concern with domestic government policies.

43.     There will likely be conflicting expert testimony in this case on the market price

effects of defendant's trading activities and the duration of any such effects on

market prices and plaintiffs' positions. That testimony will involve complex

econometric analysis for some 230 instances of the trading at issue in two cash and

futures markets. It is impossible to predict how a jury will respond to such

testimony.

44.     To provide some perspective on the risks facing the plaintiffs, the barriers they face should be contrasted with class actions brought under the provisions of Section 10(b) of the Securities Exchange Ace of 1.934 (15 U.S.C. §78j (b)), which is the principal anti-fraud provision under the federal securities laws. Class actions brought under that provision, as complicated as they often are, are several orders of magnitude easier to prove than a manipulation claim under the CEA.

45.     A securities law claim will almost inevitably involve the trading of a single security of a single issuer. In securities manipulation cases, the effects of a defendant's activities may be more easily measured than those of a trader in a worldwide commodity market. In a fraud action under Section 10(b), a few specific misstatements will be identified and proven and reliance may be presumed. Damages will be established for a limited period of time, and the scienter standard is viewed to be lower than the intent standard required for a CEA manipulation.

46.     Indeed, as a result of the inability of the government to succeed in manipulation actions, the CEA was amended in 2010 as a part of the Dodd-Frank Act. That amendment sought to provide further authority to the CFTC to attack manipulation by including the language in Section 10(b) of the Securities Exchange Act of 1934 into the CEA. However, that authority was not enacted until well after the trading in question. It is also notable that the Dodd-Frank amendments included a separate provision that was directed at abusive trading practices, such as banging the close, rather than charging it as manipulation. *See, Jerry W. Markham, Law Enforcement and The History of Financial Market Manipulation* 331-332 372-373 (2014)

14

(describing that legislation).

47.   As I also describe in my recent book, the CFTC's inability to prosecute manipulations under the CEA led it to change tactics. The CFTC began charging attempted rather than an actual manipulation in many of the cases it has brought in recent years. *See, Jerry W. Markham, Law Enforcement and The History of Financial Market Manipulation* 198-199 (2014) (describing that change).

48.   The CFTC claims that in an attempted manipulation case, it need only show intent and an overt act. *In the Matter of Hohenberg Bros.*, Comm. Fut. L. Rep. (CCH) ¶20, 271 (C.F.T.C. 1977). In charging attempted manipulation, the CFTC seeks to avoid the very heavy burden of proof required to show artificial prices and that the defendant's act was the cause and effect of such prices.

49.   Notably, the CFTC charged defendants in a parallel case with attempted manipulation, rather than actual manipulation, and allowed them to settle without admitting or denying the charges. *See, In the Matter of Moore Capital Management, LP*, CFTC Doc. No. 10-09 (2010). To me, this evidences that the government did not want to assume the burden of proving an actual manipulation because of the difficulty and litigation risks associated with such claims. Moreover, the allegations in that order are somewhat vague, and this Court expressly ruled that the findings in that Order could not be used to support the plaintiffs' claims here.

# IV

## Conclusion

50.   The present case is both illustrative of, and goes far beyond, the serious problems, risks and uncertainties faced by plaintiffs in prior CEA manipulation cases. This case has been actively litigated for several years, and the complaint has been amended six times. It is now 194 pages in length, it contains 470 numbered paragraphs and involves some 230 instances of trading. This will impose a very difficult and costly evidentiary burden on the plaintiff that is fraught with risk in proving the elements of a CEA manipulation claim.

51.   It is my opinion that the proposed settlements are highly favorable to the class plaintiffs; that the hazards of this litigation are extremely high; and that, if the claims against the settling defendants were to proceed to trial, the class members would face a serious and substantial risk of receiving no recovery at all.

I declare under the pains and penalties of perjury that the foregoing is true to the best of my knowledge.


_____

Jerry W. Markham


January 14, 2015

16

**EXHIBIT 1**

**DOCUMENTS CONSIDERED**

1.  Sixth Amended Consolidated Class Action Complaint.

2.  Memorandum and Order Dismissing Complaint for Failure to State a Claim

3.  Order Instituting Proceedings Pursuant to Sections 6(c), 6(d) and 8a of the Commodity Exchange Act and Making Findings and Imposing Remedial Sanctions dated April 29, 2010.

4.  Order Instituting Proceedings Pursuant to Section 6(c), 6(d) and 8a of the Commodity Exchange Act and Making Findings and Imposing Remedial Sanctions dated July 25, 2011

5.  Memorandum and Order denying Susan Levy and the Customer Representatives intervention.

**EXHIBIT 2**

**QUALIFICATIONS AS AN EXPERT**

*JERRY W. MARKHAM*

*PRESENT EMPLOYMENT*

Professor of Law, Florida International University
College of Law at Miami (2003--)

Subjects:  Corporation Finance, Derivatives, Banking, Securities Regulation,
International Business Transactions and International Litigation

Lecturer: Sydney, Australia (June 2001 and October 2008); Fukuoka, Japan  (March
1998); Mexico City, Mexico (October 1997); Bangkok, Thailand (May 1997); Beijing,
China (January 1995); Warsaw, Poland (February 1995); University of Lyon (Spring
1994); Montevideo, Uruguay (July 1992); London, England (1989 and 2013).

Author of *A Financial History of the United States*, a three volume history selected
by *Choice Magazine* as an Outstanding Academic Title for 2002.

Chairman, Markham Consulting Inc.

Member:

Board of Directors, Nomura Derivative Products, Inc. (2000--).

Board of Advisors, University of North Carolina Banking Institute (1997--).

Financial Products Advisory Committee of the United States Commodity Futures
Trading Commission  (1997-1999).

Institution for Regulatory Training (Founding Member. (2010--)

*PRIOR EMPLOYMENT*

Professor of Law, University of North Carolina School of Law at Chapel Hill (1991-2003)

Chairman, Securities Education Institute Inc. and Futures Education Institute Inc. (1993-1998)

Adjunct Professor of Law, Georgetown University Law Center (l981-1991)

Partner:  Rogers & Wells (now Clifford Chance), Washington, D.C. (l982-1991)
(Associate 1978-1982)

Chief Counsel, Division of Enforcement United States Commodity Futures Trading Commission (1975-1978)

Secretary and Counsel, Chicago Board Options Exchange, Inc.
Chicago, Illinois  (1974-1975)

Attorney, Office of General Counsel, United States Securities and Exchange Commission (1972-1974)

*LEGAL EDUCATION*

LL.M., Georgetown University Washington, D.C.  (1974)

J.D., University of Kentucky College of Law (1972)

> Activities and Honors:
>
>> Editor-In-Chief, Kentucky Law Journal
>>
>> Order of the Coif

*UNDERGRADUATE EDUCATION*

B.S., Western Kentucky University (1969)

*BAR Membership*

New York (retired)

*PUBLICATIONS*

*JERRY W. MARKHAM*

*BOOKS*

I. A Financial History of the United States, From Christopher Columbus to the Robber Barons (1492-1900), N.Y., M.E. Sharpe, 2002.

II. A Financial History of the United States, From J.P. Morgan to the Institutional Investors (1900-1970), N.Y., M.E. Sharpe, 2002.

III. A Financial History of the Unite States, From the Age of Derivatives into the New Millennium (1970-2001), N.Y., M.E. Sharpe, 2002.

A Financial History of Modern U.S. Corporate Scandals: From Enron to Reform, M.E. Sharpe 2005.

A Financial History of the United States, From Enron Era Scandals to the Subprime Crisis (2004-2006), N.Y., M.E. Sharpe 2011.

A Financial History of the United States, From the Subprime Crisis to the Great Recession (2006-2009), N.Y., M.E. Sharpe 2011.

Law Enforcement and The History of Financial Market Manipulation, N.Y. M.E. Sharpe (2014).

Regulation of Derivative Financial Instruments (Swaps, Options and Futures), West Academic (2014) (with R. Filler).

Corporate Finance: Debt, Equity, and Derivative Markets and Their Intermediaries, West Group, 2011 (1st- 3d editions with T. Hazen & J. Gabilondo).

Corporations and Other Business Organizations, Cases and Materials, West Group, 2009 (1st, - 3d abridged and unabridged editions with T. Hazen).

Mergers and Acquisitions, Cases and Materials, West Group, 2003, (with T. Hazen).

Regulation of Banking Financial Service Activities, Cases and Materials, Minn., West Group, 2011 (1st -4th editions with L. Broome) (translated into Chinese 2006).

23 & 23A Broker Dealer Operations Under Securities and Commodities Law: Financial Responsibilities, Credit Regulation, and Customer Protection, West Group, 2002, Two Volumes (Second Edition with T. Hazen) (updated annually).

13 & 13A Commodities Regulation: Fraud, Manipulation & Other Claims, West Group, 1987, Two volumes, (updated annually).

The History of Commodity Futures Trading and Its Regulation, N.Y., Praeger Press, 1986, cited with approval, Dunn v. Commodity Futures Trading Commission, 519 U.S. 465, 472 (1997) (updated and translated into Chinese 2007).


### BOOK CHAPTERS

Research Handbook on Securities Regulation in the United States (edited with R. Gjyshi) (2014).

Reparations Proceedings Before the Commodity Futures Trading Commission, Ch. 3 in

Alternate Dispute Resolution in the Futures Industry (2013).

The Gavel Has Fallen: The Demise of Exchange Trading Floors and the Growth of ECNs, Ch. 12 in Handbook of Research on Stock Market Globalization  (with D. Harty, 2012).

Regulating Credit Default Swaps in the Wake of the Subprime Crisis, Chapter 9 in International Monetary Fund, Current Developments in Monetary and Financial Law: Restoring Financial Stability - Current Developments in Monetary and Financial Law, Volume 6 (2012).

The Oxford Encyclopedia of American Political & Legal History (2012) (various entries).

Major Acts of Congress, N.Y. Macmillan Reference, 2004 (entries for Social Security, Commodity Exchange Act and Gold Act)

Securities Regulation, London, 1992 (co-editor and author of chapters 8 and 10).

Futures Trading Law and Regulation, London, 1993 (author of chapter 10).

Swaps and Off-Exchange Derivatives Trading: Law and Regulation, London, 1996 (author of chapter 11).

Studies of Chinese And Foreign Securities Law And Futures Trading Law and Case Analysis, Beijing, China, 1997 (Contributor).


*OP-ED*

The Politics of Executive Compensation, Regulation Magazine (Spring 2011).

Was Fur Spricht (SEC v. Goldman Sachs), Financial Times (Germany), April 22, 2010 at 24.

Give Paulson a Chance, Worldwide Finance Intelligence, 53-54 (July 2008).

How the Feds Stacked the Deck Against Enron, Chicago Sun Times, May 7, 2006, at B2.

The Enron Era Scandals—What Happened to the Good Guys? History News Network (May 1, 2006) (available at http://hnn.us/articles/24542.html).

There's Trouble in the Futures Trading Pits, Legal Times 26 (June 3, 1991).


*LAW REVIEW ARTICLES AND PROFESSIONAL PUBLICATIONS*

High Speed Trading on Stock and Commodity Markets— From Courier Pigeons to Computers, 52 San Diego L. Rev. - - (2015).

Regulation of Swap and Other Over-The-Counter Derivative Contracts, Bloomberg/BNA Securities Practice Portfolio Series No. 263 (2014).

Custodial Requirements for Customer Funds, 8 Brook. J. Corp. Fin. & Comm. L. 92 (2013).

The Financial Stability Oversight Council—Risk Manager or Debating Society, 33 J. Fin. Trans. 3 (Dec. 2011).

The Subprime Crisis—A Test Match for the Bankers. 12 U. Penn. L. & Bus. J.1081 (2010).

SEC v. Goldman Sachs & Co.—Serious Fraud or Just More Banker Bashing? 30 Fut. & Derv. L. Rep. 8 (2010).

Merging the SEC and CFTC—A Clash of Cultures, 78 U. Cinn. L. Rev. 537 (2009).

The Subprime Crisis—Some thoughts on a "Sustainable" and "Organic" Regulatory System, 4 F.I.U. L. Rev. 381 (2009).

For Whom the Bell Tolls: The Demise of Exchange Trading Floors and the Growth of ECNs, 33 J. Corp. L. 865 (2008) (with D. Harty).

Excessive Executive Compensation—Why Bother? 2 Maryland Journal of Business & Technology Law 1001 (2008).

Mutual Fund Scandals—A Comparative Analysis of the Role of Corporate Governance in the Regulation of Collective Investments, 3 Hastings Business Law Journal 67 (2006).

Clearing Firm Liability for the Acts of Introducing Brokers, 24 Futures and Derivatives Law Report 1 (2005).

The California Energy Crisis—Enron's Gaming of Governor Gray's Imperfect Market, 24 Futures and Derivatives Law Report 1 (2004) (with L. Hunt Jr.).

Market Manipulation—From Star Chamber to Lone Star, 23 Futures and Derivatives Law Report 7 (2003) (with L. Hunt Jr. & M. Sackheim).

Accountants Make Miserable Policeman: Rethinking the Federal Securities Laws, 28 North Carolina Journal of International Law and Commercial Regulation 725 (2003).

Super-Regulator: A Comparative Analysis of Securities and Derivatives Regulation in the United States, Great Britain & Japan, 28 Brooklyn J. Intl. Law 319 (2003).

Privatizing Social Security, 38 San Diego L. Rev. 747 (2001).

Banking and Insurance: Before and After the Gramm-Leach-Bliley Act, 25 J. Corp. L. 723 (2000) (with L. Broome).

Banking Regulation: Its History and Future, 4 N.C. Banking Institute 221 (2000).

The CFTC Net Capital Rule -- Should a More Risk-Based Approach be Adopted, 71 Chicago-Kent L. Rev. 1091 (1996).

Guarding the Kraal -- On the Trail of the Rogue Trader, 21 J. Corp. L. 131 (1995).

Protecting the Institutional Investor -- Jungle Predator or Shorn Lamb? 12 Yale J. on Reg. 345 (1995), reprinted, 1996 Securities L. Rev. 633.

The North Carolina Journal of International Law and Commercial Regulation and International Course Offerings, 73 N.C.L. Rev. 805 (1995).

"Confederate Bonds," "General Custer," and the Regulation of Derivative Financial Instruments, 25 Seton Hall Law Review 1 (1994).

United States: Continuing Education in the Commodity Futures and Securities Industries -- The Ethical Nineties, 1994 Fut. & Derv. L. Rev. 1 (London 1994) (with K. Schobel).

CFTC Rules to Provide Legal Certainty for OTC Products, Futures Industry Magazine, Nov/Dec., 1992, at 20 (with W. Maitland).

Fiduciary Duties Under the Commodity Exchange Act, 68 Notre Dame Law Review 199 (1992).

Commodity Exchanges and the Privatization of the Agricultural Sector in the Commonwealth of Independent States -- Needed Steps in Creating a Market Economy, 55 Law and Contemporary Problems 119-155 (1992) (with A. Belozertsev in Moscow).

The Commodity Exchange Monopoly -- Reform is Needed, 48 Washington and Lee Law Review 977-1036 (1991).

Federal Regulation of Margin in the Commodity Futures Industry -- History and Theory, 64 Temple Law Review 59-143 (1991).

The Manipulation of Commodity Futures Prices -- The Unprosecutable Crime, 8 Yale Journal on Regulation 281-389 (l99l).

More on Transnor, 8 Oil and Gas Law and Taxation Review 223-27, Oxford England (1991) (with E. Bettelheim).

The Transnor Decision And Its Aftermath, 8 Oil and Gas Law and Taxation Review 76-83, Oxford, England (l990) (with E. Bettelheim).

Regulation of Hybrid Instruments Under the Commodity Exchange Act - Alternatives Are Needed, 1990 Columbia Business Law Review 1-59 (l990).

The Stock Market Crash of 1987 -- The United States Looks at New Recommendations, 76 Georgetown Law Journal 1993-2043 (1988) (with R. Stephanz).

Prohibited Floor Trading Activities Under the Commodity Exchange Act, 58 Fordham Law Review 1-52 (1989).

Germany's Future in Futures, Futures and Options World, London, England, Issue 209 at 33-36 (October 1988).

"Front-Running" -- Insider Trading Under the Commodity Exchange Act, 38 Catholic University Law Review 69-128 (1988).

The Application of West German Statutes to United States Commodity Futures Contracts: An Unnecessary Clash of Policies, 19 Georgetown Journal of Law and Policy In International Business 273-324 (1987) (with William P. Rogers).

Recent Commodity Litigation, 19 Review of Securities and Commodities Regulation 93-116 (1986).

Commodity Litigation Update - 1984, 18 Review of Securities and Commodities Regulation 21-43 (1985).

The Role of The Commodity Futures Trading Commission In International Commodity Transactions, 18 George Washington Journal of International Law and Economics 581-629 (1985) (with K. Bergin); reprinted in part, Resources Policy 45, a publication of Butterworth Scientific Ltd., Surrey, England (March 1985).

Federal Regulation of Bank Activities In the Commodities Markets, 39 Business Lawyer 1719-1770 (1984) (with D. Gilberg).

Problems With Futures Trading, International Financial Law Review 23-25 (May 1984) (with K. Bergin).

Commodities Litigation Developments - 1983, 17 Review of Securities Regulation 945-963 (1984) (with W. Marshall).

Customer Rights Under the Commodity Exchange Act, 31 Vanderbilt Law Review 1299-1348 (1984) (with K. Bergin).

Stock and Commodity Options -- Two Regulatory Approaches and Their Conflicts, 47 Albany Law Review 741-791 (1983) (with D. Gilberg).

"Sunset" on the Commodity Futures Trading Commission: Scene II, 39 Business Lawyer 67-100 (1983) (with D. Horwitz).

Washington Watch -- Stock Index Futures, 6 Corporation Law Review 59-66 (1982) (with D. Gilberg).

Commodities Litigation Developments - 1982, 15 Review of Securities Regulation 795-806 (1982).

The Seventh Amendment and CFTC Reparation Proceedings, 68 Iowa Law Review 87-122 (1982).

Standing In the Political Arena, 45 Albany Law Review 932-957 (1981).

Developments in Commodities Litigation - 1981, 14 Review of Securities Regulation 843-851 (1981).

Developments in Commodities Litigation, 13 Review of Securities Regulation 813-831 (1980).

Investigations Under the Commodity Exchange Act, 31 Administrative Law Review 285-327 (1979).

CFTC Emergency Powers, 12 Review of Securities Regulation 863-870 (1979).

Injunctive Actions Under the Commodity Exchange Act, BNA, Securities Regulation and Law Reporter B-1 to B-15 (May 23, 1979).

Regulation of International Transactions Under the Commodity  Exchange Act, 48 Fordham Law Review 129-158 (1979).

Secondary Liability Under the Commodity Exchange Act -- Respondeat Superior, Aiding and Abetting, Supervision and Scienter, 27 Emory Law Journal 1115-1173 (1978) (with E. Meltzer).

The Nation's "Commodity Cops" -- Efforts by the Commodity Futures Trading Commission to Enforce the Commodity Exchange Act, 34 Business Lawyer 19-61 (1978) (with W. Schief).

Sunshine On The Administrative Process: Wherein Lies The Shade? 28 Administrative Law Review 463-482 (1976).

Commodity Exchange Rule Approval--Procedural Mishmash Or Antitrust Umbrella? Special Supplement, BNA, Anti-Trust and Trade Regulation Reporter 1-8 (Jan. 14, 1976), and BNA, Special Supplement, Securities Regulation and Law Reporter (January 15, 1976) (with J. Schobel).

Commodity Options--A New Industry Or Another Debacle? Special Supplement BNA, Securities Regulation and Law Reporter 1-20 (April 7, 1976) (with J. Schobel).

Self Regulation Under The Commodity Exchange Act -- Can The CFTC Make It Work? Special Supplement, BNA, Securities Regulation and Law Reporter 1-9 (September 1, 1976) (with J. Schobel).

Restrictions On Shared Decision-Making Authority In American Business, 11 California Western Law Review 217-254 (1975).

SEC Civil Injunctive Actions:  A Reply, 6 Review of Securities Regulation 955-961 (1973) (with Harvey Pitt), reprinted,  Securities Law Review -- 1973, and New York Law Journal, Defending SEC Enforcement Actions--How to Litigate Securities Problems (1974).

The Federal Advisory Committee Act, 35 University of Pittsburgh Law Review 557-608 (1974).

The Sale of Advisory Contracts - Rosenfeld v. Black, 19 New York Law Forum 61-82 (1973).

Judicial Review Of An Arbitrator's Award Under Section 301(a) Of The Labor-Management Relations Act, 39 Tennessee Law Review 613-645 (1972), reprinted, Corporate Counsel's Annual -- 1973.

Note, The Property Tax - A Withering Vine, 60 Kentucky Law Journal 174-208 (1971).

Comment, Labor Relations - Section 301(a) Labor Management Relations Act and Norris-LaGuardia Act - Collective Bargaining Agreement - No Strike Clause, 59 Kentucky Law Journal 755-770 (1971).

Seatbelt Defenses in Brief, 36 Kentucky Bar Journal 58-61 (1971).

Pollution It's Your Baby, 5 Kentucky Commentator 6-9 (1971). (with W. Stevens).


*BOOK REVIEWS*


The Truth About Boulwarism, 11 Duquesne Law Review 262-277 (1972).

Brokers Bagmen and Moles, New York Law Journal, 1991.

Eagle on the Street, New York Law Journal, 1992.

Litigating International Commercial Disputes, 22 N.C. J. Int'l L. & Comm. Reg. 689 (1996).