UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In Re: Platinum And Palladium Commodities Litigation* | MASTER FILE No. 10 Civ. 3617 (WHP) |
| This Document Relates To: | |
| Platinum/Palladium Futures Action | |

**CLASS COUNSEL'S MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

## TABLE OF CONTENTS

A.  The Requested Fee Is Reasonable.........................................................................1

    1.  The Extreme Risks Of This Litigation Favor Awarding The Requested Fee..........2

    2.  The Public Policy Factors Favor Awarding The Requested Fee ...........................5

    3.  The Time And Labor Expended By Counsel Favor Awarding The
        Requested Fee .................................................................................................6

    4.  The Extraordinary Magnitude And Complexities Of The Litigation Favor
        Awarding The Requested Fee ...........................................................................7

    5.  The Quality Of Representation Favors Awarding The Requested Fee.................12

    6.  Percentage Of The Common Fund Award: The Amount Of The Requested Fee
        In Relation To The Amount Of The Settlement, Favors Awarding The
        Requested Fee ...............................................................................................13

    7.  The Requested Fee Is Reasonable Under The Lodestar "Cross Check" ...............14

        a.  The Lodestar Multiplier Of 2.43 Is Consistent With Multipliers In Less
            Risky Cases ...........................................................................................15

        b.  Class Counsel's Hours Are Reasonable....................................................15

        c.  Class Counsel's Hourly Rates are Reasonable .........................................16

B.  The Requested Reimbursement Of Expenses Is Reasonable And
    Should Be Approved.........................................................................................18

C.  The Requested Fees And Expenses Are Less Than Those Stated In The Respective
    Notices To The Class Of The Settlements ........................................................19

CONCLUSION.......................................................................................................20

i

## TABLE OF AUTHORITIES

**Cases**

*Blum v. Stenson*,
  465 U.S. 886 (1984) ......................................................................................... 13, 17

*Cange v. Stotler & Co.,*
  826 F.2d 581 (7th Cir. 1987) ..................................................................................... 5

*DiPlacido v. CFTC*,
  364 Fed. Appx. 657 (2d Cir. 2009)............................................................................ 3

*In re Alloy, Inc. Sec. Litig.*,
  No. 03 Civ.1597, 2004 WL 2750089 (S.D.N.Y. Dec. 2, 2004) ................................. 1

*In re Bayer AG Sec. Litig.*,
  03 Civ. 1546, 2008 WL 5336691 (S.D.N.Y. Dec. 15, 2008) ............................... 1, 18

*In re BP Propane Direct Purchaser Antitrust Litig.*,
  06-CV-3621, Docket No. 1872 (JBZ) (N.D. Ill.) .................................................... 14

*In re Buspirone Patent Litigation*,
  No. 01-MD-1410, slip op. at 41-43 (S.D.N.Y. Apr. 17, 2003) ............................... 15

*In re Colgate-Palmolive Co. ERISA Litig.*,
  No 07 Civ 9515, 2014 WL 3292415 (S.D.N.Y. Jul. 8, 2014) ................................. 17

*In re Currency Conversion Fee Antitrust Litig.,*
  263 F.R.D. 110 (S.D.N.Y. Oct. 22, 2009) ...................................................... *passim*

*In re Currency Conversion Fee Antitrust Litigation*,
  773 F.Supp. 2d 351 (S.D.N.Y. 2011) ....................................................................... 4

*In re IPO Sec. Litig.*,
  671 F.Supp.2d 467 (S.D.N.Y. 2009) ......................................................................... 6

*In re Merrill Lynch Tyco Research Sec. Litig.*,
  249 F.R.D. 124 (S.D.N.Y. 2008).............................................................................. 12

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998).............................................................................. 15

*In re Natural Gas Commodity Litig.*,
  03-CV-6186, Docket No. 445 (VM) (S.D.N.Y.)...................................................... 14

*In re Platinum and Palladium Commodities Litig.*,
   828 F. Supp. 2d 588 (S.D.N.Y. 2011) ................................................................ 3, 4, 5

*In re Soybeans Futures Litig.*,
   No. 89 Civ. 7009 Docket Nos. 470-471 (N.D. Ill.) .................................................... 14

*In re Sumitomo Copper Litig.*,
   74 F.Supp.2d 393 (S.D.N.Y. 1999) ............................................................ 2, 7, 12

*In the Matter of: Moore Capital Management, LP, Moore Capital Advisors, LLC and Moore*
   *Advisors, Ltd.*, CFTC Dkt. No. 10-09 (CFTC Apr. 29, 2010) ...................................... 3

*Interborough News Co. v. Curtis Pub. Co.*,
   14 F.R.D. 408 (S.D.N.Y. 1953) .............................................................................. 4

*Maley v. Del Global Technologies Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................................................................ 6, 13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
   456 US 353 (1981) ................................................................................................ 8

*Missouri v. Jenkins*,
   491 U.S. 274 (1984) ............................................................................................ 17

*Moore v. U.S.*,
   63 Fed.Cl. 781 (2005) ............................................................................................ 8

*New York State Ass'n for Retarded Children, Inc. v. Carey*,
   711 F.2d 1136 (2d Cir. 1983) .............................................................................. 17

*Priceline.com, Inc. v. Silberman*,
   405 F. App'x 532 (2d Cir. 2010) ............................................................................ 1

*Sakiko Fujiwara v. Sushi Yasuda Ltd.*,
   No. 12 Civ. 8742, 2014 WL 5840700 (S.D.N.Y. Nov. 12, 2014) ...................................... *passim*

*United States v. Radley*,
   659 F. Supp. 2d 803 (S.D. Tex. 2009) .................................................................... 3

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d. Cir. 2005) .................................................................................. 15

**Other Authorities**

H.R. Rep. No. 565, 97th Cong., 2d Sess., pt. 1 .............................................................. 5

http://www.nationallawjournal.com/id=1202636785489/Billing-Rates-Across-the-
    Country?slreturn=20150013105548 ......................................................................... 16

http://securities.stanford.edu/Settlements
    / REVIEW_1995- 2011/Settlements_Through_12_2011.pdf. .................................... 5

Jerry W. Markham, *Manipulation of Commodity Futures Prices – The Unprosecutable Crime*, 8
    Yale J. on Reg. 281 (1991) ...................................................................................... 8

*Pimco Power in Treasuries Prompts Suit*, BLOOMBERG MARKETS, February 20, 2008 (April
    2008) ....................................................................................................................... 13

As Court appointed Class Counsel[1] for the Futures Class ("Class"), Lovell Stewart Halebian Jacobson LLP ("Lovell Stewart") respectfully submit this memorandum and the accompanying declarations[2] in support of Class Counsel's Petition for an award of attorneys' fees and reimbursement of their expenses reasonably incurred in creating the common funds under the Settlement with the Moore Capital Defendants ("Moore") and Defendant Joseph Welsh ("Moore Settlement")[3] and the Settlement with the Trustee for the estate of Defendant MF Global, Inc. ("MF Global Settlement").[4]

Class Counsel specifically request an attorneys' fee award in the amount of 29.5% of such common funds (see "A" below), and expense reimbursement in the amount of $704,294.50. See "B" below; McGrath Fee Decl., ¶33.

### A.    The Requested Fee Is Reasonable

In this Court's prior class action fee decisions, the Court has focused on six factors as well as a seventh (lodestar cross-check) factor.[5]

---

[1] "Class Counsel" refers to Lovell Stewart, Lowey Dannenberg Cohen & Hart, P.C. ("Lowey Dannenberg") and the Law Offices of Edward Cochran.

[2] Declaration of Christopher M. McGrath in Support of Lovell Stewart Halebian Jacobson LLP's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses ("McGrath Fee Decl."), Declaration of Vincent Briganti in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses ("Briganti Decl.), and Declaration of Edward Cochran in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses ("Cochran Decl.").

[3] McGrath Fee Decl., ¶6.

[4] McGrath Fee Decl., ¶8.

[5] See, e.g., Sakiko Fujiwara v. Sushi Yasuda Ltd., No. 12 Civ. 8742, 2014 WL 5840700, at *6 (S.D.N.Y. Nov. 12, 2014) (Pauley, J.) ("Sakiko") ("(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.") (citation omitted); see also In re Bayer AG Sec. Litig., 03 Civ. 1546, 2008 WL 5336691, at *4 (S.D.N.Y. Dec. 15, 2008) (Pauley, J.); In re Alloy, Inc. Sec. Litig., No. 03 Civ.1597, 2004 WL 2750089, at *2 (S.D.N.Y. Dec. 2, 2004) (Pauley, J.); In re Currency Conversion Fee Antitrust Litig., 263 F.R.D. 110, 129 (S.D.N.Y. Oct. 22, 2009) (Pauley, J.) aff'd sub nom. Priceline.com, Inc. v. Silberman, 405 F. App'x 532 (2d Cir. 2010) ("Currency Conversion").

1

1.     **The Extreme Risks Of This Litigation Favor Awarding The Requested Fee**

Most important among those seven factors, this Court has identified "the risk of litigation" as "'perhaps the foremost factor to be considered in determining'" a reasonable fee award. *Currency Conversion*, 263 F.R.D. at 129 (citation omitted).  Like most other class action fee requests, Class Counsel here have not been paid for their professional services since inception of their work, and have performed their services and advanced expenses on a wholly contingent basis.

Unlike most other class action fee requests, Class Counsel have performed their work in extremely high risk circumstances (but they have nonetheless produced a result that is far above the average class action settlement, *see* "2" *infra* and Futures Plaintiffs' Memorandum in Support of Motion for Final Approval of Class Action Settlement With The Moore Defendants and Defendant Joseph Welsh, Dkt. No. 263, "I"-"III").  Claims for manipulation in violation of the Commodity Exchange Act, 7 U.S.C. §1 *et seq*. ("CEA"), have been recognized as "notoriously difficult to prove" and "more difficult and risky than securities fraud cases."  *In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393, 395 (S.D.N.Y. 1999) ("The case involves claims of commodity price manipulation in violation of the CEA.  Such claims have been notoriously difficult to prove…."), 397 (CEA "manipulation cases…are more difficult and risky than securities fraud cases), 398 ("risks to counsel in this action were extremely high").

The specific manipulation claims here are unique in civil cases and even more risky than most prior CEA manipulation claims. Dkt. No. 263, "IX.B.4.a."  This is because Plaintiffs did not allege that Moore controlled the cash market supplies nor built up a dominant futures position.  Instead, Moore primarily engaged in a trade manipulation.  Moore allegedly made both a purchase of a futures contract and, thereafter, an offsetting later sale of such contract.

Defendants argued that the specifics of this alleged "trade manipulation" were lacking in that no rule violation or fraud were alleged. *E.g.*, McGrath Fee Decl., ¶85; *see also* Jerry Markham Decl., Dkt. No. 265, ¶¶29-31, 50. Defendants insisted that Plaintiffs alleged only that Moore traded at the "prevailing market prices."[6] Dkt. No. 57, pp. 11-14 (citing to *DiPlacido v. CFTC*, 364 Fed. Appx. 657 (2d Cir. 2009) and *United States v. Radley*, 659 F. Supp. 2d 803 (S.D. Tex. 2009)).

In addition to arguing the absence of a manipulation violation,[7] Defendants vigorously disputed Plaintiffs' impact and damages contentions. These contentions were critical. Only through these contentions, were Plaintiffs able (a) to estimate $400,000,000 in damages, and (b) ultimately to obtain the substantial consideration in the two Settlements estimated to aggregate to $68,000,000-$70,000,000. *See* McGrath Fee Decl., ¶¶4-12 (explaining estimate).

Specifically, Plaintiffs contended that the net artificial effect of Moore's purchase transaction survived not only Moore's subsequent, offsetting sale (or "liquidation") of the purchase. The artificial impact also lasted until after the futures contracts in which the transactions were made, had expired. That is, the net inflationary impact of the purchase and

---

[6] The Court was apparently sympathetic to this during oral argument on the first motion to dismiss stating "I don't think any Court wants to be second guessing trading activity after the fact. But, the argument that you are making may be very persuasive on summary judgment. But this is a motion to dismiss." Transcript of Oral Argument, 20: 5-8 (dated February 4, 2011).

[7] Although the CFTC settled charges against certain of the Moore Defendants, the charges were for **attempted, not actual** manipulation. *See In the Matter of: Moore Capital Management, LP, Moore Capital Advisors, LLC and Moore Advisors, Ltd.*, Order Instituting Proceedings Pursuant to Sections 6(c), 6(d) and 8a of the Commodity Exchange Act and Making Findings and Imposing Remedial Sanctions, CFTC Dkt. No. 10-09 (CFTC Apr. 29, 2010). This significant fact means that the CFTC made no finding as to, and if it had filed a complaint would not have to establish, the two most difficult elements of a CEA claim to establish, *i.e.*, that the Moore Defendants "caused" an "artificial price."

Moreover, the Court ruled that Plaintiffs could not rely upon any materials in the CFTC settlement orders. *In re Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 595 (S.D.N.Y. 2011).

offsetting sale by Moore of the January 2008 platinum futures contract assertedly had such appreciable artificial impact on prices that it not only caused the prices of the January 2008 contract to become artificially high.  Such price artificiality spread to other futures contract expirations, *e.g.*, the April 2008 contract.  Moreover, that artificiality in April 2008 contract prices lived on well **after** the expiration of the January 2008 contract in which the trade had originally been made.  Purchases tend to exert upward pressure on prices.  Sales tend to exert downward pressure on prices.  Was the net impact of the upward pressure from Moore's purchase more than the downward pressure from Moore's offsetting sale?  If so, was the net upward pressure so much more that the foregoing long-term inflationary effects on prices occurred?

Proving this would have been challenging.  And Defendants wholly rejected Plaintiffs' foregoing contentions.  Defendants asserted that there were no damages whatsoever or, at most, based on what Defendants considered to be "plaintiff friendly assumptions," there were $6.5 million in damages to the Class.  Declaration of Christopher M. McGrath in Support of Motion for Final Approval of Settlements, Dkt. No. 264 ("McGrath Fairness Decl."), ¶98.  After Class Counsel's extensive services described in "4" below and presentations of their intended proof, however, Defendants did agree to these substantial Settlements.

In addition to the "notoriously risky" CEA manipulation claims, there were substantial additional risks arising from bankruptcy, insurance coverage, ability to pay, and other aspects of this case.  For these and other reasons,[8] the claims here entailed extremely high risk especially

---

[8] "A plaintiff alleging a §1 violation must demonstrate (1) an agreement or concerted action among defendants in the (2) unreasonable restraint of trade."  *In re Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d at 597 (quoting *Currency Conversion*, 773 F.Supp. 2d 351, 366 (S.D.N.Y. 2011)).
Absent an admission (which is not present here), conspiracies in violation of Section 1 of the Sherman Act are difficult to prove.  *See Interborough News Co. v. Curtis Pub. Co.*, 14 F.R.D.

with respect to proving impact and damages.

### 2.     The Public Policy Factors Favor Awarding The Requested Fee

Another factor this Court analyzes in awarding a fee consists of "public policy considerations." *Sakiko*, 2014 WL 5840700, at *6 (citation omitted).  A number of strong public policies favor the award of a significant attorneys' fee here.  First, Class Counsel have obtained a recovery for Class members that is far above the average class action recovery.  *Compare* McGrath Fairness Decl., ¶¶98, 127 (the Settlements likely will produce a substantial payout of approximately **17%** of estimated damages) *with Securities Class Action Settlements, 2011 Review and Analysis*, Cornerstone Research, p. 7 (average settlement recovery for class action settlements during the years 1996 through 2010 involving estimated damages between $250 million and $499 million was only **2.5 cents on the dollar**).[9]

Second, these very risky (*see* "1" *supra*) claims further Congress' overarching purpose in the CEA of deterring manipulation of prices.  7 U.S.C. §5 (the "purpose" of the CEA is to "deter and prevent price manipulation").

Indeed, this private lawsuit is regarded by Congress as "**critical** to protecting the public and fundamental to maintaining the credibility of the futures market." *Cange v. Stotler & Co.,* 826 F.2d 581, 594-595 (7th Cir. 1987) (emphasis added) *citing* to H.R. Rep. No. 565, 97th Cong., 2d Sess., pt. 1 at 56-7, *reprinted* in 1982 U.S. Code Cong. & Admin. News 3871, 3905-06.

---

408, 410 (S.D.N.Y. 1953) ("a charge of conspiracy [under Section 1 of the Sherman Act] is most difficult to prove since the alleged unlawful acts of defendants by their very nature have been secretive").  Separate and apart from that inherent risk to Plaintiffs' Sherman Act claims, on the first motion to dismiss, Defendants prevailed on their "conspiracy among independent actors" argument.  Specifically, the Court held that the complaint failed to include plausible allegations of an agreement among "independent centers of decision making." *Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d at 596.  This finding increased the risk of Plaintiffs' conspiracy claims.

[9] *Available at* http://securities.stanford.edu/Settlements / REVIEW_1995- 2011/Settlements_Through_12_2011.pdf.

Awarding a significant fee tends to encourage these "critical" claims and promote the integrity of the futures markets.[10]

Fourth, Class Counsel have prosecuted this case to (potential) conclusion without overtaxing scarce judicial resources.  Class Counsel obtained these Settlements **before** the expenditure by the Court of time on a second round of motions to dismiss, discovery, class certification, and other judicial work.  Thereby, Class Counsel's efforts tended to vindicated the increasingly important public policy of maximizing judicial economy.

### 3. The Time And Labor Expended By Counsel Favor Awarding The Requested Fee

Another of the six factors analyzed by this Court, has been the time and labor performed by counsel in prosecuting the claims.  *E.g.*, *Sakiko*, 2014 WL 5840700, at *6 (citation omitted).  In order to overcome the foregoing extreme risks (*see* "1" *supra*) and further the foregoing important, Congressionally favored policies by obtaining an above average recovery on the Congressionally favored claims here (*see* "2" *supra*), Class Counsel have devoted the following time and labor to the successful prosecution of these claims:

| FIRM | HOURS | LODESTAR |
|------|-------|----------|
|  |  |  |
| Lovell Stewart Halebian Jacobson LLP | 12,143.98 | $7,426,056.80 |
| Lowey Dannenberg Cohen & Hart, P.C. | 1,091.50 | $780,652.50 |
| Law Offices of Edward Cochran | 73.80 | $42,435.00 |
|  |  |  |

---

[10]     [C]lass actions serve as private enforcement tools when…regulatory entities fail to adequately protect investors…plaintiffs' attorneys need to be sufficiently incentivized to commence such actions in order to ensure that defendants who engage in misconduct will suffer serious financial consequences…awarding counsel a fee that is too low would therefore be detrimental to this system of private enforcement.

*In re IPO Sec. Litig.*, 671 F.Supp.2d 467, 515-16 (S.D.N.Y. 2009); *see also Maley v. Del Global Technologies Corp.*, 186 F. Supp. 2d 358, 374 (S.D.N.Y. 2002) ("[p]rivate attorneys should be encouraged to take the risks required to represent those who would not otherwise be protected from socially undesirable activities...").

| TOTALS | 13,309.28 | $8,249,144.30 |
|---|---|---|

McGrath Fee Decl., ¶24; Briganti Decl., ¶9; Cochran Decl., ¶5.  Class Counsel's standard hourly

rates, multiplied by their time produces "lodestar" values of the attorneys' fees for the

professional services in the far right column.  *See* "7" *infra* and McGrath Fee Decl., Ex. B.

Further itemizing these services, the McGrath Fee Decl. presents exhibits providing the

amounts of fee-compensable hours of professional services performed by each time-keeper at

Lovell Stewart, on an annual basis from the inception of this case.  McGrath Fee Decl., Ex. A-C;

reproduced as Ex. A-C hereto.  In "4" below regarding "Magnitude and Complexity," Class

Counsel describe in still more detail the services they performed.  The extensive amounts of

these services arose from the very complex commodity futures manipulation, bankruptcy,

insurance law, antitrust, common law, and other legal issues present here.  Such extensive

services also arose from the extraordinary magnitude of the alleged 214 specific, separate

manipulative acts and the accompanying separate demonstration of the forms of price artificiality

caused by each separate trade.

By performing the work summarized in the table and Exhibits referenced above and

described in "4" *infra*, Class Counsel overcame the extreme risks set forth in "1" above as well

as the extraordinary complexity and magnitude described in "4" below, in order to obtain the

above-average recovery and vindicate the important public policies set forth in "2" above.

### 4.    The Extraordinary Magnitude And Complexities Of The Litigation Favor Awarding The Requested Fee

Another factor relied upon by this Court has been "the magnitude and complexity of the

litigation."  *Sakiko*, 2014 WL 5840700, at *6 (citation omitted).  This Court has stated that the

prosecution of manipulation claims in violation of the CEA is "complex and difficult."  *Compare*

*In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393, 395 (S.D.N.Y. 1999) (Pollack, J.)

("*Sumitomo*") (CEA manipulation cases are "complex and difficult") *with Merrill Lynch, Pierce,*

*Fenner & Smith, Inc. v. Curran*, 456 US 353, 356 (1981) (that commodity futures markets are

"esoteric").  Experts in the field of CEA manipulation have detailed the complexities of such

claims generally.  *See, e.g.,* Jerry W. Markham, *Manipulation of Commodity Futures Prices –*

*The Unprosecutable Crime*, 8 Yale J. on Reg. 281 (1991).

Adding to the foregoing complexity is the uncertainty arising from the fact that claims for

manipulation in violation of the CEA had been exceedingly rare.  Only 37 class actions alleging

manipulation had been filed from the enactment of the CEA in 1974, or one about every 1.8

years.[11]  This has resulted in relatively limited CEA manipulation law precedent.  Capable

counsel thus have an "open field" to make the complex law even more complex and argue for

self-serving applications of limited CEA precedent.  *See Moore v. U.S.*, 63 Fed.Cl. 781, 789

(2005) (higher fee awarded of 34% because "the risk of nonrecovery was large as there was no

precedent at the time [class counsel] took the case").

Similarly, this Court has recognized that antitrust cases are complex.  *Currency*

*Conversion,* 263 F.R.D. at 123 ("Antitrust cases, by their nature, are highly complex").

The extraordinary magnitude of this case was first revealed by Plaintiffs Third

Consolidated Amended Complaint, Dkt. No. 86.  Therein, Plaintiffs allege that, on 214 specified

days, Defendants made manipulative trades at the end of platinum and/or palladium futures

contract trading.  Third Amended Complaint, Dkt. No. 86, ¶¶157-174.[12]  Plaintiffs further

---

[11] This is derived from a WESTLAW search of the ALLFEDS database specifying "class /3 action /p commodity! /s manip!" and culling duplicates and non-commodity cases.

[12] The Moore Funds, through other Defendants, made large purchases at the end of regular trading (1) in the NYMEX platinum futures market on 95 of the 127 trading days between November 19, 2007 and May 21, 2008 (on many of these 95 days Moore Capital made more than one bang-the-close trade); and (2) in the NYMEX palladium futures market on 119 of the 139 trading days between November 1, 2007 and May 21, 2008 (on many of these 119 days Moore Capital made more than one bang-the-close trade).

correlated those trades with allegedly inculpatory conversations, and allegations of facts indicating causation of higher prices. Plaintiffs created schedules detailing the specific amounts by which the Moore Capital NYMEX platinum and palladium futures purchases were higher than or equal to the five price benchmarks set forth in the Third Amended Complaint ¶¶160-161; 163-165 (palladium) and ¶¶129-170; 172-174 (platinum).

The services performed by each attorney leading up to the Third Amended Complaint and thereafter in order to prosecute the claims here, are summarized in McGrath Fee Decl., Ex. B (quantitatively) and Ex. C (qualitatively in narrative form). In aggregate, among other things, attorneys from Lovell Stewart:

a.  Investigated, drafted, and filed the first complaint herein. Only one other party filed a complaint. This was not a case in which many counsel were interested in leadership or even filed cases.

b.  Successfully briefed and argued against Defendants' motion to stay discovery, thereby obtaining the approximately 250,000 pages of documents that Defendants previously produced to the CFTC. Absent Lovell Stewart's success on this motion, it would have been difficult to successfully re-plead the initial complaint that was dismissed largely on the basis of its reliance on findings in the CFTC consent order concerning attempted (not actual) manipulation.

c.  Used its proprietary document review software (at no charge to the Class) to review and analyze the 250,000 page CFTC document production, including over 1,000 MF Global audio files. This analysis was ultimately distilled into detailed allegations in the 220-plus page, 405 paragraph third amended complaint. After receiving the highly detailed amended

complaint, the Moore Capital Defendants (except for Defendant Burger) chose not to move to dismiss Plaintiffs' CEA claims.

        d.      Reviewed, analyzed and digested the approximately twenty-three deposition transcripts (and exhibits) obtained through subpoena to the CFTC.  This analysis resulted in further detailed allegations being added to the amended complaints.

        e.      Subpoenaed documents from the New York Mercantile Exchange ("NYMEX").  Such documents included the NYMEX "streetbook," which contains detailed information on each and every trade of NYMEX platinum and palladium futures contracts during the requested period.  Lovell Stewart used this information to help analyze the impact of Defendants' trading on market prices.

        f.      Retained and undertook substantial work with four economists and a hedge fund expert.  Much of the work with these experts was focused on establishing a reliable methodology to establish causation and impact.  These analyses were used and revised during the settlement negotiations with Defendants.  They were further used in connection with formulating the plan of allocation.

        g.      Retained and undertook significant work with an attorney with an expertise in insurance law in order to analyze the multiple relevant policies and amendments and relevant coverage correspondence pertinent to the Welsh judgment and assignment.  This work resulted in Lovell Stewart ultimately being able to assign the Welsh judgment to MF Global Holdings for $800,000 and helped with the MF Global Settlement including payment by the insurance carriers of their portion of same.

        h.      Retained and worked with two law firms with an expertise in bankruptcy law.  One or the other of these firms helped Lovell Stewart file the Class' claim against the estate

10

of MF Global, analyze the financial condition of the estate, prosecute the claims filed against the estate, settle such claim, obtain preliminary approval thereof in the bankruptcy, otherwise navigate the MF Global bankruptcy proceedings, and work to sell the general creditor claim.

        i.      Prepared and served 125 detailed Rule 34 document requests directed to Defendants, prepared Rule 26(a)(1) initial disclosures and responded and objected to approximately 75 Rule 34 document requests served by Defendants.

        j.      Prepared multiple mediation statements and presentations.  These materials were used in the two single day mediation sessions associated with the Moore Settlement and the two-day mediation session associated with the MF Global Settlement.

        k.      Engaged in approximately sixteen months of on and off settlement negotiations with counsel for the Moore Capital Defendants and approximately twelve months of on and off settlement negotiations with counsel for the Trustee of the MF Global estate.  These negotiations included numerous phone calls, e-mails and exchanges of information.

        l.      Negotiated and drafted the approximately 150 pages of settlement papers associated with the Moore Settlement and the approximately 200 pages of settlement papers associated with the MF Global Settlement.  The settlement papers included, forms of orders, class notices, proof of claim forms, requests for exclusion, escrow agreements and plans of allocation.

        m.      Briefed and argued preliminary approval of both settlements.  Lovell Stewart also successfully opposed the multiple objections and motions to intervene filed in connection with the Moore Settlement.

n.      Engaged in an allocation mediation with Lowey Dannenberg for purposes of a plan of allocation.  Lowey Dannenberg represents Plaintiff Richard White, who based on his pattern of trading, may only recover under the "net loss" portion of the plan of allocation.

o.      Worked with the Settlement Administrator in order to comply with the Court-approved programs of notice for both settlements.

p.      Conferred with Professor Francis McGovern concerning the potential sale of the $18,753,571.43 allowed general unsecured creditor claim.

q.      Relatedly, Lovell Stewart has been communicating with third party buyers of distressed debt in order to consider possible actions with regard to the sale of the allowed claim.

McGrath Fee Decl., ¶¶14, 16, 18, 20, 22.

**5.      The Quality Of Representation Favors Awarding The Requested Fee**

Another factor utilized by this Court is "the quality of representation" delivered by Class Counsel and the litigation results.  *Sakiko*, 2014 WL 5840700, at *6 (citation omitted).  Class Counsel respectfully submit that the quality of their representation is best demonstrated by the substantial recovery that they obtained herein, which is far above the average recovery. *Compare* Dkt. No. 263, "I"-"III" *with Sumitomo*, 74 F.Supp.2d at 396 ("Suffice it to say, the Plaintiffs' counsel did not have an easy path and their services in this regard are best measured by the enormous recoveries that were achieved under trying circumstances in the face of natural, virtually overwhelming, resistance.").

However, courts in this Circuit have also "review[ed] the recovery obtained and the background of the lawyers involved in the lawsuit."  *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 141 (S.D.N.Y. 2008); *Currency Conversion*, 263 F.R.D. at 129 (stating

that class counsel "represented the Class with a high degree of professionalism, and vigorously litigate every issue against some of the ablest lawyers in the antitrust defense bar.").

Lovell Stewart has over thirty years of experience litigating commodity futures manipulation cases and, as sole lead or co-lead counsel, has obtained the ***first, second and third*** largest settlements in the history of the CEA.  McGrath Fairness Decl., ¶59.  Bloomberg Markets magazine reported that Lovell Stewart's senior partner, Christopher Lovell, is to commodities manipulation lawsuits what Bill Gross (founder and former Chief Investment Officer of the world's largest bond fund) is to the world of bonds.  Seth Lubove and Elizabeth Stanton, *Pimco Power in Treasuries Prompts Suit*, BLOOMBERG MARKETS, February 20, 2008 (April 2008). Lovell Stewart respectfully submits that no other firm has more experience or has achieved better results in the realm of CEA manipulation cases.

Another consideration for assessing the quality of the services rendered is the quality of the opposing counsel in the case.  *See Maley v. Del Global Techs. Corp*., 186 F. Supp. 358, 373 (S.D.N.Y. 2002).  In this action, Defendants were represented by numerous highly respected and nationally recognized law firms.  *See* McGrath Fairness Decl., ¶60.  The fact that Class Counsel were able to successfully prosecute this action for almost five years against such formidable opponents further reflects the quality of representation provided by Lovell Stewart.

### 6. Percentage Of The Common Fund Award: The Amount Of The Requested Fee In Relation To The Amount Of The Settlement, Favors Awarding The Requested Fee

A sixth factor utilized by the Court is "the requested fee in relation to the settlement." *Sakiko*, 2014 WL 5840700, at *6 (citation omitted).  In determining the amount of a common fund fee award, the United States Supreme Court consistently has held that it is appropriate for a fee to be determined as a percentage of the fund recovered.  *See Blum v. Stenson*, 465 U.S. 886,

900 n. 16 (1984) ("under the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class"); *Sakiko*, 2014 WL 5840700, at *6 ("[t]he overwhelming trend, however, is to award a percentage of the fund").

Class Counsel here request a fee equal to 29.5% of the undetermined common fund. The requested fee is in line with prior fee awards in CEA manipulation class actions that have awarded one-third fees with lodestar multipliers from 1.1 to 2.7.[13]

### 7.     The Requested Fee Is Reasonable Under The Lodestar "Cross-Check"

This Court has also employed, as a seventh factor, the lodestar cross-check, including when the Court has used a percentage of the fund method to determine the fee.  *Sakiko*, 2014 WL 5840700, at *6, *9-11 (citation omitted).[14]

29.5% of $68,000,000 is $20,060,000.  Application of the lodestar cross check here results in a risk multiplier of 2.43 (*i.e.*, $20,060,000 / $8,249,144.30 = 2.43).  The risk multiplier would be 2.50 if $70,000,000 in Settlement proceeds are obtained.

This risk multiplier is well within the range of lodestar multipliers awarded in prior CEA manipulation cases and other cases in the Second Circuit.  *See Natural Gas* and *BP Propane* at fn. 13 *supra*.  However, Class Counsel fully recognize that this range of risk multiplier is higher than the 2.28 risk multiplier recently awarded by the Court in *Sakiko*, 2014 WL 5840700, at *11. But Class Counsel respectfully submit that there are substantially greater risks in this case than in *Sakiko*, 2014 WL 5840700, at *11.  Further, there is far greater complexity arising from the

---

[13] *See, e.g., In re Natural Gas Commodity Litig.*, 03-CV-6186, Docket No. 445 (VM) (S.D.N.Y.) (33 1/3% fee award that resulted in a 1.86 lodestar multiplier); *In re Soybeans Futures Litig.*, No. 89 Civ. 7009 Docket Nos. 470-471 (N.D. Ill.) (33 1/3% fee award that resulted in a 1.1 lodestar multiplier); *In re BP Propane Direct Purchaser Antitrust Litig.*, 06-CV-3621, Docket No. 1872 (JBZ) (N.D. Ill.) (JBZ) (33.0% fee award that resulted in a 2.7 lodestar multiplier).
[14] Courts using the percentage of the fund method use the lodestar method "as a 'cross check' on the reasonableness of the requested percentage." *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007).

"notoriously risky" commodity futures manipulation claims, the bankruptcy, insurance, and multiple other issues present here but absent in the recent *Sakiko*, 2014 5840700, at *7.  And there appear to be many more "public policy" benefits from this prosecution than in *Sakiko*, 2014 5840700, at *11.

 a. **The Lodestar Multiplier Of 2.43 Is Consistent With Multipliers In Less Risky Cases**

Courts in this Circuit have frequently awarded attorneys' fees resulting in risk multipliers of greater than 3.5 in cases involving less risky claims than the novel CEA manipulation claims here.  *See e.g.*, *In re Buspirone Patent Litigation*, No. 01-MD-1410, slip op. at 41-43 (S.D.N.Y. Apr. 17, 2003) (approving a fee request of 33.3% of the $220,000,000 common fund that resulted in a lodestar multiplier of 8.46); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396, F.3d 96, 123 (2d. Cir. 2005) (affirming lodestar multiplier of of 3.5); *NASDAQ*, 187 F.R.D. at 489 ("multipliers of between 3 and 4.5 have become common" in the Second Circuit).  In light of the foregoing authority and the substantial benefits that Class Counsel's work has bestowed upon the Class, this factor supports the requested fee.

 b. **Class Counsel's Hours Are Reasonable**

Class Counsel's hours have been summarized in the McGrath Fee Decl., ¶¶13-24 and Exs. A-B.  Lovell Stewart spent a total of 12,143.98 hours prosecuting this action to a successful conclusion.  McGrath Fee Decl., ¶¶23-24.  Lowey Dannenberg and Ed Cochran, Esq. spent 1,091.50 and 73.80 hours, respectively, working on this case at the direction of Lovell Stewart. Briganti Decl., ¶¶8-9, Cochran Decl., ¶5.  Thus, Class Counsel's total hours that form the basis for the fee request are 13,309.28.[15]

---

[15] Excluded from the lodestar is any work devoted to the attorneys' fee petition as well as certain other hours which Class Counsel determined to reduce or exclude based upon efficiency considerations.

Class Counsel attempted to be efficient.  But Class Counsel also sought to be comprehensive.  Given the complexities and risks, we were under pressure to find  the best evidence, argument, and analytical product to fit the known facts.  This included revisions and improvement by Class Counsel in their work in response to Defendants' criticisms.  Class Counsel believe these improvements made a significant contribution to obtaining the Settlements here.  Thereby, Plaintiffs succeeded in negotiating Defendants up to the levels that Defendants actually paid in the Settlements here.

In agreeing to the Welsh Assignment, later settling same, and agreeing to the MF Global Settlement, Class Counsel consulted with two bankruptcy counsel and a separate insurance counsel.  By such work, Class Counsel were able to develop arguments and analyses that helped secure the MF Global Settlement and the Welsh Assignment, as well as the sale of the latter.  We submit that the time Class Counsel spent prosecuting these claims is reasonable.

**c.**     **Class Counsel's Hourly Rates are Reasonable**

The current hourly rates of Class Counsel are reflected in the declarations submitted herewith.  McGrath Fee Decl., ¶23, Briganti Decl., ¶8, Cochran Decl., ¶5.  Class Counsel's hourly rates are competitive market hourly rates in their respective legal communities (New York for Lovell Stewart and Lowey Dannenberg) for cases of this sort that reflect the reputation, experience and records of Class Counsel.

The National Law Journal conducts an annual survey of law firm billing rates for partners and associates at the largest 350 law firms.  The results of the 2013 survey were published in January 2014.[16]  Class Counsel have not seen the results of the 2014 survey (if they have been

---

[16] *Available at* http://www.nationallawjournal.com/id=1202636785489/Billing-Rates-Across-the-Country?slreturn=20150013105548 (last visited January 14, 2015).

released yet).  It may be reasonably inferred that the hourly rates of the firms increased during the expanding economy and increasing rents and other expenses of the last year.

At any rate, the eleven New York based law firms[17] had up to an average billing rate for partners of $982 per hour, and the average billing rate for associates was $574 per hour.  *Id*.  The hourly billing rates for each of the attorneys who worked on this matter, reflect the extensive experience that each has with commodity futures manipulation claims.[18]  Class Counsel believe that they have far more experience and sophistication with the commodity manipulation claims at issue here, than does any of the law firms in the survey.  Extensive experience with esoteric, complex, specialties favors highly hourly rates.  *See, e.g.*, *In re Colgate-Palmolive Co. ERISA Litig.*, No 07 Civ. 9515, 2014 WL 3292415, at *4 (S.D.N.Y. Jul. 8, 2014) (because ERISA "concerns a highly specialized area of law" and "relatively few lawyers have the expertise to litigate the types of claims in this case…a higher fee is warranted in ERISA cases as compared with some other types of cases.").

Nonetheless, the current rates for all but the five highest billing attorneys within Lovell Stewart are either less than or only slightly more than the average associate rate in the National Law Journal survey.  *Cf.* McGrath Fee Decl., ¶23.  Lovell Stewart's partners have an average current[19] billing rate in this application of about two-thirds of some firms' average partner billing

---

[17] The hourly billing rate to be applied in a common fund case is the hourly rate that is normally charged in the community where the counsel practices, *i.e.*, the "market rate."  *See Blum v. Stenson*, 465 U.S. at 895.

[18] Even the contract attorneys and associate have familiarity with commodity futures manipulation cases over multiple different cases working with Lovell Stewart, however, their experience with such claims is obviously less than the Partners.

[19] In addition, the United States Supreme Court and the Court of Appeals for the Second Circuit have held that the use of *current* rates is proper since such rates more adequately compensate for inflation and loss of use of funds.  *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1984); *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1153 (2d Cir. 1983).

rate in the 2013 survey *i.e.*, $674.  McGrath Fee Decl., ¶23.   Lovell Stewart's sole associate's

billing rate is $275 per hour.  *Id.*

　　We submit that the hourly rates are reasonable especially for the complex subject matter

in this case.

　　**B.**　　**The Requested Reimbursement Of Expenses Is Reasonable And Should Be
　　　　　　Approved**

　　"Attorneys may be compensated for reasonable out-of-pocket expenses incurred and

customarily charged to their clients."  *In re Bayer AG Sec. Litig.*, 2008 WL 5336691, at *6

(citation omitted); *see also Currency Conversion*, 263 F.R.D. at 131.

　　From the beginning of the case, Class Counsel were aware that they might not recover

any expenses.  Class Counsel were motivated to, and did, take significant steps to mitigate

expenses wherever practical without jeopardizing the vigorous and efficient prosecution of the

case.

　　For example, a very expensive part of class actions today (especially including

commodity manipulation class actions) is the software and vendor costs required in order to host

and review substantial document productions.  Lovell Stewart avoided these costs by using its

own proprietary document review software in the case without any expenses to be charged to the

Class.  This resulted in substantial savings on costs.  For another example, Lovell Stewart Legal

Assistants and partner Craig Essenmacher, Esq. worked with the economists to provide them

with information and otherwise help them.

　　Notwithstanding the foregoing, Class Counsel were required to expend monies in order to

find and employ the right outside talents needed to prosecute this type of novel claim.  *See* Pre-

Trial Order, Dkt. No. 18, ¶15.  Among other things, Lovell Stewart consulted with four

economists, two bankruptcy counsel, and an insurance counsel.  These payments to professionals

were reasonable and necessary in order for Class Counsel to develop these novel claims and

obtain the results that Class Counsel did obtain.  McGrath Fee Decl., ¶30.

| Expense Categories | Cumulative Expenses |
|---|---|
|  |  |
| Expert / Consultant Fees | $515,076.36 |
| Westlaw / Legal Research / PACER / Data | $90,121.99 |
| Mediation Charges | $52,785.43 |
| Federal Express / Postage / Messenger | $1,677.84 |
| Court Fees / Service Fees | $1,465.13 |
|  |  |
| **TOTAL** | $661,126.75 |

With Lowey Dannenberg and Cochran, the sum total of the expenses is $704,294.50.  McGrath

Fee Decl., ¶28; Briganti Decl., ¶11 (requesting reimbursement for $43,1375.75 in expenses);

Cochran Decl., ¶6 (not seeking reimbursement of any expenses).

The remaining expenses of $146,050.39 consist primarily of $90,121.99 in Westlaw,

PACER and data expenses and $52,785.43 in mediation charges.  These expenses were

necessary, appropriate, and reasonable.  The legal research and data expenses were reasonably

incurred in the prosecution of this complex case.  The mediation sessions were an important part

of the process that ultimately resulted in the two settlements.  McGrath Fee Decl., ¶¶31-32.

The requested reimbursement of expenses represents approximately 1% of the estimated

$68 million common fund.

### C. The Requested Fees And Expenses Are Less Than Those Stated In The Respective Notices To The Class Of The Settlements

Notice of the foregoing fee and expense requests was provided to the Class.[20]  The

deadline to file objections to the fees is January 21, 2015.  Dkt. No. 225, ¶3, Dkt. No. 245, ¶23.

---

[20] The class notice for the Moore Settlement stated Class Counsel would seek fees not more than
32.8% of the common fund and expenses of no more than $750,000.  *See* Dkt. No. 266, Ex. A,
"II.D."  The class notice for the MF Global Settlement stated Class Counsel would seek fees not
more than one-third of the common fund and expenses of no more than $250,000.  *See*

Presently, no objections to the settlements or Class Counsel's requested fees and expenses have been filed.  In the event that any purported objections are filed, Class Counsel will respond to such objections in a reply brief prior to the February 13, 2015 fairness hearing.

## CONCLUSION

For all the foregoing reasons, Class Counsel's requests for (1) an award of attorneys' fees in the amount of 29.5% of the common fund, and (2) reimbursement of $704,294.50 in expenses reasonably incurred in the successful prosecution of this action against Defendants are fair and reasonable to the Class.

Dated: New York, New York
       January 15, 2015

                                    Respectfully submitted,

                                    */s/ Christopher Lovell*
                                    Christopher Lovell
                                    Christopher M. McGrath
                                    **LOVELL STEWART HALEBIAN JACOBSON LLP**
                                    61 Broadway, Suite 501
                                    New York, New York 10006
                                    Telephone:     (212) 608-1900
                                    Facsimile:     (212) 719-4775

                                    ***Counsel for Plaintiffs and the Futures Class***

---

Declaration of Eric J. Miller on Behalf of A.B. Data, Ltd. Regarding Notice and Claims Administration, Ex. A, "II.D."  Thus, the requested fees and expenses are well below the levels identified in the settlement notices.