# Exhibit C

**Christopher Lovell** and **Christopher McGrath** were the two primary attorneys responsible for prosecuting this matter for Plaintiffs.  Mr. Lovell was responsible for formulating the litigation strategies throughout this case and arguing each important motion (*e.g.*, motion to stay discovery, motion to dismiss, motions for preliminary approval) before the Court.  Mr. Lovell and Mr. McGrath were closely involved with all or almost all of the actions' numerous pleadings and legal briefing, they attended all Court conferences, they led the settlement negotiations with the Moore Defendants and the MF Global Trustee and they were otherwise involved in the day-to-day management of this nearly five year long litigation.

**Gary Jacobson** has (a) worked closely on drafting and editing the written submissions on behalf of the Futures Plaintiffs, including the complaint and the amended complaint, (b) researched, drafted and edited substantial portions of the briefing in (i) opposition to Moore Capital Defendants' motion to strike the allegations based on the CFTC consent order; (ii) opposition to Moore Capital's motion to dismiss, including sections on pleading standards, manipulative intent, and aiding and abetting CEA manipulation; (iii) opposition to the motion to exclude derivative evidence; (iv) opposition to the motion to dismiss the antitrust claims, including sections on *Copperweld*, antitrust injury and standing issues; brief in support of fairness of the settlements; (v) opposition to the motion to

intervene by the Customer Representatives; and (vi) response to the Bankruptcy Trustee's objection to the motion for preliminary approval, (c) researched, drafted and edited substantial portions of the Futures Plaintiffs' mediation statement to Moore Capital, and led the Futures Plaintiffs' delegation to a mediation session before retired Judge Weinstein, and (d) researched various bankruptcy issues, including the authority of Article I courts to adjudicate CEA claims, and advised co-counsel in preparing the form of judgment.

**Jody Krisiloff** has (a) reviewed the pleadings and amended pleadings, MF Global's D&O and excess insurance policies, numerous bankruptcy and SIPA filings regarding insurance proceeds and other insurance issues, (b) researched and drafted memoranda regarding insurance policies, coverage issues and strategies, (c) consulted with insurance counsel, (d) researched the Welsh assignment and judgment, the coverage for Welsh and the legal correspondence from carriers and Welsh, and drafted related documents, (e) participated in conferences with Welsh's counsel and insurance counsel, (f) researched and drafted a memorandum in opposition to motions to intervene by third parties in the Moore Capital and Welsh settlement proceedings, (g) reviewed filings of the MF Global Trustee in bankruptcy and related filings in the MF Global bankruptcies and SIPA proceedings, (h) participated in, researched and attended the mediation before Hon. Judge Weinstein, (i) reviewed CFTC deposition transcripts of various traders and

Welsh, (j) researched various antitrust and CEA issues, (k) attended conferences regarding the negligence claim against Welsh, (l) drafted slides for presentations to Court, (m) researched bankruptcy law issues relating to class certification and treble damages in bankruptcy, (n) reviewed, edited and prepared various settlement documents in both settlements, (o) conferred with two bankruptcy counsel about case strategies and various documents, (p) researched and drafted various memoranda regarding bankruptcy law provisions, lifting the automatic stay, and proofs of claim issues, (q) researched allowed claim, (r) attended and participated in various settlement negotiations, (s) conferred with counsel for physicals Plaintiffs, (t) drafted the preliminary settlement brief for the MF Global settlement and worked on the briefing for final approval of the settlement, and (u) researched and contributed to Plaintiffs memoranda and responses to briefs and letters submitted to the Court by SIPA Trustee for MF Global.

**Ian Stoll** worked on (a) drafting numerous written submissions by Plaintiffs including the multiple complaints, and oppositions to the motions to dismiss, (b) researching and analyzing analyst reports, articles and other metals market publications; historical precious metals prices; commodity index prices; exchange traded funds; and trading data relative to platinum and palladium, researching the law of manipulation (*e.g.*, Congressional intent and legislative statements, Courts of Appeals' definitions of commodity price manipulation, Southern District of

3

New York decisions on particularity standards, cases on moving and manipulating prices at end of day, releases and proposed regulations under the Dodd-Frank Wall Street Reform and Consumer Protection Act, and cases on F.R.Civ.P. Rule 12(b)(6) motion to dismiss); efficient market theory; and cited cases on fraud and sounding in fraud, analyzed market-on-close conversations; incriminating statements; manipulative conversations including instant messages and emails; highest execution price; VWAP data; price increases, compliance issues, and relative absolute price change comparisons, (c) reviewing and transcribing audio tapes of traders' conversations (*e.g.*, comparing, identifying and matching traders' identity with trading tickets and conversations; analyzing conversations regarding forms of manipulation, manipulative market-on-close transactions, worst purchase price trades and compliance violations), (d) analyzing market-on-close trades where there were no audio conversations in respect of days reflecting allegedly manipulative (email and instant message) conversations by Defendants Pia and Berger, (e) document review of documents that Defendants previously produced to the CFTC, including listening to and transcribing additional audio files, materials and data regarding platinum and palladium futures contracts executed on behalf of Defendants, positions and sales, bid/ask spreads, time of sales and related conversations, (f) researching historical platinum and palladium inventories and supply and demand data reported in metals market publications, pleading

standards, CEA manipulation claims, aiding and abetting, and agency issues; "per se" rule and related antitrust arguments; and amending the complaint to include an antitrust claim, (g) communicating with experts regarding market microstructure, permanence and related issues, analyzing the floor broker production and CFTC depositions transcripts and materials regarding potential claims against such brokers; floor brokers' statements which helped the case against Moore Capital; World Trade's materials and responses to MF Global's requests regarding slam-the-closes and other actions, (h) reviewing Plaintiffs' experts artificiality analyses and incorporate sales by Defendants and discount artificiality impact of such sales; and researched whether Plaintiffs would be permitted to send written deposition questions to witnesses, the preclusive effect on Rule 45 depositions, and available hearsay rule exceptions, (i) the preparation for the mediation sessions by researching and obtaining data for event studies, allocation plan and historical production and consumption of platinum, palladium, gold and silver, including analyzing market commentaries, and (j) analyzed the insurance policies and related carrier letters regarding coverage and exclusions in respect of the settlement with Defendant Welsh.

    **Craig Essenmacher** has (a) provided information and guidance to the economists, including organizing the documents and information in forms the economists could use, checking their mathematical regressions and other

assistance, (b) prepared the Defendants' document productions for loading into the Firm's proprietary document review software, including negotiations with Defendants on the form of production of certain documents, (c) subjectively reviewed Defendants' documents for liability issues (d) obtained from publicly available sources the daily prices, intraday bids, offers and trade prices and other data with respect to NYMEX platinum and palladium futures contract trades, (e) obtained from NYMEX and analyzed the actual street book trade prices with respect to NYMEX platinum and palladium futures contract trades (f) correlated Defendants' trades with the applicable NYMEX data for the day in question, (g) analyzed the NYMEX computer market v. the NYMEX floor market, (h) analyzed the apparent daily impact of Moore's transactions, (i) worked with three economists to supply them with the foregoing and other data in the forms they desired, (j) in response to Defendants' arguments that the movements in platinum and palladium were not significant compared to the movements of gold and silver, and at the request of Defendants, repeatedly obtained and did analyses of gold and silver futures contract and prices, (k) organized databases of those requested in forms requested by the economists and analyzed same, (l) ran regression analyses, checked the work of the economists, (m) consulted with Lovell and McGrath about each of the foregoing steps and what they indicated should be done to further investigate the facts, and (n) critiqued and analyzed with Lovell and McGrath the

Case 1:10-cv-03617-WHP   Document 271-3   Filed 01/15/15   Page 8 of 11

correspondence of the work by the economists with the data, common sense, and what Defendants could argue.

**Keith Essenmacher**.  During the period from approximately July through October 2011, Mr. Essenmacher reviewed and analyzed the Defendants' 250,000-plus page document production under the time pressures of filing the third consolidated amended complaint.  Mr. Essenmacher also formulated keyword searches and conducted second level reviews of key documents identified by other attorneys and paralegals.

**Amanda Miller** has (a) researched aiding and abetting, Rule 12(h), banging the close, and uneconomic conduct, (b) drafted aiding and abetting section of Plaintiffs' opposition to the motion to dismiss, (c) drafted inserts to Plaintiffs' brief regarding the number of communications used to establish manipulative intent in past cases (d) drafted memos on legal research sources, (e) listened to audio files produced by Defendants, (f) digested CFTC transcripts of individuals, (g) researched cases (1) where there was a conspiracy found between a manipulator and a broker or FCM, (2) insured assigning proceeds of a policy to a judgment creditor in order to pay judgment, (h) drafted portions of the settlement agreement, (i) drafted portions of the preliminary approval brief, and (j) researched need for separate representation and counsel for subclasses.

7

**Fred Isquith** has (a) performed legal research in connection with the motion to dismiss on various issues including (i) the market timing of trades and how the timing can signal manipulation, (ii) the various ways in which the commodities and securities markets have been manipulated in the past and the outcome of civil cases and government investigations, (iii) the legislative history of the Frank-Dodd act regarding the manipulation of the commodities and futures market, (iv) how the courts and NYMEX have interpreted NYMEX rule 6.53, (v) third party liability for commodity and antitrust violations, and (vi) aiding and abetting and potential principal/agent relationships between the Defendants, (b) helped draft other sections of the Plaintiffs' opposition to the motion to dismiss, (c) helped prepare the senior partner prepare for oral arguments on the motion to dismiss, (d) drafted allegations for the Plaintiffs' Amended Complaint, (e) listened to the Moore Capital and MF Global phone records, (f) reviewed Defendant's document discovery, (g) worked with the Plaintiffs' experts to review the Defendants' trading activity, (h) performed work on the mediation brief including (1) work with the experts to discuss damage calculations, (2) research on potential weakness for the case going forward, (3) research on potential validity of most favored nations clause in a class action settlement, and (4) research on bankruptcy code and how the Defendants' bankruptcy could affect the class and settlement process, (i) wrote

memoranda regarding his findings and attended the mediation sessions to assist the senior partner, and (j) helped prepare and draft the settlement agreement.

**Ben Jaccarino** has (a) assisted in the drafting of the initial, amended complaint, and third amended complaint (b) reviewed large portions of CME data at the direction of Lovell and Essenmacher, (c) reviewed and analyzed client trading records, (d) researched (1) the definition of "manipulation", "bid ask spread", "market on close" in previous cases, (2) admissibility of CFTC Orders in civil cases, and (3) previous Judge Pauley 10(b)-5 cases, (e) assisted in the drafting of the opposition to the motion to dismiss, (f) reviewed produced IMs and emails from Defendant Pia and others, reviewed and analyzed Moore Capital trading records highlighting Market on Close orders, (g) researched multiple SIPA and bankruptcy related items, including various procedures, and how class counsel could lift the stay, (h) assisted in the drafting with Lovell of the proof of claim against MF Global, (i) assisted Lovell in the drafting of the mediation brief, (j) assisted Lovell in the drafting of the plan of allocation, (k) assisted Lovell in the drafting of the preliminary approval brief, and (l) worked on the MF Global mediation slides

**Contract Attorneys**.  During the period from approximately August through November 2011, the contract attorneys assisted Lovell Stewart in reviewing and analyzing the 250,000-plus page CFTC document production under

9

the time pressures of re-pleading and filing the third consolidated amended complaint.

**Paralegals.** The paralegals (a) reviewed and digested various transcripts of depositions taken by the CFTC, (b) investigated the role of the floor brokers in the manipulation, (c) reviewed and synthesized daily news reports to determine what impact world events may have had on the prices of platinum and palladium to assist experts in producing a plan of allocation, (d) examined the impact of Moore's market on close trades to other commodities, (e) analyzed daily pricing data, comparing platinum and palladium to gold and other commodities over time, (f) analyzed Streetbook data, comparing Moore's trades to Volume Weighted Average prices at the end of the day and determined Moore's impact on the prices, (g) conducted general analyses of price ranges before, during and after Moore's trades at the end of the day, (h) worked with experts to determine daily artificiality numbers and their impact on prices, and (i) calculated Moore's percentage of the total trading volume during the daily closing periods.