UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In Re: Platinum And Palladium Commodities Litigation*<br><br>This Document Relates To:<br><br>   Platinum/Palladium Futures Action | MASTER FILE<br>No. 10 Civ. 3617 (WHP) |

## DECLARATION OF CHRISTOPHER M. MCGRATH IN SUPPORT OF CLASS COUNSEL'S PETITION FOR AN AWARD OF ATTORNEYS' FEES AND <u>REIMBURSEMENT OF EXPENSES</u>

I, Christopher M. McGrath, pursuant to 28 U.S.C. §1746, hereby declare as follows:

1.      I am a partner with the law firm of Lovell Stewart Halebian Jacobson LLP

("Lovell Stewart").  The statements herein are true to the best of my personal knowledge,

information and belief based on the books and records of Lovell Stewart and information

received from Lovell Stewart attorneys and staff.

2.      On July 20, 2010, the Court appointed Lovell Stewart to act as sole interim class

counsel for the putative class in the Futures Action.  Dkt. No. 18.  Lovell Stewart also represents

Plaintiffs Harry Ploss and The Stuart Sugarman Trust.

3.      I respectfully submit this declaration in support of Lovell Stewart's Motion for an

Award of Attorneys' Fees and Reimbursement of Expenses filed concurrently herewith.

### A.      <u>The Moore Settlement</u>

4.      On March 17, 2014, Plaintiffs, the Moore Defendants and Defendant Welsh

executed a settlement agreement ("Moore Settlement").  Dkt. No. 162-1.

5.      The Moore Settlement provides for (a) a payment of $48,250,000 by the Moore

Defendants; (b) a further payment of $150,000 by the Moore Defendants in order to quiet the

claims against the Moore Defendants and Defendant Welsh (provided that the Moore Defendants will receive the first $50,000 back from any proceeds that the Futures Class recovers on the judgment and related assignment stipulated to by Defendant Welsh described next); and (c) a judgment of $35,000,000 agreed to by Defendant Welsh for the benefit of the Futures Class, which the Futures Class agreed to seek to collect solely from Defendant Welsh's assets consisting of his rights in respect of certain insurance policies.  0450

6.      As part of the separate MF Global Settlement (*see* below), MF Global Holdings has agreed to purchase the foregoing Welsh Judgment for $800,000.  Accounting for the aforementioned Moore Defendants' interest, the net benefit to the Futures Class would be $750,000.  Accordingly, the total cash value of the consideration provided for by the Moore Settlement is $49,150,000.

### B.      The MF Global Settlement

7.      On October 21, 2014, Plaintiffs and the Trustee for the estate of MF Global executed a settlement ("MF Global Settlement").   Dkt. No. 230-1.

8.      The MF Global Settlement provides for (a) an $18,753,571.43 allowed general unsecured creditor claim against the estate of Defendant MF Global; (b) a $4,672,500 all-cash payment by MF Global Assurance; and (c) an $800,000 all-cash payment by MF Global Holdings in exchange for the Plaintiffs' agreement to assign the stipulated Welsh judgment to MF Global Holdings.

9.      An initial 39% payment in respect of allowed general unsecured creditor claims has already been ordered.  *See* October 30, 2014 Press Release.[1]  If the MF Global Settlement is finally approved, then Plaintiffs will be entitled to receive immediate payment of such 39% of

---

[1] *See* http://dm.epiq11.com/MFG/Project

the $18,753,571.43 allowed claim. This equals $7,313,892.86, which will be paid into the Court Registry Investment Services ("CRIS") escrow account. With the original $4,672,000 cash from the insurers, final approval of the MF Global Settlement will bring the cash portion of the consideration in this settlement up to $11,985,892.86.

10.     In the same October 30 press release as referenced above, MF Global's Trustee also stated that he "anticipates being able to make **further substantial distributions** to general creditors as claims are resolved and further assets become available for distribution."  *Id*. (emphasis added).  As to the remaining 61% of the allowed unsecured general creditor claim, Class Counsel have good reason to believe that between $7,700,000 and $9,500,000 or more in cash will be received.   In sum, Class Counsel have good reason to believe that between $19,500,000 and $21,500,000 cash consideration will be received for the MF Global Settlement.

11.     Adding the $49,150,000 from the Moore Settlement to the $19,500,000 or more from the MF Global Settlement, produces a sum total cash consideration to the Class of in excess of $68,000,000-$70,000,000 if both Settlements are finally approved.

12.     Thus, Class Counsel expects the Moore Settlement and MF Global Settlement to produce cash consideration totaling in excess of $68,000,000 and perhaps in excess of $70,000,000.

### C.     Lovell Stewart's Work That Produced the Moore Settlement and the MF Global Settlement

#### 1.     April 30, 2010 – April 29, 2011

13.     Lovell Stewart's total fee compensable time for this period is 1,742.10 hours.  The lodestar value of such time is $1,191,268.12.

14.     During this time period, Lovell Stewart drafted and filed the first complaint in this consolidated action and, after further work, filed a first amended complaint, adding MF Global,

Inc. as a defendant.  Lovell Stewart then researched and drafted a successful memorandum of law in opposition to Defendants' motion to stay discovery pending a decision on Defendants' motion to dismiss.  Lovell Stewart then researched, drafted and filed a memorandum of law in opposition to Defendants' motion to strike a portion of, and dismiss, the consolidated complaint. By January 2011, Defendants had produced, pursuant to Court order, more than 250,000 pages of documents they had previously produced to the Commodity Futures Trading Commission ("CFTC"), including over 1,000 audio files.  Lovell Stewart began to review, transcribe and synthesize this important discovery.  In February, Plaintiffs prepared for and argued against Defendants' motion to dismiss the consolidated complaint.

## 2.      April 30, 2011 – April 29, 2012

15.      Lovell Stewart's total fee compensable time for this period is 4,132.57.  The lodestar value of such time is $2,317,441.75.

16.      During this time period, Lovell Stewart attorneys, paralegals and contract attorneys spent a significant amount of time continuing their detailed review and analysis of Defendants' large CFTC document production.  Much of the foregoing work was done under time pressure.  After being granted leave to re-plead, Lovell Stewart integrated the results of its substantial work into a much improved third amended complaint.  In the third amended complaint, Lovell Stewart pled the particulars of over 200 allegedly manipulative trades and further pled the specifics of more than 50 important instant message, e-mail and phone conversations involving the Defendants.  The amended complaint also named Joseph Welsh as a Defendant and added a claim alleging violations of Section 1 of the Sherman Antitrust Act. Plaintiffs then researched and drafted a memorandum of law in opposition to Defendants' motions to dismiss the third amended complaint.  The Moore Defendants did not seek to dismiss

the CEA portion of the third amended complaint.  Thus, during this time period, Plaintiffs went

from having their complaint dismissed to re-pleading a complaint that was not challenged in

substantial part.  In March, Plaintiffs and the Moore Defendants requested a litigation time out in

order to explore settlement.  Shortly thereafter, the CFTC produced approximately twenty-three

deposition transcripts and exhibits to Plaintiffs pursuant to subpoena, which Lovell Stewart

began to digest and analyze.

### 3.    April 30, 2012 through April 29, 2013

17.    Lovell Stewart's total fee compensable time for this period is 3,339.30.  The

lodestar value of such time is $1,908,406.25.

18.    During this time period, Lovell Stewart spent considerable time, effort and

expense working with multiple economists in order to formulate a cogent and robust economic

model aimed at establishing that the Moore Defendants' trades impacted NYMEX platinum and

palladium futures prices.  Lovell Stewart and its experts also undertook to quantify the impact of

such trades.  These econometric models were extremely advanced and resembled models

submitted in connection with a merits expert report.  These models, and the assumptions

underlying same, were the primary focus of the mediation between the parties.  After preparing

and exchanging mediation statements and economic analyses, Lovell Stewart prepared for

mediation sessions with the Moore Defendants and Defendant Welsh held on July 27, 2012 and

August 27, 2012.  Due to the complexity and importance of the economic modeling, the mediator

retained a neutral economist.  Lovell Stewart continued to digest and analyze the CFTC

deposition transcripts and filed a fourth amended complaint, adding allegations based on this

work.  Lovell Stewart also submitted a bankruptcy proof of claim against the estate of MF

Global on behalf of the Class.

**4.      April 30, 2013 through April 29, 2014**

19.      Lovell Stewart's total fee compensable time for this period is 1,502.61 hours.  The lodestar value of such time is $1,021,241.83.

20.      During this time period, Lovell Stewart continued settlement negotiations with the Moore Defendants.  These negotiations involved numerous phone calls, emails and the exchange of dozens of drafts of the lengthy settlement papers.  Lovell Stewart also built on the prior economic work of its experts in order to prepare the plan of allocation, including daily artificiality estimates for a seven month period.  Lovell Stewart also retained and worked with insurance counsel in connection with the numerous insurance issues associated with the stipulated Welsh judgment and insurance rights assignment portion of the Moore Settlement.  After executing the settlement agreement with the Moore Defendants and Defendant Welsh, Lovell Stewart then researched and drafted a memorandum of law seeking preliminary approval of the settlement.  Following the preliminary approval hearing, Lovell Stewart worked to amend the settlement agreement to conform to the Court's suggested changes and then filed a revised motion for preliminary approval and a reply memorandum responding to certain objections raised by the MF Global Trustee.

**5.      April 30, 2014 through January 14, 2015**

21.      Lovell Stewart's total fee compensable time for this period is 1,427.41.  The lodestar value of such time is $987,750.56.

22.      During this time period, Lovell Stewart researched and filed successful briefs in response to multiple objections to preliminary approval of the Moore Settlement and also prepared for and successfully argued for same at the second preliminary approval hearing.  Lovell Stewart engaged in lengthy settlement discussions with the MF Global Trustee and

prepared for and participated in a two day mediation session with the Trustee and numerous insurance companies on June 4 and 5, 2014.  Lovell Stewart retained and worked with bankruptcy counsel due to the large amount of bankruptcy issues surrounding these settlement negotiations.  After the Court granted preliminary approval to the Moore Settlement, Lovell Stewart worked with the Settlement Administrator in order to ensure compliance with the approved program of notice to the Class.  After reaching an agreement in principle with the MF Global Trustee, Lovell Stewart drafted and negotiated the complex settlement papers and executed the MF Global Settlement.  Lovell Stewart then drafted and filed a motion seeking preliminary approval of the MF Global Settlement.  After the Court promptly granted the motion, Lovell Stewart again worked with the Settlement Administrator to ensure compliance with the approved notice program to the Class.  During this period, Lovell Stewart filed multiple status reports with the Court concerning the status of compliance with the notice programs for both settlements.  Lovell Stewart has worked and continues to work with bankruptcy counsel and with Professor Francis McGovern in order to determine whether it is in the Class' best interest to hold or sell the claim.  In the latter regard, Lovell Stewart has been communicating with several buyers interested in purchasing the claim.  Finally, Lovell Stewart drafted and prepared motions seeking final approval of the Moore Settlement and the MF Global Settlement.

### D.   Lovell Stewart's Fee Compensable Hours and Lodestar

23.   Overall, the fee-compensable time spent by the attorneys and professional support staff of Lovell Stewart involved in this litigation, and the lodestar calculations based on Lovell Stewart's current hourly billing rates, is set forth in the below schedule.  The schedule was prepared based upon daily time records maintained by Lovell Stewart.

| Attorneys | Rates | Hours | Charges |
|---|---|---|---|
| | | | |
| Christopher Lovell (Partner) | $950.00 | 1,672.04 | $1,588,438.00 |
| Gary Jacobson (Partner) | $905.00 | 579.05 | $524,040.25 |
| Jody Krisiloff (Partner) | $800.00 | 1,062.15 | $849,720.00 |
| Ian Stoll (Partner) | $750.00 | 1,437.55 | $1,078,162.50 |
| Craig Essenmacher (Partner) | $725.00 | 773.40 | $560,715.00 |
| Keith Essenmacher (Partner) | $680.00 | 427.40 | $290,632.00 |
| Christopher McGrath (Partner) | $625.00 | 1,971.40 | $1,232,125.00 |
| Amanda Miller (Partner) | $435.00 | 291.58 | $126,837.30 |
| Fred Isquith (Partner) | $435.00 | 685.46 | $298,175.10 |
| Ben Jaccarino (Partner) | $435.00 | 725.80 | $315,723.00 |
| Troy Gorman (Contract Attorney) | $275.00 | 74.00 | $20,350.00 |
| Matthew Kuipers (Contract Attorney) | $275.00 | 389.50 | $107,112.50 |
| Albert Powell (Contract Attorney) | $275.00 | 159.00 | $43,725.00 |
| James Payne (Contract Attorney) | $275.00 | 80.00 | $22,000.00 |
| Jacob Ferris (Contract Attorney) | $275.00 | 27.50 | $7,562.50 |
| Christopher Mooney (Associate) | $275.00 | 89.37 | $24,576.75 |
| | | | |
| **Paralegals and Legal Assistants** | | | |
| | | | |
| Tucker Kiessling (Legal Assistant) | $225.00 | 876.02 | $197,104.50 |
| Keith Andrews (Paralegal) | $185.00 | 10.00 | $1,850.00 |
| Hannah Bock (Paralegal) | $170.00 | 793.08 | $134,823.60 |
| Travis Carter (Paralegal) | $160.00 | 10.68 | $1,708.80 |
| Edward Theurkauf (Paralegal) | $75.00 | 9.00 | $675.00 |
| | | | |
| **TOTALS** | | 12,143.98 | $7,426,056.80 |

24.     Thus, the total fee compensable time for which Lovell Stewart bases its request for an award of attorneys' fees is 12,143.98 hours.  The total lodestar value of these professional services is $7,426,056.80.

25.     Messrs. Powell, Gorman, Payne, Kuipers and Ferris worked with Lovell Stewart as contract attorneys in order to help review and analyze the 250,000-plus page CFTC document production.  Mr. Powell graduated law school in 1991, Mr. Gorman in 1998, Mr. Payne in 2002,

Mr. Ferris in 2006 and Mr. Kuipers in 2007.  Each has worked with Lovell Stewart on other document review assignments in commodity futures manipulation and/or antitrust class actions.

26.      Attached as Exhibits A and B hereto are summary exhibits prepared by Lovell Stewart's timekeeper.  Exhibit A reflects Lovell Stewart's hours and lodestar on a year to date basis beginning on April 30, 2010.  Exhibit B reflects each Lovell Stewart attorney and paralegal's hours and lodestar on a year to date basis beginning on April 30, 2010.  Exhibit C hereto reflects a description of work performed by specific Lovell Stewart attorneys and paralegals.

27.      The above hourly rates for Lovell Stewart's attorneys and professional support staff are the firm's current hourly rates.  Lovell Stewart's lodestar figures do not include charges for expense items.  Expense items are billed separately and such charges are not duplicated in Lovell Stewart's current billing rates.

### E.      Lovell Stewart's Expenses For Which It is Requesting Reimbursement

28.      As set forth in the below schedule, Lovell Stewart has incurred a total of $661,126.75 in expenses for which it is currently requesting reimbursement.

| Expense Categories | Cumulative Expenses |
|---|---|
|  |  |
| Expert / Consultant Fees | $515,076.36 |
| Westlaw / Legal Research / PACER / Data | $90,121.99 |
| Mediation Charges | $52,785.43 |
| Federal Express / Postage / Messenger | $1,677.84 |
| Court Fees / Service Fees | $1,465.13 |
|  |  |
| **TOTAL** | $661,126.75 |

29.      The above schedule was prepared based upon expense records reflected in the books and records of Lovell Stewart.  These books and records are prepared from expense vouchers, check records, receipts and other source materials.

30.     The $515,076.36 in expert expenses consists of payments to four economists (totaling $337,690.75), two law firms specializing in bankruptcy law (totaling $91,112.54), a law firm specializing in insurance law (totaling $69,597.50), a hedge fund expert (totaling $5,062.50) and a private investigator (totaling $11,613.07).  Lovell Stewart believes (a) its work with the multiple economists it retained was necessary in this expert-intensive CEA manipulation case, (b) its work with bankruptcy counsel was necessitated by the MF Global bankruptcy, and (c) its work with an insurance law firm was necessitated by the complexities of the insurance issues surrounding the stipulated Welsh judgment and insurance rights assignment.

31.     The $90,121.99 in Westlaw, PACER and data expenses consists of monthly payments to Westlaw (totaling $49,144.69), quarterly payments to PACER (totaling $1,913.98), and $39,063.32 in payments to various sources (primarily the NYMEX) for data.  Lovell Stewart believes that the foregoing legal research and data expenses were reasonably incurred in the prosecution of this complex case that lasted for almost five years.

32.     The $52,785.43 in mediation charges consists of multiple payments to JAMS for mediation services in connection with the Moore Settlement and the MF Global settlement.  In total, the parties participated in four full-day mediation sessions, two days for each settlement.  Although the mediation sessions did not end with settlements, Lovell Stewart believes that it was an important part of the process that ultimately resulted in the two settlements.

33.     In sum, Lovell Stewart believes that the requested expenses were reasonably and appropriately incurred under the circumstances and should be reimbursed.  In terms of allocating the requested fees between the two settlements, Lovell Stewart believes than an equitable allocation would be based on the relative size of the Moore and MF Global settlements.

F.     **Summary of Class Counsel's Lodestar, Hours and Expenses**

34.     Based upon Lovell Stewart's lodestar and expenses detailed above and based on the lodestar and expenses attested to in the declarations of Lovell Stewart's co-counsel Vincent Briganti, Esq. and Edward Cochran, Esq. submitted herewith, Class Counsel's total lodestar and expenses are summarized as follows:

| Firm | Lodestar | Hours | Expenses |
|---|---|---|---|
|  |  |  |  |
| Lovell Stewart Halebian Jacobson LLP | $7,426,056.80 | 12,143.98 | $661,126.75 |
| Lowey Dannenberg Cohen & Hart, P.C. | $780,652.50 | 1,091.50 | $43,167.75 |
| Law Firm of Edward Cochran, P.C. | $42,435.00 | 73.80 | $0.00 |
|  |  |  |  |
| **TOTALS** | $8,249,144.30 | 13,309.28 | $704,294.50 |

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on January 14, 2015

*/s/ Christopher M. McGrath*
Christopher M. McGrath

# Exhibit A

| Time Period | Hours | Lodestar |
|---|---|---|
| April 30, 2010 - April 29, 2011 | 1,742.10 | $1,191,238.12 |
| April 30, 2011- April 29, 2012 | 4,132.57 | $2,317,441.75 |
| April 30, 2012- April 29, 2013 | 3,339.30 | $1,908,406.25 |
| April 30, 2013 - April 29, 2014 | 1,502.61 | $1,021,241.83 |
| April 30, 2014- Jan. 14, 2015 | 1,427.41 | $987,750.56 |

# Exhibit B

| **Chris Lovell** | **Hours** | **Rate** | **Lodestar** |
| --- | --- | --- | --- |
| April 30, 2010 - April 29, 2011 | 332.80 | $950.00 | $316,160.00 |
| April 30, 2011-April 29, 2012 | 328.60 | $950.00 | $312,170.00 |
| April 30, 2012-April 29, 2013 | 461.30 | $950.00 | $438,235.00 |
| April 30, 2013-April 29, 2014 | 306.84 | $950.00 | $291,498.00 |
| April 30, 2014 - Jan. 14, 2015 | 242.50 | $950.00 | $230,375.00 |

| **Gary Jacobson** | **Hours** | **Rate** | **Lodestar** |
| --- | --- | --- | --- |
| April 30, 2010 - April 29, 2011 | 220.40 | $905.00 | $199,462.00 |
| April 30, 2011-April 29, 2012 | 124.95 | $905.00 | $113,079.75 |
| April 30, 2012-April 29, 2013 | 130.70 | $905.00 | $118,283.50 |
| April 30, 2013-April 29, 2014 | 74.00 | $905.00 | $66,970.00 |
| April 30, 2014 - Jan. 14, 2015 | 29.00 | $905.00 | $26,245.00 |

| **Jody Krisiloff** | **Hours** | **Rate** | **Lodestar** |
| --- | --- | --- | --- |
| April 30, 2010 - April 29, 2011 | 0.00 | $0.00 | $0.00 |
| April 30, 2011-April 29, 2012 | 0.00 | $0.00 | $0.00 |
| April 30, 2012-April 29, 2013 | 235.95 | $800.00 | $188,760.00 |
| April 30, 2013-April 29, 2014 | 337.30 | $800.00 | $269,840.00 |
| April 30, 2014 - Jan. 14, 2015 | 488.90 | $800.00 | $391,120.00 |

| **Ian Stoll** | **Hours** | **Rate** | **Lodestar** |
| --- | --- | --- | --- |
| April 30, 2010 - April 29, 2011 | 195.00 | $750.00 | $146,250.00 |
| April 30, 2011-April 29, 2012 | 679.75 | $750.00 | $509,812.50 |
| April 30, 2012-April 29, 2013 | 526.05 | $750.00 | $394,537.50 |
| April 30, 2013-April 29, 2014 | 36.75 | $750.00 | $27,562.50 |
| April 30, 2014 - Jan. 14, 2015 | 0.00 | $750.00 | $0.00 |

| **Craig Essenmacher** | **Hours** | **Rate** | **Lodestar** |
| --- | --- | --- | --- |
| April 30, 2010 - April 29, 2011 | 88.00 | $725.00 | $63,800.00 |
| April 30, 2011-April 29, 2012 | 302.00 | $725.00 | $218,950.00 |
| April 30, 2012-April 29, 2013 | 371.40 | $725.00 | $269,265.00 |
| April 30, 2013-April 29, 2014 | 8.50 | $725.00 | $6,162.50 |
| April 30, 2014 - Jan. 14, 2015 | 3.50 | $725.00 | $2,537.50 |

| **Keith Essenmacher** | **Hours** | **Rate** | **Lodestar** |
| --- | --- | --- | --- |
| April 30, 2010 - April 29, 2011 | 0.00 | $680.00 | $0.00 |
| April 30, 2011-April 29, 2012 | 0.00 | $680.00 | $0.00 |
| April 30, 2012-April 29, 2013 | 427.40 | $680.00 | $290,632.00 |
| April 30, 2013-April 29, 2014 | 0.00 | $680.00 | $0.00 |
| April 30, 2014 - Jan. 14, 2015 | 0.00 | $680.00 | $0.00 |

| **Chris McGrath** | **Hours** | **Rate** | **Lodestar** |
| --- | --- | --- | --- |
| April 30, 2010 - April 29, 2011 | 463.00 | $625.00 | $289,375.00 |

| | | | |
|---|---|---|---|
| April 30, 2011-April 29, 2012 | 422.20 | $625.00 | $263,875.00 |
| April 30, 2012-April 29, 2013 | 272.00 | $625.00 | $170,000.00 |
| April 30, 2013-April 29, 2014 | 409.60 | $625.00 | $256,000.00 |
| April 30, 2014 - Jan. 14, 2015 | 404.60 | $625.00 | $252,875.00 |

| **Amanda Miller** | **Hours** | **Rate** | **Lodestar** |
|---|---|---|---|
| April 30, 2010 - April 29, 2011 | 0.00 | $435.00 | $0.00 |
| April 30, 2011-April 29, 2012 | 192.14 | $435.00 | $83,580.90 |
| April 30, 2012-April 29, 2013 | 55.17 | $435.00 | $23,998.95 |
| April 30, 2013-April 29, 2014 | 41.87 | $435.00 | $18,213.45 |
| April 30, 2014 - Jan. 14, 2015 | 2.40 | $435.00 | $1,044.00 |

| **Fred Isquith** | **Hours** | **Rate** | **Lodestar** |
|---|---|---|---|
| April 30, 2010 - April 29, 2011 | 107.26 | $435.00 | $46,658.10 |
| April 30, 2011-April 29, 2012 | 325.91 | $435.00 | $141,770.85 |
| April 30, 2012-April 29, 2013 | 133.57 | $435.00 | $58,102.95 |
| April 30, 2013-April 29, 2014 | 24.75 | $435.00 | $10,766.25 |
| April 30, 2014 - Jan. 14, 2015 | 93.97 | $435.00 | $40,876.95 |

| **Ben Jaccarino** | **Hours** | **Rate** | **Lodestar** |
|---|---|---|---|
| April 30, 2010 - April 29, 2011 | 257.14 | $435.00 | $111,855.90 |
| April 30, 2011-April 29, 2012 | 255.59 | $435.00 | $111,181.65 |
| April 30, 2012-April 29, 2013 | 103.91 | $435.00 | $45,200.85 |
| April 30, 2013-April 29, 2014 | 70.32 | $435.00 | $30,589.20 |
| April 30, 2014 - Jan. 14, 2015 | 38.84 | $435.00 | $16,895.40 |

| **Troy Gorman** | **Hours** | **Rate** | **Lodestar** |
|---|---|---|---|
| April 30, 2010 - April 29, 2011 | 0.00 | $275.00 | $0.00 |
| April 30, 2011-April 29, 2012 | 74.00 | $275.00 | $20,350.00 |
| April 30, 2012-April 29, 2013 | 0.00 | $275.00 | $0.00 |
| April 30, 2013-April 29, 2014 | 0.00 | $275.00 | $0.00 |
| April 30, 2014 - Jan. 14, 2015 | 0.00 | $275.00 | $0.00 |

| **Matthew Kuipers** | **Hours** | **Rate** | **Lodestar** |
|---|---|---|---|
| April 30, 2010 - April 29, 2011 | 0.00 | $275.00 | $0.00 |
| April 30, 2011-April 29, 2012 | 389.50 | $275.00 | $107,112.50 |
| April 30, 2012-April 29, 2013 | 0.00 | $275.00 | $0.00 |
| April 30, 2013-April 29, 2014 | 0.00 | $275.00 | $0.00 |
| April 30, 2014 - Jan. 14, 2015 | 0.00 | $275.00 | $0.00 |

| **Albert Powell** | **Hours** | Rate | **Lodestar** |
|---|---|---|---|
| April 30, 2010 - April 29, 2011 | 0.00 | $275.00 | $0.00 |
| April 30, 2011-April 29, 2012 | 159.00 | $275.00 | $43,725.00 |
| April 30, 2012-April 29, 2013 | 0.00 | $275.00 | $0.00 |

| | | | |
|---|---|---|---|
| April 30, 2013-April 29, 2014 | 0.00 | $275.00 | $0.00 |
| April 30, 2014 - Jan. 14, 2015 | 0.00 | $275.00 | $0.00 |

| **James Payne** | **Hours** | **Rate** | **Lodestar** |
|---|---|---|---|
| April 30, 2010 - April 29, 2011 | 0.00 | $275.00 | $0.00 |
| April 30, 2011-April 29, 2012 | 80.00 | $275.00 | $22,000.00 |
| April 30, 2012-April 29, 2013 | 0.00 | $275.00 | $0.00 |
| April 30, 2013-April 29, 2014 | 0.00 | $275.00 | $0.00 |
| April 30, 2014 - Jan. 14, 2015 | 0.00 | $275.00 | $0.00 |

| **Jacob Ferris** | **Hours** | **Rate** | **Lodestar** |
|---|---|---|---|
| April 30, 2010 - April 29, 2011 | 0.00 | $275.00 | $0.00 |
| April 30, 2011-April 29, 2012 | 27.50 | $275.00 | $7,562.50 |
| April 30, 2012-April 29, 2013 | 0.00 | $275.00 | $0.00 |
| April 30, 2013-April 29, 2014 | 0.00 | $275.00 | $0.00 |
| April 30, 2014 - Jan. 14, 2015 | 0.00 | $275.00 | $0.00 |

| **Chris Mooney** | **Hours** | **Rate** | **Lodestar** |
|---|---|---|---|
| April 30, 2010 - April 29, 2011 | 0.00 | $275.00 | $0.00 |
| April 30, 2011-April 29, 2012 | 0.00 | $275.00 | $0.00 |
| April 30, 2012-April 29, 2013 | 0.00 | $275.00 | $0.00 |
| April 30, 2013-April 29, 2014 | 64.37 | $275.00 | $17,701.75 |
| April 30, 2014 - Jan. 14, 2015 | 25.00 | $275.00 | $6,875.00 |

| **Tucker Kiessling** | **Hours** | **Rate** | **Lodestar** |
|---|---|---|---|
| April 30, 2010 - April 29, 2011 | 78.50 | $225.00 | $17,662.50 |
| April 30, 2011-April 29, 2012 | 241.02 | $225.00 | $54,229.50 |
| April 30, 2012-April 29, 2013 | 430.00 | $225.00 | $96,750.00 |
| April 30, 2013-April 29, 2014 | 88.00 | $225.00 | $19,800.00 |
| April 30, 2014 - Jan. 14, 2015 | 38.50 | $225.00 | $8,662.50 |

| **Hannah Bock** | **Hours** | **Rate** | **Lodestar** |
|---|---|---|---|
| April 30, 2010 - April 29, 2011 | 0.00 | $170.00 | $0.00 |
| April 30, 2011-April 29, 2012 | 92.33 | $170.00 | $15,696.10 |
| April 30, 2012-April 29, 2013 | 619.25 | $170.00 | $105,272.50 |
| April 30, 2013-April 29, 2014 | 31.00 | $170.00 | $5,270.00 |
| April 30, 2014 - Jan. 14, 2015 | 50.50 | $170.00 | $8,585.00 |

| **Keith Andrews** | **Hours** | **Rate** | **Lodestar** |
|---|---|---|---|
| April 30, 2010 - April 29, 2011 | 0.00 | $185.00 | $0.00 |
| April 30, 2011-April 29, 2012 | 0.00 | $185.00 | $0.00 |
| April 30, 2012-April 29, 2013 | 0.00 | $185.00 | $0.00 |
| April 30, 2013-April 29, 2014 | 0.00 | $185.00 | $0.00 |
| April 30, 2014 - Jan. 14, 2015 | 10.00 | $185.00 | $1,850.00 |

| Travis Carter | Hours | Rate | Lodestar |
|---|---|---|---|
| April 30, 2010 - April 29, 2011 | 0.00 | $160.00 | $0.00 |
| April 30, 2011-April 29, 2012 | 10.68 | $160.00 | $1,708.80 |
| April 30, 2012-April 29, 2013 | 0.00 | $160.00 | $0.00 |
| April 30, 2013-April 29, 2014 | 0.00 | $160.00 | $0.00 |
| April 30, 2014 - Jan. 14, 2015 | 0.00 | $160.00 | $0.00 |

| Ted Therkauf | Hours | Rate | Lodestar |
|---|---|---|---|
| April 30, 2010 - April 29, 2011 | 0.00 | $75.00 | $0.00 |
| April 30, 2011-April 29, 2012 | 0.00 | $75.00 | $0.00 |
| April 30, 2012-April 29, 2013 | 9.00 | $75.00 | $675.00 |
| April 30, 2013-April 29, 2014 | 0.00 | $75.00 | $0.00 |
| April 30, 2014 - Jan. 14, 2015 | 0.00 | $75.00 | $0.00 |

# Exhibit C

**Christopher Lovell** and **Christopher McGrath** were the two primary attorneys responsible for prosecuting this matter for Plaintiffs.  Mr. Lovell was responsible for formulating the litigation strategies throughout this case and arguing each important motion (*e.g.*, motion to stay discovery, motion to dismiss, motions for preliminary approval) before the Court.  Mr. Lovell and Mr. McGrath were closely involved with all or almost all of the actions' numerous pleadings and legal briefing, they attended all Court conferences, they led the settlement negotiations with the Moore Defendants and the MF Global Trustee and they were otherwise involved in the day-to-day management of this nearly five year long litigation.

**Gary Jacobson** has (a) worked closely on drafting and editing the written submissions on behalf of the Futures Plaintiffs, including the complaint and the amended complaint, (b) researched, drafted and edited substantial portions of the briefing in (i) opposition to Moore Capital Defendants' motion to strike the allegations based on the CFTC consent order; (ii) opposition to Moore Capital's motion to dismiss, including sections on pleading standards, manipulative intent, and aiding and abetting CEA manipulation; (iii) opposition to the motion to exclude derivative evidence; (iv) opposition to the motion to dismiss the antitrust claims, including sections on *Copperweld*, antitrust injury and standing issues; brief in support of fairness of the settlements; (v) opposition to the motion to

intervene by the Customer Representatives; and (vi) response to the Bankruptcy Trustee's objection to the motion for preliminary approval, (c) researched, drafted and edited substantial portions of the Futures Plaintiffs' mediation statement to Moore Capital, and led the Futures Plaintiffs' delegation to a mediation session before retired Judge Weinstein, and (d) researched various bankruptcy issues, including the authority of Article I courts to adjudicate CEA claims, and advised co-counsel in preparing the form of judgment.

**Jody Krisiloff** has (a) reviewed the pleadings and amended pleadings, MF Global's D&O and excess insurance policies, numerous bankruptcy and SIPA filings regarding insurance proceeds and other insurance issues, (b) researched and drafted memoranda regarding insurance policies, coverage issues and strategies, (c) consulted with insurance counsel, (d) researched the Welsh assignment and judgment, the coverage for Welsh and the legal correspondence from carriers and Welsh, and drafted related documents, (e) participated in conferences with Welsh's counsel and insurance counsel, (f) researched and drafted a memorandum in opposition to motions to intervene by third parties in the Moore Capital and Welsh settlement proceedings, (g) reviewed filings of the MF Global Trustee in bankruptcy and related filings in the MF Global bankruptcies and SIPA proceedings, (h) participated in, researched and attended the mediation before Hon. Judge Weinstein, (i) reviewed CFTC deposition transcripts of various traders and

Welsh, (j) researched various antitrust and CEA issues, (k) attended conferences regarding the negligence claim against Welsh, (l) drafted slides for presentations to Court, (m) researched bankruptcy law issues relating to class certification and treble damages in bankruptcy, (n) reviewed, edited and prepared various settlement documents in both settlements, (o) conferred with two bankruptcy counsel about case strategies and various documents, (p) researched and drafted various memoranda regarding bankruptcy law provisions, lifting the automatic stay, and proofs of claim issues, (q) researched allowed claim, (r) attended and participated in various settlement negotiations, (s) conferred with counsel for physicals Plaintiffs, (t) drafted the preliminary settlement brief for the MF Global settlement and worked on the briefing for final approval of the settlement, and (u) researched and contributed to Plaintiffs memoranda and responses to briefs and letters submitted to the Court by SIPA Trustee for MF Global.

**Ian Stoll** worked on (a) drafting numerous written submissions by Plaintiffs including the multiple complaints, and oppositions to the motions to dismiss, (b) researching and analyzing analyst reports, articles and other metals market publications; historical precious metals prices; commodity index prices; exchange traded funds; and trading data relative to platinum and palladium, researching the law of manipulation (*e.g.*, Congressional intent and legislative statements, Courts of Appeals' definitions of commodity price manipulation, Southern District of

New York decisions on particularity standards, cases on moving and manipulating prices at end of day, releases and proposed regulations under the Dodd-Frank Wall Street Reform and Consumer Protection Act, and cases on F.R.Civ.P. Rule 12(b)(6) motion to dismiss); efficient market theory; and cited cases on fraud and sounding in fraud, analyzed market-on-close conversations; incriminating statements; manipulative conversations including instant messages and emails; highest execution price; VWAP data; price increases, compliance issues, and relative absolute price change comparisons, (c) reviewing and transcribing audio tapes of traders' conversations (*e.g.*, comparing, identifying and matching traders' identity with trading tickets and conversations; analyzing conversations regarding forms of manipulation, manipulative market-on-close transactions, worst purchase price trades and compliance violations), (d) analyzing market-on-close trades where there were no audio conversations in respect of days reflecting allegedly manipulative (email and instant message) conversations by Defendants Pia and Berger, (e) document review of documents that Defendants previously produced to the CFTC, including listening to and transcribing additional audio files, materials and data regarding platinum and palladium futures contracts executed on behalf of Defendants, positions and sales, bid/ask spreads, time of sales and related conversations, (f) researching historical platinum and palladium inventories and supply and demand data reported in metals market publications, pleading

standards, CEA manipulation claims, aiding and abetting, and agency issues; "per se" rule and related antitrust arguments; and amending the complaint to include an antitrust claim, (g) communicating with experts regarding market microstructure, permanence and related issues, analyzing the floor broker production and CFTC depositions transcripts and materials regarding potential claims against such brokers; floor brokers' statements which helped the case against Moore Capital; World Trade's materials and responses to MF Global's requests regarding slam-the-closes and other actions, (h) reviewing Plaintiffs' experts artificiality analyses and incorporate sales by Defendants and discount artificiality impact of such sales; and researched whether Plaintiffs would be permitted to send written deposition questions to witnesses, the preclusive effect on Rule 45 depositions, and available hearsay rule exceptions, (i) the preparation for the mediation sessions by researching and obtaining data for event studies, allocation plan and historical production and consumption of platinum, palladium, gold and silver, including analyzing market commentaries, and (j) analyzed the insurance policies and related carrier letters regarding coverage and exclusions in respect of the settlement with Defendant Welsh.

**Craig Essenmacher** has (a) provided information and guidance to the economists, including organizing the documents and information in forms the economists could use, checking their mathematical regressions and other

assistance, (b) prepared the Defendants' document productions for loading into the Firm's proprietary document review software, including negotiations with Defendants on the form of production of certain documents, (c) subjectively reviewed Defendants' documents for liability issues (d) obtained from publicly available sources the daily prices, intraday bids, offers and trade prices and other data with respect to NYMEX platinum and palladium futures contract trades, (e) obtained from NYMEX and analyzed the actual street book trade prices with respect to NYMEX platinum and palladium futures contract trades (f) correlated Defendants' trades with the applicable NYMEX data for the day in question, (g) analyzed the NYMEX computer market v. the NYMEX floor market, (h) analyzed the apparent daily impact of Moore's transactions, (i) worked with three economists to supply them with the foregoing and other data in the forms they desired, (j) in response to Defendants' arguments that the movements in platinum and palladium were not significant compared to the movements of gold and silver, and at the request of Defendants, repeatedly obtained and did analyses of gold and silver futures contract and prices, (k) organized databases of those requested in forms requested by the economists and analyzed same, (l) ran regression analyses, checked the work of the economists, (m) consulted with Lovell and McGrath about each of the foregoing steps and what they indicated should be done to further investigate the facts, and (n) critiqued and analyzed with Lovell and McGrath the

correspondence of the work by the economists with the data, common sense, and what Defendants could argue.

**Keith Essenmacher**.  During the period from approximately July through October 2011, Mr. Essenmacher reviewed and analyzed the Defendants' 250,000-plus page document production under the time pressures of filing the third consolidated amended complaint.  Mr. Essenmacher also formulated keyword searches and conducted second level reviews of key documents identified by other attorneys and paralegals.

**Amanda Miller** has (a) researched aiding and abetting, Rule 12(h), banging the close, and uneconomic conduct, (b) drafted aiding and abetting section of Plaintiffs' opposition to the motion to dismiss, (c) drafted inserts to Plaintiffs' brief regarding the number of communications used to establish manipulative intent in past cases (d) drafted memos on legal research sources, (e) listened to audio files produced by Defendants, (f) digested CFTC transcripts of individuals, (g) researched cases (1) where there was a conspiracy found between a manipulator and a broker or FCM, (2) insured assigning proceeds of a policy to a judgment creditor in order to pay judgment, (h) drafted portions of the settlement agreement, (i) drafted portions of the preliminary approval brief, and (j) researched need for separate representation and counsel for subclasses.

**Fred Isquith** has (a) performed legal research in connection with the motion to dismiss on various issues including (i) the market timing of trades and how the timing can signal manipulation, (ii) the various ways in which the commodities and securities markets have been manipulated in the past and the outcome of civil cases and government investigations, (iii) the legislative history of the Frank-Dodd act regarding the manipulation of the commodities and futures market, (iv) how the courts and NYMEX have interpreted NYMEX rule 6.53, (v) third party liability for commodity and antitrust violations, and (vi) aiding and abetting and potential principal/agent relationships between the Defendants, (b) helped draft other sections of the Plaintiffs' opposition to the motion to dismiss, (c) helped prepare the senior partner prepare for oral arguments on the motion to dismiss, (d) drafted allegations for the Plaintiffs' Amended Complaint, (e) listened to the Moore Capital and MF Global phone records, (f) reviewed Defendant's document discovery, (g) worked with the Plaintiffs' experts to review the Defendants' trading activity, (h) performed work on the mediation brief including (1) work with the experts to discuss damage calculations, (2) research on potential weakness for the case going forward, (3) research on potential validity of most favored nations clause in a class action settlement, and (4) research on bankruptcy code and how the Defendants' bankruptcy could affect the class and settlement process, (i) wrote

memoranda regarding his findings and attended the mediation sessions to assist the senior partner, and (j) helped prepare and draft the settlement agreement.

**Ben Jaccarino** has (a) assisted in the drafting of the initial, amended complaint, and third amended complaint (b) reviewed large portions of CME data at the direction of Lovell and Essenmacher, (c) reviewed and analyzed client trading records, (d) researched (1) the definition of "manipulation", "bid ask spread", "market on close" in previous cases, (2) admissibility of CFTC Orders in civil cases, and (3) previous Judge Pauley 10(b)-5 cases, (e) assisted in the drafting of the opposition to the motion to dismiss, (f) reviewed produced IMs and emails from Defendant Pia and others, reviewed and analyzed Moore Capital trading records highlighting Market on Close orders, (g) researched multiple SIPA and bankruptcy related items, including various procedures, and how class counsel could lift the stay, (h) assisted in the drafting with Lovell of the proof of claim against MF Global, (i) assisted Lovell in the drafting of the mediation brief, (j) assisted Lovell in the drafting of the plan of allocation, (k) assisted Lovell in the drafting of the preliminary approval brief, and (l) worked on the MF Global mediation slides

**Contract Attorneys**.  During the period from approximately August through November 2011, the contract attorneys assisted Lovell Stewart in reviewing and analyzing the 250,000-plus page CFTC document production under

9

the time pressures of re-pleading and filing the third consolidated amended complaint.

**Paralegals.** The paralegals (a) reviewed and digested various transcripts of depositions taken by the CFTC, (b) investigated the role of the floor brokers in the manipulation, (c) reviewed and synthesized daily news reports to determine what impact world events may have had on the prices of platinum and palladium to assist experts in producing a plan of allocation, (d) examined the impact of Moore's market on close trades to other commodities, (e) analyzed daily pricing data, comparing platinum and palladium to gold and other commodities over time, (f) analyzed Streetbook data, comparing Moore's trades to Volume Weighted Average prices at the end of the day and determined Moore's impact on the prices, (g) conducted general analyses of price ranges before, during and after Moore's trades at the end of the day, (h) worked with experts to determine daily artificiality numbers and their impact on prices, and (i) calculated Moore's percentage of the total trading volume during the daily closing periods.