**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In Re: Platinum And Palladium Commodities Litigation* <br><br> This Document Relates To: <br><br> Platinum/Palladium Physical Class | Master File No. 10 Civ. 3617 (WHP) <br><br><br> Omnibus Declaration of John A. Lowther in Support of Final Approval of Physical Class Action Settlements and Support of Reimbursement of Attorneys' Fees and Expenses |

## TABLE OF CONTENTS

1.  Introduction .................................................................................................................. 1

2.  Procedural History ......................................................................................................... 9

3.  Document Review, Expert Analyses, and Third Party Discovery...................................... 24

4.  Protracted Settlement Negotiations ................................................................................ 30

5.  The Physical Class Faces Significant Litigation Risks, Including the risk of No Recovery, and thus the Settlement Is an Excellent Result for the Physical Class ................................. 34

6.  Total Lodestar Calculations For Physical Lead Counsel .................................................. 37

7.  Total Expense Calculations For Physical Lead Counsel ................................................... 38

8.  Physical Lead Counsel's Fee Request Is Reasonable ....................................................... 41

9.  Exhibits ....................................................................................................................... 42

Pursuant to 28 U.S.C. § 1746, I, John A. Lowther, declare under penalty of perjury under the laws of the United States of America the following is true and correct.

## 1. Introduction

1.      I am an attorney at law admitted to practice pro hac vice before this Court and am a member of Doyle Lowther LLP, which the Court appointed as lead counsel of record for the Physical Class[1] in this action.

2.      I have been actively involved in every phase of the prosecution of this action and have acted as principal counsel for the Physical Class.

3.      I submit this declaration in support of (1) Physical Plaintiffs' Memorandum Of Law In Support Of Final Approval Of Class Action Settlements With Defendants Moore Capital and Joseph Welsh, (2) Physical Plaintiffs' Memorandum Of Law In Support Of Final Approval Of Class Action Settlements With Defendant MF Global Inc., and (3) Physical Plaintiffs Memorandum Of Law In Support Of Lead Counsel's Motion For An Award Of Attorneys Fees And Reimbursement Of Expenses ("Fee Brief") in both settlements. Unless stated otherwise, all capitalized terms shall have the same meanings as set forth in the Stipulations Of Settlement.

4.      Physical Lead Counsel worked on a fully contingent basis litigating this matter for more than four years before reaching the Moore Capital and MF Global Settlements. During this time, Lead Counsel devoted significant time and resources to the protracted proceedings, working long hours in a vigorously contested matter against ably represented defendants, notwithstanding the significant uncertainty whether the case would be successful. Opposing the

---

[1] "Physical Class" is defined as both Physical Class in the Moore Settlement and Physicals Class in MF Global Settlement.  For purposes of this declaration, Physical Class will be used in regard to both settlements.

Physical Plaintiffs were well-qualified counsel, including Akin Gump Strauss Hauer & Feld, LLP, Hughes Hubbard & Reed, LLP, Kobre & Kim LLP, and Kramer Levin Naftalis & Frankel LLP, along with many additional counsel for MF Global's underwriters, and counsel for the SIPA Trustee in the MF Global liquidation.

5.     Plaintiffs' counsel battled Defendants over several motions to dismiss, which raised complex arguments against the validity of Physical Plaintiffs' claims. Physical Plaintiffs faced many attacks on their theory of the case and what the evidence showed. Significant time and resources were expended on expert analyses concerning the metals markets, future and physical trading in these commodities, the relevant market-moving economic forces, extensive analyses concerning artificiality in the platinum and palladium markets pursuant to the alleged "bang the close" trades, conflicting expert opinions on the maximum provable damages to the Physical Class, transmission of artificiality from the futures to the physicals market, dissipation of any alleged artificiality, and volume of over-the-counter trading in the physical market. At all times, defense counsel strongly advocated the Physical Class would not prevail at trial should the litigation continue—even assuming Physical Plaintiffs prevailed at the class certification stage, which itself presented significant risk given the asserted RICO, Sherman Act, and fraud claims.

6.     On June 14, 2010, Physical Plaintiffs filed their initial complaint. Five amendments followed, which as a result of counsel's substantial fact-finding, swelled Plaintiffs' pleadings from seventeen pages to more than 190 pages in the Sixth Amended Consolidated Class Action Complaint. As Physical Plaintiffs' counsel gained a greater understanding of the evidence in this case, through discovery and expert analyses, the length of the pleadings increased to reflect this understanding and the underlying work and expert analyses.

7.      Settlement of the case could not be achieved until Physical Plaintiffs, through class counsel:

- engaged in extensive discovery and investigation, which led to uncovering the specific details of how the platinum and palladium bullion markets were manipulated and by whom, information counsel used to demonstrate the practices and conduct that caused Defendants to violate the federal antitrust and RICO laws and commit various common law torts;

- analyzed over 8.64 gigabytes of electronic data, comprised of hundreds of thousands of pages of documents, analyzed and transcribed over 1,100 electronic audio files, including identifying the speakers and topics, and studied thousands of instant messages produced in this case, not only to determine their meaning and impact on the market, but also to identify the actual communicants, who often used aliases in their communications and electronic instant messages;

- engaged in extensive third-party discovery, including issuing document subpoenas to the Commodities Futures Trading Commission, the New York Mercantile Exchange, Monex Deposit Co., Standard Bank, UBS Investment Bank, JP Morgan Chase Bank, J. Aron & Co., Goldman Sachs, JP Morgan Asset Management, J. Aron & Co., APMEX, HSBC USA Bank, Kitco Metals, Inc., Dillon Gage, Inc., Toledo Coin Exchange, Goldline International, and Northwest Territorial Mint;

- opposed both in papers and at oral argument Defendant's comprehensive motion to dismiss and motion to strike;

- fully briefed a second comprehensive motion to dismiss;

- worked extensively with multiple experts, including commodities damage modeling experts to run various analyses for a baseline measure of artificiality, as well as experts on the platinum and palladium bullion or "spot" market to understand the scope of potential Physical Class damages;

- conducted significant legal research concerning pursuit, and ultimately resolution, of the asserted claims against bankrupt entity MF Global Inc. and the myriad related issues attendant to its liquidation proceeding, and the asserted insurer and SIPA Trustee defenses; and

- engaged in prolonged and very contentious settlement discussions, which relied heavily on legal, factual, and expert analyses of all the previously identified matters, including voluminous expert responses by the defense; Physical Plaintiffs' reports and presentations to the mediator's independent economics expert; as well as four all-day mediation sessions with the Hon. Daniel H. Weinstein (Ret.) in New York City and Napa, California (on July 27, 2013,

August 27, 2013 and June 4-5, 2014), none of which resulted in a settlement, numerous follow-on teleconferences, and exchanging dozens of iterations of settlement documents before reaching the current Settlement Agreements.

8.      These Settlements are the product of hard-fought litigation. Both Settlements take into the consideration the significant risks in this matter, which includes Defendants' numerous challenges to the pleadings, the difficulty in certifying a nationwide class under the RICO and Sherman Act claims at issue, as well as untested New York state common law claims, the obstacles to establishing the volume of manipulated platinum and palladium bullion given these markets trade over-the-counter, having to prove not only manipulation of the platinum and palladium futures markets but also the impact of the alleged conduct on the physical "spot" market of the underlying commodity, the difficult and complex analyses concerning artificiality and its dissipation in the market, the proper measure of damages, a matter on which all the experts widely differed, and for MF Global the complex and unpredictable bankruptcy process.

9.      Not only were Physical Plaintiffs confronted with the difficult task of proving a commodities manipulation case, but they also had to do so under the federal antitrust and RICO laws and certain New York common law theories. Many of Physical Plaintiffs' claims were untested when applied to the manipulation of physical metals vis-à-vis alleged manipulative trades in the futures market, and had never been approved by the Second Circuit or the New York Court of Appeals. Thus, there was a real danger the Physical Class's claims could have been dismissed via motions to dismiss, either in your Honor's court, in bankruptcy court, or on appeal with the Second Circuit or even the Supreme Court, given all Settling Defendants had formally filed a Notice Of Constitutional Question. (ECF No. 58.)

10.      Through discovery, Physical Plaintiffs reviewed and analyzed extensive

documentary evidence from the Settling Defendants, information from the CFTC, important third-party commodities trading documents, and documents from major national precious metal dealers and retailers. Physical Plaintiffs' amended complaints are the product of Physical Lead Counsel's vigorous and substantial discovery and research efforts, such as reviewing and analyzing more than two hundred thousand pages of documents, analyzing and transcribing thousands of audio files and thousands more text and instant messages as the alleged fraud was being perpetrated between and among multiple actors over an alleged period of several years, and extensive expert analyses.

11.    As a testament to counsel's investigation and discovery efforts, and the development of factual evidence supporting the case, the pleadings in this case increased in length from the initial seventeen-page complaint to the 193-page Sixth Amended Consolidated Class Action Complaint, which does not include the accompanying exhibits. Added to the original complaint were numerous communications among Defendants discussing the alleged manipulation, sworn testimony about the reasons Defendants took certain actions, and analyses of the alleged manipulative trades by Defendants. Certain communications were made through aliases, and counsel were able to identify these communicants and piece together how and why the alleged manipulation was carried out only after substantial analyses and investigation.

12.    Settlement negotiations were lengthy and arduous. As part of the protracted settlement discussions, Physical Plaintiffs negotiated directly with Defendants and also relied on the material assistance of the Hon. Daniel H. Weinstein (Ret.) and his independent economics expert. Four formal mediation sessions took place over four days. The first all-day session, on July 27, 2012, failed to result in a settlement, or even any agreement on basic terms. A second formal mediation session with Judge Weinstein, held on August 27, 2012, also failed

to result in a mediated settlement, though the Parties did make progress on some very broad points concerning the Physical Class.[2] Through this process, the Parties were made familiar with each other's claims and contentions, as well as the strengths and weaknesses of the claims and defenses of both sides. Physical Lead Counsel was well-informed of the relevant facts, and the Parties acted in a manner ensuring the negotiations were arms' length and non-collusive, with the assistance of an independent mediator. These negotiations were hard fought, and at certain points, negotiations ended.

13.    After these failed negotiations, on January 9, 2013, the Physical Plaintiffs, together with the Futures Plaintiffs, requested leave to file a Fourth Amended Complaint. This expanded complaint included new factual allegations and additional common law claims of fraud, aiding and abetting fraud and conspiracy to commit fraud. Physical Lead Counsel spent countless hours researching these potential claims, tying their legal theories to the evidence uncovered to date, and supplementing this information with sworn testimony. The Court allowed the Physical Plaintiffs to file the Fourth Amended Complaint but stayed the time for Defendants to respond to allow the Parties to further discuss settlement. Negotiations progressed, and on or about July 29, 2013, the Court granted the Parties' request to file a Fifth Amended Complaint for the sole purpose of adding a negligence claim against Defendant Joseph Welsh.

14.    The Parties' settlement discussions were buttressed with significant expert analyses. Physical Plaintiffs and Defendants submitted dramatically different damages

---

[2] Another two-day mediation session took place in New York on June 4 and 5, 2014 in an attempt to resolve the Physical Class's claims against MF Global, Inc. and reach agreement on a "cash" payment to satisfy the $7,000,000 judgment against Joseph Welsh. Although no agreement was reached during these sessions, the mediation did lay the groundwork for an eventual settlement with MF Global and Welsh's insurers.

calculations. Judge Weinstein received assistance from his own economist, who attended mediation, analyzed the competing damages models, and even prepared his own damages calculations. These analyses, including the independent analysis Judge Weinstein commissioned, informed the Parties' decision-making and enabled settlement negotiations to move forward.

15.    Even by the standards for complex class actions, the Parties' settlement negotiations were protracted and contentious. As David Zensky, lead counsel for the Moore Capital Defendants explained, the "Settlement Negotiations took place over the course of a year and a half, and were the most drawn-out, painstaking, and arduous settlement negotiations I have been a party to in my twenty-seven years as a litigator. Indeed, the current, as filed stipulation of settlement was the forty-fifth draft exchanged between the parties." ECF No. 190 at ¶ 4 (Declaration of David Zensky In Support of Defendants' Response to Susan Levy's Opposition to Preliminary Approval).

16.    The Settlements were obtained through the determined efforts of Physical Lead Counsel, who achieved significant benefits for the Physical Class through hard-fought litigation, extensive discovery reviews and analyses, and prolonged negotiations with defendants. The Settlements were reached after Physical Lead Counsel was satisfied the recovery and timing of the specific benefits for the Physical Class strongly favored resolution, when compared to the risks a class would not be certified and the uncertainty facing Plaintiffs through summary judgment, trial, and appeal.

17.    The Settlements avoid further delay and the expense of trial and appeal. Counsel believe the expenses associated with preparing this case for trial would have exceeded one million dollars, and the Physical Class would have faced a substantial fight at trial. Under these

circumstances, the Settlements are in the best interest of the Physical Class and should be approved as fair, reasonable, and adequate.

18.     <u>Moore Capital and Welsh Settlement</u>. Pursuant to the Settlement Agreement, the Moore Capital defendants have paid into the Court's registry $9,175,000 to quiet the Physical Action; $30,000 as further incentive to quiet the Physical Action's judgment against defendant Welsh, and further pay up to $150,000 to perform the Court approved notice program. Defendant Welsh agreed to a judgment in the amount of $7,000,000 for the benefit of the Physical Class—which enabled the Physical Class to successfully negotiate and secure additional cash consideration from MF Global, Inc. and its underwriters, discussed in the next paragraph.

19.     <u>MF Global Settlement</u>. Under the MF Global Settlement Agreement, the Physical Class receives cash in the amount of $577,500 from the Insurer ($70,000 of which was set aside for notice costs), and receives $2,317,857.14 in an Allowed Claim in the MFGI SIPA Proceeding. The Physical Class also obtained a cash payment of $190,000 from MFGH in exchange for assigning their claims against defendant Joseph Welsh to MFGH. In addition, the Physical Class received a limited relief from the bankruptcy stay to consummate the Settlement.

20.     This brings the total payment from the Settling Defendants to $10,122,500 in cash payments, and $2,317,857.14 in the Allowed Claim in the MF Global liquidation proceeding. Based on quotes received by Physical Class Counsel, consultations with market participants, research, and discussions with Futures Counsel, Physical Lead Counsel estimates the current cash value of the MF Global Allowed Claim to be at least 84.75% of the $2,317,857.14 Allowed Claim or $1,964,383.93. This results in about $12.1 million in total cash recovery for the Physical Class.

**2.  Procedural History**

21.    Under both Settlement Agreements, the Settling Defendants agreed to pay all costs of (1) the proposed Class Notice program up to $220,000, and (2) the costs of Administration of the Settlement and distribution of the benefits and (3) the Physical Lead Counsel's attorneys fees and expenses and a service award to each representative Plaintiffs who individually litigated this case on the Settlement Class's behalf and benefit, also to be determined by the Court.

22.    No agreement concerning attorneys' fees has been reached with the Settling Defendants. Besides requesting an award of attorneys' fees, Physical Lead Counsel seek reimbursement of expenses reasonably and necessarily incurred and advanced in prosecuting this complex consumer action for four years. These out-of-pocket expenses, detailed below, include the fees and expenses of electronic discovery experts, damages experts, platinum and palladium bullion experts, mediation and expert mediation fees, all whose services Physical Lead Counsel required to achieve a successful resolution of this case. These are all out-of-pocket costs, and all costs would be billed to a paying client. As shown below, these expenses were reasonably and necessarily incurred to obtain a successful result for the Settlement Class.

23.    Physical Lead Counsel began a comprehensive investigation into whether Moore Capital's trades in the futures market impacted the spot market for physical platinum and palladium. Considerable time was spent researching the relationship between the futures and physical market for platinum and palladium. After determining a relationship between the two markets existed and that Moore Capital's "market on close" trades in the futures market also resulted in manipulation of the spot market, counsel for Physical Plaintiffs needed to determine whether a viable claim existed for physical platinum and palladium purchasers. Counsel

excluded many theories of recovery, including relief under the Commodities Exchange Act, and focused on the federal antitrust laws.

24.     There was little history of using the federal antitrust laws in a commodities manipulation case, like this litigation. After extensive research, Physical Lead Counsel concluded antitrust violations could be pleaded. Without controlling precedent, however, Physical Plaintiffs would face serious challenges at the pleading stage, on class certification, at summary judgment, and ultimately trial.

25.     On June 14, 2010, Physical Plaintiffs filed an initial 17-page, class action complaint against defendants Moore Capital Management, LP, Moore Capital Advisors, LLC, Moore Advisors, Ltd., and Christopher Pia in the United States District Court for the Southern District of New York. Physical Plaintiffs asserted claims for violations of Section 1 of the Sherman Antitrust Act. *See F.W. DeVito Inc. Retirement Plan Trust v. Moore Capital Management, L.P. et al.*, 1:10-cv-04630-WHP.

26.     On or about July 20, 2010, the Physical Action was consolidated with the futures litigation.

27.     On August 10, 2010, the Physical Plaintiffs filed their 62-page, First Amended Consolidated Class Action Complaint.

28.     On August 26, 2010, the Moore Capital Defendants filed a 25-page Motion for Stay of Discovery. The Motion to Stay asked the Court to stay all discovery pending the filing and resolution of the Defendants' anticipated Motion to Dismiss.

29.     On September 14, 2010, Physical Lead Counsel, together with Futures Counsel, filed a comprehensive opposition to defendants' motion for a discovery stay, establishing at length why the Physical Plaintiffs had adequately alleged viable antitrust and RICO claims,

why the Physical Plaintiffs had antitrust standing, the requisite RICO continuity had been pleaded, and damages were adequately alleged for all causes of action.

30.     On September 14, 2010 the Court held a status conference and established a briefing schedule for the parties to file an amended complaint and for the defendants to file a motion to dismiss. The Court also appointed Doyle Lowther LLP as interim lead counsel for the Physical Plaintiffs in the action.

31.     Two weeks after the Court's hearing, on September 27, 2010, defendant MF Global filed an amended motion to stay, seeking to defeat Physical Plaintiffs and Futures Plaintiffs attempts to obtain any discovery in the matter and vigorously contesting any discovery being produced in this case.

32.     On September 30, 2010, the Physicals and Futures Plaintiffs filed a Consolidated Class Action Complaint.

33.     On October 15, 2010, the Court ordered the Defendants to provide Physical Plaintiffs with any subpoenas served on Defendants by the CFTC in connection with the CFTC investigation. The Court also ordered that copies of these subpoenas be provided to the Court.

34.     On November 5, 2010, defendants filed a 40-page Motion to Dismiss the Physical Plaintiffs' RICO and antitrust claims, asserting the claims were not adequately pled. Defendants also filed a Motion to Strike. This was a lengthy and substantive motion seeking dismissal of all Physical Plaintiffs' claims on many grounds, including all allegations based on the consent order must be stricken, plaintiffs failed to satisfy their pleading burden, and Physical Plaintiffs failed to allege (i) artificial prices, (ii) manipulative intent, (iii) motive, (iv) conscious misbehavior, (v) defendants caused artificial prices, (vi) ability to influence the platinum and palladium markets, (vii) defendants proximately caused any actual damages from

trading activity within the Class Period. Further, the defendants argued the antitrust claims were fatally flawed because Physical Plaintiffs failed to allege the existence of independent economic actors, an agreement to fix prices, and antitrust standing. Concerning RICO, defendants challenged this claim by asserting there was no RICO continuity, plaintiffs failed to plead RICO predicate acts, the Physical Plaintiffs lacked RICO standing, MF Global was not alleged to be a participant in any "enterprise," and there was no alleged RICO conspiracy. (ECF No. 57.)

35.     On November 8, 2010, Moore Capital, MF Global, and Christopher Pia filed their Notice of Constitutional Question, and served same on the United States Department Of Justice. In it, the Defendants stated they were "challenging the constitutionality of the Commodities Exchange Act" and the CEA's purported "failure to define the term manipulation …." Attached to the notice was a copy of Defendants' motion to dismiss the physical action and the futures action.

36.     On November 30, 2010, the Court granted in part, and denied in part, Defendants' Motion to Stay. The Court ordered the Defendants to provide Physical and Futures Plaintiffs with copies of the documents produced to the CFTC, but stayed other discovery until the Court ruled on the Defendants' Motion to Dismiss. (ECF No. 59.)

37.     Following the production order, the Parties negotiated a protective order, which required multiple rounds of drafting. On January 10, 2011, the Court entered the negotiated Confidentiality Stipulation and Protective Order.

38.     Pursuant to the Court's November 30, 2010 discovery order, the Defendants produced hundreds of thousands of pages of documents, 1,112 .wav audio files of raw telephone conversations and thousands of instant messages. The production totaled 8.64

gigabytes of material, and included information critical to the prosecution of this case, including information about Moore Capital, MF Global, Christopher Pia, Joseph Welsh, many emails and instant messages exchanged between themselves and among colleagues at each entity, as well as communications with traders, scores of trading tickets, voluminous audio files of recorded floor trading activity over an extended period, many articles and financial reports concerning the platinum and palladium markets, policies and procedures manuals at these institutions, and similar documents and materials.

39.     On December 20, 2010, the Physical and Futures Plaintiffs filed their 40-page consolidated opposition to Defendants' Motion to Dismiss the Second Amended Consolidated Complaint. The Physical Plaintiffs argued they had alleged viable antitrust claims, including an agreement between Moore Capital, MF Global, and other defendants to restrain trade by intending to cause, and actually causing, artificial prices in the platinum and palladium spot market, and further argued Physical Plaintiffs' claims were not barred by the "intra-enterprise" *Copperweld* theory, and Physical Plaintiffs had antitrust standing. Physical Plaintiffs further argued they had adequately pleaded the requisite RICO continuity, stated a RICO conspiracy claim, and had standing to pursue RICO claims. Physical Plaintiffs also contended they had properly alleged intent to manipulate, proximate damages causation. Plaintiffs also challenged Defendants' argument concerning their constitutional question. Plaintiffs also opposed defendants' Motion to Strike the complaint.

40.     On January 14, 2011, the Defendants' filed their 15-page Reply Brief in Support of Defendants' Motion to Dismiss the Second Amended Consolidated Complaint.

41.     On February 4, 2011 the Court held a hearing on the Defendants' Motion to Dismiss, attended and argued by Physical Plaintiffs Class Counsel in defense of their antitrust

and RICO claims against the Defendants. The Motion To Dismiss was vigorously contested, with multiple defense counsel present on behalf of each of the defendants.

42.    On July 25, 2011, the CFTC issued an order filing and simultaneously settling charges that Christopher Pia attempted to manipulate the prices of platinum and palladium futures contracts. The settlement included a $1,000,000 fine and a permanent ban from all trading in any CFTC regulated product during the closing period and a permanent ban from trading all CFTC regulated products in platinum and palladium. The Futures and Physical Plaintiffs had identified Pia as a participant in the alleged scheme as early as September of 2010.

43.    On September 13, 2011, the Court granted in part and denied in part, without prejudice, the Defendants' Motion to Strike and Dismiss the Second Amended Consolidated Class Action Complaint. However, the Court granted the Physical Plaintiffs leave to re-plead their allegations.

44.    On October 11, 2011 the Court held a status conference attended by Physical Lead Counsel. The Court's scheduling order was entered October 12, 2011, setting a deadline for Plaintiffs to file their amended complaint, and the Defendants deadline for response. The Court also set another status conference for December 16, 2011.

45.    On November 8, 2011, defendant MFGI filed a suggestion of bankruptcy. ECF No. 75. The Physical Action was stayed as against MFGI pursuant to the MFGI Liquidation Order entered on October 31, 2011, and Section 362 of the Bankruptcy Code. The automatic stay currently remains in effect. On November 23, 2011, the Bankruptcy Court entered the Order Approving Trustee's Expedited Application to Establish Parallel Customer Claims Processes and Related Relief (ECF No. 423). All general creditor claims were required to have

been received by June 2, 2012.

46.      On November 31, 2011, the Physical Plaintiffs filed their Third Amended Consolidated Class Action Complaint. This 161-page complaint alleged antitrust and RICO claims against Moore Capital Management, LP, Moore Capital Management, LLC, Moore Capital Advisors, LLC, Moore Advisors, Ltd., Moore Macro Fund, LP, Moore Global Fixed Income Master Fund, LP, Christopher Pia and MF Global, Inc. The complaint also alleged claims against two new defendants, Eugene Burger and Joseph Welsh, a former MF Global vice-president.

47.      On December 22, 2011 the Court entered Case Management Order No. 1, setting a deadline for Defendants' Motion to Dismiss, Plaintiffs' Response and Defendants' Reply Brief. The Case Management Order also set a fact discovery deadline of December 31, 2012 and a final pretrial conference of June 4, 2013.

48.      On January 20, 2012, the defendants filed a consolidated 40-page Motion to Dismiss, seeking to dismiss all of the Physical Plaintiffs' claims against all defendants.

49.      On February 28, 2012, the Physical Plaintiffs, together with Futures Plaintiffs, filed their Opposition to Defendants' Motion to Dismiss. Because there was little precedent where federal antitrust or RICO laws were used to prosecute a physical commodities class action, the Physical Plaintiffs spent significant time and resources conducting legal research to oppose the formidable Motion to Dismiss and drafting the opposition.

50.      On March 14, 2012, the CFTC filed an enforcement action against defendant Joseph Welsh for his role in the attempted manipulation of the platinum and palladium market. Only after the Physical Plaintiffs filed a detailed amended complaint outlining Defendant Welsh's important role in carrying out the "market on close" trades did the CFTC bring this

enforcement action. The intricate detail of the roles of MF Global, Joseph Welsh, Christopher Pia, and the various floor traders, richly detailed in the Physical Plaintiffs' 161-page Third Amended Complaint, came about only because of the effort Physical Lead Counsel (and Futures Counsel) expended in examining the evidence and discovery in this matter, analyzing and transcribing the trading and broker telephone conversations and trading tickets, as well as reading and analyzing many thousands of emails and cryptic instant messages sent during the trading day for a significant period of time.

51.     On March 14, 2012, pursuant to a subpoena issued by Physical and Futures Plaintiffs, the CFTC produced twenty-three deposition transcripts concerning the Moore Defendants and Christopher Pia.

52.     On March 22, 2012, the Court entered Case Management Order No. 2, which established certain pre-trial motion and discovery deadlines including filing dispositive motions by September 7, 2012, completing fact discovery by March 11, 2013, and concluding expert discovery by July 9, 2013.

53.     On May 17, 2012, the Court held a telephonic status conference with the Parties during which the Parties consented to hold oral arguments on Defendants' Motion to Dismiss on July 12, 2012.

54.     On June 1, 2012, the Physical Plaintiffs, on behalf of the Physical Class, timely filed a general creditor bankruptcy proof of claim in the MFGI SIPA Proceeding in the Bankruptcy Court, Proof of Claim No. 500000344. The Proof of Claim corresponds to and incorporates the claims alleged in the Physical Action. On October 11, 2012, the Bankruptcy Court entered an Order pursuant to Section 105(a) of the Bankruptcy Code and Rules 2007 and 9019(b) For Approval of General Creditor (1) Claim Objection Procedures and (2) Settlement

Procedures (SIPA Proceeding ECF No. 3765).

55.     On July 9, 2012, pursuant to a request by the Parties, the Court held a telephonic conference with the parties during which the Court was notified Plaintiffs, Moore Capital, and Joseph Welsh wished to discuss settlement. The Parties requested the Court either stay the hearing on the fully briefed Motion to Dismiss or, alternatively, to withdraw the Motion to allow time for the Parties to explore the possibility of settlement. On July 11, 2012, the Court entered an order withdrawing the Defendants' Motion to Dismiss, canceling the hearing and ordering the Parties to submit a Joint Status Report to the Court by September 19, 2012 and scheduling a status conference for October 5, 2012.

56.     On July 27, 2012, the Parties met for a full day mediation session in New York with the Hon. Daniel Weinstein (Ret.). Prior to the mediation the Parties were tasked with developing a volume and damages model. To assist in developing a damages model, Physical Plaintiffs retained the services of the Berkeley Research Group (BRG). With substantial assistance from Class Counsel, BRG developed a damages and volume model. In advance of the mediation, Physical Lead Counsel had numerous conversations with counsel for the Moore Defendants to assist in narrowing the scope of certain issues in advance of mediation. Physical Lead Counsel also had numerous conversations with Michelle Yoshida, Esq. of JAMS and with Judge Weinstein's independent economist (Chad Coffman). Physical Lead Counsel also conferred with Futures Class Counsel extensively in advance of the mediation so that complementary strategies could be formulated. In addition to Physical and Futures Lead Counsel, counsel for the Moore Defendants, Christopher Pia, Joseph Welsh attended as well as counsel for various insurers who issued policies that may have provided insurance coverage for Joseph Welsh and MF Global, Inc. Chad Coffman, the independent economist, attended and

provided his critiques of the damages models by the Physical Plaintiffs, the Futures Plaintiffs and Defendants as well as offered his own assessment of the damages for the Physical Class and Futures Class. The Parties were unable to come to a settlement agreement but did make some progress in understanding the relative strengths and weaknesses of each side.

57.     On August 27, 2012, the Parties met for a second full-day mediation session with Judge Weinstein. This session took place in Napa, California. Again, in advance of the session, Physical Lead Counsel had numerous conversations with Michelle Yoshida of JAMS as well as Futures Lead Counsel. During this second full-day session, no settlement was reached, however, the Parties were able to make additional progress in bridging certain issues. Physical Plaintiffs continued reviewing the evidence and developing physical additional legal claims.

58.     On January 9, 2013, the Physical Plaintiffs filed their Fourth Amended Complaint. This 190-page complaint included new factual allegations and additional common law claims of fraud, aiding and abetting fraud and conspiracy to commit fraud. The Court allowed the Physical Plaintiffs to file the Fourth Amended Complaint but stayed the time for defendants to respond to allow the parties to further discuss settlement.

59.     On February 4, 2013, the Parties notified the Court that an agreement in principle on the economic and certain non-economic elements of settlement had been reached. The Parties requested a brief extension of the briefing schedule on the motion to dismiss to allow the Parties to negotiate the few remaining non-economic terms.

60.     On June 11, 2013, the Court was notified the Futures Plaintiffs and the Moore Defendants and Defendant Welsh had come to a settlement agreement and requested additional time to reduce the settlement to writing. Physical Lead Counsel simultaneously notified the

Court they were close to an agreement, and expected to finalize their agreement in a reasonable period of time.

61.     On July 23, 2013, the Physical Plaintiffs filed their Fifth Amended Consolidated Class Action Complaint which added a negligence claim against defendant Welsh.

62.     On or about August 13, 2013, the Parties notified the Court a proposed settlement agreement in principle had been reached. The Court then scheduled a preliminary approval pre-motion conference on August 21, 2013 for the Parties to discuss the proposed motion for preliminary approval of class settlement.

63.     On August 21, 2013, the Court held a status conference attended by Physical Lead Counsel. The Court ordered preliminary approval briefs be filed on or before September 18, 2013, and set a hearing on preliminary approval for October 4, 2013.

64.     On September 18, 2013, the Physical Plaintiffs filed their Motion for Preliminary Approval of Class Action Settlement; a Memorandum of Law in Support of Motion for Preliminary Approval of Class Action Settlement, and the Declaration of John Lowther in Support of Motion for Preliminary Approval of Class Action Settlement.

65.      On October 4, 2013, the Court held a hearing on Physical Plaintiffs' Motion for Preliminary Approval of Class Action Settlement. During the hearing the Court asked the Physical Plaintiffs to provide certain additional information regarding the proposed settlement and requested certain minor modifications to the agreement.

66.     On October 15, 2013, Physical Lead Counsel submitted a letter to the Court containing responses to certain questions raised by the Court at the October 4, 2013 preliminary approval hearing.

67.     On October 25, 2013, the Physical Plaintiffs filed their Fifth Amended

Consolidated Complaint adding a negligence claim against Defendant Joseph Welsh.

68.     Also in October 2013, the Physical Plaintiffs and MF Global agreed to resume settlement talks. At this time the MFGI SIPA proceeding was sufficiently advanced such that Physical Plaintiffs could reasonably estimate the chances of recovery in bankruptcy proceeding. In November 2013, at the request of the SIPA Trustee, the Physical Plaintiffs sent a settlement demand to MF Global. Over the course of the following months, Physical Plaintiffs and the SIPA Trustee engaged in multiple discussions and correspondence regarding settlement including detailed discussions of damages and volume estimates by Physical Plaintiffs.

69.     On March 21, 2014, the Physical Plaintiffs filed a Motion for Preliminary Approval of Amended Class Action Settlement, a Memorandum of Law in Support of Motion for Preliminary Approval of Amended Class Action Settlement, and the Declaration of John Lowther in Support of Motion for Preliminary Approval of Amended Class Action Settlement.

70.     On April 7, 2014, certain insurers for Defendant MF Global, Inc. and Defendant Welsh filed a Motion to Intervene and Limited Objection to the Proposed Settlements in the Futures and Physical Actions. Also on April 7, 2014, the Bankruptcy Trustee for Defendant MF Global, Inc. filed a Limited Objection to Plaintiffs' Motion for Preliminary Approval of the Proposed Settlement with Joseph Welsh.

71.     Also on or about April 2014, the Plaintiffs and MF Global agreed to mediation in an attempt to finalize a settlement. The parties agreed to use Judge Weinstein, who was not only familiar with the instant matter but had mediated other matters in connection with the MFGI SIPA proceeding. The parties scheduled a two-day mediation session with Judge Weinstein for June 4 and 5, 2014 in New York. In advance of mediation, the parties and Relevant Insurers engaged in multiple conference calls with Michelle Yoshida, Esq. of JAMS

and Chad Coffman, an independent economist retained by Judge Weinstein. These calls served to allow the parties to narrow the scope of certain issues in preparation for the mediation session. Before the mediation session, the Physical Plaintiffs prepared a lengthy, detailed mediation statement outlining the Physical Plaintiffs' position on the claims, the estimated volume of physical platinum and palladium at issue and the estimated total exposure by MF Global.

72.     On May 23, 2014, pursuant to a stipulation between the Parties the Court entered an order granting Plaintiffs leave to amend to file a Sixth Consolidated Class Action Complaint. The purpose of this amendment was to substitute named Plaintiffs in the Futures Action.

73.     On May 24, 2014, the Court held a hearing on preliminary approval of the proposed Futures and Physical Action settlements, attended by Physical Lead Counsel. During this time period, Physical Lead Counsel also was preparing for formal mediation sessions with MF Global, to be held on June 4 and June 5, 2014, as discussed in Section 5, *infra*.

74.     On June 4 and June 5, 2014, Physical Lead Counsel attended two formal mediation sessions in New York concerning settlement of the MF Global matter, as well as obtaining additional consideration on the Welsh final judgment. No settlement was reached and the Parties were far apart concerning many issues attendant to the litigation.

75.     On July 15, 2014, the Court entered an order denying the Motion to Intervene and Limited Objections by the Lead Plaintiffs of the MF Global, Inc. Commodity Customer Class Action, granted preliminary approval of the proposed Physical Class Settlement, and ordered a final fairness hearing for November 7, 2014. The order preliminarily approving the Physical Class Settlement appointed Doyle Lowther LLP as Physical Lead Counsel, adopted the proposed plan of notice set forth in Physical Plaintiffs' settlement papers, and appointed

Plaintiffs FW DeVito, Inc. Retirement Plan Trust, Frederick & Mary DeVito, David W. DeVito and Russell W. Andrews as Physical Class representatives.

76.     On July 25, 2014, the Moore Capital defendants advised the Court a deposit of $57,305,000 had been effectuated into the Court's CRIS account, of which $9,355,000 is designated for the Physical Class Settlement.

77.     On August 15, 2014 the Sixth Amended Complaint was filed with the Court. During this time, negotiations concerning the MF Global Settlement continued, as did legal and expert research concerning the claims, defenses, and the insurer positions concerning Physical Plaintiffs' claims and their likely treatment in bankruptcy court. Physical Counsel coordinated its efforts with the mediator and with Futures' Counsel.

78.     On October 1, 2014, Physical Lead Counsel filed a letter motion seeking an extension of time and a revised scheduling order to continue the November 7, 2014 date for final approval of the Moore Capital and Joseph Welsh Settlement, and requesting the Court continue the dates by which Physical Class members could participate in, object to, or opt out of the Physical Class, Moore Capital and Joseph Welsh Settlement. Although this motion was initially opposed by the defense, after further discussion and negotiation by Physical Lead Counsel, a compromise was reached, and a clarification was filed with the Court on October 2, 2014.

79.     On October 7, 2014, the Court granted Physical Counsel's request for a revised scheduling order, and continued dates by which Physical Class members could participate in, object to, or opt out of the Moore Capital and Joseph Welsh Settlement.

80.     Extensive discussions and negotiations thereafter continued concerning the MF Global Settlement, with significant assistance from the Hon. Judge Weinstein (Ret.). The

negotiations were hotly contested and protracted, and significant distance remained between the parties.

81.     After multiple rounds of failed negotiations, the outlines of a proposed settlement began to form, which included an allowed claim in the MF Global liquidation proceeding, as well as cash payments from MF Global's underwriters for both the MF Global causes of action as well as the Welsh judgment achieved in the Moore settlement.

82.     Thereafter, Physical Lead Counsel and representatives for MF Global in the liquidation proceeding participated in multiple rounds of telephonic meetings, discussions, engaged in multiple rounds of drafting, and begin to finalize the Settlement.

83.     During the months following the unsuccessful mediation efforts in June 2014, the parties continued to negotiate a proposed settlement agreement. Multiple rounds of talks and meetings were undertaken, including with the assistance of the mediator. A proposed settlement agreement was not reached and agreed to until October 21, 2014.

84.     On October 29, 2014, Physical Plaintiffs and its Counsel submitted its motion, memorandum of law, and declaration in support for preliminary approval of the MF Global Settlement and all attendant exhibits thereto, including the program of notice, deposit of settlement monies into the Court's CRIS account, and the final judgment and order.

85.     On November 12, 2014, Physical Lead Counsel participated in the hearing concerning preliminary approval of the MF Global Settlement. During this hearing, the Court requested several changes to the settlement documents and program of notice. These changes included ensuring the MF Global Settlement was separate and in addition to the Moore Capital Settlement, and Physical Class members need only submit a single proof of claim. The Final Order and Judgment was revised to eliminate any reference to "preliminary approval," and the

settlement materials and settlement website simplified the discussion of the process for objecting to the proposed Settlement.

86.     Two days later, Physical Lead Counsel, after exchanging several drafts of the exhibits with both defense counsel and counsel for the Futures Plaintiffs, submitted via personal delivery the revised MF Global Settlement materials to the Court for approval.

87.     On December 1, 2014, the Court was advised of $6.1 million in CRIS account deposits arising from the MF Global Settlement.

**3.  Document Review, Expert Analyses, and Third Party Discovery**

88.     Physical Lead Counsel expended significant time and resources reviewing and understanding the evidence, researching case law, working with experts to better understand the commodities markets and the interplay between bullion and futures pricing, generating robust damages models for the platinum and palladium spot market, understanding volumes and OTC metals trading, and responding to Defendants myriad attacks concerning Physical Plaintiffs' damages models, artificiality allegations, strength of claims, attacks at class certification, and pursuit of claims in bankruptcy court. This included extensive document review, expert consultation, and third party discovery.

89.     In late 2010, upon Physical Lead Counsel's request, the Court ordered the Defendants to produce to Physical and Futures Class Counsel copies of all documents produced to the CFTC. On October 15, 2012 Physical Lead Counsel received copies of these documents from the Moore Defendants, Christopher Pia and MF Global. Physical Plaintiffs continued to receive supplemental document production from the Moore Defendants, Christopher Pia and MF Global into January of 2011. The total production included in excess of 250,000 pages of documents, 1,112 untranscribed audio recordings, which were produced as .wav files

(Waveform Audio Format), instant messages and thousands of emails and cryptic instant message files sent during the day from Bloomberg trading terminals and other devices, often with unidentified user names, which needed to be deciphered by Physical Lead Counsel using multiple means, including contextual searches and even research into the individuals Physical Lead Counsel surmised had sent some of the messages.

90.     Physical Lead Counsel conducted a preliminary review of the documents, and then began to review them in earnest. Because of the volume of material and the schedule established in this case, Physical Lead Counsel coordinated with a vendor, International Litigation Services, to assist with uploading the electronic data for targeted review. In addition to conducting document-by-document review, Physical Lead Counsel coordinated with ILS to develop complex search algorithms, which allowed Physical Lead Counsel to use modern identification techniques to search the production. Developing these algorithms required intricate knowledge of the subject matter, as well as a proper sampling of exemplar materials, so that appropriate searches could be developed. This required extensive input from Physical Lead Counsel.

91.     In addition to reviewing the large production of documents, Physical Lead Counsel also had to listen to, review, and transcribe the many audio files of actual platinum and palladium floor trading transactions. Transcribing these audio files took many hours, but this work was critical to understanding the scheme from a macro and micro perspective, understanding who participated in the scheme—and perhaps most critically, to use the conversations to establish manipulative intent and an improper purpose behind the end-of-market trading, which was the keystone of the defense. Many times Physical Plaintiffs had to listen to the conversations repeatedly to determine conversation participants, as well as dates

and other information. Frequently, participants never used their names, presumably because of the familiarity between the call participants and the brevity of certain calls, or they used "handles."

92.     This work and the resulting transcripts were the foundation of Physical Plaintiff's case, formed the primary evidence of proving antitrust conspiracy, RICO conspiracy and continuity, and fraud, and was absolutely essential to defeating Defendants' significant attack concerning manipulative intent and artificiality. It was the key evidence to show Defendants purposefully attempted to manipulate the closing price of NYMEX platinum and palladium contracts, with a corresponding artificiality experienced in the spot market.

93.     A similar process was used in reviewing and piecing together the timeline via text message, for it was not always obvious who was communicating via these intra-day instant messages due to the use of "handles" or screen names for texts and even in some emails. In some cases, Physical Lead Counsel was required to link up audio files with same-day text messages and emails to determine the timing and import of various messages, requests, and demands. This work could not be outsourced or automated—it required hands-on analysis by those who understood the underlying facts, and further understood the import of the materials and how they could be effectively used to defend highly complex legal claims and challenge Defendants' formidable defenses.

94.     This extensive analysis formed the basis of the 161-page Third Amended Complaint. Additionally, this review identified Joseph Welsh's role in the manipulation, which heretofore was unknown and had never been publicly alleged.

95.     Physical Lead Plaintiffs, together with Futures Plaintiffs, identified deficiencies and other issues with the Defendants' productions, necessitating deficiency letters and meet and

confer communications. For example, on September 26, 2011, a deficiency letter was sent on behalf of the Futures and Physical Plaintiffs notifying MF Global of certain issues with the MF Global production, such as the lack of any corresponding dates for the recorded audio files and no indication of the identities of the participants in these calls. The Plaintiffs requested MF Global provide a list of the dates of these recorded conversations as well as to identify the participants in these conversations.

96.     Physical Lead Counsel also received substantive document production from Defendants MF Global, Inc. and Christopher Pia. Then, on January 6, 2012, Physical and Futures Plaintiffs served Requests for Production of Documents on Joseph Welsh, Christopher Pia and the Moore Defendants, comprised of 125 separate document requests. On February 8, 2012, Physical Plaintiffs received separate responses and objections to these requests.

97.     On January 20, 2012, the Defendants served Requests for Production upon the named Physical Plaintiffs. The Requests included 76 separate document requests. On March 6, 2012, Physical Plaintiffs served Defendants with their forty-five page responses and objections. Responding to these lengthy document requests, including identifying and other responsive documents, was time consuming and required numerous discussions with the named Plaintiffs. A significant number of the discovery requests were "contention requests" requiring Physical Lead Counsel to expend resources to adequately respond to the requests.

98.     Physical Lead Counsel also engaged in extensive and necessary third party discovery. This included serving fifteen third party subpoenas to entities who were involved in the sale or purchase of physical platinum and palladium during the Class Period: Monex Deposit Co.; Kitco Metals, Inc.; Dillon Gage, Inc.; Standard Bank; UBS Investment Bank; JP Morgan Chase Bank; J. Aron & Co.; Goldman Sachs; JP Morgan Asset Management; J. Aron

& Co.; APMEX; HSBC USA Bank; Toledo Coin Exchange; Goldline International; and Northwest Territorial Mint. The purpose of these subpoenas was to (i) to gather additional evidence and bolster Physical Counsel's allegation the Defendants could indeed manipulate the spot market for physical platinum and palladium, and (ii) to assess the volume of physical platinum and palladium sold during the Class Period. Unlike the purchase of platinum and palladium futures, which are tracked by NYMEX, physical platinum and palladium bullion purchases complying with NYMEX good-delivery requirements are over-the-counter trades without any centralized tracking. There is no comprehensive database of physical platinum and palladium transactions.

99.     Many entities interposed objections to the subpoenas, requiring Physical Lead Counsel to expend effort and resources in resolving the objections efficiently and while gathering responsive information. Physical Lead Counsel received important trading data from several of the largest retailers of physical platinum and palladium. This data was essential in assessing the volume of physical platinum and palladium purchased during the Class Period.

100.    The Futures and Physical Plaintiffs also issued a Rule 45 subpoena to NYMEX requesting additional documentation not already produced. The Moore Defendants objected to certain of the document requests because they might possibly include work-product or attorney-client privilege. The Moore Defendants' objections necessitated Physical Lead Counsel to engage in meet and confers with counsel for the Moore Defendants on these issues.

101.    Certain of the Defendants also engaged in extensive third-party discovery, including the issuance of a number of Rule 45 subpoenas by the Moore Defendants. In January and February of 2012, the Moore Defendants served subpoenas on Johnson Matthey, Inc., NYMEX, Kitco, ICAP PLC, AG Edwards & Son, Inc. and Sutherland Commodities. Many of

these entities served responses and objections, and these discovery disputes required Physical Lead Counsel to expend time concerning discovery disputes, as well as reviewing produced documents.

102.    Physical Plaintiffs received 29 transcripts of depositions from the CFTC. Physical Lead Counsel performed a close review and analysis of the transcripts. This information filled in some holes and was used in drafting the 190-page Fourth Amended Complaint.

103.    In addition to the traditional methods of discovery, Physical Plaintiffs engaged in substantial methods of informal discovery. This primarily concerned Physical Plaintiffs' attempts to derive the volume of physical platinum and palladium purchases during the Class Period, which Defendants challenged at every step in the litigation. This included the review of voluminous expert reports and industry publications concerning the platinum and palladium market. Preeminent among these were the CPM Group's Platinum Group Metals Yearbook, its commodities and precious metals reports and studies, and various Johnson Matthey publications. These publications provided Physical Lead Counsel with vital knowledge and facts about the platinum and palladium market, and in particular the investment market for the purchase of physical platinum and palladium which complied with NYMEX good deliver requirements. Physical Lead Counsel spent significant time and resources reviewing these materials. They assisted in the formulation of the amended complaints, target subpoenas to strategic third-parties as well as calculate the estimated volume of physical platinum and palladium sold during the Class Period.

104.    In addition, Physical Lead Counsel retained experts in these matters, including the head of the CPM group, to assist Physical Lead Counsel and the Physical Class, as well as

experts concerning damages modeling, artificiality, and dissipation, along with constructing working models to calculate the artificiality imposed on the platinum and palladium markets by Defendants allegedly manipulative trades. These efforts were crucial for responding to Defendants' significant and varied attacks on all aspects of Physical Plaintiffs' case, especially damages and artificiality in the spot market during settlement negotiations, discussed *infra*. And these efforts also were necessary to assist Physical Counsel in responding to pointed questions by the mediator's independent economics expert, who not only reviewed all of Physical Counsel's work, Future Counsel's work, added as Defendants' significant expert analyses, in conducting his own independent analyses in both the Moore Capital Settlement and the MF Global Settlement, but asks to assist overall settlement negotiations.

### 4. Protracted Settlement Negotiations

105. On or about April 2012, the Physical Plaintiffs and the Moore Capital defendants and defendant Welsh decided to explore the possibility of settlement. The Parties agreed to a mediation session with the Honorable Daniel Weinstein (Ret.). However, to advance settlement discussions the parties agreed to exchange damages models and volume estimates in advance of the mediation.

106. Physical Plaintiffs faced unique and considerable obstacles in establishing damages on a classwide basis. Physical Plaintiffs were hindered by the OTC nature of physical platinum and palladium spot purchases in the United States. Unlike futures transactions, which take place on the NYMEX exchange and are tracked by NYMEX, physical purchases are not tracked by any single database. Physical Lead Counsel expended significant effort accumulating available and reliable purchase data from some of the larger dealers of platinum and palladium bullion in the United States, including Monex Deposit Co., APMEX, HSBC

USA Bank, Kitco Metals, Inc., Dillon Gage, Inc., Toledo Coin Exchange, Goldline International, Northwest Territorial Mint, and the United States Mint. Class Counsel also consulted with leading experts concerning the physical platinum and palladium bullion market.

107.    Physical Lead Counsel expended effort with multiple calculations, with baseline backups using different metals commodities, to generate a reasonable estimate of the volume of physical platinum and palladium traded during the Class Period for the damages estimate. Physical Lead Counsel used the accumulated data received from the various third party subpoenas, data from Johnson Matthey, along with information on the platinum and palladium market from Jeffrey Christian and the CPM Group to formulate these estimates, relay them during settlement discussions, and use them to advise Judge Weinstein's independent economics expert.

108.    At Physical Lead Counsel's request, the CPM Group reviewed confidential information from several major precious metals dealers and financial institutions in the United States concerning their monthly transactions in physical platinum bullion and palladium bullion during the Class Period. This information supplemented the body of information CPM Group has collected for many years on the platinum and palladium markets.

109.    Applying methodologies and procedures derived from standard commodities research procedures, CPM Group estimated net investor purchases in the United States of physical platinum bullion during the period of October 2007 through June 2008 was 201,056 ounces. CPM Group also estimated net investor purchases in the United States of physical palladium bullion for this same time period was 933,718 ounces.

110.    In addition, Physical Plaintiffs retained Berkeley Research Group (BRG) to form a damages model for the Physical Class. Physical Lead Counsel spent many hours with BRG to

develop viable damages models, using other metals commodities as baselines to demonstrably prove the artificial inflation in the market for platinum and palladium investment bullion. In addition, Physical Lead Counsel's damages experts continued to revise and refine their models and methodologies concerning artificiality and the dissipation of that artificiality in the market.

111.    In advance of the mediation session, Physical Lead Counsel had numerous communications with counsel for the Moore Capital defendants to advance issues that would be discussed at mediation. In addition to these communications, Physical Lead Counsel participated in multiple telephonic conferences with Michelle Yoshida, Esq. of JAMS as well as with Chad Coffman, the independent economist retained by Judge Weinstein to assist with economic expert analyses.

112.    The settlement negotiations were lengthy, protracted and complicated. Even after two formal mediation sessions, and many meetings and settlement negotiations thereafter, settlement talks failed.

113.    Even after the core terms of settlement were reached, the parties exchanged dozens of drafts of the Settlement Stipulation before it was finalized and agreed upon. The process of finalizing the Settlement Stipulation itself was very contentious. Likewise, the Settling Parties spent a great deal of time finalizing the various settlement forms (Long and Short Form Notice, Proof of Claim form and Request for Exclusion form). The Settling Parties exchanged more than a dozen iterations of these forms until the final forms were agreed upon.

114.    Physical Lead Counsel were also required to assess the solvency of Defendant Welsh to determine whether he had the capability of paying any sizable settlement or judgment. After concluding defendant Welsh lacked the financial ability to satisfy any significant judgment, Physical Lead Counsel began negotiating an assignment and judgment against

Welsh, which could be satisfied solely from his rights in respect to certain insurers. This required Physical Lead Counsel to become familiar with the insurance policies at issue. There were a number of insurance policies that included Welsh as a potential insured. These included a 2009 Errors & Omissions Policy, 2010 Errors & Omissions Policy, 2011 Errors & Omissions Policy and a 2011 Directors & Officers Policy. These policies may have provided coverage for defendant Welsh for some of the acts alleged by Physical Plaintiffs. The insurers of these policies have denied insurance coverage to Defendant Welsh for multiple reasons. To adequately assess any offer of assignment and judgment by Welsh, it was necessary for Physical Lead Counsel to become familiar with the policies as well as understand the reasons Welsh was denied coverage and the viability of any additional defenses asserted by the insurers. Physical Lead Counsel reviewed the relevant policies in detail, had discussions with counsel for Welsh and the relevant insurers regarding these issues, and regularly met and conferred with Futures Lead Counsel to discuss these issues and formulate a strategy to address them.

115.    On June 4 and 5, 2014, Physical Plaintiffs participated in two-full day mediation sessions with the MF Global, Inc. bankruptcy trustee and certain insurers with policies providing coverage for MF Global, Inc. and perhaps Defendant Welsh as well. From the two-day mediation session a settlement agreement was reached in principle with MF Global Inc. as well as an agreement to satisfy the Welsh settlement judgment. The insurers agreed to pay a total of $1,000,000 cash to satisfy the Welsh settlement judgments for both the Futures and Physical Classes. The agreement of $1,000,000 to satisfy both Welsh Settlement judgments was complex. The insurers vehemently denied coverage existed for Defendant Welsh and the insurers maintained viable defenses to any claim against Welsh. In advance of this mediation, Physical Lead Counsel spent significant time evaluating the coverage issues and the defenses

asserted by the insurers.

**5.   The Physical Class Faces Significant Litigation Risks, Including the risk of No Recovery, and thus the Settlement Is an Excellent Result for the Physical Class**

116.    Physical Plaintiffs face significant hurdles if litigation of this matter were to continue. Defendants have consistently and vigorously denied Physical Plaintiffs' claims. This denial includes, among other things, arguing that their MOC trades during the last two-minutes of trading were at market prices and were proper, the MOC trades were not intended to artificially raise the settlement prices of platinum and palladium futures, the MOC trades did not in fact artificially raise the settlement prices of platinum and palladium futures, and the MOC trades had no effect whatsoever on the prices of physical platinum and palladium.

117.    The District Court previously dismissed the Physical Plaintiffs' claims without prejudice, additional motions to dismiss were filed and contemplated, and the Court (thus far) has never rendered a final ruling on whether the Physical Plaintiffs have alleged valid claims. Antitrust and RICO class claims are frequently dismissed and are notoriously difficult to plead and prove. Physical Lead Counsel devoted substantial time to researching and navigating the intricacies of civil RICO and antitrust claims. The sheer difficulty of pleading and proving antitrust and RICO claims was compounded by the lack of precedent of these claims being used in a commodities manipulation case. To the best of Physical Lead Counsel's knowledge, there is no example of the federal antitrust or RICO laws being used in the prosecution of a commodities bullion manipulation case on a classwide basis. Physical Plaintiffs also asserted certain common law claims such as fraud (price mirage) and conspiracy to commit fraud. These common law claims were added in the Fourth Amended Complaint; therefore the Court has never ruled on the viability of these claims. Additionally, the price mirage fraud theory asserted and there is a paucity of district court decisions addressing these claims.

118.     In addition to complex and difficult legal claims, the Physical Class's claims involve several complex factual issues. The settlement price for platinum and palladium is determined by a number of complex factors. This includes the core issues of supply and demand. During the period which Physical Plaintiffs allege the manipulative trades occurred, there were several significant supply and demand issues that likely impacted the settlement price. There were significant supply disruptions in South Africa, which is the world's largest supplier of platinum. The period in question experienced significant volatility in the auto industry, which impacted the demand for platinum and palladium. Physical Plaintiffs may be challenged to isolate the impact the manipulative trades had on the platinum and palladium closing price instead of the impact by supply and demand issues.

119.     The Physical Plaintiffs also faced potential hurdles not present in the Futures Class's litigation. The Futures Plaintiffs' claims for violations of the Commodities Exchange Act, 7 U.S.C. §§ 1 *et seq.*, (CEA), were unavailable to the Physical Plaintiffs. Damages under the CEA are available to commodities futures purchases, but not to physical commodity purchases. Physical Plaintiffs faced a significantly higher risk of a successful dispositive motion against their antitrust, RICO, and common law claims.

120.     Because the alleged manipulation occurred in the futures market, the Physical Plaintiffs would be required to show not only that these trades artificially inflated the futures closing prices, but that any effect of these trades carried through into the physical market and adversely impacted the physical price. Showing direct manipulation can be challenging in itself but showing the secondary impact on the physical price would be even more difficult. Not only would Physical Plaintiffs have to show the manipulation in the futures market impacted the physical settlement price, but they may also have to determine exactly how much impact the

manipulation had. For this reason, the fact the Physical Action Settlement Agreement assumes there is a 100% bleed-through of any manipulation to the physical market is an outstanding result.

121.    The determination of damages, like the determination of liability, is a complicated and uncertain process, typically involving conflicting expert opinions. The reaction to such testimony is highly unpredictable. Expert testimony about damages could rest on many subjective assumptions, which would be rejected as speculative or unreliable. Conceivably, there could be a finding that there were no damages or that damages were only a fraction of the amount that Physical Plaintiffs alleged. For example, the Settling Defendants presented expert analysis tending to show that any alleged damages for the Physical Class were non-existent or at most a mere fraction of the Settlement value achieved here.

122.    Even if they survived a Motion to Dismiss, the Physical Plaintiffs would face further risks as the litigation progressed. The Physical Class faced the very real prospect of defendants' dispositive motions being granted, class certification being denied, and successful *Daubert* challenges to every aspect of the Physical Class's theories of artificial inflation, trading activity, alleged impact on the futures market and resultant impact in the physical/spot market, and damages. Unlike the futures transactions, where all transactions are carried out through NYMEX, the platinum and palladium physical market is an over-the-counter, or OTC market, where transactions take place at dozens, if not hundreds, of locations throughout the United States. Additionally, showing the alleged manipulative trades in the futures market also impacted the physical settlement price posed a significant hurdle.

123.    Based on Physical Lead Counsel's experience in complex class actions, the strength and weaknesses of Physical Plaintiffs' claims, including the distinct possibility of a

successful dispositive motion by the Settling Defendants, the extensive risk and expense of continued litigation, the analyses by various experts, and the likelihood of success at trial and appeal, counsel for the Physical Plaintiffs believe the Settlement is fair, reasonable, adequate and in the best interests of the Physical Plaintiffs and the Physical Class.

124.    Absent a settlement, Physical Class members face a significant risk of either no or *de minimus* recovery, and, even in the best case, long delays in receiving any recovery. This is especially true here, because the Physical Class's Sherman Act, RICO, and common law fraud claims are novel, complex, have not been vetted by the Second Circuit or the New York Court of Appeals. Claiming Physical Class members will receive prompt payment and without such risk.

**6.  Total Lodestar Calculations For Physical Lead Counsel**

125.    Physical Lead Counsel is experienced in the areas of complex class action, consumer protection, and antitrust law, and has billed their time and hours in accordance with court approved practices. *See* Exhibit J (firm resume).

126.    Doyle Lowther LLP acted as Physical Lead Counsel in this Litigation, and the tasks undertaken by the firm are summarized in the preceding paragraphs.

127.    The schedule below is a summary indicating the amount of time spent by the attorneys and professional support staff of our firm who were involved in this Litigation, and the lodestar calculation based on our firm's current billing rates. This schedule is based on a review of contemporaneous time records, pleadings, briefs, drafts and records of communications regularly prepared and maintained by our firm, which are available at the request of the Court.

128.    The time billed in this case was actually expended on litigating this matter and

the total billed hours for our firm and the lodestar value of the time is as follows.

**Doyle Lowther Time Report, Inception Through January 13, 2015**

| Name | Total Hours | Hourly Rate | Lodestar |
|------|-------------|-------------|----------|
| **Partners** | | | |
| William J. Doyle | 219.30 | $675.00 | $148,027.50 |
| John A. Lowther | 1,996.95 | $625.00 | $1,248,093.75 |
| James R. Hail | 1,451.0 | $625.00 | $906,875.00 |
| **Associates** | | | |
| Chris W. Cantrell | 844.90 | $395.00 | $333,735.50 |
| Katherine DiDonato | 32.25 | $300.00 | $9,675.00 |
| **Legal Professionals** | | | |
| Paralegal I | 72.25 | $185.00 | $13,366.25 |
| Paralegal II | 48.0 | $260.00 | $12,480.00 |
| Paralegal III | 161.55 | $260.00 | $42,003.00 |
| Law Clerk | 81.0 | $150.00 | $12,150.00 |
| **Total** | 4,907.20 | | $2,726,406.00 |

129.    The hourly rates for attorneys and professional support staff in our firm included above are the same as the regular current rates charged for services in non-contingent matters or which have been accepted and approved by federal courts in New York for complex class action litigation.

130.    Doyle Lowther's lodestar figures are based upon the firm's billing rates, which rates do not include charges for expense items.

**7.  Total Expense Calculations For Physical Lead Counsel**

131.    Expense items are billed separately and such charges are not duplicated in our

firm's billing rates.

**Doyle Lowther Expense Report, Inception Through January 13, 2015**

| Category | Amount |
|---|---|
| Photocopies/reproduction | $195.67 |
| Postage costs | $487.88 |
| Telephone | $122.28 |
| Filing fees | $2,340.00 |
| Lexis/legal research | $2,658.32 |
| Hotels, transportation & travel expenses | $36,072.02 |
| Experts/consultants | $133,394.68 |
| Mediation | $44,394.67 |
| Discovery/document management | $6,474.08 |
| Class communication expenses | $1,567.72 |
| **Total** | $227,707.32 |

132.    The expenses incurred in this Litigation are reflected on the books and records of our firm. These books and records are prepared from expense vouchers, check records and other source materials and represent an accurate recordation of the expenses incurred.

133.    Physical Lead Counsel have not received any payment for their services in prosecuting this Litigation nor have they been reimbursed for their expenses incurred in the prosecution of the Litigation.

134.    Physical Lead Counsel undertook this Litigation on a wholly contingent basis. From the outset, Physical Lead Counsel understood they were embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require. In undertaking that responsibility,

Physical Lead Counsel were obligated to assure that sufficient resources were dedicated to the prosecution of this Litigation and that funds were available to compensate staff and the considerable out-of-pocket costs that a case such as this entails.

135.    Because of the nature of a contingent practice involving complex litigation lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also have to advance the expenses of the litigation. With an average lag time of three to four years for these cases to conclude, the financial burden on contingent counsel is far greater than on a firm that is paid on an ongoing basis.

136.    From the outset, this Litigation presented a number of unique risks and uncertainties that could have prevented any recovery whatsoever. It is wrong to assume that a law firm handling complex contingent litigation such as this always wins. Many thousands of hours have been expended in losing efforts. This is especially true in this matter given the novelty of using the federal antitrust and RICO laws and New York common law to prosecute a physical commodities manipulation action.

137.    Physical Plaintiffs' claims were not guaranteed to survive, and there was no guarantee a class would be certified. If the case survived a motion to dismiss, prevailed at class certification and summary judgment and went to trial, there still was no guarantee of a verdict in the Physical Class's favor. Even if the Physical Class won a verdict, there would be no guarantee Defendants would not successfully appeal the judgment or that a verdict would include pecuniary recovery, or that any recovery would be better than that achieved by the Settlements.

138.    There have been many hard-fought lawsuits where, because of the discovery of facts unknown when the case commenced, or changes in the law during the pendency of the

case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of the plaintiffs' bar produced no fee for counsel.

139.    When Physical Lead Counsel undertook representation for Physical Plaintiffs in this matter, it was with the knowledge they would expend significant hours and resources against some of the best defense lawyers in the United States, with no assurance of ever obtaining any compensation for their efforts. Physical Lead Counsel was aware the only way they would be compensated was to achieve a successful result.

140.    Physical Lead Counsel's requested fee award is reasonable given the specific facts and circumstances of this case. Doyle Lowther was the principal firm and lead counsel in this case and performed the vast majority of legal services in this litigation. In working with the two other firms who also represented Plaintiffs in this case, Doyle Lowther was mindful of the Court's comments at the outset of the case, and made significant good faith efforts to prevent redundant and duplicative work by all counsel for Physical Plaintiffs, and endeavored to work efficiently and expend resources in an efficient manner. The two other firms that worked on this case incurred the majority of their time before the Court's appointment of Physical Lead Counsel.

**8.  Physical Lead Counsel's Fee Request Is Reasonable**

141.    This action was vigorously yet efficiently litigated. Qualified expert assistance was used throughout the matter, including during the pleading phase, the litigation phase, the discovery phase, and especially during the settlement phase—which was ably assisted with a nationally-recognized independent mediator, Judge Weinstein. The intent in crafting the Settlements was to provide ready compensation in a cost-efficient manner.

142.    The Court approved notice program notified Physical Class members of their

options, and thus they were able to make an informed decision on whether to accept the Settlements, or to opt out and pursue their own claims, or to object to any part of the Settlements. All settlement-related materials have been available, for free, on the Physical Class settlement website, including these materials and this declaration submitted in support of Final Approval. So far, Counsel is unaware of any objection to the Physical Class Settlements.

143.    I further submit Physical Lead Counsel's request for $4,029,300 in attorneys' fees and $229,230.82 in combined expenses is fair and reasonable under the circumstances of this case, and conforms to widely-approved metrics commonly relied upon and approved in the Southern District of New York. This represents 33.3% of the common fund or a multiplier of 1.37 from Physical Lead Counsel's lodestar.

144.    The fee and expense request does not reflect the time and expense Physical Lead Counsel will need to incur to ensure both Settlements are finally approved, including time needed to prepare for and attend the final approval hearing, manage the MF Global allowed claim, oversee the claims administration and payment processing, and litigate any possible appeal of a final approval order or attorney fee award.

9.  **Exhibits**

145.    Attached as Exhibit A is Moore Capital and Welsh Final Order and Judgment.

146.    Attached as Exhibit B is MF Global Final Order and Judgment.

147.    Attached as Exhibit C is Declaration Of Eric J. Miller On Behalf Of Settlement Administrator A.B. Data, Ltd. Regarding Notice And Claims Administration for the Moore Capital and Joseph Welsh settlement.

148.    Attached as Exhibit D is Declaration Of Eric J. Miller On Behalf Of Settlement Administrator A.B. Data, Ltd. Regarding Notice And Claims Administration for the MF Global

settlement.

149.    Attached as Exhibit E is the Declaration Of Frederick DeVito In Support Of Plaintiffs' Motion For Final Approval of Settlement.

150.    Attached as Exhibit F is the Declaration Of Russell W. Andrews In Support OF Plaintiffs' Motion For Final Approval Of Settlement.

151.    Attached as Exhibit G is the Report Of Jeffrey M. Christian, Managing Partner, CPM Group.

152.    Attached as Exhibit H is the Declaration of Christopher J. Gray In Support Of Plaintiffs' And Class Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Expenses.

153.    Attached as Exhibit I is the Declaration Of Loren Kieve In Support Of Plaintiffs' And Class Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Expenses.

154.    Attached as Exhibit J is a true and correct copy of Doyle Lowther LLP's firm resume.


I declare under penalty of perjury under the laws of the United States of America the foregoing is true and correct. Executed this 14th day of January 2015 at San Diego, California.


_____ */s/ John A. Lowther* _____

John Lowther, Esq.

Lead Counsel to the Physical Class